## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | § § | Chapter 11 |
| PYXUS INTERNATIONAL, INC., *et al.*,[1] | § § § | |
| Debtors. | § § § § § | Case No. 20-11570 (___) (Joint Administration Requested) |

### DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING CONTINUED USE OF THE DEBTORS' EXISTING CASH MANAGEMENT SYSTEM AND BANK ACCOUNTS, (II) WAIVING CERTAIN UNITED STATES TRUSTEE REQUIREMENTS, (III) AUTHORIZING CONTINUED PERFORMANCE OF INTERCOMPANY TRANSACTIONS INCLUDING INTERCOMPANY LOANS, (IV) AUTHORIZING AN INTERIM SUSPENSION OF SECTION 345(B) DEPOSIT AND INVESTMENT REQUIREMENTS AND (V) GRANTING RELATED RELIEF

Pyxus International, Inc. ("***Pyxus***") and its affiliated debtors and debtors in possession (collectively, the "***Debtors***") in the above-captioned chapter 11 cases (the "***Chapter 11 Cases***") respectfully submit this motion (the "***Motion***") for the entry of interim and final orders, substantially in the forms attached as **Exhibit A** (the "***Proposed Interim Order***") and **Exhibit B** (the "***Proposed Final Order***," and together with the Proposed Interim Order, the "***Proposed Orders***"), pursuant to sections 105(a), 345, 363(b), 363(c) and 503(b)(1) of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "***Bankruptcy Code***"), Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***") and Rule 9013-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District

---

[1] The Debtors in the Chapter 11 Cases, along with the last four digits of each Debtor's United States federal tax identification number, are: Pyxus International, Inc. (6567), Alliance One International, LLC (3302), Alliance One North America, LLC (7908), Alliance One Specialty Products, LLC (0115) and GSP Properties, LLC (5603). The Debtors' mailing address is 8001 Aerial Center Parkway, Morrisville, NC 27560-8417.

of Delaware (the "*Local Rules*"), (i) authorizing the continued use of the Debtors' existing cash

management system (the "*Cash Management System*") and the bank accounts that are listed on

**Exhibit E** hereto (collectively, the "*Debtor Bank Accounts*"); (ii) waiving certain requirements

of the Office of the United States Trustee for the District of Delaware (the "*U.S. Trustee*"); (iii)

authorizing continued performance of Intercompany Transactions, including Intercompany Loans,

and granting administrative expense status to Intercompany Claims (each as defined below); (iv)

authorizing an interim suspension of the requirements of section 345(b) of the Bankruptcy Code;

and (v) granting related relief.  In support of this Motion, the Debtors submit the *Declaration of*

*Joel Thomas, Executive Vice President and Chief Financial Officer of Debtor Pyxus International,*

*Inc., in Support of the Chapter 11 Petitions and First Day Pleadings* (the "*First Day*

*Declaration*")[2] filed contemporaneously herewith and respectfully state as follows:

## BACKGROUND

1.      On the date hereof (the "*Petition Date*"), each of the Debtors commenced a

voluntary case under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court

for the District of Delaware (the "*Court*").  The Debtors continue to operate their businesses and

manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the

Bankruptcy Code.  No official committees have been appointed in these Chapter 11 Cases, and no

request has been made for the appointment of a trustee or examiner.

2.      Prior to the Petition Date, the Debtors executed a Restructuring Support

Agreement, dated June 14, 2020, (the "*RSA*") with the Consenting Noteholders (as defined

therein) holding over 92% of the First Lien Notes and 67% of the Second Lien Notes.  The RSA

---

[2] All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the First Day Declaration.

contemplates a joint chapter 11 prepackaged plan (the "*Plan*") that effectuates a comprehensive balance sheet restructuring without impairing any of the Debtors' general unsecured creditors, including any of the Company's domestic or international vendors, employees, customers or working capital lenders.  Concurrently with this Motion, the Debtors have filed the Plan and the related Disclosure Statement (as defined in the Plan).  The Debtors commenced solicitation of the Plan on June 14, 2020, and the solicitation period will continue until July 20, 2020.  The Debtors expect the Plan to be approved by all classes entitled to vote given that the Consenting Noteholders, who hold over 66 2/3% of the claims in each voting class, have committed to support the Plan. The relief sought herein is consistent with such treatment and is supported by the Consenting Noteholders and the DIP Lenders.

3.    Additional information regarding the Debtors' businesses, capital structure and the events leading up to the Petition Date is set forth in the First Day Declaration, which is fully incorporated herein by reference.

## JURISDICTION AND VENUE

4.    This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated as of February 29, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b), and, under Local Rule 9013-1(f), the Debtors consent to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.  Venue of these Chapter 11 Cases and this Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.  The statutory and legal predicates for the relief requested herein are sections 105(a), 363(b), 507(a) and 541 of the Bankruptcy Code, Bankruptcy Rules 6003 and 6004 and Local Rule 9013-1.

26643084.1

## **RELIEF REQUESTED**

5.      By this Motion, pursuant to sections 105(a), 345, 363(b), 363(c) and 503(b)(1) of the Bankruptcy Code and Bankruptcy Rules 6003 and 6004, the Debtors request entry of interim and final orders authorizing the Debtors to continue to use their Cash Management System in the ordinary course and granting related relief.

6.      Specifically, the Debtors seek authority to: (i) maintain and continue to use the Debtor Bank Accounts, in the same manner and with existing account numbers, styles and document forms; (ii) deposit funds in, and withdraw funds from, the Debtor Bank Accounts by usual means, including check, wire transfer, automated clearinghouse ("***ACH***") transfer, draft, electronic fund transfer, centralized lockbox or other items presented, issued or drawn on the Debtor Bank Accounts; (iii) pay prepetition and ordinary-course bank fees for the Debtor Bank Accounts; (iv) perform their obligations under the Debtor Bank Accounts' governing documents and agreements; and (v) treat the Debtor Bank Accounts for all purposes as "debtor in possession" accounts ("***DIP Accounts***").

7.      To maintain the efficient operation of the Cash Management System during the Chapter 11 Cases, the Debtors also request that their banks be authorized to continue to administer, service and maintain the Debtor Bank Accounts, as they were prepetition, without interruption and in the Debtors' ordinary course of business.  In that regard, the Debtors seek to continue to receive, process, honor and pay (or to reissue, as may be necessary) all checks, drafts, wires, ACH transfers, electronic fund transfers or other items presented, issued or drawn on the Debtor Bank Accounts (collectively, the "***Disbursements***") on account of any claim this Court grants the Debtors approval to pay arising before, on or after the Petition Date, and in reliance on the Debtors' representations of such authority, subject to the applicable Debtor Bank Accounts containing sufficient funds.

26643084.1

8.      Both here and in other first-day motions, the Debtors seek authority to pay certain prepetition obligations.  For some of these obligations, the Debtors issued Disbursements before the Petition Date that have yet to clear.  For others, the Debtors will issue a Disbursement once they have Court authority to do so.  The Debtors request that their banks be authorized to accept and honor all representations from the Debtors as to which of these Disbursements should be honored.  If any banks nevertheless dishonor Court-approved Disbursements, the Debtors request authority to issue replacement Disbursements consistent with the orders of this Court.  Further, because the banks are not in a position to independently verify or audit whether they may honor a particular Court-approved prepetition Disbursement, the Debtors request that the Court order that no bank be liable to the Debtors or their estates, or otherwise be in violation of such orders, for honoring a prepetition Disbursements or other Disbursements at the Debtors' direction.

9.      Continuity of the Cash Management System is critical to the Debtors' ongoing business operations, but so is flexibility.  To that end, the Debtors also request authority to implement reasonable changes to the Cash Management System that they deem necessary or appropriate in the ordinary course, including closing any Debtor Bank Account and establishing new bank accounts and that the applicable banks be authorized to honor such changes.

10.      The Debtors additionally request a waiver of certain bank account and related operating guidelines from the U.S. Trustee relating DIP Accounts.  In each case, the requested relief is set out in further detail below.

11.      Finally, the Debtors request authority to continue, in the ordinary course, certain transactions between and among the Debtors as well as certain of their domestic and foreign non-Debtor affiliates (the "***Non-Debtor Affiliates***"), including (i) intercompany charges and allocations made in connection with the purchase and sale of certain goods and services (the

"*Intercompany Claims*"), (ii) prepetition intercompany advances and loans (the "*Intercompany Loans*"), and (iii) certain other transfers between certain Debtors and Non-Debtor Affiliates, each as described in greater detail below.  The net position of each Debtor's Intercompany Claims and Intercompany Loans is set forth on **Exhibit C** hereto.  The aforementioned transactions provide substantial benefits to the Debtors and their estates and are necessary to maintaining control over cash management among the Debtors and their Non-Debtor Affiliates and avoiding substantial disruption to their business.  Furthermore, in order to avoid disruption to the cash management system, the Debtors request that all Intercompany Claims be accorded administrative expense status.

## CASH MANAGEMENT SYSTEM

### I.      Overview of the Cash Management System

12.      In the ordinary course of business prior to the Petition Date, the Debtors used an integrated Cash Management System, which is similar to those utilized by other comparably-sized companies, to efficiently collect, concentrate and disburse the funds generated by the Debtors' business operations, both from customer payments and from sales of receivables into the receivables facilities (the "*Receivables Facilities*").[3]  The Cash Management System enables the Debtors to monitor the collection and disbursement of funds and control the administration of the Debtor Bank Accounts.  The Debtors' employees monitor the Cash Management System and manage the proper collection and disbursement of funds.

---

[3] The Receivables Facilities are described in the Debtors' *Motion For Entry of Interim and Final Orders Pursuant to Sections 105, 362(D), 363(B)(1), 363(F), 363(M), 364(C)(1), 364(C)(2) and 364(E) of the Bankruptcy Code (I) Authorizing the Debtors to (A) Enter Into Extensions and/or Amendments to the Receivables Facilities, (B) Continue Selling Receivables and Related Rights Pursuant to the Receivables Facilities and Perform All of Their Postpetition Obligations Thereunder, (C) Grant Protective Security Interests in the Receivables and Related Assets and (D) Perform and Satisfy All of Their Prepetition Obligations Under the Receivables Facilities, and (II) Granting Other Related Relief* (the "*Receivables Financing Motion*").

13.     The Cash Management System has two main components: (a) cash collection and concentration; and (b) cash disbursement.  A schematic illustrating the general flow of funds through the Cash Management System is attached as **Exhibit D** hereto.  In addition, a list of the Debtors' Bank Accounts is attached as **Exhibit E** hereto.  The Debtors maintain a total of twenty-seven (27) Debtor Bank Accounts.  As discussed more fully below, nine (9) of the Debtor Bank Accounts are actively used to facilitate the Debtors' business operations while the remaining eighteen (18) Debtor Bank Accounts are inactive and maintained solely as legacy accounts or for relationship purposes.  Each of the active Debtor Bank Accounts is maintained at Bank of America Merrill Lynch ("***BAML***") or Branch Banking & Trust Company (n/k/a Truist Bank) ("***BB&T***")[4] while the inactive Debtor Bank Accounts are maintained at BAML, BB&T, Wells Fargo Bank, N.A. ("***Wells Fargo***"), Credit Suisse Group AG ("***Credit Suisse***"), Deutsche Bank AG ("***Deutsche Bank***") and American National Bank.

14.     The two (2) main components of the Cash Management System are described below.

A.     **Cash Collection and Concentration**

15.     The Debtors use their centralized Cash Management System to facilitate the flow of funds collected in the ordinary course of their operations to the primary concentration account for each Debtor.  Revenue collected by Debtors Alliance One International, LLC ("***AOI***"), Alliance One North America, LLC ("***AONA***") and Alliance One Specialty Products, LLC ("***AOSP***" and together with AOI and AONA, the "***Operating Companies***") is deposited in their respective concentration accounts (each, an "***Operating Company Concentration Account***")

---

[4] BB&T has merged with SunTrust Bank to form Truist Bank, although the Debtor Bank Accounts are still maintained under the BB&T name.  References to BB&T herein include Truist Bank, as applicable.

maintained at BAML.  These are the Debtor Bank Accounts ending in 6587, 6600 and 9419, respectively.  Whereas AOI's revenue is attributable primarily to customer sales of tobacco products generated by foreign Non-Debtor Affiliates, AONA's and AOSP's revenue is generated primarily by their own tobacco processing and sale activities.

16.    Additionally, Pyxus maintains a concentration account ending in 7535 (the "***Parent Concentration Account***" and together with the Operating Company Concentration Accounts, the "***Concentration Accounts***") in its name, at BAML, which periodically receives Disbursements from AOI for working capital purposes.

**B.    Cash Disbursements**

17.    The Operating Companies disburse funds from their respective Operating Company Concentration Accounts to their respective disbursement accounts (the "***Operating Company Disbursement Accounts***"), which also are maintained at BAML and are used to fund vendor payments.  The Operating Company Disbursements Accounts are the Debtor Bank Accounts ending in 2058, 2072 and 7620.  Additionally, AOI's Operating Company Disbursement Account is used to fund the seasonal working capital needs of certain foreign Non-Debtor Affiliates, primarily related to advances for tobacco growing activities and overhead.  AOI expects to fund approximately $100 million over the next seven (7) weeks to these Non-Debtor Affiliates, primarily for working capital needs for the upcoming growing season in Africa.  These amounts are recorded as Intercompany Claims, which are subsequently repaid by the applicable Non-Debtor Affiliate(s), primarily out of the proceeds of tobacco customer sales made by it, with such proceeds received directly by AOI.  Similarly, AOI provides working capital to Alliance One International, GmbH ("***AOI GmbH***"), who in turn provides funding for the seasonal working capital needs of additional foreign Non-Debtor Affiliates, again primarily related to advances for tobacco growing activities and overhead.  AOI expects to fund approximately $70 million over the next seven (7)

26643084.1

weeks, $40 million of which will be funded only after entry of the Proposed Final Order, to AOI

GmbH, which will be recorded as Intercompany Claims.[5]

18.     Pyxus also maintains a disbursement account ending in 3840 (the "***Parent***

***Disbursement Account***" and together with the Operating Company Disbursement Accounts, the

"***Disbursement Accounts***").  Pyxus uses the Parent Disbursement Account to fund its own working

capital needs, including payroll for each of the Debtor entities.[6]  Additionally, Pyxus uses the

Parent Disbursement Account to fund the working capital needs for its *U.S.* Non-Debtor Affiliates

engaged in the non-leaf, specialty product businesses.  Over the course of the Chapter 11 Cases,

Pyxus expects to fund approximately $200,000 during the next seven (7) weeks to these U.S. non-

leaf, specialty product subsidiaries.  These amounts are recorded as Intercompany Claims.  The

continued operational funding of these Non-Debtor Affiliates during the pendency of the Chapter

11 Cases is essential to maintaining the Debtors' business and maximizing the value of their estates

as a going concern.

## II.     Intercompany Transactions

19.     Given the size and global nature of their enterprise, the Debtors, in the

ordinary course of business, engage in intercompany transactions among themselves and with their

Non-Debtor Affiliates, which result in Intercompany Claims and Intercompany Loans

(collectively, together with all other ordinary-course intercompany transactions, the

"***Intercompany Transactions***").

---

[5] Additionally, as detailed in the Receivables Financing Motion, AOI GmbH and AOI both maintain a Receivables Facility with Finacity Corporation.  Amounts due AOI GmbH and AOI are deposited into AOI's account.  AOI holds these amounts in trust and makes a weekly "true-up" payment to AOI GmbH.

[6] Certain FSA-related expenses for Debtor employees are funded out of AOI's BB&T account, which is the Debtor Bank Account ending in 3231.

20.     The Intercompany Transactions are made between and among the Debtors and certain of their Non-Debtor Affiliates in the ordinary course of the Debtors' business.  The costs and revenues associated with the Intercompany Transactions are accounted for among the legal entities.  The Debtors track all Intercompany Transactions electronically in their accounting system and can ascertain, trace and account for them as needed.  The system of Intercompany Transactions is vitally important to the Debtors' ability to manage their cash flow and to support the operations of Non-Debtor Affiliate subsidiaries.  If the Intercompany Transactions (including fund transfers) were to be discontinued, the Cash Management System would be disrupted, which could stifle the Debtors' reorganization efforts.

### A.     Intercompany Accounts Receivable and Payable

21.     In the ordinary course of business, the Debtors sell and purchase goods and services from various Debtors and Non-Debtor Affiliates.  The Debtors also make corporate allocations and charges to the various Debtors and Non-Debtor Affiliates in respect of their proportional shares of collective corporate expenses including, most notably, insurance costs, procurement costs, headquarters costs and fees for the use of infrastructure.  The Debtors' records of Intercompany Transactions reflect the net position of these transactions.

### B.     Intercompany Loans

### (i)     Intercompany Loans

22.     The Debtors maintain a documented system of Intercompany Loans among the Debtors and their Non-Debtor Affiliates.  The Intercompany Loans serve critical long- and short-term corporate needs of the Debtors and their Non-Debtor Affiliates.  As described above, Debtor AOI seasonally advances funds to certain foreign Non-Debtor Affiliates for funding the growing or purchasing of tobacco product, operating expenses, administrative expenses, capital expenditures and payment of principal and interest on the Foreign Credit Lines (as defined in the

26643084.1

First Day Declaration.[7]    The seasonal amounts lent to foreign Non-Debtor Affiliates are subsequently repaid by the proceeds of customer sales or by the sales of customer tobacco receivables into the Receivables Facilities, and the related receipt of proceeds by AOI. Additionally, as noted above, Pyxus is a substantial long-term lender to U.S. Non-Debtor Affiliates operating the Pyxus specialty business, advancing funds necessary for continued operations of the specialty business.  Pyxus also is a borrower of additional Intercompany Loans from AOI.  These intra-Debtor loans are primarily used for working capital purposes.

23.    These Intercompany Loans serve the critical purpose of supporting the Debtors' ongoing tobacco operations and cash generation across the world.  This funding is particularly crucial to the Debtors' operations during this time as foreign Non-Debtor Affiliates in certain regions are, by funding growing and purchasing tobacco, building inventory needed to generate revenue in the third and fourth fiscal quarters.  Without the funds to fund growing and/or purchasing and processing green tobacco during the season, the Debtors will be unable to fulfill customer orders later in the year, which would severely disrupt the projected revenue streams for the Debtors and their Non-Debtor Affiliates.  Accordingly, the Debtors seek authority to make (and will continue to receive) payments on the Intercompany Loans consistent with ordinary-course prepetition practices, subject to a cap on making cash payments to Non-Debtor Affiliates in excess of $80 million in the aggregate prior to entry of the Proposed Final Order, absent receiving further authority from the Court.[8]

---

[7] Additional details on the Foreign Credit Lines are provided in the First Day Declaration.

[8] Contemporaneously herewith, the Debtors have filed the *Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing And (B) Use Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Granting Liens and Superpriority Claims, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing and (VI) Granting Related Relief* (the "***DIP Financing Motion***"). As more fully described in the DIP Financing Motion, the Debtors are seeking authority to use proceeds of DIP Loans to continue to fund these critical Intercompany Loans and to support the Debtors' global business operations.  The

24.    This $80 million of intercompany funding is necessary to fund the upcoming growing season in Africa and the purchase of tobacco products to sell into China, which, in turn, are critical to maintaining the Debtors' going concern value.[9]  Specifically, $50 million of funding to AOI contemplates an offset of approximately $38 million in foreign line borrowings, local cash receipts and cash on hand, net of dividends back to the Debtors, and the use of approximately (i) $55 million for the purchase of green tobacco product in Zimbabwe, Tanzania, Brazil and China, without which the Company will be unable to fulfill future customer orders; (ii) $17 million for operating expenses, primarily for processing green tobacco; (iii) $3.5 million for administrative expenses and capital expenditures; and (iv) $2.5 million for interest payments on Foreign Credit Lines guaranteed by Pyxus; and (v) approximately $10 million for the repayment of foreign lines of credit to finance tobacco growing and buying operations.  The additional $30 million of funding to AOI GmbH contemplates an offset of approximately $34 million in cash receipts and drawdown of cash reserves, and the use of approximately (i) $23 million for the purchase of green tobacco product in Malawi, Turkey and Zambia, without which the Company will be unable to fulfill future customer orders; (ii) $5 million for operating expenses, primarily for processing green tobacco; (iii) $7 million for administrative expenses for AOI GmbH; (iv) $1 million for interest payments on Foreign Credit Lines guaranteed by Pyxus; and (v) $28 million for the repayment of foreign lines of credit used to finance tobacco growing and buying operations.  These payments comprise but a small part of an intricate but highly integrated

---

DIP Lenders have agreed to this use of DIP Loans, subject to the terms and conditions of the DIP Credit Agreement (all capitalized but undefined terms as defined in the DIP Financing Motion).

[9] Certain Debtors and Non-Debtor Affiliates historically have made capital contributions and paid dividends out of their accumulated earnings.  Prepetition, the Debtors supported subsidiary operations through certain capital contributions.  The Debtors do not currently seek permission to continue either making capital contributions or distributing dividends during the pendency of these Chapter 11 Cases.

26643084.1

system of foreign lines and international procurement, processing and sales of tobacco, all of which needs to run smoothly and in a timely manner to maintain the value of the enterprise.

### (ii)    Foreign, Relationship and Legacy Accounts

25.    The Debtors' Bank Accounts include eighteen (18) inactive bank accounts located in the United States, Switzerland, Germany and England that are not used for collection or disbursement of Debtor funds (the "***Inactive Accounts***").  These accounts are legacy accounts or accounts that are maintained for relationship purposes and contain funds in an aggregate amount of approximately $50,000 across the eighteen (18) inactive accounts.  The Debtors do not intend or expect to use the Inactive Accounts during the Chapter 11 Cases but wish to maintain them and pay associated fees, costs and expenses.

## III.    Bank Fees

26.    The Debtors permit their banks to deduct service charges and other fees, costs and expenses arising in the ordinary course (collectively, the "***Bank Fees***") from the Debtor Bank Accounts.  The Debtors' average monthly Bank Fees total approximately $15,000 and the Debtors estimate that they owe up to the same amount in prepetition Bank Fees.

## IV.    The Debtors' Depository Policies and Practices

27.    The Debtors believe that they are substantially in compliance with the requirements of section 345 of the Bankruptcy Code because the Debtor Bank Accounts, excluding certain of the Inactive Accounts, are maintained at BAML and BB&T, each of which is on the list of authorized depositories maintained by the U.S. Trustee.  Of the Inactive Accounts, six (6) are maintained at Credit Suisse, two (2) are maintained at American National Bank, two (2) are maintained at Wells Fargo, two (2) are maintained at Deutsche Bank, three (3) are maintained at BB&T and three (3) are maintained at BAML.  Wells Fargo is also on the list of authorized depositories maintained by the U.S. Trustee.  While Credit Suisse and American National Bank

are not authorized depositories, they are reputable banking institutions with appropriate deposit insurance, and in any case the Debtors hold only *de minimis* funds in such accounts. As discussed below, the Debtors are seeking an interim waiver of the requirements under section 345(b) of the Bankruptcy Code as it pertains to the Inactive Accounts and to the extent any other Debtor Bank Accounts are not currently in compliance with section 345(b).

## BASIS FOR RELIEF

I.     **The Debtors Should Be Authorized to Continue to Use Their Existing Cash Management System and Bank Accounts Under Sections 363(c) and 105(a) of the Bankruptcy Code.**

28.     Section 363(c)(1) of the Bankruptcy Code permits a debtor to "use property of the estate in the ordinary course of business without notice or a hearing." 11 U.S.C. § 363(c)(1). The authority granted by section 363(c)(1) of the Bankruptcy Code extends to a debtor in possession's continued use of its customary cash management system and, thus, supports the relief requested herein. *See, e.g., Charter Co. v. Prudential Ins. Co. Am. (In re Charter Co.)*, 778 F.2d 617, 621 (11th Cir. 1985) (indicating that an order authorizing the debtor to employ a cash management system that was "usual and customary in the past" was "entirely consistent" with section 363(c)(1)). Moreover, section 364(a) of the Bankruptcy Code authorizes a debtor in possession to obtain unsecured credit and incur unsecured debt in the ordinary course of business without notice and a hearing. *See* 11 U.S.C. § 364(a).

29.     Further, section 105(a) of the Bankruptcy Code also authorizes this Court to permit the Debtors to continue to use the Cash Management System, including maintenance of their existing Debtor Bank Accounts. Section 105(a) vests in this Court the power to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a). One court, in another context, has recognized that a centralized cash management system "allows efficient utilization of cash resources and recognizes

26643084.1

the impracticalities of maintaining separate cash accounts for the many different purposes that require cash." *In re Columbia Gas Sys., Inc.*, 136 B.R. 930, 934 (Bankr. D. Del. 1992), *aff'd in part* and *rev'd in part*, 997 F.2d 1039 (3d Cir. 1993).

30.    The Debtors seek authority to continue to use their Cash Management System and Debtor Bank Accounts consistent with prepetition practices and sections 363(c) and 105(a) of the Bankruptcy Code.  The Cash Management System is an ordinary-course business practice that provides the Debtors essential and significant benefits.  Through the Cash Management System, the Debtors maintain the ability to control corporate funds, ensuring maximum availability of funds when and where necessary.  The Cash Management System also reduces the administrative burden on the Debtors by facilitating the movement of funds among and across all the Debtors and Non-Debtor Affiliates.  The Debtors' ability to continue using the Cash Management System and Debtor Bank Accounts during these Chapter 11 Cases is essential to maintaining the Debtors' business and maximizing the value of their estates.  Requiring the Debtors to adopt new cash management systems and open new bank accounts would be expensive, onerous and disruptive (including because it would require systems development implementation with banks).  As one court in this District recognized, a centralized cash management system "allows efficient utilization of cash resources and recognizes the impracticalities of maintaining separate cash accounts for the many different purposes that require cash." *In re Columbia Gas Sys., Inc.*, 136 B.R. 930, 934 (Bankr. D. Del. 1992), *aff'd in part, rev'd in part*, 997 F.2d 1039 (3d Cir. 1993).

31.    Maintaining the Cash Management System and Debtor Bank Accounts without disruption is in the best interests of the Debtors, their estates and all parties in interest. Based on the foregoing, the Court should grant the Debtors the authority under sections 363(c) and

105(a) of the Bankruptcy Code to continue the collection, concentration and disbursement of cash

under their Cash Management System.[10]

## II.    The Debtors Should Be Granted a Waiver of Certain Requirements of the U.S. Trustee Under Sections 363 and 105(a) of the Bankruptcy Code.

32.    The Debtors further request that this Court grant a waiver of certain bank

account and related U.S. Trustee operating guidelines.  As set forth in (a) through (e) below (the

"*UST Requirements*"), these guidelines require a chapter 11 debtor to, among other things:

(a)    close all existing bank accounts;

(b)    open new bank accounts in a U.S. Trustee-approved depository bank that are designated as DIP Accounts, with separate DIP Accounts established for an operating account, a tax account and a payroll account;

(c)    obtain and utilize new checks for all DIP Accounts that bear the designation "Debtor In Possession" and contain other information about the debtor's chapter 11 case;

(d)    deposit all business revenues into the general operating DIP Account, with amounts needed to fund the other accounts being transferred to those accounts as necessary; and

(e)    deposit to the tax DIP Account sufficient funds to pay any tax liability (when incurred) associated with the debtor's payroll.

Although the UST Requirements are designed to provide a clear line of demarcation between a

debtor's prepetition and postpetition transactions and operations, and to prevent inadvertent

postpetition payment of prepetition claims, they risk interfering with the efficient administration

of the Debtors' Cash Management System.

33.    Pursuant to sections 363 and 105(a) of the Bankruptcy Code, the Debtors

seek a waiver of the UST Requirements that they close the Debtor Bank Accounts and open new

DIP Accounts.  As discussed above, the Debtors' ability to continue using the Debtor Bank

---

[10] Notwithstanding anything to the contrary herein, the Debtors represent that they will not pay—and each of their banks will be directed not to pay—any prepetition claims, except as the Court authorizes.

26643084.1

Accounts is essential to maximizing value of the Debtors' estates and promoting the best interests of all parties.  It prevents disruption to direct customer payments into these accounts and expedites collection for accounts receivables.  The Debtors do nonetheless request the authority to open any new bank accounts or close any existing bank accounts as they may deem necessary and appropriate in the ordinary course.  The Debtors also will contact each of their banks that is party to a Uniform Depository Agreement with the U.S. Trustee, provide such banks with each Debtor's tax identification number and identify each of their bank accounts at the banks as being held by a debtor in possession.

34.     The Debtors also seek a waiver of the UST Requirement to establish specific DIP Accounts for payroll and tax payments and to deposit into the tax accounts sufficient funds to pay any payroll tax liability (when incurred).  The Debtors believe that they can meet their payroll and tax obligations most efficiently through the Debtor Bank Accounts in accordance with existing practices and that requiring new payroll and tax DIP Accounts would be both unnecessary and highly disruptive to their business.  The Debtors are—and expect to remain—current on all payroll taxes.  If the Debtors were required to change their existing practices and deposit sufficient funds to pay any tax liability associated with the Debtors' payroll into a new account, the resulting inefficiencies would only diminish the value of the Debtors' estates.  Further, the Debtors will ensure that the U.S. Trustee can appropriately monitor and ascertain that the Debtors' payroll taxes are satisfied.

35.     To minimize expense, the Debtors seek authority to continue using checks, substantially as they existed immediately before the Petition Date, without reference to the Debtors' status as debtors in possession.  The Debtors also seek authority to use all correspondence and other business forms, including, but not limited to, purchase orders, multicopy checks,

letterhead, envelopes, promotional materials and other business forms, substantially as they existed immediately before the Petition Date without reference to the Debtors' status as debtors in possession.  Local Rule 2015-2(a) provides:

> Where the debtor uses pre-printed checks, upon motion of the debtor, the Court may, without notice and hearing, permit the debtor to use its existing checks without the designation "Debtor-in-Possession" and use its existing bank accounts.  However, once the debtor's existing checks have been used, the debtor shall, when reordering checks, require the designation "Debtor-in-Possession" and the corresponding bankruptcy number on all such checks.

Del. Bankr. L.R. 2015-2(a).  Accordingly, in the event the Debtors generate new checks during the pendency of the Chapter 11 Cases other than from their existing stock of checks, those checks will include a legend referring to the Debtors as "Debtor in Possession."[11]

36.    The Debtors are providing notice of the commencement of these Chapter 11 Cases, as required, to all creditors and parties in interest.  Accordingly, parties doing business with the Debtors will be aware of the Debtors' status as debtors in possession.

37.    To reiterate, the Cash Management System is an ordinary-course and essential business practice.  Compelling the Debtors to alter their current cash management practices and to modify the Cash Management System to comply with the UST Requirements outlined above would risk disruption to the Debtors' business and jeopardize the Debtors' ability to maximize value for any parties in interest.

---

[11] Although the UST Requirements would require the Debtors to obtain and use new checks bearing the "Debtor In Possession" designation, the Debtors do not believe that the UST Requirements impose any limitation on the Debtors' other correspondence and business forms.  Nevertheless, out of an abundance of caution, the Debtors seek authority to continue using their existing correspondence and business forms without reference to the Debtors' status as debtors in possession.  Changing the Debtors' existing checks, correspondence and other business forms would be expensive, unnecessary, and burdensome to the Debtors' estates.  Further, such changes would be disruptive at this point in time to the Debtors' business operations and would not confer any benefit upon those dealing with the Debtors.

### III.    The Debtors Should Be Authorized to Continue Their Deposit Practices Under Section 345 of the Bankruptcy Code.

38.    Section 345(a) of the Bankruptcy Code governs a debtor's deposit of cash during a chapter 11 case and authorizes deposits of estate money that "will yield the maximum reasonable net return on such money, taking into account the safety of such deposit." 11 U.S.C. § 345(a). If a deposit is not "insured or guaranteed by the United States or by a department, agency, or instrumentality of the United States or backed by the full faith and credit of the United States," section 345(b) of the Bankruptcy Code requires the debtor to obtain from the entity with which the money is deposited a bond in favor of the United States that is secured by the undertaking of an adequate corporate surety. *Id.* § 345(b). Alternatively, the estate may require the entity to deposit governmental securities under 31 U.S.C. § 9303, which permits a person who is required by law to give a surety bond, to instead provide a governmental obligation.

39.    While the Debtors believe they are in compliance with section 345(b) of the Bankruptcy Code, to the extent they are not, the Debtors submit that given their limited liquidity and need to conserve cash, incurring administrative expense complying with section 345(b) in the short term would unnecessarily drain scarce resources. Each of the Debtor Bank Accounts, other than certain Inactive Accounts holding *de minimis* funds, is insured by the FDIC, and thus complies with section 345(b) of the Bankruptcy Code.[12]

40.    The Debtors understand that their two principal banks, BAML and BB&T, have signed a Uniform Depository Agreement with the U.S. Trustee. To the extent that any other bank at which the Debtors maintain Inactive Accounts has not signed such an agreement and to the extent the Debtors, as of the Petition Date, do not otherwise comply with deposit and

---

[12] The Swiss, German and UK accounts are Inactive Accounts listed among the Debtors Bank Accounts, hold approximately $50,000 of Debtor funds in the aggregate, do not receive or disburse Debtor funds, are currently inactive, and the Debtors do not intend or expect to use such accounts during the case. They are not FDIC insured.

investment guidelines under section 345(b) of the Bankruptcy Code, the Debtors request an interim waiver of the guidelines under section 345(b) of the Bankruptcy Code.

41.    The Debtors believe that the benefits of the requested waiver far outweigh any potential harm to the estates. *See generally In re Serv. Merch. Co., Inc.*, 240 B.R. 894, 896 (Bankr. M.D. Tenn. 1999) (noting that one of the factors to consider in determining whether cause exists for "relief from the strictures of § 345(b)" is whether benefits to the debtor outweigh the harm, if any, to the estate). For banks not party to a Uniform Depository Agreement with the U.S. Trustee, the Debtors hold only *de minimis* amounts and do not intend to use such amounts during the pendency of these Chapter 11 Cases. The Debtors operate a sophisticated business and hold their funds, including these *de minimis* funds in Inactive Accounts at reputable, stable banking institutions and monitor their cash flows and positions on a daily basis.

42.    Similar relief has been granted in other chapter 11 cases in this District.[13] Requiring the Debtors to modify their Cash Management System in the near term to strictly adhere with the deadline to comply with section 345(b)'s requirements will only distract the Debtors' management and cause the Debtors' estates to needlessly incur potentially substantial costs to the detriment of all creditors. Based on the foregoing, the Debtors submit that the relief requested is in the best interests of their estates and any interested parties, and, therefore, should be granted.

---

[13] *See, e.g.*, *In re Clover Techs. Grp., LLC*, No. 19- 12680 (KBO) (Bankr. D. Del. Jan. 21, 2020) (waiving section 345 requirements with respect to existing debtor bank accounts); *In re Destination Maternity Corp.*, No. 19-12256 (BLS) (Bankr. D. Del. Nov. 12, 2019) (same); *In re Forever 21, Inc.*, No. 19-12122 (KG) (Bankr. D. Del. Oct. 1, 2019) (granting an extension of time to comply with the requirements of section 345(b) for 30 days from the Petition Date, without prejudice to the Debtors' rights to seek a further waiver); *In re Blackhawk Mining LLC*, No. 19-11595 (LSS) (Bankr. D. Del. Aug. 9, 2019) (same).

26643084.1

IV.    **The Debtors Should Be Authorized to Continue Intercompany Transactions in the Ordinary Course of Business, and Such Transactions Should Be Granted Administrative Expense Priority.**

43.    The Debtors should be authorized to pay or otherwise settle Intercompany Claims and to engage in Intercompany Transactions postpetition in the ordinary course of business under section 363(c) of the Bankruptcy Code, subject to the limitations proposed herein.[14]  As noted above, these Intercompany Loans serve the critical purpose of supporting the Debtors' ongoing tobacco operations and cash generation across the world and are necessary to sustain current operations that will generate revenue in future quarters.  Thus, the continued operational funding of these Non-Debtor Affiliates during the pendency of these Chapter 11 Cases is essential to maintaining the Debtors' business and maximizing the value of their estates as a going concern. The Debtors have done so historically, and it is typical for corporate groups like the Debtors to engage in Intercompany Transactions, and cash movements in particular, among the entities that compose them.

44.    To the extent the Court concludes that consummating Intercompany Transactions is not in the ordinary course, however, the Debtors should be authorized to do so as a sound exercise of their business judgment under Section 363(b) of the Bankruptcy Code.[15]  The Intercompany Transactions are administratively beneficial to the Debtors' estate because they facilitate the operations of, and revenue generation by, the Non-Debtor Affiliates, the benefits of which accrue ultimately to the Debtors' estates and their creditors.  Conversely, failing to honor prepetition Intercompany Claims may result in disruptions to operations and, as a result,

---

[14] *See also* case law discussed *infra*, Part III.  The basis for the relief requested in respect of certain Intercompany Loans in relation to the proposed debtor-in-possession facility is set forth in the DIP Financing Motion.

[15] *See also* case law discussed *infra*, Part III.

26643084.1

deteriorating business relationships and estate value, and so are necessary to maintain the Debtors as a going concern.

45.     For the same reasons, postpetition Intercompany Claims should be accorded priority[16] administrative claim status, subject and subordinate only to adequate protection claims granted pursuant to any applicable orders of the Court regarding the use of cash collateral and superpriority claims arising under the debtor-in-possession facility.  If postpetition Intercompany Claims are accorded priority administrative claim status, then each individual Debtor on whose behalf another Debtor or Non-Debtor Affiliate subsidiary has utilized funds or incurred expenses will continue to bear ultimate repayment responsibility, thereby protecting the interests of each individual Debtor's creditors.  Accordingly, the Debtors submit that the Court should grant priority administrative claim status to postpetition Intercompany Claims.

46.     The Debtors respectfully submit for the reasons above that they should be authorized to continue their prepetition intercompany practices and that the postpetition Intercompany Claims, as applicable, should be granted administrative priority status against the applicable Debtor.  This relief will ensure that each Debtor or Non-Debtor Affiliate will continue to bear the ultimate repayment responsibility for such transaction.[17]  Similar relief has been granted in other multi-debtor chapter 11 cases in this District.[18]

---

[16] Nothing herein constitutes a request to validate the nature or amount of any Intercompany Transaction or Intercompany Claim, if any, whether arising prepetition or postpetition.

[17] The Bankruptcy Code also provides a debtor in possession the freedom to obtain unsecured credit and incur unsecured debt in the ordinary course of business without a notice and a hearing.  11 U.S.C. § 364(a); *In re Amdura Corp.*, 75 F.3d at 1453; *LNC Invs., Inc. v. First Fid. Bank, N.A.*, 247 B.R. 38, 45 (S.D.N.Y. 2000); *Mulligan v. Sobiech*, 131 B.R. 917, 921 (S.D.N.Y. 1991).  The Debtors, therefore, seek authorization, to the extent necessary, to obtain unsecured credit in connection with the Intercompany Transactions and in the ordinary operation of their Cash Management System.

[18] *See, e.g.*, *In re Clover Techs. Grp.*, LLC, No. 19- 12680 (KBO) (Bankr. D. Del. Jan. 21, 2020) (allowing the continuation of intercompany transactions in the ordinary course of business); *In re Anna Holdings, Inc.*, No. 19-12551 (CSS) (Bankr. D. Del. Dec. 3, 2019) (same); *In re Forever 21, Inc.*, No. 19-12122 (KG) (Bankr. D. Del. Oct.

## BANKRUPTCY RULE 6003 HAS BEEN SATISFIED AND
## BANKRUPTCY RULE 6004 SHOULD BE WAIVED

47.    Under Bankruptcy Rule 6003, the Court may grant a motion to "use . . . property of the estate, including a motion to pay all or part of a claim that arose before the filing of the petition" within twenty-one (21) days after the chapter 11 case's commencement to the extent "relief is necessary to avoid immediate and irreparable harm."  Fed. R. Bankr. P. 6003. Here, the relief requested is necessary to avoid immediate and irreparable harm to the Debtors and their estates, as set forth in the First Day Declaration, and relief on an interim basis is therefore appropriate under Bankruptcy Rule 6003, if applicable.

48.    The urgency of the relief requested justifies immediate relief.  To ensure the relief requested is implemented immediately, the Debtors request that the Court waive the notice requirements under Bankruptcy Rule 6004(a), if applicable, and the fourteen (14)-day stay of an order authorizing the use, sale or lease of property under Bankruptcy Rule 6004(h).

## RESERVATION OF RIGHTS

49.    Nothing contained in this Motion is an admission of the validity of any claim against the Debtors, a waiver of the Debtors' or any other party's rights to dispute any claim or an approval or assumption of any agreement, contract or lease under section 365 of the Bankruptcy Code.  If this Court grants the relief requested in this Motion, any Court-authorized payment is not an admission of the validity of any claim or a waiver of the Debtors' or any other party's rights to subsequently dispute such claim.  In addition, authorization to pay the claims described in this Motion will not be deemed a direction to the Debtors to pay such claims; rather, the Debtors will make such payments in their discretion.

---

28, 2019) (same); *In re Blackhawk Mining LLC*, No. 19-11595 (LSS) (Bankr. D. Del. Aug. 28 9, 2019) (same); *In re PES Holdings*, LLC, No. 19-11626 (KG) (Bankr. D. Del. Aug. 20, 2019) (same).

**NOTICE**

50.     The Debtors will provide notice of this Motion by facsimile, e-mail, overnight delivery or hand delivery to: (i) the Office of the United States Trustee for the District of Delaware; (ii) the holders of the thirty (30) largest unsecured claims against the Debtors on a consolidated basis; (iii) the United States Attorney's Office for the District of Delaware; (iv) the attorneys general for the states in which the Debtors conduct business; (v) counsel to the Ad Hoc First Lien Group; (vi) counsel to the Ad Hoc Crossholder Group; (vii) the ABL Agent and counsel thereto; (viii) the DIP Agent and counsel thereto; (ix) the Internal Revenue Service; (x) the Securities and Exchange Commission and (xi) the Banks.  Following the hearing, a copy of this Motion and any order entered with respect to it will be served on the foregoing parties and all parties having filed requests for notice in these Chapter 11 Cases.  A copy of this Motion is also available on the Debtors' case website at http://www.primeclerk.com/Pyxus.

51.     As this Motion is seeking "first day" relief, notice of this Motion and any order entered hereon will be served on all parties required by Local Rule 9013-1(m).  Due to the urgency of the relief requested, the Debtors submit that no other or further notice is necessary.

*[Remainder of page intentionally blank]*

26643084.1

**WHEREFORE**, the Debtors request entry of the Proposed Orders, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B**, granting the relief requested herein and such other relief as is just and proper.

Dated: June 15, 2020
Wilmington, Delaware

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

*/s/ Kara Hammond Coyle*
Pauline K. Morgan (No. 3650)
Kara Hammond Coyle (No. 4410)
Ashley E. Jacobs (No. 5635)
Tara C. Pakrouh (No. 6192)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone:    (302) 571-6600
Facsimile:    (302) 571-1253
Email:    pmorgan@ycst.com
    kcoyle@ycst.com
    ajacobs@ycst.com
    tpakrouh@ycst.com

- and -

**SIMPSON THACHER & BARTLETT LLP**

Sandeep Qusba (*pro hac vice* pending)
Michael H. Torkin (*pro hac vice* pending)
Kathrine A. McLendon (*pro hac vice* pending)
Nicholas E. Baker (*pro hac vice* pending)
Daniel L. Biller (*pro hac vice* pending)
Jamie J. Fell (*pro hac vice* pending)
425 Lexington Avenue
New York, New York 10017
Telephone:    (212) 455-2000
Facsimile:    (212) 455-2502
Email:    squsba@stblaw.com
    michael.torkin@stblaw.com
    kmclendon@stblaw.com
    nbaker@stblaw.com
    daniel.biller@stblaw.com
    jamie.fell@stblaw.com

*Proposed Counsel to the Debtors and Debtors in Possession*

## **Exhibit A**

**Proposed Interim Order**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | § | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| PYXUS INTERNATIONAL, INC., *et al.*,[1] | § | Case No. 20-11570 (___) |
| | § | |
| Debtors. | § | (Jointly Administered) |
| | § | |
| | § | **Ref: Docket No. ___** |
| | § | |

## INTERIM ORDER (I) AUTHORIZING CONTINUED USE OF EXISTING CASH MANAGEMENT SYSTEM AND BANK ACCOUNTS, (II) WAIVING CERTAIN UNITED STATES TRUSTEE REQUIREMENTS, (III) AUTHORIZING CONTINUED PERFORMANCE OF INTERCOMPANY TRANSACTIONS, INCLUDING INTERCOMPANY LOANS, (IV) AUTHORIZING AN INTERIM SUSPENSION OF SECTION 345(B) DEPOSIT AND INVESTMENT REQUIREMENTS AND (V) GRANTING RELATED RELIEF

Upon the Debtors' motion (the "***Motion***")[2] for entry of an interim order (this "***Interim Order***") (i) authorizing the Debtors to continue to use their centralized cash management system (the "***Cash Management System***") and bank accounts; (ii) waiving certain bank account and related requirements of the Office of the United States Trustee for the District of Delaware (the "***U.S. Trustee***"); (iii) authorizing continued performance of Intercompany Transactions, including Intercompany Loans, and granting administrative expense status to Intercompany Claims; (iv) authorizing an interim suspension of the requirements of section 345(b) of the Bankruptcy Code; and (v) granting related relief, all as more fully set forth in the Motion; and due and sufficient notice of the Motion having been provided under the particular circumstances, and

---

[1] The Debtors in the Chapter 11 Cases, along with the last four digits of each Debtor's United States federal tax identification number, are: Pyxus International, Inc. (6567), Alliance One International, LLC (3302), Alliance One North America, LLC (7908), Alliance One Specialty Products, LLC (0115) and GSP Properties, LLC (5603).  The Debtors' mailing address is 8001 Aerial Center Parkway, Morrisville, NC 27560-8417.

[2] Capitalized terms used but not defined in this Interim Order have the meanings used in the Motion.

26643084.1

it appearing that no other or further notice need be provided; and the Court having jurisdiction to

consider the Motion and the relief requested therein in accordance with 28 U.S.C. §§ 157 and 1334

and the *Amended Standing Order of Reference* from the United States District Court for the District

of Delaware dated as of February 29, 2012; and consideration of the Motion and the relief

requested therein being a core proceeding under 28 U.S.C. § 157(b)(2); and the Court having

authority to enter a final order consistent with Article III of the United States Constitution; and

venue being proper before this Court under 28 U.S.C. §§ 1408 and 1409; and a hearing having

been held to consider the relief requested in the Motion (the "***Hearing***"); and upon the First Day

Declaration and the record of the Hearing and all the proceedings before the Court; and the Court

having found such relief to be in the best interests of the Debtors, their estates and creditors and

any parties in interest; and the legal and factual bases set forth in the Motion and at the Hearing

having established just cause for the relief granted herein; and after due deliberation thereon and

sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

      1.      The Motion is granted on an interim basis as set forth herein.

      2.      The final hearing (the "***Final Hearing***") on the Motion will be held on

_____, 2020, at _____:_____.m. (Eastern Time).  Any objections or responses to entry of a

final order on the Motion must be filed on or before 4:00 p.m. (Eastern Time) on _____, 2020,

and served on the following parties: (i) the Office of the United States Trustee for the District of

Delaware, J. Caleb Boggs Federal Building, 844 North King Street, Suite 2207, Wilmington,

Delaware 19801 (Attn: David L. Buchbinder, Esq. (david.l.buchbinder@usdoj.gov)); (ii) Simpson

Thacher & Bartlett LLP, 425 Lexington Avenue, New York, New York 10017 (Attn: Sandeep

Qusba (squsba@stblaw.com), Michael Torkin (michael.torkin@stblaw.com) and Nicholas Baker

(nbaker@stblaw.com)), proposed co-counsel for the Debtors; (iii) Young Conaway Stargatt &

Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, Delaware 19801 (Attn: Pauline K. Morgan (pmorgan@ycst.com) and Kara Hammond Coyle (kcoyle@ycst.com)), proposed co-counsel for the Debtors; (iv) Stroock & Stroock & Lavan LLP, 180 Maiden Lane, New York, New York 10038 (Attn: Kristopher Hansen, Esq. (khansen@stroock.com) and Jonathan Canfield, Esq. (jcanfield@stroock.com)), co-counsel to the Ad Hoc First Lien Group; (v) Pachulski Stang Ziehl & Jones LLP, 919 N. Market Street, 17th Floor, Wilmington, Delaware 19801 (Attn: Bradford J. Sandler, Esq. (bsandler@pszjlaw.com) and James E. O'Neill, Esq. (joneill@pszjlaw.com)), co-counsel to the Ad Hoc First Lien Group; (vi) Wachtell Lipton Rosen & Katz, 51 West 52nd Street, New York, New York 10019 (Attn: Joshua Feltman (jafeltman@wlrk.com) and Benjamin Arfa (bsarfa@wlrk.com)), co-counsel to the Ad Hoc Crossholder Group and the DIP Agent; (vii) Morris, Nichols, Arsht & Tunnell LLP, 1201 North Market Street, Wilmington, Delaware 19801 (Attn. Derek C. Abbott (dabbott@mnat.com)), co-counsel to the Ad Hoc Crossholder Group and the DIP Agent; (viii) White & Case LLP, 1221 Avenue of the Americas, New York, New York 10020 (Attn: Scott Greissman (sgreissman@whitecase.com) and Andrew Zatz (azatz@whitecase.com)), counsel to the ABL Agent; (ix) counsel to any committee appointed in these Chapter 11 Cases; and (x) any other party entitled to notice under Bankruptcy Rule 2002. In the event no objections to entry of a final order on the Motion are timely received, this Court may enter such final order without need for the Final Hearing.

3.      Except as otherwise provided herein, the Debtors are authorized and empowered to continue to maintain and use their Cash Management System and bank accounts consistent with their prepetition practices.

26643084.1

4.      All existing deposit agreements between the Debtors and the depository and disbursement banks listed on **Exhibit E** to the Motion (collectively, the "***Banks***" and each a "***Bank***") shall continue to govern the postpetition cash management relationship between the Debtors and the Banks, and all of the provisions of such agreements, including, without limitation, the termination and fee provisions, shall remain in full force and effect.  The Debtors and the Banks are authorized, without further order of this Court, to implement such changes to the Cash Management System and procedures in the ordinary course of business in accordance with the terms of the existing deposit and disbursement agreements, including opening any new bank accounts or closing any existing bank accounts, to the extent permitted by the Debtors' proposed postpetition secured debtor-in-possession financing ("***DIP Financing***") and subject to the notice requirements set forth in paragraph 17 of this Interim Order.  The Banks are authorized to honor the Debtors' requests to close existing bank accounts or open new bank accounts.

5.      The Debtors are authorized but not directed to (i) maintain and continue to use their existing bank accounts that are listed on the attached **Exhibit E** to the Motion (the "***Debtor Bank Accounts***"), in the same manner and with existing account numbers, styles and document forms as are currently employed; (ii) deposit funds in, and withdraw funds from, the Debtor Bank Accounts by usual means, including check, wire transfer, ACH transfer, draft, electronic fund transfer, centralized lockbox or other items presented, issued or drawn on the Debtor Bank Accounts; (iii) pay prepetition and ordinary-course bank fees for the Debtor Bank Accounts; (iv) perform their obligations under the Debtor Bank Accounts' governing documents and agreements; and (v) treat the Debtor Bank Accounts for all purposes as "debtor in possession" accounts ("***DIP Accounts***").

6.      Each Bank is authorized to continue to administer, service and maintain the Debtor Bank Accounts, as they were prepetition, without interruption and in the ordinary course, without further order of this Court, and to receive, process, honor and pay all checks, drafts, wires, ACH transfers, electronic fund transfers or other items presented, issued or drawn on the Debtor Bank Accounts (collectively, the "*Disbursements*") on account of any claim this Court has granted the Debtors approval to pay, whether arising before, on or after the Petition Date to the same extent the Debtors were responsible for such items prior to the Petition Date; *provided that* the applicable Debtor Bank Accounts contain sufficient funds.

7.      Notwithstanding any other provision of this Interim Order, no Bank that honors a prepetition check or other item drawn on any account that is the subject of this Interim Order (a) at the direction of the Debtors, (b) in good faith belief that this Court has authorized such prepetition check or item to be honored or (c) as the result of an innocent mistake made despite implementation of reasonable item-handling procedures, shall be deemed to be liable to the Debtors, their estates or any other party on account of such prepetition check or other item being honored postpetition, or otherwise deemed to be in violation of this Interim Order.

8.      Each Bank is authorized, without further order of this Court, to debit the Debtor's accounts in the ordinary course of business without the need for further order of this Court for: (i) all checks drawn on the Debtor's accounts which are cashed at such Bank's counters or exchanged for cashier's checks by the payees thereof whether arising prepetition or postpetition; (ii) all checks or other items deposited in one of Debtor's accounts with such, whether arising prepetition or postpetition, which have been dishonored or returned unpaid for any reason, together with any fees and costs in connection therewith, to the same extent the Debtor was and/or is responsible for such items whether prepetition or postpetition; and (iii) all undisputed prepetition

amounts outstanding as of the date hereof, if any, owed to any Bank as service charges for the maintenance of the Cash Management System. The Debtors shall at all times maintain sufficient balances in the accounts at each Bank to secure their obligations to each Bank for the cash management and related services provided to the Debtors.

9.      Each of the Banks may rely on the representations of the Debtors with respect to whether any check or other payment order drawn or issued by the Debtors prior to the Petition Date should be honored pursuant to this or any other order of this Court and the Banks shall not have any liability to any party for relying on such representations by the Debtors as provided for herein.

10.      The Debtors are authorized to continue performing Intercompany Transactions arising from or related to the operation of their business in the ordinary course. Notwithstanding anything to the contrary set forth herein, the Debtors shall not, absent further order of this Court, (a) make cash payments constituting Intercompany Loans in excess of approximately $80 million in the aggregate, or (b) pay any capital contributions or dividends.

11.      All obligations of the Debtors on account of any authorized postpetition Intercompany Transactions are hereby accorded administrative expense priority under section 503(b) of the Bankruptcy Code, subject and junior to the claims, including adequate protection and superpriority claims, granted in connection with any order(s) of this Court approving the DIP Financing. Each entity using funds that flow through the Cash Management System shall continue to bear the ultimate payment responsibility for those ordinary-course transactions. In connection with the Intercompany Transactions, the Debtors shall maintain records for all transfers of cash so that all transactions (including Intercompany Transactions) can be readily ascertained, traced, recorded properly and distinguished between prepetition and postpetition transactions.

26643084.1

12.     The relief granted in this Interim Order with respect to any Intercompany Transaction and/or Intercompany Claim shall not constitute a finding as to the validity, priority or status of such Intercompany Transaction and/or Intercompany Claim.  The rights of any party, including the Debtors, to contest the validity, priority or status of any Intercompany Transaction and/or Intercompany Claim are expressly reserved.

13.     The Debtors are authorized to continue using all checks, correspondence and other business forms, including, but not limited to, purchase orders, multicopy checks, letterhead, envelopes, promotional materials and other business forms, substantially as they existed immediately before the Petition Date without reference to the Debtors' status as debtors in possession; *provided that* once the Debtors' existing checks have been used, the Debtors will, when reordering checks, ensure that the designation "Debtor in Possession" and the corresponding bankruptcy case number are printed on all checks; *provided, further,* that, with respect to checks that the Debtors or their agents print themselves, the Debtors shall use commercially reasonable efforts to begin printing the "Debtor in Possession" legend and the lead bankruptcy case number on such checks within ten (10) days of the date of entry of this Interim Order.

14.     The requirements of section 345 of the Bankruptcy Code, to the extent the Debtor Bank Accounts do not strictly comply therewith, are waived on an interim basis for a period of up to forty-five (45) days after the Petition Date; *provided*, *however*, that nothing in this Interim Order shall affect the Debtors' ability to seek further extensions of such waiver.

15.     In each instance in which the Debtors hold Debtor Bank Accounts at Banks that are party to a Uniform Depository Agreement with the U.S. Trustee, within fifteen (15) days after entry of this Interim Order the Debtors shall (a) contact the Banks, (b) provide the Banks with each of the Debtor's employer identification numbers and (c) identify their Debtor Bank Accounts

held as being held by a debtor-in-possession in a bankruptcy case and provide the main case number.

16.     In any instance in which the Debtors hold Debtor Bank Accounts at Banks that are not party to a Uniform Depository Agreement with the U.S. Trustee, the Debtors shall use their good faith efforts to cause the banks to execute a Uniform Depository Agreement in a form prescribed by the U.S. Trustee within forty-five (45) days of the Petition Date.  The U.S. Trustee's rights to seek further relief from this Court in the event that the aforementioned Banks are unwilling to execute a Uniform Depository Agreement in a form prescribed by the U.S. Trustee are fully reserved.

17.     To the extent the Debtors seek to open any new bank accounts or close any existing bank accounts as permitted under paragraph 4 of this Interim Order, the Debtors shall give notice to the U.S. Trustee, any statutory committee appointed in the Chapter 11 Cases, and the administrative agents under the DIP Financing within fifteen (15) days after opening a new bank account or closing an existing bank account; *provided* that the Debtors shall open any such new bank account at a bank that has executed a Uniform Depository Agreement with the U.S. Trustee, or at a bank willing to immediately execute such an agreement.

18.     Nothing contained herein shall prevent any Bank from modifying or terminating any Bank Accounts or cash management services or related services in accordance with the agreements governing such accounts, programs or services, subject to providing no less than fifteen (15) calendar days advance notice.

19.     Despite the Debtors' use of a consolidated Cash Management System, the Debtors shall calculate any quarterly fees due under 28 U.S.C. § 1930(a)(6) based on the

26643084.1

disbursements of each Debtor, regardless of which Debtor, or other entity, pays those disbursements.

20.     Within five (5) business days from the entry of this Interim Order, the Debtors shall (i) serve a copy of this Interim Order on each Bank and (ii) request that each Bank internally code each of the Debtor Bank Accounts as "debtor in possession" accounts.

21.     The contents of the Motion satisfy the requirements of Bankruptcy Rule 6003(b).

22.     Notwithstanding anything in the Motion or this Interim Order to the contrary, any payment made or action taken by any of the Debtors pursuant to the authority granted herein, as well as the exercise of any and all other rights and authorizations granted or approved hereunder, shall be subject in all respects to, as applicable, the orders approving the Debtors' use of cash collateral and/or post-petition DIP Financing facilities, and any budgets in connection therewith governing any such use of cash collateral and/or financing (collectively, the "***DIP Orders***").  To the extent there is any inconsistency between the terms of any DIP Orders, on the one hand, and this Interim Order, on the other, the terms of the DIP Orders shall control.

23.     Nothing in the Motion or this Interim Order or the relief granted herein (including any actions taken or payments made by the Debtors) is to be construed as (i) an admission of the validity of any claim against the Debtors; (ii) an admission with respect to the validity, extent or perfection of any lien; (iii) a waiver of the Debtors' rights or those of any party in interest to dispute, contest, setoff or recoup any claim or assert any related rights, claims or defenses; (iv) a waiver of the Debtors' rights or those of any party in interest over the validity, extent, perfection or possible avoidance of any lien; or (v) an approval or assumption of any agreement, contract, program, policy or lease under section 365 of the Bankruptcy Code.

24.     The requirements set forth in Bankruptcy Rule 6004(a) are hereby waived.

25.     Notwithstanding the applicability of Bankruptcy Rule 6004(h), the terms and conditions of this Interim Order are immediately effective and enforceable upon its entry.

26.     The Debtors are authorized and empowered to take all actions necessary or appropriate to implement the relief granted in this Interim Order.

27.     This Court retains jurisdiction over all matters arising from or related to the implementation or interpretation of this Interim Order.

Dated: _____, 2020
        Wilmington, Delaware

_____
UNITED STATES BANKRUPTCY JUDGE

26643084.1

10

**Exhibit B**

**Proposed Final Order**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| PYXUS INTERNATIONAL, INC., *et al.*,[1] | § | Case No. 20-11570 (___) |
| | § | |
| Debtors. | § | (Jointly Administered) |
| | § | |
| | § | **Ref: Docket Nos. ___ & ___** |
| | § | |

## FINAL ORDER (I) AUTHORIZING CONTINUED USE OF EXISTING CASH MANAGEMENT SYSTEM AND BANK ACCOUNTS, (II) WAIVING CERTAIN UNITED STATES TRUSTEE REQUIREMENTS, (III) AUTHORIZING CONTINUED PERFORMANCE OF INTERCOMPANY TRANSACTIONS, INCLUDING INTERCOMPANY LOANS, (IV) AUTHORIZING AN INTERIM SUSPENSION OF SECTION 345(B) DEPOSIT AND INVESTMENT REQUIREMENTS AND (V) GRANTING RELATED RELIEF

Upon the Debtors' motion (the "***Motion***")[2] for entry of a final order (this "***Final Order***") (i) authorizing the Debtors to continue to use their centralized cash management system (the "***Cash Management System***") and bank accounts; (ii) waiving certain bank account and related requirements of the Office of the United States Trustee for the District of Delaware (the "***U.S. Trustee***"); (iii) authorizing continued performance of Intercompany Transactions, including Intercompany Loans, and granting administrative expense status to Intercompany Claims; (iv) authorizing an interim suspension of the requirements of section 345(b) of the Bankruptcy Code; and (v) granting related relief, all as more fully set forth in the Motion; and due and sufficient notice of the Motion having been provided under the particular circumstances, and it appearing

---

[1] The Debtors in the Chapter 11 Cases, along with the last four digits of each Debtor's United States federal tax identification number, are: Pyxus International, Inc. (6567), Alliance One International, LLC (3302), Alliance One North America, LLC (7908), Alliance One Specialty Products, LLC (0115) and GSP Properties, LLC (5603).  The Debtors' mailing address is 8001 Aerial Center Parkway, Morrisville, NC 27560-8417.

[2] Capitalized terms used but not defined in this Final Order have the meanings used in the Motion.

that no other or further notice need be provided; and the Court having jurisdiction to consider the

Motion and the relief requested therein in accordance with 28 U.S.C. §§ 157 and 1334 and the

*Amended Standing Order of Reference* from the United States District Court for the District of

Delaware dated as of February 29, 2012; and consideration of the Motion and the relief requested

therein being a core proceeding under 28 U.S.C. § 157(b)(2); and the Court having authority to

enter a final order consistent with Article III of the United States Constitution; and venue being

proper before this Court under 28 U.S.C. §§ 1408 and 1409; and a hearing having been held to

consider the relief requested in the Motion (the "***Hearing***"); and upon the First Day Declaration

and the record of the Hearing and all the proceedings before the Court; and the Court having found

and determined such relief to be in the best interests of the Debtors, their estates and creditors and

any parties in interest; and the legal and factual bases set forth in the Motion and at the Hearing

having established just cause for the relief granted herein; and after due deliberation thereon and

sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1.      The Motion is granted as set forth herein.

2.      Except as otherwise provided herein, the Debtors are authorized and

empowered to continue to maintain and use their Cash Management System and bank accounts

consistent with their prepetition practices.

3.      All existing deposit agreements between the Debtors and the depository and

disbursement banks listed on **Exhibit E** to the Motion (collectively, the "***Banks***" and each a

"***Bank***") shall continue to govern the postpetition cash management relationship between the

Debtors and the Bank and all of the provisions of such agreements, including, without limitation,

the termination and fee provisions, shall remain in full force and effect.  The Debtors and the Banks

are authorized, without further order of this Court, to implement such changes to the Cash

Management System and procedures in the ordinary course of business in accordance with the terms of the existing deposit and disbursement agreements, including opening any new bank accounts or closing any existing bank accounts, to the extent permitted by the Debtors' proposed postpetition secured debtor-in-possession financing ("*DIP Financing*") and subject to the notice requirements set forth in paragraph 16 of this Final Order.  The Banks are authorized to honor the Debtors' requests to close existing bank accounts or open new bank accounts.

4.      The Debtors are authorized but not directed to (i) maintain and continue to use their existing bank accounts that are listed on the attached **Exhibit E** to the Motion (the "*Debtor Bank Accounts*"), in the same manner and with existing account numbers, styles and document forms as are currently employed; (ii) deposit funds in, and withdraw funds from, the Debtor Bank Accounts by usual means, including check, wire transfer, ACH transfer, draft, electronic fund transfer, centralized lockbox or other items presented, issued or drawn on the Debtor Bank Accounts; (iii) pay prepetition and ordinary-course bank fees for the Debtor Bank Accounts; (iv) perform their obligations under the Debtor Bank Accounts' governing documents and agreements; and (v) treat the Debtor Bank Accounts for all purposes as "debtor in possession" accounts ("*DIP Accounts*").

5.      Each Bank is authorized and directed to continue to administer, service and maintain the Debtor Bank Accounts, as they were prepetition, without interruption and in the ordinary course, without further order of this Court, and to receive, process, honor and pay all checks, drafts, wires, ACH transfers, electronic fund transfers or other items presented, issued or drawn on the Debtor Bank Accounts (collectively, the "*Disbursements*") on account of any claim this Court has granted the Debtors approval to pay, whether arising before, on or after the Petition

Date to the same extent the Debtors were responsible for such items prior to the Petition Date; *provided that* the applicable Debtor Bank Accounts contain sufficient funds.

6.      Notwithstanding any other provision of this Final Order, no Bank that honors a prepetition check or other item drawn on any account that is the subject of this Final Order (a) at the direction of the Debtors, (b) in good faith belief that this Court has authorized such prepetition check or item to be honored or (c) as the result of an innocent mistake made despite implementation of reasonable item-handling procedures, shall be deemed to be liable to the Debtors, their estates or any other party on account of such prepetition check or other item being honored postpetition, or otherwise deemed to be in violation of this Final Order.

7.      Each Bank is authorized, without further order of this Court, to debit the Debtor's accounts in the ordinary course of business without the need for further order of this Court for: (i) all checks drawn on the Debtor's accounts which are cashed at such Bank's counters or exchanged for cashier's checks by the payees thereof whether arising prepetition or postpetition; (ii) all checks or other items deposited in one of Debtor's accounts with such, whether arising prepetition or postpetition, which have been dishonored or returned unpaid for any reason, together with any fees and costs in connection therewith, to the same extent the Debtor was and/or is responsible for such items whether prepetition or postpetition; and (iii) all undisputed prepetition amounts outstanding as of the date hereof, if any, owed to any Bank as service charges for the maintenance of the Cash Management System.  The Debtors shall at all times maintain sufficient balances in the accounts at each Bank to secure their obligations to each Bank for the cash management and related services provided to the Debtors.

8.      Each of the Banks may rely on the representations of the Debtors with respect to whether any check or other payment order drawn or issued by the Debtors prior to the

Petition Date should be honored pursuant to this or any other order of this Court and the Banks shall not have any liability to any party for relying on such representations by the Debtors as provided for herein.

9.      The Debtors are authorized to continue performing Intercompany Transactions arising from or related to the operation of their business in the ordinary course, including, for the avoidance of doubt, ordinary course practices in respect of Intercompany Loans. Notwithstanding anything to the contrary set forth herein, the Debtors shall not, absent further order of this Court, pay any capital contributions or dividends.

10.      All payments from any authorized postpetition Intercompany Transactions are hereby accorded administrative expense priority under section 503(b) of the Bankruptcy Code, subject and junior to the claims, including adequate protection claims, granted in connection with any order(s) of this Court approving the DIP Financing.  Each entity using funds that flow through the Cash Management System shall continue to bear the ultimate payment responsibility for those ordinary-course transactions.  In connection with the Intercompany Transactions, the Debtors shall maintain records for all transfers of cash so that all transactions (including Intercompany Transactions) can be readily ascertained, traced, recorded properly and distinguished between prepetition and postpetition transactions.

11.      The relief granted in this Final Order with respect to any Intercompany Transaction and/or Intercompany Claim shall not constitute a finding as to the validity, priority or status of such Intercompany Transaction and/or Intercompany Claim.  The rights of any party, including the Debtors, to contest the validity, priority or status of any Intercompany Transaction and/or Intercompany Claim are expressly reserved.

26643084.1

5

12.     The Debtors are authorized to continue using all checks, correspondence and other business forms, including, but not limited to, purchase orders, multicopy checks, letterhead, envelopes, promotional materials and other business forms, substantially as they existed immediately before the Petition Date without reference to the Debtors' status as debtors in possession; *provided that* once the Debtors' existing checks have been used, the Debtors will, when reordering checks, ensure that the designation "Debtor in Possession" and the corresponding bankruptcy case number are printed on all checks.

13.     The requirements of section 345 of the Bankruptcy Code, to the extent the Debtor Bank Accounts do not strictly comply therewith, are waived on an interim basis for a period of up to forty-five (45) days after the Petition Date; *provided*, *however*, that nothing in this Final Order shall affect the Debtors' ability to seek further extensions of such waiver.

14.     In each instance in which the Debtors hold Debtor Bank Accounts at Banks that are party to a Uniform Depository Agreement with the U.S. Trustee, within fifteen (15) days after entry of this Final Order the Debtors shall (a) contact the Banks, (b) provide the Banks with each of the Debtor's employer identification numbers and (c) identify their Debtor Bank Accounts held as being held by a debtor-in-possession in a bankruptcy case and provide the main case number.

15.     In any instance in which the Debtors hold Debtor Bank Accounts, that are not Inactive Accounts, at Banks that are not party to a Uniform Depository Agreement with the U.S. Trustee, the Debtors shall use their good faith efforts to cause the banks to execute a Uniform Depository Agreement in a form prescribed by the U.S. Trustee within fifteen (15) days of the date of this Final Order, to the extent such Bank is a domestic bank.  The U.S. Trustee's rights to seek

further relief from this Court in the event that the aforementioned banks are unwilling to execute a Uniform Depository Agreement in a form prescribed by the U.S. Trustee are fully reserved.

16.     To the extent the Debtors seek to open any new bank accounts or close any existing bank accounts as permitted under paragraph 3 of this Final Order, the Debtors shall give notice to the U.S. Trustee, any statutory committees appointed in the Chapter 11 Cases and the administrative agents under the DIP Financing within fifteen (15) days after opening a new bank account or closing an existing bank account; *provided* that the Debtors shall open any such new bank account at a bank that has executed a Uniform Depository Agreement with the U.S. Trustee, or at a bank willing to immediately execute such an agreement.

17.     Nothing contained herein shall prevent any Bank from modifying or terminating any Bank Accounts or cash management services or related services in accordance with the agreements governing such accounts, programs or services, subject to providing no less than fifteen (15) calendar days advance notice.

18.     Despite the Debtors' use of a consolidated Cash Management System, the Debtors shall calculate any quarterly fees due under 28 U.S.C. § 1930(a)(6) based on the disbursements of each Debtor, regardless of which Debtor, or other entity, pays those disbursements.

19.     Notwithstanding anything in the Motion or this Final Order to the contrary, any payment made or action taken by any of the Debtors pursuant to the authority granted herein, as well as the exercise of any and all other rights and authorizations granted or approved hereunder, shall be subject in all respects to, as applicable, the orders approving the Debtors' use of cash collateral and/or post-petition DIP Financing facilities, and any budgets in connection therewith governing any such use of cash collateral and/or financing (collectively, the "***DIP Orders***"). To

the extent there is any inconsistency between the terms of any DIP Orders, on the one hand, and this Final Order, on the other, the terms of the DIP Orders shall control.

20.     Nothing in the Motion or this Final Order or the relief granted herein (including any actions taken or payments made by the Debtors) is to be construed as (i) an admission of the validity of any claim against the Debtors; (ii) an admission with respect to the validity, extent or perfection of any lien; (iii) a waiver of the Debtors' rights or those of any party in interest to dispute, contest, setoff or recoup any claim or assert any related rights, claims or defenses; (iv) a waiver of the Debtors' rights or those of any party in interest over the validity, extent, perfection or possible avoidance of any lien; or (v) an approval or assumption of any agreement, contract, program, policy or lease under section 365 of the Bankruptcy Code.

21.     The requirements set forth in Bankruptcy Rule 6004(a) are hereby waived.

22.     Notwithstanding the applicability of Bankruptcy Rule 6004(h), the terms and conditions of this Final Order are immediately effective and enforceable upon its entry.

23.     The Debtors are authorized and empowered to take all actions necessary or appropriate to implement the relief granted in this Final Order.

24.     This Court retains jurisdiction over all matters arising from or related to the implementation or interpretation of this Final Order.

Dated: _____, 2020
         Wilmington, Delaware


_____
UNITED STATES BANKRUPTCY JUDGE

26643084.1

8

## **Exhibit C**

## **Debtor Intercompany Claims and Intercompany Loans**

**March 31, 2020**
USD

| Pyxus International Inc. | Intercompany Accounts & Advances Receivable/(Payable) | Intercompany Notes Receivable/(Payable) |
|---|---|---|
| **Consolidated Companies** | | |
| E101000 - Alliance One North America LLC | 127,291,890 | - |
| E120000 - Alliance One Specialty Products LLC | 5,880,735 | - |
| E122000 - Alliance One Specialty Products Investments LLC | 6,697,589 | - |
| E124000 - Twelfth State Brands LLC | 161,485 | - |
| E125000 - Global Specialty Products | 46,958,170 | - |
| E126000 - PURE-AG NC, LLC | 310,007 | - |
| E129000 - Eastern Carolina Packaging, LLC | 163,076 | - |
| E136000 - Pyxus Agriculture US, LLC | 853,250 | - |
| E140000 - Alliance One International LLC | 27,510,992 | - |
| E402000 - AO Brasil Exportadora de Tabacos Ltda | (26,035) | - |
| E702000 - Alliance One International GmbH | 155,209 | - |
| E815000 - Pyxus Agriculture Holdings Ltd. | 252,794 | 7,622,033 |
| **Total Consolidated Companies** | 216,209,162 | 7,622,033 |
| | | |
| **Non Consolidated Companies** | | |
| E127000 - Criticality, LLC | 319,000 | 7,450,000 |
| E416000 - China Brazil | 100,422 | - |
| **Total Non Consolidated Companies** | 419,422 | 7,450,000 |
| | | |
| **Total** | 216,628,583 | 15,072,033 |

**March 31, 2020**
USD

| *Alliance One International LLC* | Intercompany Accounts or Advances Receivable/ (Payable) | Intercompany Notes Receivable/ (Payable) |
|---|---|---|
| **Consolidated Companies** | | |
| E101000 - Alliance One North America LLC | 88,263,420 | - |
| E113000 - Alliance One Tobacco Canada, Inc | 200,000 | - |
| E120000 - Alliance One Specialty Products LLC | 2,161 | - |
| E150000 - Pyxus International Inc. | (27,510,992) | - |
| E204000 - Alliance One – Rotag | (51,086) | - |
| E234000 - Alliance One Tutun AS | (7,980,950) | - |
| E303000 - Alliance One Tabaco Guatemala, S.A. | (1,208,723) | - |
| E307000 - AO Tobacco Argentina SA | 30,766,562 | - |
| E402000 - AO Brasil Exportadora de Tabacos Ltda | (107,811,248) | (30,000,000) |
| E505000 - AOI Singapore, PTE Ltd. | 550,456 | - |
| E511000 - PT Indonesia Tri Sembilam | 545,320 | - |
| E514000 - Alliance One Services (Thailand) Li | (1,330,013) | - |
| E516000 - PT. Alliance One Indonesia | 30,367,537 | - |
| E520000 - Alliance One Beijing | (566,626) | - |
| E607000 - Alliance One Tobacco Tanzania | (51,408,493) | - |
| E629000 - Alliance One (Kenya) Ltd | 24,937,793 | - |
| E643000 - Mashonaland Tobacco Company-Zimbabwe | (70,032,759) | - |
| E647000 - Alliance One Uganda | (28,641,208) | - |
| E702000 - Alliance One International GmbH | (7,618,308) | 21,687,930 |
| E703000 - Alliance One Tabak - Netherlands | (241,420) | - |
| E705000 - Alliance One Intl Service - UK | (10,997,658) | - |
| E728000 - Leaf Trading Co. Ltd. | (91,548) | - |
| E739000 - Global Leaf Trading FZE | (63,522) | - |
| E740000 - Gadora Tobacco PSC | 4,760,927 | - |
| E741000 - AOI Holdings Limited | 885 | 54,000 |
| **Total Consolidated Companies** | (135,159,493) | (8,258,070) |
| | | |
| **Non Consolidated Companies** | | |
| E416000 - China Brazil | (5,400,102) | - |
| E506000 - Alliance One Industries  India Pvt Ltd (India) | (1,860,491) | - |
| E509000 - Siam Tobacco Export Corp | (172,676) | - |
| **Total Non Consolidated Companies** | (7,433,268) | - |
| | | |
| **Total** | (142,592,761) | (8,258,070) |

**March 31, 2020**
USD

| *Alliance One North America LLC* | Intercompany Accounts or Advances Receivable/ (Payable) | Intercompany Notes Receivable/ (Payable) |
|---|---|---|
| **Consolidated Companies** | | |
| E113000 - Alliance One Tobacco Canada, Inc | (4,569,901) | - |
| E120000 - Alliance One Specialty Products LLC | 31,378,080 | - |
| E122000 - Alliance One Specialty Products Investments LLC | 5,546 | - |
| E124000 - Twelfth State Brands LLC | 83 | - |
| E125000 - Global Specialty Products | 9,151 | - |
| E129000 - Eastern Carolina Packaging, LLC | 99,055 | - |
| E136000 - Pyxus Agriculture US, LLC | 128,577 | - |
| E140000 - Alliance One International LLC | (88,263,420) | - |
| E150000 - Pyxus International Inc. | (127,291,890) | - |
| E702000 - Alliance One International GmbH | 57,730 | - |
| **Total Consolidated Companies** | (188,446,988) | - |
| | | |
| **Non Consolidated Companies** | | |
| E127000 - Criticality, LLC | 10,339 | - |
| **Total Non Consolidated Companies** | 10,339 | - |
| | | |
| **Total** | (188,436,649) | - |

**Exhibit D**

**Cash Management System**

## Pyxus International: Debtor Cash Management Structure



proceeds from U.S. debt

**Pyxus International, Inc. (USA)**
BofA xxx-7535 (concentration)
BofA xxx-3840 (disbursement)

*interest and principal on U.S. debt*

*working capital and capex for U.S. non-debtor, non-leaf subsidiaries*

*working capital*

remittances from foreign subs

direct customer payments

**Alliance One International LLC (USA)**
BofA xxx-6587 (concentration)
BofA xxx-2058 (disbursement)

*tobacco purchases, overhead and working capital for foreign subs*

receipts from securitization vehicles

*tobacco purchases*

**Alliance One North America LLC (USA)**
BofA xxx-6600 (concentration)
BofA xxx-2072 (disbursement)

*tobacco purchases, suppliers & overhead*

direct customer payments

*tobacco purchases*

**Alliance One Specialty Products LLC (USA)**
BofA xxx-9419 (concentration)
BofA xxx-7620 (disbursement)

direct customer payments

*overhead*



RPA
ADVISORS

1

## Exhibit E

## Debtor Bank Accounts[1]

## Pyxus International, Inc.

### Active Accounts

| Bank | Last Four Digits of Account # | Account Description |
|---|---|---|
| Bank of America | 7535 | Concentration Account |
| Bank of America | 3840 | Disbursement Account (ZBA) |
| BB&T | 3231 | Flexible spending account (employee FSA) |

## Alliance One International, LLC

### Active Accounts

| Bank | Last Four Digits of Account # | Account Description |
|---|---|---|
| Bank of America | 6587 | Concentration Account |
| Bank of America | 2058 | Disbursement Account (ZBA) |

## Alliance One North America, LLC

### Active Accounts

| Bank | Last Four Digits of Account # | Account Description |
|---|---|---|
| Bank of America | 6600 | Concentration Account |
| Bank of America | 2072 | Disbursement Account (ZBA) |

---

[1] All accounts held in the United States and USD denominated unless otherwise noted.

26643084.1

**Alliance One Specialty Products, LLC**

**Active Accounts**

| Bank | Last Four Digits of Account # | Account Description |
|---|---|---|
| Bank of America | 9419 | Concentration Account |
| Bank of America | 7620 | Disbursement Account (ZBA) |

**Pyxus International, Inc.**

**Inactive Accounts to be maintained but not used**

| Bank | Last Four Digits of Account # | Account Description |
|---|---|---|
| Wells Fargo | 7479 | Unused legacy account |
| Wells Fargo | 8671 | Unused legacy account |
| Credit Suisse | 2001 | Unused legacy account (Switzerland) |
| Credit Suisse | 2000 | Unused legacy account (Switzerland- Euro) |
| Deutsche Bank | 4900 | Unused relationship account (Germany) |
| Deutsche Bank | 4900 | Unused relationship account (Germany- Euro) |
| American National Bank | 3501 | Unused legacy account |
| American National Bank | 5701 | Unused legacy account |
| BB&T | 6033 | Unused relationship account |
| BB&T | 2992 | Unused relationship account |

**Alliance One International, LLC**

**Inactive Accounts to be maintained but not used**

| Bank | Last Four Digits of Account # | Account Description |
|---|---|---|
| Bank of America | 6012 | Unused legacy account (United Kingdom- Euro) |
| Bank of America | 6038 | Unused legacy account (United Kingdom- TRY) |
| Bank of America | 6020 | Unused legacy account |

| | | |
|---|---|---|
| | | (United Kingdom- CAD) |
| Credit Suisse | 2000 | Unused legacy account (Switzerland) |
| Credit Suisse | 2001 | Unused legacy account (Switzerland- CAD) |
| Credit Suisse | 2002 | Unused legacy account (Switzerland- Euro) |

## Alliance One North America, LLC

### Inactive Accounts to be maintained but not used

| Bank | Last Four Digits of Account # | Account Description |
|---|---|---|
| BB&T | 9621 | Unused relationship account |
| Credit Suisse | 2000 | Unused legacy account (Switzerland) |