IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | § § § | Chapter 11 |
| PYXUS INTERNATIONAL, INC., *et al.*,[1] | § § | |
| Debtors. | § § § § § | Case No. 20-11570 (___)  (Joint Administration Requested) |

**DECLARATION OF BRANDON AEBERSOLD IN SUPPORT OF DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO (A) OBTAIN POSTPETITION FINANCING AND (B) USE CASH COLLATERAL, (II) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES, (III) GRANTING LIENS AND SUPERPRIORITY CLAIMS, (IV) MODIFYING THE AUTOMATIC STAY, (V) SCHEDULING A FINAL HEARING AND (VI) GRANTING RELATED RELIEF**

I, Brandon Aebersold, make this declaration under 28 U.S.C. § 1746:

1. I am a Managing Director at Lazard Frères & Co. LLC. ("***Lazard***"), the investment banker to Pyxus International, Inc. and its debtor affiliates, as debtors and debtors in possession (collectively, the "***Debtors***" or the "***Company***") in the above-captioned chapter 11 cases (the "***Chapter 11 Cases***"). I submit this Declaration in support of the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Granting Liens and Superpriority Claims, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing and (VI) Granting Related Relief* (the "***DIP Motion***"), which the Debtors filed contemporaneously herewith.

---

[1] The Debtors in the Chapter 11 Cases, along with the last four digits of each Debtor's United States federal tax identification number, are: Pyxus International, Inc. (6567), Alliance One International, LLC (3302), Alliance One North America, LLC (7908), Alliance One Specialty Products, LLC (0115) and GSP Properties, LLC (5603). The Debtors' mailing address is 8001 Aerial Center Parkway, Morrisville, NC 27560-8417.

26642973.1

2.      I am over the age of 18 years and authorized to submit this Declaration on behalf of the Debtors.  I am not being specifically compensated for this testimony.  Lazard, as a professional proposed to be retained by the Debtors, will receive payments in its capacity as financial advisor to the Debtors; none of those payments are specifically payable on account of this testimony.

3.      Except as otherwise indicated, all statements set forth in this declaration are based on my personal knowledge of the Debtors' operations and finances gleaned during the course of Lazard's engagement with the Debtors, my discussions with the Debtors' senior management, other members of the Lazard team, and the Debtors' other advisors, and my review of relevant documents and/or my opinion based upon my experience. I am authorized to submit this declaration and, if were called to testify, I could and would testify competently to the facts and opinions set forth herein.

**Background and Qualifications**

4.      I am a Managing Director with Lazard, a financial advisory and investment banking firm.  Prior to joining Lazard, I practiced law at the firm of Simpson Thacher & Bartlett LLP, where I focused on mergers and acquisitions and leveraged finance transactions. I joined Lazard in 2007 following graduation from The University of Chicago Booth School of Business.  Throughout my years of investment banking and restructuring experience, I have advised corporate clients, governments and creditor groups in a broad range of restructuring, reorganization and capital raising transactions, in traditional and distressed situations, across a diverse variety of industries.  In addition, I have substantial experience marketing, structuring, and evaluating debtor-in-possession financings, secured debt facilities, and exit financings.

5.      Together with its predecessors and affiliates, Lazard has been advising clients around the world for over 165 years.  Lazard operates in forty-three cities across twenty-

26642973.1

seven countries, and its principal offices are located at 30 Rockefeller Plaza, New York, New York 10020. Lazard has dedicated professionals who provide restructuring services to its clients. The current managing directors, directors, vice presidents, associates and analysts of Lazard have extensive experience providing investment banking and financial advisory services to financially troubled companies and creditors thereof in complex financial restructurings out-of-court and in chapter 11 proceedings. Lazard and its professionals have been involved as advisors to debtors, creditors, equity constituencies and government agencies in numerous reorganization cases. Since 1990, Lazard's professionals have been involved in over 300 restructurings, representing well over $1 trillion in debtor liabilities.

6. I am also generally familiar with the cash flow forecasts prepared by the Debtors' management and their financial advisor, RPA Advisors, LLC ("*RPA*"). I understand that these forecasts take into account cash receipts and disbursements anticipated by the Debtors' management during the projected period and consider a number of factors, including, but not limited to, Debtors' management's anticipated impact of the chapter 11 filing on business operations, fees and interest expenses associated with postpetition financing, professional fees, payroll costs, customer and vendor relationships and other required operational payments.

### Lazard's Retention

7. Prior to June 15, 2020 (the "*Petition Date*"), the Debtors engaged Lazard to act as the Debtors' exclusive investment banker in connection with the Debtors' review of strategic alternatives to address their capital structure. Under my supervision, the Lazard team has worked closely with the Debtors' management and other professionals retained by the Debtors and has become knowledgeable and familiar with the Debtors' capital structure, liquidity needs, and business operations.

8. Since Lazard's engagement in March 2020, Lazard has worked with the Debtors' management, financial team and other professionals retained by the Debtors with respect to the Debtors' evaluation of strategic and restructuring alternatives, among other things, (i) analyzing the Debtors' liquidity and projected cash flows, (ii) understanding the Debtors' business operations, properties and finances, (iii) reviewing and analyzing the Debtors' balance sheet and capital structure alternatives, (iv) providing strategic advice to the Debtors' board of directors and management, (v) participating in negotiations with certain of the Debtors' stakeholders, (vi) soliciting, negotiating and analyzing debtor-in-possession and exit financing options and (vii) assisting the Debtors in connection with preparations for the commencement of these Chapter 11 Cases, including work related to the proposed DIP Facility and Plan (each as defined below).

9. Contemporaneously with the Company's consideration of its capital structure alternatives, Lazard worked closely with the Debtors' management and other advisors to evaluate the Debtors' financing needs and alternatives, including debtor-in-possession ("***DIP***") financing. The results of these efforts culminated in the debtor-in-possession financing facility described in detail in the DIP Motion (the "***DIP Facility***").

**Debtors' Need for Postpetition Financing**

10. As explained in the *Declaration of Joel Thomas, Executive Vice President and Chief Financial Officer of Debtor Pyxus International, Inc., in Support of the Chapter 11 Petitions and First Day Pleadings* (the "***First Day Declaration***"), the Debtors have a highly-levered capital structure and faced significant challenges leading to the commencement of these Chapter 11 Cases. Further, the COVID-19 epidemic resulted in additional challenges to the Debtors' operations and liquidity. As a result, the Debtors are seeking an in-court solution to these challenges, which must be addressed on an expedited timeline.

11. The Debtors require immediate access to the DIP Facility and the ability to use cash collateral throughout the chapter 11 process to ensure they have sufficient liquidity to operate their businesses and administer their estates in the ordinary course. The Debtors are entering chapter 11 with a cash balance of only approximately $10 million as of the Petition Date. This amount, along with their operating cash flow, as currently projected by Debtors' management, is insufficient to fund ongoing operations and expenses, including the anticipated costs associated with these Chapter 11 Cases. Based on the Debtors' current cash balance, my discussions with the Debtors' management and RPA, my experience in restructuring, and my familiarity with the Debtors, I believe that the cash collateral is not sufficient and that the Debtors require immediate access to borrowings under the DIP Facility to fund the costs of administering these Chapter 11 Cases, near-term working capital needs and ongoing business operations, including to fund certain costs and expenses of non-Debtor subsidiaries, as detailed in the First Day Declaration.

12. Further, I believe it is important for the Debtors to demonstrate to their vendors, counter-parties, customers, employees and other stakeholders that they have the liquidity to fund these Chapter 11 Cases and have a path to emerge on the contemplated timeline. I believe that this positive signaling should provide the greatest chance of avoiding negative impacts to the business and to relationships with foreign lenders, vendors, customers and employees, by helping assure third parties that the Debtors and their non-Debtor subsidiaries will be able to continue operating "business as usual" and otherwise pay their obligations as they come due after the Petition Date. Based on my familiarity with the Debtors' operations and my experience as a restructuring professional, I do not believe the Debtors could achieve this result solely on a "cash collateral" basis at this time. In my view, any significant delay in the Debtors'

ability to access the DIP Facility and use cash collateral, even for a limited period of time, may pose a substantial risk to the Debtors as a going concern, which could result in a significant deterioration in the value of the Debtors.

13. In summary, based on the foregoing, I believe that the Debtors' proposed DIP Facility will provide the necessary liquidity that is not otherwise available on a "cash collateral" basis alone.

### Debtors' Efforts to Obtain Postpetition Financing

14. In advance of Lazard reaching out to potential financing providers, RPA, Lazard, the Debtors, and their other advisors undertook an analysis of how much postpetition financing would be required to operate the consolidated business, maintain access to foreign lines of credit at certain non-Debtor subsidiaries, pay administrative costs during the Chapter 11 Cases and capitalize the restructured Company. The Debtors, in consultation with their advisors, estimated that they would need up to six months to implement a restructuring in a chapter 11 case.

15. Although the required amount of funding under, and the structure of, the DIP financing would vary significantly depending on various factors such as the length of the Chapter 11 Cases and the levels of creditor support, based on the forecasted cash flows and liquidity projections, the Debtors, with the assistance of their advisors, determined the Debtors' overall DIP financing need to be approximately $200 million. Critically, the size of the financing need assumed that a plan of reorganization broadly supported by the Debtors' prepetition creditors could be confirmed on a timely basis and that the foreign operating lines described in the First Day Declaration (the "*Foreign Operating Lines*") could be maintained throughout the pendency of these Chapter 11 Cases.

16. Leading up to the Petition Date, the Debtors, with the assistance of Lazard, engaged in a marketing process to obtain postpetition DIP financing.

17. Beginning in April 2020, the Debtors, with the assistance of Lazard, began a process to secure new financing (the "***Process***"). The Process involved the outreach, either directly or indirectly, to over 35 potential providers of financing, including existing lenders, large money-center banks, a number of sophisticated alternative investment institutions and certain of the Company's largest shareholders.

18. Throughout the Process, it was challenging to find potential lenders willing to provide the financing. The feedback from the parties that were contacted varied; however, two primary themes emerged. First, a number of potential lenders indicated that they were not able to consider the financing out of Environmental, Social and Governance, or "ESG," concerns due to certain industries in which the Company operates, namely tobacco and, indirectly through certain non-debtor joint ventures, cannabis. Second, a number of potential lenders expressed concerns about the potential credit risk of the financing in the event the Second Lien Noteholders[2], as the putative fulcrum security, failed to support the contemplated financing or the restructuring process. Specifically, the stated concern of these potential lenders was that without such support, the result could be a litigious or lengthy chapter 11 process that would jeopardize the Foreign Operating Lines, as an acceleration of all or a portion of these Foreign Operating Lines would be significantly destabilizing for the Debtors.

19. Notwithstanding these challenges, the Debtors held substantive discussions for the financing with six parties that had executed non-disclosure agreements (the

---

[2] "***Second Lien Noteholders***" means the holders of 9.875% senior secured second lien notes due 2021, issued by Pyxus pursuant to an Indenture dated August 1, 2013, between Pyxus and Wilmington Trust, National Association as the trustee and collateral trustee.

26642973.1

7

"*Potential Lenders*").  In order to evaluate the DIP financing opportunity, the Potential Lenders were given presentations and provided confidential information with respect to a number of relevant issues including, but not limited to, (a) the context and reason for financing, (b) an initial DIP financing term sheet, (c) information on contemplated DIP financing structure, collateral and security, (d) financial projections and (e) weekly cash flow forecasts through the contemplated Chapter 11 Cases.  In the weeks following the initial outreach, the Debtors and their advisors engaged in multiple rounds of due diligence calls and responded to numerous information requests.

20. Following due diligence by these six parties, there were two potential lender groups that continued to express interest in providing a feasible DIP facility:  an alternative investment firm that was not at the time a lender to the Company (the "*Third-Party Lender*") and an ad-hoc group of first and Second Lien Noteholders (the "*Ad Hoc Crossholder Group*").

21. The Debtors and their advisors continued to work with both parties.  The Debtors engaged the advisors to the Ad Hoc Group and, with respect to the Third-Party Lender, agreed to pay a work fee and provide for reimbursement of fees and expenses (including counsel fees) in connection with the Third-Party Lender's review and engagement on the DIP financing.

22. Ultimately, the Ad Hoc Group offered the only viable financing commitment.  This financing commitment is the DIP Facility described in the DIP Motion. The proposed DIP Facility consists of $200 million in new money, of which $131.7 million would be available upon entry of the Proposed Interim Order, and the balance of which would be available upon entry of the Final Order (each as defined in the DIP Motion).  The $200 million new money facility would be available for: (a) operating expenses; (b) working capital needs; (c) funding for

non-Debtor subsidiaries as more fully set out in the DIP Motion, (d) payment of professional fees and other amounts authorized by the Bankruptcy Court to be paid; (e) funding of DIP Facility fees and expenses; and (f) general corporate and administrative obligations.

23.     At the time of the commencement of these Chapter 11 Cases, the DIP Facility is the Debtors' only reasonably viable currently available source of postpetition funding under the circumstances.  The proposed DIP Facility would provide the Debtors with liquidity, stability and confidence that they can emerge from these Chapter 11 Cases in a timely and expeditious manner.  As such, the Debtors, with the assistance of Lazard and other advisors, have concluded that the terms of the DIP Facility are in the best interests of the Debtors and their stakeholders under the circumstances.

### DIP Financing Has Been Negotiated at Arms-Length and in Good Faith and Should Be Approved

24.     Since the early stages of the Process, the Debtors and their advisors have engaged in extensive negotiations with the Ad Hoc Group and their advisors.  The Ad Hoc Group and the Debtors exchanged multiple drafts of term sheets and debtor-in-possession documents with respect to the proposed facility.  Wachtell, Lipton, Rosen & Katz, as counsel for the Ad Hoc Group, TRS Advisors LLC, as investment banker for the Ad Hoc Group, Simpson Thacher & Bartlett LLP, as counsel for the Debtors, RPA and Lazard were engaged, exchanging models and significant diligence information, participating in numerous conference calls and negotiations to work towards finalizing DIP financing terms. This process involved evaluation of a budget by the Debtors and the Ad Hoc Group advisors.  The DIP Facility also contains certain milestones that the Debtors must meet throughout these Chapter 11 Cases.  The milestones were required by the Ad Hoc Group as a condition to providing the DIP Facility, and the Debtors believe that such milestones will be achievable if the DIP Facility is approved.

25. The negotiations described above culminated in the terms of the proposed DIP Facility, the approval of which is sought on an interim basis in the DIP Motion. Through these negotiations, the Debtors materially improved the terms of the financing on the whole as compared to those originally offered.

26. Based on my experience and knowledge of the market, I believe that the fees and expenses in the proposed DIP Facility are necessary under the circumstances, and, on the whole and under the current circumstances, the DIP Facility, including the milestones and covenants it contains, is reasonable. Furthermore, based upon my observations and involvement in the negotiation of the DIP financing in this matter, I believe that the negotiations with potential lenders were conducted at arm's length and in good faith.

### Need for Interim Relief

27. Based upon my discussions with the Debtors and their other advisors, I understand that due to the Debtors' current limited liquidity, the Debtors require immediate access to postpetition financing and use of cash collateral to operate their businesses and preserve value in the interim period, as set forth in the 13-week forecast of the Debtors that is attached to the Interim Order, and to avoid irreparable harm pending a final hearing. As further discussed above, absent funds available from the DIP Facility and use of cash collateral pursuant to the Interim Order, the Debtors would likely be forced to curtail their operations which will threaten the Debtors' ability to reorganize. Accordingly, I believe it is appropriate and necessary for the Court to approve the DIP Facility on an interim basis pursuant to the terms of the Interim Order.

### Conclusion

28. In my view, and based on discussions with the Debtors and their other advisors, the Debtors require the DIP Facility in order to ensure they have sufficient liquidity to

26642973.1

operate their businesses and administer their estates in the ordinary course. In addition, the Debtors will benefit from the message that the DIP Facility would send to Pyxus' customers, suppliers, employees and working capital providers regarding the sufficient funding of the Debtors' operations. I believe the message should help to stabilize Pyxus' operations and supply chain at the outset of these Chapter 11 Cases, which should mitigate the possible harm that these Chapter 11 Cases could have on the value of Debtors' estates.

29. Therefore, it is my conclusion that the Debtors have evaluated the reasonably available options for postpetition financing within the timeframe available and that the DIP Facility represents the most viable option currently available for meeting the Debtors' anticipated financing needs.

[*Remainder of page intentionally left blank*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated:  June 15, 2020          */s/ Brandon Aebersold*
       New York, New York          Name:  Brandon Aebersold
                                                       Title:  Managing Director