**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| PYXUS INTERNATIONAL, INC., *et al.*,[1] | § | |
| | § | Case No. 20-11570 (___) |
| Debtors. | § | |
| | § | (Joint Administration Requested) |
| | § | |
| | § | |

**DISCLOSURE STATEMENT FOR THE JOINT PREPACKAGED CHAPTER 11 PLAN OF
REORGANIZATION OF PYXUS INTERNATIONAL, INC. AND ITS AFFILIATED DEBTORS**

**SIMPSON THACHER & BARTLETT LLP**

Sandeep Qusba (*pro hac vice* pending)
Michael H. Torkin (*pro hac vice* pending)
Kathrine A. McLendon (*pro hac vice* pending)
Nicholas E. Baker (*pro hac vice* pending)
425 Lexington Avenue
New York, New York 10017
Telephone:    (212) 455-2000
Facsimile:    (212) 455-2502
Email:    squsba@stblaw.com
    michael.torkin@stblaw.com
    kmclendon@stblaw.com
    nbaker@stblaw.com

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

Pauline K. Morgan (No. 3650)
Kara Hammond Coyle (No. 4410)
Ashley E. Jacobs (No. 5635)
Tara C. Pakrouh (No. 6192)
1000 North King Street
Wilmington, Delaware 19801
Telephone:    (302) 571-6600
Facsimile:    (302) 571-1253
Email:    pmorgan@ycst.com
    kcoyle@ycst.com
    ajacobs@ycst.com
    tpakrouh@ycst.com

*Proposed Counsel to Debtors and Debtors in Possession*

Dated: June 14, 2020

---

[1] The Debtors in the Chapter 11 Cases, along with the last four digits of each Debtor's United States federal tax identification number, are: Pyxus International, Inc. (6567), Alliance One International, LLC (3302), Alliance One North America, LLC (7908), Alliance One Specialty Products, LLC (0115) and GSP Properties, LLC (5603). The Debtors' mailing address is 8001 Aerial Center Parkway, Morrisville, NC 27560-8417.

THIS IS A SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN IN ACCORDANCE WITH BANKRUPTCY CODE SECTION 1125 AND WITHIN THE MEANING OF BANKRUPTCY CODE SECTION 1126, 11 U.S.C. §§ 1125, 1126. THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT. THE DEBTORS INTEND TO SUBMIT THIS DISCLOSURE STATEMENT TO THE BANKRUPTCY COURT FOR APPROVAL FOLLOWING COMMENCEMENT OF SOLICITATION AND THE DEBTORS' FILING FOR RELIEF UNDER CHAPTER 11 OF THE BANKRUPTCY CODE. THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE. THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.

**<u>IMPORTANT INFORMATION REGARDING THIS DISCLOSURE STATEMENT</u>**
**DISCLOSURE STATEMENT, DATED JUNE 14, 2020**

**SOLICITATION OF VOTES TO ACCEPT OR REJECT**
**THE JOINT PREPACKAGED CHAPTER 11 PLAN OF REORGANIZATION OF PYXUS**
**INTERNATIONAL, INC. AND ITS AFFILIATED DEBTORS FROM THE HOLDERS OF**
**OUTSTANDING CLAIMS**

**IF YOU ARE IN CLASSES 3 OR 4 YOU ARE RECEIVING THIS DOCUMENT AND THE**
**ACCOMPANYING MATERIALS BECAUSE YOU ARE ENTITLED TO VOTE ON THE PLAN.**

| VOTING CLASS | NAME OF CLASS UNDER THE PLAN |
|---|---|
| **CLASS 3** | **FIRST LIEN NOTES CLAIMS** |
| **CLASS 4** | **SECOND LIEN NOTES CLAIMS** |

**HOLDERS OF CLASS 4 – SECOND LIEN NOTES CLAIMS ARE ALSO ENTITLED TO ELECT THE**
**SECOND LIEN NOTES CASH OPTION OR THE SECOND LIEN NOTES STOCK OPTION**

**HOLDERS OF CLASS 4 – SECOND LIEN NOTES CLAIMS THAT ARE NOT PARTY TO THE**
**RESTRUCTURING SUPPORT AGREEMENT MAY ELECT TO RECEIVE (I) THEIR PRO RATA SHARE**
**OF THE NEW COMMON STOCK FROM THE SECOND LIEN NOTES COMMON STOCK POOL OR (II)**
**CASH IN AN AMOUNT EQUAL TO 2.00% OF THE AGGREGATE PRINCIPAL AMOUNT OF SECOND**
**LIEN NOTES HELD BY SUCH HOLDER.**

**IN ORDER TO ELECT THE SECOND LIEN NOTES STOCK OPTION, A HOLDER OF SECOND LIEN**
**NOTES CLAIMS MUST COMPLETE A SECOND LIEN NOTES STOCK ELECTION FORM NO LATER**
**THAN THE SECOND LIEN NOTES STOCK OPTION DEADLINE. SEE SECTION V.B.6 OF THIS**
**DISCLOSURE STATEMENT FOR A SUMMARY OF THE SECOND LIEN NOTES STOCK OPTION AND**
**THE SECOND LIEN NOTES CASH OPTION AND SECTION VII.F OF THIS DISCLOSURE STATEMENT**
**FOR ADDITIONAL DETAILS ON COMPLETING A SECOND LIEN NOTES STOCK ELECTION FORM.**

**HOLDERS OF CLASS 10 – EXISTING PYXUS INTERESTS**
**ARE NOT ENTITLED TO VOTE ON THE PLAN**

**HOLDERS OF CLASS 10 – EXISTING PYXUS INTERESTS WILL RECEIVE AN EQUITYHOLDER OPT-**
**OUT FORM BECAUSE THEIR RIGHTS ARE AFFECTED BY THE PLAN. SPECIFICALLY, HOLDERS**
**OF CLASS 10 – EXISTING PYXUS INTERESTS ARE ENTITLED TO OPT OUT OF THE RELEASES IN**
**ARTICLE VIII OF THE PLAN.**

**ANY HOLDER OF CLASS 10 – EXISTING PYXUS INTERESTS THAT SUBMITS A DULY EXECUTED**
**EQUITYHOLDER OPT-OUT FORM BY THE EQUITYHOLDER OPT-OUT DEADLINE WILL NOT BE**
**A RELEASING PARTY OR A RELEASED PARTY UNDER THE PLAN.**

**ANY HOLDER OF PYXUS COMMON STOCK THAT (I) SUBMITS A DULY EXECUTED**
**EQUITYHOLDER OPT-OUT FORM BY THE EQUITYHOLDER OPT-OUT DEADLINE OR (II)**
**OBJECTS TO, OPPOSES, OR SEEKS TO IMPEDE OR DELAY CONFIRMATION OF THE PLAN WILL**
**NOT BE A RELEASING PARTY OR A RELEASED PARTY UNDER THE PLAN <u>AND</u> WILL NOT**
**RECEIVE ANY DISTRIBUTION FROM THE EXISTING EQUITY CASH POOL.**

**HOLDERS OF EXISTING PYXUS INTERESTS SHOULD <u>NOT</u> SUBMIT AN EQUITYHOLDER OPT-OUT**
**FORM IF THEY WISH TO (X) RECEIVE THEIR PRO RATA SHARE OF THE EXISTING EQUITY CASH**
**POOL (IF APPLICABLE) AND (Y) BE SUBJECT TO AND BENEFIT FROM THE RELEASES IN**
**ARTICLE VIII.F OF THE PLAN.**

---

**DELIVERY OF BALLOTS, SECOND LIEN NOTES STOCK ELECTION FORM AND EQUITYHOLDER OPT-OUT FORM**

1.  Ballots or master ballots (each, a "***Ballot***") must be actually received by the Solicitation Agent before 5:00 p.m. prevailing Eastern Time, on July 20, 2020 (the "***Voting Deadline***").

2.  Ballots must be completed following the instructions received with the Ballot, so that such Holder's Ballot including their vote is actually received by the Voting Deadline.

3.  The Second Lien Notes Stock Election Form must be completed following the instructions contained therein and must actually be received by the Second Lien Notes Stock Option Deadline (which is anticipated to be the same date as the Voting Deadline).

4.  The Equityholder Opt-Out Form must be completed following the instructions contained therein and must actually be received by the Equityholder Opt-Out Deadline (which is anticipated to be the same date as the Voting Deadline).

If you have any questions on the procedures for voting on the Plan, please contact the Solicitation Agent by emailing pyxusballots@primeclerk.com and referencing "Pyxus Ballot Processing" in the subject line, or by calling 1-(844)-974-2130 (toll-free) or 1-(929)-955-3418 (international), and asking for the solicitation group.

---

**This disclosure statement (as may be amended, supplemented, or otherwise modified from time to time in accordance with its terms, this "*Disclosure Statement*") provides information regarding the *Joint Prepackaged Chapter 11 Plan of Reorganization of Pyxus International, Inc. and its Affiliated Debtors* (as may be amended, supplemented, or otherwise modified from time to time in accordance with its terms, the "*Plan*"),[2] which the Debtors are seeking to have confirmed by the Bankruptcy Court. A copy of the Plan is attached hereto as <u>Exhibit A</u>. The Debtors are providing the information in this Disclosure Statement to certain Holders of Claims for the purpose of soliciting votes to accept or reject the Plan (the "*Solicitation*").**

**This Disclosure Statement contains, among other things, descriptions and summaries of provisions of the Plan being proposed by the Debtors. The Debtors reserve the right to modify the Plan consistent with section 1127 of title 11 of the United States Code (as now in effect or hereafter amended, the "*Bankruptcy Code*"), Rule 3019 of the Federal Rules of Bankruptcy Procedure (together with the local rules of the Bankruptcy Court, as now in effect or hereafter amended, the "*Bankruptcy Rules*").**

**Pursuant to the Restructuring Support Agreement, the Plan is currently supported by the Debtors, the Consenting First Lien Noteholders, who hold greater than 92% of the First Lien Notes Claims, and the Consenting Second Lien Noteholders, who hold greater than 67% of the Second Lien Notes Claims.**

**The consummation and effectiveness of the Plan are subject to certain material conditions precedent described herein and set forth in <u>Article IX</u> of the Plan. There is no assurance that the Bankruptcy Court will confirm the Plan or, if the Bankruptcy Court does confirm the Plan, that the conditions necessary for the Plan to become effective will be satisfied or, in the alternative, waived.**

**The Debtors urge each Holder of a Claim to consult with its own advisors with respect to any legal, financial, securities, tax, or business advice in reviewing this Disclosure Statement, the Plan, and each proposed transaction contemplated by the Plan.**

**Holders of Claims should not construe the content of this Disclosure Statement as providing legal, business, financial, or tax advice. The Debtors strongly encourage Holders of Claims in Classes 3 and 4 to read this Disclosure Statement (including the Risk Factors described in <u>Section VIII</u> hereof) and the Plan in their**

---

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Plan.

**entirety before voting to accept or reject the Plan. Assuming the requisite acceptances to the Plan are obtained, the Debtors will seek the Bankruptcy Court's approval of the Plan at the Confirmation Hearing.**

<div style="border:1px solid black;">

### RECOMMENDATION BY THE DEBTORS

**EACH OF THE DEBTORS STRONGLY RECOMMENDS THAT ALL HOLDERS OF CLAIMS WHOSE VOTES ARE BEING SOLICITED SUBMIT BALLOTS TO <u>ACCEPT</u> THE PLAN BY RETURNING THEIR BALLOTS SO AS TO BE <u>ACTUALLY RECEIVED</u> BY THE SOLICITATION AGENT NO LATER THAN JULY 20, 2020 AT 5:00 P.M. (PREVAILING EASTERN TIME) PURSUANT TO THE INSTRUCTIONS SET FORTH HEREIN AND ON THE BALLOTS.**

**THE BOARD OF DIRECTORS OR MANAGERS, AS APPLICABLE, FOR EACH DEBTOR HAS APPROVED THE TRANSACTIONS CONTEMPLATED BY THE PLAN AND DESCRIBED IN THIS DISCLOSURE STATEMENT, AND EACH DEBTOR BELIEVES THAT THE COMPROMISES CONTEMPLATED UNDER THE PLAN ARE FAIR AND EQUITABLE, MAXIMIZE THE VALUE OF EACH OF THE DEBTOR'S ESTATES, AND PROVIDE THE BEST RECOVERY TO CLAIM AND INTEREST HOLDERS.**

**AT THIS TIME, EACH DEBTOR BELIEVES THAT THE PLAN AND RELATED TRANSACTIONS REPRESENT THE BEST ALTERNATIVE FOR ACCOMPLISHING THE DEBTORS' OVERALL RESTRUCTURING OBJECTIVES.**

</div>

**SPECIAL NOTICE REGARDING FEDERAL AND STATE SECURITIES LAWS**

The Bankruptcy Court has not reviewed this Disclosure Statement or the Plan, and the Securities to be issued on or after the Effective Date will not have been the subject of a registration statement filed with the U.S. Securities and Exchange Commission (the "*SEC*") under the U.S. Securities Act of 1933, as amended (the "*Securities Act*"), or any securities regulatory authority of any state under any state securities law ("*Blue Sky Laws*"). The Plan has not been approved or disapproved by the SEC or any state regulatory authority and neither the SEC nor any state regulatory authority has passed upon the accuracy or adequacy of the information contained in this Disclosure Statement or the Plan. Any representation to the contrary is a criminal offense. The Debtors are relying on section 4(a)(2) and/or Regulation D of the Securities Act, and similar Blue Sky Laws provisions, to exempt from registration under the Securities Act and Blue Sky Laws the offer to certain Holders of First Lien Notes Claims and Second Lien Notes Claims that are "accredited investors" as defined in Rule 501 of the Securities Act ("*Accredited Investors*"), respectively, of new securities prior to the Petition Date, including in connection with the Solicitation.

After the Petition Date, the Debtors will rely on section 1145(a) of the Bankruptcy Code or, to the extent not available, Section 4(a)(2) and/or Regulation D of the Securities Act and similar Blue Sky Laws provisions, to exempt from registration under the Securities Act and Blue Sky Laws the issuance of Securities, including the New Common Stock and the Exit Secured Notes, in connection with the Plan. Neither the Solicitation nor this Disclosure Statement constitutes an offer to sell or the solicitation of an offer to buy Securities in any state or jurisdiction in which such offer or solicitation is not authorized.

# DISCLAIMER

This Disclosure Statement contains summaries of certain provisions of the Plan and certain other documents and financial information. The information included in this Disclosure Statement is provided solely for the purpose of soliciting acceptances of the Plan and should not be relied upon for any purpose other than to determine whether and how to vote on the Plan. All Holders of Claims entitled to vote to accept or reject the Plan are advised and encouraged to read this Disclosure Statement and the Plan in their entirety before voting to accept or reject the Plan. The Debtors believe that these summaries are fair and accurate. The summaries of the financial information and the documents that are attached to, or incorporated by reference in, this Disclosure Statement are qualified in their entirety by reference to such information and documents. In the event of any inconsistency or discrepancy between a description in this Disclosure Statement, on the one hand, and the terms and provisions of the Plan or the financial information and documents incorporated in this Disclosure Statement by reference, on the other hand, the Plan or the financial information and documents, as applicable, shall govern for all purposes.

Except as otherwise provided in the Plan or in accordance with applicable law, the Debtors are under no duty to update or supplement this Disclosure Statement. The Bankruptcy Court's approval of this Disclosure Statement does not constitute a guarantee of the accuracy or completeness of the information contained herein or the Bankruptcy Court's endorsement of the merits of the Plan. The statements and financial information contained in this Disclosure Statement have been made as of the date hereof unless otherwise specified. Holders of Claims or Interests reviewing the Disclosure Statement should not assume at the time of such review that there have been no changes in the facts set forth in this Disclosure Statement since the date of this Disclosure Statement. No Holder of a Claim or Interest should rely on any information, representations, or inducements that are not contained in or are inconsistent with the information contained in this Disclosure Statement, the documents attached to this Disclosure Statement, and the Plan. This Disclosure Statement does not constitute legal, business, financial, or tax advice. Any Person or Entity desiring any such advice should consult with their own advisors. Additionally, this Disclosure Statement has not been approved or disapproved by the Bankruptcy Court, the SEC, or any securities regulatory authority of any state under Blue Sky Laws. The Debtors are soliciting acceptances to the Plan prior to commencing any cases under chapter 11 of the Bankruptcy Code.

# FORWARD LOOKING STATEMENTS

The financial information contained in or incorporated by reference into this Disclosure Statement has not been audited, except as specifically indicated otherwise. The Debtors' management, in consultation with the Debtors' advisors, has prepared the financial projections attached hereto as <u>Exhibit D</u> and described in this Disclosure Statement (the "***Financial Projections***"). The Financial Projections, while presented with numerical specificity, necessarily were based on a variety of estimates and assumptions that are inherently uncertain and may be beyond the control of the Debtors' management. Important factors that may affect actual results and cause the management forecasts not to be achieved include, but are not limited to, risks and uncertainties relating to the Debtors' businesses (including their ability to achieve strategic goals, objectives, and targets over applicable periods), industry performance, the regulatory environment, general business and economic conditions, and other factors. The Debtors caution that no representations can be made as to the accuracy of these projections or to their ultimate performance compared to the information contained in the forecasts or that the forecasted results will be achieved. Therefore, the Financial Projections may not be relied upon as a guarantee or other assurance that the actual results will occur.

Regarding contested matters, adversary proceedings, and other pending, threatened, or potential litigation or other actions, this Disclosure Statement does not constitute, and may not be construed as, an admission of fact, liability, stipulation, or waiver by the Debtors or any other party, but rather as a statement made in the context of settlement negotiations in accordance with Rule 408 of the Federal Rules of Evidence and any analogous state or foreign laws or rules. As such, this Disclosure Statement shall not be admissible in any non-bankruptcy proceeding involving the Debtors or any other party in interest, nor shall it be construed to be conclusive advice on the tax, Securities, financial or other effects of the Plan to Holders of Claims against the Debtors or any other party in interest. Please refer to <u>Section VIII</u> of this Disclosure Statement, entitled "Risk Factors" for a discussion of certain risk factors that Holders of Claims voting on the Plan should consider.

Except as otherwise expressly set forth herein, all information, representations, or statements contained herein have been provided by the Debtors. No Person is authorized by the Debtors in connection with this Disclosure

Statement, the Plan, or the Solicitation to give any information or to make any representation or statement regarding this Disclosure Statement, the Plan, or the Solicitation, in each case, other than as contained in this Disclosure Statement and the exhibits attached hereto or as otherwise incorporated herein by reference or referred to herein. If any such information, representation, or statement is given or made, it may not be relied upon as having been authorized by the Debtors.

This Disclosure Statement contains certain forward-looking statements, all of which are based on various estimates and assumptions. Such forward-looking statements are subject to inherent uncertainties and to a wide variety of significant regulatory, business, economic, and competitive risks and contingencies, which are difficult or impossible to predict accurately and may be beyond the control of the Debtors, including, but not limited to, those summarized herein. When used in this Disclosure Statement, the words "anticipate," "believe," "estimate," "think," "will," "may," "intend," and "expect" and similar expressions generally identify forward-looking statements. Although the Debtors believe that their plans, intentions, and expectations reflected in the forward-looking statements are reasonable, they cannot be sure that they will be achieved. These statements are only predictions and are not guarantees of future performance or results. Forward-looking statements are subject to known and unknown risks, uncertainties and other factors that could cause actual results and performance to differ materially from any future results or performance contemplated by a forward-looking statement, including under the heading "Risk Factors" below and other factors described in the Debtors' SEC filings. Accordingly, the Debtors cannot give any assurance that their expectations will in fact occur and caution that actual results may differ materially from those in the forward-looking statements. All forward-looking statements attributable to the Debtors or Persons or Entities acting on their behalf are expressly qualified in their entirety by the cautionary statements set forth in this Disclosure Statement. Forward-looking statements speak only as of the date on which they are made. Except as required by law, the Debtors expressly disclaim any obligation to revise or update any forward-looking statement, or to make any other forward-looking statements, whether as a result of new information, future events, or otherwise.

*[Remainder of Page Intentionally Left Blank]*

**TABLE OF CONTENTS**

I.      Executive Summary ...................................................................................................................1

    A.      Purpose of this Disclosure Statement and the Plan. ...................................................1
    B.      Overview of the Transactions Contemplated by the Plan. ..........................................1
    C.      Summary of Treatment of Claims and Interests and Description of Recoveries under the Plan. ............................................................................................................................2
    D.      Voting on the Plan.......................................................................................................4
    E.      Confirmation and Consummation of the Plan.............................................................5

        1.      Confirmation Hearing. ...................................................................................5
        2.      Effect of Confirmation and Consummation of the Plan..................................6

    F.      Additional Plan-Related Documents. ..........................................................................6

II.     The Debtors' Business Operations and Capital Structure ..........................................................6

    A.      Corporate History. .......................................................................................................6
    B.      The Company's Business. ............................................................................................7
    C.      The Debtors' Operations. ............................................................................................7
    D.      The Debtors' Prepetition Capital Structure. ...............................................................8

        1.      ABL Facility. ..................................................................................................8
        2.      First Lien Notes. .............................................................................................9
        3.      Second Lien Notes. ........................................................................................10
        4.      Foreign Credit Lines. ....................................................................................10
        5.      Receivables Facilities. ..................................................................................11
        6.      Intercompany Financing. ..............................................................................12

III.    Key Events Leading to Chapter 11 ..........................................................................................12

    A.      Excess Leverage and the Failed Canadian IPO ........................................................12
    B.      Delayed Sales and COVID-19 ..................................................................................13
    C.      Negotiations with Key Stakeholders .........................................................................13

IV.     The Debtors' Proposed Restructuring: Key Components...........................................................14

    A.      The Restructuring Support Agreement and the Plan..................................................14
    B.      The Debtors' Proposed Disclosure Statement and Solicitation Process.....................17
    C.      New MIP ....................................................................................................................17
    D.      The Debtors' First-Day Motions and Certain Related Relief.....................................17

        1.      Operational First-Day Pleadings. ..................................................................17
        2.      Postpetition Financing. ..................................................................................18
        3.      Motion To Approve Solicitation Procedures and Confirm the Plan. ..............18

    E.      Other Requested First-Day Relief and Retention Applications..................................18

V.      Summary of the Plan ...............................................................................................................18

    A.      Treatment of Unclassified Claims. ............................................................................19

        1.      DIP Facility Claims. ......................................................................................19
        2.      Administrative Claims. ..................................................................................19
        3.      Professional Fee Claims.................................................................................19
        4.      Priority Tax Claims........................................................................................21
        5.      Statutory Fees. ..............................................................................................21

    B.      Classification and Treatment of Claims and Interests. ..............................................21

        1.      Classification of Claims and Interests............................................................21
        2.      Treatment of Classes of Claims and Interests. ...............................................22
        3.      Class 1 — Other Secured Claims....................................................................22

|  |  | 4. | Class 2 — Other Priority Claims | 22 |
|  |  | 5. | Class 3 — First Lien Notes Claims | 23 |
|  |  | 6. | Class 4 — Second Lien Notes Claims | 23 |
|  |  | 7. | Class 5 — Foreign Credit Line Claims | 24 |
|  |  | 8. | Class 6 — General Unsecured Claims | 24 |
|  |  | 9. | Class 7 — Debtor Intercompany Claims | 25 |
|  |  | 10. | Class 8 — Non-Debtor Intercompany Claims | 25 |
|  |  | 11. | Class 9 — Intercompany Interests | 25 |
|  |  | 12. | Class 10 — Existing Pyxus Interests | 26 |
|  | **C.** | Means for Implementation of the Plan. | | 26 |
|  |  | 1. | General Settlement of Claims and Interests. | 26 |
|  |  | 2. | Restructuring Transactions. | 26 |
|  |  | 3. | Sources of Consideration for Plan Distributions | 27 |
|  |  | 4. | New Shareholders Agreement. | 29 |
|  |  | 5. | Exemption from Registration Requirements. | 29 |
|  |  | 6. | Corporate Existence. | 30 |
|  |  | 7. | Corporate Action. | 30 |
|  |  | 8. | Vesting of Assets in the Reorganized Debtors | 31 |
|  |  | 9. | Cancellation of Facilities, Notes, Instruments, Certificates, and Other Documents. | 31 |
|  |  | 10. | Effectuating Documents; Further Transactions. | 31 |
|  |  | 11. | Exemptions from Certain Taxes and Fees. | 32 |
|  |  | 12. | New Pyxus Constituent Documents. | 32 |
|  |  | 13. | Directors and Officers. | 32 |
|  |  | 14. | New MIP. | 33 |
|  |  | 15. | Preservation of Causes of Action. | 33 |
|  |  | 16. | Executory Contracts and Expired Leases. | 33 |
|  | **D.** | Conditions to Consummation of the Plan. | | 37 |
|  |  | 1. | Conditions Precedent to the Effective Date. | 37 |
|  |  | 2. | Waiver of Conditions Precedent to Confirmation or the Effective Date. | 38 |
|  |  | 3. | Substantial Consummation. | 38 |
|  |  | 4. | Effect of Non-Occurrence of Conditions to Consummation. | 38 |
|  | **E.** | Settlement, Release, Injunction, and Related Provisions. | | 38 |
|  |  | 1. | Compromise and Settlement of Claims, Interests, and Controversies. | 38 |
|  |  | 2. | Binding Effect. | 39 |
|  |  | 3. | Discharge of Claims. | 39 |
|  |  | 4. | Release of Liens. | 39 |
|  |  | 5. | Debtor Release. | 39 |
|  |  | 6. | Third-Party Release. | 40 |
|  |  | 7. | Exculpation. | 41 |
|  |  | 8. | Injunction. | 41 |
| **VI.** | Confirmation of the Plan | | | 42 |
|  | **A.** | The Confirmation Hearing. | | 42 |
|  | **B.** | Deadline to Object to Approval of the Disclosure Statement and Confirmation of the Plan. | | 42 |
|  | **C.** | Requirements for Approval of the Disclosure Statement. | | 42 |
|  | **D.** | Requirements for Confirmation of the Plan. | | 42 |
|  |  | 1. | Requirements of Section 1129(a) of the Bankruptcy Code. | 42 |
|  |  | 2. | The Debtor Release, Third-Party Release, Exculpation, and Injunction Provisions. | 43 |
|  |  | 3. | Best Interests of Creditors—Liquidation Analysis. | 44 |

|  |  | 4. | Feasibility/Financial Projections. | 45 |
|  |  | 5. | Acceptance by Impaired Classes. | 45 |
|  |  | 6. | Confirmation Without Acceptance by All Impaired Classes. | 45 |
|  |  | 7. | Valuation of the Debtors. | 47 |
| **VII.** | Voting Instructions | | | 47 |
|  | **A.** | Overview. | | 47 |
|  | **B.** | Solicitation Procedures. | | 47 |
|  |  | 1. | Solicitation Agent. | 47 |
|  |  | 2. | Solicitation Package. | 47 |
|  |  | 3. | Voting Deadline. | 47 |
|  |  | 4. | Distribution of the Solicitation Package and Plan Supplement. | 48 |
|  | **C.** | Voting Procedures. | | 48 |
|  | **D.** | Voting Tabulation. | | 49 |
|  | **E.** | Equityholder Opt-Out Forms. | | 50 |
|  | **F.** | Second Lien Notes Stock Election Forms. | | 51 |
| **VIII.** | Risk Factors | | | 51 |
|  | **A.** | Risks Related to the Restructuring. | | 52 |
|  |  | 1. | The Restructuring May Take Longer Than Anticipated. | 52 |
|  |  | 2. | The Debtors Will Consider All Available Restructuring Alternatives if the Restructuring Transactions are not Implemented, and Such Alternatives May Result in Lower Recoveries for Holders of Claims Against the Debtors. | 52 |
|  |  | 3. | Even if the Restructuring Transactions are Successful, the Debtors Will Continue to Face Risks. | 52 |
|  |  | 4. | Risks Related to Confirmation and Consummation of the Plan. | 52 |
|  | **B.** | Risks Related to Recoveries Under the Plan. | | 55 |
|  |  | 1. | The Debtors May Not Be Able to Achieve Their Projected Financial Results or Meet Their Post-Restructuring Debt Obligations. | 55 |
|  |  | 2. | Estimated Valuations of the Debtors, the New Common Stock and the Exit Secured Notes and Estimated Recoveries to Holders of Allowed Claims and Interests Are Not Intended to Represent Potential Market Values. | 56 |
|  |  | 3. | Certain Tax Implications of the Debtors' Bankruptcy and Reorganization May Increase the Tax Liability of the Reorganized Debtors. | 56 |
|  | **C.** | Risks Related to the Offer and Issuance of Securities Under the Plan. | | 56 |
|  |  | 1. | The Consideration Under the Plan Does Not Reflect any Independent Valuation of Claims against or Interests in the Debtors. | 56 |
|  |  | 2. | A Decline in the Reorganized Debtors' Credit Ratings Could Negatively Affect the Reorganized Debtors' Ability to Access the Capital Markets in the Future. | 56 |
|  |  | 3. | Risks Related to the Exit Term Facility | 57 |
|  |  | 4. | The Debtors Do Not Intend to Register or to Offer to Exchange the New Common Stock or the Exit Secured Notes in a Registered Exchange Offer. | 57 |
|  |  | 5. | Implied Valuation of New Common Stock and Exit Secured Notes Not Intended to Represent Trading Value of New Common Stock Exit Secured Notes, as Applicable | 58 |
|  |  | 6. | Risks Related to the New Common Stock. | 58 |
|  |  | 7. | The Debtors May Not Be Able to Secure A Commitment for the Exit ABL Facility. | 59 |
|  |  | 8. | Risks Related to the Exit Secured Notes. | 60 |
|  | **D.** | Risk Factors Related to the Business Operations of the Company and Reorganized Debtors. | | 63 |

1.    Global or regional health pandemics or epidemics, including COVID-19, could negatively impact the Company's business operations, financial performance and results of operations. .................................................................................63

2.    The Company's reliance on a small number of significant customers may adversely affect its financial statements...............................................................65

3.    The Company may not have access to available capital to finance our local operations in non-U.S. jurisdictions.............................................................65

4.    Failure of foreign banks in which the Company's subsidiaries deposit funds or the failure to transfer funds or honor withdrawals may affect its results of operations...........................................................................................65

5.    Continued vertical integration by the Company's customers could materially adversely affect its financial statements.....................................................65

6.    Suppliers who have historically grown tobacco and from whom the Company has purchased tobacco may elect to grow other crops instead of tobacco, which affects the world supply of tobacco and may impact the Debtors' quarterly and annual financial performance......................................................................66

7.    The Company faces increased risks of doing business due to the extent of its international operations...............................................................................66

8.    The Company's investments in new business lines as part of its transformational business strategy have been in companies with limited histories that are operating in newly developing markets and are subject to numerous risks and uncertainties. ........................................................................................66

9.    The Company expects to incur significant ongoing costs and obligations related to its investment in infrastructure, growth, regulatory compliance, and operations of the new business lines. ..........................................................67

10.    Changing consumer preferences may adversely affect consumer retention and results of operations. ..............................................................................67

11.    The industries in which the new business lines operate are highly regulated, require regulatory approvals or licensing and the Company may not always succeed in complying fully with applicable regulatory requirements and obtaining required approvals and licenses in all jurisdictions where the Company carries on business. ....................................................................................67

12.    The Company and its U.S. subsidiaries may be unable to receive any funds generated by the Company's Canadian cannabis subsidiaries and such funds may not be used to fund the payment of obligations of our U.S. based operations................................................................................................68

E.    Miscellaneous Risks and Disclaimers. .........................................................69

1.    The Financial Information Is Based on the Debtors' Books and Records and, Unless Otherwise Stated, No Audit Was Performed. ......................................69

2.    No Legal or Tax Advice Is Provided By This Disclosure Statement................................69

3.    No Admissions Made. ...............................................................................69

4.    Failure to Identify Litigation Claims or Projected Objections. .........................................69

5.    Information Was Provided by the Debtors and Was Relied Upon by the Debtors' Advisors. ................................................................................................69

6.    No Representations Outside This Disclosure Statement Are Authorized.......................69

IX.    Important Securities Laws Disclosures ..............................................................70

A.    Plan Consideration. ..................................................................................70

B.    Exemption from Registration Requirements; Issuance and Resale of New Common Stock, and Exit Secured Notes; Definition of "Underwriter" Under Section 1145(b) of the Bankruptcy Code. ......................................................................................70

1.    Exemption from Registration Requirements; Issuance and Resale of New Common Stock, and Exit Secured Notes. ..................................................................70

2.    Definition of "Underwriter" Under Section 1145(b) of the Bankruptcy Code;

|  |  | Implications for Resale of New Common Stock and Exit Secured Notes. | 71 |
| **C.** |  | Private Placement Exemptions. | 72 |
| **X.** |  | Certain United States Federal Tax Consequences of the Plan | 73 |
| **A.** |  | Introduction. | 74 |
| **B.** |  | Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors and the Reorganized Pyxus. | 75 |
|  | **1.** | Cancellation of Debt and Reduction of Tax Attributes. | 75 |
|  | **2.** | Limitation of NOL Carryforwards and Other Tax Attributes. | 76 |
| **C.** |  | Certain U.S. Federal Income Tax Consequences of the Plan to U.S. Holders of Allowed Second Lien Notes Claims, Allowed First Lien Notes Claims and Existing Pyxus Interests. | 78 |
|  | **1.** | U.S. Federal Income Tax Consequences of the Consummation of the Plan. | 78 |
|  | **2.** | U.S. Federal Income Tax Consequences of Owning and Disposing of the New Common Stock. | 83 |
|  | **3.** | U.S. Federal Income Tax Consequences of Owning and Disposing of the Exit Secured Notes. | 83 |
|  | **4.** | Limitation of Use of Capital Losses. | 84 |
| **D.** |  | Certain U.S. Federal Income Tax Consequences of the Plan to Non-U.S. Holders of Allowed Second Lien Notes Claims, Allowed First Lien Notes Claims and Existing Pyxus Interests. | 85 |
|  | **1.** | U.S. Federal Income Tax Consequences to Non-U.S. Holders of Allowed Second Lien Notes Claims and Allowed First Lien Notes Claims. | 85 |
|  | **2.** | U.S. Federal Income Tax Consequences to Non-U.S. Holders of Existing Pyxus Interests. | 87 |
|  | **3.** | U.S. Federal Income Tax Consequences to Non-U.S. Holders of Owning and Disposing of New Common Stock. | 87 |
|  | **4.** | U.S. Federal Income Tax Consequences to Non-U.S. Holders of Payments of Interest and Owning and Disposing of Exit Secured Notes. | 89 |
| **E.** |  | Information Reporting and Backup Withholding | 89 |
| **F.** |  | FATCA | 89 |
| **XI.** |  | Recommendation | 90 |

### EXHIBITS

Exhibit A       Plan of Reorganization

Exhibit B       Corporate Structure of the Debtors

Exhibit C       Restructuring Support Agreement

Exhibit D       Financial Projections

Exhibit E       Valuation Analysis

Exhibit F       Liquidation Analysis

# I.    Executive Summary

**A.    Purpose of this Disclosure Statement and the Plan.**

Pyxus International, Inc. ("***Pyxus***") and certain of its direct and indirect subsidiaries, as debtors and debtors-in-possession (collectively, with Pyxus, the "***Debtors***", and together with their non-Debtor subsidiaries and affiliates, the "***Company***"), submit this Disclosure Statement pursuant to sections 1125 and 1126 of the Bankruptcy Code to Holders of Class 3 First Lien Notes Claims and Class 4 Second Lien Notes Claims against certain of the Debtors in connection with the Solicitation of the Plan. A copy of the Plan is attached hereto as <u>Exhibit A</u> and incorporated herein by reference.[1] The Plan constitutes a separate chapter 11 plan for each of the Debtors.

**THE DEBTORS BELIEVE THAT THE COMPROMISES AND SETTLEMENTS CONTEMPLATED BY THE PLAN ARE FAIR AND EQUITABLE, MAXIMIZE THE VALUE OF THE DEBTORS' ESTATES, AND MAXIMIZE RECOVERIES TO HOLDERS OF CLAIMS. THE DEBTORS BELIEVE THE PLAN IS THE BEST AVAILABLE ALTERNATIVE FOR IMPLEMENTING A RESTRUCTURING OF THE DEBTORS' BALANCE SHEET. THE DEBTORS STRONGLY RECOMMEND THAT YOU VOTE TO <u>ACCEPT</u> THE PLAN.**

**B.    Overview of the Transactions Contemplated by the Plan.**

The Debtors will commence chapter 11 cases (the "***Chapter 11 Cases***") in the United States Bankruptcy Court for the District of Delaware (the "***Bankruptcy Court***") in order to implement financial restructuring transactions (the "***Restructuring Transactions***") that will eliminate approximately $440 million of net indebtedness from their balance sheet and provide the Debtors and Reorganized Debtors at least $260 million of new working capital. Critically, the Restructuring Transactions and the Plan will not impair any of the lenders to the Company's foreign operating subsidiaries, none of which are debtors in the Chapter 11 Cases, nor will the Company's global workforce, vendors or customers be impaired under the Plan.

The Debtors will seek joint administration of the Chapter 11 Cases for procedural purposes and, upon commencement of the Chapter 11 Cases, will file the Plan, this Disclosure Statement, a motion seeking to approve the Disclosure Statement and proposed Solicitation process, and motions seeking first-day relief.

On June 14, 2020, the Debtors, certain Holders of greater than 92% of the First Lien Notes Claims (the "***Consenting First Lien Noteholders***") and certain Holders of greater than 67% of the Second Lien Notes Claims (the "***Consenting Second Lien Noteholders***") entered into the Restructuring Support Agreement attached hereto as <u>Exhibit C</u> (as may be amended, supplemented, or otherwise modified from time to time in accordance with its terms, the "***Restructuring Support Agreement***"), that sets forth the principal terms of the Restructuring Transactions and requires the Consenting First Lien Noteholders and the Consenting Second Lien Noteholders to support the Plan.

As set forth in the Plan, the Restructuring Transactions provide for a comprehensive restructuring of a significant portion of the Claims against and Interests in the Debtors by replacing or refinancing in full the First Lien Notes and by equitizing or distributing Cash on account of the Second Lien Notes. Holders of at least 67% of the Second Lien Notes have elected the Second Lien Notes Stock Option. Holders of Second Lien Notes that do not elect the Second Lien Notes Stock Option will receive Cash in an amount equal to 2.00% of the principal amount of their Second Lien Notes.

A lynchpin of the Restructuring Transactions and the Plan, is a $206.7 million debtor-in-possession financing facility (the "***DIP Facility***") that provides critical working capital to the Company during the Chapter 11 Cases and that will convert upon emergence (together with certain fees) into the Exit Term Facility. Each Holder of a DIP Facility

---

[1] This Disclosure Statement incorporates the rules of interpretation located in Article I of the Plan. **Any summary provided in this Disclosure Statement of any documents attached to this Disclosure Statement, including the Plan, is qualified in its entirety by reference to the Plan, the exhibits, and other materials referenced in the Plan, the Plan Supplement, and the documents being summarized. In the event of any inconsistencies between the terms of this Disclosure Statement and the Plan, the Plan shall govern.**

Claim will also receive its ratable portion of the Exit Facility Shares, consisting of approximately 44.44% shares of New Common Stock issued on the Effective Date subject to dilution by New Common Stock issued on account of the New MIP. Eligible Holders of Second Lien Notes Claims can ratably participate in 87.5% of the DIP Facility subject to subscription terms, conditions, and procedures to be distributed following the Petition Date. The subscription period will be held open for ten days following entry of the Interim DIP Order and certain members of the Ad Hoc Crossholder Group (the "***Initial Commitment Parties***") have committed to fund the Debtors' interim borrowings under the DIP Facility and certain of the Initial Commitment Parties (the "***Financing Commitment Parties***") have committed to fund any unsubscribed portion of the DIP Facility remaining after the subscription period expires.[2]

The Debtors' existing ABL Facility will be refinanced by the DIP Facility, and upon emergence, the Reorganized Debtors will enter into a new exit ABL revolving or term loan facility having commitments of not less than $60 million (the "***Exit ABL Facility***"). The Exit ABL Facility may be provided by new third party lenders or by the Company's existing creditors.

Existing Pyxus Interests will be discharged and cancelled on the Effective Date, but Holders of Pyxus Common Stock that (i) do not opt out of the releases contained in Article VIII.F of the Plan pursuant to the Equityholder Opt-Out Form and (ii) do not otherwise oppose, object to, or seek to impede or delay confirmation of the Plan will receive their ratable share of $1,000,000 in Cash on the Effective Date.

The Company recognizes the importance of its business partners around the world, including its joint venture counterparties and lenders under the Foreign Credit Lines, and structured the Restructuring Transactions to have no impact on those critical relationships. Other than the Holders of the First Lien Notes Claims and Second Lien Notes Claims (who overwhelmingly support the Plan pursuant to the Restructuring Support Agreement), the Debtors' other creditors (including employees, vendors, and general unsecured claim holders) will be paid in full or otherwise receive such treatment to render them unimpaired. The Company's foreign operations, including the Foreign Credit Lines, are unaffected by these Chapter 11 Cases and will continue uninterrupted.

The Plan and Restructuring Transactions, therefore, implement a significant deleveraging with the overwhelming support of the largest creditors that allows the Company to fully pay its employees and vendors and continue to focus on its traditional business strengths while pursuing new markets.

As described below, you are receiving this Disclosure Statement because you are a Holder of a Claim entitled to vote to accept or reject the Plan. **Prior to voting on the Plan, you are encouraged to read this Disclosure Statement and all documents attached to this Disclosure Statement in their entirety. As reflected in this Disclosure Statement, there are risks, uncertainties, and other important factors that could cause the Debtors' actual performance or achievements to be materially different from those they may project, and the Debtors undertake no obligation to update any such statement. Certain of these risks, uncertainties, and factors are described in <u>Section VIII</u> of this Disclosure Statement, entitled "Risk Factors."**

**C.      Summary of Treatment of Claims and Interests and Description of Recoveries under the Plan.**

The Plan organizes the Debtors' creditor and equity constituencies into groups called "Classes." For each Class, the Plan describes: (1) the underlying Claim or Interest; (2) the recovery available to the Holders of Claims or Interests in that Class under the Plan; (3) whether the Class is Impaired or Unimpaired under the Plan; (4) the form of consideration, if any, that Holders in such Class will receive on account of their respective Claims or Interests; and (5) whether the Holders of Claims or Interests in such Class are entitled to vote to accept or reject the Plan.

The proposed distributions under the Plan are based upon a number of factors, including the Debtors' valuation and liquidation analyses. The valuation of the Reorganized Debtors as a going concern is based upon the value of the Debtors' assets and liabilities as of an assumed Effective Date of July 31, 2020 and incorporates various

---

[2] Further details regarding these DIP Facility syndication procedures are set forth in <u>Section IV.A.2</u> below and in the motion to approve the DIP Orders.

assumptions and estimates, as discussed in detail in the Valuation Analysis prepared by the Debtors, and together with their proposed financial advisor, RPA Advisors, LLC ("**RPA**"), and investment banker, Lazard Ltd. ("**Lazard**").

The table below provides a summary of the classification, description, treatment, and anticipated recovery of Claims and Interests under the Plan. This information is provided in summary form below for illustrative purposes only and is qualified in its entirety by reference to the provisions of the Plan. Any estimates of Claims or Interests in this Disclosure Statement may vary from the final amounts allowed by the Bankruptcy Court. Your ability to receive distributions under the Plan depends upon the ability of the Debtors to obtain Confirmation and meet the conditions necessary to consummate the Plan. The recoveries available to Holders of Claims are estimates and actual recoveries may materially differ based on, among other things, whether the amount of Claims actually Allowed exceeds the estimates provided below. In such an instance, the recoveries available to Holders of Allowed Claims could be materially lower when compared to the estimates provided below. To the extent that any inconsistency exists between the summaries contained in this Disclosure Statement and the Plan, the terms of the Plan shall govern.

For a more detailed description of the treatment of Claims and Interests under the Plan and the sources of satisfaction for Claims and Interests, see <u>Section V</u> of this Disclosure Statement, entitled "Summary of the Plan."

| | | | SUMMARY OF ESTIMATED RECOVERIES[3] | | |
|---|---|---|---|---|---|
| Class | Claim/Interest | Plan Treatment | Voting Rights | Projected[4] Amount of Allowed Claims or Interests | Projected Plan Recovery |
| 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) | $200,000 | 100% |
| 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) | $12,300,000 | 100% |
| 3 | First Lien Notes Claims | Impaired | Entitled to Vote | $275,000,000 | 100% |
| 4 | Second Lien Notes Claims | Impaired | Entitled to Vote | $635,686,000 | 30.3% |
| 5 | Foreign Credit Line Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) | $523,000,000 | 100% |
| 6 | General Unsecured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) | $21,700,000 | 100% |
| 7 | Debtor Intercompany Claims | Unimpaired/Impaired | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) | $280,000,000[5] | N/A |
| 8 | Non-Debtor Intercompany Claims | Unimpaired/Impaired | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) | $315,000,000[6] | N/A |
| 9 | Intercompany Interests | Unimpaired/Impaired | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) | N/A | N/A |
| 10 | Existing Pyxus Interests | Impaired | Not Entitled to Vote (Deemed to Reject) | N/A | 0% |

**D.  Voting on the Plan.**

Certain procedures will be used to collect and tabulate votes on the Plan, as summarized in Section VII of this Disclosure Statement, entitled "Voting Instructions." Readers should carefully read the voting instructions in Section VII herein.

Only Holders of First Lien Notes Claims and Second Lien Notes Claims, which are classified in Classes 3 and 4 under the Plan, are entitled to vote on the Plan (the "*Voting Classes*"). Holders of Claims in Classes 1, 2, 5, and 6 are conclusively presumed to accept the Plan because they are Unimpaired by the Plan. Holders of Interests in Class 10 are Impaired and deemed to reject. Holders of Claims or Interests in Classes 7, 8, or 9 are deemed to reject or presumed to accept the Plan because they are (1) Unimpaired under the Plan and presumed to accept the Plan, or (2) Impaired and entitled to no recovery under the Plan and deemed to reject the Plan.

---

[3] The estimated recoveries presented for Holders of First Lien Notes Claims and Second Lien Notes Claims are estimated recoveries to such Holders solely on account of their First Lien Notes Claims and Second Lien Notes Claims, respectively, and do not reflect consideration received by such Holders for any other Claims or in any other capacity, including in their capacity as a party to the Restructuring Support Agreement or as a Holder of DIP Facility Claims.

The recovery of Holders of Second Lien Notes Claims reflects the mid-point of total enterprise value of Reorganized Pyxus as set forth in the Valuation Analysis. The recovery for Holders making the Second Lien Notes Cash Option will be 2.00%.

[4] Unless otherwise indicated, all Claim amounts in this Disclosure Statement and accompanying exhibits are estimates as of the Petition Date, Classes 3 and 4 reflect outstanding principal only, and Class 5 reflects the approximate principal amount of the Foreign Credit Lines that is guaranteed by Pyxus.

[5] As of March 31, 2020.

[6] As of March 31, 2020.

**The Voting Deadline is 5:00 p.m., prevailing Eastern Time, on July 20, 2020.** To be counted as votes to accept or reject the Plan, a Ballot must be **actually received** on or before the Voting Deadline by Prime Clerk LLC ("***Prime Clerk***" or the "***Solicitation Agent***") as follows:

---

### DELIVERY OF BALLOTS

1.  Ballots must be actually received by the Solicitation Agent before the Voting Deadline (5:00 p.m. prevailing Eastern Time, on July 20, 2020).

2.  Ballots must be completed following the instructions received with the Ballot, so that such Holder's Ballot including their vote is actually received by the Voting Deadline.

If you have any questions on the procedures for voting on the Plan, please contact the Solicitation Agent by emailing pyxusballots@primeclerk.com and referencing "Pyxus Ballot Processing" in the subject line, or by calling 1-(844)-974-2130 (toll-free) or 1-(929)-955-3418 (international), and asking for the solicitation group.

---

**IF YOU HAVE ANY QUESTIONS ABOUT THE SOLICITATION OR VOTING PROCESS, PLEASE CONTACT THE SOLICITATION AGENT. ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE OR OTHERWISE NOT IN COMPLIANCE WITH THE VOTING INSTRUCTIONS WILL NOT BE COUNTED EXCEPT AS DETERMINED BY THE DEBTORS.**

### E.    Confirmation and Consummation of the Plan.

Under section 1128(a) of the Bankruptcy Code, the Bankruptcy Court, after notice, may hold a hearing to confirm a plan of reorganization. If the Debtors file the Chapter 11 Cases, they will file a motion on the Petition Date requesting that the Bankruptcy Court set a date and time as soon as practicable after the Petition Date for a hearing (such hearing, the "***Confirmation Hearing***") for the Bankruptcy Court to determine whether the Disclosure Statement contains adequate information under section 1125(a) of the Bankruptcy Code, whether the Debtors' prepetition solicitation of acceptances in support of the Plan complied with section 1126(b) of the Bankruptcy Code, and whether the Plan should be confirmed in light of both the affirmative requirements of the Bankruptcy Code and objections, if any, that are timely filed, as permitted by section 105(d)(2)(B)(2)(v) of the Bankruptcy Code. The Confirmation Hearing, once set, may be continued from time to time without further notice other than an adjournment announced in open court or a notice of adjournment filed with the Bankruptcy Court and served on those parties who have requested notice under Bankruptcy Rule 2002 and the Entities who have filed an objection to the Plan, if any, without further notice to parties in interest. The Bankruptcy Court, in its discretion and prior to the Confirmation Hearing, may put in place additional procedures governing the Confirmation Hearing. Subject to section 1127 of the Bankruptcy Code, the Plan may be modified, if necessary, prior to, during, or as a result of the Confirmation Hearing, without further notice to parties in interest.

Additionally, section 1128(b) of the Bankruptcy Code provides that any party in interest may object to Confirmation. The Debtors, in the same motion requesting a date for Confirmation of the Plan, will request that the Bankruptcy Court set a date and time for parties in interest to file objections to the adequacy of the Disclosure Statement, the Debtors' prepetition Solicitation of acceptances in support of the Plan, and Confirmation of the Plan. All such objections must be filed with the Bankruptcy Court and served on the Debtors and certain other parties in interest in accordance with the applicable order of the Bankruptcy Court so that they are received before the deadline to file such objections.

### 1.    Confirmation Hearing.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Disclosure Statement contains adequate information under section 1125(a) of the Bankruptcy Code, whether the Debtors' prepetition solicitation of acceptances in support of the Plan complied with section 1126(b) of the Bankruptcy Code, and whether the Plan should be confirmed in light of both the affirmative requirements of the Bankruptcy Code and objections, if any, that are timely filed, and subject to satisfaction or waiver of each condition precedent in Article IX of the Plan.

For a more detailed discussion of the Confirmation Hearing, see <u>Section VI</u> of this Disclosure Statement, entitled "Confirmation of the Plan."

### 2.        Effect of Confirmation and Consummation of the Plan.

Following Confirmation, and subject to satisfaction or waiver of each condition precedent in Article IX of the Plan, the Plan will be consummated on the Effective Date. Among other things, on the Effective Date, certain release, injunction, exculpation, and discharge provisions set forth in Article VIII of the Plan will become effective. Accordingly, it is important to read the provisions contained in Article VIII of the Plan very carefully so that you understand how Confirmation and Consummation—which effectuates such release, injunction, exculpation, and discharge provisions—will affect you and any Claim or Interest you may hold with respect to the Debtors so that you may cast your vote accordingly. These provisions are described in <u>Section V</u> of this Disclosure Statement.

### F.        Additional Plan-Related Documents.

The Debtors will file certain documents that provide more details about implementation of the Plan in the Plan Supplement, which will be filed with the Bankruptcy Court no later than seven calendar days before the Confirmation Objection Deadline and otherwise in accordance with the Restructuring Support Agreement. The Debtors will serve a notice that will inform all parties that the initial Plan Supplement was filed, list the information included therein, and explain how copies of the Plan Supplement may be obtained. Eligible Holders of Claims entitled to vote to accept or reject the Plan shall not be entitled to change their vote based on the contents of the Plan Supplement after the Voting Deadline. The Plan Supplement will include:

- the New Shareholders Agreement;

- the New Pyxus Constituent Documents;

- the identity of the members of the Reorganized Pyxus Board and the officers of Reorganized Pyxus;

- the Rejected Executory Contract and Unexpired Lease List, if any;

- the Exit Term Facility Agreement;

- the Exit ABL Credit Agreement;

- the Exit Secured Notes Indenture or, if applicable, the Replacement First Lien Financing Agreement; and

- any other necessary documentation related to the Restructuring Transactions.

*THE FOREGOING EXECUTIVE SUMMARY IS ONLY A GENERAL OVERVIEW OF THIS DISCLOSURE STATEMENT AND THE MATERIAL TERMS OF, AND TRANSACTIONS PROPOSED BY, THE PLAN AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO, AND SHOULD BE READ IN CONJUNCTION WITH, THE MORE DETAILED DISCUSSIONS APPEARING ELSEWHERE IN THIS DISCLOSURE STATEMENT AND THE EXHIBITS ATTACHED TO THIS DISCLOSURE STATEMENT, INCLUDING THE PLAN.*

## II.        The Debtors' Business Operations and Capital Structure

### A.        Corporate History.

In 2005, DIMON Incorporated and Standard Commercial Corporation merged to create Alliance One International, Inc., which later changed its name to Pyxus International, Inc. Its primary business has historically been as a tobacco leaf merchant, purchasing, processing, packing, storing and shipping tobacco to manufacturers of cigarettes and other consumer tobacco products throughout the world. Through its predecessors, the Company has a

long operating history in the leaf tobacco industry with some customer relationships beginning in the early 1900s. Alliance One's common stock was listed on The New York Stock Exchange in 1995.

In 2018, the Company began a transformation process designed to diversify its products and services by leveraging its core strengths in agronomy and traceability. This process included diversification into the production and sale of "e-liquids" for vapable products and CBD oil, which is a non-intoxicating extract from industrial hemp. Pyxus, through certain non-Debtor Affiliates, also took controlling stakes in two Canadian cannabis producers producing cannabis exclusively for sale in the Canadian market, where production for medicinal use has been legal since 2001 and recreational use has been federally legal since 2018. The Company operates its federally cannabis business lines primarily through joint ventures and Company-owned subsidiaries, none of which are Debtors in these Chapter 11 Cases.

**B.      The Company's Business.**

As of the date of Solicitation (the "***Solicitation Date***"), the Company purchases tobacco in more than 35 countries and ships to approximately 90 countries. The Company has approximately 3,564 employees, excluding approximately 4,710 seasonal employees as of the Solicitation Date. Most seasonal employees, as well as approximately 125 full-time factory personnel in the United States, are members of unions and covered by collective bargaining agreements.

The Company's operations are organized by product category and geographic area and aggregated into three segments: (i) Leaf – North America, (ii) Leaf – Other Regions, and (iii) Other Products and Services (also known as the Global Specialty Products). The Company has approximately 100 direct and indirect subsidiaries, including joint ventures which are consolidated on an equity basis in the Company's financial statements.

The "Leaf" segments cover the core business of purchasing, processing, packing, storing and shipping tobacco to manufacturers of cigarettes and other consumer tobacco products throughout the world. The Company's leaf tobacco operations deal primarily in flue-cured, burley, and oriental tobaccos that are used in international brand cigarettes. The Company purchases tobacco directly from suppliers and assumes the risk of matching the quantities and grades required by its customers to the entire crop it must purchase under contract.

In some markets, the Company buys tobacco from local entities that have purchased tobacco from their own suppliers and, in some cases, it also processes tobacco at its facilities for customers who need this service. The Company also supplies seeds, fertilizer, pesticides and other products related to growing tobacco to farmers on a short-term basis to assist in crop production. In an increasing number of markets, the Company also provides agronomy expertise to its contracted tobacco grower base for growing leaf tobacco, hemp, groundnuts and sunflower seeds.

A substantial portion of the Company's inventory is sourced abroad. Once purchased, the Company processes tobacco to meet each customer's specifications as to quality, yield, chemistry, particle size, moisture content and other characteristics. The processing of leaf tobacco facilitates shipping, prevents spoilage, and is an essential service to the Company's customers, because the quality of processed leaf tobacco substantially affects the quality of the manufacturer's end product. The Company processes tobacco in company-owned and third-party facilities around the world, including the United States, Argentina, Brazil, China, Zimbabwe, Jordan, Guatemala, India, Tanzania, Malawi, Thailand, Indonesia, Macedonia, Kenya and Turkey.

The "Other Products and Services" (also known as Global Specialty Products) segment is comprised of the new business lines, including hemp-derived CBD, flavors for multiple uses, "e-liquids" for electronic cigarettes and, in the Canadian market, federally legal cannabis. These business lines are primarily operated through various joint ventures and Company-owned subsidiaries, none of which are Debtors. The revenue from these product lines represent approximately 2% of total revenue for the fiscal year ending 2020.

**C.      The Debtors' Operations.**

The Company operates its businesses through the Debtors, other domestic and international subsidiaries and affiliates (collectively, the "***Non-Debtor Affiliates***") and domestic and international joint ventures. In addition to

housing certain domestic operations and assets, certain of the Debtors provide critical financial, logistical and administrative support to non-Debtor Affiliates.

Debtor Pyxus is the publicly-listed parent of the Company and employs senior management. One of its primary functions is distributing funds to its various subsidiaries, including from borrowings under the ABL Facility. Pyxus does not directly own or operate any factories or facilities. Debtor Alliance One International, LLC ("*AOI*") imports processed tobacco from foreign suppliers which it then sells to domestic customers. It also acquires domestic processed tobacco through an intercompany arrangement with Debtor Alliance One North America, LLC ("*AONA*"), which it exports to foreign customers. A portion of the receivables that AOI generates are sold to certain financial institutions through certain receivables facilities (the "***Receivables Facilities***"). Debtor GSP Properties leases office space in New York.

AONA purchases, processes, packs, stores, and ships tobacco to domestic manufacturers of cigarettes and other consumer tobacco products. Processing begins first by classifying flue-cured and burley tobacco according to grade. Tobacco is then blended to meet customer specifications regarding color, body and chemistry, threshed to remove the stem from the leaf and further processed to produce strips of tobacco and sieve out small scrap. AONA processes domestic tobacco, excluding both "cut rag" (described below) and cut-rolled expanded stem tobaccos. AONA's tobacco processing activities are comprised of (i) the purchase of U.S.-origin green tobacco from U.S. suppliers and (ii) the sale of U.S.-origin tobacco to U.S. customers or to AOI for export to non-U.S. customers. Debtor Alliance One Specialty Products LLC ("*AOSP*") houses the Company's cut rag operations, by which it turns strips of leaf tobacco into cut rag tobacco, the type used in traditional, cigarettes, cigars, roll your own products and pipe products. AOSP also indirectly holds the Company's interests in the North American non-Debtor joint ventures for "e-liquids" and vaping products.

**D.    The Debtors' Prepetition Capital Structure.**

As of the Solicitation Date, the Debtors' long-term debt obligations total in excess of $1.5 billion. The primary components of the Debtors' consolidated funded debt obligations outstanding as of the Solicitation Date are as follows:

| Type of Debt | Description | Maturity | Principal Outstanding |
|---|---|---|---|
| ABL Facility | Revolving credit facility based on eligible accounts receivable and eligible inventory | January 2021 | $44,900,000 |
| First Lien Notes | 8.5% senior secured first lien notes due 2021 | April 2021 | $275,000,000 |
| Second Lien Notes | 9.875% senior secured second lien notes due 2021 | July 2021 | $635,686,000 |
| Foreign Credit Lines | Uncommitted short-term seasonal lines of credit at the local level | Various | $557,000,000 |

The ABL Facility and the First Lien Notes share *pari passu* crossing liens on substantially all of the Debtor Obligors' (as defined below) assets. The ABL Facility has priority in respect of the ABL Priority Collateral and the First Lien Notes have priority in respect of the Notes Priority Collateral (each as defined below). The Second Lien Notes are secured by second priority liens on a portion of the ABL Priority Collateral and First Lien Notes Collateral, junior in each case to the liens securing the ABL Facility and First Lien Notes.

In addition, many of the Company's foreign subsidiaries (none of which are Debtors) borrow under seasonal lines of credit from local financial institutions (the "***Foreign Credit Lines***") to fund local operations, including the local purchase of tobacco. Pyxus guarantees a significant portion of the Foreign Credit Lines.

**1.    ABL Facility.**

On October 14, 2016, Pyxus entered into the ABL Credit Agreement (as amended, supplemented or otherwise modified from time to time, the "***ABL Credit Agreement***") with certain lenders (the "***ABL Lenders***") and Deutsche

Bank AG New York Branch, as Administrative Agent and Collateral Agent (the "**ABL Collateral Agent**"), establishing a senior secured revolving asset-based lending facility (the "**ABL Facility**") of $60 million subject to a borrowing base composed of its eligible accounts receivable and inventory.

The borrowing base is subject to customary reserves, which are established by the ABL Collateral Agent in its permitted discretion as set forth in the ABL Credit Agreement. As of the Petition Date, although the borrowing base is $77.9 million, only $44.9 million in principal amount of loans is currently outstanding. If Pyxus were to borrow more than $45 million, the ABL Collateral Agent would be permitted to impose cash dominion and sweep the Debtors' cash in its deposit accounts on a daily basis to repay the ABL Facility.

Pyxus' obligations as the borrower under the ABL Facility are (a) guaranteed by AOSP, AONA and AOI (collectively with Pyxus, the "**Debtor Obligors**") and (b) secured by substantially all of the Debtor Obligors' tangible and intangible assets, subject to certain exceptions and permitted liens (the "**Collateral**").

The ABL Collateral Agent, on behalf of the ABL Lenders, and the First Lien Indenture Trustee (as defined below), on behalf of the First Lien Noteholders, and Pyxus are party to the Senior Lien Intercreditor Agreement, dated as of October 14, 2016 (as amended, the "**Senior Lien Intercreditor Agreement**") which governs the respective rights and remedies of the ABL Lenders and First Lien Noteholders in respect of the Collateral. The Senior Lien Intercreditor Agreement gives the ABL Facility priority over the First Lien Notes in respect of Collateral consisting of accounts receivable, certain chattel paper, inventory, payment intangibles, certain investment property, cash (other than identifiable cash proceeds of the Notes Priority Collateral), deposit accounts, related general intangibles and instruments and proceeds of the foregoing (collectively, the "**ABL Priority Collateral**").

The ABL Facility is junior in priority to the First Lien Notes in respect of the remaining Collateral, including material owned real property in the United States, capital stock of subsidiaries owned directly by a Debtor Obligor (but only 65% of the voting capital stock of direct foreign subsidiaries), intellectual property rights, equipment, related general intangibles and instruments and proceeds of the foregoing (collectively, the "**Notes Priority Collateral**").

The ABL Facility matures on January 14, 2021 and bears interest at LIBOR plus 2.50% or Base Rate plus 1.50% (each such term as defined in the ABL Credit Agreement), exclusive of default interest of 2.00%.

Given the over-collateralization of the ABL Facility and its senior position regarding the Debtor Obligors' working capital assets, the Debtors are requesting authorization to use a portion of the DIP Facility to repay the ABL Facility in full.

## 2.    First Lien Notes.

On October 14, 2016, Pyxus issued $275 million in aggregate principal amount of 8.500% Senior Secured First Lien Notes due 2021 (the "**First Lien Notes**" and the holders thereof, the "**First Lien Noteholders**") pursuant to an Indenture (as amended, the "**First Lien Indenture**") between Pyxus and the Bank of New York Mellon Trust Company, N.A., as the indenture trustee and collateral agent (the "**First Lien Indenture Trustee**"). As of the Petition Date, there was approximately $275 million in principal amount outstanding under the First Lien Notes. Like the ABL Facility, the First Lien Notes are guaranteed by the Debtor Obligors and are secured by liens on the Collateral (see "ABL Facility" above for a discussion on the Collateral as shared between the ABL Facility and the First Lien Notes).

Pursuant to the Senior Lien Intercreditor Agreement, the First Lien Noteholders are deemed to consent to any debtor-in-possession financing that the ABL Collateral Agent consents (or otherwise does not object) to, even if such financing is secured by priming liens on the ABL Priority Collateral, so long as (among other conditions) such financing does not have senior priority to the First Lien Notes as to the Notes Priority Collateral.

The First Lien Notes bear interest at a rate of 8.50% per annum payable semi-annually in arrears in cash on April 15 and October 15 of each year, subject to an additional 1.00% of default interest, on demand, following the occurrence of a payment default.

The First Lien Notes mature on April 15, 2021. If the First Lien Notes are voluntarily redeemed by Pyxus prior to October 15, 2020, they are subject to a redemption premium equal to 2.125% of the principal amount of the redeemed notes. Thereafter, the First Lien Notes can be redeemed with no premium.

3.       **Second Lien Notes.**

On August 1, 2013, Pyxus issued $735 million in aggregate principal amount of 9.875% senior secured second lien notes due 2021 (the "*Second Lien Notes*" and the holders thereof, the "*Second Lien Noteholders*") pursuant to an Indenture (as amended, supplemented or otherwise modified from time to time, the "*Second Lien Indenture*") between Pyxus and Wilmington Trust, National Association as the successor trustee and collateral trustee (the "*Second Lien Indenture Trustee*"). As of the Petition Date, there was $635,686,000 in principal amount outstanding under the Second Lien Notes.

The Second Lien Notes are guaranteed by AONA and AOI (together with Pyxus, the "*Debtor Second Lien Notes Obligors*"). The Second Lien Notes are secured by liens on the ABL Priority Collateral of the Debtor Second Lien Notes Obligors as well as certain capital stock of subsidiaries and the "cut rag" processing facility located in North Carolina, which facility is part of the Notes Priority Collateral. The ABL Collateral Agent, on behalf of the ABL Lenders, and the First Lien Indenture Trustee, on behalf of the First Lien Noteholders, and the Second Lien Indenture Trustee, on behalf of the Second Lien Noteholders are party to the  Junior Lien Intercreditor Agreement, dated as of August 1, 2013 (as amended, the "*Junior Lien Intercreditor Agreement*"), which governs the rights and remedies of the ABL Lenders, First Lien Noteholders and Second Lien Noteholders in respect of the Collateral. Under the Junior Lien Intercreditor Agreement, the liens securing the Second Lien Notes are junior to the liens securing both the ABL Facility and the First Lien Notes.[7]

The Second Lien Notes bear interest at a rate of 9.875% per annum, payable semi-annually in arrears in cash on January 15 and July 15 of each year. The Second Lien Notes are subject to an additional 1.00% of default interest following the occurrence of a payment default. The Second Lien Notes mature on July 15, 2021.

4.       **Foreign Credit Lines.**

Certain of the Company's foreign Non-Debtor Affiliates (the "*Foreign Borrowers*") borrow under the Foreign Credit Lines. The Company uses the proceeds from these facilities to purchase tobacco from local farmers and run operations including production facilities in Africa, Europe and South America. The Foreign Borrowers occasionally purchase seeds, fertilizers, pesticides and other products related to growing tobacco, and provide them to farmers in these regions with which the Foreign Borrowers have contracts to purchase the resulting tobacco crop. The resulting crop is then purchased and marketed by the Company. The Foreign Credit Lines are typically seasonal in nature, normally extending for a term of 180 to 270 days corresponding to the tobacco crop cycle in the applicable location.

---

[7] The Junior Lien Intercreditor Agreement provides that Second Lien Noteholders are deemed to consent to any debtor-in-possession financing that the ABL Collateral Agent consents (or otherwise does not object) to, even if such financing is secured by priming liens on the ABL Priority Collateral and/or Notes Priority Collateral.

As of May 31, 2020, approximately $557 million is drawn and outstanding under the Foreign Credit Lines. Approximately 35 Foreign Credit Lines are currently available, spread among approximately 30 lenders, the four largest of which are identified in the following table:

| Lender | Amount Outstanding as of the Solicitation Date (in millions) |
|---|---|
| Eastern & Southern African Trade & Development Bank (TDB) | $269.6 |
| Banco do Brasil SA | $106.3 |
| Industrial and Commercial Bank of China (ICBC) | $56.0 |
| Standard Bank of South Africa Limited | $33.0 |

The Foreign Credit Lines may be unsecured or secured by certain assets of the Foreign Borrowers, consisting primarily of receivables and tobacco inventory on hand. Although none of the Foreign Borrowers are Debtors, Pyxus guaranties approximately 95% of the outstanding principal of the Foreign Credit Lines.

Many of the Foreign Credit Lines are uncommitted, demand facilities. This gives Foreign Credit Line lenders the right to stop making loans or require payment on demand at any time. The Company customarily renews the Foreign Credit Lines at the start of the tobacco crop season in the relevant country.

Certain of the lenders under the Foreign Credit Lines renewed their commitments prior to the Solicitation Date but included covenants in respect of these Chapter 11 Cases, while others entered into limited waiver agreements or amendments in respect of termination events that may be caused by the commencement of these cases and related consequences. However, a protracted bankruptcy proceeding could nonetheless trigger events of defaults that would permit those lenders to terminate their facilities and exercise remedies against collateral that is crucial to the Company's ongoing operations.

5.    **Receivables Facilities.**

The Company relies on certain facilities to monetize accounts receivables given the delay between shipping its products and receiving payments from customers. Pyxus, AOI and AONA, all of whom are Debtors, are sellers under that certain Third Amended and Restated Receivables Purchase Agreement, dated as of December 21, 2018, and Alliance One International GmbH ("**AOI GmbH**"), a Non-Debtor Affiliate, is a seller under that certain Fourth Amended and Restated Receivables Purchase Agreement, dated as of December 21, 2018 (as amended, supplemented or otherwise modified from time to time, collectively, "**Finacity RPAs**"). Finacity Receivables 2006-2, LLC (the "**Finacity Purchaser**") purchases all right, title and interest to the receivables sold by Pyxus, AOI, AONA and AOI GmbH under the Finacity RPAs and then enters into back-to-back sales with certain financial institutions. The Finacity Purchaser purchases the receivables under the Finacity RPAs for a discount to the face amount, of which a portion is paid up front with the balance deferred. The sale of receivables under the Finacity RPAs have been structured as a true sale and are non-recourse to the sellers, subject to certain customary repurchase obligations for (among other things) breaches of representations and warranties by the Company sellers. As of the week of June 8, 2020, approximately $80 million was outstanding under the Finacity RPAs.

Pyxus and AOI GmbH are also sellers under that certain Amendment and Restatement Agreement, dated December 2, 2016 (as amended, supplemented or otherwise modified from time to time, the "**Standard Bank RPA**" together with the Finacity RPAs, the "**Securitization Facilities**"), with Standard Bank of South Africa Limited ("**Standard Bank**"). The Standard Bank RPA is a $125 million uncommitted receivables facility. As of the week of June 8, 2020, approximately $20 million was outstanding under the Standard Bank RPA. Similar to the Finacity RPAs, these purchases are structured as true sales, without recourse to Pyxus or AOI GmbH, subject to certain customary repurchase obligations for (among other things) failure by either of the Company sellers to perform their obligations under the applicable sales contract. The receivables are purchased at a discount to the invoiced amount less any

applicable fees and discounts. Upon payment of the invoice by the customer to Standard Bank, the sellers are entitled to receive agreed-upon additional amounts paid by the customer to Standard Bank in respect of such invoice. In general, the Company financed approximately 5% of all receivables through the Standard Bank RPA in fiscal year 2020. The Standard Bank RPA expires by its terms on December 6, 2020.

These Chapter 11 Cases trigger termination events under each of the Receivables Facilities. Because the Receivables Facilities are a critical source of liquidity for the Company, prior to the Petition Date, Pyxus approached the counterparties under the Receivables Facilities and successfully obtained waivers and/or amendments necessary to continue the availability of the Receivables Facilities during these Chapter 11 Cases and, in the case of the Finacity RPAs, reached an agreement to renew the facility for another two years, subject to entry of an interim order in respect thereof by the Court. However, the extension of the Finacity RPAs is tied to bankruptcy milestones and other bankruptcy-related defaults that will be triggered if the Chapter 11 Cases are not completed by September 3, 2020. Similarly, the prepetition amendments to the Standard Bank RPA require the consummation of the restructuring within a certain timeline.

###### 6.    Intercompany Financing.

The Debtors, in the ordinary course of business, engage in intercompany transactions among themselves and their Non-Debtor Affiliates, which typically result in intercompany accounts receivables and payables and intercompany loans.

The costs and revenues associated with these intercompany transactions are accounted for among the legal entities and result in intercompany claims that are tracked electronically in their accounting system and can be ascertained, traced and accounted for as needed. This system of intercompany transactions is important to the Debtors' ability to manage their cash flow and to support the operations of Non-Debtor Affiliates.

### III.    Key Events Leading to Chapter 11.

#### A.    Excess Leverage and the Failed Canadian IPO

Pyxus (f/k/a Alliance One International, Inc.) was formed by the merger of DIMON Incorporated and Standard Commercial Corporation in 2005. At the time, both companies had significant amounts of corporate debt, which the merged Company has continued to carry and service. In 2013 and 2016, Pyxus issued the Second Lien Notes and First Lien Notes, respectively, to refinance some of that legacy debt and for working capital. In 2016, Pyxus also entered into the ABL Facility to fund working capital expenses. Each year, the Debtors pay approximately $85 million in interest on these facilities, which imposes a significant burden on their free cash flow.

The First Lien Notes, Second Lien Notes and ABL Facility were scheduled to mature by July, 2021, but in reality needed to be refinanced by June 2020, when the Company's annual financial statements were to be published.[8] Absent a refinancing by June, 2020, the Company's independent auditors likely would have included a "going concern qualification" in the annual financial statement, which would have triggered events of default or caused Foreign Credit Line lenders not to renew.

In order to address its "maturity wall," the Company began developing a refinancing strategy in 2018; however, its options were limited due to its leverage metrics. Net income remained fairly flat during this period for a number of reasons, including the strengthening U.S. dollar and the U.S.-China trade dispute. As a consequence, the Company's debt to EBITDA ratio – a common metric for leverage – remained high and existing cash flow would not support a traditional refinancing of the First Lien Notes and Second Lien Notes.

To address that issue, the Company attempted to capitalize on the growth of its new and growing Global Specialty Products business lines to raise capital. Beginning in mid-2019, the Company tried to take advantage of a strong market for "cannabis" companies in Canada and began preparing for a potential initial public offering of its Canadian cannabis business combined with its hemp and CBD business and e-liquids flavor and fragrance business.

---

[8] The Company's fiscal year ends on March 31st, with its 10-K due 75 days thereafter.

The Company moved quickly to take advantage of the positive market conditions: it engaged investment bankers in Canada and dedicated considerable resources to complete all the requisite regulatory filings. Unfortunately, there was a sudden and significant downturn in the public markets for Canadian cannabis companies and the Company's investment bankers determined an IPO was not feasible based on conditions in September and October 2019.

In reaction to those unfavorable market conditions, the Company pivoted, and began exploring private capital solutions. However, the offers it received were inadequate to address its refinancing needs. The Company pivoted again, and in late 2019, Pyxus pursued possible financing transactions, including a potential debt-for-debt exchange. However, a confluence of factors beyond the Company's control, most significantly the COVID-19 pandemic, made that effort impossible and catalyzed these Chapter 11 Cases.

## B.    Delayed Sales and COVID-19

In any given fiscal year, the Company sells a substantial portion of its tobacco between October and March. Because there is a significant delay between a sale and payment for such sale, the Company usually sells its receivables into the Receivables Facilities and uses the proceeds to repay the Foreign Credit Lines in Africa and South America in its fourth quarter (which ends March 31).

Unfortunately, the Company's sales in the third quarter of fiscal year 2020 were delayed, which triggered a liquidity shortfall just as it was preparing to repay the Foreign Credit Lines and renew its principal Receivables Facility maturing at the end of May.

While the Company typically would manage through the shortfall, the COVID-19 epidemic exacerbated the Company's already tenuous financial position. Starting in January 2020, exports from China to customers in other areas of the world began to become delayed. In early March, tobacco handling facilities across the globe were prohibited from operating, ports were closed and vessel callings slowed down, all resulting in valuable inventory and product being stuck in port. In addition, social distancing laws closed many of the retailers in which the Company sells its Global Specialty Products. The resulting revenue collapse triggered an unprecedented liquidity crisis. Ongoing uncertainty regarding US-China trade negotiations, COVID-19 impacts on the Company's customer requirements and consumers' economic and physical ability to purchase the Company's Global Specialty Products created future uncertainty as regards its business lines.

## C.    Negotiations with Key Stakeholders

Facing the perfect storm, the Company concluded new capital would not be available without a holistic recalibration of its balance sheet and that a Chapter 11 proceeding likely would be necessary to achieve that objective. While the Company continued to explore all strategic alternatives, an out-of-court solution presented numerous insurmountable challenges, including the lack of material unencumbered assets, the time frame needed to consummate a transaction and the ability to obtain the requisite level of support to consummate an exchange or voluntary maturity extension.

To assist with a potential restructuring, the Company retained Lazard as its investment banker, RPA as its financial advisor and Simpson Thacher & Bartlett LLP and Young Conaway Stargatt & Taylor ("**Young Conaway**") as special Delaware counsel. In March 2020, legal and financial advisors to certain First Lien Noteholders and Second Lien Noteholders (the "**Ad Hoc Crossholder Group**") entered into nondisclosure agreements with the Company, and soon thereafter, the Company and its advisors began negotiating the contours of a comprehensive restructuring. Following multiple rounds of negotiations, certain members of the Ad Hoc Crossholder Group entered into nondisclosure agreements as well.

In parallel with these negotiations, the Company began soliciting interest in debtor-in-possession and exit financing. The Debtors (with guidance from RPA and Lazard) estimated they needed at least $200 million of working capital during the Chapter 11 Cases to bridge the liquidity trough caused by COVID-19. In addition to seeking proposals from the current lenders, Lazard sent requests for proposal to over 35 third party institutions including existing lenders, large money-center banks, a number of sophisticated alternative investment institutions and certain of the Company's largest shareholders. Although a number of parties signed nondisclosure agreements, only two

potential lender groups, including one group composed of members of the Ad Hoc Crossholder Group, expressed sustained interest in providing a DIP Facility. After continued engagement and negotiation, members of the Ad Hoc Crossholder Group submitted the only viable proposal for a DIP Facility.

As part of a comprehensive Chapter 11 restructuring that would fully equitize the Second Lien Notes, the Ad Hoc Crossholder Group was willing to commit to the DIP Facility and agreed to have the obligations thereunder convert into an exit term facility on the effective date of the Plan. Over the course of several weeks, numerous proposals and counter-proposals were sent among advisors and principals on the terms of the DIP Facility and the restructuring more generally. The proposed DIP Facility consists of $206.7 million in new money (less upfront fees), of which $131.7 million (less upfront fees) would be available upon entry of the Proposed Interim Order, and the balance upon entry of the Final Order (each as defined in the DIP Motion).

Throughout the same period, the Company also negotiated with advisors and a group of Holders of First Lien Notes (the "***Ad Hoc First Lien Group***") and the Ad Hoc Crossholder Group regarding the treatment of the First Lien Notes. Members of the Ad Hoc First Lien Group favored a refinancing or, alternatively, better economic terms on the "take back" notes than the Debtors (and members of the Ad Hoc Crossholder Group) initially proposed. After several weeks, the parties settled on terms that balanced these competing interests: under the Plan the First Lien Notes (including a capitalized prepayment premium of $5.8 million) either will be exchanged for the Exit Secured Notes that have a longer term but higher interest rate than the First Lien Notes or will be repaid in full with Cash from proceeds of the Replacement First Lien Financing if the Debtors can secure commitments for such financing within 60 days of the Petition Date (and, in any event, prior to the Confirmation Date).

On June 14, 2020, the Debtors and the members of the Ad Hoc First Lien Group and Ad Hoc Crossholder Group signed the Restructuring Support Agreement.

## IV.    The Debtors' Proposed Restructuring: Key Components

### A.    The Restructuring Support Agreement and the Plan.

The Restructuring Support Agreement contemplates a comprehensive financial restructuring of the Debtors that will result in the deleveraging of the Debtors' balance sheet and that includes commitments from the Initial Commitment Parties to fully backstop the DIP Facility. The key financial components of the restructuring pursuant to the Plan and Restructuring Support Agreement are as follows. On the Effective Date:

- All Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Other Priority Claims, and Allowed Other Secured Claims shall be paid in full in Cash or receive such other treatment that renders such Claims Unimpaired.

- Each Holder of an Allowed DIP Facility Claim shall receive such Holder's *pro rata* share of (x) the Exit Term Facility, (y) the Exit Facility Shares and (z) Cash on account of any interest, fees (other than the Total Exit Fee (as defined in the DIP Credit Agreement)) and expenses that are outstanding as of the Effective Date.

- Each Holder of an Allowed First Lien Notes Claim shall receive (i) (x) payment in full in Cash of all accrued and unpaid interest on such Holder's First Lien Notes at the non-default rate to, but excluding, the Effective Date, and (y) such Holder's *pro rata* share of the Exit Secured Notes; or (ii) if Pyxus obtains and accepts a binding commitment for Replacement First Lien Financing on or prior to the date this is 60 days after the Petition Date (and, in any event, prior to the Confirmation Date) and consummates the Replacement First Lien Financing on the Effective Date, its *pro rata* share of $280.8 million *plus* all accrued and unpaid interest due and payable on such Holder's First Lien Notes at the non-default rate to, but excluding, the Effective Date (to the extent not paid during the Chapter 11 Cases), payable in Cash with the proceeds of the Replacement First Lien Financing.

- Each Holder of an Allowed Second Lien Notes Claim may elect to receive either (i) such Holder's *pro rata* share of the Second Lien Notes Common Stock Pool (the "***Second Lien Notes Stock Option***") or

(ii) for each Holder of Second Lien Notes Claims that is not a Consenting Noteholder, Cash in an amount equal to 2.00% of the aggregate outstanding principal amount of such Holder's Second Lien Notes (the "**Second Lien Notes Cash Option**"). Any Holder of Second Lien Notes Claims that does not submit a Second Lien Notes Stock Election Form on or prior to the Second Lien Notes Stock Option Deadline will be deemed to have elected the Second Lien Notes Cash Option.

- All outstanding and undisputed General Unsecured Claims and Foreign Credit Line Claims will be Unimpaired by the restructuring unless otherwise agreed to by the Holder of such General Unsecured Claim or such Foreign Credit Line Claim.

- Holders of Existing Pyxus Interests (and any related Claims described in section 510(b) of the Bankruptcy Code in respect of such Existing Pyxus Interests), shall not receive or retain any other property or interests under the Plan. Notwithstanding the foregoing, each Holder of Pyxus Common Stock as of the Existing Equity Record Date that does not (i) submit an Equityholder Opt-Out Form prior to the deadline for doing so or (ii) object to, oppose, or seek to impede or delay confirmation of the Plan will receive its ratable share of the Existing Equity Cash Pool.

The Consenting Noteholders have agreed pursuant to the Restructuring Support Agreement to support and vote in favor of the Plan. This consensus will save the Debtors material delay, expense, and value degradation that could have resulted from a non-consensual restructuring process.

The Debtors maintain a broad "fiduciary out" under the Restructuring Support Agreement and can terminate the Restructuring Support Agreement if Pyxus' board of directors (the "**Board**"), in good faith and after consulting with counsel, determines that proceeding with the Restructuring Transactions and pursuing confirmation and consummation of the Plan would be inconsistent with the Board's fiduciary obligations, including in order to pursue a "Superior Alternative Transaction" (as defined the Restructuring Support Agreement).

The Restructuring Support Agreement also contains a number of milestones, including:

- the Interim DIP Order must be approved within two Business Days of the Petition Date;

- the Final DIP Order must be approved within 35 days of the Petition Date;

- the Plan must be confirmed and the Disclosure Statement approved within 60 days of the Petition Date; and

- the Effective Date must occur within 75 days of the Petition Date.

To incentivize participation, Pyxus agreed to pay a support fee to each Consenting First Lien Noteholder (the "**First Lien Notes Cash RSA Fee**") and each Consenting Second Lien Noteholder (the "**Second Lien Notes Equity RSA Fee**") that signed the Restructuring Support Agreement prior to the Petition Date. The aggregate amount of the First Lien Notes Cash RSA Fee is $5.5 million, payable in Cash on the Effective Date, and the aggregate amount of the Second Lien Notes Equity RSA Fee is $5.0 million, payable in the form of the Second Lien Notes RSA Fee Shares on the Effective Date. Each of the foregoing fees becomes due and payable in Cash within three Business Days of the Restructuring Support Agreement terminating as a result of a breach by the Debtors or the Debtors exercising their fiduciary out termination right.

The Plan includes the Debtor Release, the Third-Party Release, and customary exculpatory relief for the Exculpated Parties. Each Holder of Existing Pyxus Interests may opt out of the releases contained in Article VIII.F of the Plan by submitting a duly exercised Equityholder Opt-Out Form on or prior to the Equityholder Opt-Out Deadline. If a Holder of Existing Pyxus Interests submits a duly exercised Equityholder Opt-Out Form on or prior to the Equityholder Opt-Out Deadline, it will not be bound to, or benefit from, the Plan releases, and, with respect to Holders of Pyxus Common Stock, will not receive any distribution from the Existing Equity Cash Pool.

Pursuant to the Restructuring Support Agreement and the Plan, Reorganized Pyxus will issue 23,000,000

shares of New Common Stock (or such other amount as may be agreed by the Debtors and the Required Consenting Second Lien Noteholders) on the Effective Date on account of the Second Lien Notes Common Stock Pool, the Exit Facility Shares, the Backstop Fee Shares and the Second Lien Notes RSA Fee Shares.

The chart below summarizes the Reorganized Debtors' anticipated capital structure upon emergence:

| Debt | Principal Amount |
|------|------------------|
| Exit ABL Facility | $60,000,000[9] |
| Exit Secured Notes or Replacement First Lien Financing | $280,800,000 |
| Exit Term Facility | $213,400,000 |
| Foreign Credit Lines | $470,100,000[10] |

The liens securing the Exit ABL Facility, the Exit Term Facility, and the Exit Secured Notes or the Replacement First Lien Financing, as applicable, will be subject to the Exit Intercreditor Agreements governing the respective rights as among those facilities on common collateral. The following chart summarizes the anticipated priorities (assuming the Replacement First Lien Financing is not consummated):

| | Exit ABL Priority Collateral (current assets of domestic obligors) | Exit Secured Notes Priority Collateral (fixed assets of domestic obligors) | Foreign Obligor Collateral (all assets of foreign obligors) |
|---|---|---|---|
| First Priority | Exit ABL Facility | Exit Secured Notes | Exit Term Facility |
| Second Priority | Exit ABL Facility / Priority Portion[11] of the Exit Term Facility | Exit Term Facility | Exit Secured Notes |
| Third Priority | Exit Secured Notes / Non-Priority Portion of the Exit Term Facility on a pari passu basis | Exit ABL Facility | |

Reorganized Pyxus shall be a public, SEC reporting company or a private, non- SEC reporting company on the Effective Date as mutually agreed upon by the Company and the Required Consenting Second Lien Noteholders and as disclosed in a supplement to the Plan.

The board of directors (or similar governing body) of Reorganized Pyxus (the "***Reorganized Pyxus Board***") initially shall include seven directors, comprised of the Chief Executive Officer of Reorganized Pyxus, two directors appointed by Glendon Capital Management LP (or its applicable affiliates), two directors appointed by Monarch Alternative Capital LP (or its applicable affiliates) and two independent directors appointed by the Initial Commitment

---

[9] The Restructuring Support Agreement contemplates that the Exit ABL Facility will have a commitment amount of at least $60,000,000 but the Debtors may seek commitments for a greater amount subject to market conditions. The Debtors do not currently anticipate fully drawing the Exit ABL Facility at emergence.

[10] Estimated amount guaranteed by the Pyxus as of July 31, 2020.

[11] The "***Priority Portion***" of the Exit Term Facility is the obligations thereunder in an amount of $125,000,000 *minus* the principal amount of loans outstanding and letters of credit issued under the Exit ABL Facility.

Parties pursuant to terms and procedures set forth in the New Shareholders Agreement, each of whom shall be identified in the Plan Supplement.

**B.      The Debtors' Proposed Disclosure Statement and Solicitation Process.**

Following the execution of the Restructuring Support Agreement, the Debtors commenced solicitation of the Plan on the Solicitation Date by delivering a copy of the Plan and the Disclosure Statement (including Ballots) to Holders of Class 3 First Lien Notes Claims and Class 4 Second Lien Notes Claims, the only Classes entitled to vote to accept or reject the Plan. The Debtors also delivered the Equityholder Opt-Out Form to Holders of the Existing Pyxus Interests and the Second Lien Notes Stock Election Form to Holders of Second Lien Notes Claims. The Debtors have established July 20, 2020, at 5:00 p.m., prevailing Eastern Time, as the deadline for the receipt of votes to accept or reject the Plan and the deadline to submit an Equityholder Opt-Out Form or a Second Lien Notes Stock Election Form. The Debtors expect that they will commence the Chapter 11 Cases on or about June 15, 2020.

The Debtors will seek Bankruptcy Court approval of the Voting Deadline at the outset of their Chapter 11 Cases. As soon as reasonably practicable after the Voting Deadline, the Solicitation Agent will file the voting report (the "***Voting Report***") with the Bankruptcy Court setting forth the voting results. Based on the execution of the Restructuring Support Agreement by the Consenting Noteholders, the Debtors believe the Voting Report likely will show that the Holders of Claims entitled to vote on the Plan have overwhelmingly voted to accept the Plan. Accordingly, on the Petition Date, the Debtors intend to file the Plan, this Disclosure Statement, and a motion to approve the solicitation procedures (the "***Solicitation Procedures***") and schedule the Confirmation Hearing to consider approval of this Disclosure Statement and Confirmation of the Plan. The following table sets forth the timetable for the solicitation process and the anticipated Chapter 11 Cases.

| Event | Date |
|---|---|
| Voting Record Date | June 12, 2020 |
| Commencement of Prepetition Solicitation | June 14, 2020 |
| Petition Date | June 15, 2020 |
| Mailing of Combined Hearing Notice Date | Within three business days, or as soon as reasonably practicable, after entry of an order approving the combined hearing date |
| Plan Supplement Deadline | July 13, 2020, at 11:59 p.m., prevailing Eastern Time, or such other date as the Court may direct |
| Voting Deadline; Equityholder Opt-Out Deadline; Second Lien Notes Stock Option Deadline | July 20, 2020, at 5:00 p.m., prevailing Eastern Time |
| Objection Deadline | July 20, 2020, at 5:00 p.m., prevailing Eastern Time, or such other date as the Court may direct |
| Reply Deadline | July 23, 2020, at 11:59 p.m., prevailing Eastern Time, or such other date as the Court may direct |
| Combined Hearing | July 27, 2020, or such other date as the Court may direct |

**C.      New MIP**

On or after the Effective Date, the Reorganized Pyxus Board shall adopt and institute the New MIP, enact and enter into related policies and agreements, and distribute New Common Stock to participants based on the terms and conditions determined by the Reorganized Pyxus Board.

**D.      The Debtors' First-Day Motions and Certain Related Relief.**

**1.      Operational First-Day Pleadings.**

To minimize disruption to the Debtors' operations and effectuate the terms of the Plan, upon the commencement of the Chapter 11 Cases, the Debtors intend to file various first-day motions seeking authority to, among other things, (a) continue using the Company's existing cash management system; (b) pay prepetition claims

owed to employees and on account of employee benefit programs and to continue offering employee benefit programs postpetition; (c) pay prepetition claims owed due to maintaining insurance and continue maintaining the Company's insurance; (d) pay prepetition claims owed to taxing authorities and continue paying taxes in the ordinary course of business; (e) provide adequate assurance of payment to utility companies; (f) continue performing under and make certain amendments to the Receivables Facilities and (g) and pay trade claims in the ordinary course of business. All of the relief requested by the first-day motions and throughout the Chapter 11 Cases will be subject to the DIP Orders.

### 2.    Postpetition Financing.

The Debtors will also seek approval of a new money DIP Facility. The DIP Facility will have a term ending six months after the closing date and bear interest at a rate per annum equal to LIBOR plus 10.25% or ABR plus 9.25% per annum. Each of the Debtors will be an obligor under the DIP Facility, as will certain of Pyxus' indirect domestic and foreign subsidiaries that are not Debtors. The DIP Facility will provide the Debtors with approximately $200 million in aggregate net proceeds to repay the ABL Facility, fund the Chapter 11 Cases, stabilize the business, and continue operations. At the conclusion of the Chapter 11 Cases, the principal outstanding under the DIP Facility (including a capitalized exit fee of $6.7 million) will convert into the Exit Term Facility on a dollar-for-dollar basis. Each Holder of the DIP Facility Claims will also receive its ratable portion of the Exit Facility Shares. The Debtors will also seek approval of the use of cash collateral.

Certain Holders of Second Lien Notes Claims are eligible to participate in their ratable share of 87.5% of the DIP Facility pursuant to syndication terms, conditions, and procedures that will be distributed by the Solicitation Agent to all Holders of Second Lien Notes Claims (or their nominees) following entry of the Interim DIP Order (the "*Syndication Procedures*"). The syndication period will be open for ten days following entry of the Interim DIP Order, and each qualifying Holder of Second Lien Notes Claims that elects to participate in the DIP Facility pursuant to the Syndication Procedures must also become a signatory to the Restructuring Support Agreement in addition to submitting all other forms and signature pages set forth in the Syndication Procedures.

Pursuant to the Restructuring Support Agreement, the Financing Commitment Parties have, severally and not jointly, committed to fund any unsubscribed portion of the DIP Facility.

In exchange for this commitment, certain Initial Commitment Parties will be entitled to the Backstop Fee Shares on the Effective Date, which consists of approximately 4.25% of the New Common Stock issued on the Effective Date, subject to dilution by the New MIP. Under certain conditions set forth in the Restructuring Term Sheet, certain Initial Commitment Parties will be entitled to a Cash fee of $18 million in lieu of the Backstop Fee Shares.

### 3.    Motion To Approve Solicitation Procedures and Confirm the Plan.

Additionally, the Debtors intend to file a motion seeking (a) entry of an order scheduling the Confirmation Hearing and approving the form of notices and procedures related thereto; (b) approval of the Disclosure Statement as containing adequate information under section 1125(a) of the Bankruptcy Code; and (c) approval of the Solicitation Procedures.

## E.    Other Requested First-Day Relief and Retention Applications.

The Debtors also plan to file motions and/or applications seeking certain customary relief, including the entry of orders (a) directing the joint administration of the Debtors' Chapter 11 Cases under a single docket and (b) preserving valuable tax attributes. In addition, the Debtors will seek orders approving the retention of Simpson Thacher, Young Conaway, Lazard, as investment banker, RPA, as financial advisor, Prime Clerk as Solicitation Agent, and Ernst & Young LLP and Deloitte LLP as accountants.

## V.    Summary of the Plan

**SECTION V OF THIS DISCLOSURE STATEMENT IS INTENDED ONLY TO PROVIDE A SUMMARY OF THE KEY TERMS, STRUCTURE, CLASSIFICATION, TREATMENT, AND IMPLEMENTATION OF THE PLAN, AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE ENTIRE PLAN**

> **AND EXHIBITS TO THE PLAN. ALTHOUGH THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT INCLUDE SUMMARIES OF THE PROVISIONS CONTAINED IN THE PLAN AND IN DOCUMENTS REFERRED TO THEREIN, THIS DISCLOSURE STATEMENT DOES NOT PURPORT TO BE A PRECISE OR COMPLETE STATEMENT OF ALL RELATED TERMS AND PROVISIONS, AND SHOULD NOT BE RELIED ON FOR A COMPREHENSIVE DISCUSSION OF THE PLAN. INSTEAD, REFERENCE IS MADE TO THE PLAN AND ALL SUCH DOCUMENTS FOR THE FULL AND COMPLETE STATEMENTS OF SUCH TERMS AND PROVISIONS. THE PLAN ITSELF (INCLUDING ATTACHMENTS) AND THE PLAN SUPPLEMENT WILL CONTROL THE TREATMENT OF HOLDERS OF CLAIMS AND INTERESTS UNDER THE PLAN. TO THE EXTENT THERE ARE ANY INCONSISTENCIES BETWEEN THIS SECTION V AND THE PLAN (INCLUDING ANY ATTACHMENTS TO THE PLAN) AND THE PLAN SUPPLEMENT, THE PLAN AND PLAN SUPPLEMENT, AS APPLICABLE, SHALL GOVERN.**

A.      **Treatment of Unclassified Claims.**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Priority Tax Claims, DIP Facility Claims, and Professional Fee Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.

1.      **DIP Facility Claims.**

All DIP Facility Claims shall be deemed Allowed as of the Effective Date in an amount equal to (1) the principal amount outstanding under the DIP Facility on such date, (2) all interest accrued and unpaid thereon to the date of payment, (3) all accrued and unpaid fees, expenses, and non-contingent indemnification obligations payable under the DIP Documents and the DIP Orders, and (4) all other Obligations (as defined in the DIP Credit Agreement).

In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed DIP Facility Claim, each Holder of an Allowed DIP Facility Claim shall receive, on the Effective Date:

(a)      payment in full in Cash of (i) all accrued and unpaid interest on all outstanding DIP Loans as of the Effective Date and (ii) all fees (other than the Total Exit Fee) and expenses payable pursuant to the DIP Documents as of the Effective Date; and

(b)      such Holder's *pro rata* share of (i) the Exit Term Loans and (ii) the Exit Facility Shares.

2.      **Administrative Claims.**

Pursuant to section 1129(a)(9) of the Bankruptcy Code, unless otherwise agreed to by the Holders of an Allowed Administrative Claim and the Debtors, or the Reorganized Debtors, or as otherwise set forth in an order of the Bankruptcy Court (including pursuant to the procedures specified therein), as applicable, each Holder of an Allowed Administrative Claim (other than Holders of Professional Fee Claims and Claims for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code) will receive in full and final satisfaction of its Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim in accordance with the following: (1) if an Administrative Claim is Allowed as of the Effective Date (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (2) if such Administrative Claim is not Allowed as of the Effective Date, no later than 60 days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (3) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim without any further action by the Holders of such Allowed Administrative Claim; or (4) at such time and upon such terms as set forth in a Final Order of the Bankruptcy Court.

3.      **Professional Fee Claims.**

(a)      **Professional Fee Escrow Account.**

As soon as reasonably practicable after the Confirmation Date, and no later than one Business Day prior to the Effective Date, the Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Escrow Amount. The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals and for no other Entities until all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court. No Liens, claims, or interests shall encumber the Professional Fee Escrow Account or Cash held in the Professional Fee Escrow Account in any way. Such funds shall not be considered property of the Estates, the Debtors, or the Reorganized Debtors.

The amount of Professional Fee Claims owing to the Professionals shall be paid in Cash to such Professionals from the funds held in the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed by a Final Order of the Bankruptcy Court; *provided*, *however*, that obligations with respect to Allowed Professional Fee Claims shall not be limited nor be deemed limited to funds held in the Professional Fee Escrow Account. When all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court, any remaining funds held in the Professional Fee Escrow Account shall promptly be paid to the Reorganized Debtors without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

(b)        **Final Fee Applications and Payment of Accrued Professional Compensation Claims**.

All final requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be Filed no later than 30 days after the Effective Date; *provided, however*, that any Professional who is subject to the Ordinary Course Professionals Order may continue to receive such compensation and reimbursement of expenses for services rendered before the Confirmation Date, without further Bankruptcy Court order, pursuant to the Ordinary Course Professionals Order. The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Code, Bankruptcy Rules, and prior Bankruptcy Court orders. The amount of the Allowed Professional Fee Claims owing to the Professionals shall be paid in Cash to such Professionals, including from funds held in the Professional Fee Escrow Account when such Professional Fee Claims are Allowed by entry of an order of the Bankruptcy Court.

(c)        **Professional Fee Escrow Amount.**

The Professionals shall provide a reasonable and good-faith estimate of their fees and expenses incurred in rendering services to the Debtors before and as of the Effective Date projected to be outstanding as of the Effective Date, and shall deliver such estimate to the Debtors no later than five days before the anticipated Effective Date; *provided*, *however*, that such estimate shall not be considered an admission or limitation with respect to the fees and expenses of such Professional and such Professionals are not bound to any extent by the estimates. If a Professional does not provide an estimate, the Debtors may estimate a reasonable amount of unbilled fees and expenses of such Professional, taking into account any prior payments; *provided*, *however*, that such estimate shall not be binding or considered an admission with respect to the fees and expenses of such Professional. The total aggregate amount so estimated as of the Effective Date shall be utilized by the Debtors to determine the amount to be funded to the Professional Fee Escrow Account, *provided* that the Reorganized Debtors shall use Cash on hand to increase the amount of the Professional Fee Escrow Account to the extent fee applications are Filed after the Effective Date in excess of the amount held in the Professional Fee Escrow Account based on such estimates.

(d)        **Post-Confirmation Date Fees and Expenses.**

From and after the Confirmation Date, the Debtors or Reorganized Debtors, as applicable, shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by the Debtors or the Reorganized Debtors, as applicable. Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

The Debtors and Reorganized Debtors, as applicable, shall pay, within ten Business Days after submission of a detailed invoice to the Debtors or Reorganized Debtors, as applicable, such reasonable claims for compensation or reimbursement of expenses incurred by the retained Professionals of the Debtors or the Reorganized Debtors, as applicable. If the Debtors or Reorganized Debtors, as applicable, dispute the reasonableness of any such invoice, the Debtors or Reorganized Debtors, as applicable, or the affected professional may submit such dispute to the Bankruptcy Court for a determination of the reasonableness of any such invoice, and the disputed portion of such invoice shall not be paid until the dispute is resolved.

### 4.     Priority Tax Claims.

Pursuant to section 1129(a)(9)(C) of the Bankruptcy Code, unless otherwise agreed by the Holder of an Allowed Priority Tax Claim and the applicable Debtor or Reorganized Debtor, each Holder of an Allowed Priority Tax Claim will receive, at the option of the applicable Debtor or Reorganized Debtor, in full satisfaction of its Allowed Priority Tax Claim that is due and payable on or before the Effective Date, either (1) Cash equal to the amount of such Allowed Priority Tax Claim on (a) the date such Allowed Priority Tax Claim is due and payable in the ordinary course or (b) the later of (i) the Effective Date (or as soon thereafter as reasonably practicable) and (ii) the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim, or (2) otherwise treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

### 5.     Statutory Fees.

Notwithstanding anything in the Plan to the contrary, on the Effective Date, the Debtors shall pay, in full, in Cash, any fees due and owing to the U.S. Trustee at the time of Confirmation pursuant to 28 U.S.C. § 1930(a)(6). The Debtors or Reorganized Debtors, as applicable, shall remain obligated to pay quarterly fees, including any interest thereon, if applicable, to the U.S. Trustee until the earliest of the Chapter 11 Cases being closed, dismissed or converted to a case under chapter 7 of the Bankruptcy Code.

### B.     Classification and Treatment of Claims and Interests.

### 1.     Classification of Claims and Interests.

The Plan constitutes a separate Plan proposed by each Debtor. Except for the Claims addressed in Article II of the Plan, all Claims and Interests are classified in the Classes set forth below in accordance with section 1122 of the Bankruptcy Code. A Claim or an Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes. A Claim or an Interest also is classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

The following chart represents the classification of Claims and Interests for each Debtor pursuant to the Plan:

| Class | Claim or Interest | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 3 | First Lien Notes Claims | Impaired | Entitled to Vote |
| 4 | Second Lien Notes Claims | Impaired | Entitled to Vote |
| 5 | Foreign Credit Line Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 6 | General Unsecured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 7 | Debtor Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) |
| 8 | Non-Debtor Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) |
| 9 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) |

| 10 | Existing Pyxus Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |

### 2. Treatment of Classes of Claims and Interests.

To the extent a Class contains Allowed Claims or Allowed Interests with respect to any Debtor, the classification of Allowed Claims and Allowed Interests is specified below.

### 3. Class 1 — Other Secured Claims

(a) *Classification*: Class 1 consists of any Other Secured Claims.

(b) *Treatment*: Except to the extent that a Holder of an Allowed Other Secured Claim agrees to less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Other Secured Claim, each such Holder shall receive, at the option of the applicable Debtor(s), either:

    (i) payment in full in Cash of the due and unpaid portion of its Other Secured Claim on the later of (x) the Effective Date (or as soon thereafter as reasonably practicable) and (y) as soon as reasonably practicable after the date such Claim becomes due and payable;

    (ii) delivery of collateral securing any such Claim and payment of any interest required under section 506(b) of the Bankruptcy Code;

    (iii) Reinstatement of such Allowed Other Secured Claim; or

    (iv) such other treatment rendering its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.

(c) *Voting*: Class 1 is Unimpaired under the Plan. Holders of Allowed Other Secured Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Holders of Allowed Other Secured Claims are not entitled to vote to accept or reject the Plan.

### 4. Class 2 — Other Priority Claims

(a) *Classification*: Class 2 consists of any Other Priority Claims.

(b) *Treatment*: Except to the extent that a Holder of an Allowed Other Priority Claim agrees to less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Other Priority Claim, each such Holder shall receive, at the option of the applicable Debtor(s), either:

    (i) payment in full in Cash of the due and unpaid portion of its Other Priority Claim on the later of (x) the Effective Date (or as soon thereafter as reasonably practicable) and (y) as soon as reasonably practicable after the date such Claim becomes due and payable; or

    (ii) such other treatment rendering its Allowed Other Priority Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.

(c) (c) *Voting*: Class 2 is Unimpaired under the Plan. Holders of Allowed Other Priority Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Holders of Allowed Other Priority Claims are not entitled to vote to accept or reject the Plan.

5.      **Class 3 — First Lien Notes Claims**

(a)      *Classification:*  Class 3 consists of any First Lien Notes Claims against any Debtor.

(b)      *Allowance:*  On the Effective Date, First Lien Notes Claims shall be Allowed in their entirety for all purposes of the Plan in the aggregate principal amount of $275,000,000, *plus* any accrued but unpaid interest to, but excluding, the Effective Date, and fees, premiums, and other expenses arising under or in connection with the First Lien Notes Indenture as of the Effective Date.

(c)      *Treatment:*  Except to the extent that a Holder of an Allowed First Lien Notes Claim agrees to less favorable treatment, on the Effective Date, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Allowed First Lien Notes Claim, each Holder of an Allowed First Lien Notes Claim shall receive either:

(i)      (x) payment in full in Cash of all accrued and unpaid interest on such Holder's First Lien Notes at the non-default rate to, but excluding, the Effective Date, and (y) such Holder's *pro rata* share of the Exit Secured Notes (determined based upon the aggregate principal amount of such Holder's First Lien Notes as a percentage of all First Lien Notes outstanding as of the date of distribution to Holders of Allowed First Lien Notes Claims); or

(ii)      if Pyxus obtains and accepts a binding commitment for Replacement First Lien Financing on or prior to such day that is 60 days after the Petition Date (and, in any event, prior to the Confirmation Date) and consummates the Replacement First Lien Financing on the Effective Date, its *pro rata* share of $280.8 million *plus* all accrued and unpaid interest due and payable on such Holder's First Lien Notes at the non-default rate to, but excluding, the Effective Date (to the extent not paid during the Chapter 11 Cases), payable in Cash with the proceeds of the Replacement First Lien Financing.

(d)      *Voting:*  Class 3 is Impaired under the Plan. Holders of Allowed First Lien Notes Claims are entitled to vote to accept or reject the Plan.

6.      **Class 4 — Second Lien Notes Claims**

(a)      *Classification:*  Class 4 consists of any Second Lien Notes Claims against any Debtor.

(b)      *Allowance:*  On the Effective Date, Second Lien Notes Claims shall be Allowed in their entirety for all purposes of the Plan in the aggregate principal amount of $635,686,000, *plus* any accrued but unpaid interest, fees, and other expenses arising under or in connection with the Second Lien Notes Indenture.

(c)      *Treatment:*  Except to the extent that a Holder of an Allowed Second Lien Notes Claim agrees to less favorable treatment, on the Effective Date, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Second Lien Notes Claim, each Holder of an Allowed Second Lien Notes Claim shall receive, at such Holder's election, either:

(i)      such Holder's Pro Rata Share of the Second Lien Notes Common Stock Pool; or

(ii)      Cash equal to 2.00% of the principal amount of all Second Lien Notes beneficially owned by such Holder as of the date of distribution to Holders of Allowed Second Lien Notes Claims.

23

A Holder of an Allowed Second Lien Notes Claim has the right to elect to participate in either the Second Lien Notes Cash Option or the Second Lien Notes Stock Option. Such election must be made as to the entirety of the Second Lien Notes Claims beneficially owned by such Holder.

A Holder of an Allowed Second Lien Notes Claim that elects to participate in the Second Lien Notes Stock Option must duly and timely complete and submit its Second Lien Notes Stock Election Form in accordance with the instructions set forth therein. A Holder of an Allowed Second Lien Notes Claim that elects to participate in the Second Lien Notes Cash Option does not need to complete or submit a Second Lien Notes Stock Election Form. For the avoidance of doubt, a Holder of an Allowed Second Lien Notes Claim that does not duly and timely submit a Second Lien Notes Stock Election Form in accordance with the instructions set forth therein will be deemed to have elected the Second Lien Notes Cash Option.

The Restructuring Support Agreement requires all Consenting Second Lien Noteholders to elect the Second Lien Notes Stock Option, and such Persons must take all necessary actions to effectuate such election.

Any Holder that duly and timely elects the Second Lien Notes Stock Option shall be deemed to be a party to the New Shareholders Agreement.

"Pro Rata Share" means, with respect to any Holder of an Allowed Second Lien Notes Claim, the percentage equal to (x) the aggregate principal amount of Second Lien Notes beneficially owned by such Holder as of the date of distribution to Holders of Allowed Second Lien Notes Claims, divided by (y) $635,686,000.

(d)    *Voting:* Class 4 is Impaired under the Plan. Holders of Allowed Second Lien Notes Claims are entitled to vote to accept or reject the Plan.

**7.    Class 5 — Foreign Credit Line Claims**

(a)    *Classification*: Class 5 consists of any Foreign Credit Line Claims against any Debtor.

(b)    *Treatment*:  Except to the extent that a Holder of an Allowed Foreign Credit Line Claim agrees to less favorable treatment, on the Effective Date, in full and final satisfaction, compromise, settlement, release and discharge of and in exchange for each Allowed Foreign Credit Line Claim, each Holder of an Allowed Foreign Credit Line Claim shall be Reinstated and paid in the ordinary course of business in accordance with the terms and conditions of the particular transaction or agreement giving rise to such Allowed Foreign Credit Line Claim.

(c)    *Voting*: Class 5 is Unimpaired and Holders of Allowed Foreign Credit Line Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Allowed Foreign Credit Line Claims are not entitled to vote to accept or reject the Plan.

**8.    Class 6 — General Unsecured Claims**

(a)    *Classification*: Class 6 consists of any General Unsecured Claims against any Debtor.

(b)    *Treatment*: Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Allowed General Unsecured Claim, each Holder of an Allowed General Unsecured Claim shall be Reinstated and paid in the

ordinary course of business in accordance with the terms and conditions of the particular transaction or agreement giving rise to such Allowed General Unsecured Claim.

(c)    *Voting*:  Class 6 is Unimpaired and Holders of Allowed General Unsecured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Allowed General Unsecured Claims are not entitled to vote to accept or reject the Plan.

**9.        Class 7 — Debtor Intercompany Claims**

(a)    *Classification*:  Class 7 consists of any Debtor Intercompany Claims.

(b)    *Treatment*:  Except to the extent otherwise provided in the Plan Supplement, each Allowed Debtor Intercompany Claim shall, at the option of the applicable Debtors, either on or after the Effective Date, be:

(i)        Reinstated; or

(ii)       extinguished, compromised, addressed, setoff, cancelled, or settled, potentially without any distribution on account of such Claims.

(c)    *Voting:*  Holders of Allowed Debtor Intercompany Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) or deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code, respectively. Therefore, Holders of Allowed Debtor Intercompany Claims are not entitled to vote to accept or reject the Plan.

**10.        Class 8 — Non-Debtor Intercompany Claims**

(a)    *Classification*:  Class 8 consists of any Non-Debtor Intercompany Claims.

(b)    *Treatment*:  Except to the extent otherwise provided in the Plan Supplement, each Allowed Non-Debtor Intercompany Claim shall, at the option of the applicable Debtors, be:

(i)        Reinstated; or

(ii)       (extinguished, compromised, addressed, setoff, cancelled, or settled, potentially without any distribution on account of such Claims.

(c)    *Voting*:  Holders of Allowed Non-Debtor Intercompany Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) or deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Holders of Allowed Non-Debtor Intercompany Claims are not entitled to vote to accept or reject the Plan.

**11.        Class 9 — Intercompany Interests**

(a)    *Classification*:  Class 9 consists of all Intercompany Interests.

(b)    *Treatment*:  Except to the extent otherwise provided in the Plan Supplement, each Allowed Intercompany Interest shall, at the option of the applicable Debtors, be:

(i)        Reinstated; or

(ii)       extinguished, compromised, addressed, setoff, cancelled, or settled, potentially without any distribution on account of such Interests.

25

For the avoidance of doubt, any Interest in non-Debtor subsidiaries owned by a Debtor shall continue to be owned by the applicable Reorganized Debtor unless otherwise provided in the Plan Supplement.

(c)     *Voting*:  Holders of Allowed Intercompany Interests are conclusively presumed to have accepted the Plan pursuant to section 1126(f) or deemed to have accepted or rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code, respectively. Therefore, Holders of Allowed Intercompany Interests are not entitled to vote to accept or reject the Plan.

### 12.     Class 10 — Existing Pyxus Interests

(a)     *Treatment:*  On the Effective Date, all Existing Pyxus Interests, and any related Claims described in section 510(b) of the Bankruptcy Code in respect of such Existing Pyxus Interests, shall be discharged, cancelled, released, and extinguished and of no further force or effect without any distribution on account of such Interests. Except as set forth below, Holders of Existing Pyxus Interests (and any related Claims described in section 510(b) of the Bankruptcy Code in respect of such Existing Pyxus Interests), shall not receive or retain any other property or interests under the Plan.

(b)     Notwithstanding the foregoing, each Qualifying Holder of Pyxus Common Stock will receive its *pro rata* share of the Existing Equity Cash Pool (determined based upon the aggregate number of shares of Pyxus Common Stock held by such Holder as a percentage of all shares of Pyxus Common Stock as of the date of distribution to such Holders). Any portion of the Existing Equity Cash Pool attributable to a Holder of Pyxus Common Stock that is not a Qualifying Holder of Pyxus Common Stock shall be retained by the Reorganized Debtors.

(c)     *Voting:*  Holders of Class 10 Existing Pyxus Interests are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Existing Pyxus Interests are not entitled to vote to accept or reject the Plan.

## C.     Means for Implementation of the Plan.

### 1.     General Settlement of Claims and Interests.

Unless otherwise set forth in the Plan, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Plan, including with respect to issues related to the value of the Debtors' unencumbered property.

### 2.     Restructuring Transactions.

On and after the Confirmation Date, the Debtors or Reorganized Debtors, as applicable, shall take all actions as may be necessary or appropriate to effectuate the Restructuring Transactions (as agreed and in accordance with the Restructuring Support Agreement and subject to the applicable consent and approval rights thereunder), including to establish Reorganized Pyxus and, if applicable, to transfer assets of the Debtors to Reorganized Pyxus or a subsidiary thereof. The applicable Debtors or the Reorganized Debtors will take any actions as may be necessary or advisable to effect a corporate restructuring of the overall corporate structure of the Debtors, to the extent agreed in accordance with the consent rights in the Restructuring Support Agreement and provided in the Plan or in the Definitive Restructuring Documents, including the issuance of all Securities, notes, instruments, certificates, and other documents required to be issued pursuant to the Plan, one or more intercompany mergers, consolidations, amalgamations, arrangements, continuances, restructurings, conversions, dissolutions, transfers, liquidations, or other corporate transactions.

The actions to implement the Restructuring Transactions may include, in each case if and as agreed in accordance with the Restructuring Support Agreement and subject to the applicable consent and approval rights thereunder:  (1) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, reorganization, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of the Plan; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms to which the applicable parties agree; (3) the filing of appropriate certificates or articles of incorporation, reincorporation, formation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution or other certificates or documentation for other transactions as described in clause (1), pursuant to applicable state law; (4) the execution and delivery of the New Shareholders Agreement and the New Pyxus Constituent Documents, and any certificates or articles of incorporation, bylaws, or such other applicable formation documents (if any) of each Reorganized Debtor (including all actions to be taken, undertakings to be made, and obligations to be incurred and fees and expenses to be paid by the Debtors and/or the Reorganized Debtors, as applicable); and the issuance, distribution, reservation, or dilution, as applicable, of the New Common Stock as set forth in the Plan; and (5) all other actions that the Debtors and the Required Consenting Noteholders determine to be necessary or appropriate.

The Confirmation Order shall and shall be deemed to, pursuant to both section 1123 and section 363 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan.

**3.        Sources of Consideration for Plan Distributions.**

The Debtors shall fund distributions under the Plan, as applicable, with:  (1) the issuance of New Common Stock; (2) the Exit ABL Facility; (3) the Exit Term Facility; (4) the Exit Secured Notes, or, if applicable, the Replacement First Lien Financing; and (5) the Debtors' Cash on hand. Each distribution and issuance referred to in Article VI of the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments or other documents evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance. The issuance, distribution, or authorization, as applicable, of certain Securities in connection with the Plan, including the New Common Stock will be exempt from SEC registration, as described more fully in Section V.C.5 below.

(a)        **Issuance and Distribution of the New Common Stock.**

On the Effective Date, Reorganized Pyxus shall have at least twenty-five (25) million authorized shares of New Common Stock (or such other amount as may be agreed by the Debtors and the Required Consenting Second Lien Noteholders) to satisfy the Effective Date Issuance Amount and all grants under the New MIP. To the extent of any increase in the Effective Date Issuance Amount, the number of authorized shares of New Common Stock shall be increased accordingly. The number of shares of New Common Stock equal to the Effective Date Issuance Amount shall be issued on the Effective Date as follows: (a) on account of distributions of the Second Lien Notes Common Stock Pool to Holders of Allowed Second Lien Notes Claims who duly and timely submit the Second Lien Notes Stock Election Form, (b) in satisfaction of the Second Lien Notes RSA Fee Shares, (c) in satisfaction of the Backstop Fee Shares, and (d) on account of the Exit Facility Shares (in the cases of clauses (b) through (d), to the Persons entitled thereto pursuant to the terms and conditions of the Restructuring Support Agreement).

The chart below illustrates the number of shares of New Common Stock that will be issued on the Effective Date and the percentage of all such shares of New Common Stock (a) without giving effect to the New MIP, (b) assuming no change in the Effective Date Issuance Amount, and (c) assuming all Holders duly and timely elect the Second Lien Notes Stock Option.

| Issuance | Number of Shares | Percentage |
|---|---|---|
| Second Lien Notes Common Stock Pool | 11,526,593.75 | 50.12% |
| Exit Facility Shares | 10,220,625.00 | 44.44% |
| Backstop Fee Shares | 965,281.25 | 4.20% |
| Second Lien Notes RSA Fee Shares | 287,500.00 | 1.25% |

| Total | 23,000,000 | 100.000000% |
|---|---|---|

There shall be no reduction in the Effective Date Issuance Amount in the event any Holders of Allowed Second Lien Notes Claims duly and timely elect (or are deemed to have elected) the Second Lien Notes Cash Option. Any shares of New Common Stock that would have been issued to such Holders had such Holders duly and timely elected the Second Lien Notes Stock Option will be allocated as follows: (a) 50.75% to Holders of Allowed Second Lien Notes Claims who duly and timely elect the Second Lien Notes Stock Option, (b) 45.00% to the recipients of the Exit Facility Shares, and (c) 4.25% to the recipients of the Backstop Fee Shares (in each case ratably among the Persons entitled to such distributions or fees, as applicable).

Each distribution and issuance of the New Common Stock as of the Effective Date shall be governed by the terms and conditions set forth in the Plan applicable to such distribution, issuance, and/or dilution, as applicable, and by the terms and conditions of the instruments evidencing or relating to such distribution, issuance, and/or dilution, as applicable, including the New Pyxus Constituent Documents and New Shareholders Agreement, the terms and conditions of which shall bind each Entity receiving such distribution of the New Common Stock. Any Entity's acceptance of New Common Stock shall be deemed as its agreement to the New Pyxus Constituent Documents and the New Shareholders Agreement, as the same may be amended or modified from time to time following the Effective Date in accordance with their terms.

The New Common Stock will not be registered on any exchange as of the Effective Date and may or may not (at the Debtors' discretion with the consent of the Required Consenting Second Lien Noteholders) meet the eligibility requirements of DTC. For the avoidance of doubt, distributions to Holders of Class 4 – Second Lien Notes Claims shall be made on or as soon as practicable after the Effective Date, and the Distribution Record Date shall not apply to such distributions. Notwithstanding anything set forth herein, in the Plan, or in the Confirmation Order, distributions of New Common Stock or Cash, as applicable, to the Holders of Second Lien Notes shall be made to or at the direction of the Second Lien Notes Indenture Trustee or the Distribution Agent as determined by the Debtors.

(b)    **The Exit ABL Facility and the Exit Term Facility.**

On the Effective Date, the Reorganized Debtors shall execute and deliver the Exit ABL Credit Agreement and the Exit Term Facility Agreement and shall execute, deliver, file, record, and issue any other related, notes, guarantees, security documents, instruments, or agreements in connection therewith, in each case, without (a) further notice to the Bankruptcy Court or (b) further act or action under applicable, law, regulation, order, or rule or the vote, consent, authorization, or approval of any Entity.

(c)    **The Exit Secured Notes.**

On the Effective Date, Reorganized Pyxus shall issue the Exit Secured Notes pursuant to the Exit Secured Notes Indenture in an initial aggregate principal amount equal to 102.1250% of the principal amount of First Lien Notes outstanding as of immediately prior to the Effective Date, and the Reorganized Debtors are authorized to and authorized to cause any non-Debtor guarantors to, execute, deliver, file, record, and issue any other related notes, guarantees, security documents, instruments, or agreements in connection therewith, in each case, without (a) further notice to the Bankruptcy Court or (b) further act or action under applicable law, regulation, order, or rule or the vote, consent, authorization, or approval of any Entity.

Confirmation of the Plan shall be deemed approval of the Exit Secured Notes, the Exit Secured Notes Indenture, all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith, including the payment of all fees, indemnities, and expenses provided for therein, authorization of the Reorganized Debtors to be party thereto to enter into and execute the Exit Secured Notes Indenture, and authorization for Reorganized Pyxus to create or perfect the Liens in connection therewith.

On the Effective Date, the collateral agent under the Exit Secured Notes Indenture shall be granted valid, binding, and enforceable Liens on the collateral specified in, and to the extent required by, the Exit Secured Notes

Indenture and the other documents executed in connection therewith. To the extent granted, the guarantees, mortgages, pledges, Liens, and other security interests granted pursuant to the Exit Secured Notes Indenture and the other documents executed in connection therewith are granted in good faith as an inducement to the collateral agent under the Exit Secured Notes Indenture to extend credit thereunder, shall be valid and enforceable, and shall be deemed not to constitute a fraudulent conveyance or fraudulent transfer, shall not otherwise be subject to avoidance, and the priorities of any such Liens and security interests shall be as set forth in the Exit Secured Notes Indenture, the Exit Intercreditor Agreements, and the other documents executed in connection therewith.

Alternatively, if Pyxus obtains and accepts a binding commitment for Replacement First Lien Financing on or prior to such day that is sixty (60) days after the Petition Date (and, in any event, prior to the Confirmation Date), such Replacement First Lien Financing shall be consummated on the Effective Date, and Reorganized Pyxus shall not issue any Exit Secured Notes. The proceeds of such Replacement First Lien Financing shall be used in accordance with the Plan.

For the avoidance of doubt, the Distribution Record Date shall not apply to distributions to Holders of Class 3 – First Lien Notes Claims. Notwithstanding anything set forth herein, in the Plan, or in the Confirmation Order, distributions of Exit Secured Notes or Cash, as applicable, to the Holders of First Lien Notes shall be made to or at the direction of the First Lien Notes Indenture Trustee or the Distribution Agent as determined by the Debtors.

(d)     **Cash on Hand.**

The Debtors or Reorganized Debtors, as applicable, shall use Cash on hand to fund distributions to certain Holders of Allowed Claims, consistent with the terms of the Plan.

**4.      New Shareholders Agreement.**

On the Effective Date, Reorganized Pyxus shall enter into and deliver the New Shareholders Agreement, in substantially the form included in the Plan Supplement, to each Holder of New Common Stock and such Holders shall be bound thereby, in each case without the need for execution by any party thereto other than Reorganized Pyxus.

**5.      Exemption from Registration Requirements.**

All shares of New Common Stock or other Securities, as applicable, issued and distributed pursuant to the Plan, will be issued and distributed without registration under the Securities Act or any similar federal, state, or local law in reliance upon (1) section 1145 of the Bankruptcy Code; (2) section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder; or (3) such other exemption as may be available from any applicable registration requirements.

The offering, issuance, and distribution of any shares of New Common Stock or of the Exit Secured Notes pursuant to the Plan in reliance upon section 1145 of the Bankruptcy Code is exempt from, among other things, the registration requirements of Section 5 of the Securities Act and any other applicable U.S. state or local law requiring registration prior to the offering, issuance, distribution, or sale of Securities. Such shares of New Common Stock or other Securities to be issued under the Plan pursuant to section 1145 of the Bankruptcy Code (a) are not "restricted securities" as defined in Rule 144(a)(3) under the Securities Act, and (b) subject to the terms of the New Shareholders Agreement, are freely tradable and transferable by any initial recipient thereof that (i) is not an "affiliate" of the Debtors as defined in Rule 144(a)(1) under the Securities Act, (ii) has not been such an "affiliate" within 90 days of such transfer, and (iii) is not an entity that is an "underwriter" as defined in subsection (b) of Section 1145 of the Bankruptcy Code.

All shares of New Common Stock or other Securities issued pursuant to the Plan that are not issued in reliance on section 1145 of the Bankruptcy Code will be issued without registration under the Securities Act or any similar federal, state, or local law in reliance on section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder, or such other exemption as may be available from any applicable registration requirements. All shares of New Common Stock issued pursuant to the exemption from registration set forth in section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder will be considered "restricted securities" and may not be transferred except

pursuant to an effective registration statement under the Securities Act or an available exemption therefrom. The New Common Stock underlying the New MIP will be issued pursuant to a registration statement or an available exemption from registration under the Securities Act and other applicable law.

The availability of the exemption under section 1145 of the Bankruptcy Code or any other applicable securities laws shall not be a condition to the occurrence of the Effective Date.

Should the Reorganized Debtors elect, on or after the Effective Date, to reflect all or any portion of the ownership of Reorganized Pyxus' New Common Stock or the Exit Secured Notes through the facilities of DTC, the Reorganized Debtors shall not be required to provide any further evidence other than the Plan or Final Order with respect to the treatment of such applicable portion of Reorganized Pyxus' New Common Stock or the Exit Secured Notes, and such Plan or Final Order shall be deemed to be legal and binding obligations of the Reorganized Debtors in all respects.

DTC shall be required to accept and conclusively rely upon the Plan and Final Order in lieu of a legal opinion regarding whether Reorganized Pyxus' New Common Stock or the Exit Secured Notes are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

Notwithstanding anything to the contrary in the Plan, no Entity (including, for the avoidance of doubt, DTC) may require a legal opinion regarding the validity of any transaction contemplated by the Plan, including, for the avoidance of doubt, whether Reorganized Pyxus' New Common Stock or the Exit Secured Notes are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

### 6. Corporate Existence.

Except as otherwise provided in the Plan or the Plan Supplement, each Debtor shall continue to exist after the Effective Date as a separate corporate entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws (or other formation documents) are amended under the Plan, the New Pyxus Constituent Documents, or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law).

### 7. Corporate Action.

On or before the Effective Date, as applicable, all actions contemplated under the Plan or the Plan Supplement shall be deemed authorized and approved in all respects, including: (1) adoption or assumption, as applicable, of the agreements with existing management; (2) selection of the directors, managers, and officers for the Reorganized Debtors; (3) implementation of the Restructuring Transactions; and (4) all other actions contemplated under the Plan (whether to occur before, on, or after the Effective Date). All matters provided for in the Plan involving the corporate structure of the Debtors or the Reorganized Debtors, as applicable, and any corporate action required by the Debtors or the Reorganized Debtors in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders, directors, managers, or officers of the Debtors or the Reorganized Debtors, as applicable. On or (as applicable) prior to the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Reorganized Debtors, including the New Shareholders Agreement, the New Pyxus Constituent Documents, the Exit ABL Credit Agreement, the Exit Term Facility Agreement, Exit Secured Notes Indenture or, if applicable, the Replacement First Lien Financing Agreement, and any and all other agreements, documents, securities, and instruments relating to the foregoing. The authorizations and approvals contemplated by Article IV.G of the Plan shall be effective notwithstanding any requirements under non-bankruptcy law.

8.        **Vesting of Assets in the Reorganized Debtors.**

Except as otherwise provided in the Plan or the Plan Supplement, or in any agreement, instrument, or other document incorporated in the Plan, on the Effective Date, all property in each Debtor's Estate, all Causes of Action, and any property acquired by any of the Debtors under the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances (except for Liens securing obligations on account of Other Secured Claims that are Reinstated pursuant to the Plan, if any). On and after the Effective Date, except as otherwise provided in the Plan, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

9.        **Cancellation of Facilities, Notes, Instruments, Certificates, and Other Documents.**

On the Effective Date, except to the extent otherwise provided in the Plan, all facilities, notes, instruments, certificates, shares, and other documents evidencing Claims or Interests shall be cancelled, and the obligations of the Debtors or the Reorganized Debtors thereunder or in any way related thereto shall be discharged and deemed satisfied in full, and the DIP Agent, First Lien Notes Indenture Trustee, and Second Lien Notes Indenture Trustee shall be released from all duties and obligations thereunder; *provided, however,* that notwithstanding Confirmation or the occurrence of the Effective Date, any credit document or agreement that governs the rights of the Holder of a Claim or Interest and any debt issued thereunder shall continue in effect solely for purposes of (1) allowing Holders of Allowed Claims to receive distributions under the Plan; (2) allowing and preserving the rights of the DIP Agent, First Lien Notes Indenture Trustee, and Second Lien Notes Indenture Trustee to make distributions pursuant to the Plan; (3) preserving the DIP Agent's, First Lien Notes Indenture Trustee's, and Second Lien Notes Indenture Trustee's rights to compensation and indemnification as against any money or property distributable to the Holders of First Lien Notes Claims, Holders of Second Lien Notes Claims, or Holders of DIP Facility Claims, including permitting the DIP Agent, First Lien Notes Indenture Trustee, and Second Lien Notes Indenture Trustee to maintain, enforce, and exercise their charging liens, if any, against such distributions; (4) preserving all rights, including rights of enforcement, of the DIP Agent, First Lien Notes Indenture Trustee, and Second Lien Notes Indenture Trustee against any Person other than a Released Party (including the Debtors), including with respect to indemnification or contribution from the Holders of First Lien Notes Claims, Holders of Second Lien Notes Claims, and Holders of DIP Facility Claims, pursuant and subject to the terms of the First Lien Notes Indenture, the Second Lien Notes Indenture, and the DIP Credit Agreement, respectively, as in effect on the Effective Date; (5) permitting the DIP Agent, First Lien Notes Indenture Trustee, and Second Lien Notes Indenture Trustee to enforce any obligation (if any) owed to the DIP Agent, First Lien Notes Indenture Trustee, and Second Lien Notes Indenture Trustee, respectively, under the Plan; (6) permitting the DIP Agent, First Lien Notes Indenture Trustee, and Second Lien Notes Indenture Trustee to appear in the Chapter 11 Cases or in any proceeding in the Bankruptcy Court or any other court; and (7) permitting the DIP Agent, First Lien Notes Indenture Trustee, and Second Lien Notes Indenture Trustee to perform any functions that are necessary to effectuate the foregoing; *provided, further, however,* that (a) the preceding proviso shall not affect the discharge of Claims or Interests pursuant to the Bankruptcy Code, the Confirmation Order, or the Plan, or result in any expense or liability to the Debtors or Reorganized Debtors, as applicable, except as expressly provided for in the Plan and (b) except as otherwise provided in the Plan, the terms and provisions of the Plan shall not modify any existing contract or agreement that would in any way be inconsistent with distributions under the Plan. The DIP Agent, First Lien Notes Indenture Trustee, and Second Lien Notes Indenture Trustee shall be discharged and shall have no further obligation or liability except as provided in the Plan and Confirmation Order, and after the performance by the DIP Agent, First Lien Notes Indenture Trustee, and Second Lien Notes Indenture Trustee and their representatives and professionals of any obligations and duties required under or related to the Plan or Confirmation Order, the DIP Agent, First Lien Notes Indenture Trustee, and Second Lien Notes Indenture Trustee shall be relieved of and released from any obligations and duties arising hereunder or thereunder. The fees, expenses, and costs of the DIP Agent, First Lien Notes Indenture Trustee, and Second Lien Notes Indenture Trustee, including fees, expenses, and costs of its professionals incurred after the Effective Date in connection with the DIP Credit Agreement, the First Lien Notes Indenture, and the Second Lien Notes Indenture, as applicable, and reasonable and documented costs and expenses associated with effectuating distributions pursuant to the Plan will be paid by the Reorganized Debtors in the ordinary course.

10.        **Effectuating Documents; Further Transactions.**

On and after the Effective Date, the Reorganized Debtors, and the officers and members of the boards of directors and managers thereof, are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, the New Shareholders Agreement, the New Pyxus Constituent Documents, and the Securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorizations, or consents except for those expressly required under the Plan.

### 11.    Exemptions from Certain Taxes and Fees.

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Reorganized Debtor or to any other Person) of property under the Plan or pursuant to: (1) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtors or the Reorganized Debtors, including the New Common Stock; (2) the Restructuring Transactions; (3) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (4) the making, assignment, or recording of any lease or sublease; (5) the grant of collateral as security for any or all of the Exit Term Facility, Exit ABL Facility, or Exit Secured Notes; or (6) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, sales or use tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment. All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(c) of the Bankruptcy Code, shall forego the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

### 12.    New Pyxus Constituent Documents.

The New Pyxus Constituent Documents shall, among other things: (1) contain terms consistent with the documentation set forth in the Plan Supplement; (2) authorize the issuance, distribution, and reservation of the New Common Stock to the Entities entitled to receive such issuances, distributions and reservations under the Plan; and (3) pursuant to and only to the extent required by section 1123(a)(6) of the Bankruptcy Code, and limited as necessary to facilitate compliance with non-bankruptcy federal laws, prohibit the issuance of non-voting equity Securities.

On or immediately before the Effective Date, Pyxus or Reorganized Pyxus, as applicable, will file its New Pyxus Constituent Documents with the applicable Secretary of State and/or other applicable authorities in its state of incorporation or formation in accordance with the applicable laws of its respective state of incorporation or formation, to the extent required for such New Pyxus Constituent Documents to become effective. After the Effective Date, Reorganized Pyxus may amend and restate its formation, organizational, and constituent documents as permitted by the laws of its jurisdiction of formation and the terms of such documents.

### 13.    Directors and Officers.

On the Effective Date, the Reorganized Pyxus Board shall be determined and selected consistent with the New Shareholders Agreement.

On the Effective Date, the terms of the current members of the Pyxus board of directors shall expire, and the Reorganized Pyxus Board will include those directors set forth in the list of directors of the Reorganized Debtors included in the Plan Supplement. On the Effective Date, the officers and overall management structure of Reorganized Pyxus, and all officers and management decisions with respect to Reorganized Pyxus (and/or any of its direct or indirect subsidiaries), compensation arrangements, and Affiliate transactions shall only be subject to the approval of

32

the Reorganized Pyxus Board.

From and after the Effective Date, each director, officer, or manager of the Reorganized Debtors shall be appointed and serve pursuant to the terms of their respective charters and bylaws or other formation and constituent documents, the New Shareholders Agreement, and the New Pyxus Constituent Documents, and applicable laws of the respective Reorganized Debtor's jurisdiction of formation. To the extent that any such director or officer of the Reorganized Debtors is an "insider" pursuant to section 101(31) of the Bankruptcy Code, the Debtors will disclose the nature of any compensation to be paid to such director or officer.

### 14. New MIP.

On or after the Effective Date, the Reorganized Pyxus Board shall adopt and institute the New MIP, enact and enter into related policies and agreements, and distribute New Common Stock to participants based on terms and conditions determined by the Reorganized Pyxus Board.

### 15. Preservation of Causes of Action.

In accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article VIII of the Plan, which shall be deemed released and waived by the Debtors and Reorganized Debtors as of the Effective Date.

The Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors. **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Reorganized Debtors will not pursue any and all available Causes of Action against it. The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity.** Unless any Cause of Action against an Entity is expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order of the Bankruptcy Court, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

### 16. Executory Contracts and Expired Leases.

(a)    Assumption of Executory Contracts and Unexpired Leases.

On the Effective Date, except as otherwise provided in the Plan or in any contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan, all Executory Contracts and Unexpired Leases shall be deemed assumed, including the Restructuring Support Agreement, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, as of the Effective Date under section 365 of the Bankruptcy Code, unless such Executory Contract and Unexpired Lease:  (1) was assumed or rejected previously by the Debtors; (2) previously expired or terminated pursuant to its own terms; (3) is the subject of a motion to reject Filed on or before the Effective Date; or (4) is identified on the Rejected Executory Contract and Unexpired Lease List. Any intercompany Executory Contracts or Unexpired Leases may be amended, assumed, assigned, or terminated as of the Effective Date as determined by the Reorganized Debtors with the consent of the Required Consenting Second Lien Noteholders (such consent not to be unreasonably withheld, conditioned or delayed) and in consultation with the Required Consenting First Lien Noteholders.

Entry of the Confirmation Order shall constitute a Bankruptcy Court order approving the assumptions or assumption and assignment, as applicable, of such Executory Contracts or Unexpired Leases as provided for in the

33

Plan, pursuant to sections 365(a) and 1123 of the Bankruptcy Code effective as of the Effective Date. Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order but not assigned to a third party before the Effective Date shall re-vest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its terms, except as such terms may have been modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption under applicable federal law. Any motions to assume Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by the Bankruptcy Court on or after the Effective Date by a Final Order.

To the maximum extent permitted by law, to the extent that any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption or assumption and assignment of such Executory Contract or Unexpired Lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto.

(b)    **Claims Based on Rejection of Executory Contracts or Unexpired Leases.**

Entry of the Confirmation Order shall constitute a Bankruptcy Court order approving the rejections, if any, of any Executory Contracts or Unexpired Leases as provided for in the Plan or the Rejected Executory Contract and Unexpired Lease List, as applicable. Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be Filed with the Solicitation Agent at the address specified in any notice of entry of the Confirmation Order and served on the Reorganized Debtors no later than 30 days after the effective date of such rejection.

**Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed with the Solicitation Agent within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors, the Reorganized Debtors, the Estates, or their property, without the need for any objection by the Debtors or Reorganized Debtors, or further notice to, action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, and be subject to the permanent injunction set forth in Article VIII.H of the Plan, notwithstanding anything in a Proof of Claim to the contrary.**

All Claims arising from the rejection by any Debtor of any Executory Contract or Unexpired Lease pursuant to section 365 of the Bankruptcy Code shall be treated as a General Unsecured Claim pursuant to Article III.B of the Plan and may be objected to in accordance with the provisions of Article VII of the Plan and the applicable provisions of the Bankruptcy Code and Bankruptcy Rules.

Notwithstanding anything to the contrary in the Plan, the Debtors, or the Reorganized Debtors, as applicable, reserve the right to alter, amend, modify, or supplement the Rejected Executory Contract and Unexpired Lease List at any time through and including thirty days after the Effective Date.

(c)    **Cure of Defaults and Objections to Cure and Assumption.**

The Reorganized Debtors shall satisfy any monetary defaults, if any, under any Executory Contract or Unexpired Lease to be assumed hereunder, to the extent required by section 365(b)(1) of the Bankruptcy Code, upon assumption thereof in the ordinary course of business. If a counterparty to an Executory Contract or Unexpired Lease believes any Cure amount is due, it shall assert the Cure Claim against the Debtors or Reorganized Debtors, as applicable, in the ordinary course of business, subject to all defenses the Debtors or Reorganized Debtors may have with respect to such Cure Claim. Any Cure Claim shall be deemed fully satisfied, released, and discharged upon payment by the Reorganized Debtors of the applicable Cure Claim. The Debtors, with the consent of the Required Consenting Noteholders, or the Reorganized Debtors, as applicable, may settle any Cure Claims without any further notice to or action, order, or approval of the Bankruptcy Court.

Unless otherwise agreed upon in writing by the parties to the applicable Executory Contract or Unexpired Lease, any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption must be Filed, served, and actually received by the counsel to the Debtors and the U.S. Trustee on the Confirmation Objection Deadline or other deadline that may be set by the Court. Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption will be deemed to have assented to such assumption.

In the event of a dispute regarding (1) the amount of any Cure Claim; (2) the ability of the Reorganized Debtors or any assignee to provide adequate assurance of future performance under the Executory Contract or Unexpired Lease to be assumed; or (3) any other matter pertaining to assumption or the payment of Cure Claims, payment of a Cure Claim, if any, shall occur as soon as reasonably practicable after the entry of a Final Order resolving such dispute and approving such assumption.

Each Debtor or Reorganized Debtor, as applicable, shall be authorized to reject any Executory Contract or Unexpired Lease to the extent the Debtor or the Reorganized Debtor, as applicable, in the exercise of its sound business judgment, concludes that the amount of the Cure obligation as determined by Final Order or as otherwise finally resolved, renders assumption of such Executory Contract or Unexpired Lease unfavorable to the applicable Debtor's Estate or the Reorganized Debtor. Such rejected Executory Contracts or Unexpired Leases shall be deemed as listed on the Rejected Executory Contract and Unexpired Lease List, if any.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption. **Any Proof of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.**

(d)    **Insurance Policies.**

Each of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto, are treated as Executory Contracts under the Plan. On the Effective Date, the Debtors shall be deemed to have assumed all insurance policies and any agreements, documents, and instruments relating to coverage of all insured Claims. Except as set forth in Article V.F the Plan, nothing in the Plan, the Plan Supplement, the Disclosure Statement, the Confirmation Order, or any other order of the Bankruptcy Court (including any other provision that purports to be preemptory or supervening), (1) alters, modifies, or otherwise amends the terms and conditions of (or the coverage provided by) any of such insurance policies or (2) alters or modifies the duty, if any, that the insurers or third party administrators pay claims covered by such insurance policies and their right to seek payment or reimbursement from the Debtors (or after the Effective Date, the Reorganized Debtors) or draw on any collateral or security therefor. For the avoidance of doubt, insurers and third party administrators shall not need to nor be required to File or serve a Cure objection or a request, application, claim, Proof of Claim, or motion for payment and shall not be subject to any claims bar date or similar deadline governing Cure amounts or Claims.

(e)    **Indemnification Provisions.**

On and as of the Effective Date, the Indemnification Provisions will be assumed and irrevocable and will survive the effectiveness of the Plan, and the Reorganized Debtors' New Pyxus Constituent Documents will provide for the indemnification, defense, reimbursement, exculpation, and/or limitation of liability of, and advancement of fees and expenses to the Debtors' and the Reorganized Debtors' current and former directors, officers, managers, and employees at least to the same extent as the organizational documents of each of the respective Debtors on the Petition Date. None of the Debtors, or the Reorganized Debtors, as applicable, will amend and/or restate their respective governance documents before or after the Effective Date to amend, augment, terminate, or adversely affect any of the Debtors' or the Reorganized Debtors' obligations to provide such indemnification rights or such current or former directors', officers', managers', or employees' indemnification rights.

On and as of the Effective Date, any of the Debtors' indemnification obligations with respect to any contract or agreement that is the subject of or related to any litigation against the Debtors or Reorganized Debtors, as applicable, shall be assumed by the Reorganized Debtors and otherwise remain unaffected by the Chapter 11 Cases.

(f)    **Director, Officer, Manager, and Employee Liability Insurance.**

On the Effective Date, pursuant to section 365(a) of the Bankruptcy Code, the Debtors shall be deemed to have assumed all of the D&O Liability Insurance Policies (including, if applicable, any "tail policy") and any agreements, documents, or instruments relating thereto. Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Reorganized Debtors' assumption of all such policies (including, if applicable, any "tail policy").

After the Effective Date, none of the Debtors or the Reorganized Debtors shall terminate or otherwise reduce the coverage under any such policies (including, if applicable, any "tail policy") with respect to conduct occurring prior to the Effective Date, and all officers, directors, managers, and employees of the Debtors who served in such capacity at any time before the Effective Date shall be entitled to the full benefits of any such policies regardless of whether such officers, directors, managers, or employees remain in such positions after the Effective Date.

On and after the Effective Date, each of the Reorganized Debtors shall be authorized to purchase a directors' and officers' liability insurance policy for the benefit of their respective directors, members, trustees, officers, and managers in the ordinary course of business.

(g)    **Employee and Retiree Benefits.**

Except as otherwise provided in the Plan, on and after the Effective Date, without limiting any authority to modify the same provided to the Reorganized Debtors and/or the Reorganized Pyxus Board under the Debtors' respective formation and constituent documents, employment policies, and contracts or under law, *provided*, that no modification shall impact any obligations arising prior to the Petition Date, the Reorganized Debtors shall: (1) honor in the ordinary course of business any assumed contracts, agreements, policies, programs, and plans, in accordance with their respective terms, for, among other things, compensation (including any incentive plans), retention plans, health care benefits, disability benefits, deferred compensation benefits, savings, severance benefits, retirement benefits, SERP benefits, SRAP benefits, welfare benefits, workers' compensation insurance, and accidental death and dismemberment insurance for the directors, officers, and employees of any of the Debtors who served in such capacity from and after the Petition Date; and (2) honor, in the ordinary course of business, Claims of employees employed as of the Effective Date for accrued vacation time arising prior to the Petition Date and not otherwise paid pursuant to a Bankruptcy Court order. Notwithstanding the foregoing, pursuant to section 1129(a)(13) of the Bankruptcy Code, from and after the Effective Date, all retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code) shall continue to be paid in accordance with applicable law.

Notwithstanding any other provision in the Plan, any provisions in any of the aforementioned compensation and benefits programs that provide rights to purchase or receive Pyxus Common Stock shall be cancelled and given no effect to the extent such Pyxus Common Stock has not been issued as of the Petition Date (and will be null and void and have no effect with respect to shares of New Common Stock after the Effective Date).

(h)    **Modifications, Amendments, Supplements, or Other Agreements.**

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter

the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

(i)      **Reservation of Rights.**

Neither the assumption of any Executory Contract or Unexpired Lease pursuant to the Plan nor exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Rejected Executory Contract and Unexpired Lease List, if any, nor anything contained in the Plan or Plan Supplement, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder.

If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption, the Debtors or the Reorganized Debtors, as applicable, shall have thirty calendar days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease, including by rejecting such contract or lease *nunc pro tunc* to the Confirmation Date. The deemed assumption provided in the Plan shall not apply to any such contract or lease, and any such contract or lease shall be assumed or rejected only upon motion of the Debtor following the Bankruptcy Court's determination that the contract is executory or the lease is unexpired.

(j)      **Nonoccurrence of Effective Date.**

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code, unless such deadline(s) have expired.

(k)      **Contracts and Leases Entered Into After the Petition Date.**

Contracts and leases entered into after the Petition Date by any Debtor and any Executory Contracts and Unexpired Leases assumed by any Debtor may be performed by the applicable Reorganized Debtor in the ordinary course of business.

**D.      Conditions to Consummation of the Plan.**

**1.      Conditions Precedent to the Effective Date.**

It shall be a condition to the Effective Date that the following conditions shall have been satisfied or waived pursuant to Article IX.B of the Plan:

1.      the Restructuring Support Agreement shall remain in full force and effect and shall not have been terminated;

2.      the Final DIP Order shall remain in full force and effect and no event of default shall have occurred and be continuing under the DIP Facility;

3.      all conditions precedent to the effectiveness of the Exit ABL Facility in form and substance consistent with the Restructuring Support Agreement in all respects shall have been satisfied or duly waived (or shall be satisfied contemporaneously with consummation of the Plan);

4.      the Plan Supplement and all of the schedules, documents, and exhibits contained therein, and all other schedules, documents, supplements and exhibits to the Plan, shall have been Filed, and shall be in form and substance consistent with the Restructuring Support Agreement in all respects;

5.      the Bankruptcy Court shall have entered the Confirmation Order in form and substance consistent with the Restructuring Support Agreement in all respects, and such

Confirmation Order shall have become a Final Order;

6.       the Debtors and applicable Consenting Noteholders shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan and each of the other transactions contemplated by the Restructuring Transactions;

7.       the Definitive Restructuring Documents in form and substance consistent with the Restructuring Support Agreement in all respects shall, where applicable, have been executed and remain in full force and effect (with all conditions precedent thereto having been satisfied or waived in accordance with their terms);

8.       the Plan shall not have been materially amended, altered or modified from the Plan as confirmed by the Confirmation Order, unless such material amendment, alteration or modification has been made in accordance with Article X.A of the Plan and the Restructuring Support Agreement;

9.       all fees and expenses provided for in the Restructuring Support Agreement and the DIP Credit Agreement shall have been paid in full by the Debtors in accordance with the Restructuring Support Agreement and the DIP Credit Agreement, as applicable; and

10.      the New Common Stock shall have been issued by Reorganized Pyxus in accordance with the Plan.

**2.       Waiver of Conditions Precedent to Confirmation or the Effective Date.**

Subject to Noteholder Approval Rights and the terms of the Restructuring Support Agreement, each condition to the Effective Date set forth in Article IX.A may be waived in whole or in part at any time by the Debtors without an order of the Bankruptcy Court.

**3.       Substantial Consummation.**

"Substantial Consummation" of the Plan, as defined in section 1101(2) of the Bankruptcy Code, with respect to any of the Debtors, shall be deemed to occur on the Effective Date with respect to such Debtor.

**4.       Effect of Non-Occurrence of Conditions to Consummation.**

If the Effective Date does not occur with respect to any of the Debtors, the Plan shall be null and void in all respects with respect to such Debtor, and nothing contained in the Plan or the Disclosure Statement shall: (1) constitute a waiver or release of any Claims by or Claims against or Interests in such Debtors; (2) prejudice in any manner the rights of such Debtors, any Holders of a Claim or Interest, or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking by such Debtors, any Holders, or any other Entity in any respect.

**E.       Settlement, Release, Injunction, and Related Provisions.**

**1.       Compromise and Settlement of Claims, Interests, and Controversies.**

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable. In accordance

with the provisions of the Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtors may compromise and settle Claims against, and Interests in, the Debtors and their Estates and Causes of Action against other Entities.

**2.      Binding Effect.**

**On the Effective Date, and effective as of the Effective Date, the Plan will bind, and will be deemed binding upon, all Holders of Claims against and Interests in the Debtors, and each Holder's respective successors and assigns, to the maximum extent permitted by applicable law, notwithstanding whether or not any such Holder (1) will receive or retain any property or interest in property under the Plan, (2) has Filed a Proof of Claim or Proof of Interest in the Chapter 11 Cases, or (3) voted to accept or reject the Plan.**

**3.      Discharge of Claims.**

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Debtor Intercompany Claims or Non-Debtor Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors prior to the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (1) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted the Plan or voted to reject the Plan. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the occurrence of the Effective Date, except as otherwise specifically provided in the Plan. For the avoidance of doubt, Allowed General Unsecured Claims shall be discharged in accordance with Article VIII.C of the Plan on the date each such Allowed General Unsecured Claim is satisfied in the ordinary course of business in accordance with the terms and conditions of the particular transaction or agreement giving rise to such Allowed General Unsecured Claims.

**4.      Release of Liens.**

**Except (1) with respect to the Liens securing Other Secured Claims that are Reinstated pursuant to the Plan, or (2) as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates and, subject to the consummation of the applicable distributions contemplated in the Plan, shall be fully released and discharged, at the sole cost and expense of the Reorganized Debtors, and the Holders of such mortgages, deeds of trust, Liens, pledges, or other security interests shall execute such documents as may be reasonably requested by the Debtors or the Reorganized Debtors, as applicable, to reflect or effectuate such releases, and all of the right, title, and interest of any Holders of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the applicable Reorganized Debtor and its successors and assigns.**

**5.      Debtor Release.**

**Effective as of the Effective Date, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Effective Date, each Released Party is deemed released and discharged by each and all of the Debtors, the Reorganized Debtors, and their Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action, directly or**

derivatively, by, through, for, or because of the foregoing Entities, from any and all Causes of Action, whether known or unknown (including any derivative claims, asserted or assertable on behalf of any of the Debtors) that the Debtors, the Reorganized Debtors, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), the purchase, sale, or rescission of any Security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the DIP Facility, the DIP Orders, the First Lien Notes, the Second Lien Notes, the Exit ABL Facility, the Exit Term Facility, the Exit Secured Notes or Replacement First Lien Financing, as applicable, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, entry into, or Filing of, as applicable, the Restructuring Support Agreement and related prepetition transactions, the Disclosure Statement, the New Pyxus Constituent Documents, the New Shareholders Agreement, the Plan, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the New Pyxus Constituent Documents, the New Shareholders Agreement, or the Plan (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion), the Plan Supplement, the Filing of the Chapter 11 Cases, the pursuit of Confirmation of the Plan, the pursuit of Consummation of the Plan, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act, omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date except for claims or liabilities arising out of or relating to any act or omission by a Released Party that is determined in a Final Order of a court of competent jurisdiction to have constituted actual fraud. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any obligations arising after Consummation of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, including the assumption of the Indemnification Provisions as set forth in the Plan.

6.      **Third-Party Release.**

Effective as of the Effective Date, each Releasing Party, in each case on behalf of itself and its respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, is deemed to have released and discharged each Debtor, Reorganized Debtor, and Released Party from any and all Causes of Action, whether known or unknown (including any derivative claims, asserted or assertable on behalf of any of the Debtors) that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership or operation thereof), the purchase, sale, or rescission of any Security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the DIP Facility, the DIP Orders, the First Lien Notes, the Second Lien Notes, the Exit ABL Facility, the Exit Term Facility, the Exit Secured Notes or Replacement First Lien Financing, as applicable, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, entry into, or Filing of, as applicable, the Restructuring Support Agreement and related prepetition transactions, the Disclosure Statement, the New Pyxus Constituent Documents, the New Shareholders Agreement, the Plan, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the New Pyxus Constituent Documents, the New Shareholders Agreement, or the Plan (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion), the Plan Supplement, the Filing of the Chapter 11 Cases, the pursuit of Confirmation of the Plan, the pursuit of Consummation of the Plan, the administration and implementation of the Plan,

including the issuance or distribution of any Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act, omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date except for claims or liabilities arising out of or relating to any act or omission by a Released Party that is determined in a Final Order of a court of competent jurisdiction to have constituted actual fraud. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any obligations arising after Consummation of any party or Entity under the Plan, any Restructuring Transaction, any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, including the assumption of the Indemnification Provisions as set forth in the Plan.

7.    Exculpation.

Effective as of the Effective Date, to the fullest extent permissible under applicable law and without affecting or limiting either the Debtor Release or the Third-Party Release, and except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is released and exculpated from any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the formulation, preparation, dissemination, negotiation, entry into, or Filing of, as applicable, the Restructuring Support Agreement and related prepetition transactions, the Chapter 11 Cases, the Disclosure Statement, the Plan, the Plan Supplement, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the Filing of the Chapter 11 Cases, the pursuit of Confirmation of the Plan, the pursuit of Consummation of the Plan, the administration and implementation of the Plan, including the issuance of any Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion), except for claims or liabilities arising out of or relating to any act or omission that is determined in a Final Order of a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

8.    Injunction.

Effective as of the Effective Date, pursuant to section 524(a) of the Bankruptcy Code, to the fullest extent permissible under applicable law, and except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities that have held, hold, or may hold Claims or Interests that have been released, discharged, or are subject to exculpation are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties: (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (3) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims or Interests unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a claim or interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or

**other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released or settled pursuant to the Plan.**

## VI.    Confirmation of the Plan

### A.    The Confirmation Hearing.

At the Confirmation Hearing, the Bankruptcy Court will determine whether to approve the Disclosure Statement and whether the Plan should be confirmed in light of both the affirmative requirements of the Bankruptcy Code and objections, if any, that are timely filed. **The Confirmation Hearing may be adjourned from time to time without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or the filing of a notice of such adjournment served in accordance with the order approving the Solicitation Procedures.**

### B.    Deadline to Object to Approval of the Disclosure Statement and Confirmation of the Plan.

Upon commencement of the Chapter 11 Cases and scheduling of the Confirmation Hearing, the Debtors will provide notice of the Confirmation Hearing, and, if approved by the Bankruptcy Court, the notice will provide that objections to the Disclosure Statement and Confirmation of the Plan must be filed and served at or before 5:00 p.m., prevailing Eastern Time, on July 20, 2020. Unless objections to the Disclosure Statement or Confirmation of the Plan are timely served and filed, they may not be considered by the Bankruptcy Court.

### C.    Requirements for Approval of the Disclosure Statement.

Pursuant to sections 1125(g) and 1126(b) of the Bankruptcy Code, prepetition solicitation of votes to accept or reject a chapter 11 plan must comply with applicable federal or state securities laws and regulations (including the registration and disclosure requirements thereof) or, if such laws and regulations do not apply, provide "adequate information" under section 1125 of the Bankruptcy Code. At the Confirmation Hearing, the Debtors will seek a determination from the Bankruptcy Court that the Disclosure Statement satisfies sections 1125(g) and 1126(b) of the Bankruptcy Code.

### D.    Requirements for Confirmation of the Plan.

#### 1.    Requirements of Section 1129(a) of the Bankruptcy Code.

Among the requirements for confirmation are the following: (a) the plan is accepted by all impaired classes of claims and interests or, if the plan is rejected by an impaired class, at least one impaired class of claims or interests has voted to accept the plan and a determination that the plan "does not discriminate unfairly" and is "fair and equitable" as to holders of claims in all rejecting impaired classes; (b) the plan is feasible; and (c) the plan is in the "best interests" of holders of Impaired Claims and Interests.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of section 1129 of the Bankruptcy Code. The Debtors believe that the Plan satisfies or will satisfy all of the necessary requirements of chapter 11 of the Bankruptcy Code. Specifically, in addition to other applicable requirements, the Debtors believe that the Plan satisfies or will satisfy the applicable Confirmation requirements of section 1129 of the Bankruptcy Code set forth below.

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The Debtors, as the Plan proponents, have complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or promised under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, will be disclosed to the Bankruptcy Court, and any such payment: (a) made before Confirmation will be reasonable or (b) will be subject to the approval of the Bankruptcy Court as reasonable, if it is to be fixed after Confirmation.

- Either each Holder of an Impaired Claim against or Interest in the Debtors will accept the Plan, or each non-accepting Holder will receive or retain under the Plan on account of such Claim or Interest property of a value, as of the Effective Date, that is not less than the amount that the Holder would receive or retain if the Debtors were liquidated on that date under chapter 7 of the Bankruptcy Code.

- Except to the extent that the Holder of a particular Claim agrees to a different treatment of its Claim, the Plan provides that, to the extent an Allowed Administrative Claim has not already been paid in full or otherwise satisfied during the Chapter 11 Cases, Allowed Administrative Claims and Other Priority Claims will be paid in full on the Effective Date, or as soon thereafter as is reasonably practicable.

- At least one Class of Impaired Claims will have accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in that Class.

- Confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the Debtors or any successors thereto under the Plan.

- All fees of the type described in 28 U.S.C. § 1930, including the fees of the U.S. Trustee, will be paid as of the Effective Date.

Section 1126(c) of the Bankruptcy Code provides that a class of claims has accepted a plan of reorganization if such plan has been accepted by creditors that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class. Section 1126(d) of the Bankruptcy Code provides that a class of interests has accepted a plan of reorganization if such plan has been accepted by holders of such interests that hold at least two-thirds in amount of the allowed interests of such class.

### 2.    The Debtor Release, Third-Party Release, Exculpation, and Injunction Provisions.

Article VIII of the Plan provides for releases of certain claims and Causes of Action the Debtors may hold against the Released Parties. The Released Parties are: (a) each of the Debtors; (b) the Reorganized Debtors; (c) the DIP Agent; (d) each of the DIP Lenders; (e) each Holder of a First Lien Notes Claim who votes in favor of the Plan; (f) the First Lien Notes Indenture Trustee; (g) each Holder of a Second Lien Notes Claim who votes in favor of the Plan; (h) the Second Lien Notes Indenture Trustee; (i) the agents or indenture trustees under the Exit Secured Notes, Exit ABL Facility, and Exit Term Facility; (j) each lender or holder under the Exit Secured Notes, Exit ABL Facility, and Exit Term Facility; (k) the Initial Commitment Parties; (l) each current and former Affiliate of each Entity in clause (a) through (k); and (m) each Related Party of each Entity in clause (a) through (l); *provided, however*, that in each case, an Entity shall not be a Released Party if it (A) timely provides, either formally or informally in writing, an objection to the releases contained in Article VIII.F of the Plan that is not resolved before Confirmation of the Plan or (B) elects to opt out of the releases contained in Article VIII.F of the Plan; *provided, further*, that any such Entity shall be identified by name as a non-Released Party in the Confirmation Order.

Article VIII of the Plan provides for releases of certain claims and Causes of Action that Holders of Claims may hold against the Released Parties in exchange for the good and valuable consideration and the valuable compromises made by the Released Parties (the "***Third-Party Releases***"). The Holders of Claims who are releasing certain claims and Causes of Action against the Released Parties identified in subsection (a)–(l) and those Released Parties identified in subsection (m) of the definition of "Released Party" on behalf of whom the parties identified in subsections (a)–(l) of the definition of "Released Party" have the authority, including under any agreement or applicable non-bankruptcy law, to grant the Third-Party Release set forth in Article VIII.F of the Plan; (b) the Holders of all Claims and Interests who vote to accept the Plan; (c) the Holders of all Claims or Interests that are Unimpaired under the Plan; (d) the Holders of all Claims or Interests whose

vote to accept or reject the Plan is solicited but who do not vote either to accept or to reject the Plan and do not opt out of granting the releases set forth in the Plan; (e) the Holders of all Claims or Interests who vote to reject the Plan but do not opt out of granting the releases set forth in the Plan; (f) the Holders of all Claims or Interests (other than Holders of Existing Pyxus Interests) who are deemed to reject the Plan and who do not (A) timely provide, either formally or informally in writing, an objection to the Third Party Releases or (B) elect to opt out of the Third Party Releases; (g) the Holders of all Claims and Interests (other than Holders of Existing Pyxus Interests) who were given notice of the opportunity to opt out of granting the Third Party Releases but did not opt out; (h) the Holders of Existing Pyxus Interests who do not timely submit an Equityholder Opt-Out Form opting out of the Third Party Releases; and (i) each Related Party of each Entity in clause (b) through clause (h).

Article VIII of the Plan provides for the exculpation of each Exculpated Party for certain acts or omissions taken in connection with the Chapter 11 Cases. The released and exculpated claims are limited to those claims or Causes of Action that may have arisen in connection with, related to, or arising out of the Plan, this Disclosure Statement, or the Chapter 11 Cases. The Exculpated Parties are: (a) the Debtors; (b) the Reorganized Debtors; (c) each Related Party of each Entity in clauses (a) and (b); and (d) any other Person entitled to the protections of section 1125(e) of the Bankruptcy Code; *provided* that non-Debtor Affiliates of the Debtors shall not be Exculpated Parties.

Article VIII of the Plan permanently enjoins Entities who have held, hold, or may hold Claims, Interests, or Liens that have been discharged or released pursuant to the Plan or are subject to exculpation pursuant to the Plan from asserting such Claims, Interests, or Liens against each Debtor, the Reorganized Debtors, the Exculpated Parties, and the Released Parties.

Under applicable law, a release provided by a debtor is appropriate where: (a) there is an identity of interest between the debtor and the third party, such that a suit against the released non-debtor party is, at core, a suit against the debtor or will deplete assets of the estate; (b) there is a substantial contribution by the non-debtor of assets to the reorganization; (c) the injunction is essential to the reorganization; (d) there is overwhelming creditor support for the injunction; and (e) the chapter 11 plan will pay all or substantially all of the claims affected by the injunction. *In re Indianapolis Downs, LLC*, 486 B.R. 286, 303 (Bankr. D. Del. 2013). Importantly, these factors are "neither exclusive nor are they a list of conjunctive requirements," but "[i]nstead, they are helpful in weighing the equities of the particular case after a fact-specific review." *Id.* Further, a chapter 11 plan may provide for a release of third-party claims against non-debtors, such as the Third-Party Releases, where such releases are consensual. *Id.* at 304–06. In addition, exculpation is appropriate where it applies to estate fiduciaries. *Id.* at 306. Finally, an injunction is appropriate where it is necessary to the reorganization and fair pursuant to section 105(a) of the Bankruptcy Code. *In re W.R. Grace & Co.*, 475 B.R. 34, 107 (D. Del. 2012). In addition, approval of the releases, exculpations, and injunctions for each of the Released Parties and each Exculpated Party as part of Confirmation of the Plan will be limited to the extent such releases, exculpations, and injunctions are permitted by applicable law.

The Debtors believe that the releases, exculpations, and injunctions set forth in the Plan are appropriate because, among other things, the releases are narrowly tailored to the Debtors' restructuring proceedings, and each of the Released Parties has contributed value to the Debtors and aided in the reorganization process, which facilitated the Debtors' ability to propose and pursue Confirmation. The Debtors believe that each of the Released Parties has played an integral role in formulating the Plan and has expended significant time and resources analyzing and negotiating the issues presented by the Debtors' prepetition capital structure. The Debtors further believe that such releases, exculpations, and injunctions are a necessary part of the Plan. In addition, the Debtors believe the Third-Party Releases are entirely consensual under the established case law in the United States Bankruptcy Court for the District of Delaware. *See In re Indianapolis Downs, LLC*, 486 B.R. at 304–06. The Debtors will be prepared to meet their burden to establish the basis for the releases, exculpations, and injunctions for each of the Released Parties and each Exculpated Party as part of Confirmation of the Plan.

### 3.    Best Interests of Creditors—Liquidation Analysis.

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each class, that each holder of a claim or an interest in such class either (a) has accepted the plan, or (b) will receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtors liquidated under chapter 7 of the Bankruptcy Code.

To demonstrate compliance with the "best interests" test, the Debtors, with the assistance of their advisors, prepared the Liquidation Analysis, attached hereto as Exhibit F, showing that the value of the distributions provided to holders of Allowed Claims and Interests under the Plan would be the same or greater than under a hypothetical chapter 7 liquidation. Accordingly, the Debtors believe that the Plan is in the best interests of creditors.

### 4.    Feasibility/Financial Projections.

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a chapter 11 plan of reorganization is not likely to be followed by the liquidation of the reorganized debtor or the need for further financial reorganization of the debtor, or any successor to the debtor (unless such liquidation or reorganization is proposed in the chapter 11 plan). For purposes of determining whether the Plan meets this requirement, the Debtors have analyzed their ability to meet their obligations under the Plan. As part of this analysis, the Debtors, RPA, and Lazard have prepared certain Financial Projections, which projections and the assumptions upon which they are based are attached hereto as Exhibit D. Based on these Financial Projections, the Debtors believe the deleveraging contemplated by the Plan meets the financial feasibility requirement. Moreover, the Debtors believe that sufficient funds will exist to make all payments required by the Plan. Accordingly, the Debtors believe that the Plan satisfies the feasibility requirement of section 1129(a)(11) of the Bankruptcy Code.

### 5.    Acceptance by Impaired Classes.

The Bankruptcy Code requires that, except as described in the following section, each impaired class of claims or interests must accept a plan in order for it to be confirmed. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to the class is not required. A class is "impaired" unless the plan: (a) leaves unaltered the legal, equitable, and contractual rights to which the claim or the interest entitles the holder of the claim or interest; (b) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder of such claim or interest; or (c) provides that, on the consummation date, the holder of such claim receives Cash equal to the allowed amount of that claim or, with respect to any equity interest, the holder of such interest receives value equal to the greater of (i) any fixed liquidation preference to which the holder of such equity interest is entitled, (ii) the fixed redemption price to which such holder is entitled, or (iii) the value of the interest.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of allowed claims in that class, counting only those claims that actually voted to accept or to reject the plan. Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number of creditors actually voting cast their ballots in favor of acceptance. For a class of impaired interests to accept a plan, section 1126(d) of the Bankruptcy Code requires acceptance by interest holders that hold at least two-thirds in amount of the allowed interests of such class, counting only those interests that actually voted to accept or reject the plan. Thus, a class of interests will have voted to accept the plan only if two-thirds in amount actually voting cast their ballots in favor of acceptance.

### 6.    Confirmation Without Acceptance by All Impaired Classes.

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted the plan, *provided* that the plan has been accepted by at least one impaired class of claims. Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as "cramdown," so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

If any Impaired Class of Claims or Interests rejects the Plan, including Classes of Claims or Interests deemed to reject the Plan, the Debtors will request Confirmation of the Plan, as it may be modified from time to time, utilizing the "cramdown" provision under section 1129(b) of the Bankruptcy Code. The Debtors reserve the right to modify the Plan in accordance with Article X of the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims

to render such Class of Claims Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules or to withdraw the Plan as to such Debtor.

The Debtors believe that the Plan and the treatment of all Classes of Claims and Interests under the Plan satisfy the requirements for cramdown and the Debtors will be prepared to meet their burden to establish that the Plan can be confirmed pursuant to section 1129(b) of the Bankruptcy Code as part of Confirmation of the Plan.

        (a)        **No Unfair Discrimination.**

The "unfair discrimination" test applies with respect to classes of claim or interests that are of equal priority but are receiving different treatment under a proposed plan. The test does not require that the treatment be the same or equivalent, but that the treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (*e.g.*, classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly. Under certain circumstances, a proposed plan may treat two classes of unsecured creditors differently without unfairly discriminating against either class.

With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank. Accordingly, the Debtors believe that the Plan meets the standard to demonstrate that the Plan does not unfairly discriminate and the Debtors will be prepared to meet their burden to establish that there is no unfair discrimination as part of Confirmation of the Plan.

        (b)        **Fair and Equitable Test.**

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the amount of the allowed claims in such class. As to each non-accepting class and as set forth below, the test sets different standards depending on the type of claims or interests in such class. The Debtors believe that the Plan satisfies the "fair and equitable" requirement, notwithstanding the fact that certain Classes are deemed to reject the Plan. There is no Class receiving more than a 100% recovery and no junior Class is receiving a distribution under the Plan until all senior Classes have received a 100% recovery or agreed to receive a different treatment under the Plan or had the opportunity to submit a Superior Alternative Proposal.

        (i)        **Secured Claims.**

The condition that a plan be "fair and equitable" to a non-accepting class of secured claims includes the requirements that: (A) the holders of such secured claims retain the liens securing such claims to the extent of the allowed amount of the claims, whether the property subject to the liens is retained by the debtor or transferred to another entity under the plan; and (B) each holder of a secured claim in the class receives deferred cash payments totaling at least the allowed amount of such claim with a value, as of the effective date, at least equivalent to the value of the secured claimant's interest in the debtor's property subject to the claimant's liens. In addition, it would be "fair and equitable" if a secured creditor has a right to credit bid for the debtors' assets pursuant to section 363(k) of the Bankruptcy Code. For the avoidance of doubt, and to the extent applicable, the Plan shall be deemed to be a sale of all of the Debtors' assets, solely for purposes of Section 1129(b)(2)(a)(ii) of the Bankruptcy Code, to Holders of Second Lien Notes Claims as directed by the majority of the Holders of Second Lien Notes Claims under their collateral documents, and, as contemplated by section 363(k) of the Bankruptcy Code, such sale was subject to any Superior Alternative Proposal (as defined in the Restructuring Support Agreement), and no such Superior Alternative Proposal was received and/or accepted by the Debtors.

        (ii)        **Unsecured Claims.**

The condition that a plan be "fair and equitable" to a non-accepting class of unsecured claims includes the requirement that either: (A) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date, equal to the allowed amount of such claim; or (B) the holder

of any claim or any interest that is junior to the claims of such class will not receive or retain any property under the plan on account of such junior claim or junior interest, subject to certain exceptions.

(iii)     **Interests.**

The condition that a plan be "fair and equitable" to a non-accepting class of interests, includes the requirements that either: (A) the plan provides that each holder of an interest in that class receives or retains under the plan on account of that interest property of a value, as of the effective date, equal to the greater of: (1) the allowed amount of any fixed liquidation preference to which such holder is entitled; (2) any fixed redemption price to which such holder is entitled; or (3) the value of such interest; or (B) the holder of any interest that is junior to the interests of such class will not receive or retain any property under the plan on account of such junior interest.

**7.     Valuation of the Debtors.**

The Debtors' investment banker, Lazard, has prepared an independent valuation analysis, which is attached to this Disclosure Statement as Exhibit E (the "*Valuation Analysis*"). The Valuation Analysis should be considered in conjunction with the Risk Factors discussed in Section VIII of this Disclosure Statement, entitled "Risk Factors," and the Financial Projections. The Valuation Analysis is dated as of June 14, 2020, and is based on data and information as of that date. Holders of Claims should carefully review the information in Exhibit E in its entirety. The Debtors believe that the Valuation Analysis demonstrates that the Plan is "fair and equitable" to the non-accepting Classes.

**VII.     Voting Instructions**

**A.     Overview.**

Holders of Claims in a Class entitled to vote should carefully read the below voting instructions.

**B.     Solicitation Procedures.**

**1.     Solicitation Agent.**

The Debtors have proposed to retain Prime Clerk to act, among other things, as the Solicitation Agent in connection with the solicitation of votes to accept or reject the Plan. The Solicitation Agent will process and tabulate Ballots for each Class entitled to vote to accept or reject the Plan and will file the Voting Report as soon as practicable after the Voting Deadline. The Solicitation Agent will also process and tabulate the Equityholder Opt-Out Forms and the Second Lien Notes Stock Election Forms.

**2.     Solicitation Package.**

The following materials constitute the solicitation package (the "*Solicitation Package*") distributed to Holders of Claims in the Voting Classes:

- the appropriate Ballot and applicable voting instructions, together with a pre-addressed, postage pre-paid return envelope; and

- this Disclosure Statement and all exhibits hereto, including the Plan and all exhibits thereto (which may be distributed in paper or USB-flash drive format).

**3.     Voting Deadline.**

The period during which Ballots with respect to the Plan will be accepted by the Debtors will terminate at **5:00 p.m. prevailing Eastern Time on July 20, 2020**, unless the Debtors extend the date until which Ballots will be accepted. Except to the extent that the Debtors so determine or as permitted by the Bankruptcy Court, Ballots that are

47

received after the Voting Deadline will not be counted or otherwise used by the Debtors in connection with the Debtors' request for Confirmation of the Plan (or any permitted modification thereof).

The Debtors reserve the right, at any time or from time to time, to extend the period of time (on a daily basis, if necessary) during which Ballots will be accepted for any reason, including determining whether or not the requisite number of acceptances have been received, by making a public announcement of such extension no later than the first Business Day next succeeding the previously announced Voting Deadline. The Debtors will give notice of any such extension in a manner deemed reasonable by the Debtors in their discretion. There can be no assurance that the Debtors will exercise their right to extend the Voting Deadline.

4.      **Distribution of the Solicitation Package and Plan Supplement.**

On June 14, 2020, which is more than 28 days before the Voting Deadline, the Debtors caused the Solicitation Agent to distribute the Solicitation Package to Holders of Claims in the Voting Classes (or their brokers, dealers, commercial banks, trust companies, or other agent nominees) by electronic mail and overnight mail.

The Solicitation Package may also be obtained from the Solicitation Agent by: (a) calling 1-(844)-974-2130 (domestic toll-free) or 1-(929)-955-3418 (international toll), and asking for the Solicitation Group; (b) emailing pyxusballots@primeclerk.com and referencing "Pyxus Ballot Processing" in the subject line; or (c) writing to the following address: Pyxus Ballot Processing, c/o Prime Clerk LLC, One Grand Central Place, 60 East 42nd Street, Suite 1440, New York, NY 10165. When the Debtors file the Chapter 11 Cases, you may also obtain copies of any pleadings filed with the Bankruptcy Court for free by visiting the Debtors' restructuring website, https://cases.primeclerk.com/pyxus, or for a fee at https://ecf.deb.uscourts.gov/.

The Debtors will file the Plan Supplement in accordance with the terms of the Plan on or before July 13, 2020 (or such other date as the Bankruptcy Court may direct). As the Plan Supplement is updated or otherwise modified, such modified or updated documents will be made available on the Debtors' restructuring website. The Debtors will not serve paper or CD-ROM copies of the Plan Supplement; however, parties may obtain a copy of the Plan Supplement at no cost from the Solicitation Agent by: (a) calling the Solicitation Agent at one of the telephone numbers set forth above; (b) visiting the Debtors' restructuring website, https://cases.primeclerk.com/pyxus; or (c) emailing the Solicitation Agent at the email address set forth above.

C.      **Voting Procedures.**

June 12, 2020 (the "***Record Date***"), is the date that was used for determining which Holders of Claims are entitled to vote to accept or reject the Plan and receive the Solicitation Package in accordance with the solicitation procedures. Except as otherwise set forth herein, the Record Date and all of the Debtors' solicitation and voting procedures shall apply to all of the Debtors' creditors and other parties in interest.

In order for the Holder of a Claim in a Voting Class to have such Holder's Ballot counted as a vote to accept or reject the Plan, such Holder's Ballot must be properly completed, executed, and delivered by following the instructions received with the Ballot, so that such Holder's Ballot including their vote is **actually received** by the Solicitation Agent before the Voting Deadline or, with respect a Claim in a Voting Class held through a nominee, to the nominee with sufficient time for the nominee to complete and return the master ballot to the Solicitation Agent prior to the Voting Deadline, as applicable.

IF A BALLOT IS RECEIVED AFTER THE VOTING DEADLINE, IT WILL NOT BE COUNTED UNLESS THE DEBTORS DETERMINE OTHERWISE.

ANY BALLOT THAT IS PROPERLY EXECUTED BY THE HOLDER OF A CLAIM BUT THAT DOES NOT CLEARLY INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN OR ANY BALLOT THAT INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN WILL NOT BE COUNTED FOR PURPOSES OF ACCEPTING OR REJECTING THE PLAN.

EACH HOLDER OF A CLAIM IN A VOTING CLASS MUST VOTE ALL OF ITS CLAIMS WITHIN THE VOTING CLASS EITHER TO ACCEPT OR REJECT THE PLAN AND MAY NOT SPLIT SUCH VOTES. BY SIGNING AND RETURNING A BALLOT, EACH HOLDER OF A CLAIM WILL CERTIFY TO THE BANKRUPTCY COURT AND THE DEBTORS THAT NO OTHER BALLOTS WITH RESPECT TO SUCH CLAIM HAVE BEEN CAST OR, IF ANY OTHER BALLOTS HAVE BEEN CAST WITH RESPECT TO SUCH CLASS OF CLAIMS, ONLY THE LAST PROPERLY EXECUTED BALLOT CAST PRIOR TO THE VOTING DEADLINE WILL BE COUNTED AND ANY OTHER PREVIOUSLY CAST BALLOT SHALL BE DEEMED REVOKED.

IT IS IMPORTANT THAT THE HOLDER OF A CLAIM IN THE VOTING CLASSES FOLLOWS THE SPECIFIC INSTRUCTIONS PROVIDED ON SUCH HOLDER'S BALLOT.

**D.      Voting Tabulation.**

A Ballot does not constitute, and shall not be deemed to be, a Proof of Claim or an assertion or admission of a Claim. Only Holders of Claims in the Voting Classes (or their nominees) shall be entitled to vote with regard to such Claims.

Unless the Debtors decide otherwise, Ballots received after the Voting Deadline may not be counted. A Ballot will be deemed delivered only when the Solicitation Agent actually receives the executed Ballot as instructed in the applicable voting instructions. No Ballot should be sent to the Debtors, the Debtors' agents (other than the Solicitation Agent), or the Debtors' financial or legal advisors.

The Bankruptcy Code may require the Debtors to disseminate additional solicitation materials if the Debtors make material changes to the terms of the Plan or if the Debtors waive a material condition to Confirmation. In that event, Solicitation will be extended to the extent directed by the Bankruptcy Court.

To the extent there are multiple Claims within the same Voting Class, the Debtors may, in their discretion, and to the extent possible, aggregate the Claims of any particular Holder within a Voting Class for the purpose of counting votes.

In the event a designation of lack of good faith is requested by a party in interest under section 1126(e) of the Bankruptcy Code, the Bankruptcy Court will determine whether any vote to accept and/or reject the Plan cast with respect to that Claim will be counted for purposes of determining whether the Plan has been accepted and/or rejected.

The following Ballots will not be counted in determining the acceptance or rejection of the Plan: (a) any Ballot that is illegible or contains insufficient information to permit the identification of the Holder of the Claim; (b) any Ballot that is not actually received by the Solicitation Agent by the Voting Deadline (unless the Debtors determine otherwise or as permitted by the Court); (c) any unsigned Ballot; (d) other than a master ballot, any Ballot that partially rejects and partially accepts the Plan; (e) any Ballot not marked to accept or reject the Plan or marked to both accept and reject the Plan; (f) any Ballot superseded by a later, timely submitted valid Ballot; (g) any improperly submitted Ballot, or any form of ballot other than the official form of Ballot sent by the Solicitation Agent (unless the Debtors determine otherwise or as permitted by the Court); and (h) any Ballot cast by a Person or entity that does not hold a Claim in a Class that is entitled to vote on the Plan.

In addition, the following additional procedures will apply in tabulating master ballots:

- All nominees are required to retain the beneficial holder ballots cast by their respective beneficial holders (or a record thereof if such vote was otherwise cast in accordance with the nominees' customary practices) for inspection for a period of one year following the Voting Deadline;

- Votes cast by holders of securities through nominees will be applied to the applicable positions held by such nominees as of the Voting Record Date, as evidenced by the record and depository listings. Votes submitted by a nominee shall not be counted in excess of the amount of securities held by such nominee as of the Voting Record Date;

- If conflicting votes or "over-votes" are submitted by a nominee, the Solicitation Agent shall use reasonable efforts to reconcile discrepancies with the nominee;

- If over-votes are submitted by a nominee that are not reconciled prior to the preparation of the certification of vote results, the votes to accept and to reject the Plan shall be approved in the same proportion as the votes to accept and to reject the Plan submitted by the nominee, but only to the extent of the nominee's Voting Record Date position in the securities;

- For the purposes of tabulating votes, each beneficial holder shall be deemed (regardless of whether such holder includes interest in the amount voted on its Ballot) to have voted only the principal amount of its securities.

A single nominee may complete and deliver to the Solicitation Agent multiple master ballots. Votes reflected on multiple master ballots shall be counted except to the extent that they are duplicative of other master ballots. If two or more master ballots are inconsistent, the last properly completed master ballot received prior to the Voting Deadline shall, to the extent of such inconsistency, supersede any prior received master ballot.

As soon as practicable after the Voting Deadline, the Solicitation Agent will file the Voting Report with the Bankruptcy Court. The Voting Report shall, among other things, delineate every Ballot that does not conform to the voting instructions or that contains any form of irregularity (each an "*Irregular Ballot*"), including those Ballots that are late or (in whole or in material part) illegible, unidentifiable, lacking signatures, lacking necessary information, or damaged. The Solicitation Agent will attempt to reconcile the amount of any Claim reported on a Ballot with the Debtors' or nominee's records, as applicable, but in the event such amount cannot be timely reconciled without undue effort on the part of the Solicitation Agent, the amount shown in the Debtors' or nominee's records, as applicable, shall govern. The Voting Report also shall indicate the Debtors' intentions with regard to such Irregular Ballots. Neither the Debtors nor any other Person or Entity will be under any duty to provide notification of defects or irregularities with respect to delivered Ballots other than as provided in the Voting Report, nor will any of them incur any liability for failure to provide such notification.

**E.      Equityholder Opt-Out Forms.**

Holders of Existing Pyxus Interests may elect to opt out of the voluntary releases contained in Article VIII.F of the Plan by timely submitting an Equityholder Opt-Out Form. The Debtors will serve the Equityholder Opt-Out Form on Holders of Existing Pyxus Interests (or their Nominees) on or before June 20, 2020 (or such other date as the Bankruptcy Court may direct). Holders of Existing Pyxus Interests who wish to opt out of granting the voluntary releases contained in Article VIII.F of the Plan must complete an Equityholder Opt-Out Form and return it to the Solicitation Agent so that it is actually received by the Solicitation Agent **on or before July 20, 2020 at 5:00 p.m. (Prevailing Eastern Time) (or such other date as the Bankruptcy Court may direct) (the "*Equityholder Opt-Out Deadline*").**

**Holders of Exiting Pyxus Interests that do not complete and return the Equityholder Opt-Out Form so that it is received by the Solicitation Agent by the Equityholder Opt-Out Deadline will be deemed to have granted the releases contained in Article VIII.F of the Plan.**

Although the Plan does not provide for a distribution to Holders of Existing Pyxus Interests on account of such Existing Pyxus Interests, each Holder of Pyxus Common Stock will automatically receive its ratable share of the Existing Equity Cash Pool (determined based upon the aggregate number of shares of Pyxus Common Stock held by such Holder as a percentage of all shares of Pyxus Common Stock as of the date of distribution to such Holders) unless such Holder of Pyxus Common Stock (i) opts out of the releases contained in Article VIII.F of the Plan by submitting an Equityholder Opt-Out Form by the Equityholder Opt-Out Deadline, or (ii) opposes, objects to, or seeks to impede or delay confirmation of the Plan. **Any Holder of Pyxus Common Stock that opts not to grant the releases contained in Article VIII.F of the Plan by submitting an Equityholder Opt-Out Form or objects to, opposes, or seeks to impede or delay confirmation of the Plan shall not be entitled to receive any portion of the Existing Equity Cash Pool.**

**HOLDERS OF EXISTING PYXUS INTERESTS SHOULD <u>NOT</u> SUBMIT AN EQUITYHOLDER OPT-OUT FORM IF THEY WISH TO (X) RECEIVE THEIR PRO RATA SHARE OF THE EXISTING EQUITY CASH POOL (IF APPLICABLE) AND (Y) BE SUBJECT TO AND BENEFIT FROM THE RELEASES IN ARTICLE VIII.F OF THE PLAN.**

F.     **Second Lien Notes Stock Election Forms.**

Each Holder of Class 4 Second Lien Notes Claims may elect on a form to be delivered by the Solicitation Agent (the "***Second Lien Notes Stock Election Form***") to receive such Holder's *pro rata* share of New Common Stock from the Second Lien Notes Common Stock Pool (the "***Second Lien Notes Stock Option***"). The Debtors will serve the Second Lien Notes Stock Election Form on Holders of Second Lien Notes Claims (or their Nominees) on or before June 20, 2020 (or such other date as the Bankruptcy Court may direct). Holders of Second Lien Notes Claims who wish to exercise the Second Lien Notes Stock Option must complete a Second Lien Notes Stock Election Form and return it to the Solicitation Agent so that it is actually received by the Solicitation Agent **on or before July 20, 2020 at 5:00 p.m. (Prevailing Eastern Time) (or such other date as the Bankruptcy Court may direct) (the "***Second Lien Notes Stock Option Deadline***").**

**Holders of Second Lien Notes Claims that do not complete and return the Second Lien Notes Stock Election Form so that it is received by the Solicitation Agent by the Second Lien Notes Stock Option Deadline will receive payment in Cash equal to 2.00% of the aggregate outstanding principal amount of Second Lien Notes held by such Holder as of the date of distribution to Holders of Allowed Second Lien Notes Claims.**

**HOLDERS OF SECOND LIEN NOTES CLAIMS SHOULD <u>NOT</u> SUBMIT A SECOND LIEN NOTES STOCK ELECTION FORM IF THEY WISH TO RECEIVE PAYMENT IN CASH.**

<div align="center">

VIII.     <u>Risk Factors</u>

</div>

**BEFORE TAKING ANY ACTION WITH RESPECT TO THE PLAN, HOLDERS OF CLAIMS AGAINST THE DEBTORS WHO ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN SHOULD READ AND CONSIDER CAREFULLY THE RISK FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT, THE PLAN, AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH, REFERRED TO, OR INCORPORATED BY REFERENCE INTO THIS DISCLOSURE STATEMENT, INCLUDING OTHER DOCUMENTS FILED WITH THE BANKRUPTCY COURT IN THE CHAPTER 11 CASES. EACH OF THE RISK FACTORS DISCUSSED IN THIS DISCLOSURE STATEMENT MAY APPLY EQUALLY TO THE DEBTORS AND THE REORGANIZED DEBTORS, AS APPLICABLE AND AS CONTEXT REQUIRES.**

**THIS SECTION PROVIDES INFORMATION REGARDING POTENTIAL RISKS IN CONNECTION WITH THE PLAN. THE FACTORS BELOW SHOULD NOT BE REGARDED AS THE ONLY RISKS ASSOCIATED WITH THE PLAN OR ITS IMPLEMENTATION. THE RISK FACTORS SHOULD NOT BE REGARDED AS CONSTITUTING THE ONLY RISKS PRESENT IN CONNECTION WITH THE DEBTORS' BUSINESSES OR THE RESTRUCTURING AND CONSUMMATION OF THE PLAN. ADDITIONAL RISK FACTORS IDENTIFIED IN THE DEBTORS' PUBLIC FILINGS WITH THE SEC MAY ALSO BE APPLICABLE TO THE MATTERS SET OUT HEREIN AND SHOULD BE REVIEWED AND CONSIDERED IN CONJUNCTION WITH THIS DISCLOSURE STATEMENT, TO THE EXTENT APPLICABLE. THE RISK FACTORS SET FORTH IN THE DEBTORS' ANNUAL REPORT ON FORM 10-K FOR THE FISCAL YEAR ENDED MARCH 31, 2019 FILED WITH THE SEC ON JUNE 14, 2019, AS UPDATED BY THE QUARTERLY REPORT ON FORM 10-Q FOR THE QUARTER ENDED JUNE 30, 2019 FILED WITH THE SEC ON AUGUST 9, 2019, THE QUARTERLY REPORT ON FORM 10-Q FOR THE QUARTER ENDED SEPTEMBER 30, 2019 FILED WITH THE SEC ON NOVEMBER 7, 2019, THE QUARTERLY REPORT ON FORM 10-Q FOR THE QUARTER ENDED DECEMBER 31, 2019 FILED WITH THE SEC ON FEBRUARY 10, 2019, AND ALL FILED FORM 8-KS ARE HEREBY INCORPORATED BY REFERENCE. ANY CURRENT REPORTS ON FORM 8-K (OTHER THAN INFORMATION FURNISHED PURSUANT TO ITEMS 2.02 OR 7.01 AND ANY RELATED EXHIBITS OF ANY FORM 8-K, UNLESS EXPRESSLY STATED OTHERWISE THEREIN), QUARTERLY REPORTS ON FORM 10-Q OR ANNUAL REPORTS ON FORM 10-K FILED BY THE DEBTORS WITH THE SEC AFTER**

**THE DATE OF THIS DISCLOSURE STATEMENT MAY ALSO INCLUDE RISK FACTORS AND WILL BE CONSIDERED A PART OF THIS DISCLOSURE STATEMENT FROM THE DATE OF THE FILING OF SUCH DOCUMENTS. NEW FACTORS, RISKS AND UNCERTAINTIES EMERGE FROM TIME TO TIME AND IT IS NOT POSSIBLE TO PREDICT ALL SUCH FACTORS, RISKS AND UNCERTAINTIES.**

**A.     Risks Related to the Restructuring.**

**1.     The Restructuring May Take Longer Than Anticipated.**

It is impossible to predict with certainty the amount of time required to confirm the Plan or conclude the Chapter 11 Cases. Although the Plan is designed to minimize the length of the Chapter 11 Cases, it is impossible to predict with certainty the amount of time that one or more of the Debtors may spend in bankruptcy or to assure parties in interest that the Plan will be confirmed. Any material delay in the confirmation of the Plan, the Chapter 11 Cases, or the threat of rejection of the Plan by the Bankruptcy Court, would add substantial expense and uncertainty to the process. Further, prolonged bankruptcy proceedings may divert Debtors' resources, including the attention of the Debtors' management, away from business operations.

The uncertainty surrounding a prolonged restructuring would have other adverse effects on the Company. For example, it would adversely affect:

- the Company's ability to raise additional capital;

- the Company's liquidity, including its ability to access the Foreign Credit Lines;

- how the Company's business is viewed by regulators, investors, lenders, and credit ratings agencies;

- the Company's enterprise value; and

- the Company's relationships with customers and vendors.

Even if confirmed on a timely basis, bankruptcy cases to confirm the Plan could have an adverse effect on the Company's business.

**2.     The Debtors Will Consider All Available Restructuring Alternatives if the Restructuring Transactions are not Implemented, and Such Alternatives May Result in Lower Recoveries for Holders of Claims Against the Debtors.**

Subject to the terms of the Restructuring Support Agreement, if the Restructuring Transactions are not consummated, the Debtors thereafter will consider all available restructuring alternatives, including filing an alternative chapter 11 plan, converting to a chapter 7 plan, commencing section 363 sales of the Debtors' assets, and any other transaction that would maximize the value of the Debtors' estates. The terms of any alternative restructuring proposal may be less favorable to Holders of Claims against the Debtors than the terms of the Plan as described in this Disclosure Statement.

**3.     Even if the Restructuring Transactions are Successful, the Debtors Will Continue to Face Risks.**

The Restructuring Transactions are generally designed to reduce the Debtors' leverage, cash interest expense, improve the Debtors' liquidity, and provide the Debtors' greater flexibility to generate long-term growth. Even if the Restructuring Transactions are implemented, the Company will continue to face a number of risks, including certain risks that are beyond the Company's control, such as changes in economic conditions, changes in the Company's industry, and changes in demand for the Company's services. As a result of these risks, there is no guarantee that the Restructuring Transactions will achieve the Debtors' stated goals.

**4.     Risks Related to Confirmation and Consummation of the Plan.**

(a)        **The Restructuring Support Agreement May Be Terminated**.

The Restructuring Support Agreement contains certain provisions that allow the Restructuring Support Agreement to be terminated if various conditions are satisfied. Termination of the Restructuring Support Agreement could result in protracted Chapter 11 Cases, which could significantly and detrimentally impact the Debtors' relationships with, among others, vendors, suppliers, employees, and major customers. As more fully set forth in Section 14 of the Restructuring Support Agreement, the Restructuring Support Agreement may be terminated upon the occurrence of certain events, including, among others, (i) a determination that proceeding with the proposed Plan would be inconsistent with the Board's fiduciary obligations; (ii) a breach by one of more Consenting First Lien Noteholders, such that non-breaching Consenting First Lien Noteholders collectively own (or have voting control of) less than 66 2/3 percent of the aggregate outstanding principal amount of the First Lien Notes; (iii) a breach by one of more Consenting Second Lien Noteholders, such that non-breaching Consenting Second Lien Noteholders collectively own (or have voting control of) less than 66 2/3 percent of the aggregate outstanding principal amount of the Second Lien Notes; (iv) the Bankruptcy Court issues any order, injunction or other decree or takes any other action, which restrains, enjoins or otherwise prohibits the implementation of the Restructuring Transactions or the Definitive Restructuring Documents substantially on the terms and conditions set forth in the Restructuring Support Agreement; (v) an event of default occurs under the DIP Facility that has not been cured or waived within the applicable grace periods; or (vi) if any milestone set forth in Section 7 of the Restructuring Support Agreement is not satisfied, unless extended in accordance with the terms of the Restructuring Support Agreement. If the Restructuring Support Agreement is terminated as a result of a breach thereof by the Debtors or because the Board determines proceeding with the proposed Plan would be inconsistent with its fiduciary obligations, the Debtors may owe significant cash fees to the Consenting Noteholders and the Financing Commitment Parties.

(b)        **Conditions Precedent to Confirmation May Not Occur.**

As more fully set forth in Article IX of the Plan, the occurrence of Confirmation and the Effective Date are each subject to a number of conditions precedent. If each condition precedent to Confirmation is not met or waived, the Plan will not be confirmed, and if each condition precedent to Consummation is not met or waived, the Effective Date will not take place and the Plan shall be null and void in all respects. In the event that the Plan is not confirmed or is not consummated, the Debtors may seek Confirmation of a new plan. Pursuit of a new plan may require consents or concessions from various parties in interest. The Debtors can provide no assurances that such consents or concessions would be obtained. If the Debtors do not secure sufficient working capital to continue their operations or if the new plan is not confirmed, however, the Debtors may be forced to liquidate their assets.

(c)        **Parties in Interest May Object to the Plan's Classification of Claims and Interests.**

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class. The Debtors believe that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests, each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims or Interests, as applicable, in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

(d)        **The Debtors May Not Be Able to Satisfy Vote Requirements.**

The Debtors can make no assurances that they will receive the requisite votes for acceptance to confirm the Plan. Even if all Voting Classes vote in favor of the Plan or the requirements for "cramdown" are met with respect to any Class that rejected the Plan, the Bankruptcy Court could decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation are not met. Pursuant to section 1126(c) of the Bankruptcy Code, section 1129(a)(7)(A)(i) of the Bankruptcy Code will be satisfied with respect to Classes 3 and 4 if Holders of at least two-thirds in amount and more than one-half in number of the Allowed Claims in the Class that votes on the Plan cast votes to accept the Plan. There is no guarantee that the Debtors will receive the necessary acceptances from Holders of Claims in the Voting Classes. If the Voting Classes vote to reject the Plan, the Debtors may elect to amend the Plan, file an alternative chapter 11 plan, convert to a chapter 7 plan, commence section 363 sales of the Debtors' assets or pursue any other transaction that would maximize the value of the Debtors' estates. If the Plan is not confirmed, it is

unclear what distributions holders of Claims or Interests ultimately would receive with respect to their Claims or Interests in a subsequent plan of reorganization.

(e)    **The Debtors May Not Be Able to Secure Confirmation.**

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the bankruptcy court that: (i) the plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (ii) the plan is not likely to be followed by a liquidation or a need for further financial reorganization unless liquidation or reorganization is contemplated by the plan; and (iii) the value of distributions to non-accepting holders of claims within a particular class under the plan will not be less than the value of distributions such holders would receive if the debtor were liquidated under chapter 7 of the Bankruptcy Code.

Even if the requisite acceptances are received or the requirements for "cramdown" are met with respect to any Class that rejected the Plan, there can be no assurance that the Bankruptcy Court will confirm the Plan. A dissenting Holder of an Allowed Claim or Interest might challenge either the adequacy of this Disclosure Statement or whether the voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determines that this Disclosure Statement and the voting results are appropriate, the Bankruptcy Court can decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation have not been met, including the requirement that the terms of the Plan do not "unfairly discriminate" and are "fair and equitable" to non-accepting Classes.

If the Plan is not confirmed, it is unclear what distributions, if any, Holders of Allowed Claims and Interests will receive with respect to their Allowed Claims and Interests, as applicable.

Subject to the limitations contained in the Plan, the Debtors reserve the right to modify the Plan and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan. Any modifications could result in a less favorable treatment of any Class than the treatment currently provided in the Plan, such as a distribution of property to the Class affected by the modification of a lesser value than currently provided in the Plan.

(f)    **Parties in Interest May Object to Provisions Contained in the Plan.**

There is a risk that certain parties could oppose and object to either the entirety of the Plan or specific provisions of the Plan. There can be no guarantee that a party in interest will not file an objection to the Plan or that the Bankruptcy Court will not sustain such an objection.

(g)    **Releases, Injunction, and Exculpation Provisions May Not Be Approved.**

Confirmation is also subject to the Bankruptcy Court's approval of the settlement, release, injunction, and related provisions described in Article VIII of the Plan. Certain parties in interest may assert that the Debtors cannot demonstrate that they meet the standards for approval of releases, exculpations, and injunctions established by the United States Court of Appeals for the Third Circuit. If the releases and exculpations are not approved, certain parties may not be considered Releasing Parties, Released Parties, or Exculpated Parties, and certain Released Parties or Exculpated Parties may withdraw their support for the Plan.

(h)    **The Debtors May Not Be Able to Pursue Nonconsensual Confirmation Over Certain Impaired Non-Accepting Classes.**

Generally, a bankruptcy court may confirm a plan under the Bankruptcy Code's "cramdown" provisions over the objection of an impaired non-accepting class of claims or interests if at least one impaired class of claims has accepted the plan (with acceptance being determined without including the vote of any "insider" in that accepting class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the rejecting impaired classes.

As to Classes 3 and 4, while the Debtors believe they have secured Plan support from the Holders of Claims well in excess of the requisite two-thirds in amount and more than one-half in number of the Allowed Classes 3 and 4 pursuant to the Restructuring Support Agreement, the amount required for an accepting Class of Claims pursuant to section 1126(c) of the Bankruptcy Code, there is no guarantee that those Holders will vote those Claims in favor of the Plan. There can be no assurances that the Debtors will confirm a chapter 11 plan and emerge as a reorganized company in that event, and it is unclear what distributions, if any, Holders of Allowed Claims and Interests will receive with respect to their Allowed Claims and Interests in that instance. In addition, the pursuit of an alternative restructuring proposal may result in, among other things, increased expenses relating to Professional Fee Claims.

Finally, to the extent that the Voting Classes vote to reject the Plan, the Debtors may not be able to seek to "cramdown" such Voting Classes under section 1129(b) of the Bankruptcy Code because there is no other impaired Class of Claims entitled to vote under the Plan.

(i)     **The Amount or Classification of a Claim or Interest is Subject to the Debtors' Right to Object and Other Potential Changes.**

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim or Interest under the Plan. Any Holder of a Claim or Interest that is subject to an objection or dispute may not receive its expected share of the estimated distributions described in this Disclosure Statement. Further, there can be no assurance that the estimated amount of Claims in certain Classes will not be significantly more than projected, which in turn, could cause the value of distributions to a Holder of a Claim to be reduced substantially. Therefore, the actual amount of Allowed Claims may vary materially from the estimates set forth in this Disclosure Statement.

(j)     **The Debtors' Historical Financial Information May Not Be Comparable to the Financial Information of the Reorganized Debtors.**

As a result of Consummation and the transactions contemplated thereby, the financial condition and results of operations of the Reorganized Debtors from and after the Effective Date may not be comparable to the financial condition or results of operations reflected in the Debtors' historical financial statements. Thus, it may be difficult to predict the future financial performance of the Reorganized Debtors.

(k)     **The Effective Date May Not Occur.**

There can be no assurance as to the timing of the Effective Date or as to whether the Effective Date will, in fact, occur. If the conditions precedent to the Effective Date set forth in the Plan have not occurred or have not been waived, then the Confirmation Order may be vacated, in which event no distributions would be made under the Plan, the Debtors and all holders of Claims or Interests would be restored to the status quo as of the day immediately preceding the Confirmation Date, and the Debtors' obligations with respect to Claims and Interests would remain unchanged.

B.     **Risks Related to Recoveries Under the Plan.**

1.     **The Debtors May Not Be Able to Achieve Their Projected Financial Results or Meet Their Post-Restructuring Debt Obligations.**

Certain of the information contained herein is, by nature, forward-looking, and contains estimates and assumptions, which might ultimately prove to be incorrect, and projections, which may be materially different from actual future experiences. Many of the assumptions underlying the projections are subject to significant uncertainties that are beyond the control of the Debtors or Reorganized Debtors, including the timing, confirmation, and consummation of the Plan, the Reorganized Debtors' future revenues, inflation, and other unanticipated market and economic conditions. There are uncertainties associated with any projections and estimates, and they should not be considered assurances or guarantees of the amount of funds or the amount of Claims in the various Classes that might be allowed. Some assumptions may not materialize, and unanticipated events and circumstances may affect the actual results.

The Financial Projections represent the best estimate of the Debtors' management, financial advisor, and investment banker of the future financial performance of the Debtors or the Reorganized Debtors, as applicable, based on currently known facts and assumptions about future operations of the Debtors or the Reorganized Debtors, as applicable, as well as the U.S. and world economy in general and the relevant industries in which the Company operates. The Financial Projections are inherently subject to substantial and numerous uncertainties and to a wide variety of significant business, economic, and competitive risks, and the assumptions underlying the projections may be inaccurate in material respects. In addition, unanticipated events and circumstances occurring after the approval of this Disclosure Statement by the Bankruptcy Court including any natural disasters, terrorist attacks, or health epidemics and/or pandemics may affect the actual financial results achieved. There is no guarantee that the Financial Projections will be realized, and actual financial results may differ significantly from the Financial Projections.

To the extent the Reorganized Debtors do not meet their projected financial results or achieve projected revenues and cash flows, the Reorganized Debtors may lack sufficient liquidity to continue operating as planned after the Effective Date, may be unable to service their debt obligations as they come due, or may not be able to meet their operational needs, all of which may negatively affect the value of the New Common Stock and the Exit Secured Notes.

 2. **Estimated Valuations of the Debtors, the New Common Stock and the Exit Secured Notes and Estimated Recoveries to Holders of Allowed Claims and Interests Are Not Intended to Represent Potential Market Values.**

There can be no assurance that the estimated Allowed amount of Claims in certain Classes will not be significantly more than projected, which in turn, could cause the value of distributions to be reduced substantially. The Debtors' estimated recoveries to Holders of Allowed Claims and Allowed Interests are not intended to represent the market value of the Debtors' Securities. The estimated recoveries are based on numerous assumptions (the realization of many of which will be beyond the control of the Debtors), including: (a) the successful reorganization of the Debtors; (b) an assumed date for the occurrence of the Effective Date; (c) the Debtors' ability to achieve the operating and financial results included in the Financial Projections; (d) the Debtors' ability to maintain adequate liquidity to fund operations; (e) the assumption that capital and equity markets remain consistent with current conditions; and (f) the Debtors' ability to maintain and develop critical client relationships. Accordingly, the estimated recoveries do not necessarily reflect, and should not be construed as reflecting, values that may be attained for the Debtors' Securities in the public or private markets.

 3. **Certain Tax Implications of the Debtors' Bankruptcy and Reorganization May Increase the Tax Liability of the Reorganized Debtors.**

Holders of Allowed Claims and Interests should carefully review <u>Section X</u> of this Disclosure Statement, entitled "Certain United States Federal Income Tax Consequences of the Plan," to determine how the U.S. federal income tax implications of the Plan and the Chapter 11 Cases may adversely affect the Debtors.

**C. Risks Related to the Offer and Issuance of Securities Under the Plan.**

 1. **The Consideration Under the Plan Does Not Reflect any Independent Valuation of Claims against or Interests in the Debtors.**

The Debtors have not obtained or requested an opinion from any bank or other firm as to the fairness of the consideration under the Plan.

 2. **A Decline in the Reorganized Debtors' Credit Ratings Could Negatively Affect the Reorganized Debtors' Ability to Access the Capital Markets in the Future.**

The Debtors' or the Reorganized Debtors' credit ratings could be lowered, suspended, or withdrawn entirely, at any time, by the rating agencies, if, in each rating agency's judgment, circumstances warrant, including as a result of exposure to the credit risk and the business and financial condition of the Debtors or the Reorganized Debtors, as applicable. Downgrades in the Reorganized Debtors' long-term debt ratings may increase the cost of any debt that they may incur in the future.

3.        **Risks Related to the Exit Term Facility**

(a)        **The Exit Term Facility is expected to be issued with original issue discount ("*OID*") for U.S. federal income tax purposes.**

If the stated redemption price at maturity of the Exit Term Facility exceeds its issue price by an amount equal to or more than a statutory *de minimis* amount, the Exit Term Facility will be issued with OID for U.S. federal income tax purposes. In such event, in addition to the stated interest on the Exit Term Facility, a holder subject to U.S. federal income taxation will be required to include the OID in gross income (as ordinary income), on a constant yield to maturity basis, in advance of the receipt of the cash payment thereof and regardless of such holder's regular method of accounting for U.S. federal income tax purposes. See "Certain United States Federal Income Tax Consequences of the Plan."

4.        **The Debtors Do Not Intend to Register or to Offer to Exchange the New Common Stock or the Exit Secured Notes in a Registered Exchange Offer.**

The Debtors do not intend to register the New Common Stock or the Exit Secured Notes under the Securities Act or to offer to exchange the New Common Stock or the Exit Secured Notes in an exchange offer registered under the Securities Act. As a result, the New Common Stock and the Exit Secured Notes may be transferred or resold only in transactions exempt from the securities registration requirements of federal and applicable state laws.

To the extent that any New Common Stock or the Exit Secured Notes issued under the Plan in satisfaction of Claims are covered by section 1145 of the Bankruptcy Code, they may be resold by the Holders thereof without registration under the Securities Act unless the Holder is an "underwriter," as defined in section 1145(b) of the Bankruptcy Code with respect to such Securities; *provided*, *however*, shares of such Securities will not be freely tradable if, at the time of transfer, the Holder is either an "affiliate" of Reorganized Pyxus as defined in Rule 144(a)(1) under the Securities Act or has been such an "affiliate" within 90 days of such transfer. Such affiliate Holders would only be permitted to sell such Securities without registration if they are able to comply with an applicable exemption from registration, including Rule 144 under the Securities Act. Resales by Persons who receive New Common Stock or Exit Secured Notes pursuant to the Plan that are deemed to be "underwriters" would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or applicable law. Such Persons would only be permitted to sell such Securities without registration if they are able to comply with an applicable exemption from registration, including Rule 144 under the Securities Act.

In addition, the information which the Debtors are required to provide in order to issue the New Common Stock and the Exit Secured Notes may be less than the Debtors would be required to provide if the New Common Stock or the Exit Secured Notes were registered under the Securities Act.

Unlike the Securities that will be issued pursuant to section 1145(a)(1) of the Bankruptcy Code, all shares of New Common Stock or other Securities issued pursuant to the exemption from registration set forth in section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder will be considered "restricted securities" and may not be offered, sold, exchanged, assigned or otherwise transferred unless they are registered under the Securities Act, or an exemption from registration under the Securities Act is available. All Persons who receive such Securities will be required to agree that they will not offer, sell or otherwise transfer any such Securities except in accordance with an exemption from registration, including under Rule 144 under the Securities Act, if and when available. A non-affiliate of an issuer that is not subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act and who has not been an affiliate of the issuer during the 90 days preceding such sale may resell restricted securities after a one-year holding period whether or not there is current public information regarding the issuer. An affiliate of an issuer that is not subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act may resell restricted Securities after the one year holding period if at the time of the sale certain current public information regarding the issuer is available. The affiliate must also comply with the volume, manner of sale and notice requirements of Rule 144.

5.      **Implied Valuation of New Common Stock and Exit Secured Notes Not Intended to Represent Trading Value of New Common Stock Exit Secured Notes, as Applicable**

The valuation of the Reorganized Debtors is not intended to represent the trading value of New Common Stock or the Exit Secured Notes in public or private markets and is subject to additional uncertainties and contingencies, all of which are difficult to predict. Actual market prices of such securities at issuance will depend upon, among other things: (a) prevailing interest rates; (b) conditions in the financial markets; (c) the anticipated initial securities holdings of prepetition creditors, some of whom may prefer to liquidate their investment rather than hold it on a long-term basis; and (d) other factors that generally influence the prices of securities. The actual market prices of the New Common Stock and the Exit Secured Notes is likely to be volatile. Many factors, including factors unrelated to the Reorganized Debtors' actual operating performance and other factors not possible to predict, could cause the market price of the New Common Stock or the Exit Secured Notes to rise and fall. Accordingly, the implied value, stated herein and in the Plan, of the securities to be issued does not necessarily reflect, and should not be construed as reflecting, values that will be attained for the New Common Stock or the Exit Secured Notes in the public or private markets.

6.      **Risks Related to the New Common Stock.**

The following are some of the risks that apply to Holders of Claims against the Debtors who become Holders of the New Common Stock pursuant to the Plan. There are additional risk factors related to ownership of the New Common Stock that Holders of Claims against the Debtors should consider before deciding to vote to accept or reject the Plan.

(a)      **The Terms of the New Shareholders Agreement Are Subject to Change Based on Negotiation and the Approval of the Bankruptcy Court.**

The terms of the New Shareholders Agreement are subject to change based on negotiations between the Debtors and the Consenting Second Lien Noteholders. Holders of Claims that are not the Consenting Second Lien Noteholders will not participate in these negotiations and the results of such negotiations may affect the rights of shareholders in Reorganized Pyxus following the Effective Date.

(b)      **Holders of the New Common Stock Will Experience Dilution of Their Ownership Interests.**

Shares of New Common Stock issued by the Reorganized Debtors on the Effective Date, including those received by Holders of Allowed Second Lien Notes Claims under the Plan on account of such Claims, are subject to dilution by the issuance of New Common Stock pursuant to the New MIP.

(c)      **The Interests of Holders of the New Common Stock Will Be Subordinated to Reorganized Debtors' Indebtedness.**

In any subsequent liquidation, dissolution, or winding up of the Reorganized Debtors, the New Common Stock would rank below all debt claims against the Reorganized Debtors and their subsidiaries, including all outstanding Foreign Credit Lines . As a result, Holders of the New Common Stock will not be entitled to receive any payment or other distribution of assets upon the liquidation, dissolution, or winding up of the Reorganized Debtors until after all applicable Holders of debt have been paid in full.

(d)      **Reorganized Pyxus Does Not Intend To Pay Dividends on the New Common Stock.**

Reorganized Pyxus may not pay any dividends on the New Common Stock and the terms of the loan agreements and indentures governing the Reorganized Debtors' indebtedness, including the Exit Secured Notes Indenture or Replacement First Lien Financing Agreement, the Exit ABL Credit Agreement and the Exit Term Facility Agreement will restrict the ability of Reorganized Pyxus to pay any such dividends. In such circumstances, the success of an investment in the Reorganized Debtors will depend entirely upon any future appreciation in the value of the New

Common Stock. There is, however, no guarantee that the New Common Stock will appreciate in value or even maintain its initial implied valuation.

(e)    **A Small Number of Holders Will Own a Significant Percentage of the New Common Stock.**

Consummation of the Plan will result in a small number of holders owning a significant percentage of the outstanding New Common Stock. Accordingly, these holders may, among other things, have significant influence over the business and affairs of Reorganized Pyxus and, pursuant to the New Shareholders Agreement, will have the power to elect directors or managers and approve or disapprove of proposed mergers and other material corporate transactions.

(f)    **There can be no assurance that the New Common Stock will be listed on any exchange or that Reorganized Pyxus will continue to file reports with the SEC.**

There can be no assurance that Reorganized Pyxus will continue to be subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act. As a result, Reorganized Pyxus may not continue to file periodic reports with the SEC either mandatorily or on a voluntary basis pursuant to any obligations under the Exit Secured Notes Indenture. In the event that Reorganized Pyxus were to cease filing reports with the SEC, whether or not in contravention of its obligations under the Exit Secured Notes Indenture, holders of the New Common Stock would receive less information with respect to the Reorganized Debtors' business than they would have received if Reorganized Pyxus were subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act or filed reports with the SEC on a voluntary basis.

Further, the information which the Reorganized Debtors provide regarding the New Common Stock may be less than the Reorganized Debtors would be required to provide if the New Common Stock were registered with the SEC. Among other things, the Reorganized Debtors may not be required to provide: (a) separate financial information for any subsidiary; (b) selected historical consolidated financial data of Pyxus; (c) selected quarterly financial data of Pyxus; (d) certain information about the Reorganized Debtors' disclosure controls and procedures and their internal controls over financial reporting; and (e) certain information regarding the Reorganized Debtors' executive compensation policies and practices and historical compensation information for their executive officers. This lack of information could impair your ability to evaluate your ownership and the marketability of the New Common Stock.

(g)    **There Is No Established Market for the New Common Stock.**

The New Common Stock will be a new issuance of Securities, and there is no established trading market for those Securities. The Debtors are under no obligation, and do not intend to apply for the New Common Stock to be listed on any securities exchange or to arrange for quotation on any automated dealer quotation system. As a result, there can be no assurance as to the liquidity of any trading market for the New Common Stock. Further, the New Common Stock will be subject to transfer restrictions, if any, in the New Shareholders Agreement. Accordingly, Holders of the New Common Stock may be required to bear the financial risk of ownership indefinitely. If a trading market were to develop, Holders of the New Common Stock may experience difficulty in reselling the New Common Stock and may not be able to sell the New Common Stock at a particular time or at favorable prices. If a trading market were to develop, any such future trading prices of the New Common Stock may be volatile and will depend on many factors, including: (a) the Reorganized Debtors' operating performance and financial condition; (b) the interest of securities dealers in making a market for them; and (c) the market for similar Securities. Accordingly, holders of the New Common Stock may bear certain risks associated with holding securities for an indefinite period of time.

**7.    The Debtors May Not Be Able to Secure A Commitment for the Exit ABL Facility.**

As of the Solicitation Date, the Debtors do not have a commitment for the Exit ABL Facility. There is no guarantee that the Debtors will be able to secure such a commitment or secure a commitment satisfying the terms described in the Restructuring Support Agreement, which would result in the Debtors not satisfying one of the conditions precedent to Consummation unless such condition is waived by the Debtors with the consent of the Required Consenting Noteholders. If the Required Consenting Noteholders were to provide such consent, the Debtors

may seek to emerge from the Chapter 11 Cases without an Exit ABL Facility or with an Exit ABL Facility on less favorable terms to the Reorganized Debtors than contemplated by the Restructuring Support Agreement. Either situation could negatively affect the Reorganized Debtors' ability to operate going forward.

8.    **Risks Related to the Exit Secured Notes.**

(a)    **Compliance with Terms of Exit Secured Notes.**

The Debtors believe that they will have sufficient cash flow to make all required interest payments on the Exit Secured Notes. If the Reorganized Debtors' actual financial performance does not meet their cash flow projections, however, and if other sources of liquidity are not available, there is a risk that the Reorganized Debtors might be unable to pay interest and principal payments on the Exit Secured Notes.

(b)    **The Debtors' company structure will result in significant structural subordination of the Exit Secured Notes and may affect their ability to make payments on the Exit Secured Notes.**

The Debtors currently conduct a substantial majority of their operations through their subsidiaries and their subsidiaries generate a substantial majority of their operating income and cash flow. As a result, the Reorganized Debtors' cash flow and their ability to service debt, including the Reorganized Debtors' ability to pay the interest on and principal of the Exit Secured Notes when due, will be dependent to a significant extent on interest payments, cash dividends and distributions and other transfers of cash from the Reorganized Debtors' subsidiaries. Moreover, payments to the Reorganized Debtors by their subsidiaries will be contingent upon these subsidiaries' earnings. In addition, any payment of interest, dividends, distributions, loans or advances by the Reorganized Debtors' foreign subsidiaries to the Reorganized Debtors could be subject to taxation or other restrictions on dividends or repatriation of earnings under applicable local law, monetary transfer restrictions and foreign currency exchange regulations in the jurisdiction in which the Reorganized Debtors' foreign subsidiaries operate.

The Exit Secured Notes will initially be guaranteed on a senior secured basis by AOI, AOSP, each other domestic subsidiary of Reorganized Pyxus, if any, that guarantees the Exit Term Facility or the Exit ABL Facility as of the Effective Date, as well as each foreign subsidiary of Reorganized Pyxus, if any, that guarantees the Exit Term Facility as of the Effective Date, subject to applicable laws and local law limitations, provided that any such guarantee by such foreign guarantors shall be subordinated in payment to such subsidiary's guarantee of the Exit Term Facility. Following the Effective Date, any guarantee of the Exit Secured Notes by any such foreign guarantor, and the assets pledged to secure such guarantee, shall automatically be released to the extent the continuing provision of such guarantee or such pledge could reasonably be expected to result in material adverse tax consequences to Reorganized Pyxus and its subsidiaries (as reasonably determined by Reorganized Pyxus or if such guarantor is released as a guarantor and pledgor under the Exit Term Facility upon repayment of the Exit Term Facility (unless such guarantor remains an obligor on any refinancing indebtedness). The Debtors' subsidiaries are separate and distinct legal entities and, unless they become a guarantor of the Exit Secured Notes, have no obligations, contingent or otherwise, to pay any amounts due pursuant to the Exit Secured Notes, or to make any funds available therefor, whether by dividends, loans, distributions or other payments. Thus, the Exit Secured Notes will be structurally subordinated to all existing and future liabilities, including trade payables, of the Reorganized Debtors' non-guarantor subsidiaries. In the event of a bankruptcy, liquidation or dissolution of a nonguarantor subsidiary, the creditors of such subsidiary will be paid first, after which the subsidiary may not have sufficient assets remaining to make any payments to the Reorganized Debtors as a shareholder or otherwise so that the Reorganized Debtors can meet their obligations under the Exit Secured Notes. In addition, the Exit Secured Notes Indenture will allow the Reorganized Debtors' subsidiaries to incur additional indebtedness, which could be substantial.

(c)    **After the consummation of the Plan, the Debtors will have substantial debt, which may adversely affect the Debtors by limiting future sources of financing, interfering with their ability to pay interest and principal on the Exit Secured Notes and subjecting the Debtors to additional risks.**

The Reorganized Debtors will have a significant amount of indebtedness and debt service obligations upon emergence. If the Reorganized Debtors incur additional indebtedness to those anticipated indebtedness levels,

including borrowings under the Exit ABL Facility, the Exit Term Facility or other short or long-term credit facilities, the related risks that the Reorganized Debtors face could increase.

The Reorganized Debtors' substantial debt could have important consequences, including:

- making it more difficult for the Reorganized Debtors to satisfy their obligations with respect to the Exit Secured Notes and their other obligations;

- limiting the Reorganized Debtors' ability to obtain additional financing on satisfactory terms and to otherwise fund working capital, capital expenditures, debt refinancing, acquisitions and other general corporate requirements;

- a significant portion of the Reorganized Debtors' cash flow from operations must be dedicated to paying interest on, and the repayment of, the principal of the Reorganized Debtors' indebtedness. This reduces the amount of cash that the Debtors have available for making principal and interest payments under the Exit Secured Notes and for other purposes and makes the Debtors more vulnerable to a decrease in demand for leaf tobacco, increases in operating costs or general economic or industry conditions;

- The Reorganized Debtors' ability to adjust to changing market conditions and to compete with other global leaf tobacco merchants may be hampered by the amount of debt they owe;

- increasing the Reorganized Debtors' vulnerability to general adverse economic and industry conditions;

- placing the Reorganized Debtors at a competitive disadvantage compared to their competitors that have less debt or are less leveraged;

- limiting the Reorganized Debtors' flexibility in planning for, or reacting to, changes in their business and the industry in which the Reorganized Debtors operate; and

- restricting the Reorganized Debtors from making strategic acquisitions or exploiting business opportunities.

In addition, the Exit Secured Notes Indenture, the Exit ABL Facility and the Exit Term Facility will contain covenants that will limit the Reorganized Debtors' ability to engage in activities that may be in the Reorganized Debtors' long-term best interests. The Reorganized Debtors' failure to comply with those covenants could result in an event of default which, if not cured or waived, could result in the acceleration of all of their debt. Also, a substantial portion of the Reorganized Debtors' debt, including the Exit ABL Facility and Exit Term Facility, will bear interest at variable rates. If market interest rates increase, variable-rate debt will create higher debt service requirements, which would adversely affect the Debtors' cash flow. While the Reorganized Debtors may enter into agreements limiting their exposure to higher debt service requirements, any such agreements may not offer complete protection from this risk.

     (d)      **Despite current indebtedness levels, the Reorganized Debtors may still be able to incur substantially more debt, which would increase the risks associated with the Reorganized Debtors' substantial leverage.**

Even with the Reorganized Debtors' debt levels, the Reorganized Debtors' subsidiaries may be able to incur substantial additional indebtedness in the future. Although the Exit Secured Notes Indenture will contain restrictions on the incurrence of additional indebtedness, these restrictions are likely to be subject to a number of significant qualifications and exceptions and, under certain circumstances, the amount of indebtedness that could be incurred in compliance with these restrictions could be substantial. If the Reorganized Debtors incur additional indebtedness, the related risks that the Reorganized Debtors face would intensify. In addition, the Exit Secured Notes Indenture does not prevent the Reorganized Debtors from incurring obligations that do not constitute indebtedness under those agreements and the Debtors anticipate that any agreement governing their future indebtedness will similarly not

prevent the Reorganized Debtors from incurring obligations that do not constitute indebtedness under those agreements and could exacerbate the risks associated with the Reorganized Debtors' leverage.

(e)        **The Reorganized Debtors will require a significant amount of cash to service their indebtedness. The Reorganized Debtors' ability to generate cash depends on many factors beyond their control.**

The Reorganized Debtors' ability to make payments on and to refinance their indebtedness, including the Exit Secured Notes, will depend on the Reorganized Debtors' ability to generate cash in the future. This is subject to general economic, financial, competitive, legislative, regulatory and other factors that are beyond the Reorganized Debtors' control. There can be no assurance that the Reorganized Debtors' business will generate sufficient cash flow from operations or that future borrowings will be available to the Reorganized Debtors under the Exit ABL Facility, the Exit Term Facility or otherwise in an amount sufficient to enable the Reorganized Debtors to pay their indebtedness, including the Exit Secured Notes, or to fund the Reorganized Debtors' other liquidity needs.

(f)        **The Debtors may not be able to refinance or renew the Reorganized Debtors' indebtedness, including the Exit Secured Notes, the Exit ABL Facility and the Exit Term Facility, or be able to borrow under the Exit ABL Facility or other future credit facilities, which may have a material adverse effect on the Reorganized Debtors' financial condition and the Debtors' ability to meet their obligations to holders of the Exit Secured Notes.**

The Reorganized Debtors may not be able to renew or refinance the Exit ABL Facility, the Exit Term Facility or other indebtedness, including the Exit Secured Notes, on substantially similar terms, or at all. The Reorganized Debtors may have to pay additional fees and expenses that the Reorganized Debtors might not have to pay under normal circumstances, and the Reorganized Debtors may have to agree to terms that could increase the cost of the Debtors' debt structure. If the Reorganized Debtors are unable to renew or refinance the Exit ABL Facility, the Exit Term Facility and/or their other indebtedness on terms which are not materially less favorable than the terms currently available to the Reorganized Debtors or obtain alternative or additional financing arrangements, the Reorganized Debtors may not be able to repay the Exit Secured Notes, the Exit ABL Facility, the Exit Term Facility and/or certain of the Debtors' other indebtedness, which may result in a default under the Exit Secured Notes Indenture.

The Reorganized Debtors may need to refinance all or a portion of their indebtedness, including the Exit Secured Notes the Exit ABL Facility and/or the Exit Term Facility on or before maturity. Additionally, to the extent permitted under the agreement governing the Exit ABL Facility, the agreement governing the Exit Term Facility and indenture governing the Exit Secured Notes, the Reorganized Debtors may repurchase, repay or tender for their bank debt, the Exit Secured Notes or other debt, which may place pressure on future cash requirements to the extent that the debt repurchased, repaid or tendered cannot be redrawn.

(g)        **The Reorganized Debtors' debt agreements will contain restrictions that limit flexibility in operating their business.**

The Exit Secured Notes Indenture, the Exit Term Facility Agreement and the Exit ABL Credit Agreement will contain a number of significant covenants. These covenants are expected to limit the Debtors' ability to, among other things:

- incur additional indebtedness or issue disqualified stock or preferred stock;

- make investments;

- pay dividends and make other restricted payments;

- sell certain assets;

- create liens;

- enter into sale and leaseback transactions;

- consolidate, merge, sell or otherwise dispose of all or substantially all of the Debtors' assets;

- enter into transactions with affiliates; and

- designate subsidiaries as unrestricted subsidiaries.

(h)     **There is no established trading market for the Exit Secured Notes. If an actual trading market does not develop for the Exit Secured Notes, Holders of the Exit Secured Notes may not be able to resell them quickly, for the value that they expect or at all.**

The Exit Secured Notes will constitute a new issue of securities and there is no established trading market for the Exit Secured Notes. We do not intend to apply for the Exit Secured Notes to be listed on any securities exchange or to arrange for any quotation on any automated dealer quotation systems. Any securities dealers who make a market in the Exit Secured Notes are not obligated to do so and may discontinue any market making in the Exit Secured Notes at any time, in their sole discretion. As a result, there can be no assurance as to the liquidity of any trading market for the Exit Secured Notes.

There can be no assurance that the Exit Secured Notes will be able to be sold at a particular time or at all, or that the prices received when they are sold will be favorable. If no active trading market develops, Holders of the Exit Secured Notes may not be able to resell them at their fair market value, or at all.

(i)     **The Exit Secured Notes may be issued with OID for U.S. federal income tax purposes.**

If the stated redemption price at maturity of the Exit Secured Notes exceeds their issue price by an amount equal to or more than a statutory de minimis amount, the Exit Secured Notes will be issued with OID for U.S. federal income tax purposes. In such event, in addition to the stated interest on the Exit Secured Notes, a holder subject to U.S. federal income taxation will be required to include the OID in gross income (as ordinary income), on a constant yield to maturity basis, in advance of the receipt of the cash payment thereof and regardless of such holder's regular method of accounting for U.S. federal income tax purposes. See "Certain United States Federal Income Tax Consequences of the Plan."

**D.     Risk Factors Related to the Business Operations of the Company and Reorganized Debtors.**

The risks associated with the Debtors' businesses and industry are more fully described in the Company's SEC filings, including Form 10-K for the fiscal year ended March 31, 2019, filed with the SEC on June 14, 2019, as updated by the quarterly report on Form 10-Q for the quarter ended June 30, 2019 filed with the SEC on August 9, 2019, the quarterly report on Form 10-Q for the quarter ended September 30, 2019 filed with the SEC on November 7, 2019, and the quarterly report on Form 10-Q for the quarter ended December 31, 2019 filed with the SEC on February 10, 2020. The risks associated with the Debtors' businesses and industry described in the Company's SEC filings include, but are not limited to, the following.

**1.     Global or regional health pandemics or epidemics, including COVID-19, could negatively impact the Company's business operations, financial performance and results of operations.**

The business and financial results of the Company has been and may continue to be negatively impacted by the recent outbreak of COVID-19 and could be similarly negatively impacted by other pandemics or epidemics in the future. The severity, magnitude and duration of the current COVID-19 pandemic is uncertain, rapidly changing and hard to predict. In 2020, COVID-19 has significantly impacted economic activity and markets around the world, and it could negatively impact the Company's business in numerous ways, including but not limited to those outlined below:

- Although in many jurisdictions, the Company's operations have been classified as "essential" under various governmental orders restricting business activities implemented in response to the COVID-19

outbreak, that classification has not been universal and the Company has been, and may in the future be, required to suspend operations at certain facilities as a result of similar governmental orders. The Company cannot predict whether its operations classified as "essential" will continue to be so classified or, even if so classified, whether site-specific health and safety concerns related to COVID-19 might otherwise require operations at any of its facilities to be halted for some period of time.

• The COVID-19 pandemic may damage the Company's business due to negative consumer purchasing behavior with respect to the products of the Company's leaf tobacco customers and our other products. Public health officials around the world have recommended, and local, state, and national governments have mandated, precautions to mitigate the spread of COVID-19, including prohibitions on congregating in groups, shelter-in-place orders or similar measures. Consumer purchasing behavior may be impacted by reduced consumption by consumers who may not be able to leave home or otherwise shop in a normal manner as a result of these restrictions or who experience a reduction in disposable income due to work limitations and layoffs implemented in response to mandatory social distancing and lockdown measures implemented by governmental authorities. In addition, in view of uncertainties with respect to the further spread of COVID-19 and the duration and terms of related governmental orders restricting activities, the Company cannot predict whether demand for its products will persist at current levels or decrease on a global or regional basis.

• Other operational disruptions may result from restrictions on the ability of employees and others in the supply chain to travel and work, such as caused by quarantine or individual illness, or which may result from border closures imposed by governments to deter the spread of COVID-19, or determinations by the Company or shippers to temporarily suspend operations in affected areas, or other actions that restrict the ability to ship the Company's products or which may otherwise negatively impact the Company's ability to ship its products. Ports or channels of entry may be closed, operate at only a portion of capacity or require quarantining of vessels, or transportation of products within a region or country may be limited, if workers are unable to report to work due to travel restrictions or personal illness. These factors have also impacted certain of the Company's suppliers and the Company has been and will likely continue to be impacted by disruptions in the supply of certain materials used in its operations.

• Due to the scope of the Company's operations, including in emerging markets, and its sales to customers around the world, the impact of the COVID-19 pandemic on its operations and the demand for its products may not coincide with impacts experienced in the United States. The Company's operations in jurisdictions only recently experiencing COVID-19 outbreaks, such as portions of Africa and South America, may continue to be subject to governmental orders restricting activities after such governmental orders are lifted in the United States. Accordingly, to the extent that the impact of the COVID-19 pandemic in the United States may improve over time, results of operations may continue to be adversely affected by COVID-19 impacts in other areas of the world.

• Disruptions or uncertainties related to the COVID-19 outbreak for a sustained period of time could result in delays or modifications to the Company's strategic plans and initiatives.

• The Company expects to be negatively impacted by currency translation losses from a generally stronger U.S. dollar relative to other currencies in the countries in which they operate. These along with currency transaction losses could adversely affect the Company's results of operations and financial condition.

• The COVID-19 outbreak has increased volatility and pricing in the capital markets, and volatility is likely to continue. The Company might not be able to continue to access preferred sources of liquidity, and the Company's borrowing costs could increase.

These and other impacts of the COVID-19 pandemic or other global or regional health pandemics or epidemics could have the effect of heightening many of the other risks described in this "Risk Factors" section and those incorporated by reference herein, such as those relating to the Company's brands, product sales, results of operations or financial condition. The Company might not be able to predict or respond to all impacts on a timely basis to prevent near- or long-term adverse impacts to their results. The ultimate impact of these disruptions also

depends on events beyond the knowledge or control of the Company, including the duration and severity of any outbreak and actions taken by parties other than the Company to respond to them. Any of these disruptions could have a negative impact on the Company's business operations, financial performance and results of operations, which impact could be material.

**2.    The Company's reliance on a small number of significant customers may adversely affect its financial statements.**

The customers of the Company's leaf tobacco business are manufacturers of cigarette and other tobacco products. Several of these customers individually account for a significant portion of the Company's sales in a normal year.

For the year ended March 31, 2020, each of Philip Morris International, Inc. and China Tobacco International Inc., including their respective affiliates, accounted for more than 10% of our revenues from continuing operations. In addition, tobacco product manufacturers have experienced consolidation and further consolidation among the Company's customers could decrease such customers' demand for the Company's leaf tobacco or processing services. The loss of any one or more of the Company's significant customers could have a material adverse effect on the Company's financial statements.

**3.    The Company may not have access to available capital to finance our local operations in non-U.S. jurisdictions.**

The Company has typically financed its non-U.S. local operations with the Foreign Credit Lines.

As of May 31, 2020, the Company had approximately $576 million drawn and outstanding on the Foreign Credit Lines.

Because the lenders under these Foreign Credit Lines may have the right to cancel the loan at any time and each line must be renewed with each crop season, there can be no assurance that this capital will be available to the Reorganized Company's subsidiaries. Further, although the Debtors have sought and obtained forbearances and waivers from lenders under certain of these Foreign Credit Lines in respect of provisions that would allow the lenders to terminate them for events relating to the Chapter 11 Cases, the Debtors have not obtained such forbearances and waivers in respect of all of the Foreign Credit Lines. The Debtors' participation in the Chapter 11 Cases may increase the likelihood of lenders terminating or limiting Foreign Credit Lines for which waivers and forbearances have not been obtained and may adversely affect the willingness of lenders to renew Foreign Credit Lines. If a number of these lenders cease lending to the Company's subsidiaries or dramatically decrease such lending, it could have a material adverse effect on the Reorganized Company's liquidity.

**4.    Failure of foreign banks in which the Company's subsidiaries deposit funds or the failure to transfer funds or honor withdrawals may affect its results of operations.**

Funds held by the Company's foreign subsidiaries are often deposited in their local banks. Banks in certain foreign jurisdictions may be subject to a higher rate of failure or may not honor withdrawals of deposited funds. In addition, the countries in which these local banks operate may lack sufficient regulatory oversight or suffer from structural weaknesses in the local banking system. Due to uncertainties and risks relating to the political stability of certain foreign governments, these local banks also may be subject to exchange controls and therefore unable to perform transfers of certain currencies. If the Company's ability to gain access to these funds was impaired, it could have a material adverse effect on the Company's results of operations.

**5.    Continued vertical integration by the Company's customers could materially adversely affect its financial statements.**

Demand for the Company's leaf tobacco or processing services could be materially reduced if cigarette manufacturers continue to significantly vertically integrate their operations, either through acquisition of the Company's competitors, establishing new operations or contracting directly with suppliers. Japan Tobacco, Inc. has

vertically integrated operations in Malawi, Brazil and the United States. In addition, Philip Morris International, Inc. acquired supplier contracts and related assets in Brazil in order to procure leaf directly. In general, the Company's results of operations have been adversely affected by customers' vertical integration initiatives. Although some customers have reversed certain aspects of their previous vertical integration of operations, further vertical integration by the Company's customers could have a material adverse effect on the Company's financial statements.

6.     **Suppliers who have historically grown tobacco and from whom the Company has purchased tobacco may elect to grow other crops instead of tobacco, which affects the world supply of tobacco and may impact the Debtors' quarterly and annual financial performance.**

Increases in the prices for other crops have led and may in the future lead suppliers who have historically grown tobacco, and from whom the Company has purchased tobacco, to elect to grow these other, more profitable, items instead of tobacco. A decrease in the volume of tobacco available for purchase may increase the purchase price of such tobacco. As a result, the Company could experience an increase in tobacco crop acquisition costs which may impact the Company's quarterly and annual financial performance.

7.     **The Company faces increased risks of doing business due to the extent of its international operations.**

Some of the countries the Company does business in do not have stable economies or governments. The Company's international operations are subject to international business risks, including unsettled political conditions, uncertainty in the enforcement of legal obligations including the collection of accounts receivable, fraud risks, expropriation, import and export restrictions, exchange controls, inflationary economies, currency risks and risks related to the restrictions on repatriation of earnings or proceeds from liquidated assets of foreign subsidiaries. These risks are exacerbated in countries where the Company has advanced substantial sums or guaranteed local loans or lines of credit for the purchase of tobacco from suppliers. For example, in 2006 as a result of the political environment, economic instability, foreign currency controls and governmental regulations in Zimbabwe, the Company deconsolidated its Zimbabwe subsidiary, Mashonaland Tobacco Company LTD ("*MTC*"). Subsequently, the Company determined that the significant doubt about the Company's ability to control MTC was eliminated and the Company reconsolidated MTC as of March 31, 2016. The Company utilizes the Zimbabwe RTGS system for local transactions. RTGS is a local currency equivalent that is exchanged at a government specified rate with the USD. In order to convert these units to USD, the Company must obtain foreign currency resources from the Reserve Bank of Zimbabwe subject to the monetary and exchange control policy in Zimbabwe. If the foreign exchange restrictions and government-imposed controls become severe, the Company may have to reassess its ability to control MTC.

The Company's international operations are in areas where the demand is for the export of lower priced tobacco. The Company has significant investments in purchasing, processing and exporting operations in Argentina, Brazil, Malawi, Tanzania and Turkey.

In recent years, economic problems in certain countries where we have international operations have received wide publicity related to devaluation and appreciation of the local currency and inflation, including the classification of the Argentina, Malawi and Zimbabwe economies as highly inflationary. Devaluation and appreciation of the local currency and inflation can affect its purchase costs of tobacco and its processing costs. In addition, the Company conducts business with suppliers and customers in countries that have relatively recently had or may be subject to dramatic political regime change. In the event of such dramatic changes in the government of such countries, the Company may be unable to continue to operate its business, or adequately enforce legal obligations, after the change in a manner consistent with prior practice.

8.     **The Company's investments in new business lines as part of its transformational business strategy have been in companies with limited histories that are operating in newly developing markets and are subject to numerous risks and uncertainties.**

The Company's investments in new business lines and the operation of these businesses, involve a high degree of risk. These investments are in businesses with limited operating histories and are dependent upon receipt of requisite licenses and approvals. The Company cannot assure that as these operations further develop they will be profitable or otherwise sustainable. While certain of these businesses involve the cultivation and/or processing of

agricultural products, similar in certain ways to leaf tobacco, and accordingly share commonality with the Company's agronomy, traceability and agricultural product processing expertise, they are subject to commercial and regulatory challenges different from the Company's leaf tobacco business and with respect to which the Company does not have the same level of experience.

9.    **The Company expects to incur significant ongoing costs and obligations related to its investment in infrastructure, growth, regulatory compliance, and operations of the new business lines.**

The Company expects to incur significant ongoing costs and obligations related to its investment in infrastructure and growth and for regulatory compliance with respect to the new business lines, which could have a material adverse impact on the Company's results of operations, financial condition, and cash flows. In addition, future changes in regulations, changes in the enforcement thereof or other unanticipated events could require extensive changes to the Company's operations, increased compliance costs or give rise to material liabilities, which could have a material adverse effect on the business, results of operations and financial condition of the Company. Efforts to grow the business of the new business lines may be costlier than the Company expects, and the Company may not be able to increase its revenue enough to offset higher operating expenses. The new business lines may incur significant losses in the future for a number of reasons, including the other risks described herein, and unforeseen expenses, difficulties, complications, and delays, and other unknown events. If the new business lines are not able to reach or sustain profitability or if any requires additional capital to fund growth or other initiatives, they may require additional equity or debt financing. There can be no assurance that any new business line will be able to obtain additional financial resources on favorable commercial terms or at all. Failure to obtain such financial resources could affect the Company's plan for growth or result in the Company being unable to satisfy its obligations as they become due, either of which could have a material adverse effect on the business, financial condition and results of operations of the Company.

10.    **Changing consumer preferences may adversely affect consumer retention and results of operations.**

As a result of changing consumer preferences, many novel products, dietary supplements, and other innovative products attain financial success for a limited period of time. Even if the products of the new business lines find retail success, there can be no assurance that any of these products will continue to see extended financial success. The success of the new business lines will be significantly dependent upon their ability to develop new and improved product lines and to adapt to consumer preferences. Even if the new business lines are successful in introducing new products or developing current products, a failure to gain consumer acceptance or to update products with compelling content could cause a decline in popularity of these products that could reduce revenues and harm the Company's brands, business, financial condition, and results of operations.

11.    **The industries in which the new business lines operate are highly regulated, require regulatory approvals or licensing and the Company may not always succeed in complying fully with applicable regulatory requirements and obtaining required approvals and licenses in all jurisdictions where the Company carries on business.**

The Company's new business lines are heavily regulated in all jurisdictions where they carry on business and generally require governmental approvals or licenses. For example, the operations of the Company's Canadian cannabis subsidiaries are subject to various laws, regulations and guidelines by governmental authorities (including licenses issued by Health Canada) relating to the manufacture, marketing, management, transportation, storage, sale, pricing and disposal of cannabis and cannabis oil, and also including laws and regulations relating to health and safety, insurance coverage, the conduct of operations and the protection of the environment. Laws and regulations, applied generally, grant government agencies and self-regulatory bodies broad administrative discretion over such activities, including the power to limit or restrict business activities as well as impose additional disclosure requirements on these products and services. The commercial cannabis industry is still a new industry and, in Canada, in particular, the Canadian Cannabis Act is a new regime that has no close precedent in Canadian law. The effect of relevant governmental authorities' administration, application and enforcement of their respective regulatory regimes and delays in obtaining, or failure to obtain, applicable regulatory approvals which may be required may significantly

delay or impact the development of markets, products and sales initiatives and could have a material adverse effect on the Company's business, financial condition, and results of operations.

Further, upon change in control of Pyxus, which would occur upon consummation of the Plan and may occur upon the consummation of any other plan of reorganization confirmed by the Bankruptcy Court in the Chapter 11 Cases, the Company's Canadian cannabis subsidiaries will be required to notify certain Canadian provincial governments with which they have entered into supply agreements. In many Canadian provinces and territories, the provincial or territorial government has a monopoly over adult-use sales and thus the Canadian cannabis subsidiaries derive a significant portion of their collective revenue from supply agreements with provincial governments. While the Company does not believe that such a change of control in and of itself will give rise to a termination right of such provincial governments, due to the wide range of rights afforded to the provincial governments under these contracts, there is a risk that such provincial governments may terminate the supply agreements under their general termination rights or cease ordering product from these subsidiaries.

In addition, the Company may be required to submit a New Dietary Ingredient ("**NDI**") notification to the U.S. Food and Drug Administration (the "**FDA**") with respect to hemp extracts. This could depend on whether the Company can establish that a particular extract was marketed as a dietary ingredient in a dietary supplement prior to October 15, 1994, or is otherwise currently in the food supply in the same chemical form as used in its dietary supplement product. If the FDA objects to the Company's NDI notification, this would have a material adverse effect upon the Company's CBD business.

Further, the FDA has determined that any flavored nicotine-containing e-liquid or e-cigarette product (other than a tobacco-flavored product) is required to exit the U.S. market until such time that the FDA authorizes the product's return in response to a marketing application submitted under the Food, Drug, and Cosmetic Act, as amended by the Tobacco Control Act, provided that products on the market on August 8, 2016 were permitted to continue being marketed through at least September 9, 2020, and for potentially up to one year thereafter during the FDA's review of a marketing application filed by September 9, 2020 for such a product. In the event that these applications are not timely approved, the Company may be required to remove these products from the market.

Achievement of the Company's business objectives is contingent, in part, upon compliance with regulatory requirements enacted by all relevant governmental authorities and obtaining all necessary regulatory approvals for the production, storage, transportation, sale, import and export, as applicable, of the products of its subsidiaries and joint ventures. Any failure to comply with the regulatory requirements applicable to the operations of the new business lines may lead to possible sanctions including the revocation or imposition of additional conditions on licenses to operate; the suspension or expulsion from a particular market or jurisdiction or of key personnel; the imposition of additional or more stringent inspection, testing and reporting requirements; and the imposition of fines and censures. In addition, changes in regulations, more vigorous enforcement thereof or other unanticipated events could require extensive changes to operations, increase compliance costs or give rise to material liabilities or a revocation of licenses and other permits, which could have a material adverse effect on the Company's business, financial condition, and results of operations. Furthermore, governmental authorities may change their administration, application or enforcement practices at any time, which may adversely impact the ongoing costs relating to regulatory compliance.

12.     **The Company and its U.S. subsidiaries may be unable to receive any funds generated by the Company's Canadian cannabis subsidiaries and such funds may not be used to fund the payment of obligations of our U.S. based operations.**

Under U.S. federal law, it is unlawful to engage in financial transactions involving the proceeds of unlawful activity, including the sale of controlled substances, which in the United States includes marijuana (i.e., cannabis plants, plant parts, or derivatives that do not qualify as either hemp, the mature stalks of non-hemp plants, the sterilized seeds of non-hemp plants, or derivatives or such mature stalks or seeds). Also under U.S. federal law, banks or other financial institutions that provide a marijuana-related business with a checking account, debit or credit card, small business loan, or any other service could be found guilty of money laundering, aiding and abetting a violation of federal law (e.g., the Controlled Substances Act), or conspiracy (e.g., to violate the Controlled Substances Act). The Company does not believe any of its activities implicate prohibitions under these laws. However, if any of the Company's investments, or any proceeds thereof, any dividends or distributions therefrom, or any profits or revenues accruing from such investments in the United States or Canada were found to be in violation of money laundering

legislation or otherwise, such transactions may be viewed as proceeds of crime under certain U.S. or Canadian laws or any other applicable legislation and any persons found to be aiding and abetting or conspiring to commit such violations could be subject to liability. This could restrict or otherwise jeopardize the ability of the Company's Canadian cannabis subsidiaries to declare or pay dividends, effect other distributions or otherwise repatriate funds to Pyxus or any Pyxus subsidiary in the United States. Accordingly, funds generated by these Canadian subsidiaries' operations, or in certain circumstances the potential future sale of these Canadian subsidiaries, may not be available to fund the payment of obligations of the Company's U.S. based operations, including the debt obligations of Pyxus and the other Debtors.

**E.    Miscellaneous Risks and Disclaimers.**

    **1.    The Financial Information Is Based on the Debtors' Books and Records and, Unless Otherwise Stated, No Audit Was Performed.**

In preparing this Disclosure Statement, the Debtors relied on financial data derived from their books and records that was available at the time of such preparation. Although the Debtors have used their reasonable business judgment to assure the accuracy of the financial information provided in this Disclosure Statement, and while the Debtors believe that such financial information fairly reflects their financial condition, the Debtors are unable to warrant or represent that the financial information contained in this Disclosure Statement (or any information in any of the exhibits to the Disclosure Statement) is without inaccuracies.

    **2.    No Legal or Tax Advice Is Provided By This Disclosure Statement.**

This Disclosure Statement is not legal advice to any Person or Entity. The contents of this Disclosure Statement should not be construed as legal, business, or tax advice. Each reader should consult its own legal counsel and accountant with regard to any legal, tax, and other matters concerning its Claim. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote to accept or reject the Plan or whether to object to Confirmation.

    **3.    No Admissions Made.**

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any Entity (including the Debtors) nor (b) be deemed evidence of the tax or other legal effects of the Plan on the Debtors, the Reorganized Debtors, Holders of Allowed Claims or Interests, or any other parties in interest.

    **4.    Failure to Identify Litigation Claims or Projected Objections.**

No reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim is, or is not, identified in this Disclosure Statement. The Debtors may seek to investigate, file, and prosecute Claims and may object to Claims after Confirmation and Consummation of the Plan, irrespective of whether this Disclosure Statement identifies such Claims or objections to Claims.

    **5.    Information Was Provided by the Debtors and Was Relied Upon by the Debtors' Advisors.**

Counsel to and other advisors retained by the Debtors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement. Although counsel to and other advisors retained by the Debtors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement and the exhibits to the Disclosure Statement, they have not independently verified the information contained in this Disclosure Statement or the information in the exhibits to the Disclosure Statement.

    **6.    No Representations Outside This Disclosure Statement Are Authorized.**

No representations concerning or relating to the Debtors, the Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement. Any representations

or inducements made to secure voting Holders' acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement, should not be relied upon by voting Holders in arriving at their decision. Voting Holders should promptly report unauthorized representations or inducements to counsel to the Debtors and the Office of the United States Trustee for the District of Delaware.

## IX.    Important Securities Laws Disclosures

### A.    Plan Consideration.

In accordance with the Plan and the Restructuring Support Agreement, the Debtors and/or Reorganized Debtors, as applicable, will distribute (x) the Exit Secured Notes to Holders of First Lien Notes Claims on account of such Claims (unless the Debtors consummate the Replacement First Lien Financing) and (y) shares of New Common Stock from the Second Lien Notes Common Stock Pool to Holders of Second Lien Notes Claims on account of such Claims for those Holders that make the Second Lien Notes Stock Option. The Restructuring Support Agreement and the Plan also provide for New Common Stock to be issued as Exit Facility Shares, Backstop Fee Shares and the Second Lien Notes RSA Fee Shares. The Debtors believe that the New Common Stock and the Exit Secured Notes may constitute "securities," as defined in section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code, and all applicable state Blue Sky Laws.

### B.    Exemption from Registration Requirements; Issuance and Resale of New Common Stock, and Exit Secured Notes; Definition of "Underwriter" Under Section 1145(b) of the Bankruptcy Code.

#### 1.    Exemption from Registration Requirements; Issuance and Resale of New Common Stock, and Exit Secured Notes.

Section 1145 of the Bankruptcy Code provides that the registration requirements of section 5 of the Securities Act (and any applicable state Blue Sky Laws) shall not apply to the offer or sale of stock, options, warrants, or other Securities by a debtor if: (a) the offer or sale occurs under a plan of reorganization; (b) the recipients of the Securities hold a claim against, an interest in, or claim for administrative expense against, the debtor; and (c) the Securities are issued in exchange for a claim against or interest in a debtor or are issued principally in such exchange and partly for cash and property.

Any Securities issued in reliance of section 1145 may be resold without registration under the Securities Act or other federal securities laws, unless the Holder is an "underwriter" (as discussed in <u>Section IX.B.2</u> below) with respect to such Securities, as that term is defined in section 1145(b) of the Bankruptcy Code, or an affiliate of the Reorganized Debtors (or has been such an "affiliate" within 90 days of such transfer). In addition, such Securities generally may be able to be resold without registration under applicable state Blue Sky Laws by a Holder that is not an underwriter or an affiliate of the Reorganized Debtors pursuant to various exemptions provided by the respective Blue Sky Laws of those states. However, the availability of such exemptions cannot be known unless individual state Blue Sky Laws are examined.

Recipients of the New Common Stock and Exit Secured Notes to be issued pursuant to the Plan or the Restructuring Support Agreement are advised to consult with their own legal advisors as to the availability and applicability of section 1145 of the Bankruptcy Code to such New Common Stock or Exit Secured Notes, as applicable, and any other potential exemption from registration under the Securities Act or applicable state Blue Sky Laws in any given instance and as to any applicable requirements or conditions to such availability.

Notwithstanding anything to the contrary in the Plan, no Entity (including, for the avoidance of doubt, DTC) may require a legal opinion regarding the validity of any transaction contemplated by the Plan, including, for the avoidance of doubt, whether the New Common Stock or the Exit Secured Notes are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

The Debtors do not have any contract, arrangement, or understanding relating to, and will not, directly or indirectly, pay any commission or other remuneration to any broker, dealer, salesperson, agent, or any other Person for soliciting votes to accept or reject the Plan. In addition, no broker, dealer, salesperson, agent, or any other Person,

is engaged or authorized to express any statement, opinion, recommendation, or judgment with respect to the relative merits and risks of the Plan. Thus, no Person will receive any commission or other remuneration, directly or indirectly, for soliciting votes to accept or reject the Plan or in connection with the offer of any Securities that may be the deemed to occur in connection with voting on the Plan.

In addition to the foregoing, all transfers of New Common Stock will be subject to the transfer provisions and other applicable provisions set forth in the New Shareholders Agreement.

**2.      Definition of "Underwriter" Under Section 1145(b) of the Bankruptcy Code; Implications for Resale of New Common Stock and Exit Secured Notes.**

Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as one who, except with respect to "ordinary trading transactions of an entity that is not an issuer": (a) purchases a claim against, interest in, or claim for an administrative expense in the case concerning, the debtor, if such purchase is with a view to distribution of any Security received or to be received in exchange for such claim or interest; (b) offers to sell Securities offered or sold under a plan for the holders of such Securities; (c) offers to buy Securities offered or sold under a plan from the holders of such Securities, if such offer to buy is (i) with a view to distribution of such Securities and (ii) under an agreement made in connection with the plan, with the consummation of the plan, or with the offer or sale of Securities under the plan; or (d) is an issuer of the Securities within the meaning of section 2(a)(11) of the Securities Act. In addition, a Person who receives a fee in exchange for purchasing an issuer's securities could also be considered an underwriter within the meaning of section 2(a)(11) of the Securities Act.

The definition of an "issuer," for purposes of whether a Person is an underwriter under section 1145(b)(1)(D) of the Bankruptcy Code, by reference to section 2(a)(11) of the Securities Act, includes as "statutory underwriters" all persons who, directly or indirectly, through one or more intermediaries, control, are controlled by, or are under common control with, an issuer of Securities. The reference to "issuer," as used in the definition of "underwriter" contained in section 2(a)(11) of the Securities Act, is intended to cover "controlling persons" of the issuer of the securities. "Control," as defined in Rule 405 of the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting Securities, by contract, or otherwise. Accordingly, an officer or director of a reorganized debtor or its successor under a plan of reorganization may be deemed to be a "controlling person" of such debtor or successor, particularly if the management position or directorship is coupled with ownership of a significant percentage of the reorganized debtor's or its successor's voting securities. In addition, the legislative history of section 1145 of the Bankruptcy Code may suggest that a creditor who owns ten percent or more of a class of voting Securities of a reorganized debtor may be presumed to be a "controlling person" and, therefore, an underwriter.

Whether any particular Person would be deemed to be an "underwriter" (including whether such Person is a "controlling person") with respect to the New Common Stock or the Exit Secured Notes to be issued in respect of Claims as contemplated by the Plan would depend upon various facts and circumstances applicable to that Person. Accordingly, the Debtors express no view as to whether any Person would be deemed an "underwriter" with respect to the New Common Stock or the Exit Secured Notes to be issued in respect of Claims as contemplated by the Plan and, in turn, whether any Person may freely resell such New Common Stock or the Exit Secured Notes. The Debtors recommend that potential recipients of such New Common Stock or Exit Secured Notes consult their own counsel concerning their ability to freely trade such Securities without registration under the federal and applicable state Blue Sky Laws.

Under certain circumstances, holders of New Common Stock or Exit Secured Notes to be issued in respect of Claims as contemplated by the Plan who are deemed to be "underwriters" may be entitled to resell their New Common Stock or Exit Secured Notes, as applicable, pursuant to the limited safe harbor resale provisions of Rule 144 of the Securities Act. Generally, Rule 144 of the Securities Act would permit the public sale of Securities received by such Person after a specified holding period if current information regarding the issuer is publicly available and certain other conditions are met, and, if such seller is an affiliate of the issuer, if volume limitations and manner of sale requirements are met.

C.      **Private Placement Exemptions.**

Section 4(a)(2) of the Securities Act provides that the issuance of Securities by an issuer in transactions not involving any public offering are exempt from registration under the Securities Act. Regulation D is a non-exclusive safe harbor from registration promulgated by the SEC under section 4(a)(2) of the Securities Act.

To the extent any of the Securities issued pursuant to the Plan or the Restructuring Supporting Agreement do not qualify for exemption from registration in reliance on section 1145 of the Bankruptcy Code, the Debtors believe such Securities will be issued without registration under the Securities Act or any similar federal, state, or local law in reliance on Section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder. These Securities will be subject to resale restrictions and may be resold, exchanged, assigned or otherwise transferred only pursuant to registration, or an applicable exemption from registration, under the Securities Act and other applicable law, as described below.

Unlike the Securities that will be issued pursuant to section 1145(a)(1) of the Bankruptcy Code, all Securities, including shares of New Common Stock, issued pursuant to the exemption from registration set forth in section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder will be considered "restricted securities" and may not be offered, sold, exchanged, assigned or otherwise transferred unless they are registered under the Securities Act, or an exemption from registration under the Securities Act is available.

All Persons who receive such Securities will be required to agree that they will not offer, sell or otherwise transfer any such shares except in accordance with an exemption from registration, including under Rule 144 under the Securities Act, if and when available.

Rule 144 provides an exemption for the public resale of "restricted securities" if certain conditions are met. These conditions vary depending on whether the holder of the restricted Securities is an affiliate of the issuer. An affiliate is defined as "a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, the issuer."

A non-affiliate of an issuer that is not subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act and who has not been an affiliate of the issuer during the 90 days preceding such sale may resell restricted securities after a one-year holding period whether or not there is current public information regarding the issuer.

An affiliate of an issuer that is not subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act may resell restricted Securities after the one-year holding period if at the time of the sale certain current public information regarding the issuer is available. The affiliate must also comply with the volume, manner of sale and notice requirements of Rule 144. First, the rule limits the number of restricted Securities (plus any unrestricted Securities) sold for the account of an affiliate (and related persons) in any three-month period to the greater of 1% of the outstanding Securities of the same class being sold, or, if the class is listed on a stock exchange, the greater of 1% of the average weekly reported volume of trading in such restricted Securities during the four weeks preceding the filing of a notice of proposed sale on Form 144. Second, the manner of sale requirement provides that the restricted Securities must be sold in a broker's transaction, which generally means they must be sold through a broker and handled as a routine trading transaction. The broker must receive no more than the usual commission and cannot solicit orders for the sale of the restricted Securities except in certain situations. Third, if the sale exceeds 5,000 restricted Securities or has an aggregate sale price greater than $50,000, an affiliate must file with the SEC three copies of a notice of proposed sale on Form 144. The sale must occur within three months of filing the notice unless an amended notice is filed.

The Debtors believe that the Rule 144 exemption will not be available with respect to any such shares (whether held by non-affiliates or affiliates) until at least one year after the Effective Date. Accordingly, Holders of such shares will be required to hold such shares for at least one year and, thereafter, to sell them only in accordance with the applicable requirements of Rule 144, pursuant to the an effective registration statement or pursuant to another available exemption from the registration requirements of applicable securities laws.

It is currently contemplated that Reorganized Pyxus will not be subject to the reporting requirements of Section 13 or 15(b) of the Exchange Act; however, there may be a period after emergence from chapter 11 during which Reorganized Pyxus is subject to the reporting requirements of Section 13 or 15(b). During any such period, the holding periods described above may decrease from one-year to six months

<div align="center">****</div>

*Legend*. To the extent certificated or issued by way of direct registration on the records of the issuer's transfer agent, certificates evidencing the New Common Stock held by Holders of 10% or more of the outstanding New Common Stock will bear a legend substantially in the form below:

> THE SECURITIES REPRESENTED BY THIS CERTIFICATE WERE ORIGINALLY ISSUED ON [DATE OF ISSUANCE], HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "*ACT*"), OR ANY OTHER APPLICABLE STATE SECURITIES LAWS, AND MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR AN AVAILABLE EXEMPTION FROM REGISTRATION THEREUNDER.

The Debtors and Reorganized Debtors, as applicable, reserve the right to reasonably require certification, legal opinions or other evidence of compliance with Rule 144 as a condition to the removal of such legend or to any resale of the 4(a)(2) Securities. The Debtors and Reorganized Debtors, as applicable, also reserve the right to stop the transfer of any 4(a)(2) Securities if such transfer is not in compliance with Rule 144, pursuant to an effective registration statement or pursuant to another available exemption from the registration requirements of applicable securities laws. All Persons who receive 4(a)(2) Securities will be required to acknowledge and agree that (a) they will not offer, sell or otherwise transfer any 4(a)(2) Securities except in accordance with an exemption from registration, including under Rule 144 under the Securities Act, if and when available, or pursuant to an effective registration statement, and (b) the 4(a)(2) Securities will be subject to the other restrictions described above.

In any case, recipients of Securities issued under the Plan are advised to consult with their own legal advisers as to the availability of any such exemption from registration under state law in any given instance and as to any applicable requirements or conditions to such availability.

**BECAUSE OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A PARTICULAR PERSON MAY BE AN UNDERWRITER OR AN AFFILIATE AND THE HIGHLY FACT-SPECIFIC NATURE OF THE AVAILABILITY OF EXEMPTIONS FROM REGISTRATION UNDER THE SECURITIES ACT, INCLUDING THE EXEMPTIONS AVAILABLE UNDER SECTION 1145 OF THE BANKRUPTCY CODE AND RULE 144 UNDER THE SECURITIES ACT, NONE OF THE DEBTORS OR THE REORGANIZED DEBTORS MAKE ANY REPRESENTATION CONCERNING THE ABILITY OF ANY PERSON TO DISPOSE OF THE SECURITIES TO BE DISTRIBUTED UNDER THE PLAN. ACCORDINGLY, THE DEBTORS RECOMMEND THAT POTENTIAL RECIPIENTS OF THE SECURITIES TO BE ISSUED UNDER THE PLAN CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH SECURITIES AND THE CIRCUMSTANCES UNDER WHICH THEY MAY RESELL SUCH SECURITIES.**

Notwithstanding anything contained herein to the contrary, each recipient of the New Common Stock issued pursuant to the Plan will be deemed to be a party to the New Shareholders Agreement, and such New Common Stock will be subject to the New Shareholders Agreement.

## X.      Certain United States Federal Tax Consequences of the Plan

## A.    Introduction.

The following discussion summarizes certain United States (“*U.S.*”) federal income tax consequences of the implementation of the Plan to the Debtors, the Reorganized Pyxus, and certain Holders (which, solely for purposes of this discussion, means the beneficial owners for U.S. federal income tax purposes) of certain Claims entitled to vote on the Plan and Existing Pyxus Interests. The following summary does not address the U.S. federal income tax consequences to Holders not entitled to vote to accept or reject the Plan (other than Holders of Existing Pyxus Interests). This summary is based on the Internal Revenue Code of 1986, as amended (the “*Tax Code*”), the U.S. Treasury Regulations promulgated thereunder (the “*Treasury Regulations*”), judicial decisions and published administrative rules, and pronouncements of the Internal Revenue Service (the “*IRS*”), and other applicable authorities, all as in effect on the date hereof (collectively, “*Applicable Tax Law*”). Changes in the rules or new interpretations of the rules may have retroactive effect and could significantly affect the U.S. federal income tax consequences described below. Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below. No opinion of counsel has been obtained, and the Debtors have not requested, and do not intend to request, any ruling or determination from the IRS or any other taxing authority with respect to the tax consequences discussed herein, and the discussion below is not binding upon the IRS or the courts. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

This summary does not address foreign, state, local, gift, or estate tax consequences of the Plan, nor does it purport to address all aspects of U.S. federal income taxation that may be relevant to the Debtors or to certain Holders of Claims in light of their individual circumstances or to a Holder that may be subject to special tax rules (such as Persons who are related to the Debtors within the meaning of the Tax Code, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, real estate investment trusts, tax exempt organizations, controlled foreign corporations, passive foreign investment companies, pass-through entities, beneficial owners of pass-through entities, trusts, governmental authorities or agencies, dealers and traders in securities, subchapter S corporations, Persons who hold Claims or who will hold consideration received under the Plan as part of a straddle, hedge, conversion transaction, or other integrated investment, Persons using a mark-to-market method of accounting, Persons required to accelerate the recognition of any item of gross income with respect to the Claims as a result of such income being recognized on an applicable financial statement, U.S. Holders (as defined below) whose “functional currency” is not the U.S. dollar, Non-U.S. Holders (as defined below) who have at any time actually or constructively owned more than 5% of Existing Pyxus Interests, and Holders of Claims who are themselves in bankruptcy). No aspect of state, local, estate, gift, or non-U.S. taxation is addressed herein. Furthermore, this summary assumes that a Holder of a Claim holds only Claims in a single Class and holds Claims only as “capital assets” (within the meaning of section 1221 of the Tax Code). This summary also assumes that the various debt and other arrangements to which any of the Debtors and Reorganized Debtors are or will be a party will be respected for U.S. federal income tax purposes in accordance with their form, and that the Claims constitute interests in the Debtors “solely as a creditor” for purposes of section 897 of the Tax Code. This summary does not discuss differences in tax consequences to Holders of Claims that act or receive consideration in a capacity other than any other Holder of a Claim of the same Class or Classes, and the tax consequences for such Holders may differ materially from that described below. This summary does not address the U.S. federal income tax consequences to Holders (a) whose Claims are Unimpaired or otherwise entitled to payment in full in Cash under the Plan, or (b) that are deemed to reject the Plan (other than Holders of Existing Pyxus Interests).

For purposes of this discussion, a “*U.S. Holder*” is a Holder of a Claim that is: (a) an individual who is a citizen or resident of the United States for U.S. federal income tax purposes; (b) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the U.S., any state thereof or the District of Columbia; (c) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (d) a trust (i) if a court within the U.S. is able to exercise primary jurisdiction over the trust’s administration and one or more “United States persons” (within the meaning of section 7701(a)(30) of the Tax Code) have authority to control all substantial decisions of the trust, or (ii) that has a valid election in effect under applicable Treasury Regulations to be treated as a “United States person” (within the meaning of section 7701(a)(30) of the Tax Code). For purposes of this discussion, a “*Non-U.S. Holder*” is any Holder of a Claim that is not a U.S. Holder other than any partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a Holder of a Claim, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the partner (or other beneficial owner) and the entity. Partnerships (or other pass-through entities) and partners (or other beneficial owners) of partnerships (or other pass-through entities) that are Holders of Claims should consult their respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM. ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR TAX ADVISORS AS TO THE FEDERAL, STATE, LOCAL, AND NON-U.S. TAX CONSEQUENCES OF THE PLAN.**

B.      **Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors and the Reorganized Pyxus.**

The U.S. federal income tax consequences of the implementation of the Plan to the Debtors and Holders will differ depending on whether the Restructuring Transactions are structured as a Taxable Transaction (as defined below), tax-free transaction or otherwise. Although the Debtors have not yet determined how the Restructuring Transactions will be structured, the Debtors currently anticipate that the Restructuring Transactions will constitute as a recapitalization of existing Pyxus under its current corporate structure (the "***Recapitalization Transaction***"). Under the Recapitalization Transaction, Pyxus will stay in place and issue New Common Stock to Holders of Allowed Second Lien Notes Claims and Exit Secured Notes to Holders of Allowed First Lien Notes Claims in satisfaction of such Claims. Also, Pyxus will pay the Existing Equity Cash Pool to certain Holders of Pyxus Common Stock that do not submit an Equityholder Opt-Out Form by the deadline set forth therein and do not otherwise object to the Plan. The Debtors would not currently expect to recognize any gain or loss as a result of consummating a Recapitalization Transaction, but will be subject to the rules discussed below with respect to cancellation of indebtedness income ("***COD Income***") and the application of section 382 of the Tax Code.

Alternatively, the Plan may be structured as a taxable transaction that is or is deemed to be a disposition of some or all of the assets of the Debtors and/or their direct and indirect subsidiaries which is intended to be treated as a taxable disposition for U.S. federal income tax purposes, and which transaction may be structured, for U.S. federal income tax purposes, as a sale or other disposition of assets and/or a sale or other disposition of the stock of certain of the Debtors or their direct and indirect subsidiaries (a "***Taxable Transaction***"). If a Taxable Transaction is pursued the U.S. federal income tax consequences described herein would be materially different and this Disclosure Statement will be updated accordingly.

1.      **Cancellation of Debt and Reduction of Tax Attributes.**

In general, absent an applicable exception, a taxpayer will realize and recognize COD Income upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness. The amount of COD Income, in general, is the excess of (a) the "adjusted issue price" (within the meaning of the Treasury Regulations) of the indebtedness satisfied, over (b) the sum of (i) the amount of cash paid, (ii) the issue price of any new indebtedness issued by the taxpayer, and (iii) the fair market value of any other non-cash consideration (including New Common Stock), in each case, given in satisfaction of such indebtedness at the time of the exchange. Unless an exception or exclusion applies, COD Income constitutes taxable income like any other item of taxable income.

Under section 108 of the Tax Code, a taxpayer is not, however, required to include any amount of COD Income in gross income if the taxpayer is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding. Instead, as a consequence of such exclusion, a taxpayer must reduce certain tax attributes and tax basis in assets (including stock of subsidiaries) by the amount of COD Income that it excluded from gross income pursuant to section 108 of the Tax Code. Such reduction in certain tax attributes and tax basis occurs only after the tax for the year of the debt discharge has been determined. In general, tax attributes and tax basis will be reduced in the following order: (a) net operating losses ("***NOLs***") and NOL carryforwards; (b) general business credit carryover; (c) minimum tax credit carryovers; (d) capital loss carryforwards;

(e) tax basis in assets, which includes the stock of subsidiaries (but not below the amount of liabilities to which the taxpayer remains subject immediately after the discharge); (f) passive activity loss and credit carryforwards; and (g) foreign tax credit carryforwards. Alternatively, a debtor with COD Income may elect first to reduce the basis of its depreciable assets pursuant to section 108(b)(5) of the Tax Code. In the absence of contrary guidance, it appears to be the case that interest expense deductions allowable under section 163(j) of the Tax Code (and carryforwards of any such deductions) ("**163(j) Deductions**") are not subject to reduction under these rules. Any excess COD Income over the amount of available tax attributes described in clauses (a) through (g) above will generally not give rise to U.S. federal income tax and will generally have no other U.S. federal income tax impact.

The Treasury Regulations address the method and order for applying tax attribute reduction to an affiliated group of corporations. Under these Treasury Regulations, the tax attributes of each member of an affiliated group of corporations that is excluding COD Income is first subject to reduction. To the extent the debtor member's tax basis in stock of a lower-tier member of the affiliated group is reduced, a "look through rule" requires that a corresponding reduction be made to the tax attributes of the lower-tier member. If a debtor member's excluded COD Income exceeds its tax attributes, the excess COD Income is applied to reduce certain remaining consolidated tax attributes of the affiliated group.

In connection with the Restructuring Transactions, the Debtors expect to realize COD Income, with an attendant reduction in tax attributes (but in the case of tax basis where no election is made to reduce the basis of depreciable assets as described above, only to the extent such tax basis exceeds the amount of the Debtors' liabilities, as determined for these purposes, immediately after the Effective Date). While the exact amount of any COD Income that will be realized by the Debtors, and the resulting reduction in the Debtors' tax attributes, will not be determinable until, at the earliest, the consummation of the Plan (because the amount of COD Income will depend, in part, on the issue price of new debt instruments and the value of non-cash consideration (including the New Common Stock), neither of which can be determined until after the Plan is consummated), it is currently expected that the Debtors' NOLs will not survive the attribute reduction.

### 2.    Limitation of NOL Carryforwards and Other Tax Attributes.

After giving effect to the reduction in tax attributes and aggregate tax basis pursuant to excluded COD Income described above, Reorganized Pyxus' ability to use any remaining tax attributes post-emergence will be subject to certain limitations under sections 382 and 383 of the Code.[12]

Under sections 382 and 383 of the Tax Code, if a corporation undergoes an "ownership change" as defined under section 382 of the Tax Code, the amount of any remaining NOL carryforwards, 163(j) Deductions, tax credit carryforwards, and possibly certain other attributes (potentially including losses and deductions that have accrued economically but are unrecognized as of the date of the ownership changed and cost recovery deductions) of the Debtors allocable to periods prior to the Effective Date (collectively, "**Pre- Change Losses**") that may be utilized to offset future taxable income generally are subject to an annual limitation. For this purpose, if a corporation (or consolidated group) has a net unrealized built-in loss at the time of an ownership change (taking into account most

---

[12] The IRS issued proposed regulations in September 2019 that would revoke IRS Notice 2003-65 and make substantial changes to the way limitations under section 382 of the Tax Code are calculated. The changes would decrease the limitation set forth in section 382 of the Tax Code in most cases and potentially cause entities that would have had a net unrealized built-in gain under Notice 2003-65 to instead have a net unrealized built-in loss, which would result in additional limitations on the ability to deduct Pre-Change Losses. Additionally, the IRS issued further proposed regulations in January 2020 that would provide certain transition relief for the application of any finalized regulation. Under such transition relief, any finalized regulations would apply only to ownership changes occurring 31 days after the regulations are finalized and certain specified and identifiable transactions would be subject to a "grandfathering" rule that allows for application of the prior IRS Notice 2003-65 rules. Additionally, the "grandfathering" rule would also apply as long as a company files its chapter 11 case on or before the day that is 31 days following the issuance of final regulations, even where the applicable ownership change occurs more than 31 days after finalization of the regulations. Because the Debtors have already filed their chapter 11 cases we believe that any such finalized regulations would likely not be applicable and, accordingly, the remainder of this discussion assumes that IRS Notice 2003-65 will apply to the Debtors.

assets and items of "built-in" income and deductions), then generally built-in losses (including amortization or depreciation deductions attributable to such built-in losses) recognized during the following five years (up to the amount of the original net unrealized built-in loss) will be treated as Pre-Change Losses and similarly will be subject to the annual limitation. In general, a corporation's (or consolidated group's) net unrealized built-in loss will be deemed to be zero unless it is greater than the lesser of (a) $10,000,000, or (b) 15% of the fair market value of its assets (with certain adjustments) before the ownership change.

The rules of section 382 of the Tax Code are complicated, but as a general matter, the Debtors anticipate that the issuance of New Common Stock pursuant to the Plan will result in an "ownership change" of the Debtors for these purposes, and that the ability of Reorganized Pyxus and its subsidiaries to use the Pre-Change Losses will be subject to limitation unless an exception to the general rules of section 382 of the Tax Code applies.

(a)    **General Section 382 Annual Limitation.**

In general, the amount of the annual limitation to which a corporation that undergoes an "ownership change" would be subject (the "*382 Limitation*") is equal to the product of (a) the fair market value of the stock of the corporation (or parent of the consolidated group) immediately before the "ownership change" (with certain adjustments) and (b) the "long-term tax-exempt rate" (which is the highest of the adjusted federal long-term rates in effect for any month in the 3-month-calendar period ending with the calendar month in which the ownership change occurs, currently 1.09% for June 2020). Under certain circumstances, the 382 Limitation may be increased to the extent that the corporation (or parent of the consolidated group) has an overall built-in gain in its assets at the time of the ownership change. If the corporation or consolidated group has such "net unrealized built-in gain" at the time of an ownership change (taking into account most assets and items of "built-in" income, gain, loss, and deduction), any built-in gains recognized (or, according to the currently effective IRS Notice 2003-65, treated as recognized) during the following five year period (up to the amount of the original net unrealized built-in gain) generally will increase the annual limitation in the year of such recognition, such that the loss corporation or consolidated group would be permitted to sue its pre-change losses against such built-in gain income in addition to its otherwise applicable annual limitation. Section 383 of the Tax Code applies a similar limitation to capital loss carryforwards and tax credits. Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable year. As discussed below, however, special rules may apply in the case of a corporation that experiences an ownership change as the result of a bankruptcy proceeding.

Notwithstanding the rules described above, if subsequent to an ownership change, a debtor corporation and its subsidiaries do not continue the debtor corporation's historic business or use a significant portion of its historic business assets in a new business for two years after the ownership change, the annual limitation resulting from the ownership change is zero (absent any increases due to recognized built-in gains). The issuance under the Plan of the New Common Stock is expected to cause an ownership change with respect to the Debtor on the Effective Date. As a result, unless an exception applies, Section 382 of the Tax Code will apply to limit the Debtor's use of any remaining Pre-Change Losses after the Effective Date. This limitation is independent of, and in addition to, the reduction of tax attributes described in the preceding section resulting from the exclusion of COD Income.

(b)    **Special Bankruptcy Exceptions.**

Special rules may apply in the case of a corporation that experiences an "ownership change" as a result of a bankruptcy proceeding. An exception to the foregoing annual limitation rules generally applies when so-called "qualified creditors" of a debtor corporation in chapter 11 receive, in respect of their claims, at least 50 percent of the vote and value of the stock of the reorganized debtor (or a controlling corporation if also in chapter 11) pursuant to a confirmed chapter 11 plan (the "*382(l)(5) Exception*"). If the requirements of the 382(l)(5) Exception are satisfied, a corporation's Pre-Change Losses would not be limited on an annual basis, but, instead, NOL carryforwards would be reduced by the amount of any interest deductions claimed by the corporation during the three taxable years preceding the effective date of the plan of reorganization, and during the part of the taxable year prior to and including the effective date of the plan of reorganization in respect of all debt converted into stock pursuant to the reorganization. If the 382(l)(5) Exception applies and Reorganized Pyxus undergoes another "ownership change" within two years after the Effective Date, then Reorganized Pyxus's Pre-Change Losses thereafter would be effectively eliminated in their entirety.

Where the 382(l)(5) Exception is not applicable to a corporation in bankruptcy (either because the debtor corporation does not qualify for it or the debtor corporation otherwise elects not to utilize the 382(l)(5) Exception), a second special rule will generally apply (the "***382(l)(6) Exception***"). Under the 382(l)(6) Exception, the annual limitation will be calculated by reference to the lesser of (a) the value of the debtor corporation's new stock (with certain adjustments) immediately after the ownership change or (b) the value of such debtor corporation's assets (determined without regard to liabilities) immediately before the ownership change. This differs from the ordinary rule that requires the fair market value of a debtor corporation that undergoes an "ownership change" to be determined before the events giving rise to the change. The 382(l)(6) Exception also differs from the 382(l)(5) Exception in that under it the debtor corporation is not required to reduce its NOL carryforwards by the amount of interest deductions claimed within the prior three-year period (and during the part of the taxable year prior to and including the effective date of the plan of reorganization), and the debtor may undergo a change of ownership within two years without automatically triggering the elimination of its Pre-Change Losses. The resulting limitation would be determined under the regular rules for ownership changes.

If an ownership change is triggered on the Effective Date, the Debtors may not be eligible for the 382(l)(5) Exception. Alternatively, the Debtors may decide to affirmatively elect out of the 382(l)(5) Exception so that the 382(l)(6) Exception instead applies. Regardless of whether the Debtors take advantage of the 382(l)(6) Exception or the 382(l)(5) Exception, the Debtors' use of their Pre-Change Losses after the Effective Date may be adversely affected if an "ownership change" within the meaning of section 382 of the Tax Code were to occur after the Effective Date. However, Reorganized Pyxus and its subsidiaries do not expect to have significant NOL carryforwards after the completion of the Restructuring Transactions.

## C.  Certain U.S. Federal Income Tax Consequences of the Plan to U.S. Holders of Allowed Second Lien Notes Claims, Allowed First Lien Notes Claims and Existing Pyxus Interests.

The following discussion assumes that the Debtors will undertake the Restructuring Transactions currently contemplated by the Plan. U.S. Holders of Claims and Existing Pyxus Interests are urged to consult their tax advisors regarding the tax consequences of the Restructuring Transactions.

### 1.  U.S. Federal Income Tax Consequences of the Consummation of the Plan.

Pursuant to the Plan, in exchange for full and final satisfaction, compromise, settlement, release, and discharge of their Claims, each U.S. Holder of:

(I) an Allowed Second Lien Notes Claim shall either (i) receive such Holder's *pro rata* share of the Second Lien Notes Common Stock Pool or (ii) at such Holder's option, receive Cash equal to 2.00% of such Holder's Allowed Second Lien Notes Claim in lieu of the Second Lien Notes Common Stock Pool; and

(II) an Allowed First Lien Notes Claim shall receive such Holder's *pro rata* share of (i) (x) payment in full in Cash of all accrued and unpaid interest on such Holder's First Lien Notes at the non-default rate, and (y) such Holder's *pro rata* share of the Exit Secured Notes; or (ii) to the extent that Pyxus consummates the Replacement First Lien Financing by the Effective Date, payment in full in Cash.

To incentivize participation, the Restructuring Support Agreement includes a fee for each Consenting First Lien Noteholder and Consenting Second Lien Noteholder that signed prior to the Petition Date. The First Lien Notes Cash RSA fee is $5.5 million of Cash for such Consenting First Lien Noteholders and the Second Lien Notes Equity RSA fee is $5.0 million for such Consenting Second Lien Noteholders, which is payable in the form of the Second Lien Notes RSA Fee Shares if the Plan is consummated. The Second Lien Notes RSA Fee Shares consists of 1.25% of the shares of New Common Stock to be issued on the Effective Date, subject to dilution by the New MIP.

In addition, each U.S. Holder of an Pyxus Common Stock that is a Qualifying Holder of Pyxus Common Stock shall receive such Holder's *pro rata* share of the Existing Equity Cash Pool.

Whether a U.S. Holder of an Allowed Claim recognizes gain or loss as a result of the exchange of its Claim for the Second Lien Notes Common Stock Pool or Exit Secured Notes, as applicable, depends on whether (a) in case of the First Lien Notes, the exchange results in a "significant modification"; (b) the exchange qualifies as a tax-free recapitalization, which in turn depends on whether the debt underlying the Claim surrendered is treated as a "security" for the reorganization provisions of the Tax Code; (c) the holder has previously included in income any accrued but unpaid interest with respect to the Claim; (d) the U.S. Holder has Claimed a bad debt deduction or worthless security deduction with respect to such Claim; and (e) the U.S. Holder uses the accrual or cash method of accounting for tax purposes.

(a)        **Treatment of a Debt Instrument as a "Security".**

Neither the Tax Code nor the Treasury Regulations define the term "security," and it has not been clearly defined by judicial decisions. Whether a debt instrument constitutes a "security" for U.S. federal income tax purposes is determined based on all the relevant facts and circumstances. Factors evaluated include whether the U.S. Holder of such debt instrument is subject to a material level of entrepreneurial risk, the security for payment, the creditworthiness of the obligor, the subordination or lack thereof with respect to other creditors, the convertibility of the instrument into an equity interest of the obligor, whether payments of interest are fixed, variable, or contingent, whether such payments are made on a current basis or accrued, and the U.S. Holder's degree of participation and continuing interest in the debtor's business, but most authorities conclude that the term to maturity of the debt instrument at initial issuance is one of the most significant factors. In this regard, debt instruments with a term of ten years or more generally have qualified as securities, whereas debt instruments with a term of less than five years generally have not qualified as securities. Although it is not free from doubt, the Debtor intends to take the position that the Second Lien Notes constitute a "security" and the First Lien Notes do not constitute a "security" for U.S. federal income tax purposes (and the remainder of this discussion assumes that this position is correct). U.S. Holders are urged to consult their tax advisors regarding the potentially different tax treatment that could apply if their Claims were treated other than as described in the foregoing sentence.

(b)        **Treatment of a Holder of Allowed Second Lien Notes Claims as a Reorganization or Taxable Exchange.**

If a debt instrument constituting a surrendered Allowed Second Lien Notes Claim is treated as a "security" for U.S. federal income tax purposes, the receipt of New Common Stock (including any Second Lien Notes Equity RSA Fee that is payable in New Common Stock) by the U.S. Holder of the Allowed Second Lien Notes Claim in exchange for such Allowed Second Lien Notes Claim will be treated as a "recapitalization," and therefore a reorganization for U.S. federal income tax purposes. As such, subject to the discussion below under "Accrued Interest" and "First Lien Notes Cash RSA Fee and Second Lien Notes Equity RSA Fee", a U.S. Holder of an Allowed Second Lien Notes Claim is not expected to recognize any gain or loss on the exchange. The U.S. Holder's tax basis in its New Common Stock received (other than any such New Common Stock attributable to accrued but unpaid interest (and OID) and subject to the discussion below under "First Lien Notes Cash RSA Fee and Second Lien Notes Equity RSA Fee") should be equal to the tax basis of the obligation constituting the Allowed Second Lien Notes Claim surrendered in exchange therefor, and the U.S. Holder's holding period for such New Common Stock should include the holding period for the obligation constituting the surrendered Allowed Second Lien Notes Claim. The tax basis of any New Common Stock treated as received in satisfaction of accrued but untaxed interest (and OID), or to the extent treated as a separate fee (as discussed below) should equal the amount of such accrued but untaxed interest (and OID), or fee, and the holding period for any such New Common Stock should not include the holding period of the debt instrument constituting the surrendered Allowed Second Lien Notes Claim.

Alternatively, in the case an Allowed Second Lien Notes Claim is exchanged for Cash, a U.S. Holder will generally recognize gain or loss equal to the difference, if any, between (i) the amount of Cash received on the exchange (other than amounts attributable to accrued but unpaid interest, which will be taxed as ordinary interest income to the extent not previously so taxed) and (ii) the U.S. Holder's adjusted tax basis in the Second Lien Notes. In general, a U.S. Holder's adjusted tax basis in the Second Lien Notes will be its initial tax basis in the Second Lien Notes, increased by any accrued OID previously included in such U.S. Holder's gross income. A U.S. Holder's gain or loss will generally constitute capital gain or loss and will be long-term capital gain or loss if the U.S. Holder has held such Second Lien Notes for longer than one year, except that any such gain will be treated as ordinary income to the extent of any market discount accrued during the U.S. Holder's holding period (see discussion of "Market

Discount" below). Non-corporate taxpayers are generally subject to a reduced federal income tax rate on net long-term capital gains. The deductibility of capital losses is subject to certain limitations.

(c)      **Treatment of a Holder of Allowed First Lien Notes Claims as a Taxable Exchange.**

The exchange of a debt instrument constituting a surrendered Allowed First Lien Notes Claim for Exit Secured Notes and First Lien Notes Cash RSA Fee pursuant to the Plan will be treated as a taxable "exchange" under section 1001 of the Tax Code of the First Lien Notes for cash and different debt of the Reorganized Pyxus for U.S. federal income tax purposes if such exchange results in a "significant modification" of the First Lien Notes.

Under applicable Treasury Regulations, the modification of the terms of a debt instrument (including pursuant to an exchange of a new debt instrument for the existing debt instrument) generally is a significant modification if, based on all of the facts and circumstances and taking into account all modifications of the debt instrument, the legal rights or obligations that are altered and the degree to which they are altered are "economically significant." A modification that adds, deletes, or alters customary accounting or financial covenants is not a significant modification. A modification that releases, substitutes, adds or otherwise alters the collateral for, a guarantee on, or other form of credit enhancement on a recourse debt instrument is a significant modification if the modification results in a change in payment expectations. A modification that changes the timing of payments due under a debt instrument is a significant modification if it results in a material deferral of scheduled payments. The materiality of the deferral depends on all the facts and circumstances, including the length of the deferral, the original term of the instrument, the amounts of the payments that are deferred, and the time period between the modification and the actual deferral of payment. However, a deferral of one or more scheduled payments is not a material deferral if it is within a safe-harbor period beginning on the original due date of the first scheduled payment that is deferred and extending for a period equal to the lesser of five years or 50 percent of the original term of the instrument. A change in the yield of a debt instrument is a significant modification if the yield of the modified instrument (as computed under the applicable Treasury Regulations) varies from the annual yield of the unmodified instrument (determined as of the date of the modification) by more than the greater of ¼ of one percent or 5 percent of the annual yield of the unmodified instrument.

Based on such applicable Treasury Regulations, the exchange of Allowed First Lien Notes Claim for Exit Secured Notes and First Lien Notes Cash RSA Fee pursuant to the Plan is expected to be treated as a "significant modification" of the First Lien Notes and accordingly as a taxable "exchange" under section 1001 of the Tax Code of the First Lien Notes for Cash and different debt of Reorganized Pyxus for U.S. federal income tax purposes. The remainder of this discussion assumes such treatment.

Since a debt instrument constituting a surrendered Allowed First Lien Notes Claim is not expected to qualify as a "security" for U.S. federal income tax purposes, the receipt of Exit Secured Notes and First Lien Notes Cash RSA Fee by the U.S. Holder will not be treated as a "recapitalization," (as discussed under "Treatment of a Holder of Allowed Second Lien Notes Claims as a Reorganization" above) and therefore, a U.S. Holder of such a Claim is expected to be treated as exchanging its Allowed First Lien Notes Claim for Exit Secured Notes and First Lien Notes Cash RSA Fee in a fully taxable exchange. Subject to the discussion below under "First Lien Notes Cash RSA Fee and Second Lien Notes Equity RSA Fee," a U.S. Holder of an Allowed First Lien Notes Claim who is subject to this treatment is expected to recognize gain or loss equal to the difference between (i) sum of the issue price of the Exit Secured Notes and the First Lien Notes Cash RSA Fee, if any, received by such U.S. Holder, and (ii) the U.S. Holder's adjusted tax basis in the obligation constituting the surrendered Allowed First Lien Notes Claim. In general, a U.S. Holder's adjusted tax basis in the Allowed First Lien Notes will be its initial tax basis in the First Lien Notes, increased by any accrued OID previously included in such U.S. Holder's gross income. A U.S. Holder's adjusted tax basis in the Exit Secured Notes generally would equal their issue price and a U.S. Holder would have a new holding period in the Exit Secured Notes commencing the day after the Effective Date. If the First Lien Notes or the Exit Secured Notes were "traded on an established securities market" (within the meaning of Treasury Regulations), as we believe would be the case, then the issue price of the Exit Secured Notes would be their fair market value on the Effective Date. Except with respect to accrued market discount and subject to the discussion below under "First Lien Notes Cash RSA Fee and Second Lien Notes Equity RSA Fee," any gain or loss a U.S. Holder recognized in the exchange generally would be capital gain or loss and would be long-term capital gain or loss if the First Lien Notes had been held for more than one year. Non-corporate U.S. Holders generally are eligible for preferential rates of taxation on long-term capital gains.

With respect to the payment in full in Cash of all accrued and unpaid interest on the First Lien Notes at the non-default rate, a U.S. Holder generally will be taxed on such cash as ordinary interest income to the extent not previously so taxed.

Alternatively, in the event that Pyxus consummates the Replacement First Lien Financing by the Effective Date and an Allowed First Lien Notes Claim is exchanged for Cash (including any First Lien Notes Cash RSA Fee) subject to the discussion below under "First Lien Notes Cash RSA Fee and Second Lien Notes Equity RSA Fee," a U.S. Holder will generally recognize gain or loss equal to the difference, if any, between (i) the amount of Cash received on the exchange (other than amounts attributable to accrued but unpaid interest, which will be taxed as ordinary interest income to the extent not previously so taxed) and (ii) the U.S. Holder's adjusted tax basis in the First Lien Notes. Any such gain or loss will generally constitute capital gain or loss and will be long-term capital gain or loss if the U.S. Holder has held such First Lien Notes for longer than one year, except that any such gain will be treated as ordinary income to the extent of any market discount accrued during the U.S. Holder's holding period (see discussion of "Market Discount" below). Non-corporate taxpayers are generally subject to a reduced U.S. federal income tax rate on net long-term capital gains. The deductibility of capital losses is subject to certain limitations.

(d)      **Accrued Interest (and OID).**

A portion of the consideration received by U.S. Holders of Claims may be attributable to accrued but unpaid interest or OID during its holding period on the debt instruments constituting the surrendered Claims. Such amount should be taxable to that U.S. Holder as ordinary income if such accrued interest or OID has not been previously included in the U.S. Holder's gross income for U.S. federal income tax purposes. Conversely, U.S. Holders of Claims may be able to recognize a deductible loss to the extent that any accrued interest or OID on the Claims was previously included in the U.S. Holder's gross income but was not paid in full by the Debtors. Such loss may be ordinary, but the tax law is unclear on this point.

If the fair market value of the consideration received by a U.S. Holder pursuant to the Plan is not sufficient to fully satisfy all principal and interest on Allowed Claims, the extent to which such consideration will be attributable to accrued but unpaid interest and OID is unclear. Under the Plan, the aggregate consideration to be distributed to U.S. Holders of each Allowed First Lien Notes Claims and Allowed Second Lien Notes Claims will be allocated first to the principal amount (as determined for federal income tax purposes) of Allowed Claims, with any excess allocated to unpaid interest that accrued on such Claims, if any. Certain legislative history and case law indicate that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes, while certain Treasury Regulations treat payments under debt instruments as allocated first to any accrued but unpaid interest. The IRS could take the position that the consideration received by the U.S. Holder should be allocated in some way other than as provided in the Plan. U.S. Holders of Claims should consult their respective tax advisors regarding the proper allocation of the consideration received by them under the Plan between principal and accrued but unpaid interest in such event.

(e)      **Market Discount.**

Under the "market discount" provisions of the Tax Code, some or all of any gain realized by a U.S. Holder of a Claim may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt instruments constituting the exchanged Claim. In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired other than at original issuance, and if the U.S. Holder's adjusted tax basis in the debt instrument is less than (a) in the case of a debt instrument issued without OID, the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or (b) in the case of a debt instrument issued with OID, its "revised issue price," in each case, by at least a *de minimis* amount (equal to 0.25 percent of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

In the case of a "recapitalization" (as described under "Treatment of a Holder of Allowed Second Lien Notes Claims as a Reorganization or Taxable Exchange" above), if the debt underlying the Allowed Second Lien Notes Claim had been acquired with market discount, any such market discount that accrued on such debt but was not recognized by the U.S. Holder may be required to be carried over to the New Common Stock received therefor and any gain recognized on the subsequent sale, exchange, redemption or other disposition of such New Common Stock

may be treated as ordinary income to the extent of the accrued but unrecognized market discount with respect to the exchanged debt underlying the Allowed Second Lien Notes Claim. U.S. Holders should consult their own tax advisors concerning the application of the market discount rules to their Claims.

In the case of a taxable exchange (as described under "Treatment of a Holder of Allowed First Lien Notes Claims as a Taxable Exchange" above), any gain recognized by a U.S. Holder on the taxable disposition of debts that it acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while such debts were considered to be held by the U.S. Holder (unless the U.S. Holder elected to include market discount in income as it accrued). U.S. Holders should consult their own tax advisors concerning the application of the market discount rules to their Claims.

(f)    **First Lien Notes Cash RSA Fee and Second Lien Notes Equity RSA Fee.**

The U.S. federal income tax treatment of the Cash RSA Fee and Equity RSA Fee (the "*Fees*") is unclear. If treated as additional consideration for First Lien Notes and Second Lien Notes, as applicable, the Fee would be treated as part of the total consideration received and subject to tax in the manner described above. It is also possible that the Fee may instead be treated as a separate fee rather than as additional consideration for First Lien Notes and Second Lien Notes, as applicable, in which case such a payment would be subject to tax as ordinary income. Although no assurances can be provided, we intend to take the position, and this discussion assumes, that the Fees are treated as additional consideration received by a U.S. Holder in exchange for First Lien Notes and Second Lien Notes, as applicable. There can be no assurance, however, that the IRS will agree with such treatment. U.S. Holders should consult their tax advisor regarding the U.S. federal income tax treatment of the Fees.

(g)    **Treatment of a Holder of Existing Pyxus Interests.**

A U.S. Holder of Existing Pyxus Interests that receives Cash from the Existing Equity Cash Pool generally will be required to recognize gain or loss equal to the difference between the amount of Cash received on the exchange and the U.S. Holder's tax basis in the Existing Pyxus Interests. Such gain or loss will generally be capital gain or loss and will generally be long-term capital gain or loss if the U.S. Holder has held the Existing Pyxus Interests for more than one year. Long-term capital gains of an individual taxpayer generally are taxed at preferential rates. The deductibility of capital losses is subject to certain limitations.

Contrary to the foregoing discussion, it is possible that a U.S. Holder of Existing Pyxus Interests may be treated as having received the Existing Equity Cash Pool as compensation or a fee for agreeing to provide the voluntary releases set forth in the Plan (rather than in exchange for such U.S. Holder's Existing Pyxus Interests). In such case, the U.S. Holder would recognize immediate income in an amount equal to the Cash received. A U.S. Holder would likely be permitted to claim a capital loss in an amount equal to the U.S. Holder's adjusted tax basis in the Existing Pyxus Interests. U.S. Holders should consult their tax advisor regarding the U.S. federal income tax treatment of the Existing Pyxus Interests pursuant to the Plan (including the receipt of Existing Equity Cash Pool (if any)).

(h)    **Medicare Tax.**

Certain U.S. Holders that are individuals, estates, or trusts are required to pay an additional 3.8 percent tax on, among other things, gains from the sale or other disposition of capital assets. U.S. Holders that are individuals, estates, or trusts should consult their tax advisors regarding the effect, if any, of this tax provision on their ownership and disposition of any consideration to be received under the Plan.

**2.      U.S. Federal Income Tax Consequences of Owning and Disposing of the New Common Stock.**

(a)      **Distributions on New Common Stock.**

Any distributions made on account of the New Common Stock will constitute dividends for U.S. federal income tax purposes to the extent of the current or accumulated earnings and profits of Reorganized Pyxus as determined under U.S. federal income tax principles. To the extent that a U.S. Holder receives distributions that would otherwise constitute dividends for U.S. federal income tax purposes but that exceed such current and accumulated earnings and profits, such distributions will be treated first as a non-taxable return of capital reducing the U.S. Holder's basis in its shares (determined on a share-by-share basis). Any such distributions in excess of the U.S. Holder's basis in its shares (determined on a share-by-share basis) generally will be treated as capital gain from the sale or exchange of such stock, as described below under "Sale, Exchange, Redemption, or Repurchase of New Common Stock."

Subject to applicable limitations, any such dividends on New Common Stock paid to U.S. Holders that are corporations generally will be eligible for the dividends-received deduction. However, the dividends-received deduction is only available if such U.S. Holder satisfies certain holding period requirements with respect to its New Common Stock. Such holding period is reduced for any period during which such U.S. Holder's risk of loss with respect to the New Common Stock is diminished by reason of the existence of certain options, contracts to sell, short sales, or similar transactions. In addition, to the extent that such U.S. Holder's investment in the New Common Stock on which the dividend is paid is directly attributable to indebtedness incurred, all or a portion of the dividends-received deduction may be disallowed.

(b)      **Sale, Exchange, Redemption, or Repurchase of New Common Stock.**

Unless a non-recognition provision applies, subject to the "market discount" rules discussed above, U.S. Holders generally will recognize capital gain or loss upon the sale, exchange, redemption, repurchase, or other taxable disposition of the New Common Stock. Such capital gain will be long-term capital gain if at the time of the sale, exchange, redemption, repurchase, or other taxable disposition, the U.S. Holder held the New Common Stock for more than one year. Long-term capital gains of an individual taxpayer generally are taxed at preferential rates. Under the recapture rules of section 108(e)(7) of the Tax Code, a U.S. Holder may be required to treat gain recognized on such dispositions of the New Common Stock as ordinary income if such U.S. Holder took a bad debt deduction with respect to its Claim or recognized an ordinary loss on the exchange of its Claim for New Common Stock. The deductibility of capital losses is subject to certain limitations.

**3.      U.S. Federal Income Tax Consequences of Owning and Disposing of the Exit Secured Notes.**

(a)      **Issue Price.**

The issue price of a debt instrument issued in exchange for another debt instrument depends on whether either debt instrument is considered "traded on an established market" ("***publicly traded***"). If the First Lien Notes or the Exit Secured Notes are treated as "publicly traded" for U.S. federal income tax purposes, as we expect to be the case, then the "issue price" of the Exit Secured Notes will be the fair market value of the Exit Secured Notes as of their issue date.

(b)      **Payments of Qualified Stated Interest.**

Payments or accruals of "qualified stated interest" (as defined below) on the Exit Secured Notes will be includible in the U.S. Holder's gross income as ordinary interest income and taxable at the time that such payments are accrued or are received in accordance with such U.S. Holder's regular method of accounting for U.S. federal income tax purposes. The term "qualified stated interest" generally means stated interest that is unconditionally payable in Cash or property (other than debt instruments of the issuer) at least annually during the entire term of the Exit Secured Notes at a single fixed rate of interest, or, subject to certain conditions, based on one or more interest indices.

(c)        **Original Issue Discount.**

An Exit Secured Note will be treated as issued with OID for U.S. federal income tax purposes if the "stated redemption price at maturity" of such Exit Secured Note exceeds its "issue price" (see "—Issue Price" above) by an amount equal to or more than a statutorily defined *de minimis* amount (generally, 0.25 percent multiplied by the product of the stated redemption price at maturity and the number of complete years to maturity). The "stated redemption price at maturity" of an Exit Secured Note is the total of all payments to be made under the Exit Secured Note other than "qualified stated interest."

If an Exit Secured Note were treated as having been issued with more than *de minimis* OID, U.S. Holders would be required to include the OID with respect to such Exit Secured Note in ordinary income on an annual basis under a constant yield accrual method regardless of such U.S. Holder's regular method of accounting for U.S. federal income tax purposes. A U.S. Holder must include in income in each taxable year the sum of the daily portions of OID for each day on which it held an Exit Secured Note during the taxable year. To determine the daily portions of OID, the amount of OID allocable to an accrual period is determined, and a ratable portion of such OID is allocated to each day in the accrual period. An accrual period may be of any length and the length of the accrual periods may vary over the life of the Exit Secured Note, provided that no accrual period may be longer than one year and each scheduled payment of interest or principal on the Exit Secured Note must occur on either the first day or last day of an accrual period. The amount of OID allocable to an accrual period will equal (A) the product of (i) the Exit Secured Note's adjusted issue price at the beginning of the accrual period and (ii) the Exit Secured Note's yield to maturity (adjusted to reflect the length of the accrual period), less (B) any qualified stated interest allocable to the accrual period.

An Exit Secured Note's adjusted issue price at any time generally will be its original issue price, increased by the amount of OID on such Exit Secured Note accrued for each prior accrual period and decreased by the amount of payments on such Exit Secured Note other than payments of qualified stated interest. An Exit Secured Note's yield to maturity is the discount rate that, when used in computing the present value of all principal and interest payments to be made on the Exit Secured Note, produces an amount equal to the Exit Secured Note's original issue price.

The Exit Secured Notes may be treated as issued with an amount of OID that is not *de minimis*.

(d)        **Sale, Taxable Exchange, or Other Taxable Disposition of Exit Secured Note.**

Upon the disposition of the Exit Secured Notes by sale, exchange, repurchase, redemption or other taxable disposition, a U.S. Holder will generally recognize gain or loss equal to the difference, if any, between (i) the amount realized on the disposition (other than amounts attributable to accrued but unpaid interest, which will be taxed as ordinary interest income to the extent not previously so taxed) and (ii) the U.S. Holder's adjusted tax basis in the Exit Secured Notes, as applicable. In general, a U.S. Holder's adjusted tax basis in the Exit Secured Notes will be its initial tax basis in the Exit Secured Notes, increased by any accrued OID previously included in such U.S. Holder's gross income. A U.S. Holder's gain or loss will generally constitute capital gain or loss and will be long term capital gain or loss if the U.S. Holder has held such Exit Secured Notes for longer than one year, except that any such gain will be treated as ordinary income to the extent of any market discount accrued during the U.S. Holder's holding period, including any accrued market discount carried over from the First Lien Notes. Non-corporate taxpayers are generally subject to a reduced federal income tax rate on net long-term capital gains. The deductibility of capital losses is subject to certain limitations.

4.        **Limitation of Use of Capital Losses.**

U.S. Holders who recognize capital losses as a result of the distributions under the Plan will be subject to limits on their use of capital losses. For non-corporate U.S. Holders, capital losses may be used to offset any capital gains (without regard to holding periods) plus ordinary income to the extent of the lesser of (a) $3,000 ($1,500 for married individuals filing separate returns) or (b) the excess of the capital losses over the capital gains. Non-corporate U.S. Holders may carry over unused capital losses and apply them to capital gains and a portion of their ordinary income for an unlimited number of years. For corporate U.S. Holders, losses from the sale or exchange of capital assets may only be used to offset capital gains. U.S. Holders who have more capital losses than can be used in a tax year may be allowed to carry over the excess capital losses for use in succeeding tax years. Corporate U.S. Holders

may only carry over unused capital losses for the five years following the capital loss year, but are generally allowed to carry back unused capital losses to the three years preceding the capital loss year.

**U.S. HOLDERS SHOULD CONSULT THEIR TAX ADVISORS REGARDING THE POSSIBLE IMPACT OF THESE RULES ON SUCH HOLDERS' EXCHANGE OF ANY CLAIMS AND THE EXISTING PYXUS INTERESTS PURSUANT TO THE PLAN AND ON ITS OWNERSHIP OF THE EXIT SECURED NOTES AND NEW COMMON STOCK.**

**D.      Certain U.S. Federal Income Tax Consequences of the Plan to Non-U.S. Holders of Allowed Second Lien Notes Claims, Allowed First Lien Notes Claims and Existing Pyxus Interests.**

The following discussion assumes that the Debtors will undertake the Restructuring Transactions currently contemplated by the Plan and includes only certain U.S. federal income tax consequences of the Plan to Non-U.S. Holders. The discussion does not include any non-U.S. tax considerations. The rules governing the U.S. federal income tax consequences to Non-U.S. Holders are complex. Each Non-U.S. Holder should consult its own tax advisor regarding the U.S. federal, state, local, non-U.S., and non-income tax consequences of the consummation of the Plan to such Non-U.S. Holder and the ownership and disposition of the Existing Pyxus Interests, New Common Stock and Exit Secured Notes, as applicable.

Whether a Non-U.S. Holder realizes gain or loss pursuant to the transactions undertaken as part of the Plan and the amount of such gain or loss is determined in the same manner as set forth above in connection with U.S. Holders.

**1.      U.S. Federal Income Tax Consequences to Non-U.S. Holders of Allowed Second Lien Notes Claims and Allowed First Lien Notes Claims.**

(a)      **Gain Recognition on the Exchange of Claims.**

Subject to the discussion below under "First Lien Notes Cash RSA Fee and Second Lien Notes Equity RSA Fee," any gain recognized by a Non-U.S. Holder on the exchange of its Claim generally will not be subject to U.S. federal income taxation unless (a) the Non-U.S. Holder is an individual who was present in the United States for 183 days or more during the taxable year in which the Restructuring Transactions occur and certain other conditions are met or (b) such gain is effectively connected with the conduct by such Non-U.S. Holder of a trade or business in the United States (and if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States).

If the first exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of the exchange. If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to any gain realized on the exchange if such gain is effectively connected with the Non-U.S. Holder's conduct of a trade or business in the United States in the same manner as a U.S. Holder (except that the Medicare tax would generally not apply). In addition, if such a Non-U.S. Holder is a corporation, it may be subject to a branch profits tax equal to 30 percent (or such lower rate provided by an applicable treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

(b)      **Accrued but Unpaid Interest (and OID).**

Payments made to a Non-U.S. Holder under the Plan (including Exit Secured Notes) that are attributable to accrued but unpaid interest (and OID) generally will not be subject to U.S. federal income or withholding tax, provided that the withholding agent has received or receives, prior to payment, appropriate documentation (generally, IRS Form W-8BEN or W-8BEN-E) establishing that the Non-U.S. Holder is not a U.S. person, unless:

(i)      the Non-U.S. Holder actually or constructively owns 10 percent or more of the total combined voting power of all classes of the stock of the Debtors within the

meaning of section 871(d)(4) of the Tax Code;

(ii)    the Non-U.S. Holder is a "controlled foreign corporation" that is a "related person" with respect to the Debtor obligor (each, within the meaning of the Tax Code);

(iii)    the Non-U.S. Holder is a bank receiving interest described in section 881(c)(3)(A) of the Tax Code; or

(iv)    such interest and OID is effectively connected with the conduct by the Non-U.S. Holder of a trade or business within the United States (or, if required by an applicable income tax treaty, is attributable to a permanent establishment of the U.S. Holder in the United States ) (in which case, provided the Non-U.S. Holder provides a properly executed IRS Form W-8ECI (or successor form) to the withholding agent, the Non-U.S. Holder (x) generally will not be subject to withholding tax, but (y) will be subject to U.S. federal income tax in the same manner as a U.S. Holder (unless an applicable income tax treaty provides otherwise), and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such Non-U.S. Holder's effectively connected earnings and profits that are attributable to the accrued but unpaid interest (and OID) at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty)).

A Non-U.S. Holder that does not meet the requirements for exemption from withholding tax described above will be subject to withholding of U.S. federal income tax at a 30 percent rate (or at a reduced rate or exemption from tax under an applicable income tax treaty) on payments that are attributable to accrued but unpaid interest and OID. For purposes of providing a properly executed IRS Form W-8BEN or W-8BEN-E, special procedures are provided under applicable Treasury Regulations for payments through qualified foreign intermediaries or certain financial institutions that hold customers' securities in the ordinary course of their trade or business.

The certifications described above must be provided to the applicable withholding agent prior to the payment of interest and, as applicable, must be updated periodically. Non-U.S. Holders that do not timely provide the applicable withholding agent with the required certification, but that qualify for a reduced rate under an applicable income tax treaty, may obtain a refund of any excess amounts withheld by timely filing an appropriate claim for refund with the IRS. Non-U.S. Holders should consult their tax advisors regarding their entitlement to benefits under any applicable income tax treaty

(c)    **First Lien Notes Cash RSA Fee and Second Lien Notes Equity RSA Fee.**

As discussed above under "U.S. Federal Income Tax Consequences of the Consummation of the Plan— First Lien Notes Cash RSA Fee and Second Lien Notes Equity RSA Fee," the u.s. federal income tax treatment of the Fees is unclear. If the Fee constitutes additional consideration for First Lien Notes and Second Lien Notes, as applicable, the consequences of such receipt will be as discussed above under "U.S. Federal Income Tax Consequences to Non-U.S. Holders of Allowed Second Lien Notes Claims and Allowed First Lien Notes Claims—Gain Recognition on the Exchange of Claims." However, it is also possible that such a payment could be treated as a separate fee. Although no assurances can be provided, we intend to take the position that the Fees are treated as additional consideration received by a Non-U.S. Holder in exchange for First Lien Notes and Second Lien Notes, as applicable. Because the U.S. federal income tax consequences to a Non-U.S. Holder of the receipt of the Fees are uncertain, however, a withholding agent (other than Reorganized Pyxus) may withhold U.S. federal income tax from Fees paid to a Non-U.S. Holder at a withholding tax at a rate of 30 percent unless (i) the Non-U.S. Holder is engaged in the conduct of a trade or business in the United States to which the receipt of the Fees is effectively connected and provides a properly executed IRS Form W-8ECI, or (ii) a U.S. tax treaty either eliminates or reduces such withholding tax with respect to the Fees paid to the Non-U.S. Holder and the Non-U.S. Holder provides a properly executed applicable IRS Form W-8BEN or W-8BEN-E providing for such elimination or reduction. Non-U.S. Holders should consult their tax advisors regarding the U.S. federal income tax treatment of the Fees and the application of U.S. federal income tax withholding, including eligibility for a withholding tax exemption and refund procedures. In the case of the Second Lien Notes

Equity RSA Fee that is payable in New Common Stock, to the extent such Fee is subject to withholding, it is possible that the withholding tax would be withheld from or set off against any amount owed to or received from a Non-U.S. Holder, including, but not limited to, payments on the New Common Stock, sale proceeds received by the Non-U.S. Holder, or other of such Holder's funds or assets.

### 2.     U.S. Federal Income Tax Consequences to Non-U.S. Holders of Existing Pyxus Interests.

As discussed above under "U.S. Federal Income Tax Consequences of the Consummation of the Plan—Treatment of a Holder of Existing Pyxus Interests," the U.S. federal income tax consequences to Non-U.S. Holders of Existing Pyxus Interests will depend on whether the cash received pursuant to the Existing Equity Cash Pool is treated as received in exchange for such Non-U.S. Holder's Existing Pyxus Interests or as compensation or a fee for agreeing to provide the voluntary releases set forth in the Plan. The U.S. federal income tax consequences to a Non-U.S. Holder of the receipt of cash from the Existing Equity Cash Pool are uncertain.

If the Cash is received in exchange for such Non-U.S. Holder's Existing Pyxus Interests, the Non-U.S. Holder's tax treatment will be as described below under "U.S. Federal Income Tax Consequences to Non-U.S. Holders of Owning and Disposing of New Common Stock—Sale, Redemption, or Repurchase of New Common Stock," provided, that FIRPTA rules (as defined and discussed below) will not apply as a result of the Existing Pyxus Interests regularly trading on an established securities market. However, contrary to the foregoing discussion, it is possible that a Non-U.S. Holder of Existing Pyxus Interests may be treated as having received the Existing Equity Cash Pool as compensation or a fee for agreeing to provide the voluntary releases set forth in the Plan. In such case, the payment may be subject to U.S. federal withholding tax at a rate of 30 percent on payments of the Cash to a Non-U.S. Holder unless (i) the Non-U.S. Holder is engaged in the conduct of a trade or business in the United States to which the receipt of the Existing Equity Cash Pool is effectively connected and provides a properly executed IRS Form W-8ECI, or (ii) a U.S. tax treaty either eliminates or reduces such withholding tax with respect to the Existing Equity Cash Pool paid to the Non-U.S. Holder and the Non-U.S. Holder provides a properly executed applicable IRS Form W-8BEN or W-8BEN-E providing for such elimination or reduction.

Non-U.S. Holders should consult their tax advisors regarding the U.S. federal income tax treatment of the Cash received pursuant to the Existing Equity Cash Pool and the application of U.S. federal income tax withholding, including eligibility for a withholding tax exemption and refund procedures.

### 3.     U.S. Federal Income Tax Consequences to Non-U.S. Holders of Owning and Disposing of New Common Stock.

#### (a)     Dividends on New Common Stock.

Any distributions made with respect to New Common Stock will constitute dividends for U.S. federal income tax purposes to the extent of Reorganized Debtors' current or accumulated earnings and profits as determined under U.S. federal income tax principles. To the extent that a Non-U.S. Holder receives distributions that exceed such current and accumulated earnings and profits, such distributions will be treated (a) first, as a non-taxable return of capital and reduce the Non-U.S. Holder's basis in its New Common Stock, and (b) second, any portion of such distributions in excess of the Non-U.S. Holder's basis in its New Common Stock (determined on a share-by-share basis) generally will be treated as capital gain from a sale or exchange (and the respective excess distributions as proceeds from a sale or exchange; *see* the section entitled "Sale, Redemption, or Repurchase of New Common Stock" below).

Except as described below, any such dividends paid with respect to New Common Stock held by a Non-U.S. Holder that are not effectively connected with a Non-U.S. Holder's conduct of a U.S. trade or business (or if an income tax treaty applies, are not attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States) will be subject to U.S. federal withholding tax at a rate of 30 percent (or lower treaty rate or exemption from tax, if applicable). A Non-U.S. Holder generally will be required to satisfy certain IRS certification requirements in order to claim a reduction of or exemption from withholding under a tax treaty by filing IRS Form W-8BEN or W-8BEN-E (or a successor form) upon which the Non-U.S. Holder certifies, under penalties of perjury, its status as a non-U.S. person and its entitlement to the lower treaty rate or exemption from tax with respect to such payments. Dividends paid with respect to New Common Stock held by a Non-U.S. Holder that are effectively connected with a Non-U.S. Holder's conduct of a U.S. trade or business (and if an income tax treaty applies, are attributable to a

permanent establishment maintained by such Non-U.S. Holder in the United States), and the Non-U.S. provides a properly executed IRS Form W-8ECI, will not be subject to U.S. federal withholding taxes and generally will be subject to U.S. federal income tax in the same manner as a U.S. Holder, and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such Non-U.S. Holder's effectively connected earnings and profits that are attributable to the dividends at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty).

(b)     **Sale, Exchange, Redemption, or Repurchase of New Common Stock.**

A Non-U.S. Holder generally will not be subject to U.S. federal income tax with respect to any gain realized on the sale, exchange, redemption, repurchase, or other taxable disposition (including a cash redemption) of New Common Stock unless:

i.    such Non-U.S. Holder is an individual who is present in the United States for 183 days or more in the taxable year of disposition or who is subject to special rules applicable to former citizens and residents of the United States;

ii.   such gain is effectively connected with such Non-U.S. Holder's conduct of a U.S. trade or business (and if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States); or

iii.  Reorganized Pyxus is or has been during a specified testing period a "United States real property holding corporation" (a "*USRPHC*") under the FIRPTA rules (as defined and discussed below) for U.S. federal income tax purposes.

If the first exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of disposition of New Common Stock. If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to such gain in the same manner as a U.S. Holder, and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to earnings and profits effectively connected with a U.S. trade or business that are attributable to such gains at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty).

If the third exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax on any gain recognized on the disposition of all or a portion of its New Common Stock under the Foreign Investment in Real Property Tax Act ("*FIRPTA*") unless an exception applies. Taxable gain from the disposition of an interest in a USRPHC will constitute effectively connected income that is subject to U.S. federal income tax even if a Non-U.S. Holder is not otherwise engaged in a U.S. trade or Business. Further, any buyer of the New Common Stock will be required to withhold a tax equal to 15 percent of the amount realized on the sale. The amount of any such withholding would be allowed as a credit against the Non-U.S. Holder's federal income tax liability and may entitle the Non-U.S. Holder to a refund, provided that the Non-U.S. Holder properly and timely files a tax return with the IRS. In general, the FIRPTA provisions (e.g., the substantive taxation and withholding upon a disposition of the shares) will not apply if (a) the Non-U.S. Holder does not directly or indirectly own more than 5 percent of the value of such interest at any time during a specified testing period, and (b) such interest is regularly traded on an established securities market. Whether and when the New Common Stock will be considered regularly traded on an established securities market will depend, in part, on whether a market develops in such equity, and cannot currently be determined.

The Debtors do not believe it is likely that Reorganized Pyxus will be a USRPHC for U.S. federal income tax purposes upon the consummation of the Plan. In general, a corporation is a USRPHC as to a Non-U.S. Holder if the fair market value of the corporation's U.S. real property interests (as defined in the Tax Code and applicable Treasury Regulations) equals or exceeds 50 percent of the aggregate fair market value of its worldwide real property interests and its other assets used or held for use in a trade or business (applying certain look-through rules to evaluate the assets of subsidiaries) at any time within the shorter of the 5-year period ending on the effective time of the applicable disposition or the period of time the Non-U.S. Holder held such interest.

4.      **U.S. Federal Income Tax Consequences to Non-U.S. Holders of Payments of Interest and Owning and Disposing of Exit Secured Notes.**

(a)      **Payments of Interest and OID.**

Interest including any OID paid on an Exit Secured Note to a Non-U.S. Holder that is not effectively connected with the Non-U.S. Holder's conduct of a trade or business within the United States generally will not be subject to U.S. federal income tax, or withholding, subject to the discussion above under "U.S. Federal Income Tax Consequences to Non-U.S. Holders of Allowed Second Lien Notes Claims and Allowed First Lien Notes Claims—Accrued but Unpaid Interest and OID."

(b)      **Sale, Taxable Exchange, or Other Taxable Disposition of Exit Secured Note.**

A Non-U.S. Holder will not be subject to U.S. federal income or withholding tax on any gain recognized upon the sale, exchange, redemption, retirement or other taxable disposition of an Exit Secured Note (excluding any amount allocable to accrued and unpaid interest (and any OID), which will be treated as interest and may be subject to the rules discussed above in "U.S. Federal Income Tax Consequences to Non-U.S. Holders of Allowed Second Lien Notes Claims and Allowed First Lien Notes Claims—Accrued but Unpaid Interest and OID") unless certain exceptions apply, as described above under "U.S. Federal Income Tax Consequences to Non-U.S. Holders of Allowed Second Lien Notes Claims and Allowed First Lien Notes Claims—Gain Recognition on the Exchange of Claims."

**NON-U.S. HOLDERS SHOULD CONSULT THEIR TAX ADVISORS REGARDING THE POSSIBLE IMPACT OF THESE RULES ON SUCH HOLDERS' EXCHANGE OF ANY CLAIMS AND EXISTING PYXUS INTERESTS PURSUANT TO THE PLAN AND ON ITS OWNERSHIP OF THE NEW COMMON STOCK OR EXIT SECURED NOTES.**

E.      **Information Reporting and Backup Withholding**

The Debtors will comply with all applicable reporting requirements of the Tax Code. In general, information reporting requirements may apply to distributions or payments made to a Holder of a Claim or Existing Pyxus Interests under the Plan. The IRS may make the information returns reporting such interests and dividends and withholding available to the tax authorities in the country in which a Non U.S. Holder is resident. Additionally, under the backup withholding rules, a Holder of a Claim or Existing Pyxus Interests may be subject to backup withholding with respect to distributions or payments made pursuant to the Plan unless, in the case of a U.S. Holder, such U.S. Holder provides a properly executed IRS Form W-9 and, in the case of Non-U.S. Holder, such Non-U.S. Holder provides a properly executed applicable IRS Form W-8 (or otherwise establishes such Non-U.S. Holder's eligibility for an exemption). The current backup withholding rate is 24 percent. Backup withholding is not an additional tax but is, instead, an advance payment that may entitle the Holder to a refund from the IRS to the extent it results in an overpayment of tax, provided that the required information is provided to the IRS.

In addition, from an information reporting perspective, the Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' tax returns.

F.      **FATCA**

Under legislation commonly referred to as the Foreign Account Tax Compliance Act ("**FATCA**"), foreign financial institutions and certain other foreign entities must report certain information with respect to their U.S. account holders and investors or be subject to withholding at a rate of 30 percent on the receipt of "withholdable payments." For this purpose, "withholdable payments" are generally U.S. source payments of fixed or determinable, annual or periodical income, and, subject to the paragraph immediately below, also include gross proceeds from the sale of any property of a type which can produce U.S. source interest, including any OID or dividends. FATCA

withholding will apply even if the applicable payment would not otherwise be subject to U.S. federal nonresident withholding.

FATCA withholding rules were previously scheduled to take effect on January 1, 2019, that would have applied to payments of gross proceeds from the sale or other disposition of property of a type that can produce U.S. source interest (including any OID) or dividends. However, such withholding has effectively been suspended under proposed Treasury Regulations that may be relied on until final regulations become effective. Nonetheless, there can be no assurance that a similar rule will not go into effect in the future. Each Non-U.S. Holder should consult its own tax advisor regarding the possible impact of FATCA withholding rules on such Non-U.S. Holder.

---

**THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER OF A CLAIM OR EXISTING PYXUS INTERESTS IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS AND EXISTING PYXUS INTERESTS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED UNDER THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, NON-US, OR OTHER TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

---

## XI.    Recommendation

In the opinion of the Debtors and the Consenting Noteholders, the Plan is preferable to the alternatives described in this Disclosure Statement because it provides for a larger distribution to Holders of Allowed Claims and Interests than would otherwise result in a liquidation under chapter 7 of the Bankruptcy Code. In addition, any alternative other than Confirmation could result in extensive delays and increased administrative expenses resulting in smaller distributions to Holders of Allowed Claims than proposed under the Plan. Accordingly, the Debtors recommend that Holders of Claims entitled to vote to accept or reject the Plan support Confirmation and vote to accept the Plan.

Pyxus International, Inc., et al.,
on behalf of itself and each of the other Debtors

By: /s/ Joel L. Thomas
    Name: Joel L. Thomas
    Title: Chief Financial Officer

Prepared By:

Dated:   June 14, 2020        **YOUNG CONAWAY STARGATT & TAYLOR, LLP**
Wilmington, Delaware

/s/ Pauline K. Morgan
Pauline K. Morgan (No. 3650)
Kara Hammond Coyle (No. 4410)
Ashley E. Jacobs (No. 5635)
Tara C. Pakrouh (No. 6192)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone:      (302) 571-6600
Facsimile:      (302) 571-1253
Email:          pmorgan@ycst.com
                kcoyle@ycst.com
                ajacobs@ycst.com
                tpakrouh@ycst.com

- and -

**SIMPSON THACHER & BARTLETT LLP**

Sandeep Qusba (*pro hac vice* pending)
Michael H. Torkin (*pro hac vice* pending)
Kathrine A. McLendon (*pro hac vice* pending)
Nicholas E. Baker (*pro hac vice* pending)
425 Lexington Avenue
New York, New York 10017
Telephone:      (212) 455-2000
Facsimile:      (212) 455-2502
Email:          squsba@stblaw.com
                michael.torkin@stblaw.com
                kmclendon@stblaw.com
                nbaker@stblaw.com

*Proposed Counsel to the Debtors and Debtors in Possession*

<u>**Exhibit A**</u>

**Plan of Reorganization**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| PYXUS INTERNATIONAL, INC., *et al.*,[1] | § | |
| | § | Case No. 20-11570 (___) |
| Debtors. | § | |
| | § | (Joint Administration Requested) |
| | § | |
| | § | |

## JOINT PREPACKAGED CHAPTER 11 PLAN OF REORGANIZATION OF
## PYXUS INTERNATIONAL, INC. AND ITS AFFILIATED DEBTORS

---

**THIS CHAPTER 11 PLAN IS BEING SOLICITED FOR ACCEPTANCE OR REJECTION IN ACCORDANCE WITH BANKRUPTCY CODE SECTION 1125 AND WITHIN THE MEANING OF BANKRUPTCY CODE SECTION 1126. THIS CHAPTER 11 PLAN WILL BE SUBMITTED TO THE BANKRUPTCY COURT FOR APPROVAL FOLLOWING SOLICITATION AND THE DEBTORS' FILING FOR CHAPTER 11 BANKRUPTCY.**

---

**SIMPSON THACHER & BARTLETT LLP**

Sandeep Qusba (*pro hac vice* pending)
Michael H. Torkin (*pro hac vice* pending)
Kathrine A. McLendon (*pro hac vice* pending)
Nicholas E. Baker (*pro hac vice* pending)
425 Lexington Avenue
New York, New York 10017
Telephone:    (212) 455-2000
Facsimile:    (212) 455-2502
Email:    squsba@stblaw.com
          michael.torkin@stblaw.com
          kmclendon@stblaw.com
          nbaker@stblaw.com

*Proposed Counsel to Debtors and Debtors in Possession*

Dated: June 14, 2020

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

Pauline K. Morgan (No. 3650)
Kara Hammond Coyle (No. 4410)
Ashley E. Jacobs (No. 5635)
Tara C. Pakrouh (No. 6192)
1000 North King Street
Wilmington, Delaware 19801
Telephone:    (302) 571-6600
Facsimile:    (302) 571-1253
Email:    pmorgan@ycst.com
          kcoyle@ycst.com
          ajacobs@ycst.com
          tpakrouh@ycst.com

---

[1] The Debtors in the Chapter 11 Cases, along with the last four digits of each Debtor's United States federal tax identification number, are: Pyxus International, Inc. (6567), Alliance One International, LLC (3302), Alliance One North America, LLC (7908), Alliance One Specialty Products, LLC (0115) and GSP Properties, LLC (5603). The Debtors' mailing address is 8001 Aerial Center Parkway, Morrisville, NC 27560-8417.

## <u>TABLE OF CONTENTS</u>

<div align="right">**Page**</div>

**ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW, AND OTHER REFERENCES**.................................................................................**1**

|   |   |   |
|---|---|---|
| A. | *Defined Terms* ............................................................... | 1 |
| B. | *Rules of Interpretation* ................................................... | 16 |
| C. | *Computation of Time* ...................................................... | 17 |
| D. | *Governing Law* ............................................................... | 17 |
| E. | *Reference to Monetary Figures* ...................................... | 17 |
| F. | *Reference to the Debtors or the Reorganized Debtors* ........ | 17 |
| G. | *Restructuring Support Agreement Party Consent Rights and Controlling Documents* ...................................................... | 17 |

**ARTICLE II. ADMINISTRATIVE AND PRIORITY CLAIMS**.................................**18**

|   |   |   |
|---|---|---|
| A. | *DIP Facility Claims* ........................................................ | 18 |
| B. | *Administrative Claims* ..................................................... | 18 |
| C. | *Professional Fee Claims* ................................................. | 19 |
| D. | *Priority Tax Claims* ........................................................ | 20 |

**ARTICLE III. CLASSIFICATION, TREATMENT, AND VOTING OF CLAIMS AND INTERESTS** ...................................................................**21**

|   |   |   |
|---|---|---|
| A. | *Classification of Claims and Interests* ............................. | 21 |
| B. | *Treatment of Classes of Claims and Interests*.................... | 22 |
| C. | *Special Provision Governing Unimpaired Claims* ............. | 28 |
| D. | *Elimination of Vacant Classes* ....................................... | 28 |
| E. | *Voting Classes; Presumed Acceptance by Non-Voting Classes* ........ | 28 |
| F. | *Subordinated Claims* ...................................................... | 28 |
| G. | *Intercompany Interests*.................................................... | 28 |
| H. | *Controversy Concerning Impairment* ............................... | 29 |
| I. | *Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code* ........ | 29 |

**ARTICLE IV. MEANS FOR IMPLEMENTATION OF THE PLAN**..................................**29**

|   |   |   |
|---|---|---|
| A. | *General Settlement of Claims and Interests*....................... | 29 |
| B. | *Restructuring Transactions*.............................................. | 29 |
| C. | *Sources of Consideration for Plan Distributions* ............. | 30 |
| D. | *New Shareholders Agreement* .......................................... | 34 |
| E. | *Exemption from Registration Requirements* ..................... | 34 |
| F. | *Corporate Existence*........................................................ | 35 |
| G. | *Corporate Action* ............................................................ | 35 |
| H. | *Vesting of Assets in the Reorganized Debtors* .................. | 36 |
| I. | *Cancellation of Facilities, Notes, Instruments, Certificates, and Other Documents*...................................................... | 36 |
| J. | *Effectuating Documents; Further Transactions* ................ | 37 |
| K. | *Exemptions from Certain Taxes and Fees* ........................ | 37 |

L.      New Pyxus Constituent Documents ........................................................38
M.     Directors and Officers .........................................................................38
N.      New MIP ..............................................................................................39
O.      Preservation of Causes of Action .......................................................39

**ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED**
**LEASES ...............................................................................................39**
A.      Assumption of Executory Contracts and Unexpired Leases .................39
B.      Claims Based on Rejection of Executory Contracts or Unexpired Leases ...........40
C.      Cure of Defaults and Objections to Cure and Assumption .................41
D.      Insurance Policies ...............................................................................42
E.      Indemnification Provisions ..................................................................42
F.      Director, Officer, Manager, and Employee Liability Insurance ..........42
G.      Employee and Retiree Benefits ...........................................................43
H.      Modifications, Amendments, Supplements, Restatements, or Other
        Agreements ..........................................................................................43
I.      Reservation of Rights ..........................................................................44
J.      Nonoccurrence of Effective Date ........................................................44
K.      Contracts and Leases Entered Into After the Petition Date ................44

**ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS ...........................44**
A.      Timing and Calculation of Amounts to Be Distributed .......................44
B.      Distributions on Account of Obligations of Multiple Debtors .............45
C.      Distribution Agent ...............................................................................45
D.      Rights and Powers of Distribution Agent ...........................................45
E.      Delivery of Distributions ......................................................................46
F.      Manner of Payment ..............................................................................47
G.      Compliance Matters .............................................................................47
H.      No Postpetition or Default Interest on Claims ...................................47
I.      Allocation Between Principal and Accrued Interest ............................47
J.      Setoffs and Recoupment ......................................................................47
K.      Claims Paid or Payable by Third Parties ...........................................48

**ARTICLE VII. PROCEDURES FOR RESOLVING DISPUTED CLAIMS AND**
**INTERESTS ..........................................................................................49**
A.      Disputed Claims Process ......................................................................49
B.      Claims Administration Responsibilities ...............................................49
C.      Estimation of Claims and Interests ......................................................50
D.      Adjustment to Claims Without Objection .............................................50
E.      No Distributions Pending Allowance ...................................................50
F.      Distributions After Allowance ..............................................................50
G.      No Interest ............................................................................................50

**ARTICLE VIII. SETTLEMENT, RELEASE, INJUNCTION, AND RELATED**
**PROVISIONS .......................................................................................51**
A.      Compromise and Settlement of Claims, Interests, and Controversies ...................51
B.      Binding Effect .......................................................................................51

C.      *Discharge of Claims* ..........................................................................51
D.      *Release of Liens* ...............................................................................52
E.      *Debtor Release* .................................................................................52
F.      *Third-Party Release* .........................................................................53
G.      *Exculpation* ......................................................................................54
H.      *Injunction* .........................................................................................55
I.      *Protection Against Discriminatory Treatment* ...................................55
J.      *Recoupment* ......................................................................................55
K.      *Reimbursement or Contribution* .......................................................56
L.      *Term of Injunctions or Stays* ............................................................56
M.      *Document Retention* ..........................................................................56

**ARTICLE IX. CONDITIONS PRECEDENT TO THE EFFECTIVE DATE** .....................**56**
A.      *Conditions to Effective Date* .............................................................56
B.      *Waiver of Conditions to Confirmation or the Effective Date* .............57
C.      *Substantial Consummation* ...............................................................57
D.      *Effect of Non-Occurrence of Conditions to Consummation* ...............57

**ARTICLE X. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE
PLAN** ...........................................................................................................**58**
A.      *Modification of Plan* .........................................................................58
B.      *Effect of Confirmation on Modifications* ...........................................58
C.      *Revocation or Withdrawal of Plan* ...................................................58

**ARTICLE XI. RETENTION OF JURISDICTION** .............................................**58**

**ARTICLE XII. MISCELLANEOUS PROVISIONS** ...........................................**61**
A.      *Immediate Binding Effect* ..................................................................61
B.      *Additional Documents* .......................................................................61
C.      *Payment of Certain Fees and Expenses* .............................................61
D.      *Reservation of Rights* ........................................................................61
E.      *Successors and Assigns* .....................................................................61
F.      *Service of Documents* ........................................................................62
G.      *Entire Agreement* ..............................................................................63
H.      *Plan Supplement Exhibits* .................................................................63
I.      *Non-Severability* ...............................................................................64
J.      *Votes Solicited in Good Faith* ...........................................................64
K.      *Waiver or Estoppel* ...........................................................................64
L.      *Closing of Chapter 11 Cases* ............................................................64

**INTRODUCTION**

Pyxus International, Inc. ("Pyxus") and its debtor affiliates, as debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors") propose this joint plan of reorganization (the "Plan") for the resolution of the outstanding Claims against and Interests in the Debtors pursuant to chapter 11 of the Bankruptcy Code. Capitalized terms used in the Plan and not otherwise defined shall have the meanings set forth in Article I.A of the Plan. Although proposed jointly for administrative purposes, the Plan constitutes a separate Plan for each Debtor for the resolution of outstanding Claims and Interests pursuant to the Bankruptcy Code. Each Debtor is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code. The classifications of Claims and Interests set forth in Article III of the Plan shall be deemed to apply separately with respect to each Plan proposed by each Debtor, as applicable. The Plan does not contemplate substantive consolidation of any of the Debtors. Reference is made to the Disclosure Statement for a discussion of the Debtors' history, business, properties and operations, projections, risk factors, a summary and analysis of this Plan, and certain related matters.

**ALL HOLDERS OF CLAIMS AND INTERESTS ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY, PARTICULARLY HOLDERS OF CLAIMS AND INTERESTS ENTITLED TO VOTE TO ACCEPT OR TO REJECT THE PLAN.**

**ARTICLE I.**
**DEFINED TERMS, RULES OF INTERPRETATION,**
**COMPUTATION OF TIME, GOVERNING LAW, AND OTHER REFERENCES**

A.    *Defined Terms*

1.    "*Ad Hoc Crossholder Group*" means the ad hoc committee of Consenting Second Lien Noteholders and certain Consenting First Lien Noteholders represented by the Crossholder Notes Representatives.

2.    "*Ad Hoc First Lien Group*" means the ad hoc committee of certain Consenting First Lien Noteholders represented by the First Lien Notes Representatives.

3.    "*Administrative Claim*" means a Claim for costs and expenses of administration of the Chapter 11 Cases pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses of preserving the Estates and operating the Debtors' businesses incurred on or after the Petition Date until and including the Effective Date; and (b) Allowed Professional Fee Claims.

4.    "*Affiliate*" has the meaning set forth in section 101(2) of the Bankruptcy Code.

5.    "*Agreed Percentage*" means the percentage equal to (a) $5.0 million *divided* by (b) the Agreed Post-Reorganization Equity Value.

6.    "*Agreed Post-Reorganization Equity Value*" means $400,000,000.

7.      "*Allowed*" or "*Allowing*" means, with respect to any Claim or Interest in a Debtor, (a) any Claim to which the Debtors and the Holder of the Claim agree to the amount of the Claim or a court of competent jurisdiction has determined the amount of the Claim by Final Order, (b) any Claim or Interest that is compromised, settled, or otherwise resolved pursuant to the authority of the Debtors or Reorganized Debtors, as applicable, in a Final Order of the Bankruptcy Court, (c) any Claim that is listed in the Schedules, if any are Filed, as liquidated, non-contingent, and undisputed, or (d) any Claim or Interest expressly allowed hereunder; *provided, however*, that the Reorganized Debtors shall retain all claims and defenses with respect to Allowed Claims that are Reinstated or otherwise Unimpaired pursuant to the Plan; *provided, further*, that no Claim shall be "Allowed" if it is subject to disallowance in accordance with section 502(d) of the Bankruptcy Code.

8.      "*Backstop Fee Shares*" means that number of shares of New Common Stock equal to the product of (a) the Effective Date Issuance Amount, *multiplied* by (b) the product of (i) the difference between (x) 100% *minus* (y) the Agreed Percentage, *multiplied* by (ii) 4.25%, as set forth in the table in Article IV.C.1 of the Plan.

9.      "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

10.     "*Bankruptcy Court*" means the United States Bankruptcy Court for the District of Delaware or such other court having jurisdiction over the Chapter 11 Cases, including, to the extent of the withdrawal of the reference under 28 U.S.C. § 157, the United States District Court for the District of Delaware.

11.     "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, 28 U.S.C. § 2075, as applicable to the Chapter 11 Cases and the general, local, and chambers rules of the Bankruptcy Court, as now in effect or hereafter amended.

12.     "*Business Day*" means any day, other than a Saturday, Sunday, or a legal holiday, as defined in Bankruptcy Rule 9006(a).

13.     "*Cash*" or "*$*" means the legal tender of the United States of America or the equivalent thereof, including bank deposits, checks, and cash equivalents, as applicable.

14.     "*Cash Collateral*" has the meaning set forth in Section 363(a) of the Bankruptcy Code.

15.     "*Causes of Action*" means any claims, interests, damages, remedies, causes of action, demands, rights, actions, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, Liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable, directly or derivatively, matured or unmatured, suspected or unsuspected, in contract, tort, law, equity, or otherwise. Causes of Action also include: (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law; (b) the right to object to or otherwise contest Claims or Interests; (c) claims pursuant to sections 362, 510, 542, 543, 544

2

through 550, or 553 of the Bankruptcy Code; (d) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any state or foreign law fraudulent transfer or similar claim.

16.    "*Chapter 11 Cases*" means the procedurally consolidated cases Filed or to be Filed (as applicable) by the Debtors in the Bankruptcy Court under chapter 11 of the Bankruptcy Code.

17.    "*Claim*" means any claim, as defined in section 101(5) of the Bankruptcy Code, against any of the Debtors, whether or not assessed or Allowed.

18.    "*Claims Register*" means the official register of Claims against and Interests in the Debtors maintained by the Solicitation Agent.

19.    "*Class*" means a category of Holders of Claims or Interests under section 1122(a) of the Bankruptcy Code.

20.    "*Confirmation*" means entry of the Confirmation Order by the Bankruptcy Court on the docket of the Chapter 11 Cases.

21.    "*Confirmation Date*" means the date on which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases within the meaning of Bankruptcy Rules 5003 and 9021.

22.    "*Confirmation Hearing*" means the hearing held by the Bankruptcy Court pursuant to Bankruptcy Rule 3020(b)(2) and section 1128 of the Bankruptcy Code, including any adjournments thereof, at which the Bankruptcy Court will consider confirmation of the Plan and approval of the Disclosure Statement.

23.    "*Confirmation Objection Deadline*" means the deadline by which objections to confirmation of the Plan must be received by the Debtors.

24.    "*Confirmation Order*" means the order of the Bankruptcy Court confirming the Plan under section 1129 of the Bankruptcy Code and approving the Disclosure Statement.

25.    "*Consenting First Lien Noteholders*" has the meaning ascribed to such term in the Restructuring Support Agreement.

26.    "*Consenting Noteholders*" has the meaning ascribed to such term in the Restructuring Support Agreement.

27.    "*Consenting Second Lien Noteholders*" has the meaning ascribed to such term in the Restructuring Support Agreement.

28.    "*Consummation*" means the occurrence of the Effective Date.

29.    "*Crossholder Notes Representatives*" means Wachtell, Lipton, Rosen & Katz, TRS Advisors LLC, and any local counsel to the Ad Hoc Crossholder Group.

30.    "*Cure*" means the payment of Cash, or the distribution of other property or other action (as the parties may agree or the Bankruptcy Court may order), as necessary to cure defaults under an Executory Contract or Unexpired Lease of the Debtors that the Debtors seek to assume under section 365(a) of the Bankruptcy Code.

31.    "*Cure Claim*" means a Claim (unless waived or modified by the applicable counterparty) based upon a Debtor's defaults under an Executory Contract or an Unexpired Lease assumed by such Debtor under section 365 of the Bankruptcy Code, other than a default that is not required to be cured pursuant to section 365(b)(2) of the Bankruptcy Code.

32.    "*D&O Liability Insurance Policies*" means all insurance policies (including any "tail policy") maintained by the Debtors as of the Petition Date for liabilities against any of the Debtors' current or former directors, managers, and officers, and all agreements, documents, or instruments relating thereto.

33.    "*Debtor Intercompany Claim*" means any Claim held by a Debtor against another Debtor.

34.    "*Debtor Release*" means the release given on behalf of the Debtors and their Estates to the Released Parties as set forth in Article VIII.E of the Plan.

35.    "*Definitive Restructuring Documents*" means (a) the Plan and the Plan Supplement (and all exhibits, ballots, solicitation procedures, and other documents and instruments related thereto); (b) the Confirmation Order; (c) the Disclosure Statement; (d) the order of the Bankruptcy Court approving the Disclosure Statement and the other Solicitation Materials (which may be the Confirmation Order); (e) the first day pleadings and all orders sought pursuant thereto; (f) the DIP Orders, the DIP Credit Agreement, and the other DIP Documents and related documentation; (g) the Exit ABL Credit Agreement; (h) the Exit Term Facility Agreement; (i) the Exit Secured Notes Indenture or the Replacement First Lien Financing Agreement, as applicable; (j) the Exit Intercreditor Agreements; (k) the New Pyxus Constituent Documents; and (l) the New Shareholders Agreement.

36.    "*DIP Agent*" means Cortland Capital Market Services LLC, in its capacity as administrative agent and collateral agent under the DIP Facility, or its successor thereunder.

37.    "*DIP Credit Agreement*" means that certain debtor-in-possession credit agreement consistent in all respects with the Restructuring Support Agreement, by and among Pyxus, as borrower, each of the guarantors named therein, the DIP Agent, and the DIP Lenders, as amended, restated, supplemented, or otherwise modified in accordance with its terms.

38.    "*DIP Documents*" means, collectively, the DIP Credit Agreement and any and all other agreements, documents, and instruments delivered or entered into in connection therewith, including any guarantee agreements, pledge and collateral agreements, intercreditor agreements, and other security documents (and any joinders thereto).

39.    "*DIP Facility*" means that certain $206.7 million delayed-draw term loan debtor-in-possession facility to be provided to the Debtors by the DIP Lenders in accordance with the

terms, and subject in all respects to the conditions, set forth in the DIP Credit Agreement and the DIP Orders.

40.      "*DIP Facility Claim*" means any Claim arising under, derived from or based upon the DIP Documents or DIP Orders, including Claims for all principal amounts outstanding, interest, fees, expenses, costs, indemnification, and other charges arising under or related to the DIP Facility.

41.      "*DIP Lenders*" means, collectively, the banks, financial institutions, and other lenders party to the DIP Credit Agreement from time to time, each solely in their capacity as such.

42.      "*DIP Loans*" means the loans made under the DIP Facility.

43.      "*DIP Orders*" means, collectively, the Interim DIP Order and Final DIP Order.

44.      "*Disclosure Statement*" means the disclosure statement containing "adequate information" (as that term is defined in section 1125(a)(1) of the Bankruptcy Code) with respect to the Plan and the transactions contemplated thereby, and which is in form and substance reasonably satisfactory to (a) the Debtors, (b) the Required Consenting Noteholders, and (c) the Required Ad Hoc First Lien Consenting Noteholders.

45.      "*Disputed*" means, with respect to any Claim or Interest, (a) any Claim or Interest that is disputed under Article VII of the Plan or as to which the Debtors have interposed and not withdrawn an objection or request for estimation that has not been determined by a Final Order, (b) any Claim or Interest, proof of which was required to be Filed by order of the Bankruptcy Court but as to which a proof of Claim or Interest was not timely or properly Filed, (c) any Claim or Interest that is listed in the Schedules, if any are Filed, as unliquidated, contingent or disputed, and as to which no request for payment or Proof of Claim or Interest has been Filed, or (d) any Claim or Interest that is otherwise disputed by any of the Debtors or Reorganized Debtors in accordance with applicable law or contract, which dispute has not been withdrawn, resolved or overruled by a Final Order. To the extent the Debtors dispute only the amount of a Claim or Interest, such Claim or Interest shall be deemed Allowed in the amount the Debtors do not dispute, if any, and Disputed as to the balance of such Claim or Interest.

46.      "*Distribution Agent*" means, as applicable, the Reorganized Debtors or any Entity the Reorganized Debtors select to make or to facilitate distributions in accordance with the Plan.

47.      "*Distribution Record Date*" means the date for determining which Holders of Allowed Claims and Allowed Interests, other than with respect to holders of public Securities, are eligible to receive distributions pursuant to the Plan, which date shall be the Confirmation Date or such other date indicated in the Confirmation Order.

48.      "*DTC*" means The Depository Trust Company.

49.      "*Effective Date*" means the date that is the first Business Day after the Confirmation Date on which all conditions precedent to the occurrence of the Effective Date set forth in Article IX.A of the Plan have been satisfied or waived in accordance with Article IX.B of the Plan.

50.    "*Effective Date Issuance Amount*" means twenty-three (23) million shares of New Common Stock or such other amount as may be agreed by the Debtors and the Required Consenting Second Lien Noteholders.

51.    "*Entity*" has the meaning set forth in section 101(15) of the Bankruptcy Code.

52.    "*Equityholder Opt-Out Form*" means that certain form to be served, together with certain information relating to the Plan and instructions for accessing copies of the Plan and Disclosure Statement, on each Holder of an Existing Pyxus Interest, and to be completed and returned to the Debtors, in each case, consistent with the Scheduling Order, pursuant to which a Holder of an Existing Pyxus Interest may opt out of the voluntary releases contained in Article VIII.F of the Plan.

53.    "*Estate*" means the estate of any Debtor created under sections 301 and 541 of the Bankruptcy Code upon the commencement of the applicable Debtor's Chapter 11 Case.

54.    "*Exculpated Party*" means, collectively, and in each case in its capacity as such: (a) the Debtors; (b) the Reorganized Debtors; (c) each Related Party of each Entity in clauses (a) and (b); and (d) any other Person entitled to the protections of section 1125(e) of the Bankruptcy Code; *provided* that non-Debtor Affiliates of the Debtors shall not be Exculpated Parties.

55.    "*Executory Contract*" means a contract or lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

56.    "*Existing Equity Cash Pool*" means $1,000,000.

57.    "*Existing Equity Record Date*" means June 12, 2020.

58.    "*Existing Pyxus Interests*" means the outstanding Interests in Pyxus.

59.    "*Exit ABL Credit Agreement*" means a credit agreement for a senior secured asset-based revolving or term loan credit facility, by and among Reorganized Pyxus, the other applicable subsidiaries of Reorganized Pyxus party thereto, and the lenders and agents party thereto (which lenders may be existing creditors, including the Consenting Noteholders), which shall become effective on the Effective Date and be consistent with the Restructuring Term Sheet and otherwise in form and substance reasonably satisfactory to (a) the Debtors, (b) the Required Consenting Second Lien Noteholders, and (c) the Required Consenting First Lien Noteholders, solely with respect to any term or provision of the Exit ABL Credit Agreement that materially and adversely affects the rights of the Consenting First Lien Noteholders (in their capacities as such).

60.    "*Exit ABL Facility*" means the credit facility provided for under the Exit ABL Credit Agreement.

61.    "*Exit Facility Shares*" means that number of shares of New Common Stock equal to the product of (a) the Effective Date Issuance Amount, *multiplied* by (b) the product of (i) the difference between (x) 100% *minus* (y) the Agreed Percentage, *multiplied* by (ii) 45.00%, as set forth in the table in Article IV.C.1 of the Plan.

62.    "*Exit Intercreditor Agreements*" means one or more intercreditor agreements by and among the agents or indenture trustees under the Exit ABL Credit Agreement, the Exit Term Facility Agreement, and the Exit Secured Notes Indenture or Replacement First Lien Financing Agreement, as applicable, which shall become effective on the Effective Date and be in form and substance reasonably satisfactory to (a) the Debtors, (b) the Required Consenting Noteholders, and (c) the Required Ad Hoc First Lien Consenting Noteholders.

63.    "*Exit Secured Notes*" means the notes issued by Reorganized Pyxus under the Exit Secured Notes Indenture on the Effective Date to holders of First Lien Notes. The aggregate principal amount of Exit Secured Notes as of the Effective Date shall equal 102.1250% of the aggregate principal amount of First Lien Notes outstanding immediately prior to the Effective Date.

64.    "*Exit Secured Notes Indenture*" means an indenture by and among Reorganized Pyxus, as issuer, the guarantors named therein, and the trustee and collateral agent thereunder, providing for the issuance of the Exit Secured Notes, which indenture shall become effective on the Effective Date and be substantially consistent with the Exit Secured Notes Term Sheet and otherwise in form and substance reasonably satisfactory to (a) the Debtors, (b) the Required Consenting Noteholders, and (c) the Required Ad Hoc First Lien Consenting Noteholders.

65.    "*Exit Secured Notes Term Sheet*" means the term sheet attached to the Restructuring Support Agreement as Exhibit D, as such term sheet may be amended, modified, or supplemented from time to time only in accordance with the Restructuring Support Agreement.

66.    "*Exit Term Facility Agreement*" means a credit agreement for the Exit Term Facility, by and among Reorganized Pyxus, the administrative agent and collateral agent thereunder, the guarantors named therein, and the lenders and agents party thereto, which shall become effective on the Effective Date and be consistent with the terms and conditions set forth in the Exit Term Facility Term Sheet and otherwise in form and substance reasonably satisfactory to (a) the Debtors and (b) the Required Consenting Noteholders.

67.    "*Exit Term Facility*" means the credit facility provided for under the Exit Term Facility Agreement.

68.    "*Exit Term Facility Term Sheet*" means the term sheet attached as Exhibit E to the Restructuring Support Agreement, as such term sheet may be amended, modified, or supplemented from time to time only in accordance with the Restructuring Support Agreement.

69.    "*Exit Term Loans*" means the loans made under the Exit Term Facility. The aggregate principal amount of Exit Term Loans as of the Effective Date shall equal (x) the aggregate principal amount of DIP Loans outstanding immediately prior to the Effective Date, *plus* (y) the Total Exit Fee (as defined in the DIP Credit Agreement).

70.    "*File*," "*Filed*," or "*Filing*" means file, filed, or filing in the Chapter 11 Cases with the Bankruptcy Court or, with respect to the filing of a Proof of Claim or Proof of Interest, the Solicitation Agent.

71.    "*Financing Commitment Parties*" has the meaning ascribed to such term in the Restructuring Support Agreement.

72.    "*Final DIP Order*" means the Final Order entered by the Bankruptcy Court approving entrance into the DIP Facility and the use of Cash Collateral, and incorporating the terms and conditions set forth in, and approving entry into and performance under the DIP Credit Agreement, and otherwise in form and substance reasonably satisfactory to (a) the Debtors, (b) the Financing Commitment Parties, (c) the Required Consenting Noteholders, and (d) the Required Ad Hoc First Lien Consenting Noteholders.

73.    "*Final Decree*" means the decree contemplated under Bankruptcy Rule 3022.

74.    "*Final Order*" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter that has not been reversed, modified, or amended, is not subject to any pending stay and as to which the time to appeal, move for reargument, reconsideration, or rehearing, or seek certiorari has expired and no appeal, motion for reargument, reconsideration, or rehearing or petition for certiorari has been timely taken or Filed, or as to which any appeal that has been taken, motion for reargument, reconsideration, or rehearing that has been granted or any petition for certiorari that has been or may be Filed has been resolved by the highest court to which the order or judgment could be appealed or from which certiorari could be sought or the new trial, reargument, reconsideration, or rehearing shall have been denied, resulted in no modification of such order, or has otherwise been dismissed with prejudice; *provided*, *however*, that the possibility that a motion under rule 60 of the Federal Rules of Civil Procedure or any comparable Bankruptcy Rule may be Filed relating to such order or judgment shall not cause such order or judgment to not be a Final Order.

75.    "*First Lien Notes*" means the $275,000,000 aggregate outstanding principal amount of 8.500% Senior Secured First Lien Notes due 2021 issued by Pyxus pursuant to the First Lien Notes Indenture.

76.    "*First Lien Notes Claim*" means any Claim against a Debtor arising under, derived from, or based on the First Lien Notes Indenture or any other agreement, instrument or document executed at any time in connection therewith.

77.    "*First Lien Notes Indenture*" means that certain Indenture, dated as of October 14, 2016, by and among Pyxus, the guarantors named therein and the First Lien Notes Indenture Trustee, as amended, restated, supplemented or otherwise modified from time to time.

78.    "*First Lien Notes Indenture Trustee*" means The Bank of New York Mellon Trust Company, N.A., and any successor thereto, as trustee under the First Lien Notes Indenture.

79.    "*First Lien Notes Representatives*" means Stroock & Stroock & Lavan LLP, Pachulski, Stang, Ziehl & Jones LLP, as local counsel to the Ad Hoc First Lien Group, and Perella Weinberg Partners L.P.

80.    "*Foreign Credit Line*" means any working capital line of credit or working capital loan facility under which a non-U.S. subsidiary or Affiliate of Pyxus is a borrower.

8

81. "*Foreign Credit Line Claim*" means any claim arising under, derived from, or based on any Debtor's obligations under their Foreign Credit Lines.

82. "*General Unsecured Claim*" means any Claim that is not secured, an Administrative Claim (including, for the avoidance of doubt, a Professional Fee Claim), a DIP Facility Claim, an Other Secured Claim, a Priority Tax Claim, an Other Priority Claim, a First Lien Notes Claim, a Second Lien Notes Claim, a Debtor Intercompany Claim, a Non-Debtor Intercompany Claim, a Foreign Credit Line Claim, or a Claim arising under section 510(b) of the Bankruptcy Code.

83. "*Governing Body*" means the board of directors, board of managers, manager, general partner, investment committee, special committee, or such similar governing body of an Entity.

84. "*Governmental Unit*" has the meaning set forth in section 101(27) of the Bankruptcy Code.

85. "*Holder*" means an Entity holding a Claim or an Interest, or, if applicable, the New Common Stock, as applicable.

86. "*Impaired*" means, with respect to any Class of Claims or Interests, a Claim or an Interest that is not Unimpaired.

87. "*Indemnification Provisions*" means each of the Debtors' indemnification provisions in place immediately prior to the Effective Date contained in the Debtors' bylaws, certificates of incorporation, other formation documents, board resolutions, or contracts for the current and former directors, officers, managers, and employees.

88. "*Initial Commitment Parties*" has the meaning ascribed to such term in the Restructuring Support Agreement.

89. "*Intercompany Interest*" means an Interest held by a Debtor in another Debtor.

90. "*Interest*" means any common stock, limited liability company interest, equity security (as defined in section 101(16) of the Bankruptcy Code), equity, ownership, profit interests, unit, or share in a Debtor, including all issued, unissued, authorized, or outstanding shares of capital stock of the Debtors and any other rights, options, warrants, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, repurchase rights, convertible, exercisable or exchangeable Securities or other agreements, arrangements or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in any Debtor.

91. "*Interim DIP Order*" means the interim order entered by the Bankruptcy Court approving entrance into the DIP Facility and the use of Cash Collateral, and incorporating the terms and conditions set forth in, and approving entry into and performance under, the DIP Credit Agreement, and otherwise in form and substance reasonably satisfactory to (a) the Debtors, (b) the Financing Commitment Parties, (c) the Required Consenting Noteholders, and (d) the Required Ad Hoc First Lien Consenting Noteholders.

92.    "*Lien*" has the meaning set forth in section 101(37) of the Bankruptcy Code.

93.    "*New Common Stock*" means the shares of common stock, limited liability company membership units, or functional equivalent thereof of Reorganized Pyxus authorized for issuance pursuant to the New Pyxus Constituent Documents subject to the terms and conditions set forth herein and in the New Shareholders Agreement.

94.    "*New MIP*" means the post-Effective Date management incentive plan that shall be implemented with respect to Reorganized Pyxus (and/or its subsidiaries) on or after the Effective Date, pursuant to which 8.00% of New Common Stock (on a fully diluted basis) shall be reserved for grant to management, key employees, and directors of the Reorganized Debtors; *provided*, that all individual grants under the New MIP will be determined by the Reorganized Pyxus Board.

95.    "*New Pyxus Constituent Documents*" means the certificate of incorporation and the bylaws, or operating or other applicable agreement, of Reorganized Pyxus, each of which shall be consistent with the Restructuring Term Sheet and otherwise in form and substance reasonably satisfactory to (a) the Debtors, (b) the Required Consenting Second Lien Noteholders, and (c) the Required Consenting First Lien Noteholders, solely with respect to any term or provision of the New Pyxus Constituent Documents that materially affects the rights of the Consenting First Lien Noteholders (in their capacities as such).

96.    "*New Shareholders Agreement*" means the shareholders agreement or operating or other applicable agreement , including all annexes, exhibits, and schedules thereto, that will govern certain matters related to the governance of Reorganized Pyxus and the New Common Stock, which agreement shall become effective on the Effective Date and be consistent with the terms and conditions set forth in the Restructuring Term Sheet and otherwise in form and substance reasonably satisfactory to (a) the Debtors and (b) the Required Consenting Second Lien Noteholders.

97.    "*Non-Debtor Intercompany Claim*" means any Claim against a Debtor held by a non-Debtor Affiliate of the Debtors.

98.    "*Noteholder Approval Rights*" means, collectively, the approval, consent, and consultation rights set forth in the Restructuring Support Agreement, or, if applicable, in a Definitive Restructuring Document, excluding any approval, consent, or consultation right of any Debtor under the Restructuring Support Agreement or a Definitive Restructuring Document.

99.    "*Ordinary Course Professionals Order*" means an order of the Bankruptcy Court, if any, approving a motion to employ ordinary course professionals in the Chapter 11 Cases.

100.    "*Other Priority Claim*" means any Claim other than an Administrative Claim or a Priority Tax Claim entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

101.    "*Other Secured Claim*" means any Secured Claim other than a DIP Facility Claim, a First Lien Notes Claim, or a Second Lien Notes Claim.

102.    "*Person*" has the meaning set forth in section 101(41) of the Bankruptcy Code.

103.    "*Petition Date*" means the date on which each of the Debtors commence the Chapter 11 Cases.

104.    "*Plan Supplement*" means the compilation of documents and forms of documents, agreements, schedules, and exhibits to the Plan to be Filed by the Debtors (as may be amended, supplemented, altered, or modified from time to time on the terms set forth herein), and which includes:  (a) the New Shareholders Agreement; (b) the New Pyxus Constituent Documents; (c) the identity of the members of the Reorganized Pyxus Board and the officers of Reorganized Pyxus; (d) the Rejected Executory Contract and Unexpired Lease List, if any; (e) the Exit Term Facility Agreement; (f) the Exit ABL Credit Agreement; (g) the Exit Secured Notes Indenture or, if applicable, the Replacement First Lien Financing Agreement; and (h) any other necessary documentation related to the Restructuring Transactions.

105.    "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

106.    "*Professional*" means an Entity retained in the Chapter 11 Cases pursuant to a Final Order in accordance with sections 327, 363, and 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Effective Date pursuant to sections 327, 328, 329, 330, 331, or 363 of the Bankruptcy Code.

107.    "*Professional Fee Claims*" means all Claims for accrued, contingent, and/or unpaid fees and expenses (including transaction and success fees) incurred by a Professional in the Chapter 11 Cases on or after the Petition Date and through and including the Confirmation Date that the Bankruptcy Court has not denied by Final Order. To the extent that the Bankruptcy Court or any higher court of competent jurisdiction denies or reduces by a Final Order any amount of a Professional's fees or expenses, then those reduced or denied amounts shall no longer constitute Professional Fee Claims.

108.    "*Professional Fee Escrow Account*" means an interest-bearing account funded by the Debtors with Cash on or before the Effective Date in an amount equal to the Professional Fee Escrow Amount, *provided*, *however*, that the Cash funds in the Professional Fee Escrow Account shall be increased from Cash on hand at the Reorganized Debtors to the extent applications are Filed after the Effective Date in excess of the amount of Cash funded into the Professional Fee Escrow Account as of the Effective Date.

109.    "*Professional Fee Escrow Amount*" means the aggregate amount of Professional Fee Claims and other unpaid fees and expenses Professionals estimate they have incurred or will incur in rendering services to the Debtors prior to and as of the Confirmation Date, which estimates Professionals shall deliver to the Debtors as set forth in Article II.C.3 of this Plan.

110.    "*Proof of Claim*" means a proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

111.    "*Proof of Interest*" means a proof of Interest Filed against any of the Debtors in the Chapter 11 Cases.

112.     "*Pyxus*" means Pyxus International, Inc.

113.    "*Pyxus Common Stock*" means all issued and outstanding shares of common stock of Pyxus.

114.    "*Qualifying Holder of Pyxus Common Stock*" means each Holder of Pyxus Common Stock as of the Existing Equity Record Date that does not (a) submit an Equityholder Opt-Out Form prior to the deadline for doing so or (b) oppose, object to, or seek to impede or delay Confirmation.

115.    "*Reinstate*," "*Reinstated*," or "*Reinstatement*" means with respect to Claims and Interests, that the Claim or Interest shall be rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code.

116.    "*Rejected Executory Contract and Unexpired Lease List*" means the list, as determined by the Debtors and reasonably satisfactory to the Required Consenting Second Lien Noteholders, of Executory Contracts and Unexpired Leases that will be rejected by the Reorganized Debtors pursuant to the Plan, which list, as may be amended from time to time, with the consent of the Debtors and the Required Consenting Second Lien Noteholders, shall be included in the Plan Supplement.

117.    "*Related Party*" means, each of, and in each case in its capacity as such, current and former directors, managers, officers, investment committee members, special or other committee members, equityholders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds, predecessors, participants, successors, assigns, subsidiaries, Affiliates, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, employees, agents, trustees, advisory board members, financial advisors, attorneys (including any other attorneys or professionals retained by any current or former director or manager in his or her capacity as director or manager of an Entity), accountants, investment bankers, consultants, representatives, and other professionals and advisors and any such Person's or Entity's respective heirs, executors, estates, and nominees.

118.    "*Released Party*" means collectively, and in each case in its capacity as such:  (a) each of the Debtors; (b) the Reorganized Debtors; (c) the DIP Agent; (d) each of the DIP Lenders; (e) each Holder of a First Lien Notes Claim who votes in favor of the Plan; (f) the First Lien Notes Indenture Trustee; (g) each Holder of a Second Lien Notes Claim who votes in favor of the Plan; (h) the Second Lien Notes Indenture Trustee; (i) the agents or indenture trustees under the Exit Secured Notes, Exit ABL Facility, and Exit Term Facility; (j) each lender or holder under the Exit Secured Notes, Exit ABL Facility, and Exit Term Facility; (k) the Initial Commitment Parties; (l) each current and former Affiliate of each Entity in clause (a) through (k); and (m) each Related Party of each Entity in clause (a) through (l); *provided, however*, that in each case, an Entity shall not be a Released Party if it (A) timely provides, either formally or informally in writing, an objection to the releases contained in Article VIII.E of the Plan that is not resolved before Confirmation of the Plan or (B) elects to opt out of the releases contained in Article VIII.F of the Plan; *provided, further*, that any such Entity shall be identified by name as a non-Released Party in the Confirmation Order.

119.    "*Releasing Parties*" means collectively and in each case in their capacity as such: (a) the Released Parties identified in subsection (a)–(l) and those Released Parties identified in subsection (m) of the definition of "Released Party" on behalf of whom the parties identified in subsections (a)–(l) of the definition of "Released Party" have the authority, including under any agreement or applicable non-bankruptcy law, to grant the Third-Party Release set forth in Article VIII.F; (b) the Holders of all Claims and Interests who vote to accept the Plan; (c) the Holders of all Claims or Interests that are Unimpaired under the Plan; (d) the Holders of all Claims or Interests whose vote to accept or reject the Plan is solicited but who do not vote either to accept or to reject the Plan and do not opt out of granting the releases set forth herein; (e) the Holders of all Claims or Interests who vote to reject the Plan but do not opt out of granting the releases set forth herein; (f) the Holders of all Claims or Interests (other than Holders of Existing Pyxus Interests) who are deemed to reject the Plan and who do not (A) timely provide, either formally or informally in writing, an objection to the releases contained in Article VIII.F of the Plan or (B) elect to opt out of the releases contained in Article VIII.F of the Plan; (g) the Holders of all Claims and Interests (other than Holders of Existing Pyxus Interests) who were given notice of the opportunity to opt out of granting the releases set forth herein but did not opt out; (h) the Holders of Existing Pyxus Interests who do not duly and timely submit an Equityholder Opt-Out Form opting out of the releases contained in Article VIII.F of the Plan; and (i) each Related Party of each Entity in clause (b) through clause (h).

120.    "*Reorganized Debtor*" means a Debtor, or any successor or assign thereto, by merger, consolidation, reorganization, or otherwise, in the form of a corporation, limited liability company, partnership, or other form, as the case may be, on and after the Effective Date, including Reorganized Pyxus.

121.    "*Reorganized Pyxus*" means collectively, Pyxus as reorganized pursuant to the Restructuring Transactions, including any new holding company created prior to the Effective Date that may be the ultimate parent of Reorganized Pyxus, and any successor(s) thereto.

122.    "*Reorganized Pyxus Board*" means the board of directors (or other applicable Governing Body) of Reorganized Pyxus determined in accordance with the New Shareholders Agreement.

123.    "*Replacement First Lien Financing*" means a financing facility or notes (a) in an aggregate principal amount sufficient to refinance the First Lien Notes in full (but not in part) in Cash, including the payment of the redemption premium and accrued and unpaid interest at the non-default rate to, but not including, the Effective Date, (b) having economic terms that are more favorable to the Reorganized Debtors in the aggregate (and no less favorable in any material respect) than the economic terms of the Exit Secured Notes, and (c) having non-economic terms and conditions that are as or more favorable to the Reorganized Debtors in all material respects than the Exit Secured Notes.

124.    "*Replacement First Lien Financing Agreement*" means an agreement evidencing the Replacement First Lien Financing (if any), which shall become effective on the Effective Date and otherwise be in form and substance reasonably satisfactory to (a) the Debtors and (b) the Required Consenting Second Lien Noteholders.

125.    "*Required Ad Hoc First Lien Consenting Noteholders*" has the meaning ascribed to such term in the Restructuring Support Agreement, *provided*, that any consent rights in the Plan shall only be effective and enforceable until (a) the Minimum Threshold Condition (as defined in the Restructuring Support Agreement) ceases to be satisfied at any time or (b) Pyxus obtains and accepts binding commitments for the Replacement First Lien Financing at any time on or prior to the 60th day after the Petition Date (or, if earlier, the Confirmation Date), and upon the occurrence of either such event such rights shall be null and void, and from and after such time this Plan shall be deemed automatically amended to remove all such rights, *provided*, that if such binding commitments for the Replacement First Lien Financing are terminated, such consent rights shall be reinstated and thereafter be effective and enforceable; *provided, further,* that that nothing in this definition shall be construed as amending, waiving, supplementing, or otherwise modifying the Debtors' obligations to pay the First Lien Notes Representatives to the extent provided in Section 8(f) of the Restructuring Support Agreement.

126.    "*Required Consenting First Lien Noteholders*" has the meaning ascribed to such term in the Restructuring Support Agreement.

127.    "*Required Consenting Second Lien Noteholders*" has the meaning ascribed to such term in the Restructuring Support Agreement.

128.    "*Required Consenting Noteholders*" means, collectively, the Required Consenting First Lien Noteholders and the Required Consenting Second Lien Noteholders.

129.    "*Restructuring Support Agreement*" means that certain Restructuring Support Agreement (and all of the schedules, documents, and exhibits contained therein) entered into on June 14, 2020 by and among the Debtors, the Consenting Noteholders, and any subsequent Entity that becomes a party thereto pursuant to the terms thereof.

130.    "*Restructuring Term Sheet*" means the term sheet attached to the Restructuring Support Agreement as Exhibit B, as such term sheet may be amended, modified, or supplemented from time to time only in accordance with the Restructuring Support Agreement.

131.    "*Restructuring Transactions*" means the transactions described in Article IV.B of the Plan.

132.    "*Schedules*" means any schedules of assets and liabilities, statements of financial affairs, lists of holders of Claims or Interests and all amendments or supplements thereto Filed by the Debtors with the Bankruptcy Court to the extent such Filing is not waived pursuant to an order of the Bankruptcy Court.

133.    "*Scheduling Order*" means the order entered by the Bankruptcy Court approving the Debtors' proposed schedule for, among other things, (a) a combined Confirmation Hearing to consider Confirmation of the Plan and approval of the Disclosure Statement and (b) the objection deadlines related thereto.

134.    "*SEC*" means the United States Securities and Exchange Commission.

135.    "*Secured Claim*" means a Claim: (a) secured by a valid, perfected, and enforceable Lien on collateral to the extent of the value of such collateral, as determined in accordance with section 506(a) of the Bankruptcy Code or (b) subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code.

136.    "*Securities Act*" means the Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, or any similar federal, state, or local law, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

137.    "*Security*" has the meaning set forth in section 2(a)(1) of the Securities Act.

138.    "*Second Lien Notes*" means the $635,686,000 aggregate outstanding principal amount of 9.875% Senior Secured Second Lien Notes due 2021 issued by Pyxus pursuant to the Second Lien Notes Indenture.

139.    "*Second Lien Notes Cash Option*" means the "cash" option described in subsection (c) of the treatment section for Class 4 – Second Lien Notes Claims.

140.    "*Second Lien Notes Claim*" means any Claim against the Debtors arising under, derived from, or based upon the Second Lien Notes Indenture.

141.    "*Second Lien Notes Common Stock Pool*" means that number of shares of New Common Stock equal to the product of (a) the Effective Date Issuance Amount, *multiplied* by (b) the product of (i) the difference between (x) 100% *minus* (y) the Agreed Percentage, *multiplied* by (ii) 50.75%, as set forth in Article IV.C.1 of the Plan.

142.    "*Second Lien Notes Indenture*" means that certain Indenture, dated as of August 1, 2013 by and among Pyxus, the guarantors named therein and the Second Lien Notes Indenture Trustee.

143.    "*Second Lien Notes Indenture Trustee*" means Law Debenture Trust Company of New York, and any successor thereto, as trustee and collateral trustee under the Second Lien Notes Indenture.

144.    "*Second Lien Notes RSA Fee Shares*" means the number of shares of New Common Stock equal to the product of (a) the Agreed Percentage *multiplied* by (b) the Effective Date Issuance Amount, as set forth in the table in Article IV.C.1 of the Plan.

145.    "*Second Lien Notes Stock Election Form*" means that certain form to be served, together with certain information relating to the Plan and instructions for accessing copies of the Plan and Disclosure Statement, on each Holder of a Second Lien Notes Claim, and to be completed and returned to the Debtors, in each case, consistent with the Scheduling Order, pursuant to which a Holder of a Second Lien Notes Claim may elect to exercise the Second Lien Notes Stock Option.

146.    "*Second Lien Notes Stock Option*" means the "stock" option described in subsection (c) of the treatment section for Class 4 – Second Lien Notes Claims.

15

147.    "*Solicitation Agent*" means Prime Clerk, LLC, the notice, claims, and solicitation agent retained by the Debtors for the Chapter 11 Cases.

148.    "*Solicitation Materials*" means all solicitation materials with respect to the Plan, including the Disclosure Statement and related ballots.

149.    "*Third-Party Release*" means the release given by each of the Releasing Parties to the Released Parties as set forth in Article VIII.F of the Plan.

150.    "*Trustee Restructuring Expenses*" means the reasonable, undisputed, and documented fees and expenses of (a) the First Lien Notes Indenture Trustee and (b) the Second Lien Notes Indenture Trustee, in each case, limited to one primary counsel and one local counsel for each, and only to the extent such fees and expenses are due and payable pursuant to the First Lien Notes Indenture or Second Lien Notes Indenture, as applicable.

151.    "*Unexpired Lease*" means a lease of nonresidential real property to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

152.    "*Unimpaired*" means a Class of Claims or Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

153.    "*U.S. Trustee*" means the Office of the United States Trustee for the District of Delaware.

B.    *Rules of Interpretation*

For purposes of the Plan, except as otherwise provided in this Plan:  (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) unless otherwise specified, any reference in the Plan to an existing document, schedule, term sheet or exhibit, shall mean such document, schedule, term sheet, or exhibit, as it may have been or may be amended, modified, or supplemented; (3) unless otherwise specified, all references in the Plan to "Articles" and "Sections" are references to Articles and Sections, respectively, hereof or hereto; (4) the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to any particular portion of the Plan; (5) any effectuating provisions may be interpreted by the Debtors or the Reorganized Debtors in such a manner that is consistent with the overall purpose and intent of the Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity; (6) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (7) unless otherwise specified in the Plan, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (8) any term used in capitalized form in the Plan that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to such term in the Bankruptcy Code or the Bankruptcy Rules, as applicable; (9) references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (10) references to "Proofs of Claim," "Holders of Claims," "Disputed Claims," and the like shall include "Proofs of Interest," "Holders of Interests," "Disputed Interests," and the like as

16

applicable; (11) references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable state limited liability company laws; (12) the terms "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation"; and (13) except as otherwise provided in the Plan, any reference to the Effective Date shall mean the Effective Date or as soon as reasonably practicable thereafter.

C.      *Computation of Time*

Unless otherwise specifically stated in the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed in the Plan. If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next Business Day.

D.      *Governing Law*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control); *provided*, *however*, that corporate governance matters relating to the Debtors or the Reorganized Debtors, as applicable, shall be governed by the laws of the state of incorporation or formation of the relevant Debtor or Reorganized Debtor, as applicable.

E.      *Reference to Monetary Figures*

All references in the Plan to monetary figures refer to currency of the United States of America, unless otherwise expressly provided herein.

F.      *Reference to the Debtors or the Reorganized Debtors*

Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or to the Reorganized Debtors mean the Debtors and the Reorganized Debtors, as applicable, to the extent the context requires.

G.      *Restructuring Support Agreement Party Consent Rights and Controlling Documents*

Notwithstanding anything herein to the contrary, any and all consent rights of the parties to the Restructuring Support Agreement as set forth in the Restructuring Support Agreement with respect to the form and substance of this Plan, any Definitive Restructuring Document, all exhibits to the Plan, and the Plan Supplement, including any amendments, restatements, supplements, or other modifications to such agreements and documents, and any consents, waivers, or other deviations under or from any such documents, shall be incorporated herein by this reference (including to the applicable definitions in Article I.A hereof) and be fully enforceable as if stated in full herein.

17

In the event of an inconsistency between the Plan and the Disclosure Statement, the terms of the Plan shall control in all respects. In the event of an inconsistency between the Plan and the Plan Supplement, the Plan Supplement shall control. In the event of any inconsistency between the Plan or Plan Supplement, on the one hand, and the Confirmation Order on the other hand, the Confirmation Order shall control.

## ARTICLE II.
## ADMINISTRATIVE AND PRIORITY CLAIMS

The Plan constitutes a joint plan of reorganization for all of the Debtors. All Claims and Interests, except DIP Facility Claims, Administrative Claims, Professional Fee Claims, and Priority Tax Claims, are placed in the Classes set forth in Article III below. In accordance with section 1123(a)(1) of the Bankruptcy Code, DIP Facility Claims, Administrative Claims, Professional Fee Claims, and Priority Tax Claims have not been classified and thus are excluded from the Classes of Claims set forth in Article III of the Plan.

A.      *DIP Facility Claims*

All DIP Facility Claims shall be deemed Allowed as of the Effective Date in an amount equal to (1) the principal amount outstanding under the DIP Facility on such date, (2) all interest accrued and unpaid thereon to the date of payment, (3) all accrued and unpaid fees, expenses, and non-contingent indemnification obligations payable under the DIP Documents and the DIP Orders, and (4) all other Obligations (as defined in the DIP Credit Agreement).

In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed DIP Facility Claim, each Holder of an Allowed DIP Facility Claim shall receive, on the Effective Date:

(a) payment in full in Cash of (i) all accrued and unpaid interest on all outstanding DIP Loans as of the Effective Date and (ii) all fees (other than the Total Exit Fee (as defined in the DIP Credit Agreement)) and expenses payable pursuant to the DIP Documents as of the Effective Date; and

(b) such Holder's *pro rata* share of (i) the Exit Term Loans and (ii) the Exit Facility Shares.

B.      *Administrative Claims*

Pursuant to section 1129(a)(9) of the Bankruptcy Code, unless otherwise agreed to by the Holders of an Allowed Administrative Claim and the Debtors, or the Reorganized Debtors, or as otherwise set forth in an order of the Bankruptcy Court (including pursuant to the procedures specified therein), as applicable, each Holder of an Allowed Administrative Claim (other than Holders of Professional Fee Claims and Claims for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code) will receive in full and final satisfaction of its Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim in accordance with the following:  (1) if an Administrative Claim is Allowed as of the Effective Date (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (2) if such Administrative Claim is not Allowed as of the

Effective Date, no later than sixty (60) days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (3) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim without any further action by the Holders of such Allowed Administrative Claim; or (4) at such time and upon such terms as set forth in a Final Order of the Bankruptcy Court.

C.    *Professional Fee Claims*

1.    Professional Fee Escrow Account

As soon as reasonably practicable after the Confirmation Date, and no later than one (1) Business Day prior to the Effective Date, the Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Escrow Amount. The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals and for no other Entities until all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court. No Liens, claims, or interests shall encumber the Professional Fee Escrow Account or Cash held in the Professional Fee Escrow Account in any way. Such funds shall not be considered property of the Estates, the Debtors, or the Reorganized Debtors.

The amount of Professional Fee Claims owing to the Professionals shall be paid in Cash to such Professionals from the funds held in the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed by a Final Order of the Bankruptcy Court; *provided*, *however*, that obligations with respect to Allowed Professional Fee Claims shall not be limited nor be deemed limited to funds held in the Professional Fee Escrow Account. When all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court, any remaining funds held in the Professional Fee Escrow Account shall promptly be paid to the Reorganized Debtors without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

2.    Final Fee Applications and Payment of Professional Fee Claims

All final requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be Filed no later than thirty (30) days after the Effective Date; *provided, however*, that any Professional who is subject to the Ordinary Course Professionals Order may continue to receive such compensation and reimbursement of expenses for services rendered before the Confirmation Date, without further Bankruptcy Court order, pursuant to the Ordinary Course Professionals Order. The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Code, Bankruptcy Rules, and prior Bankruptcy Court orders. The amount of the Allowed Professional Fee Claims owing to the Professionals shall be paid in Cash to such Professionals, including from funds held in the Professional Fee Escrow Account when such Professional Fee Claims are Allowed by entry of an order of the Bankruptcy Court.

3.      Professional Fee Escrow Amount

The Professionals shall provide a reasonable and good-faith estimate of their fees and expenses incurred in rendering services to the Debtors before and as of the Effective Date projected to be outstanding as of the Effective Date, and shall deliver such estimate to the Debtors no later than five (5) days before the anticipated Effective Date; *provided*, *however*, that such estimate shall not be considered an admission or limitation with respect to the fees and expenses of such Professional and such Professionals are not bound to any extent by the estimates. If a Professional does not provide an estimate, the Debtors may estimate a reasonable amount of unbilled fees and expenses of such Professional, taking into account any prior payments; *provided*, *however*, that such estimate shall not be binding or considered an admission with respect to the fees and expenses of such Professional. The total aggregate amount so estimated as of the Effective Date shall be utilized by the Debtors to determine the amount to be funded to the Professional Fee Escrow Account, *provided* that the Reorganized Debtors shall use Cash on hand to increase the amount of the Professional Fee Escrow Account to the extent fee applications are Filed after the Effective Date in excess of the amount held in the Professional Fee Escrow Account based on such estimates.

4.      Post-Confirmation Date Fees and Expenses.

From and after the Confirmation Date, the Debtors or Reorganized Debtors, as applicable, shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by the Debtors or the Reorganized Debtors, as applicable. Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

The Debtors and Reorganized Debtors, as applicable, shall pay, within ten (10) Business Days after submission of a detailed invoice to the Debtors or Reorganized Debtors, as applicable, such reasonable claims for compensation or reimbursement of expenses incurred by the retained Professionals of the Debtors or the Reorganized Debtors, as applicable. If the Debtors or Reorganized Debtors, as applicable, dispute the reasonableness of any such invoice, the Debtors or Reorganized Debtors, as applicable, or the affected professional may submit such dispute to the Bankruptcy Court for a determination of the reasonableness of any such invoice, and the disputed portion of such invoice shall not be paid until the dispute is resolved.

D.      *Priority Tax Claims*

Pursuant to section 1129(a)(9)(C) of the Bankruptcy Code, unless otherwise agreed by the Holder of an Allowed Priority Tax Claim and the applicable Debtor or Reorganized Debtor, each Holder of an Allowed Priority Tax Claim will receive, at the option of the applicable Debtor or Reorganized Debtor, in full satisfaction of its Allowed Priority Tax Claim that is due and payable on or before the Effective Date, either (1) Cash equal to the amount of such Allowed Priority Tax Claim on (a) the date such Allowed Priority Tax Claim is due and payable in the ordinary course or (b) the later of (i) the Effective Date (or as soon thereafter as reasonably practicable) and (ii)

20

the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim, or (2) otherwise treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

E.    *Statutory Fees*

Notwithstanding anything herein to the contrary, on the Effective Date, the Debtors shall pay, in full, in Cash, any fees due and owing to the U.S. Trustee at the time of Confirmation pursuant to 28 U.S.C. § 1930(a)(6). The Debtors or Reorganized Debtors, as applicable, shall remain obligated to pay quarterly fees, including any interest thereon, if applicable, to the U.S. Trustee until the earliest of the Chapter 11 Cases being closed, dismissed or converted to a case under chapter 7 of the Bankruptcy Code.

## ARTICLE III.
## CLASSIFICATION, TREATMENT, AND VOTING OF CLAIMS AND INTERESTS

A.    *Classification of Claims and Interests*

This Plan constitutes a separate Plan proposed by each Debtor. Except for the Claims addressed in Article II of the Plan, all Claims and Interests are classified in the Classes set forth below in accordance with section 1122 of the Bankruptcy Code. A Claim or an Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes. A Claim or an Interest also is classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

The following chart represents the classification of Claims and Interests for each Debtor pursuant to the Plan:

| Class | Claim or Interest | Status | Voting Rights |
|-------|-------------------|--------|---------------|
| 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 3 | First Lien Notes Claims | Impaired | Entitled to Vote |
| 4 | Second Lien Notes Claims | Impaired | Entitled to Vote |
| 5 | Foreign Credit Line Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 6 | General Unsecured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |

| Class | Claim or Interest | Status | Voting Rights |
|:---:|---|:---:|:---:|
| 7 | Debtor Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) |
| 8 | Non-Debtor Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) |
| 9 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) |
| 10 | Existing Pyxus Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |

B.    *Treatment of Classes of Claims and Interests*

To the extent a Class contains Allowed Claims or Allowed Interests with respect to any Debtor, the classification of Allowed Claims and Allowed Interests is specified below.

1.    Class 1 — Other Secured Claims

(a)    *Classification*:  Class 1 consists of any Other Secured Claims.

(b)    *Treatment*:  Except to the extent that a Holder of an Allowed Other Secured Claim agrees to less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Other Secured Claim, each such Holder shall receive, at the option of the applicable Debtor(s), either:

(i)    payment in full in Cash of the due and unpaid portion of its Other Secured Claim on the later of (x) the Effective Date (or as soon thereafter as reasonably practicable) and (y) as soon as reasonably practicable after the date such Claim becomes due and payable;

(ii)    delivery of collateral securing any such Claim and payment of any interest required under section 506(b) of the Bankruptcy Code;

(iii)    Reinstatement of such Allowed Other Secured Claim; or

(iv)    such other treatment rendering its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.

(c)    *Voting*:  Class 1 is Unimpaired under the Plan. Holders of Allowed Other Secured Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Holders of Allowed Other Secured Claims are not entitled to vote to accept or reject the Plan.

2.    Class 2 — Other Priority Claims

    (a)    *Classification*:  Class 2 consists of any Other Priority Claims.

    (b)    *Treatment*:  Except to the extent that a Holder of an Allowed Other Priority Claim agrees to less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Other Priority Claim, each such Holder shall receive, at the option of the applicable Debtor(s), either:

        (i)    payment in full in Cash of the due and unpaid portion of its Other Priority Claim on the later of (x) the Effective Date (or as soon thereafter as reasonably practicable) and (y) as soon as reasonably practicable after the date such Claim becomes due and payable; or

        (ii)    such other treatment rendering its Allowed Other Priority Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.

    (c)    *Voting*:  Class 2 is Unimpaired under the Plan. Holders of Allowed Other Priority Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Holders of Allowed Other Priority Claims are not entitled to vote to accept or reject the Plan.

3.    Class 3 — First Lien Notes Claims

    (a)    *Classification*:  Class 3 consists of any First Lien Notes Claims against any Debtor.

    (b)    *Allowance:*  On the Effective Date, First Lien Notes Claims shall be Allowed in their entirety for all purposes of the Plan in the aggregate principal amount of $275,000,000, *plus* any accrued but unpaid interest to, but excluding, the Effective Date, and fees, premiums, and other expenses arising under or in connection with the First Lien Notes Indenture as of the Effective Date.

    (c)    *Treatment*:  Except to the extent that a Holder of an Allowed First Lien Notes Claim agrees to less favorable treatment, on the Effective Date, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Allowed First Lien Notes Claim, each Holder of an Allowed First Lien Notes Claim shall receive either:

        (i)    (x) payment in full in Cash of all accrued and unpaid interest on such Holder's First Lien Notes at the non-default rate to, but excluding, the Effective Date, and (y) such Holder's *pro rata* share of the Exit Secured Notes (determined based upon the aggregate principal amount of such Holder's First Lien Notes as a percentage of all First

Lien Notes outstanding as of the date of distribution to Holders of Allowed First Lien Notes Claims); or

(ii)     if Pyxus obtains and accepts a binding commitment for Replacement First Lien Financing on or prior to such day that is sixty (60) days after the Petition Date (and, in any event, prior to the Confirmation Date) and consummates the Replacement First Lien Financing on the Effective Date, its *pro rata* share of $280.8 million *plus* all accrued and unpaid interest due and payable on such Holder's First Lien Notes at the non-default rate to, but excluding, the Effective Date (to the extent not paid during the Chapter 11 Cases), payable in Cash with the proceeds of the Replacement First Lien Financing.

(d)     *Voting*:  Class 3 is Impaired under the Plan. Holders of Allowed First Lien Notes Claims are entitled to vote to accept or reject the Plan.

4.     Class 4 — Second Lien Notes Claims

(a)     *Classification*:  Class 4 consists of any Second Lien Notes Claims against any Debtor.

(b)     *Allowance:*  On the Effective Date, Second Lien Notes Claims shall be Allowed in their entirety for all purposes of the Plan in the aggregate principal amount of $635,686,000, *plus* any accrued but unpaid interest, fees, and other expenses arising under or in connection with the Second Lien Notes Indenture.

(c)     *Treatment*:  Except to the extent that a Holder of an Allowed Second Lien Notes Claim agrees to less favorable treatment, on the Effective Date, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Second Lien Notes Claim, each Holder of an Allowed Second Lien Notes Claim shall receive, at such Holder's election, either:

(i)     such Holder's Pro Rata Share of the Second Lien Notes Common Stock Pool; or

(ii)     Cash equal to 2.00% of the principal amount of all Second Lien Notes beneficially owned by such Holder as of the date of distribution to Holders of Allowed Second Lien Notes Claims.

A Holder of an Allowed Second Lien Notes Claim has the right to elect to participate in either the Second Lien Notes Cash Option or the Second Lien Notes Stock Option. Such election must be made as to the entirety of the Second Lien Notes Claims beneficially owned by such Holder.

A Holder of an Allowed Second Lien Notes Claim that elects to participate in the Second Lien Notes Stock Option must duly and timely complete and

24

submit its Second Lien Notes Stock Election Form in accordance with the instructions set forth therein. A Holder of an Allowed Second Lien Notes Claim that elects to participate in the Second Lien Notes Cash Option does **not** need to complete or submit a Second Lien Notes Stock Election Form. For the avoidance of doubt, a Holder of an Allowed Second Lien Notes Claim that does not duly and timely submit a Second Lien Notes Stock Election Form in accordance with the instructions set forth therein will be deemed to have elected the Second Lien Notes Cash Option.

The Restructuring Support Agreement requires all Consenting Second Lien Noteholders to elect the Second Lien Notes Stock Option, and such Persons must take all necessary actions to effectuate such election.

Any Holder that duly and timely elects the Second Lien Notes Stock Option shall be deemed to be a party to the New Shareholders Agreement.

"Pro Rata Share" means, with respect to any Holder of an Allowed Second Lien Notes Claim, the percentage equal to (x) the aggregate principal amount of Second Lien Notes beneficially owned by such Holder as of the date of distribution to Holders of Allowed Second Lien Notes Claims, *divided by* (y) $635,686,000.

(d)     *Voting*:  Class 4 is Impaired under the Plan. Holders of Allowed Second Lien Notes Claims are entitled to vote to accept or reject the Plan.

5.     Class 5 — Foreign Credit Line Claims

(a)     *Classification*:  Class 5 consists of any Foreign Credit Line Claims against any Debtor.

(b)     *Treatment*:  Except to the extent that a Holder of an Allowed Foreign Credit Line Claim agrees to less favorable treatment, on the Effective Date, in full and final satisfaction, compromise, settlement, release and discharge of and in exchange for each Allowed Foreign Credit Line Claim, each Holder of an Allowed Foreign Credit Line Claim shall be Reinstated and paid in the ordinary course of business in accordance with the terms and conditions of the particular transaction or agreement giving rise to such Allowed Foreign Credit Line Claim.

(c)     *Voting*:  Class 5 is Unimpaired and Holders of Allowed Foreign Credit Line Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Allowed Foreign Credit Line Claims are not entitled to vote to accept or reject the Plan.

6.     Class 6 — General Unsecured Claims

(a)   *Classification*:  Class 6 consists of any General Unsecured Claims against any Debtor.

(b)   *Treatment*:  Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Allowed General Unsecured Claim, each Holder of an Allowed General Unsecured Claim shall be Reinstated and paid in the ordinary course of business in accordance with the terms and conditions of the particular transaction or agreement giving rise to such Allowed General Unsecured Claim.

(c)   *Voting*:  Class 6 is Unimpaired and Holders of Allowed General Unsecured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Allowed General Unsecured Claims are not entitled to vote to accept or reject the Plan.

7.    Class 7 — Debtor Intercompany Claims

(a)   *Classification*:  Class 7 consists of any Debtor Intercompany Claims.

(b)   *Treatment*:  Except to the extent otherwise provided in the Plan Supplement, each Allowed Debtor Intercompany Claim shall, at the option of the applicable Debtors, either on or after the Effective Date, be:

(i)    Reinstated; or

(ii)   extinguished, compromised, addressed, setoff, cancelled, or settled, potentially without any distribution on account of such Claims.

(c)   *Voting*:  Holders of Allowed Debtor Intercompany Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) or deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code, respectively. Therefore, Holders of Allowed Debtor Intercompany Claims are not entitled to vote to accept or reject the Plan.

8.    Class 8 — Non-Debtor Intercompany Claims

(a)   *Classification*:  Class 8 consists of any Non-Debtor Intercompany Claims.

(b)   *Treatment*:  Except to the extent otherwise provided in the Plan Supplement, each Allowed Non-Debtor Intercompany Claim shall, at the option of the applicable Debtors, be:

(i)    Reinstated; or

      (ii)     extinguished, compromised, addressed, setoff, cancelled, or settled, potentially without any distribution on account of such Claims.

(c)    *Voting*:  Holders of Allowed Non-Debtor Intercompany Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) or deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code, respectively. Therefore, Holders of Allowed Non-Debtor Intercompany Claims are not entitled to vote to accept or reject the Plan.

9.    Class 9 — Intercompany Interests

(a)    *Classification*:  Class 9 consists of all Intercompany Interests.

(b)    *Treatment*:  Except to the extent otherwise provided in the Plan Supplement, each Allowed Intercompany Interest shall, at the option of the applicable Debtors, be:

      (i)     Reinstated; or

      (ii)     extinguished, compromised, addressed, setoff, cancelled, or settled, potentially without any distribution on account of such Interests.

For the avoidance of doubt, any Interest in non-Debtor subsidiaries owned by a Debtor shall continue to be owned by the applicable Reorganized Debtor unless otherwise provided in the Plan Supplement.

(c)    *Voting*:  Holders of Allowed Intercompany Interests are conclusively presumed to have accepted the Plan pursuant to section 1126(f) or deemed to have accepted or rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code, respectively. Therefore, Holders of Allowed Intercompany Interests are not entitled to vote to accept or reject the Plan.

10.    Class 10 — Existing Pyxus Interests

(a)    *Classification*:  Class 10 consists of all Interests in Pyxus.

(b)    *Treatment:*  On the Effective Date, all Existing Pyxus Interests, and any related Claims described in section 510(b) of the Bankruptcy Code in respect of such Existing Pyxus Interests, shall be discharged, cancelled, released, and extinguished and of no further force or effect without any distribution on account of such Interests. Except as set forth below, Holders of Existing Pyxus Interests (and any related Claims described in section 510(b) of the Bankruptcy Code in respect of such Existing Pyxus Interests), shall not receive or retain any other property or interests under the Plan.

Notwithstanding the foregoing, each Qualifying Holder of Pyxus Common Stock will receive its *pro rata* share of the Existing Equity Cash Pool

(determined based upon the aggregate number of shares of Pyxus Common Stock held by such Holder as a percentage of all shares of Pyxus Common Stock as of the date of distribution to such Holders). Any portion of the Existing Equity Cash Pool attributable to a Holder of Pyxus Common Stock that is not a Qualifying Holder of Pyxus Common Stock shall be retained by the Reorganized Debtors.

*Voting:*  Holders of Class 10 Existing Pyxus Interests are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Existing Pyxus Interests are not entitled to vote to accept or reject the Plan.

C.    *Special Provision Governing Unimpaired Claims*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' or the Reorganized Debtors' rights regarding any Unimpaired Claim, including all rights regarding legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claim.

D.    *Elimination of Vacant Classes*

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

E.    *Voting Classes; Presumed Acceptance by Non-Voting Classes*

If a Class contains Claims or Interests eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Debtors shall request the Bankruptcy Court to deem the Plan accepted by the Holders of such Claims or Interests in such Class.

F.    *Subordinated Claims*

The allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Reorganized Debtors reserve the right to re-classify any Allowed Claim or Allowed Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

G.    *Intercompany Interests*

To the extent Reinstated under the Plan, distributions on account of Intercompany Interests are not being received by Holders of such Intercompany Interests on account of their Intercompany

Interests but for the purposes of administrative convenience and due to the importance of maintaining the corporate structure for the ultimate benefit of the Holders that receive New Common Stock in exchange for the Debtors' and Reorganized Debtors' agreement under the Plan to make certain distributions on account of such Holders' Allowed Claims. For the avoidance of doubt, any Interest in non-Debtor subsidiaries owned by a Debtor shall continue to be owned by the applicable Reorganized Debtor.

H.      *Controversy Concerning Impairment*

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

I.      *Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by one or more of the Classes entitled to vote pursuant to Article III.B of the Plan. The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests. The Debtors reserve the right to alter, amend, or modify the Plan, or any document in the Plan Supplement in accordance with Article X hereof to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims to render such Class of Claims Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules or to withdraw the Plan as to such Debtor, with the consent of the Consenting Noteholders in accordance with the Restructuring Support Agreement and in accordance with the provisions of the Plan. For the avoidance of doubt, and to the extent applicable, this Plan shall be deemed to be a sale of all of the Debtors' assets, solely for purposes of Section 1129(b)(2)(a)(ii) of the Bankruptcy Code, to Holders of Second Lien Notes Claims as directed by the majority of the Holders of Second Lien Notes Claims under their collateral documents, and, as contemplated by section 363(k) of the Bankruptcy Code, such sale was subject to any Superior Alternative Proposal (as defined in the Restructuring Support Agreement), and no such Superior Alternative Proposal was received and/or accepted by the Debtors.

# ARTICLE IV.
## MEANS FOR IMPLEMENTATION OF THE PLAN

A.      *General Settlement of Claims and Interests*

Unless otherwise set forth in the Plan, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Plan, including with respect to issues related to the value of the Debtors' unencumbered property.

B.      *Restructuring Transactions*

On and after the Confirmation Date, the Debtors or Reorganized Debtors, as applicable, shall take all actions as may be necessary or appropriate to effectuate the Restructuring Transactions (as agreed and in accordance with the Restructuring Support Agreement and subject to the applicable consent and approval rights thereunder), including to establish Reorganized Pyxus and, if applicable, to transfer assets of the Debtors to Reorganized Pyxus or a subsidiary thereof. The applicable Debtors or the Reorganized Debtors will take any actions as may be necessary or advisable to effect a corporate restructuring of the overall corporate structure of the Debtors, to the extent agreed in accordance with the consent rights in the Restructuring Support Agreement and provided herein or in the Definitive Restructuring Documents, including the issuance of all Securities, notes, instruments, certificates, and other documents required to be issued pursuant to the Plan, one or more intercompany mergers, consolidations, amalgamations, arrangements, continuances, restructurings, conversions, dissolutions, transfers, liquidations, or other corporate transactions.

The actions to implement the Restructuring Transactions may include, in each case if and as agreed in accordance with the Restructuring Support Agreement and subject to the applicable consent and approval rights thereunder: (1) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, reorganization, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of the Plan; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms to which the applicable parties agree; (3) the filing of appropriate certificates or articles of incorporation, reincorporation, formation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution or other certificates or documentation for other transactions as described in clause (1), pursuant to applicable state law; (4) the execution and delivery of the New Shareholders Agreement and the New Pyxus Constituent Documents, and any certificates or articles of incorporation, bylaws, or such other applicable formation documents (if any) of each Reorganized Debtor (including all actions to be taken, undertakings to be made, and obligations to be incurred and fees and expenses to be paid by the Debtors and/or the Reorganized Debtors, as applicable); and the issuance, distribution, reservation, or dilution, as applicable, of the New Common Stock as set forth herein; and (5) all other actions that the Debtors and the Required Consenting Noteholders determine to be necessary or appropriate.

The Confirmation Order shall and shall be deemed to, pursuant to both section 1123 and section 363 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan.

C.    *Sources of Consideration for Plan Distributions*

The Debtors shall fund distributions under the Plan, as applicable, with: (1) the issuance of New Common Stock; (2) the Exit ABL Facility; (3) the Exit Term Facility; (4) the Exit Secured Notes, or, if applicable, the Replacement First Lien Financing; and (5) the Debtors' Cash on hand. Each distribution and issuance referred to in Article VI of the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments or other documents evidencing or relating to such distribution or

issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance. The issuance, distribution, or authorization, as applicable, of certain Securities in connection with the Plan, including the New Common Stock will be exempt from SEC registration, as described more fully in Article IV.E below.

1. Issuance and Distribution of the New Common Stock

On the Effective Date, Reorganized Pyxus shall have at least twenty-five (25) million authorized shares of New Common Stock (or such other amount as may be agreed by the Debtors and the Required Consenting Second Lien Noteholders) to satisfy the Effective Date Issuance Amount and all grants under the New MIP. To the extent of any increase in the Effective Date Issuance Amount, the number of authorized shares of New Common Stock shall be increased accordingly. The number of shares of New Common Stock equal to the Effective Date Issuance Amount shall be issued on the Effective Date as follows: (a) on account of distributions of the Second Lien Notes Common Stock Pool to Holders of Allowed Second Lien Notes Claims who duly and timely submit the Second Lien Notes Stock Election Form, (b) in satisfaction of the Second Lien Notes RSA Fee Shares, (c) in satisfaction of the Backstop Fee Shares, and (d) on account of the Exit Facility Shares (in the cases of clauses (b) through (d), to the Persons entitled thereto pursuant to the terms and conditions of the Restructuring Support Agreement).

The chart below illustrates the number of shares of New Common Stock that will be issued on the Effective Date and the percentage of all such shares of New Common Stock (a) without giving effect to the New MIP, (b) assuming no change in the Effective Date Issuance Amount, and (c) assuming all Holders duly and timely elect the Second Lien Notes Stock Option:

| Issuance | Number of Shares | Percentage |
|---|---|---|
| Second Lien Notes Common Stock Pool | 11,526,593.75 | 50.115625% |
| Exit Facility Shares | 10,220,625.00 | 44.437500% |
| Backstop Fee Shares | 965,281.25 | 4.196875% |
| Second Lien Notes RSA Fee Shares | 287,500.00 | 1.250000% |
| Total | 23,000,000 | 100.000000% |

There shall be no reduction in the Effective Date Issuance Amount in the event any Holders of Allowed Second Lien Notes Claims duly and timely elect (or are deemed to have elected) the Second Lien Notes Cash Option. Any shares of New Common Stock that would have been issued to such Holders had such Holders duly and timely elected the Second Lien Notes Stock Option will be allocated as follows: (a) 50.75% to Holders of Allowed Second Lien Notes Claims who duly and timely elect the Second Lien Notes Stock Option, (b) 45.00% to the recipients of the Exit Facility Shares, and (c) 4.25% to the recipients of the Backstop Fee Shares (in each case ratably among the Persons entitled to such distributions or fees, as applicable).

Each distribution and issuance of the New Common Stock as of the Effective Date shall be governed by the terms and conditions set forth in the Plan applicable to such distribution, issuance, and/or dilution, as applicable, and by the terms and conditions of the instruments evidencing or relating to such distribution, issuance, and/or dilution, as applicable, including the New Pyxus Constituent Documents and New Shareholders Agreement, the terms and conditions of which shall bind each Entity receiving such distribution of the New Common Stock. Any Entity's acceptance

31

of New Common Stock shall be deemed as its agreement to the New Pyxus Constituent Documents and the New Shareholders Agreement, as the same may be amended or modified from time to time following the Effective Date in accordance with their terms.

The New Common Stock will not be registered on any exchange as of the Effective Date and may or may not (at the Debtors' discretion with the consent of the Required Consenting Second Lien Noteholders) meet the eligibility requirements of DTC. For the avoidance of doubt, distributions to Holders of Class 4 – Second Lien Notes Claims shall be made on or as soon as practicable after the Effective Date, and the Distribution Record Date shall not apply to such distributions. Notwithstanding anything set forth herein, in the Disclosure Statement, or in the Confirmation Order, distributions of New Common Stock or Cash, as applicable, to the Holders of Second Lien Notes shall be made to or at the direction of the Second Lien Notes Indenture Trustee or the Distribution Agent as determined by the Debtors.

2.    Exit ABL Facility and Exit Term Facility

On the Effective Date, the Reorganized Debtors shall execute and deliver the Exit ABL Credit Agreement and the Exit Term Facility Agreement and shall execute, deliver, file, record, and issue any other related, notes, guarantees, security documents, instruments, or agreements in connection therewith, including one or more Exit Intercreditor Agreements, in each case, without (a) further notice to the Bankruptcy Court or (b) further act or action under applicable, law, regulation, order, or rule or the vote, consent, authorization, or approval of any Entity.

Confirmation of the Plan shall be deemed approval of the Exit ABL Credit Agreement and the Exit Term Facility Agreement, and all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith, including the payment of all fees, indemnities, and expenses provided for therein, authorization of the Reorganized Debtors to be party thereto to enter into and execute the Exit ABL Credit Agreement and the Exit Term Facility Agreement, and authorization for Reorganized Pyxus to create or perfect the Liens in connection therewith.

On the Effective Date, the agents under the Exit ABL Credit Agreement and the Exit Term Facility Agreement, as applicable, shall be granted valid, binding, and enforceable Liens on the collateral specified in, and to the extent required by, the Exit ABL Credit Agreement and the Exit Term Facility Agreement, as applicable, and the other documents executed in connection therewith. To the extent granted, the guarantees, mortgages, pledges, Liens, and other security interests granted pursuant to the Exit ABL Credit Agreement or the Exit Term Facility Agreement, as applicable, and the other documents executed in connection therewith are granted in good faith as an inducement to extend credit thereunder, shall be valid and enforceable, and shall be deemed not to constitute a fraudulent conveyance or fraudulent transfer, shall not otherwise be subject to avoidance, and the priorities of any such Liens and security interests shall be as set forth in the Exit ABL Credit Agreement, the Exit Term Facility Agreement, the Exit Intercreditor Agreements, and the other documents executed in connection therewith.

3.    Exit Secured Notes

On the Effective Date, Reorganized Pyxus shall issue the Exit Secured Notes pursuant to the Exit Secured Notes Indenture in an initial aggregate principal amount equal to 102.1250% of the principal amount of First Lien Notes outstanding as of immediately prior to the Effective Date, and the Reorganized Debtors are authorized to and authorized to cause any non-Debtor guarantors to, execute, deliver, file, record, and issue any other related notes, guarantees, security documents, instruments, or agreements in connection therewith, in each case, without (a) further notice to the Bankruptcy Court or (b) further act or action under applicable law, regulation, order, or rule or the vote, consent, authorization, or approval of any Entity.

Confirmation of the Plan shall be deemed approval of the Exit Secured Notes, the Exit Secured Notes Indenture, all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith, including the payment of all fees, indemnities, and expenses provided for therein, authorization of the Reorganized Debtors to be party thereto to enter into and execute the Exit Secured Notes Indenture, and authorization for Reorganized Pyxus to create or perfect the Liens in connection therewith.

On the Effective Date, the collateral agent under the Exit Secured Notes Indenture shall be granted valid, binding, and enforceable Liens on the collateral specified in, and to the extent required by, the Exit Secured Notes Indenture and the other documents executed in connection therewith. To the extent granted, the guarantees, mortgages, pledges, Liens, and other security interests granted pursuant to the Exit Secured Notes Indenture and the other documents executed in connection therewith are granted in good faith as an inducement to the collateral agent under the Exit Secured Notes Indenture to extend credit thereunder, shall be valid and enforceable, and shall be deemed not to constitute a fraudulent conveyance or fraudulent transfer, shall not otherwise be subject to avoidance, and the priorities of any such Liens and security interests shall be as set forth in the Exit Secured Notes Indenture, the Exit Intercreditor Agreements, and the other documents executed in connection therewith.

Alternatively, if Pyxus obtains and accepts a binding commitment for Replacement First Lien Financing on or prior to such day that is sixty (60) days after the Petition Date (and, in any event, prior to the Confirmation Date), such Replacement First Lien Financing shall be consummated on the Effective Date, and Reorganized Pyxus shall not issue any Exit Secured Notes. The proceeds of such Replacement First Lien Financing shall be used in accordance with the Plan.

For the avoidance of doubt, the Distribution Record Date shall not apply to distributions to Holders of Class 3 – First Lien Notes Claims. Notwithstanding anything set forth herein, in the Disclosure Statement, or in the Confirmation Order, distributions of Exit Secured Notes or Cash, as applicable, to the Holders of First Lien Notes shall be made to or at the direction of the First Lien Notes Indenture Trustee or the Distribution Agent as determined by the Debtors.

4.      Cash on Hand

The Debtors or Reorganized Debtors, as applicable, shall use Cash on hand to fund distributions to certain Holders of Allowed Claims, consistent with the terms of the Plan.

33

D.      *New Shareholders Agreement*

On the Effective Date, Reorganized Pyxus shall enter into and deliver the New Shareholders Agreement, in substantially the form included in the Plan Supplement, to each Holder of New Common Stock and such Holders shall be bound thereby, in each case without the need for execution by any party thereto other than Reorganized Pyxus.

E.      *Exemption from Registration Requirements*

All shares of New Common Stock or other Securities, as applicable, issued and distributed pursuant to the Plan, will be issued and distributed without registration under the Securities Act or any similar federal, state, or local law in reliance upon (1) section 1145 of the Bankruptcy Code; (2) section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder; or (3) such other exemption as may be available from any applicable registration requirements.

The offering, issuance, and distribution of any shares of New Common Stock or of the Exit Secured Notes pursuant to the Plan in reliance upon section 1145 of the Bankruptcy Code is exempt from, among other things, the registration requirements of Section 5 of the Securities Act and any other applicable U.S. state or local law requiring registration prior to the offering, issuance, distribution, or sale of securities. Such shares of New Common Stock or other Securities to be issued under the Plan pursuant to section 1145 of the Bankruptcy Code (a) are not "restricted securities" as defined in Rule 144(a)(3) under the Securities Act, and (b) subject to the terms of the New Shareholders Agreement, are freely tradable and transferable by any initial recipient thereof that (i) is not an "affiliate" of the Debtors as defined in Rule 144(a)(1) under the Securities Act, (ii) has not been such an "affiliate" within 90 days of such transfer, and (iii) is not an entity that is an "underwriter" as defined in subsection (b) of Section 1145 of the Bankruptcy Code.

All New Common Stock or other Securities issued pursuant to the Plan that are not issued in reliance on section 1145 of the Bankruptcy Code will be issued without registration under the Securities Act or any similar federal, state, or local law in reliance on section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder, or such other exemption as may be available from any applicable registration requirements. All shares of New Common Stock issued pursuant to the exemption from registration set forth in section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder will be considered "restricted securities" and may not be transferred except pursuant to an effective registration statement under the Securities Act or an available exemption therefrom. The New Common Stock underlying the New MIP will be issued pursuant to a registration statement or an available exemption from registration under the Securities Act and other applicable law.

The availability of the exemption under section 1145 of the Bankruptcy Code or any other applicable securities laws shall not be a condition to the occurrence of the Effective Date.

Should the Reorganized Debtors elect, on or after the Effective Date, to reflect all or any portion of the ownership of Reorganized Pyxus' New Common Stock or the Exit Secured Notes through the facilities of DTC, the Reorganized Debtors shall not be required to provide any further evidence other than the Plan or Final Order with respect to the treatment of such applicable portion of Reorganized Pyxus' New Common Stock or the Exit Secured Notes, and such Plan or Final

34

Order shall be deemed to be legal and binding obligations of the Reorganized Debtors in all respects.

DTC shall be required to accept and conclusively rely upon the Plan and Final Order in lieu of a legal opinion regarding whether Reorganized Pyxus' New Common Stock or the Exit Secured Notes are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

Notwithstanding anything to the contrary in the Plan, no Entity (including, for the avoidance of doubt, DTC) may require a legal opinion regarding the validity of any transaction contemplated by the Plan, including, for the avoidance of doubt, whether Reorganized Pyxus' New Common Stock or the Exit Secured Notes are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

F.      *Corporate Existence*

Except as otherwise provided in the Plan or the Plan Supplement, each Debtor shall continue to exist after the Effective Date as a separate corporate entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws (or other formation documents) are amended under the Plan, the New Pyxus Constituent Documents, or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law).

G.      *Corporate Action*

On or before the Effective Date, as applicable, all actions contemplated under the Plan or the Plan Supplement shall be deemed authorized and approved in all respects, including: (1) adoption or assumption, as applicable, of the agreements with existing management; (2) selection of the directors, managers, and officers for the Reorganized Debtors; (3) implementation of the Restructuring Transactions; and (4) all other actions contemplated under the Plan (whether to occur before, on, or after the Effective Date). All matters provided for in the Plan involving the corporate structure of the Debtors or the Reorganized Debtors, as applicable, and any corporate action required by the Debtors or the Reorganized Debtors in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders, directors, managers, or officers of the Debtors or the Reorganized Debtors, as applicable. On or (as applicable) prior to the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Reorganized Debtors, including the New Shareholders Agreement, the New Pyxus Constituent Documents, the Exit ABL Credit Agreement, the Exit Term Facility Agreement, the Exit Secured Notes Indenture, the Exit Intercreditor Agreements, and any and all other agreements,

documents, securities, and instruments relating to the foregoing. The authorizations and approvals contemplated by this Article IV.G shall be effective notwithstanding any requirements under non-bankruptcy law.

## H.    *Vesting of Assets in the Reorganized Debtors*

Except as otherwise provided in the Plan or the Plan Supplement, or in any agreement, instrument, or other document incorporated in the Plan, on the Effective Date, all property in each Debtor's Estate, all Causes of Action, and any property acquired by any of the Debtors under the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances (except for Liens securing obligations on account of Other Secured Claims that are Reinstated pursuant to the Plan, if any). On and after the Effective Date, except as otherwise provided in the Plan, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

## I.    *Cancellation of Facilities, Notes, Instruments, Certificates, and Other Documents*

On the Effective Date, except to the extent otherwise provided in the Plan, all facilities, notes, instruments, certificates, shares, and other documents evidencing Claims or Interests shall be cancelled, and the obligations of the Debtors or the Reorganized Debtors thereunder or in any way related thereto shall be discharged and deemed satisfied in full, and the DIP Agent, First Lien Notes Indenture Trustee, and Second Lien Notes Indenture Trustee shall be released from all duties and obligations thereunder; *provided*, *however*, that notwithstanding Confirmation or the occurrence of the Effective Date, any credit document or agreement that governs the rights of the Holder of a Claim or Interest and any debt issued thereunder shall continue in effect solely for purposes of (1) allowing Holders of Allowed Claims to receive distributions under the Plan; (2) allowing and preserving the rights of the DIP Agent, First Lien Notes Indenture Trustee, and Second Lien Notes Indenture Trustee to make distributions pursuant to the Plan; (3) preserving the DIP Agent's, First Lien Notes Indenture Trustee's, and Second Lien Notes Indenture Trustee's rights to compensation and indemnification as against any money or property distributable to the Holders of First Lien Notes Claims, Holders of Second Lien Notes Claims, or Holders of DIP Facility Claims, including permitting the DIP Agent, First Lien Notes Indenture Trustee, and Second Lien Notes Indenture Trustee to maintain, enforce, and exercise their charging liens, if any, against such distributions; (4) preserving all rights, including rights of enforcement, of the DIP Agent, First Lien Notes Indenture Trustee, and Second Lien Notes Indenture Trustee against any Person other than a Released Party (including the Debtors), including with respect to indemnification or contribution from the Holders of First Lien Notes Claims, Holders of Second Lien Notes Claims, and Holders of DIP Facility Claims, pursuant and subject to the terms of the First Lien Notes Indenture, the Second Lien Notes Indenture, and the DIP Credit Agreement, respectively, as in effect on the Effective Date; (5) permitting the DIP Agent, First Lien Notes Indenture Trustee, and Second Lien Notes Indenture Trustee to enforce any obligation (if any) owed to the DIP Agent, First Lien Notes Indenture Trustee, and Second Lien Notes Indenture Trustee, respectively, under the Plan; (6) permitting the DIP Agent, First Lien Notes Indenture Trustee, and Second Lien Notes Indenture Trustee to appear in the Chapter 11 Cases or in any proceeding in the Bankruptcy Court or any other court; and (7) permitting the DIP Agent, First

Lien Notes Indenture Trustee, and Second Lien Notes Indenture Trustee to perform any functions that are necessary to effectuate the foregoing; *provided*, *further*, *however*, that (a) the preceding proviso shall not affect the discharge of Claims or Interests pursuant to the Bankruptcy Code, the Confirmation Order, or the Plan, or result in any expense or liability to the Debtors or Reorganized Debtors, as applicable, except as expressly provided for in the Plan and (b) except as otherwise provided in the Plan, the terms and provisions of the Plan shall not modify any existing contract or agreement that would in any way be inconsistent with distributions under the Plan. The DIP Agent, First Lien Notes Indenture Trustee, and Second Lien Notes Indenture Trustee shall be discharged and shall have no further obligation or liability except as provided in the Plan and Confirmation Order, and after the performance by the DIP Agent, First Lien Notes Indenture Trustee, and Second Lien Notes Indenture Trustee and their representatives and professionals of any obligations and duties required under or related to the Plan or Confirmation Order, the DIP Agent, First Lien Notes Indenture Trustee, and Second Lien Notes Indenture Trustee shall be relieved of and released from any obligations and duties arising hereunder or thereunder. The fees, expenses, and costs of the DIP Agent, First Lien Notes Indenture Trustee, and Second Lien Notes Indenture Trustee, including fees, expenses, and costs of its professionals incurred after the Effective Date in connection with the DIP Credit Agreement, the First Lien Notes Indenture, and the Second Lien Notes Indenture, as applicable, and reasonable and documented costs and expenses associated with effectuating distributions pursuant to the Plan will be paid by the Reorganized Debtors in the ordinary course.

J.      *Effectuating Documents; Further Transactions*

On and after the Effective Date, the Reorganized Debtors, and the officers and members of the boards of directors and managers thereof, are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, the New Shareholders Agreement, the New Pyxus Constituent Documents, and the Securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorizations, or consents except for those expressly required under the Plan.

K.      *Exemptions from Certain Taxes and Fees*

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Reorganized Debtor or to any other Person) of property under the Plan or pursuant to: (1) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtors or the Reorganized Debtors, including the New Common Stock; (2) the Restructuring Transactions; (3) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (4) the making, assignment, or recording of any lease or sublease; (5) the grant of collateral as security for any or all of the Exit Term Facility, Exit ABL Facility, or Exit Secured Notes; or (6) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or

similar tax, mortgage tax, stamp act, real estate transfer tax, sales or use tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment. All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(c) of the Bankruptcy Code, shall forego the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

L.    *New Pyxus Constituent Documents*

The New Pyxus Constituent Documents shall, among other things: (1) contain terms consistent with the documentation set forth in the Plan Supplement; (2) authorize the issuance, distribution, and reservation of the New Common Stock to the Entities entitled to receive such issuances, distributions and reservations under the Plan; and (3) pursuant to and only to the extent required by section 1123(a)(6) of the Bankruptcy Code, and limited as necessary to facilitate compliance with non-bankruptcy federal laws, prohibit the issuance of non-voting equity Securities.

On or immediately before the Effective Date, Pyxus or Reorganized Pyxus, as applicable, will file its New Pyxus Constituent Documents with the applicable Secretary of State and/or other applicable authorities in its state of incorporation or formation in accordance with the applicable laws of its respective state of incorporation or formation, to the extent required for such New Pyxus Constituent Documents to become effective. After the Effective Date, Reorganized Pyxus may amend and restate its formation, organizational, and constituent documents as permitted by the laws of its jurisdiction of formation and the terms of such documents.

M.    *Directors and Officers*

On the Effective Date, the Reorganized Pyxus Board shall be determined and selected consistent with the New Shareholders Agreement.

On the Effective Date, the terms of the current members of the Pyxus board of directors shall expire, and the Reorganized Pyxus Board will include those directors set forth in the list of directors of the Reorganized Debtors included in the Plan Supplement. On the Effective Date, the officers and overall management structure of Reorganized Pyxus, and all officers and management decisions with respect to Reorganized Pyxus (and/or any of its direct or indirect subsidiaries), compensation arrangements, and Affiliate transactions shall only be subject to the approval of the Reorganized Pyxus Board.

From and after the Effective Date, each director, officer, or manager of the Reorganized Debtors shall be appointed and serve pursuant to the terms of their respective charters and bylaws or other formation and constituent documents, the New Shareholders Agreement, and the New Pyxus Constituent Documents, and applicable laws of the respective Reorganized Debtor's

jurisdiction of formation. To the extent that any such director or officer of the Reorganized Debtors is an "insider" pursuant to section 101(31) of the Bankruptcy Code, the Debtors will disclose the nature of any compensation to be paid to such director or officer.

## N.    New MIP

On or after the Effective Date, the Reorganized Pyxus Board shall adopt and institute the New MIP, enact and enter into related policies and agreements, and distribute New Common Stock to participants based on terms and conditions determined by the Reorganized Pyxus Board.

## O.    Preservation of Causes of Action

In accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article VIII of the Plan, which shall be deemed released and waived by the Debtors and Reorganized Debtors as of the Effective Date.

The Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors. **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Reorganized Debtors will not pursue any and all available Causes of Action against it. The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity.** Unless any Cause of Action against an Entity is expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order of the Bankruptcy Court, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

## ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

## A.    Assumption of Executory Contracts and Unexpired Leases

On the Effective Date, except as otherwise provided in the Plan or in any contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan, all Executory Contracts and Unexpired Leases shall be deemed assumed, including the Restructuring Support Agreement, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, as of the Effective Date under section 365 of the Bankruptcy Code, unless such Executory Contract and Unexpired Lease:  (1) was assumed or rejected previously by the Debtors; (2) previously expired or terminated pursuant to its own terms; (3) is the subject of a motion to reject Filed on or before the Effective Date; or (4) is identified on the Rejected Executory Contract and Unexpired Lease List. Any intercompany Executory Contracts

or Unexpired Leases may be amended, assumed, assigned, or terminated as of the Effective Date as determined by the Reorganized Debtors with the consent of the Required Consenting Second Lien Noteholders (such consent not to be unreasonably withheld, conditioned or delayed) and in consultation with the Required Consenting First Lien Noteholders.

Entry of the Confirmation Order shall constitute a Bankruptcy Court order approving the assumptions or assumption and assignment, as applicable, of such Executory Contracts or Unexpired Leases as provided for in the Plan, pursuant to sections 365(a) and 1123 of the Bankruptcy Code effective as of the Effective Date. Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order but not assigned to a third party before the Effective Date shall re-vest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its terms, except as such terms may have been modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption under applicable federal law. Any motions to assume Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by the Bankruptcy Court on or after the Effective Date by a Final Order.

To the maximum extent permitted by law, to the extent that any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption or assumption and assignment of such Executory Contract or Unexpired Lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto.

B.    *Claims Based on Rejection of Executory Contracts or Unexpired Leases*

Entry of the Confirmation Order shall constitute a Bankruptcy Court order approving the rejections, if any, of any Executory Contracts or Unexpired Leases as provided for in the Plan or the Rejected Executory Contract and Unexpired Lease List, as applicable. Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be Filed with the Solicitation Agent at the address specified in any notice of entry of the Confirmation Order and served on the Reorganized Debtors no later than thirty days after the effective date of such rejection.

**Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed with the Solicitation Agent within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors, the Reorganized Debtors, the Estates, or their property, without the need for any objection by the Debtors or Reorganized Debtors, or further notice to, action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, and be subject to the permanent injunction set forth in Article VIII.H of the Plan, notwithstanding anything in a Proof of Claim to the contrary.**

All Claims arising from the rejection by any Debtor of any Executory Contract or Unexpired Lease pursuant to section 365 of the Bankruptcy Code shall be treated as a General Unsecured Claim pursuant to Article III.B of the Plan and may be objected to in accordance with the provisions of Article VII of the Plan and the applicable provisions of the Bankruptcy Code and Bankruptcy Rules.

Notwithstanding anything to the contrary in the Plan, the Debtors, or the Reorganized Debtors, as applicable, reserve the right to alter, amend, modify, or supplement the Rejected Executory Contract and Unexpired Lease List at any time through and including thirty days after the Effective Date.

C.      *Cure of Defaults and Objections to Cure and Assumption*

The Reorganized Debtors shall satisfy any monetary defaults, if any, under any Executory Contract or Unexpired Lease to be assumed hereunder, to the extent required by section 365(b)(1) of the Bankruptcy Code, upon assumption thereof in the ordinary course of business. If a counterparty to an Executory Contract or Unexpired Lease believes any Cure amount is due, it shall assert a Cure Claim against the Debtors or Reorganized Debtors, as applicable, in the ordinary course of business, subject to all defenses the Debtors or Reorganized Debtors may have with respect to such Cure Claim. Any Cure Claim shall be deemed fully satisfied, released, and discharged upon payment by the Reorganized Debtors of the applicable Cure Claim. The Debtors, with the consent of the Required Consenting Noteholders, or the Reorganized Debtors, as applicable, may settle any Cure Claims without any further notice to or action, order, or approval of the Bankruptcy Court.

Unless otherwise agreed upon in writing by the parties to the applicable Executory Contract or Unexpired Lease, any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption must be Filed, served, and actually received by the counsel to the Debtors and the U.S. Trustee on the Confirmation Objection Deadline or other deadline that may be set by the Court. Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption will be deemed to have assented to such assumption.

In the event of a dispute regarding (1) the amount of any Cure Claim; (2) the ability of the Reorganized Debtors or any assignee to provide adequate assurance of future performance under the Executory Contract or Unexpired Lease to be assumed; or (3) any other matter pertaining to assumption or the payment of Cure Claims, payment of a Cure Claim, if any, shall occur as soon as reasonably practicable after the entry of a Final Order resolving such dispute and approving such assumption.

Each Debtor or Reorganized Debtor, as applicable, shall be authorized to reject any Executory Contract or Unexpired Lease to the extent the Debtor or the Reorganized Debtor, as applicable, in the exercise of its sound business judgment, concludes that the amount of the Cure obligation as determined by Final Order or as otherwise finally resolved, renders assumption of such Executory Contract or Unexpired Lease unfavorable to the applicable Debtor's Estate or the Reorganized Debtor. Such rejected Executory Contracts or Unexpired Leases shall be deemed as listed on the Rejected Executory Contract and Unexpired Lease List, if any.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption. **Any Proof of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.**

D.    *Insurance Policies*

Each of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto, are treated as Executory Contracts under the Plan. On the Effective Date, the Debtors shall be deemed to have assumed all insurance policies and any agreements, documents, and instruments relating to coverage of all insured Claims. Except as set forth in Article V.F of the Plan, nothing in this Plan, the Plan Supplement, the Disclosure Statement, the Confirmation Order, or any other order of the Bankruptcy Court (including any other provision that purports to be preemptory or supervening), (1) alters, modifies, or otherwise amends the terms and conditions of (or the coverage provided by) any of such insurance policies or (2) alters or modifies the duty, if any, that the insurers or third party administrators pay claims covered by such insurance policies and their right to seek payment or reimbursement from the Debtors (or after the Effective Date, the Reorganized Debtors) or draw on any collateral or security therefor. For the avoidance of doubt, insurers and third party administrators shall not need to nor be required to File or serve a Cure objection or a request, application, claim, Proof of Claim, or motion for payment and shall not be subject to any claims bar date or similar deadline governing Cure amounts or Claims.

E.    *Indemnification Provisions*

On and as of the Effective Date, the Indemnification Provisions will be assumed and irrevocable and will survive the effectiveness of the Plan, and the Reorganized Debtors' New Pyxus Constituent Documents will provide for the indemnification, defense, reimbursement, exculpation, and/or limitation of liability of, and advancement of fees and expenses to the Debtors' and the Reorganized Debtors' current and former directors, officers, managers, and employees at least to the same extent as the organizational documents of each of the respective Debtors on the Petition Date. None of the Debtors, or the Reorganized Debtors, as applicable, will amend and/or restate their respective governance documents before or after the Effective Date to amend, augment, terminate, or adversely affect any of the Debtors' or the Reorganized Debtors' obligations to provide such indemnification rights or such current or former directors', officers', managers, or employees' indemnification rights.

On and as of the Effective Date, any of the Debtors' indemnification obligations with respect to any contract or agreement that is the subject of or related to any litigation against the Debtors or Reorganized Debtors, as applicable, shall be assumed by the Reorganized Debtors and otherwise remain unaffected by the Chapter 11 Cases.

F.    *Director, Officer, Manager, and Employee Liability Insurance*

On the Effective Date, pursuant to section 365(a) of the Bankruptcy Code, the Debtors shall be deemed to have assumed all of the D&O Liability Insurance Policies (including, if applicable, any "tail policy") and any agreements, documents, or instruments relating thereto. Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Reorganized Debtors' assumption of all such policies (including, if applicable, any "tail policy").

After the Effective Date, none of the Debtors or the Reorganized Debtors shall terminate or otherwise reduce the coverage under any such policies (including, if applicable, any "tail policy") with respect to conduct occurring prior to the Effective Date, and all officers, directors, managers, and employees of the Debtors who served in such capacity at any time before the Effective Date shall be entitled to the full benefits of any such policies regardless of whether such officers, directors, managers, or employees remain in such positions after the Effective Date.

On and after the Effective Date, each of the Reorganized Debtors shall be authorized to purchase a directors' and officers' liability insurance policy for the benefit of their respective directors, members, trustees, officers, and managers in the ordinary course of business.

G.    *Employee and Retiree Benefits*

Except as otherwise provided in the Plan, on and after the Effective Date, without limiting any authority to modify the same provided to the Reorganized Debtors and/or the Reorganized Pyxus Board under the Debtors' respective formation and constituent documents, employment policies, and contracts or under law, *provided*, that no modification shall impact any obligations arising prior to the Petition Date, the Reorganized Debtors shall:  (1)  honor in the ordinary course of business any assumed contracts, agreements, policies, programs, and plans, in accordance with their respective terms, for, among other things, compensation (including any incentive plans), retention plans, health care benefits, disability benefits, deferred compensation benefits, savings, severance benefits, retirement benefits, SERP benefits, SRAP benefits, welfare benefits, workers' compensation insurance, and accidental death and dismemberment insurance for the directors, officers, and employees of any of the Debtors who served in such capacity from and after the Petition Date; and (2) honor, in the ordinary course of business, Claims of employees employed as of the Effective Date for accrued vacation time arising prior to the Petition Date and not otherwise paid pursuant to a Bankruptcy Court order. Notwithstanding the foregoing, pursuant to section 1129(a)(13) of the Bankruptcy Code, from and after the Effective Date, all retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code) shall continue to be paid in accordance with applicable law.

Notwithstanding any other provision in the Plan, any provisions in any of the aforementioned compensation and benefits programs that provide rights to purchase or receive Pyxus Common Stock shall be cancelled and given no effect to the extent such Pyxus Common Stock has not been issued as of the Petition Date (and will be null and void and have no effect with respect to shares of New Common Stock after the Effective Date).

H.    *Modifications, Amendments, Supplements, Restatements, or Other Agreements*

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other

agreements that in any manner affect such Executory Contract or Unexpired Lease, and Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

I.      *Reservation of Rights*

Neither the assumption of any Executory Contract or Unexpired Lease pursuant to the Plan nor exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Rejected Executory Contract and Unexpired Lease List, if any, nor anything contained in the Plan or Plan Supplement, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder.

If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption, the Debtors or the Reorganized Debtors, as applicable, shall have thirty calendar days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease, including by rejecting such contract or lease *nunc pro tunc* to the Confirmation Date. The deemed assumption provided for herein shall not apply to any such contract or lease, and any such contract or lease shall be assumed or rejected only upon motion of the Debtor following the Bankruptcy Court's determination that the contract is executory or the lease is unexpired.

J.      *Nonoccurrence of Effective Date*

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code, unless such deadline(s) have expired.

K.      *Contracts and Leases Entered Into After the Petition Date*

Contracts and leases entered into after the Petition Date by any Debtor and any Executory Contracts and Unexpired Leases assumed by any Debtor may be performed by the applicable Reorganized Debtor in the ordinary course of business.

## ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

A.      *Timing and Calculation of Amounts to Be Distributed*

Unless otherwise provided in the Plan, on the Effective Date, or as soon as reasonably practicable thereafter (or if a Claim or Interest is not an Allowed Claim or Interest on the Effective Date, on the date that such Claim becomes an Allowed Claim or Interest or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim and Interest shall receive the full amount of the distributions that the Plan provides for Allowed Claims and Interests in each applicable Class and in the manner provided in the Plan. If any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date. If and to the extent that there are Disputed Claims or Interests, distributions on account of any such Disputed Claims or Interests shall be made pursuant to the provisions set forth in Article VII of this Plan. Except as otherwise provided in the Plan, Holders of Claims and Interests shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date. The Debtors shall have no obligation to recognize any transfer of Claims or Interests occurring on or after the Distribution Record Date.

B.      *Distributions on Account of Obligations of Multiple Debtors*

For all purposes associated with distributions under the Plan, all guarantees by any Debtor of the obligations of any other Debtor, as well as any joint and several liability of any Debtor with respect to any other Debtor, shall be deemed eliminated so that any obligation that could otherwise be asserted against more than one Debtor shall result in a single distribution under the Plan; *provided* that Claims held by a single Entity at different Debtors that are not based on guarantees or joint and several liability shall be entitled to the applicable distribution for such Claim at each applicable Debtor. Any such Claims shall be released and discharged pursuant to Article VIII of the Plan and shall be subject to all potential objections, defenses, and counterclaims, and to estimation pursuant to section 502(c) of the Bankruptcy Code. For the avoidance of doubt, this shall not affect the obligation of each and every Debtor to pay U.S. Trustee fees until such time as a particular case is closed, dismissed, or converted.

C.      *Distribution Agent*

Except as otherwise provided in the Plan, all distributions under the Plan shall be made by the Distribution Agent on the Effective Date or as soon as reasonably practicable thereafter. The Distribution Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.

D.      *Rights and Powers of Distribution Agent*

1.      Powers of the Distribution Agent

The Distribution Agent shall be empowered to: (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Distribution Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Distribution Agent to be necessary and proper to implement the provisions hereof.

2.       Expenses Incurred On or After the Effective Date

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and out-of-pocket expenses incurred by the Distribution Agent on or after the Effective Date (including taxes) and any reasonable compensation and out-of-pocket expense reimbursement claims (including reasonable, actual, and documented attorney and/or other professional fees and expenses) made by the Distribution Agent shall be paid in Cash by the Reorganized Debtors.

E.       *Delivery of Distributions*

1.       Delivery of Distributions in General

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be made to Holders of record as of the Distribution Record Date by the Reorganized Debtors or the Distribution Agent, as appropriate: (a) to the signatory set forth on any Proof of Claim or Proof of Interest Filed by such Holder or other representative identified therein (or at the last known addresses of such Holder if no Proof of Claim or Proof of Interest is Filed or if the Debtors have not been notified in writing of a change of address); (b) at the addresses set forth in any written notices of address changes delivered to the Reorganized Debtors or the applicable Distribution Agent, as appropriate, after the date of any related Proof of Claim or Proof of Interest; or (c) on any counsel that has appeared in the Chapter 11 Cases on the Holder's behalf. Subject to this Article VI distributions under the Plan on account of Allowed Claims shall not be subject to levy, garnishment, attachment, or like legal process, so that each Holder of an Allowed Claim shall have and receive the benefit of the distributions in the manner set forth in the Plan. The Debtors, the Reorganized Debtors, and the Distribution Agent, as applicable, shall not incur any liability whatsoever on account of any distributions under the Plan except for fraud, gross negligence, or willful misconduct.

2.       Undeliverable Distributions and Unclaimed Property

In the event that any distribution to any Holder is returned as undeliverable, no distribution to such Holder shall be made unless and until the Distribution Agent has determined the then-current address of such Holder, at which time such distribution shall be made to such Holder without interest; *provided*, *however*, that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of six months from the later of (a) the Effective Date and (b) the date of the distribution. After such date, all unclaimed property or interests in property shall revert to the Reorganized Debtors automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial, or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder to such property or interest in property shall be discharged of and forever barred.

3.       No Fractional Distributions

No fractional notes or shares, as applicable, of the New Common Stock shall be distributed, and no Cash shall be distributed in lieu of such fractional amounts. When any distribution pursuant to the Plan on account of an applicable Allowed Claim would otherwise result in the issuance of a number of notes or shares, as applicable, of the New Common Stock that is not a whole number, the actual distribution of notes or shares, as applicable, of the New Common Stock shall be rounded

46

as follows: (a) fractions of one-half (½) or greater shall be rounded to the next higher whole number and (b) fractions of less than one-half (½) shall be rounded to the next lower whole number with no further payment therefor. The total number of authorized notes and shares, as applicable, of the New Common Stock shall be adjusted as necessary to account for the foregoing rounding.

F.    *Manner of Payment*

At the option of the Distribution Agent, any Cash payment to be made under the Plan may be made by check or wire transfer or as otherwise required or provided in applicable agreements.

G.    *Compliance Matters*

In connection with the Plan, to the extent applicable, the Reorganized Debtors and the Distribution Agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors and the Distribution Agent shall (1) be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate and (2) reasonably cooperate with the relevant recipients to minimize any such withholding to the extent permitted by applicable law. The Reorganized Debtors reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances.

H.    *No Postpetition or Default Interest on Claims*

Unless otherwise specifically provided for in the Plan, the DIP Orders, or the Confirmation Order, and notwithstanding any documents that govern the Debtors' prepetition indebtedness to the contrary, (1) postpetition and/or default interest shall not accrue or be paid on any Claims and (2) no Holder of a Claim shall be entitled to: (a) interest accruing on or after the Petition Date on any such Claim; or (b) interest at the contract default rate, as applicable.

I.    *Allocation Between Principal and Accrued Interest*

Except as otherwise provided in the Plan, the aggregate consideration paid to Holders with respect to their Allowed Claims shall be treated pursuant to the Plan as allocated first to the principal amount (as determined for federal income tax purposes) of such Allowed Claims (to the extent thereof) and, thereafter, to the interest, if any, on such Allowed Claim accrued through the Petition Date.

J.    *Setoffs and Recoupment*

Unless otherwise provided in the Plan or the Confirmation Order, each Debtor and each Reorganized Debtor, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the Holder of a Claim, may set off against or recoup any Allowed Claim and the distributions to be made pursuant to the Plan on

account of such Allowed Claim (before any distribution is made on account of such Allowed Claim), any claims, rights, and Causes of Action of any nature that such Debtor or Reorganized Debtor, as applicable, may hold against the Holder of such Allowed Claim, to the extent such claims, rights, or Causes of Action against such Holder have not been otherwise compromised or settled as of the Effective Date (whether pursuant to the Plan or otherwise); *provided*, *however*, that neither the failure to effect such a setoff or recoupment nor the allowance of any Claim pursuant to the Plan shall constitute a waiver or release by such Debtor or Reorganized Debtor of any such claims, rights, and Causes of Action that such Reorganized Debtor may possess against such Holder. In no event shall any Holder of Claims be entitled to set off or recoup any such Claim against any claim, right, or Cause of Action of the Debtor or Reorganized Debtor (as applicable), unless such Holder has Filed a motion with the Bankruptcy Court requesting the authority to perform such setoff or recoupment on or before the Confirmation Date, and notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of setoff or recoupment pursuant to section 553 of the Bankruptcy Code or otherwise.

K.    *Claims Paid or Payable by Third Parties*

1.    Claims Paid by Third Parties

A Claim shall be reduced in full, and such Claim shall be disallowed without an objection to such Claim having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or Reorganized Debtor. To the extent that a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such Holder shall repay, return, or deliver any distribution held by or transferred to the Holder to the applicable Reorganized Debtor to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.

2.    Claims Payable by Third Parties

The availability, if any, of insurance policy proceeds for the satisfaction of an Allowed Claim shall be determined by the terms of the insurance policies of the Debtors or Reorganized Debtors, as applicable. To the extent that one or more of the Debtors' insurers agrees to satisfy in full a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, such Claim may be expunged to the extent of any agreed upon satisfaction on the Claims Register by the Solicitation Agent without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

3.    Applicability of Insurance Policies

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of an applicable insurance policy. Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall

anything contained in the Plan constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

# ARTICLE VII.
## PROCEDURES FOR RESOLVING DISPUTED CLAIMS AND INTERESTS

A.      *Disputed Claims Process*

Holders of Claims and Interests are not required to File a Proof of Claim or Proof of Interest, as applicable, with the Bankruptcy Court and shall be subject to the Bankruptcy Court process only to the extent provided in the Plan, except to the extent a Claim arises on account of rejection of an Executory Contract or Unexpired Lease in accordance with Article V.B hereof. On and after the Effective Date, except as otherwise provided in the Plan, all Allowed Claims shall be paid pursuant to the Plan in the ordinary course of business of the Reorganized Debtors and shall survive the Effective Date as if the Chapter 11 Cases had not been commenced. Other than Claims arising from the rejection of an Executory Contract or Unexpired Lease, if the Debtors or the Reorganized Debtors dispute any Claim or Interest, such dispute shall be determined, resolved, or adjudicated, as the case may be, in a manner as if the Chapter 11 Cases had not been commenced and shall survive the Effective Date as if the Chapter 11 Cases had not been commenced. Solely to the extent that an Entity is required to File a Proof of Claim and the Debtors or the Reorganized Debtors, as applicable, do not determine, and without the need for notice to or action, order, or approval of the Bankruptcy Court, that the Claim subject to such Proof of Claim is Allowed, such Claim shall be Disputed unless Allowed or disallowed by a Final Order or as otherwise set forth in this Article VII of the Plan. For the avoidance of doubt, there is no requirement to File a Proof of Claim or Proof of Interest (or move the Court for allowance) to be an Allowed Claim or Allowed Interest, as applicable, under the Plan except as otherwise provided in Article V.B. **All Proofs of Claim required to be Filed by the Plan that are Filed after the date that they are required to be Filed pursuant to the Plan shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against, as applicable, the Debtors, the Reorganized Debtors, the Estates, or the property of the foregoing parties, without the need for any objection by the Debtors or the Reorganized Debtors, as applicable, or further notice to, or action, order or approval of the Bankruptcy Court or any other Entity in accordance with Article V.B.**

B.      *Claims Administration Responsibilities.*

Except as otherwise specifically provided in the Plan, after the Effective Date, the Reorganized Debtors shall have the sole authority to: (1) File, withdraw, or litigate to judgment, objections to Claims or Interests; (2) settle or compromise any Disputed Claim or Interest without any further notice to or action, order, or approval by the Bankruptcy Court; and (3) administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court. For the avoidance of doubt, except as otherwise provided in the Plan, from and after the Effective Date, each Reorganized Debtor shall have and retain any and all rights and defenses such Debtor had immediately prior to the Effective Date with respect to any Disputed Claim or Interest, including the Causes of Action retained pursuant to the Plan.

C.      *Estimation of Claims and Interests*

Before or after the Effective Date, the Debtors or the Reorganized Debtors, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Disputed Claim or Interest that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party in interest previously has objected to such Claim or Interest or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim or Interest, including during the litigation of any objection to any Claim or Interest or during the appeal relating to such objection. Notwithstanding any provision otherwise in the Plan, a Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim or Interest, that estimated amount shall constitute a maximum limitation on such Claim or Interest for all purposes under the Plan (including for purposes of distributions), and the relevant Reorganized Debtor may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim or Interest.

D.      *Adjustment to Claims Without Objection*

Any duplicate Claim or Interest or any Claim or Interest that has been paid, satisfied, amended, or superseded may be adjusted or expunged on the Claims Register by the Reorganized Debtors without the Reorganized Debtors having to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Bankruptcy Court.

E.      *No Distributions Pending Allowance*

Notwithstanding any other provision hereof, if any portion of a Claim or Interest is a Disputed Claim or Interest, as applicable, no payment or distribution provided hereunder shall be made on account of such Claim or Interest unless and until such Disputed Claim or Interest becomes an Allowed Claim or Interest.

F.      *Distributions After Allowance*

To the extent that a Disputed Claim or Interest ultimately becomes an Allowed Claim or Interest, distributions (if any) shall be made to the Holder of such Allowed Claim or Interest in accordance with the provisions of the Plan. As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim or Interest becomes a Final Order, the Distribution Agent shall provide to the Holder of such Claim or Interest the distribution (if any) to which such Holder is entitled under the Plan as of the Effective Date, without any interest to be paid on account of such Claim or Interest.

G.      *No Interest*

Interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

**ARTICLE VIII.**
**SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS**

A.    *Compromise and Settlement of Claims, Interests, and Controversies*

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable. In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtors may compromise and settle Claims against, and Interests in, the Debtors and their Estates and Causes of Action against other Entities.

B.    *Binding Effect*

**On the Effective Date, and effective as of the Effective Date, the Plan will bind, and will be deemed binding upon, all Holders of Claims against and Interests in the Debtors, and each Holder's respective successors and assigns, to the maximum extent permitted by applicable law, notwithstanding whether or not any such Holder (1) will receive or retain any property or interest in property under the Plan, (2) has Filed a Proof of Claim or Proof of Interest in the Chapter 11 Cases, or (3) voted to accept or reject the Plan.**

C.    *Discharge of Claims*

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Debtor Intercompany Claims or Non-Debtor Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors prior to the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (1) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section

51

501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted the Plan or voted to reject the Plan. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the occurrence of the Effective Date, except as otherwise specifically provided in the Plan. For the avoidance of doubt, Allowed General Unsecured Claims shall be discharged in accordance with this Article VIII.C on the date each such Allowed General Unsecured Claim is satisfied in the ordinary course of business in accordance with the terms and conditions of the particular transaction or agreement giving rise to such Allowed General Unsecured Claims.

D.     *Release of Liens*

**Except (1) with respect to the Liens securing Other Secured Claims that are Reinstated pursuant to the Plan, or (2) as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates and, subject to the consummation of the applicable distributions contemplated in the Plan, shall be fully released and discharged, at the sole cost of and expense of the Reorganized Debtors, and the Holders of such mortgages, deeds of trust, Liens, pledges, or other security interests shall execute such documents as may be reasonably requested by the Debtors or the Reorganized Debtors, as applicable, to reflect or effectuate such releases, and all of the right, title, and interest of any Holders of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the applicable Reorganized Debtor and its successors and assigns.**

E.     *Debtor Release*

**Effective as of the Effective Date, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Effective Date, each Released Party is deemed released and discharged by each and all of the Debtors, the Reorganized Debtors, and their Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Causes of Action, whether known or unknown (including any derivative claims, asserted or assertable on behalf of any of the Debtors) that the Debtors, the Reorganized Debtors, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), the purchase, sale, or rescission of any Security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the DIP Facility, the DIP Orders, the First Lien Notes, the Second Lien Notes, the Exit ABL Facility, the Exit Term Facility, the Exit Secured Notes or Replacement First Lien Financing, as applicable, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, entry into, or**

Filing of, as applicable, the Restructuring Support Agreement and related prepetition transactions, the Disclosure Statement, the New Pyxus Constituent Documents, the New Shareholders Agreement, the Plan, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the New Pyxus Constituent Documents, the New Shareholders Agreement, or the Plan (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion), the Plan Supplement, the Filing of the Chapter 11 Cases, the pursuit of Confirmation of the Plan, the pursuit of Consummation of the Plan, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act, omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date except for claims or liabilities arising out of or relating to any act or omission by a Released Party that is determined in a Final Order of a court of competent jurisdiction to have constituted actual fraud. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any obligations arising after Consummation of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, including the assumption of the Indemnification Provisions as set forth in the Plan.

F.    *Third-Party Release*

Effective as of the Effective Date, each Releasing Party, in each case on behalf of itself and its respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, is deemed to have released and discharged each Debtor, Reorganized Debtor, and Released Party from any and all Causes of Action, whether known or unknown (including any derivative claims, asserted or assertable on behalf of any of the Debtors) that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership or operation thereof), the purchase, sale, or rescission of any Security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the DIP Facility, the DIP Orders, the First Lien Notes, the Second Lien Notes, the Exit ABL Facility, the Exit Term Facility, the Exit Secured Notes or Replacement First Lien Financing, as applicable, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, entry into, or Filing of, as applicable, the Restructuring Support Agreement and related prepetition transactions, the Disclosure Statement, the New Pyxus Constituent Documents, the New Shareholders Agreement, the Plan, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the New Pyxus Constituent Documents, the New Shareholders Agreement, or the Plan (including, for the

avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion), the Plan Supplement, the Filing of the Chapter 11 Cases, the pursuit of Confirmation of the Plan, the pursuit of Consummation of the Plan, the administration and implementation of the Plan, including the issuance or distribution of any Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act, omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date except for claims or liabilities arising out of or relating to any act or omission by a Released Party that is determined in a Final Order of a court of competent jurisdiction to have constituted actual fraud. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any obligations arising after Consummation of any party or Entity under the Plan, any Restructuring Transaction, any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, including the assumption of the Indemnification Provisions as set forth in the Plan.

G.    *Exculpation*

Effective as of the Effective Date, to the fullest extent permissible under applicable law and without affecting or limiting either the Debtor Release or the Third-Party Release, and except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is released and exculpated from any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the formulation, preparation, dissemination, negotiation, entry into, or Filing of, as applicable, the Restructuring Support Agreement and related prepetition transactions, the Chapter 11 Cases, the Disclosure Statement, the Plan, the Plan Supplement, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the Filing of the Chapter 11 Cases, the pursuit of Confirmation of the Plan, the pursuit of Consummation of the Plan, the administration and implementation of the Plan, including the issuance of any Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion), except for claims or liabilities arising out of or relating to any act or omission that is determined in a Final Order of a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

H.      *Injunction*

**Effective as of the Effective Date, pursuant to section 524(a) of the Bankruptcy Code, to the fullest extent permissible under applicable law, and except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities that have held, hold, or may hold Claims or Interests that have been released, discharged, or are subject to exculpation are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties: (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (3) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims or Interests unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a claim or interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released or settled pursuant to the Plan.**

I.      *Protection Against Discriminatory Treatment*

In accordance with section 525 of the Bankruptcy Code, and consistent with paragraph 2 of Article VI of the United States Constitution, no Governmental Unit shall discriminate against any Reorganized Debtor, or any Entity with which a Reorganized Debtor has been or is associated, or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, or discriminate with respect to such a grant against, the Reorganized Debtors, or another Entity with whom the Reorganized Debtors have been associated, solely because such Reorganized Debtor was a Debtor under chapter 11, may have been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before such Debtor was granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

J.      *Recoupment*

In no event shall any Holder of Claims or Interests be entitled to recoup any Claim or Interest against any claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

K.      *Reimbursement or Contribution*

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the Effective Date, such Claim shall be forever disallowed notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Effective Date (1) such Claim has been adjudicated as noncontingent, or (2) the relevant Holder of a Claim has Filed a noncontingent Proof of Claim on account of such Claim and a Final Order has been entered determining such Claim as no longer contingent.

L.      *Term of Injunctions or Stays*

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases (pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court) and existing on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

M.      *Document Retention*

On and after the Effective Date, the Reorganized Debtors may maintain documents in accordance with their standard document retention policy, as may be altered, amended, modified, or supplemented by the Reorganized Debtors.

## ARTICLE IX.
## CONDITIONS PRECEDENT TO THE EFFECTIVE DATE

A.      *Conditions to Effective Date*

The following are conditions to the occurrence of the Effective Date unless such conditions, or any of them, have been satisfied or waived pursuant to Article IX.B:

1.      the Restructuring Support Agreement shall remain in full force and effect and shall not have been terminated;

2.      the Final DIP Order shall remain in full force and effect and no event of default shall have occurred and be continuing under the DIP Facility;

3.      all conditions precedent to the effectiveness of the Exit ABL Facility in form and substance consistent with the Restructuring Support Agreement in all respects shall have been satisfied or duly waived (or shall be satisfied contemporaneously with consummation of the Plan);

4.      the Plan Supplement and all of the schedules, documents, and exhibits contained therein, and all other schedules, documents, supplements and exhibits to the Plan, shall have been Filed, and shall be in form and substance consistent with the Restructuring Support Agreement in all respects;

5. the Bankruptcy Court shall have entered the Confirmation Order in form and substance consistent with the Restructuring Support Agreement in all respects, and such Confirmation Order shall have become a Final Order;

6. the Debtors and applicable Consenting Noteholders shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan and each of the other transactions contemplated by the Restructuring Transactions;

7. the Definitive Restructuring Documents in form and substance consistent with the Restructuring Support Agreement in all respects shall, where applicable, have been executed and remain in full force and effect (with all conditions precedent thereto having been satisfied or waived in accordance with their terms);

8. the Plan shall not have been materially amended, altered or modified from the Plan as confirmed by the Confirmation Order, unless such material amendment, alteration or modification has been made in accordance with Article X.A of the Plan and the Restructuring Support Agreement;

9. all fees and expenses provided for in the Restructuring Support Agreement and the DIP Credit Agreement shall have been paid in full by the Debtors in accordance with the Restructuring Support Agreement and the DIP Credit Agreement, as applicable; and

10. the New Common Stock shall have been issued by Reorganized Pyxus in accordance with the Plan.

B.    *Waiver of Conditions to Confirmation or the Effective Date*

1. Subject to Noteholder Approval Rights and the terms of the Restructuring Support Agreement, each condition to the Effective Date set forth in Article IX.A may be waived in whole or in part at any time by the Debtors without an order of the Bankruptcy Court.

C.    *Substantial Consummation*

"Substantial Consummation" of the Plan, as defined in section 1101(2) of the Bankruptcy Code, with respect to any of the Debtors, shall be deemed to occur on the Effective Date with respect to such Debtor.

D.    *Effect of Non-Occurrence of Conditions to Consummation*

If the Effective Date does not occur with respect to any of the Debtors, the Plan shall be null and void in all respects with respect to such Debtor, and nothing contained in the Plan or the Disclosure Statement shall:  (1) constitute a waiver or release of any Claims by or Claims against or Interests in such Debtors; (2) prejudice in any manner the rights of such Debtors, any Holders of a Claim or Interest, or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking by such Debtors, any Holders, or any other Entity in any respect.

## ARTICLE X.
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

A.    *Modification of Plan*

Subject to Noteholder Approval Rights, the Debtors reserve the right to modify the Plan prior to Confirmation and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan. Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in the Plan, the Debtors expressly reserve their rights to alter, amend, or modify materially the Plan, one or more times, after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.

B.    *Effect of Confirmation on Modifications*

Entry of the Confirmation Order shall constitute approval of all modifications to the Plan occurring after the solicitation thereof pursuant to section 1127(a) of the Bankruptcy Code and a finding that such modifications to the Plan do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

C.    *Revocation or Withdrawal of Plan*

The Debtors reserve the right, subject to the terms of the Restructuring Support Agreement, to revoke or withdraw the Plan before the Confirmation Date and to File subsequent chapter 11 plans. If the Debtors revoke or withdraw the Plan, or if the Confirmation Date or the Effective Date does not occur, then: (1) the Plan will be null and void in all respects; (2) any settlement or compromise embodied in the Plan, assumption of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant hereto will be null and void in all respects; and (3) nothing contained in the Plan shall (a) constitute a waiver or release of any Claims, Interests, or Causes of Action, (b) prejudice in any manner the rights of any Debtor or any other Entity, or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by any Debtor or any other Entity.

## ARTICLE XI.
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1.    allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Claim or Interest and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims or Interests;

2.      decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.      resolve any matters related to Executory Contracts or Unexpired Leases, including: (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Cure Claims arising therefrom, including pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; and (c) any dispute regarding whether a contract or lease is or was executory or expired;

4.      ensure that distributions to Holders of Allowed Claims and Interests (as applicable) are accomplished pursuant to the provisions of the Plan and adjudicate any and all disputes arising from or relating to distributions under the Plan;

5.      adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6.      enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of (a) contracts, instruments, releases, indentures, and other agreements or documents approved by Final Order in the Chapter 11 Cases and (b) the Plan, the Confirmation Order, and contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan;

7.      enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

8.      grant any consensual request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code;

9.      adjudicate, decide, or resolve any and all matters related to the Restructuring Transactions;

10.      issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

11.      resolve any cases, controversies, suits, disputes, Causes of Action, or any other matters that may arise in connection with the Consummation, interpretation, or enforcement of the Plan, the Disclosure Statement, the Confirmation Order, or the Restructuring Transactions, or any Entity's obligations incurred in connection with the foregoing, including disputes arising under agreements, documents, or instruments executed in connection with the Plan, the Disclosure Statement, the Confirmation Order, or the Restructuring Transactions;

12.      hear, determine, and resolve any cases, matters, controversies, suits, disputes, or Causes of Action in connection with or in any way related to the Chapter 11 Cases, including:

(a) with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or an Interest for amounts not timely repaid pursuant to Article VI.K.1 of the Plan; (b) with respect to the releases, injunctions, and other provisions contained in Article VIII of the Plan, including entry of such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions; (c) that may arise in connection with the Consummation, interpretation, implementation, or enforcement of the Plan, the Confirmation Order, and, subject to any applicable forum selection clauses, contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan; or (d) related to section 1141 of the Bankruptcy Code;

13.    enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

14.    consider any modifications to the Plan before or after the Effective Date pursuant to section 1127 of the Bankruptcy Code, the Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, the Disclosure Statement or the Confirmation Order; or remedy any defect or omission or reconcile or clarify any inconsistency in any Bankruptcy Court order, the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document entered into, delivered or created in connection with the Plan, the Disclosure Statement or the Confirmation Order, in such manner as may be necessary or appropriate to consummate the Plan;

15.    hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

16.    enter an order or Final Decree concluding or closing the Chapter 11 Cases;

17.    enforce all orders previously entered by the Bankruptcy Court; and

18.    hear any other matter not inconsistent with the Bankruptcy Code;

*provided, however*, that the Bankruptcy Court shall not retain jurisdiction over disputes concerning documents contained in the Plan Supplement that have a jurisdictional, forum selection or dispute resolution clause that refers disputes to a different court, and any disputes concerning documents contained in the Plan Supplement that contain such clauses shall be governed in accordance with the provisions of such documents.

To the extent that it is legally impermissible for the Bankruptcy Court to have exclusive jurisdiction over any of the foregoing matters, the Bankruptcy Court will have non-exclusive jurisdiction over such matters to the extent legally permissible.

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter, including the matters set forth in this Article XI, the provisions of this Article XI shall have no effect upon and shall not control, prohibit or limit the exercise of jurisdiction by any other court having jurisdiction with respect to such matter.

# ARTICLE XII.
## MISCELLANEOUS PROVISIONS

A.    *Immediate Binding Effect*

Subject to Article IX.A hereof and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, and any and all Holders of Claims or Interests (irrespective of whether such Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.

B.    *Additional Documents*

Subject to and in accordance with the Debtors' obligations under the Restructuring Support Agreement, on or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. Subject to their respective obligations under the Restructuring Support Agreement as a party thereto, the Debtors or the Reorganized Debtors, as applicable, and all Holders of Claims and Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

C.    *Payment of Certain Fees and Expenses*

Without any further notice to or action, order, or approval of the Bankruptcy Court, the Debtors or Reorganized Debtors, as applicable, shall pay on the Effective Date all then-outstanding reasonable, undisputed, and documented unpaid fees and expenses incurred on or before the Effective Date by all of the attorneys, advisors, and other professionals payable under the Plan and the Restructuring Support Agreement, including the Trustee Restructuring Expenses and all fees and expenses set forth in Section 8(f) of the Restructuring Support Agreement, *provided, however,* that this paragraph shall not apply to Professional Fee Claims, which shall be paid in accordance with Article II.C.

D.    *Reservation of Rights*

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court has entered the Confirmation Order. None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests prior to the Effective Date.

E.    *Successors and Assigns*

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, director, agent, representative, attorney, beneficiary, or guardian, if any, of each Entity.

F.    *Service of Documents*

All notices, requests, and demands to or upon the Debtors to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided in the Plan, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

**If to the Debtors:**

Senior Vice President, Chief Legal Officer and Secretary
Pyxus International, Inc.
8001 Aerial Center Parkway
P.O. Box 2009
Morrisville, North Carolina 27560-8417

Attention:    Chief Legal Officer
Email:    woquinn@pyxus.com

*With copies to:*

Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, New York 10017

Attention:    Sandeep Qusba
              Michael Torkin
              Nicholas Baker
E-mail:    squsba@stblaw.com
           michael.torkin@stblaw.com
           nbaker@stblaw.com

*and*

Young Conaway Stargatt & Taylor, LLP
1000 North King Street
Wilmington, DE 19801

Attention:    Pauline K. Morgan
              Kara Hammond Coyle
E-mail:    pmorgan@ycst.com
           kcoyle@ycst.com

**If to the Ad Hoc First Lien Group represented by the First Lien Notes Representatives:**

Stroock & Stroock & Lavan LLP
180 Maiden Lane
New York, New York 10038-4982

Attention:      Kristopher M. Hansen
                Jonathan D. Canfield
                Allison Miller
Email:          khansen@stroock.com
                jcanfield@stroock.com
                amiller@stroock.com

**If to a Consenting First Lien Noteholder or Consenting Second Lien Noteholder that is represented by the Crossholder Notes Representatives:**

Wachtell, Lipton, Rosen & Katz
51 West 52nd Street
New York, New York 10019

Attention:      Joshua Feltman
                Benjamin S. Arfa
Email:          jafeltman@wlrk.com
                bsarfa@wlrk.com

After the Effective Date, the Reorganized Debtors shall have the authority to send a notice to Entities that continue to receive documents pursuant to Bankruptcy Rule 2002 requiring such Entity to File a renewed request to receive documents pursuant to Bankruptcy Rule 2002. After the Effective Date, the Reorganized Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests.

G.      *Entire Agreement*

Except as otherwise indicated, and without limiting the effectiveness of the Restructuring Support Agreement, the Plan (including, for the avoidance of doubt, the Plan Supplement) supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

H.      *Plan Supplement Exhibits*

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan. After the exhibits and documents are Filed, copies of such exhibits and documents shall be made available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from

https://www.primeclerk.com/Pyxus or the Bankruptcy Court's website at www.del.uscourts.gov/bankruptcy. Unless otherwise ordered by the Bankruptcy Court, to the extent any exhibit or document in the Plan Supplement is inconsistent with the terms of any part of the Plan that does not constitute the Plan Supplement, the Plan Supplement shall control. The documents considered in the Plan Supplement are an integral part of the Plan and shall be deemed approved by the Bankruptcy Court pursuant to the Confirmation Order.

I.      *Non-Severability*

Except as set forth in Article VIII of the Plan, the provisions of the Plan, including its release, injunction, exculpation and compromise provisions, and the Definitive Restructuring Documents, are mutually dependent and non-severable. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan and the Definitive Restructuring Documents are: (1) valid and enforceable pursuant to their terms; (2) integral to the Plan and may not be deleted or modified without the consent of the Debtors; and (3) non-severable and mutually dependent.

J.      *Votes Solicited in Good Faith*

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under the Plan and any previous plan, and, therefore, no such parties, individuals, or the Reorganized Debtors will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan and any previous plan.

K.      *Waiver or Estoppel*

Each Holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers Filed with the Bankruptcy Court prior to the Confirmation Date.

L.      *Closing of Chapter 11 Cases*

Upon the Effective Date, without the need to obtain further approval from the Bankruptcy Court, the Chapter 11 Cases of the Debtors identified as "Closing Cases" in the Plan Supplement shall be deemed closed as of the Effective Date without prejudice to the rights of any party in interest to seek to reopen such Chapter 11 Cases, and (1) all motions, contested matters, adversary proceedings, and other matters with respect to such Chapter 11 Cases shall be administered in the remaining Chapter 11 Cases of one or more Debtors, without prejudice to the rights of any party in interest, (2) the caption of the remaining Chapter 11 Cases shall be amended as necessary to reflect the closure of the applicable closing Chapter 11 Cases, and (3) a docket entry shall be made

by the clerk of the Bankruptcy Court in each of the closing Chapter 11 Cases that reflects the closure of those cases pursuant hereto.

Dated: June 14, 2020                    Respectfully submitted,


                                        By:___/s/ Joel L. Thomas_____
                                        Name: Joel L. Thomas
                                        Title:   Chief Financial Officer
                                        PYXUS INTERNATIONAL, INC., on behalf of itself and
                                        all other Debtors

                                        Prepared by:


                                        **YOUNG CONAWAY STARGATT & TAYLOR, LLP**

                                        Pauline K. Morgan (No. 3650)
                                        Kara Hammond Coyle (No. 4410)
                                        Ashley E. Jacobs (No. 5635)
                                        Tara C. Pakrouh (No. 6192)
                                        1000 North King Street
                                        Wilmington, Delaware 19801
                                        Telephone:    (302) 571-6600
                                        Facsimile:    (302) 571-1253
                                        Email:        pmorgan@ycst.com
                                                      kcoyle@ycst.com
                                                      ajacobs@ycst.com
                                                      tpakrouh@ycst.com


                                        - and -


                                        **SIMPSON THACHER & BARTLETT LLP**

                                        Sandeep Qusba (*pro hac vice* pending)
                                        Michael H. Torkin (*pro hac vice* pending)
                                        Kathrine A. McLendon (*pro hac vice* pending)
                                        Nicholas E. Baker (*pro hac vice* pending)
                                        425 Lexington Avenue
                                        New York, New York 10017
                                        Telephone:    (212) 455-2000
                                        Facsimile:    (212) 455-2502
                                        Email:        squsba@stblaw.com
                                                      michael.torkin@stblaw.com
                                                      kmclendon@stblaw.com
                                                      nbaker@stblaw.com


                                        *Proposed Counsel to the Debtors and Debtors in Possession*

**<u>Exhibit B</u>**

**Corporate Structure of the Debtors**



# Company Overview: Corporate Structure





PYXUS INTERNATIONAL, INC. (USA)
AOI RELIEF FUND, INC. (USA)
100%
ALLIANCE ONE INTERNATIONAL, LLC (USA) CO #140
DIBRELL BROTHERS, INCORPORATED (USA)
THE AUSTIN TOBACCO COMPANY, INC. (USA)
AUSTIN CAROLINA COMPANY (USA)
A. C. MONK & COMPANY, INC (USA)
CHINA AMERICAN TOBACCO COMPANY (USA)
CAROLINA LEAF TOBACCO COMPANY (USA)
DIMON INTERNATIONAL, INC. (USA)
MONK-AUSTIN INTERNATIONAL, INC. (USA)
W A ADAMS COMPANY (USA)
ALLIANCE ONE INTERNATIONAL SERVICES, INC.(USA)
TOBACCO SERVICES LLC (USA)
CRES TOBACCO COMPANY LLC (USA) CO
ALLIANCE ONE SPECIALTY PRODUCTS LLC* (USA) CO #120
EASTERN CAROLINA PACKAGING, LLC (USA) CO #129
AOSP INVESTMENTS LLC (USA) CO #122
51% HUMBLE SPECIALTY PRODUCTS LLC (USA)
50% PURILUM, LLC (USA) CO #133
40% NICOTINE RIVER LLC (USA) CO #1
100% TWELFTH STATE BRANDS, LLC (USA) CO #124
51% HUMBLE JUICE CO., LLC USA) CO #135
GLOBAL SPECIALTY PRODUCTS, LLC (USA) CO #125
100% PYXUS AGRICULTURE USA, LLC (USA) CO #136
100% GSP PROPERTIES, LLC (USA)
80% ZIP FULFILLMENT LLC (USA) CO #132
100% PUREAG-NC, LLC (USA) CO #126
100% CRITICALITY LLC (USA)
100% ALLIANCE ONE NORTH AMERICA, LLC (USA) CO #101
100% ALLIANCE ONE TOBACCO CANADA, INC. (CANADA) CO #113
100% BRITISH LEAF TOBACCO COMPANY OF CANADA, INC. (CANADA)
100% ALLIANCE ONE INTERNATIONAL HOLDINGS, LTD (UK) CO #741
100% INTABEX NETHERLANDS BV (NETHERLANDS) CO #709
100% FIGR BRANDS, INC. (CANADA)
100% FIGR CANADA HOLDING ULC (CANADA) CO # 128
94.3% CANADA'S ISLAND GARDENS, INC. (DBA FIGR EAST, INC.) (CANADA) CO #130
80% FIGR NORFOLK, INC (FKA GOLDLEAF PHARM, INC.) (CANADA) CO #131
100% ALLIANCE ONE ROTAG AG (FORMERLY DIMON ROTAG AG) (GERMANY) CO #204
99.999% ALLIANCE ONE MACEDONIA AD (MACEDONIA) CO #214
100% ALLIANCE ONE TOBACCO BULGARIA EOOD (BULGARIA) CO #210
100% DIMON SOUTH AFRICA (PTY) LTD (SOUTH AFRICA) CO #615
99.99% ALLIANCE ONE TOBACCO TANZANIA LTD. (TANZANIA) CO #607
35% ASSOCIATION OF TANZANIA TOBACCO TRADERS LTD(TANZANIA)
100% ALLIANCE ONE TOBACCO (UGANDA) LIMITED CO #647
100% DIMON HELLAS TOBACCO SA (GREECE) CO #206
55% PT INDONESIA TRI SEMBILAN (INDONESIA) CO #511
99.999% RIO GRANDE TABACOS (BRAZIL) CO #404
99.999% (0.001% AOIT BV) ALLIANCE ONE BRASIL EXPORTADORADE TABACOS LTDA (BRAZIL) CO #402
49% CHINA BRASIL TABACOS EXPORTADORA S/A. (BRAZIL)CO # 416
99.9% ALLIANCE ONE TABACO GUATEMALA SA (GUATEMALA)CO #303
100% ALLIANCE ONE TOBACCO D.O.O. (SERBIA) CO #226
95% (5% BY TCLTC) ALLIANCE ONE TOBACCO ARGENTINA SA (ARGENTINA) CO #307
100% MASHONALAND TOBACCO HOLDINGS (PVT) LTD (ZIMBABWE) CO #616
100% MASHONALAND TOBACCO COMPANY (ZIMBABWE) CO #643
100% KAYPACHA SAU (ARGENTINA)
100% ALLIANCE ONE INTERNATIONAL TABAK B.V. (NETHERLANDS) CO #703
All CHINA REP OFFICE
100% ALLIANCE ONE INTERNATIONAL GmbH (SWITZERLAND) CO # 702
VIETNAM REP OFFICE
100% STANDARD COMMERCIAL SA (SWITZERLAND) CO #722
99.99% ALLIANCE ONE TUTUN AS (TURKEY) CO #234
92% HERMAN TUTUN TIC (TURKEY)
50% ORYANTAL TUTUN PAKETLEME SANAYIE VE TICARET AS (TURKEY) CAB#251
100% WORLD LEAF TRADING FZE (DUBAI) CO #736
100% WORLD LEAF TRADING (WLT) AFRICA (MAURITIUS) CO# 738
100% WORLDLEAF TRADING CAYMAN (CAYMAN ISLANDS) CO #737
100% GLOBAL LEAF TRADING FZE (DUBAI) CO #739
100% CARRINGTON & MICHAUX AG (SWITZERLAND) CO #718
100% SCTS (UK) LTD. (UK) CO #723
100% DIMON INTERNATIONAL AG (SWITZERLAND)
100% ALLIANCE ONE INTERNATIONAL SERVICES LIMITED (UK) CO #705
100% SCTC (UK) LTD. (UK) CO #724
49% ALLIANCE ONE INDUSTRIES INDIA PVT LTD (INDIA) CO #506
99.99% ALLIANCE ONE TOBACCO (MALAWI) LTD CO #602*
99.99% IMPALA FARMING CO. LIMITED (MALAWI) CO #614
25% TOBACCO PROCESSORS ASSOCIATION LIMITED (MALAWI)
99.99% TABAGRI (2003) LIMITED (MALAWI) CO #635
99.99% TABMARC LIMITED (MALAWI) CO #636
100% INTABEX S.A. AG LTD (SWITZERLAND)
100% TRANS-CONTINENTAL LEAF TOBACCO AG (SWITZERLAND) CO # 734
100% W.A. ADAMS INTERNATIONAL AG (SWITZERLAND)
100% TRANS-CONTINENTAL LEAF TOBACCO CORP. LTD. (LIECHTENSTEIN) CO #725
100% MAURITIUS TOBACCO INVESTMENTS LTD (MAURITIUS) CO #730
100% LEAF TRADING COMPANY, LTD (RUSSIA) CO #728
100% GADORA TOBACCO, PSC (JORDAN) CO #740
100% STANCOM TOBACCO (PRIVATE) LTD. (ZIMBABWE) CO #644
99.6% SENA INVESTMENTS (PVT) LTD (ZIMBABWE) CO # 639
100% STANFIRE (PVT) LTD (ZIMBABWE)
99.95% KINGOLWIRA TOBACCO COMPANY LIMITED (TANZANIA) CO #648
50% ALLIANCE ONE TOBACCO (KENYA) LTD (KENYA) CO #629 50%
99.9995% (0.0005% AOI Services, Inc.) ALLIANCE ONE ZAMBIA LTD. (FKA STANCOM TOBACCO SERVICES LTD.) (ZAMBIA) CO #646
99.95% DIMON TANZANIA LTD. (TANZANIA)
99.90% (0.10% AOI SERVICES) PT ALLIANCE ONE INDONESIA (INDONESIA) CO #516
100% ALLIANCE ONE INTERNATIONAL SINGAPORE, PTE. LTD. (SINGAPORE) CO #505
99.98% ALLIANCE ONE SERVICES THAILAND LTD (THAILAND) CO # 514
60% ALLIANCE ONE MYANMAR COMPANY LIMITED (MYANMAR) CO #519
100% ALLIANCE ONE (BEIJING) ENTERPRISE MANAGEMENT AND CONSULTING CO. LTD. (CHINA)
100% ALLIANCE ONE (BEIJING)ENTERPRISE MANAGEMENT AND CONSULTING SERVICES CO., LTD KUNMING BRANCH
100% ALLIANCE ONE (BEIJING) ENTERPRISE MANAGEMENT AND CONSULTING SERVICES CO., LTD BAOSHAN BRANCH
100% ALLIANCE ONE (BEIJING) ENTERPRISE MANAGEMENT AND CONSULTING SERVICES CO., LTD GUIYANG BRANCH
100% ALLIANCE ONE (BEIJING) ENTERPRISE MANAGEMENT AND CONSULTING SERVICES CO., LTD CHENGDU BRANCH
49% ADAMS INTERNATIONAL LTD (THAILAND) CO #507
17% CHIENGMAI COMMERCIAL CO., LTD (THAILAND)
42.7% SINOVEST ENTERPRISES COL, LTD. (THAILAND)
49% SIAM TOBACCO EXPORT CORPORATION LTD. (THAILAND)CO #509
100% SOUTHERTON HOLDINGS (HONG KONG) LIMITED
100% GLOBAL LEAF SERVICES HONG KONG LIMITED (HONG KONG) CO #742
100% LI FU HENG LIAN (BEIJING) CONSULTING CO., LTD (CHINA)
100% PYXUS AGRICULTURE HOLDINGS LIMITED (UK) CO #815
100% PYXUS AGRICULTURE TANZANIA LTD (TANZANIA) CO #816
100% PYXUS AGRICULTURE LTD (MALAWI) CO #817
PYXUS AGRICULTURE CANADA, LTD. (CANADA)
ANTHOS BOTANICAL DOOEL (MACEDONIA) CO #252
1L/2L/ABL Obligor
DIP Guarantor
Sellers under receivables facility
Filing Entity
Borrower or Guarantor under a Foreign Line of Credit
* Alliance One Specialty Products, LLC is not a 2L Guarantor

## Exhibit C

**Restructuring Support Agreement**

Execution Version

**THIS RESTRUCTURING SUPPORT AGREEMENT IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF VOTES WITH RESPECT TO A CHAPTER 11 PLAN OF REORGANIZATION.  ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR, AS APPLICABLE, PROVISIONS OF THE BANKRUPTCY CODE**

---

**RESTRUCTURING SUPPORT AGREEMENT**

**by and among**

**PYXUS INTERNATIONAL, INC.**

**EACH OF ITS SUBSIDIARIES PARTY HERETO**

**and**

**EACH CONSENTING NOTEHOLDER PARTY HERETO**

**dated as of June 14, 2020**

---

# RESTRUCTURING SUPPORT AGREEMENT

PREAMBLE ........................................................................................................................... 1

RECITALS............................................................................................................................. 1

1.    DEFINITIONS; INTERPRETATION ................................................................. 2

2.    EFFECTIVENESS; ENTIRE AGREEMENT ..................................................11

3.    DEFINITIVE RESTRUCTURING DOCUMENTS.........................................11

4.    COVENANTS OF ALL PARTIES.....................................................................11

5.    ADDITIONAL COVENANTS OF THE CONSENTING NOTEHOLDERS........................12

6.    DIP FACILITY COMMITMENT.......................................................................14

7.    MILESTONES.......................................................................................................15

8.    ADDITIONAL COVENANTS OF THE COMPANY PARTIES...........................15

9.    NO WAIVER OF PARTICIPATION AND PRESERVATION OF RIGHTS ....................18

10.   MUTUAL REPRESENTATIONS AND WARRANTIES BY ALL PARTIES....................18

11.   ADDITIONAL REPRESENTATIONS AND WARRANTIES BY THE CONSENTING
      NOTEHOLDERS.................................................................................................19

12.   ADDITIONAL REPRESENTATIONS AND WARRANTIES BY THE COMPANY
      PARTIES ...............................................................................................................20

13.   TRANSFER RESTRICTIONS ...........................................................................21

14.   TERMINATION OF OBLIGATIONS................................................................22

15.   SPECIFIC PERFORMANCE .............................................................................27

16.   COUNTERPARTS ...............................................................................................28

17.   NO SOLICITATION AND ACKNOWLEDGEMENTS..................................28

18.   NOTEHOLDER CONSENT FEES; FEES GENERALLY .............................28

19.   GOVERNING LAW; CONSENT TO JURISDICTION..................................30

20.   INDEPENDENT ANALYSIS .............................................................................30

21.     THIRD-PARTY BENEFICIARIES ..........................................................................30

22.     NOTICES..................................................................................................................30

23.     SEVERABILITY .....................................................................................................31

24.     MUTUAL DRAFTING..............................................................................................32

25.     HEADINGS ...............................................................................................................32

26.     WAIVERS AND AMENDMENTS; RIGHTS OF THE AD HOC GROUP OF
        CONSENTING FIRST LIEN NOTEHOLDERS......................................................32

27.     SEVERAL, NOT JOINT, CLAIMS.........................................................................34

28.     INDEPENDENT NATURE OF CONSENTING NOTEHOLDERS' OBLIGATIONS AND
        RIGHTS. ....................................................................................................................34

29.     AUTOMATIC STAY. ...............................................................................................35

30.     SETTLEMENT DISCUSSIONS ..............................................................................35

31.     CONSIDERATION ...................................................................................................35

32.     CONFIDENTIALITY AND PUBLICITY ...............................................................35

33.     SURVIVAL ...............................................................................................................36


EXHIBIT A              FORM OF TRANSFER AGREEMENT
EXHIBIT B              RESTRUCTURING TERM SHEET
EXHIBIT C              DIP FACILITY TERM SHEET
EXHIBIT D              EXIT SECURED NOTES TERM SHEET
EXHIBIT E              EXIT TERM FACILITY TERM SHEET

## PREAMBLE

      This Restructuring Support Agreement (including all annexes, exhibits, term sheets and schedules attached hereto or thereto, in each case, as may be amended, modified or supplemented from time to time only in accordance with the terms hereof, this "<u>Agreement</u>"), dated as of June 14, 2020 (the "<u>Execution Date</u>"), is entered into by and among the following parties (each of the persons described in the following sub-clauses a "<u>Party</u>" and, collectively, the "<u>Parties</u>"):[1]

      i.    Pyxus International, Inc. (f/k/a Alliance One International, Inc.), a Virginia corporation ("<u>Pyxus</u>") and each of the undersigned subsidiaries of Pyxus (and together with Pyxus, the "<u>Company Parties</u>" or the "<u>Debtors</u>");

      ii.    severally and not jointly, each beneficial owner, or investment advisor, sub-advisor or manager thereof, of First Lien Notes that has executed and delivered a counterpart signature page to this Agreement as of the date hereof (together with their respective successors and permitted assigns and any subsequent beneficial owner, or investment advisor, sub-advisor or manager thereof, of First Lien Notes that becomes party to this Agreement in accordance with the terms hereof, collectively, the "<u>Consenting First Lien Noteholders</u>," and each a "<u>Consenting First Lien Noteholder</u>"); and

      iii.    severally and not jointly, each beneficial owner, or investment advisor, sub-advisor or manager thereof, of Second Lien Notes that has executed and delivered a counterpart signature page to this Agreement as of the date hereof (together with their respective successors and permitted assigns and any subsequent beneficial owner, or investment advisor, sub-advisor or manager thereof, of Second Lien Notes that becomes party to this Agreement in accordance with the terms hereof, collectively, the "<u>Consenting Second Lien Noteholders</u>," and each a "<u>Consenting Second Lien Noteholder</u>"; the Consenting First Lien Noteholders and the Consenting Second Lien Noteholders, collectively, the "<u>Consenting Noteholders</u>," and each a "<u>Consenting Noteholder</u>").

## RECITALS

      **WHEREAS**, the Parties have negotiated in good faith and at arm's-length a transaction that will effectuate a financial restructuring (the "<u>Restructuring</u>") of the capital structure and financial obligations of the Company Parties, on the terms and conditions set forth in this Agreement and the Definitive Restructuring Documents;

      **WHEREAS**, to effectuate the Restructuring, the Company Parties propose to (x) begin solicitation of votes for a joint prepackaged Chapter 11 plan of reorganization consistent with the terms of this Agreement and the Definitive Restructuring Documents, (y) commence voluntary prepackaged bankruptcy cases (collectively, the "<u>Chapter 11 Cases</u>") under Chapter 11

---

[1]    Capitalized terms used but not defined in the preamble and recitals to this Agreement have the meanings ascribed to them in Section 1 of this Agreement.

of the United States Bankruptcy Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), and (z) seek confirmation of the joint prepackaged Chapter 11 plan of reorganization and Bankruptcy Court approval of the other Definitive Restructuring Documents; and

**WHEREAS**, the Parties desire to express to each other their mutual support and commitment in respect of the Restructuring, including with respect to the consummation of the Plan and the execution, delivery and/or performance of the other Definitive Restructuring Documents.

## AGREEMENT

**NOW, THEREFORE**, in consideration of the covenants and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Party, intending to be legally bound hereby, agrees as follows:

1.    **Definitions; Interpretation**.

The general terms and conditions of the Restructuring are set forth in this Agreement. In the event the terms and conditions set forth in any Definitive Restructuring Document are inconsistent with this Agreement, the terms and conditions set forth in such other Definitive Restructuring Document shall govern. Each of the annexes, schedules, term sheets and exhibits attached hereto is expressly incorporated herein and made a part of this Agreement.

In this Agreement, unless the context otherwise requires:

(a)    words importing the singular also include the plural, and references to one gender include all genders;

(b)    the headings in this Agreement are inserted for convenience only and do not affect the construction of this Agreement and shall not be taken into consideration in its interpretation

(c)    the words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement;

(d)    the words "include," "includes," and "including" shall be deemed to be followed by the phrase "without limitation;" the word "or" is not exclusive;

(e)    the phrase "counsel to the Consenting Noteholders" refers to each counsel listed in Section 22 hereof other than counsel to the Company Parties;

(f)    references to any governmental entity or any governmental department, commission, board, bureau, agency, regulatory authority, instrumentality, or judicial or administrative body, in any jurisdiction shall include any successor to such entity; and

(g)    unless otherwise specified, any reference herein to an existing document, schedule, or exhibit shall mean such document, schedule, or exhibit, as it may have been or may be amended, restated, supplemented, or otherwise modified from time to time in accordance with the terms of this Agreement.

The following terms shall have the following meanings:

"Ad Hoc Group of Consenting First Lien Noteholders" means the *ad hoc* group of Consenting First Lien Noteholders advised by Stroock & Stroock & Lavan LLP, Pachulski Stang Ziehl & Jones LLP and Perella Weinberg Partners L.P; provided, that all rights expressly provided to the Ad Hoc Group of Consenting First Lien Noteholders and/or the Required Ad Hoc First Lien Consenting Noteholders in this Agreement or the Definitive Restructuring Documents (including all consent and termination rights in Sections 1, 14 and 26 of this Agreement) shall only be effective and enforceable until (i) the Minimum Threshold Condition ceases to be satisfied at any time or (ii) Pyxus obtains and accepts binding commitments for the Replacement First Lien Financing (as defined in the Restructuring Term Sheet) at any time on or prior to the date set forth in the Restructuring Term Sheet, and upon the occurrence of either such event such rights shall be null and void and from and after such time this Agreement and the Definitive Restructuring Documents shall be deemed automatically amended to remove all such rights; provided that, if with respect to the foregoing clause (ii), such binding commitments for the Replacement First Lien Financing are terminated, such consent rights shall be reinstated and thereafter be effective and enforceable; provided, further, that nothing in this definition shall be construed as amending, waiving, supplementing or otherwise modifying the Company's obligations to pay the Consenting Noteholder Advisors of the Ad Hoc Group of Consenting First Lien Noteholders to the extent provided in Section 8(f). The members of the Ad Hoc Group of Consenting First Lien Noteholders as of the Execution Date are identified on Schedule 2.

"Agreement" has the meaning set forth in the preamble hereto.

"Alternative Transaction" means (i) any alternative refinancing, recapitalization, share exchange, rights offering, equity investment or other transaction (in each case, other than the Restructuring) or any purchase, sale, or other disposition of all or a material portion of the Debtors' business or assets (including interests in any Debtor or its subsidiaries) taken as a whole, except for the sale of assets in the ordinary course of business, including with respect to the Debtors' existing receivables facilities, (ii) any merger, acquisition, consolidation, or similar business combination transaction involving a Debtor (excluding any intercompany transactions among any Company Parties) or (iii) any other reorganization, restructuring or other transaction the purpose or effect of which would be reasonably expected to, or which would, prevent or render impractical, or otherwise frustrate or impede in any material respect, the Restructuring, or is otherwise inconsistent with the Definitive Restructuring Documents. The Replacement First Lien Financing shall not be an Alternative Transaction and the solicitation, negotiation and consummation thereof shall be consistent with the Restructuring.

"Antitrust Laws" means the Sherman Act, as amended, the Clayton Act, as amended, the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, the Federal Trade Commission Act, as amended and all other laws (statutory or common), statutes, regulations, rules, codes or ordinances enacted, adopted, issued or promulgated by any U.S. or non-U.S.

federal, state, municipal, local, judicial, administrative, legislative or regulatory agency, department, commission, court, or tribunal of competent jurisdiction (including any branch, department or official thereof), that are designed or intended to prohibit, restrict or regulate actions having the purpose or effect of monopolization or restraint of trade or lessening of competition through merger or acquisition.

"<u>Bankruptcy Code</u>" has the meaning set forth in the recitals hereto.

"<u>Bankruptcy Court</u>" has the meaning set forth in the recitals hereto.

"<u>Bankruptcy Rules</u>" means the Federal Rules of Bankruptcy Procedure, promulgated under 28 U.S.C. § 2075, the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware, the Local Rules of Civil Practice and Procedure of the United States District Court for the District of Delaware, and general orders and chambers procedures of the Bankruptcy Court, each as applicable to the Chapter 11 Cases and as amended from time to time.

"<u>Board</u>" means the Board of Directors of Pyxus.

"<u>Business Day</u>" means any day, other than a Saturday, Sunday or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

"<u>Cash Collateral</u>" has the meaning set forth in Section 363(a) of the Bankruptcy Code.

"<u>Chapter 11 Cases</u>" has the meaning set forth in the recitals hereto.

"<u>Claim</u>" means any claim (as defined in Section 101(5) of the Bankruptcy Code) against any Debtor.

"<u>Company Parties</u>" has the meaning set forth in the recitals hereto.

"<u>Confirmation Order</u>" means the order confirming the Plan and any related motion or other pleadings, which shall be in form and substance reasonably satisfactory to (a) the Debtors, (b) the Required Consenting Noteholders and (c) the Required Ad Hoc First Lien Consenting Noteholders.

"<u>Consenting First Lien Noteholder</u>" has the meaning set forth in the preamble hereto.

"<u>Consenting Noteholder</u>" has the meaning set forth in the preamble hereto.

"<u>Consenting Noteholder Advisors</u>" means, (a) with respect to the Ad Hoc Group of Consenting First Lien Noteholders: Stroock & Stroock & Lavan LLP, Pachulski Stang Ziehl & Jones LLP and Perella Weinberg Partners L.P.; and (b) with respect to the Consenting Second Lien Noteholders: Wachtell, Lipton, Rosen & Katz, Morris, Nichols, Arsht & Tunnell LLP and TRS Advisors, LLC.

"Consenting Second Lien Noteholder" has the meaning set forth in the preamble hereto.

"Covered Claims/Interests" means, individually or in the aggregate, any Claims against or Interests in a Company Party, including the First Lien Notes Claims and the Second Lien Notes Claims.

"Debtors" has the meaning set forth in the recitals hereto.

"Definitive Restructuring Documents" has the meaning set forth in Section 3(a) hereof.

"DIP Credit Agreement" means a debtor-in-possession credit agreement (as amended, restated, supplemented or otherwise modified in accordance with its terms), by and among Pyxus, as borrower, and the lenders and agents from time to time party thereto, consistent in all material respects with the terms of and substantially in the form of the draft credit agreement attached as Annex II to the DIP Facility Term Sheet and otherwise reasonably satisfactory to (a) the Debtors and (b) the Financing Commitment Parties.

"DIP Documents" means, collectively, the DIP Credit Agreement and any and all other agreements, documents, and instruments delivered or entered into in connection therewith, including any guarantee agreements, pledge and collateral agreements, intercreditor agreements, and other security documents (and any joinders thereto).

"DIP Facility" means the debtor-in-possession facility to be provided to Pyxus in accordance with the terms, and subject in all respects to the conditions, set forth in the DIP Facility Term Sheet, the DIP Credit Agreement and the DIP Orders.

"DIP Facility Term Sheet" means the term sheet attached hereto as Exhibit C, including all annexes, exhibits and schedules attached thereto, as such term sheet may be amended, modified, or supplemented only in accordance with this Agreement.

"DIP Motion" means the motion to be filed by the Debtors in the Chapter 11 Cases seeking entry of the DIP Orders.

"DIP Orders" means collectively, the Interim DIP Order and the Final DIP Order.

"Disclosure Statement" means a disclosure statement containing "adequate information" (as that term is defined in Section 1125(a)(1) of the Bankruptcy Code) with respect to the Plan and the transactions contemplated thereby, and which otherwise is in form and substance reasonably satisfactory to (a) the Debtors, (b) the Required Consenting Noteholders and (c) the Required Ad Hoc First Lien Consenting Noteholders.

"Entity" has the meaning set forth in Section 101(15) of the Bankruptcy Code.

"Execution Date" has the meaning set forth in the preamble hereto.

"Exit ABL Credit Agreement" means a credit agreement for a senior secured asset-based revolving or term loan credit facility, by and among Reorganized Pyxus, the other applicable Company Parties, and the lenders and agents party thereto (which lenders may be third parties or one or more existing creditors of the Company Parties), which shall (i) become effective on the Plan Effective Date and (ii) be consistent with the Restructuring Term Sheet and otherwise in form and substance reasonably satisfactory to (a) the Debtors, (b) the Required Consenting Second Lien Noteholders, and (c) the Required Consenting First Lien Noteholders, solely with respect to any term or provision of the Exit ABL Credit Agreement that materially and adversely affects the rights of the Consenting First Lien Noteholders (in their capacities as such).

"Exit Intercreditor Agreement" means one or more intercreditor agreements by and among the agent and trustees under the Exit ABL Credit Agreement, the Exit Secured Notes Indenture or the Replacement First Lien Financing (as defined in the Restructuring Term Sheet), as applicable, and/or the Exit Term Facility Agreement in each case in form and substance reasonably satisfactory to (a) the Debtors, (b) the Required Consenting Noteholders and (c) the Required Ad Hoc First Lien Consenting Noteholders.

"Exit Secured Notes" means the notes issued by Reorganized Pyxus under the Exit Secured Notes Indenture on the Plan Effective Date to holders of First Lien Notes pursuant to the Plan.

"Exit Secured Notes Indenture" means an indenture by and among Reorganized Pyxus, as issuer, the guarantors named therein, and the trustee and collateral agent party thereto, providing for the issuance of the Exit Secured Notes, which indenture shall be (i) effective on the Plan Effective Date and (ii) substantially consistent with the Exit Secured Notes Term Sheet and otherwise in form and substance reasonably satisfactory to (a) the Debtors, (b) the Required Consenting Noteholders and (c) the Required Ad Hoc First Lien Consenting Noteholders.

"Exit Secured Notes Term Sheet" means the term sheet attached hereto as Exhibit D, as such term sheet may be amended, modified, or supplemented only in accordance with this Agreement.

"Exit Term Facility" means the term loan facility provided for under the Exit Term Facility Agreement.

"Exit Term Facility Agreement" means a credit agreement for the Exit Term Facility, by and among Reorganized Pyxus, the guarantors named therein, and the lenders and agents party thereto, which shall (i) become effective on the Plan Effective Date, (ii) be consistent with the terms and conditions set forth in the Exit Term Facility Term Sheet and otherwise in form and substance reasonably satisfactory to (a) the Debtors and (b) the Required Consenting Noteholders.

"Exit Term Facility Term Sheet" means the term sheet attached hereto as Exhibit E, as such term sheet may be amended, modified, or supplemented only in accordance with this Agreement.

"Expense Reimbursement Agreements" means, collectively, (i) that certain letter agreement, dated as of March 28, 2020, by and among Pyxus and Wachtell, Lipton, Rosen & Katz,

as counsel to certain Second Lien Noteholders, (ii) that certain letter agreement, dated as of March 15, 2020, by and among Pyxus, Wachtell, Lipton, Rosen & Katz, and TRS Advisors, LLC regarding the retention of TRS Advisors, LLC as advisor to certain Second Lien Noteholders, (iii) that certain letter agreement, dated as of April 13, 2020, by and among Pyxus and Stroock & Stroock & Lavan LLP, as counsel to the Ad Hoc Group of Consenting First Lien Noteholders and (iv) that certain letter agreement, dated as of June 14, 2020, by and among Pyxus, Stroock & Stroock & Lavan LLP, and Perella Weinberg Partners L.P. regarding the retention of Perella Weinberg Partners L.P. as advisor to the Ad Hoc Group of Consenting First Lien Noteholders.

"Final" means an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction with respect to the subject matter, which has not been reversed, stayed, modified or amended, and as to which (i) the time to appeal, petition for certiorari, or move for reargument or rehearing (other than a request for rehearing under Federal Rule of Civil Procedure 60(b), which shall not be considered for purposes of this definition) has expired and no appeal or petition for certiorari has been timely taken, or (ii) any timely appeal that has been taken or any petition for certiorari that has been or may be timely filed has been resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or has otherwise been dismissed with prejudice.

"Final DIP Order" means a final order entered by the Bankruptcy Court approving entrance into the DIP Facility and the use of Cash Collateral, and authorizing the entry into and performance of the DIP Credit Agreement, substantially in the form of the Interim DIP Order (subject to customary changes to make such order Final) and otherwise in form and substance reasonably satisfactory to (a) the Debtors, (b) the Financing Commitment Parties, (c) the Required Consenting Noteholders and (d) the Required Ad Hoc First Lien Consenting Noteholders.

"Financing Commitment Parties" means Glendon Capital Management LP, Monarch Alternative Capital LP, Owl Creek Asset Management, L.P. and Intermarket Corporation.

"First Day Pleadings" means the "first day" motions or pleadings that the Debtors determine are necessary or desirable to file in the Chapter 11 Cases, each in form and substance reasonably satisfactory to (a) the Debtors and (b) the Required Consenting Noteholders.

"First Lien Notes" means the $275,000,000 aggregate outstanding principal amount of 8.500% Senior Secured First Lien Notes due 2021 issued by Pyxus pursuant to the First Lien Notes Indenture.

"First Lien Notes Claims" has the meaning ascribed to it in the Restructuring Term Sheet.

"First Lien Notes Indenture" means that certain Indenture, dated as of October 14, 2016, by and among Pyxus, the guarantors named therein and The Bank of New York Mellon Trust Company, N.A., as trustee and collateral agent.

"First Lien Notes RSA Fee" means the fee payable to the Consenting First Lien Noteholders pursuant to Section 18(a) hereof.

"<u>Governing Body</u>" means the board of directors, board of managers, manager, general partner, investment committee, special committee, or such similar governing body of an Entity (including the Board).

"<u>Holder</u>" means any Entity that is the legal and/or beneficial owner of, or the investment advisor, sub-advisor or manager of, a Claim or Interest.

"<u>Initial Commitment Parties</u>" has the meaning set forth in <u>Section 6</u> hereof.

"<u>Interest</u>" means any equity security (as defined in Section 101(16) of the Bankruptcy Code) in any Debtor.

"<u>Interim DIP Order</u>" means an interim order entered by the Bankruptcy Court authorizing the entry into and performance of the DIP Credit Agreement and use of Cash Collateral and incorporating the terms and conditions set forth in the DIP Facility Term Sheet and otherwise in form and substance reasonably satisfactory to (a) the Debtors, (b) the Financing Commitment Parties, (c) the Required Consenting Noteholders and (d) the Required Ad Hoc First Lien Consenting Noteholders.

"<u>Milestone</u>" means, collectively, (i) the actions and events set forth in <u>Section 7</u> hereof and (ii) the corresponding deadlines for the performance or occurrence of such actions or events, as set forth in <u>Section 7</u> hereof.

"<u>Minimum Threshold Condition</u>" means the condition that, as of any time, the Ad Hoc Group of Consenting First Lien Noteholders collectively owns (or holds voting control of) at least 25% of the aggregate outstanding principal amount of the First Lien Notes.

"<u>New Common Stock</u>" means the common stock, limited liability company membership units, or functional equivalent thereof of Reorganized Pyxus.

"<u>New Pyxus Constituent Documents</u>" means the certificate of incorporation and the bylaws, or operating or other applicable agreement, of Reorganized Pyxus, each of which shall be consistent with the Restructuring Term Sheet and otherwise in form and substance reasonably satisfactory to (a) the Debtors, (b) the Required Consenting Second Lien Noteholders, and (c) the Required Consenting First Lien Noteholders, solely with respect to any term or provision of the New Pyxus Constituent Documents that materially affects the rights of the Consenting First Lien Noteholders (in their capacities as such).

"<u>New Shareholders Agreement</u>" means the shareholders agreement or operating or other applicable agreement, including all annexes, exhibits, and schedules thereto, that will govern certain matters related to the governance of Reorganized Pyxus and the New Common Stock, which agreement shall (i) become effective on the Plan Effective Date, (ii) be consistent with the terms and conditions set forth in the Restructuring Term Sheet and otherwise in form and substance reasonably satisfactory to (a) the Debtors and (b) the Required Consenting Second Lien Noteholders and (iii) be included in a supplement to the Plan.

"<u>Party</u>" or "<u>Parties</u>" has the meaning set forth in the preamble.

"<u>Permitted Transfer</u>" has the meaning set forth in <u>Section 13(a)</u> hereof.

"<u>Permitted Transferee</u>" has the meaning set forth in <u>Section 13(a)</u> hereof.

"<u>Person</u>" has the meaning set forth in Section 101(41) of the Bankruptcy Code.

"<u>Petition Date</u>" means the date on which the Debtors file voluntary petitions commencing the Chapter 11 Cases.

"<u>Plan</u>" means a joint prepackaged Chapter 11 plan of reorganization for the Debtors, including all annexes, exhibits, schedules and supplements thereto, (i) consistent with this Agreement and the Definitive Restructuring Documents and (ii) otherwise reasonably satisfactory to (a) the Debtors, (b) the Required Consenting Noteholders, and (c) the Required Ad Hoc First Lien Consenting Noteholders in each case as may be amended, modified or supplemented from time to time only in accordance with this Agreement.

"<u>Plan Effective Date</u>" means the date on which the Plan becomes effective in accordance with its terms.

"<u>Pyxus</u>" has the meaning set forth in the recitals hereto.

"<u>Qualified Marketmaker</u>" means an entity that (a) holds itself out to the public or the applicable private markets as standing ready in the ordinary course of business to purchase from customers and sell to customers claims of the Debtors (or enter with customers into long and short positions in claims against the Debtors), in its capacity as a dealer or marketmaker in claims against the Debtors, and (b) is, in fact, regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt).

"<u>Reorganized Pyxus</u>" means, collectively, Pyxus as reorganized pursuant to the Restructuring, together with any new holding company created prior to the Plan Effective Date that may be the ultimate parent of Reorganized Pyxus, and any successor(s) thereto.

"<u>Required Ad Hoc First Lien Consenting Noteholders</u>" means, as of any date of determination, members of the Ad Hoc Group of Consenting First Lien Noteholders who collectively hold a majority of the aggregate outstanding principal amount of First Lien Notes held by all members of the Ad Hoc Group of Consenting First Lien Noteholders; <u>provided</u> that for purposes of this definition, the term "Ad Hoc Group of Consenting First Lien Noteholders" excludes any Consenting First Lien Noteholder that, on the relevant date of determination, is in breach of any of its material obligations hereunder.

"<u>Required Consenting First Lien Noteholders</u>" means, as of any date of determination, Consenting First Lien Noteholders (comprising not fewer than 3 unaffiliated entities) who collectively own (or have voting control of) a majority of the aggregate outstanding principal amount of First Lien Notes held by all Consenting First Lien Noteholders at such time; <u>provided</u> that for purposes of this definition, the term "Consenting First Lien Noteholders" excludes any Holder of First Lien Notes that, on the relevant date of determination, is in breach of any of its material obligations hereunder.

"Required Consenting Noteholders" means the Required Consenting First Lien Noteholders and the Required Consenting Second Lien Noteholders.

"Required Consenting Second Lien Noteholders" means, as of any date of determination, Consenting Second Lien Noteholders (comprising not fewer than 3 unaffiliated entities) who collectively own (or have voting control of) a majority of the aggregate outstanding principal amount of Second Lien Notes held by all Consenting Second Lien Noteholders at such time; provided that for purposes of this definition, the term "Consenting Second Lien Noteholders" excludes any Holder of Second Lien Notes that, on the relevant date of determination, is in breach of any of its material obligations hereunder.

"Restructuring" has the meaning set forth in the recitals hereto.

"Restructuring Term Sheet" means the term sheet attached hereto as Exhibit B, including all annexes, exhibits and schedules attached thereto, as such term sheet may be amended, modified or supplemented only in accordance with this Agreement.

"SEC" means the United States Securities and Exchange Commission.

"Securities Act" means the Securities Act of 1933, as amended.

"Securities Act Rules" means Rule 501(a)(1), (2), (3), and (7) of the Securities Act.

"Second Lien Notes" means the $635,686,000 aggregate outstanding principal amount of 9.875% Senior Secured Second Lien Notes due 2021 issued by Pyxus pursuant to the Second Lien Notes Indenture.

"Second Lien Notes Claims" has the meaning ascribed to it in the Restructuring Term Sheet.

"Second Lien Notes Indenture" means that certain Indenture, dated as of August 1, 2013 by and among Pyxus, the guarantors named therein and Law Debenture Trust Company of New York, as trustee and collateral trustee.

"Second Lien Notes RSA Fee" means the fee payable to Consenting Second Lien Noteholders pursuant to Section 18(b) hereof.

"Solicitation" means the solicitation of votes on the Plan.

"Solicitation Materials" means the Disclosure Statement, the Plan, the letters of transmittal and the ballots and other documents required to solicit votes to accept or reject the Plan from Holders of First Lien Notes Claims and Second Lien Notes Claims, each in form and substance reasonably satisfactory to (a) the Debtors and (b) the Required Consenting Noteholders.

"Superior Alternative Transaction" has the meaning set forth in Section 8 hereof.

"Transfer" has the meaning set forth in Section 13(a) hereof.

"<u>Transfer Agreement</u>" has the meaning set forth in <u>Section 13(a)</u> hereof.

**2.**    **<u>Effectiveness; Entire Agreement</u>**. This Agreement shall become effective and binding upon each of the Parties on the first date upon which this Agreement has been executed and delivered by (w) Pyxus; (x) each undersigned subsidiary of Pyxus; (y) Consenting First Lien Noteholders who collectively own (or hold voting control of) at least 66 2/3% of the aggregate outstanding principal amount of the First Lien Notes; and (z) Consenting Second Lien Noteholders who collectively own (or hold voting control of) at least 66 2/3% of the aggregate outstanding principal amount of the Second Lien Notes.

(b)    With the exception of non-disclosure and confidentiality agreements among the Parties (and fee arrangements with Consenting Noteholder Advisors), this Agreement and the other Definitive Restructuring Documents executed and delivered on the Execution Date or hereafter collectively constitute the entire agreement of the Parties as of the Execution Date with respect to the subject matter hereof and thereof and supersedes all prior negotiations and documents reflecting such prior negotiations between and among the Parties (and their respective advisors) with respect to the Restructuring.

**3.**    **<u>Definitive Restructuring Documents</u>**. The definitive restructuring documents (the "<u>Definitive Restructuring Documents</u>") governing the Restructuring shall include the following: (i) the Plan; (ii) the Confirmation Order; (iii) the Disclosure Statement; (iv) the order of the Bankruptcy Court approving the Disclosure Statement and the other Solicitation Materials (which may be the Confirmation Order); (v) the First Day Pleadings and all orders sought pursuant thereto; (vi) the DIP Orders, the DIP Credit Agreement and the other DIP Documents and related documentation; (vii) the Exit ABL Credit Agreement; (viii) the Exit Term Facility Agreement; (ix) the Exit Secured Notes Indenture or the Replacement First Lien Financing Agreement, as applicable; (x) the Exit Intercreditor Agreements; (xi) the New Pyxus Constituent Documents; and (xii) the New Shareholders Agreement.

(b)    The Definitive Restructuring Documents not executed or in a form attached to this Agreement as of the Execution Date remain subject to negotiation and completion (but shall be consistent with the terms of this Agreement).  Upon completion, the Definitive Restructuring Documents and every other document, deed, agreement, filing, notification, letter, or instrument related to the Restructuring shall contain terms, conditions, representations, warranties and covenants (i) consistent with the terms of this Agreement, as they may be modified, amended or supplemented in accordance with this Agreement; and (ii) (A) satisfactory to the applicable Parties to the standards set forth in <u>Section 1</u> of this Agreement and (B) to the extent the standards for such document are not set forth in <u>Section 1</u>, (x) reasonably satisfactory to the Company Parties and the Required Consenting Noteholders and (y) to the extent affecting any economic term of the Restructuring or any other material term impacting the Consenting First Lien Noteholders in their capacity as Holders or prospective Holders of the First Lien Notes or the Exit Secured Notes, as applicable, in each case reasonably satisfactory to the Required Ad Hoc First Lien Consenting Noteholders.

**4.**    **<u>Covenants of All Parties</u>**.

Each Party severally and not jointly agrees (in the case of any Consenting Noteholder, solely on behalf of itself, and not on behalf of any other Consenting Noteholder, so long as it remains the legal owner or beneficial owner of, or investment advisor, sub-advisor or manager with respect to, any Covered Claims/Interests, <u>provided</u> that any Transfer of Covered Claims/Interests is made in accordance with <u>Section 13</u> herein), that it shall:

(a)     support and cooperate with each other Party in good faith, and otherwise use its commercially reasonable efforts to consummate, the Restructuring as soon as reasonably practicable in accordance with this Agreement, and, once executed, as prescribed by the Definitive Restructuring Documents;

(b)     use its commercially reasonable efforts and work in good faith to (i) negotiate and complete the Definitive Restructuring Documents that remain subject to negotiation and completion, and (ii) duly execute and deliver (to the extent it is a party thereto) the Definitive Restructuring Documents and otherwise support and seek to effect the actions and transactions contemplated thereby, in each case as soon as reasonably practicable;

(c)     use its commercially reasonable efforts and work in good faith to negotiate and complete such other related documents as may be required to implement the Restructuring and obtain entry of the Confirmation Order, in each case as soon as reasonably practicable (and in any event in accordance with the Milestones);

(d)     support and use its commercially reasonable efforts to (i) consummate the Restructuring and all transactions contemplated by the Definitive Restructuring Documents to which it is a party as soon as reasonably practicable, (ii) take any and all reasonably necessary actions in furtherance of the Restructuring and the transactions contemplated by the Definitive Restructuring Documents, and (iii) if applicable, submit all required and/or advisable notifications, applications, and filings for and obtain (in each case, solely as it relates to such Party) any and all required or advisable regulatory and/or third-party approvals necessary or advisable to consummate the Restructuring, including any approvals required under Antitrust Laws;

(e)     not take any action that is inconsistent in any material respect with, or is intended to or does frustrate, delay or impede in any material respect the timely approval and entry of the Confirmation Order and consummation of the transactions contemplated by the Definitive Restructuring Documents;

(f)     (i) work in good faith to prepare agreed-upon forms of the DIP Orders, (ii) obtain entry of, and support and not object to such entry of, the DIP Orders, and (iii) not propose, seek approval for, or support any use of debtor-in-possession financing that is not consistent with the DIP Credit Agreement and each of the DIP Orders; and

(g)     not challenge the validity, enforceability or priority of the First Lien Notes or the Second Lien Notes or any First Lien Notes Claim or Second Lien Notes Claim (or the liens in respect of such Claims) in any way, including by commencing an avoidance action or other legal proceeding.

5.     <u>**Additional Covenants of the Consenting Noteholders**</u>.

Each Consenting Noteholder (solely on behalf of itself, and not on behalf of any other Consenting Noteholder) shall, so long as it remains the legal owner or beneficial owner of, or investment advisor, sub-advisor or manager with respect to, any Covered Claims/Interests (provided that any Transfer of Covered Claims/Interests is made in accordance with Section 13 herein):

(a)    not, directly or indirectly, (i) object to, delay, impede, or take any other action to interfere with the acceptance, implementation, confirmation or consummation of the Restructuring and the Plan, (ii) seek, solicit, support, encourage, or vote any Claims for, or consent to, any restructuring or reorganization for any Debtor that is inconsistent with the Definitive Restructuring Documents in any respect, (iii) commence or support any action to appoint a trustee, conservator, receiver, or examiner for the Debtors, or to dismiss the Chapter 11 Cases, or to convert the Chapter 11 Cases to cases under Chapter 7 of the Bankruptcy Code, (iv) commence or support any action or proceeding to shorten or terminate the period during which only the Debtors may propose and/or seek confirmation of any plan of reorganization, or (v) otherwise support any plan, sale process or other transaction that is inconsistent with the Definitive Restructuring Documents;

(b)    (i) not object to or oppose the approval by the Bankruptcy Court of any Definitive Restructuring Document, (ii) neither join in nor support any objection by any Entity to approval by the Bankruptcy Court of any Definitive Restructuring Document, and (iii) not otherwise commence, join or support any proceeding to oppose or alter any of the terms of the Definitive Restructuring Documents, or any of the transactions contemplated thereby, in connection with the confirmation and consummation of the Plan, in each case pursuant to this clause (b) to the extent the applicable Definitive Restructuring Documents and transactions comply with the requirements of this Agreement;

(c)    (i) vote each of its Covered Claims/Interests (to the extent in a voting class under the Plan) to accept the Plan by delivering its duly executed and completed ballot(s) accepting the Plan on a timely basis following the commencement of the Solicitation and its actual receipt of the Disclosure Statement and other related Solicitation Materials, (ii) not elect on its ballot(s) to preserve Claims, if any, that such Consenting Noteholder may own or control that may be affected by any releases expressly contemplated by the Plan, to the extent such election is available and (iii) in the case of any Consenting Second Lien Noteholder, elect to exercise the Second Lien Notes Stock Option (as defined in the Restructuring Term Sheet) and provide confirmation that it has electronically delivered its Second Lien Notes to the Depository Trust Company and taken any other actions necessary to effectuate the Second Lien Notes Stock Option;

(d)    give any notice, order, instruction, or direction to the indenture trustee and collateral agent under the First Lien Notes Indenture or Second Lien Notes Indenture, as applicable, reasonably necessary to give effect to the Restructuring, including directing such indenture trustee or collateral agent to consent to the incurrence of the liens securing the DIP Facility and to the other terms of the DIP Orders; provided, that such Consenting Noteholder shall not be required to provide such indenture trustee, collateral agent or any other Person with any indemnities or similar undertakings in connection with taking any such action; and

(e)    not change, amend, revoke or withdraw (or cause to be changed, amended, revoked or withdrawn) such vote to accept the Plan, provided, however, that the votes of the

Consenting Noteholders in respect of the Plan shall be immediately and automatically, without further action of any Consenting Noteholder, revoked and deemed null and void *ab initio* upon termination of this Agreement with respect to such Consenting Noteholder prior to the Plan Effective Date in accordance with this Agreement (and it being understood that any termination of this Agreement with respect to a Consenting Noteholder shall entitle such Consenting Noteholder to change its vote in accordance with section 1127(d) of the Bankruptcy Code, and the Solicitation Materials with respect to the Plan shall be consistent with this proviso).

Notwithstanding any other provision of this Agreement, including Section 4 and this Section 5, nothing in this Agreement shall require any Consenting Noteholder to incur any out-of-pocket expenses that are not reimbursable by the Company Parties in connection with the performance of its obligations hereunder.

6.     **DIP Facility Commitment**. Subject to the conditions and on the terms set forth herein and in the DIP Credit Agreement, each Financing Commitment Party and each other Consenting Second Lien Noteholder set forth on Schedule 3 hereto (collectively, the "Initial Commitment Parties") severally commits to provide (on behalf of itself or its lending affiliates identified on Schedule 3, without releasing or excusing its or their commitments under this Section 6) the percentage of the full amount of the DIP Facility set forth next to its name on Schedule 3 hereto, including, in the case of certain of the Initial Commitment Parties identified on Schedule 3, the amount of the DIP Facility that is not subscribed for in the DIP Allocation (as defined in the DIP Facility Term Sheet) (ratably among all such certain Initial Commitment Parties based on their commitment percentages set forth on Schedule 3). Each Initial Commitment Party agrees that this Section 6 is a binding and enforceable agreement with respect to the commitments under the DIP Facility, it being acknowledged and agreed that the commitments provided hereunder are subject solely to the conditions precedent set forth in the DIP Credit Agreement. Notwithstanding anything to the contrary in this Agreement, the commitment of each Initial Commitment Party to provide (or to have its lending affiliates identified on Schedule 3 provide) the full amount of the DIP Facility set forth in this Section 6 may not be transferred or assigned without the prior written consent of the Company Parties (other than, in the case of certain of the Initial Commitment Parties as specified on Schedule 3, pursuant to the DIP Allocation), and the Transfer of any Covered Claims/Interests shall not be deemed a transfer or assignment of such commitments nor relieve the applicable Initial Commitment Party (or such affiliate) of such commitments hereunder (which commitments shall survive any Transfer of Covered Claims/Interests). Any failure of a lending affiliate of an Initial Commitment Party to fund the DIP Facility as required by this Section 6 shall be deemed a breach of this Section 6 by such Initial Commitment Party as if such Initial Commitment Party had directly provided the commitment of such lending affiliate in this Section 6.

Without releasing any of its obligations hereunder, each Financing Commitment Party may, at its option, arrange for the DIP Credit Agreement to be executed by one or more financial institutions selected by the applicable Financing Commitment Party and reasonably acceptable to Pyxus (the "**Fronting Lender(s)**"), to act as an initial lender and to fund some or all of the Financing Commitment Party's commitments, in which case the applicable Financing Commitment Party will acquire its loans under the DIP Facility by assignment from the Fronting Lender(s) in accordance with the assignment provisions of the DIP Credit Agreement.

7.    **Milestones**. The following Milestones shall apply to this Agreement:

(a)    No later than June 14, 2020, the Debtors shall commence solicitation of votes to accept or reject the Plan;

(b)    No later than June 15, 2020, the Debtors shall commence the Chapter 11 Cases;

(c)    On the Petition Date, the Debtors shall file with the Bankruptcy Court the DIP Motion, the Plan and the Disclosure Statement;

(d)    No later than two (2) Business Days after the Petition Date, the Bankruptcy Court shall have entered the Interim DIP Order;

(e)    No later than thirty-five (35) calendar days after entry of the Interim DIP Order, the Bankruptcy Court shall have entered the Final DIP Order;

(f)    No later than sixty (60) calendar days after the Petition Date, the Bankruptcy Court shall have entered the Confirmation Order and an order approving the Disclosure Statement (which may be the Confirmation Order); and

(g)    No later than seventy-five (75) calendar days after the Petition Date, the Plan Effective Date shall have occurred.

The date of each Milestone shall be calculated in accordance with Rule 9006 of the Federal Rules of Bankruptcy Procedure and the Milestones set forth in the immediately preceding clauses (d), (e) and (f) shall be automatically extended by up to three (3) Business Days solely to the extent it is not reasonably feasible to hold and conclude any necessary hearing before the Bankruptcy Court prior to the expiration of such Milestone as a result of events or circumstances surrounding the virus known as COVID-19.

8.    **Additional Covenants of the Company Parties**.

Each Company Party shall:

(a)    use its commercially reasonable efforts and work in good faith to obtain (i) approval by the Bankruptcy Court of the Solicitation Materials, including the Disclosure Statement and the other Definitive Restructuring Documents and (ii) entry of the Confirmation Order by the Bankruptcy Court in accordance with the Bankruptcy Code and the Bankruptcy Rules, in each case, on or before the applicable Milestone;

(b)    use commercially reasonable efforts to seek additional support for the Restructuring from their other material stakeholders to the extent reasonably prudent; provided, that the Company Parties shall not be permitted to offer any fees, expenses or other economics to holders of First Lien Notes Claims or Second Lien Notes Claims other than as provided or permitted in this Agreement and the Definitive Restructuring Documents without the prior written consent from the Required Consenting Second Lien Noteholders.

(c)      (i) provide counsel for the Consenting Noteholders a reasonable opportunity (which shall be no less than two calendar days) to review draft copies of all pleadings, motions, declarations, supporting exhibits and proposed orders (including the First Day Pleadings and "second day" pleadings) and any other documents the Debtors intend to file in the Chapter 11 Cases and (ii) consult in good faith with counsel to the Consenting Noteholders regarding the form and substance of any document referred to in the immediately preceding clause (i) before filing such document in the Chapter 11 Cases, in each case (other than with respect to First Day Pleadings and "second day" pleadings) except where doing so is not practicable due to exigent circumstances outside of the Company Parties' control;

(d)      not take any action that is contrary to or inconsistent with any Definitive Restructuring Document, or that would be reasonably expected to materially delay consummation of the Restructuring or the transactions contemplated by the Definitive Restructuring Documents;

(e)      not, directly or indirectly (including through its representatives and advisors), seek, solicit, encourage or, other than as expressly permitted in the final paragraph of this Section 8, negotiate or engage in, any discussions or other communications relating to, or enter into any agreements or arrangements relating to, any Alternative Transaction;

(f)      following receipt of an invoice therefor, on (i) the date on which the initial borrowing under the DIP Facility occurs, and (ii) subject to any required approvals of the Bankruptcy Court and review periods set forth in the DIP Orders, from time to time thereafter promptly pay in cash all reasonable, undisputed, and documented fees and expenses of the Consenting Noteholder Advisors, in accordance with the applicable Expense Reimbursement Agreement;

(g)      if the Company Parties know of a breach by any Company Party of any of the obligations, representations, warranties, or covenants of the Company Parties set forth in this Agreement or the Plan, furnish prompt written notice (and in any event within three (3) Business Days of obtaining actual knowledge) to counsel to the Consenting Noteholders and use commercially reasonable efforts to take all remedial action reasonably necessary as soon as reasonably practicable to cure such breach by any such Company Party;

(h)      operate their businesses in the ordinary course in a manner consistent with past practice in all material respects (other than any changes in operations (i) resulting from or relating to the Plan or the proposed or actual filing of the Chapter 11 Cases or (ii) imposed by the Bankruptcy Court);

(i)      to the extent any legal or structural impediments arise that would prevent, hinder, or delay the consummation of the transactions contemplated by the Definitive Restructuring Documents, negotiate in good faith appropriate additional or alternative provisions to address any such impediments; provided that such alternative does not alter, in any material respect, the substance and economics of the Restructuring or the transactions contemplated by the Definitive Restructuring Documents;

(j)      not redeem, purchase, or acquire or offer to acquire any equity interests of Pyxus, or pay any dividend or make any distribution on account thereof;

-16-

(k)    not acquire or divest (by merger, exchange, consolidation, acquisition of stock or assets, or otherwise), or file any motion or application seeking authority to acquire or divest (i) any corporation, partnership, limited liability company, joint venture, or other business organization or division or (ii) the Company Parties' assets, other than (x) to the extent not prohibited under the DIP Credit Agreement, (y) as contemplated by the other Definitive Restructuring Documents, or (z) with the advance written consent of the Required Consenting Noteholders;

(l)    actively oppose and object to the efforts of any person seeking to object to, delay, impede, or take any other action to interfere with the acceptance, implementation, or consummation of the Restructuring (including, if applicable, the filing of timely filed objections or written responses) to the extent such opposition or objection is reasonably necessary or desirable to facilitate implementation of the Restructuring; and

(m)    use its commercially reasonable efforts to (i) file with the SEC on or prior to the Plan Effective Date (or as soon as reasonably practicable thereafter) all financial statements, reports and other information required to be so filed pursuant to the rules and regulations of the Securities Act and the Securities Exchange Act of 1934, as amended and (ii) upon request by the Financing Commitment Parties, cooperate with the Financing Commitment Parties to suspend or terminate Reorganized Pyxus's reporting obligations under the Securities Act and the Securities Exchange Act of 1934, as amended, effective as of the Plan Effective Date (or as soon as reasonably practicable thereafter).

Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement shall require a Company Party or the Governing Body of a Company Party to take any action or to refrain from taking any action with respect to the Restructuring to the extent such Company Party or Governing Body determines, after consultation with counsel, that taking or failing to take such action would violate applicable law or breach its or their fiduciary obligations under applicable law.  The Company Parties shall give prompt written notice to the Consenting Noteholders of any determination made in accordance with this paragraph.  This paragraph shall not impede any Party's right to terminate this Agreement pursuant to Section 14 hereof.  The Company Parties acknowledge that they have reviewed this Agreement and have decided to enter into this Agreement in the exercise of their fiduciary duties.

Notwithstanding anything to the contrary herein, but subject to the immediately preceding paragraph, the Company Parties may (i) receive, respond to, and consider (but not solicit) unsolicited proposals, offers, indications of interest or inquiries for one or more Alternative Transactions from other parties and, (ii) solely to the extent the Board determines that, in the exercise of the Board's fiduciary duties, such unsolicited Alternative Transaction could reasonably be expected to provide a higher or better recovery to Holders of (x) Interests in the Debtors or (y) if such unsolicited Alternative Transaction would not reasonably be expected to delay, in any material respect, the consummation of a restructuring in the time frame contemplated herein, Claims in the Debtors, in each case as compared to the recovery such Holders would receive pursuant to the transactions contemplated herein (such Alternative Transaction, a "Superior Alternative Transaction"), negotiate, pursue, provide due diligence in connection with, discuss, and/or analyze such unsolicited Superior Alternative Transaction without breaching or terminating this Agreement; provided that the Company Parties shall promptly and, in any event, within two

Business Days (i) notify the Consenting Noteholders Advisors upon (x) receipt of any offer or proposal (written or oral) for any Alternative Transaction which the Company Parties are considering and (y) electing to enter into a Superior Alternative Transaction, (ii) subject to confidentiality restrictions, provide the Consenting Noteholders Advisors with all offers or proposals received from third parties in connection with an Alternative Transaction, and (iii) respond promptly to reasonable information requests and questions from the Consenting Noteholders Advisors relating to any such offer or proposal on a confidential basis to the extent not inconsistent with their fiduciary obligations.  If any Company Party notifies the Consenting Noteholders Advisors, or announces publicly, that any Company Party has entered, or intends to enter, into definitive documentation with respect to a Superior Alternative Transaction, then all obligations of each Consenting Noteholder and the Company Parties under this Agreement shall immediately terminate, without any further action of any Party hereunder.  The Company represents and warrants to the Consenting Noteholders that there are no pending agreements or understandings (oral or written) and that it has not entered into a definitive agreement (oral or written) with respect to an Alternative Transaction as of the date first written above.

9.      **No Waiver of Participation and Preservation of Rights**.

For the avoidance of doubt, nothing in this Agreement shall (A) limit any rights of any Party, subject to applicable law and the agreements contained in any Definitive Restructuring Document, to (a) initiate, prosecute, appear, or participate as a party in interest in any contested matter or adversary proceeding to be adjudicated in the Chapter 11 Cases so long as such initiation, prosecution, appearance, or participation and the positions advocated in connection therewith are not inconsistent with this Agreement or the Definitive Restructuring Documents, (b) enforce this Agreement or any Definitive Restructuring Document or contest whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement or any Definitive Restructuring Document, (c) object to any motion to approve or confirm, as applicable, any other plan of reorganization, sale transaction, or any motions related thereto filed in the Chapter 11 Cases, to the extent that the terms of any such motions, plans or transactions are inconsistent with this Agreement or any Definitive Restructuring Document, (d) appear as a party in interest in the Chapter 11 Cases for the purpose of contesting whether any matter or fact is or results in a breach of, or is inconsistent in any material respect with, this Agreement or any Definitive Restructuring Document, and (e) file a proof of claim, if required, or (B) require any Party to waive or forego the benefit of any applicable legal professional privilege. Except as provided in any Definitive Restructuring Document, nothing herein or therein is intended to, does or shall be deemed in any manner to, waive, limit, impair, or restrict the ability of any Party to protect and preserve (but not enforce) its rights (including under this Agreement), remedies, and interests, including Claims against any of the Company Parties, or liens or security interests it may have in any assets of any of the Company Parties.  Without limiting the foregoing in any way, if this Agreement is terminated in accordance with its terms for any reason, each Party fully reserves any and all of its respective rights, remedies and interests.

10.     **Mutual Representations and Warranties by All Parties**.

Each Party (in the case of a Consenting Noteholder, solely on behalf of itself, and not on behalf of any other Consenting Noteholder) represents and warrants to each of the other Parties that, as of the date hereof:

(a)    it has all requisite power and authority to enter into this Agreement and to carry out the transactions contemplated hereby, and to perform its obligations hereunder;

(b)    the execution and delivery of this Agreement and the performance of its obligations hereunder have been duly authorized by all necessary action on its part; and

(c)    this Agreement constitutes the legally valid and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium, or other similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability.

## 11.    <u>Additional Representations and Warranties by the Consenting Noteholders</u>.

Each Consenting Noteholder (solely on its own behalf and not on behalf of any other Consenting Noteholder) represents and warrants to the Company Parties and each other Consenting Noteholder party hereto, as of the date hereof, that:

(a)    <u>Holdings by the Consenting Noteholders</u>.  Such Consenting Noteholder (i) either (A) is the sole legal or beneficial owner of the full amount of Covered Claims/Interests listed on <u>Schedule 1</u> or <u>Schedule 2</u>, as applicable, or (B) has sole investment or voting discretion with respect to the full amount of such Covered Claims/Interests and has the power and authority to bind the legal or beneficial owners of such Covered Claims/Interests to the terms of this Agreement; (ii) has full power and authority to act on behalf of, vote, and consent to matters concerning such Covered Claims/Interests and to dispose of, exchange, assign, and transfer such Covered Claims/Interests, including the power and authority to execute and deliver this Agreement and to perform its obligations hereunder; and (iii) does not directly or indirectly own any Covered Claims/Interests other than as set forth on such schedule;

(b)    <u>No Transfers</u>.  Such Consenting Noteholder has made no Transfer of the Covered Claims/Interests held by such Consenting Noteholder set forth on <u>Schedule 1</u> or <u>Schedule 2</u>, as applicable;

(c)    <u>Sufficiency of Information Received</u>.  Such Consenting Noteholder has reviewed, or has had the opportunity to review, with the assistance of professional and legal advisors of its choosing, all information it deems necessary and appropriate for such Consenting Noteholder to evaluate the financial and other risks inherent in the Restructuring and accept the terms of the Plan as set forth in the Restructuring Term Sheet;

(d)    <u>Knowledge and Experience</u>.  Such Consenting Noteholder has such knowledge and experience in financial and business matters of this type that it is capable of evaluating the merits and risks of entering into this Agreement and of making an informed investment decision, and has conducted an independent review and analysis of the business and affairs of the Debtors that it considers sufficient and reasonable for purposes of entering into this Agreement;

(e)    <u>No Conflicts (Contracts)</u>.  The execution, delivery and performance by such Consenting Noteholder of this Agreement does not and shall not conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under, any contractual obligation

to which such Consenting Noteholder is a party, except as would not have a material adverse effect on or materially delay consummation of the Restructuring;

(f)    <u>Governmental Approvals</u>.  The execution, delivery and performance by such Consenting Noteholder of this Agreement does not and shall not require any registration or filing with, consent or approval of, or notice to, or other action to, with or by, any federal, state or governmental authority or regulatory body, except as may be required for approval of the transactions contemplated by the Definitive Restructuring Documents pursuant to applicable Antitrust Laws and the Bankruptcy Code, and except as would not otherwise have a material adverse effect on the Restructuring; and

(g)    <u>No Conflicts (Laws and Organizational Documents)</u>.  The execution, delivery, and performance of this Agreement does not (i) violate any provision of any law, rule, or regulation applicable to such Consenting Noteholder or (ii) violate such Consenting Noteholder's certificate of incorporation, limited liability company agreement, bylaws, or other organizational documents.

(h)    <u>Certain Securities Matters</u>.  (i) Such Consenting Noteholder is either (A) a qualified institutional buyer as defined in Rule 144A of the Securities Act, (B) not a U.S. person (as defined in Regulation S of the Securities Act), or (C) an institutional accredited investor (as defined in the Securities Act Rules); and (ii) any securities acquired by the Consenting Noteholder in connection with the Restructuring will have been acquired for investment and not with a view to distribution or resale in violation of the Securities Act.

**12.    <u>Additional Representations and Warranties by the Company Parties</u>**.

Each Company Party (on a joint and several basis) represents and warrants to the Consenting Noteholders party hereto, as of the date hereof, that:

(a)    <u>No Conflicts (Contracts)</u>.  The execution, delivery and performance by such Company Party of this Agreement does not and shall not conflict with, result in a breach of, or constitute (with due notice or lapse of time or both) a default under, any contractual obligation to which such Company Party is a party, except (i) as a direct result of the filing of the Chapter 11 Cases, (ii) to the extent the applicable Company Party has obtained a waiver or forbearance of any such default which such waiver remains in effect, and/or (iii) to the extent any such breach or default would not be expected to have a material adverse effect on the Company Parties' business or materially delay consummation of the Restructuring;

(b)    <u>Governmental Approvals</u>.  Subject to the accuracy of <u>Section 11(f)</u>, the execution, delivery and performance by such Debtor of this Agreement does not and shall not require any registration or filing with, consent or approval of, or notice to, or other action to, with or by, any federal, state or governmental authority or regulatory body, except as may be necessary or required for (i) approval by the Bankruptcy Court of such Debtor's authority to implement this Agreement and the Restructuring, (ii) filings pursuant to the Securities Exchange Act of 1934, as amended, (iii) filings pursuant to applicable state securities or "blue sky" laws, and (iv) approval of the transactions contemplated by the Definitive Restructuring Documents pursuant to applicable Antitrust Laws, and except as would not otherwise have a material adverse effect on the

consummation of the Restructuring;

(c)    <u>No Conflicts (Laws and Organizational Documents)</u>.    The execution, delivery, and performance of this Agreement does not (i) violate any provision of any law, rule, or regulation applicable to such Company Party or (ii) violate such Company Party's certificate of incorporation, limited liability company agreement, bylaws, or other organizational documents; and

## 13.    <u>Transfer Restrictions</u>.

(a)    Subject to clause (d) of this <u>Section 13</u>, so long as this Agreement has not been terminated in accordance with its terms, no Consenting Noteholder shall (i) sell, use, pledge, assign, transfer, permit the participation in, or otherwise dispose of any ownership (including any beneficial ownership[2]) in its Covered Claims/Interests, in whole or in part (other than pledges, transfers or security interests that such Consenting Noteholder may have created (A) in favor of a prime broker under and in accordance with its prime brokerage agreement with such prime broker or (B) in favor of a financing counterparty in accordance with any ordinary course financing arrangements, in each case which will be released in connection with the consummation of the transactions contemplated by the Definitive Restructuring Documents) or (ii) grant any proxies or deposit any of such Consenting Noteholder's Covered Claims/Interests into a voting trust, or enter into a voting agreement with respect to any such Covered Claim (collectively, the actions described in clauses (i) and (ii), a "<u>Transfer</u>"), unless such Transfer satisfies the following requirement (a transfer that satisfies such requirement, a "<u>Permitted Transfer</u>" and the transferee of a Permitted Transfer, a "<u>Permitted Transferee</u>"): the intended transferee (A) is a Consenting Noteholder or (B) if not a Consenting Noteholder, executes and delivers to counsel to Pyxus and each of the Consenting Noteholders Advisors an executed transfer agreement in the form attached hereto as <u>Exhibit A</u> (a "<u>Transfer Agreement</u>") before such Transfer is effective (it being understood that in the case of this clause (B), no such Transfer shall be effective, including without limitation for purposes of calculating Required Consenting First Lien Noteholders, Required Ad Hoc First Lien Consenting Noteholders and Required Consenting Second Lien Noteholders, until notification of such Transfer and a copy of the executed Transfer Agreement is received by counsel to Pyxus and the Consenting Noteholders Advisors).

(b)    Subject to clause (d) of this <u>Section 13</u>, (i) any Consenting Noteholder may Transfer, and execution of a Transfer Agreement shall not be required for any Transfer of, Covered Claims/Interests to any other Consenting Noteholder and (ii) a Qualified Marketmaker that acquires any Covered Claims/Interests solely for the purpose of acting as a Qualified Marketmaker for such Covered Claims/Interests shall not be required to execute and deliver a Transfer Agreement or otherwise agree to be bound by the terms and conditions set forth in this Agreement if such Qualified Marketmaker promptly, and in any event no later than the earlier of (x) (3) Business Days after such acquisition and (y) two (2) Business Days before the voting deadline under the Plan, transfers such Claims (by purchase, sale, assignment, participation, or otherwise) to a Permitted Transferee pursuant to a Permitted Transfer.

---

[2]    As used herein, the term "<u>beneficial ownership</u>" means the direct or indirect economic ownership of, and/or the power, whether by contract or otherwise, to direct the exercise of the voting rights and the disposition of, the Covered Claims/Interests or the right to acquire such claims.

(c)     This Agreement shall in no way be construed to preclude a Consenting Noteholder from acquiring additional Covered Claims/Interests or any other Claim against or equity Interest in Pyxus; <u>provided</u> that each Consenting Noteholder hereby acknowledges and agrees that such additional Covered Claims/Interests shall automatically and immediately upon acquisition by such Consenting Noteholder be subject to the terms of this Agreement (regardless of when or whether notice of such acquisition is given in accordance herewith). Each Consenting Noteholder shall provide revised holdings information, as to itself, to counsel to Pyxus and counsel to the Consenting Noteholders within a reasonable time period following reasonable written request by any such counsel.

(d)     A Transfer of any or all of the Covered Claims/Interests beneficially owned by an Initial Commitment Party shall not relieve such Initial Commitment Party of its commitments under <u>Section 6</u>, and a transfer or assignment of an Initial Commitment Party's commitments under <u>Section 6</u> shall not relieve such Initial Commitment Party of its other obligations hereunder as a Consenting Noteholder.

(e)     Any Transfer made in violation of this provision shall be void *ab initio*. Any Consenting Noteholder that effectuates a Permitted Transfer to a Permitted Transferee shall have no liability under this Agreement arising from or related to the failure of the Permitted Transferee to comply with the terms of this Agreement.

### 14.    <u>Termination of Obligations</u>.

(a)     This Agreement shall terminate and all of the obligations of the Parties shall be of no further force or effect upon the occurrence of any of the following events: (i) the Plan Effective Date, (ii) the Confirmation Order is reversed or vacated, (iii) any court of competent jurisdiction has entered a Final order declaring this Agreement to be unenforceable, (iv) the Company Parties, the Required Consenting Noteholders and the Required Ad Hoc First Lien Consenting Noteholders mutually agree to such termination in writing, or (v) this Agreement is terminated pursuant to paragraph (b), (d) or (f) of this <u>Section 14</u>.

(b)     Pyxus may, in its discretion, terminate this Agreement by written notice to the other Parties, upon the occurrence of any of the following events:

(i)     within three (3) Business Days after the giving of written notice by Pyxus to the Consenting Noteholders of a determination by the Board, in good faith and after consulting with counsel, that proceeding with the Restructuring and pursuit of confirmation and consummation of the Plan would be inconsistent with the Board's fiduciary obligations, including in order to pursue a Superior Alternative Transaction;

(ii)     a breach by one or more Consenting First Lien Noteholders, holding First Lien Notes in an aggregate amount such that non-breaching Consenting First Lien Noteholders collectively own (or have voting control) of less than 66 2/3% of the aggregate outstanding principal amount of the First Lien Notes, of its or their material obligations, representations or warranties hereunder, which breach is not cured within ten (10) days after the giving of written notice by Pyxus of such breach to such breaching Consenting First Lien Noteholder(s) and counsel to the Consenting Noteholders;

(iii)   a breach by one or more Consenting Second Lien Noteholders holding Second Lien Notes in an aggregate amount such that non-breaching Consenting Second Lien Noteholders collectively own (or have voting control of) less than 66 2/3% of the aggregate outstanding principal amount of the Second Lien Notes, of its or their material obligations, representations or warranties hereunder, which breach is not cured within ten (10) days after the giving of written notice by Pyxus of such breach to such breaching Consenting Second Lien Noteholder(s) and counsel to the Consenting Noteholders; or

(iv)   the (A) Consenting First Lien Noteholders no longer collectively own (or have voting control of) at least 66 2/3% of the aggregate outstanding principal amount of the First Lien Notes or (B) Consenting Second Lien Noteholders no longer collectively own (or have voting control of) at least 66 2/3% of the aggregate outstanding principal amount of the Second Lien Notes;

provided that, upon a termination of this Agreement by Pyxus pursuant to this Section 14(b), none of the Company Parties (nor their respective directors, officers, employees, advisors, subsidiaries, or representatives) shall have or incur any liability under this Agreement or otherwise on account of such termination.

(c)   This Agreement may be terminated by the Required Consenting First Lien Noteholders, solely as to Consenting First Lien Noteholders, upon the occurrence of any of the following events:

(i)   any Debtor files any plan of reorganization (or disclosure statement related thereto) in the Chapter 11 Cases other than the Plan without the prior written consent of the Required Consenting First Lien Noteholders;

(ii)   the Bankruptcy Court grants relief that is inconsistent in any material respect with any Definitive Restructuring Document in a manner that directly and adversely impacts the treatment of the First Lien Notes Claims or the transactions contemplated by the Definitive Restructuring Documents as to the First Lien Notes without the consent of the Required Consenting First Lien Noteholders;

(iii)   a breach by any Company Party of (A) its obligations hereunder in any material respect (including filing with the Bankruptcy Court or otherwise finalizing or making effective any Definitive Restructuring Document or any amendment or modification thereto that is (1) inconsistent with this Agreement and (2) otherwise not in form and substance satisfactory to the Required Consenting First Lien Noteholders) or (B) any of its representations or warranties hereunder that would reasonably be expected to have a material adverse impact on the Company Parties or their ability to consummate the Plan or the transactions contemplated by the Definitive Restructuring Documents, which breach, in the case of each of clause (A) and clause (B), is not cured within ten (10) days after the giving of written notice by counsel for the Consenting First Lien Noteholders to counsel to Pyxus and counsel to the Consenting Second Lien Noteholders;

(iv)   a breach by one or more Consenting Second Lien Noteholders holding Second Lien Notes in an aggregate amount such that non-breaching Consenting Second Lien Noteholders collectively own (or having voting control of) less than 66 2/3% of the aggregate

outstanding principal amount of the Second Lien Notes, of (A) its or their obligations hereunder in any material respect or (B) any of its or their representations or warranties hereunder, in each case that would be reasonably likely to have a material adverse impact on the Debtors or their ability to consummate the Plan or the transactions contemplated by the Definitive Restructuring Documents, which breach is not cured within ten (10) days after the giving of written notice by Pyxus or counsel for the Consenting First Lien Noteholders to such breaching Consenting Second Lien Noteholder, counsel to Pyxus and counsel to the Consenting Second Lien Noteholders;

(v)     any Milestone set forth in Section 7 hereof has not been satisfied, unless extended in accordance with the terms of this Agreement;

(vi)     any Debtor's use of the DIP Facility or Cash Collateral is terminated and remains terminated for five (5) Business Days;

(vii)     (A) a trustee, receiver, or examiner with expanded powers beyond those set forth in Sections 1106(a)(3) and (4) of the Bankruptcy Code is appointed in one or more of the Chapter 11 Cases, (B) the filing by any Debtor of a motion or other request for relief seeking to dismiss any of the Chapter 11 Cases or convert any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code, or (C) entry of an order by the Bankruptcy Court dismissing any of the Chapter 11 Cases or converting any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code;

(viii)     any Company Party challenges the principal amount, priority, and/or validity of the First Lien Notes Claims and/or the liens in respect thereof;

(ix)     the Bankruptcy Court enters an order in the Chapter 11 Cases terminating any of the Debtors' exclusive right to file a plan or plans of reorganization pursuant to Section 1121 of the Bankruptcy Code;

(x)     any Company Party sells or files any motion or application seeking authority to sell a material portion of the Company Parties' assets as a whole, without the prior written consent of the Required Consenting First Lien Noteholders;

(xi)     the Required Consenting Second Lien Noteholders terminate this Agreement pursuant to Section 14(d)14(d) hereof;

(xii)     any Debtor (A) files a motion or pleading with the Bankruptcy Court seeking authority to terminate this Agreement, (B) files a motion or pleading with the Bankruptcy Court that is inconsistent in any material respect with this Agreement or (C) provides notice to counsel to the Consenting First Lien Noteholders of its intent to enter into or otherwise publicly announces its entry into or intent to pursue an Alternative Transaction;

(xiii)     an order is entered by the Bankruptcy Court granting relief from automatic stay imposed by Section 362 of the Bankruptcy Code authorizing any party to proceed against any material asset of the Company Parties; or

(xiv)     the occurrence of any Event of Default under the DIP Credit Agreement that has not been cured (if susceptible to cure) or waived by the applicable percentage

of DIP Lenders (as defined therein) in accordance with the terms of the DIP Credit Agreement within the applicable grace period.

(d)     This Agreement may be terminated by the Required Consenting Second Lien Noteholders upon the occurrence of any of the following events:

(i)     any Debtor files any plan of reorganization (or disclosure statement related thereto) in the Chapter 11 Cases other than the Plan without the prior written consent of the Required Consenting Second Lien Noteholders;

(ii)     the Bankruptcy Court grants relief that is inconsistent in any material respect with any Definitive Restructuring Document in a manner that directly and adversely impacts the treatment of the Second Lien Notes Claims or the transactions contemplated by the Definitive Restructuring Documents as to the Second Liens Notes without the consent of the Required Consenting Second Lien Noteholders;

(iii)     a breach by any Company Party of (A) its obligations hereunder in any material respect (including filing with the Bankruptcy Court or otherwise finalizing or making effective any Definitive Restructuring Document or any amendment or modification thereto that is (1) inconsistent with this Agreement and (2) otherwise not in form and substance satisfactory to the Required Consenting Second Lien Noteholders) or (B) any of its representations or warranties hereunder that would reasonably be expected to have a material adverse impact on the Debtors or their ability to consummate the Plan or the transactions contemplated by the Definitive Restructuring Documents, which breach, in the case of each of clause (A) and clause (B), is not cured within ten (10) days after the giving of written notice by counsel for the Consenting Second Lien Noteholders to counsel to Pyxus and counsel to the Consenting First Lien Noteholders;

(iv)     a breach by one or more Consenting First Lien Noteholders holding First Lien Notes in an aggregate amount such that non-breaching Consenting First Lien Noteholders collectively own (or having voting control of) less than 66 2/3% of the aggregate outstanding principal amount of the First Lien Notes, of (A) its or their obligations hereunder in any material respect or (B) any of its or their representations or warranties hereunder, in each case that would be reasonably likely to have a material adverse impact on the Debtors or their ability to consummate the Plan or the transactions contemplated by the Definitive Restructuring Documents, which breach is not cured within ten (10) days after the giving of written notice by Pyxus or counsel for the Consenting Second Lien Noteholders to such breaching Consenting First Lien Noteholder, counsel to Pyxus and counsel to the Consenting First Lien Noteholders;

(v)     any Milestone set forth in Section 7 hereof has not been satisfied, unless extended in accordance with the terms of this Agreement;

(vi)     any Debtor's use of the DIP Facility or Cash Collateral is terminated and remains terminated for five (5) Business Days;

(vii)     (A) a trustee, receiver, or examiner with expanded powers beyond those set forth in Sections 1106(a)(3) and (4) of the Bankruptcy Code is appointed in one or more of the Chapter 11 Cases, (B) the filing by any Debtor of a motion or other request for relief seeking to dismiss any of the Chapter 11 Cases or convert any of the Chapter 11 Cases to a case under

Chapter 7 of the Bankruptcy Code, or (C) entry of an order by the Bankruptcy Court dismissing any of the Chapter 11 Cases or converting any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code;

        (viii)    any Company Party challenges the principal amount, priority, and/or validity of the Second Lien Notes Claims and/or the liens in respect thereof;

        (ix)    the Bankruptcy Court enters an order in the Chapter 11 Cases terminating any of the Debtors' exclusive right to file a plan or plans of reorganization pursuant to Section 1121 of the Bankruptcy Code;

        (x)    any Company Party sells or files any motion or application seeking authority to sell a material portion of the Company Party's assets as a whole, without the prior written consent of the Required Consenting Second Lien Noteholders;

        (xi)    the Required Consenting First Lien Noteholders terminate this Agreement pursuant to Section 14(c) hereof;

        (xii)    any Debtor (A) files a motion or pleading with the Bankruptcy Court seeking authority to terminate this Agreement, (B) files a motion or pleading with the Bankruptcy Court that is inconsistent in any material respect with this Agreement or (C) provides notice to counsel to the Consenting Second Lien Noteholders of its entry into or otherwise publicly announces its entry into or intent to pursue an Alternative Transaction;

        (xiii)    an order is entered by the Bankruptcy Court granting relief from automatic stay imposed by Section 362 of the Bankruptcy Code authorizing any party to proceed against any material asset of the Company Parties; or

        (xiv)    the occurrence of any Event of Default under the DIP Credit Agreement that has not been cured (if susceptible to cure) or waived by the applicable percentage of DIP Lenders (as defined therein) in accordance with the terms of the DIP Credit Agreement within the applicable grace period.

        (e)    This Agreement may be terminated by the Required Ad Hoc First Lien Consenting Noteholders, solely as to Consenting First Lien Noteholders that are members of the Ad Hoc Group of Consenting First Lien Noteholders, upon the occurrence of any of the following events:

        (i)    (A) any of the Confirmation Order, Disclosure Statement, Plan, Exit Intercreditor Agreements, Exit Secured Notes Indenture, Interim DIP Order or Final DIP Order are not satisfactory to the Required First Lien Consenting Noteholders to the standards set forth in Section 1 of this Agreement or (B) any other Definitive Restructuring Document (or any amendment, waiver, modification, change, consent, or supplement thereto) or related agreement, to the extent affecting any economic term of the Restructuring or any other material term, impacting the Consenting First Lien Noteholders in their capacity as Holders or prospective Holders of the First Lien Notes or the Exit Secured Notes, as applicable, in each case is inconsistent with this Agreement; or

(ii)     any Milestone set forth in <u>Section 7</u> hereof has not been satisfied, unless extended in accordance with the terms of this Agreement.

(f)     The Company Parties or the Required Consenting Noteholders (by written notice executed by counsel for the respective Required Consenting Noteholders at the direction of the respective Required Consenting Noteholders) may terminate this Agreement by written notice to the Parties in the event that the Bankruptcy Court or other governmental authority shall have issued any order, injunction or other decree or taken any other action, which restrains, enjoins or otherwise prohibits the implementation of the Restructuring or the Definitive Restructuring Documents substantially on the terms and conditions set forth in this Agreement; <u>provided</u>, <u>however</u>, that the Company Parties shall have ten (10) days after notice to the Company Parties of such ruling or order to obtain relief that would allow consummation of the Restructuring and the Definitive Restructuring Documents, as applicable, in a manner that (i) does not prevent or diminish in a material way compliance with the terms of the Definitive Restructuring Documents and (ii) is satisfactory to the Required Consenting Noteholders in their sole discretion.

(g)     Other than as set forth in <u>Section 6</u>, this Agreement shall terminate solely as to any Consenting Noteholder on the date on which such Consenting Noteholder has transferred all (but not less than all) of its Covered Claims/Interests in accordance with and subject to <u>Section 13</u> of this Agreement.

(h)     No Party may seek to terminate or terminate this Agreement based upon any default, failure of a condition, or right of termination in this Agreement arising (directly or indirectly) out of its own actions or omissions.

(i)     If this Agreement is terminated as to any Party pursuant to <u>Section 8</u> or this <u>Section 14</u>, this Agreement shall forthwith become void and of no further force or effect with respect to such Party, such Party shall be released from its commitments, undertakings and agreements under or related to this Agreement, and there shall be no liability or obligation on the part of such Party; <u>provided</u> that (i) such Party shall have all rights and remedies available to it under applicable law (for all matters unrelated to this Agreement); (ii) any and all consents and ballots tendered by such Party prior to such termination shall be deemed, for all purposes, automatically to be null and void *ab initio*, shall not be considered or otherwise used in any manner by the Parties in connection with the Plan and this Agreement or otherwise and such consents or ballots may be changed or resubmitted regardless of whether the applicable voting deadline has passed (without the need to seek a court order or consent from the Debtors allowing such change or resubmission); (iii) in no event shall any such termination relieve such Party from liability for its breach or non-performance of its obligations hereunder prior to the date of such termination (including, with respect to the Company Parties, any reimbursement obligations incurred prior to the date of such termination); and (iv) in no event shall any such termination relieve such Party from its obligations under this Agreement which expressly survive any such termination pursuant to <u>Section 33</u> hereof.

### 15.    <u>Specific Performance</u>.

The Parties agree that money damages would be an insufficient remedy for any breach of this Agreement by any Party and each non-breaching Party shall be entitled to specific

performance and injunctive or other equitable relief, including attorneys' fees and costs, as a remedy of any such breach, including an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder, and each Party agrees to waive any requirement for the securing or posting of a bond in connection with such remedy, as the sole remedy to which such non-breaching Party will be entitled, at law or in equity.  The Parties agree that such relief will be their only remedy against the applicable other Party with respect to any such breach, and that in no event will any Party be liable for monetary damages (including consequential, special, indirect or punitive damages or damages for lost profits) other than attorneys' fees and costs.

## 16.   **Counterparts**.

This Agreement and any amendments, waivers, consents, or supplements hereto or in connection herewith may be executed in multiple counterparts (including via any electronic means) and delivered by electronic mail (in ".pdf" or ".tif" format), facsimile or otherwise, each of which shall be deemed to be an original for the purposes of this Agreement and all of which taken together shall constitute one and the same Agreement.

## 17.   **No Solicitation and Acknowledgements**.

Notwithstanding anything to the contrary in this Agreement, each Party acknowledges that (a) no securities of Pyxus are being offered or sold hereby and this Agreement neither constitutes an offer to sell nor a solicitation of an offer to buy any securities of Pyxus and (b) this Agreement is not, and shall not be deemed to be, a solicitation of a vote for the acceptance of the Plan pursuant to Section 1125 of the Bankruptcy Code.  The acceptance of votes from holders of Claims and Interests, as applicable, will not be solicited until such holders have received the Disclosure Statement and related Solicitation Materials that meet the requirements of the Bankruptcy Code, including Bankruptcy Code Sections 1125 and 1126.

## 18.   **Noteholder Consent Fees; Fees Generally**.

(a)      If the Consenting First Lien Noteholders, in aggregate, beneficially own or control more than 66 2/3% of the aggregate outstanding principal amount of the First Lien Notes as of the Petition Date, the Company Parties shall pay to each Consenting First Lien Noteholder that shall have duly executed and delivered to counsel to Pyxus a counterpart signature page to this Agreement as of the Petition Date its ratable share (based on the aggregate principal amount of First Lien Notes held by such Consenting First Lien Noteholder as a percentage of the aggregate principal amount of First Lien Notes held by all such Consenting First Lien Noteholders as of immediately prior to the Petition Date) of a non-refundable consent fee in the aggregate amount of $5,500,000 (the "First Lien Notes RSA Fee"), which fee shall be (x) earned by each applicable Consenting First Lien Noteholder upon delivery of such signature page to counsel to Pyxus on or prior to the Petition Date, and (y) due and payable in full in cash (A) on the Plan Effective Date or (B) if earlier, three (3) Business Days following the date on which this Agreement is terminated as a result of a breach by any Company Parties of their obligations hereunder or pursuant to Section 14(b)(i); provided that, no such fee shall be payable to any Consenting First Lien Noteholder that is in material breach of its obligations hereunder at the time such fee becomes payable or whose material breach is the direct cause of the termination of this Agreement with respect to the

Consenting First Lien Noteholders and such fee shall be retained by the Company Parties and not be paid to the other Consenting First Lien Noteholders.

(b)     If the Consenting Second Lien Noteholders, in aggregate, beneficially own or control more than 66 2/3% of the aggregate outstanding principal amount of the Second Lien Notes as of the Petition Date, the Company Parties shall pay to each Consenting Second Lien Noteholder that shall have executed and delivered to counsel to Pyxus a counterpart signature page to this Agreement as of the Petition Date its ratable share (based on the aggregate principal amount of Second Lien Notes held by such Consenting Second Lien Noteholder as a percentage of the aggregate principal amount of Second Lien Notes held by all such Consenting Second Lien Noteholders as of immediately prior to the Petition Date) of a non-refundable consent fee in the aggregate amount of $5.0 million (the "Second Lien Notes RSA Fee"), which fee shall be (x) earned by each applicable Consenting Second Lien Noteholder upon delivery to counsel to Pyxus of such signature page on or prior to the Petition Date, and (y) due and payable (A) on the Plan Effective Date, in full in kind in the form of equity of Reorganized Pyxus (based on the Plan value of such equity and subject to dilution by the MIP (as defined in the Restructuring Term Sheet)) or (B) if earlier, three (3) Business Days following the date on which this Agreement is terminated with respect to the Consenting Second Lien Noteholders as a result of a breach by any Company Parties of their obligations hereunder or pursuant to Section 14(b)(i), in full in cash; provided that, no such fee shall be payable to any Consenting Second Lien Noteholder that is in material breach of its obligations hereunder at the time such fee becomes payable or whose material breach is the direct cause of the termination of this Agreement with respect to the Consenting Second Lien Noteholders and such fee shall be retained by the Company Parties and not be paid to the other Consenting Second Lien Noteholders.

(c)     For U.S. federal income tax purposes, unless otherwise required by a change in applicable tax law or contrary determinations (as defined in Section 1313(a) of the Internal Revenue Code of 1986, as amended), the Parties (A) acknowledge that the intent is to (i) treat the DIP Backstop Fee (as defined in the Restructuring Term Sheet) as premium paid by Pyxus to the applicable Initial Commitment Parties in exchange for the issuance of a put right to Pyxus with respect to the DIP Facility, (ii) treat the DIP Exit Fee (as defined in the DIP Facility Term Sheet) as part of the DIP Facility's stated redemption price at maturity within the meaning of Treasury Regulations Section 1.1273-1(b), (iii) treat the Exit Equity (as defined in the Restructuring Term Sheet) issued as part of an investment unit with the Exit Term Loans to each holder of an allowed DIP Facility Claim as within the meaning of Treasury Regulations Section 1.1273-2(h), (iv) treat the First Lien Notes RSA Fee paid by Pyxus to each applicable Consenting First Lien Noteholder as part of the consideration for such Consenting First Lien Noteholder's claims on outstanding obligations under the First Lien Notes, (v) treat the Second Lien Notes RSA Fee as paid by Pyxus to each applicable Consenting Second Lien Noteholder as part of the consideration for such Consenting Second Lien Noteholder's claims on outstanding obligations under the Second Lien Notes and (vi) treat any additional New Common Stock received with respect to the Exit Term Loans (as additional Exit Equity) or DIP Backstop Fee, in each case, as a result of holders of Second Lien Notes exercising the Second Lien Notes Cash Option (as defined in the Restructuring Support Agreement), consistent with clauses (i) or (iii), as applicable,  and (B) agree not to take any tax position inconsistent with the tax treatment described in clause (A)(i), (ii), (iii), (iv), (v) or (vi).

19. **Governing Law; Consent to Jurisdiction**.

(a)     THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO ANY CONFLICTS OF LAW PROVISION WHICH WOULD REQUIRE THE APPLICATION OF THE LAW OF ANY OTHER JURISDICTION.

(b)     By its execution and delivery of this Agreement, each Party hereby irrevocably and unconditionally agrees for itself that any legal action, suit or proceeding against it with respect to any matter under or arising out of or in connection with this Agreement or for recognition or enforcement of any judgment rendered in any such action, suit or proceeding, may be brought solely in either a state or federal court of competent jurisdiction in the County of New York in the State of New York.  By execution and delivery of this Agreement, each Party hereto hereby irrevocably accepts and submits itself to the nonexclusive jurisdiction of each such court, generally and unconditionally, with respect to any such action, suit or proceeding. Notwithstanding the foregoing, upon the commencement of the Chapter 11 Cases, each Party hereto hereby agrees that, if the petitions have been filed and the Chapter 11 Cases are pending, the Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of or in connection with this Agreement.  The Parties to this Agreement expressly consent to entry of final orders by the Bankruptcy Court arising out of or relating to this Agreement, including but not limited to orders interpreting and enforcing this Agreement.

20. **Independent Analysis**.

Each Party hereby confirms that it has made its own decision to execute this Agreement based upon its own independent assessment of documents and information available to it, as it has deemed appropriate.  Each Party has had the ability to, and has, consulted with counsel in connection with its consideration of this Agreement.  Each Party agrees that it has not entered into this Agreement based upon any representations or warranties that are not included herein.

21. **Third-Party Beneficiaries**.

Unless expressly stated herein, this Agreement shall be solely for the benefit of the Parties hereto and no other Entity shall be a third-party beneficiary hereof.

22. **Notices**.

Any notice, request, instruction or other document to be given hereunder by any Party to the others shall be in writing and delivered personally or sent by registered or certified mail, by email, or overnight courier:

(a)     If to the Ad Hoc Group of Consenting First Lien Noteholders, to counsel at:

Stroock & Stroock & Lavan LLP
180 Maiden Lane
New York, New York 10038-4982

Attention:        Kristopher M. Hansen; Jonathan D. Canfield; Allison Miller
khansen@stroock.com; jcanfield@stroock.com;
amiller@stroock.com

(b)      If to a Consenting Noteholder that is not part of the Ad Hoc Group of
Consenting First Lien Noteholders, to counsel at:

Wachtell, Lipton, Rosen & Katz
51 West 52nd Street
New York, New York 10019

Attention:        Joshua A. Feltman; Benjamin S. Arfa
jafeltman@wlrk.com; bsarfa@wlrk.com

(c)      If to Company Parties, to:

Senior Vice President, Chief Legal Officer and Secretary
Pyxus International, Inc.
8001 Aerial Center Parkway
P.O. Box 2009
Morrisville, North Carolina 27560-8417

Attention:        Chief Legal Officer
woquinn@pyxus.com

*With a copy (that does not constitute notice) to*:

Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, New York 10017
Attention:        Sandeep Qusba
squsba@stblaw.com
Michael Torkin
michael.torkin@stblaw.com

23.    **Severability**.

Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be prohibited by or invalid under applicable law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.  In the event that any part of this Agreement is declared by any court or other judicial or administrative body to be null, void or unenforceable, said provision survives to the extent it is not so declared, and all of the other provisions of this Agreement remain in full force and effect only if, after excluding the portion deemed to be unenforceable, the remaining terms provide for the consummation of the transactions contemplated hereby in substantially the same manner as originally set forth at the later of the date this Agreement was executed or last amended.

24. **Mutual Drafting**.

This Agreement is the result of the Parties' joint efforts, and each of them and their respective counsel have reviewed this Agreement and each provision hereof has been subject to the mutual consultation, negotiation, and agreement of the Parties, and the language used in this Agreement shall be deemed to be the language chosen by the Parties to express their mutual intent, and therefore there shall be no construction against any Party based on any presumption of that Party's involvement in the drafting thereof.

25. **Headings**.

The headings used in this Agreement are for convenience of reference only and do not constitute a part of this Agreement and shall not be deemed to limit, characterize, or in any way affect any provision of this Agreement, and all provisions of this Agreement shall be enforced and construed as if no headings had been used in this Agreement.

26. **Waivers and Amendments; Rights of the Ad Hoc Group of Consenting First Lien Noteholders**.

Notwithstanding anything to the contrary contained herein, this Agreement may not be changed, modified, amended, or supplemented in any manner, nor shall any provision or requirement hereof be waived, except in accordance with this Section 26:

(a)     This Agreement may be modified, amended, or supplemented, or a condition or requirement of this Agreement may be waived, with the prior written consent of (i) Pyxus; and (ii) except as provided in Section 26(b) hereof, the Required Consenting Noteholders; provided, however, that any modification, amendment, supplement or waiver to or of this Agreement, to the extent affecting any economic term of the Restructuring set forth herein or any other material term, in each case in a manner adverse to the Consenting First Lien Noteholders in their capacity as Holders or prospective Holders of the First Lien Notes or the Exit Secured Notes, as applicable, shall also require the consent of the Required Ad Hoc First Lien Consenting Noteholders.

(b)     Any modification, amendment, supplement, waiver, or change described in this Section 26(b) requires the written consent specified in this Section 26(b).

(i)     Any modification, amendment, supplement, waiver, or change with respect to the following provisions of this Agreement requires the prior written consent of each Consenting Noteholder:  (A) Section 3 of this Agreement and (B) this Section 26.

(ii)     Any modification, amendment, supplement, waiver, or change with respect to any of the following requires the prior written consent of each Consenting First Lien Noteholder:  (A) the definition of "Consenting First Lien Noteholders" herein, (B) the definition of "Required Consenting First Lien Noteholders" herein and (C) the definition of "Required Consenting Noteholders" herein.

(iii)     Any modification, amendment, supplement, waiver, or change with respect to any of the following requires the prior written consent of each member of the Ad Hoc

Group of First Lien Noteholders: the definition of "Required Ad Hoc First Lien Consenting Noteholders" herein.

(iv)    Any modification, amendment, supplement, waiver, or change with respect to any of the following requires the prior written consent of the Required Ad Hoc First Lien Consenting Noteholders: (A) the definitions of "Confirmation Order", "Disclosure Statement", "Plan", "Exit Intercreditor Agreements", "Exit Secured Notes Indenture", "Interim DIP Order" and "Final DIP Order" and (B) Section 14(e).

(v)    Any modification, amendment, supplement, waiver, or change with respect to any of the following requires the prior written consent of each Consenting Second Lien Noteholder: (A) the definition of "Consenting Second Lien Noteholders" herein, (B) the definition of "Required Consenting Second Lien Noteholders" herein and (C) the definition of "Required Consenting Noteholders" herein.

(vi)    Any modification, amendment, supplement or waiver of any provision of this Agreement that is materially adverse and disproportionate on its face to a particular Consenting Noteholder or the Covered Claims/Interests held by a particular Consenting Noteholder relative to other Consenting Noteholders requires the consent of such affected Consenting Noteholder.

(vii)    Any modification of this Agreement to extend a Milestone shall require the consent of the Required Consenting Second Lien Noteholders but not the consent of any other Consenting Noteholder; provided, in no event shall the Milestone related to the Plan Effective Date be extended to a date more than 120 days from the Petition Date without the consent of each Consenting Noteholder.

(viii)    Any modification, amendment, supplement, waiver or change with respect to any provision of this Agreement that has a material and adverse effect on the Financing Commitment Parties in their capacity as such shall require the consent of at least three (3) unaffiliated Financing Commitment Parties who collectively have committed to provide greater than 66 2/3% of the total commitments provided by all Financing Commitment Parties pursuant to Section 6.

(ix)    Except as expressly set forth herein, any modification, amendment, supplement, waiver or change to this Agreement that requires a Consenting Noteholder to incur any additional expenses or financial obligations, or to agree to any commitments, undertakings, concessions, indemnities or other arrangements that could result in additional expenses or financial obligations to such Consenting Noteholder or its affiliates that are not to be reimbursed by the Debtors shall require the consent of such Consenting Noteholder.

(c)    Any proposed modification, amendment, supplement, or waiver that does not comply with this Section 26 shall be ineffective and void *ab initio.*

(d)    The waiver by any Party of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach.  No failure on the part of any Party to exercise, and no delay in exercising, any right, power, or remedy under this Agreement shall operate as a waiver of any such

right, power, or remedy or any provision of this Agreement, nor shall any single or partial exercise of such right, power, or remedy by such Party preclude any other or further exercise of such right, power, or remedy or the exercise of any other right, power, or remedy.  All remedies under this Agreement are cumulative and are not exclusive of any other remedies.

(e)    A Party shall be deemed to have given the written consent required by this Section 26 if counsel to such Party conveys such consent in writing (including by electronic mail) to counsel to the Party receiving such consent.

(f)    If at any time the Minimum Threshold Condition is not satisfied but members of the Ad Hoc Group of Consenting First Lien Noteholders are party to this Agreement, the Company's obligations to pay the Consenting Noteholder Advisors of the Ad Hoc Group of Consenting First Lien Noteholders in accordance with Section 8(f) may not be modified, amended, supplemented or waived without the consent of the applicable Consenting Noteholder Advisor. Notwithstanding anything in the foregoing, the fees of Perella Weinberg Partners L.P. shall be earned as of the Execution Date and payable upon consummation of the Plan, in each case subject to the terms of its Expense Reimbursement Agreement, and the Company's obligations to pay Perella Weinberg Partners L.P. in accordance with Section 8(f) may not be modified, amended, supplemented or waived without the consent of Perella Weinberg Partners L.P.

27.    **Several, Not Joint, Claims**.

The agreements, representations, warranties, and obligations of the Parties under this Agreement are, in all respects, several and not joint.

28.    **Independent Nature of Consenting Noteholders' Obligations and Rights**.

The obligations of each Consenting Noteholder under this Agreement and the transactions contemplated herein are several and not joint with the obligations of any other Consenting Noteholder, and no Consenting Noteholder shall be responsible in any way for the performance of the obligations of any other Consenting Noteholder under this Agreement or the transactions contemplated herein.  Nothing contained herein or in any other agreement referred to in this Agreement, and no action taken by any Consenting Noteholder pursuant hereto or thereto, shall be deemed to constitute the Consenting Noteholders as, and the Company Parties acknowledge that the Consenting Noteholders do not so constitute, a partnership, an association, a joint venture or any other kind of entity, or create a presumption that the Consenting Noteholders are in any way acting in concert or as a group, including, without limitation, with respect to any agreement, arrangement, or understanding with respect to acting together for the purpose of acquiring, holding, voting, or disposing of any equity securities of Pyxus or with respect to acting as a "group" within the meaning of Rule 13d-5 under the Securities Exchange Act of 1934, as amended, and the Company Parties will not assert any such claim with respect to such obligations or the transactions contemplated by this Agreement, and the Company Parties acknowledge that the Consenting Noteholders are not acting in concert or as a group with respect to such obligations or the transactions contemplated by this Agreement.  The Company Parties acknowledge and each Consenting Noteholder confirms that it has independently participated in the negotiation of the transactions contemplated herein.  Each Consenting Noteholder shall be entitled to independently protect and enforce its rights, including, without limitation, the rights arising out of this Agreement

and it shall not be necessary for any other Consenting Noteholder to be joined as an additional party in any proceeding for such purpose. The use of a single agreement to effectuate the transactions contemplated herein was solely in the control of the Company Parties, not the action or decision of any Consenting Noteholder, and was done solely for the convenience of the Company Parties and not because it was required or requested to do so by any Consenting Noteholder.

29.    **Automatic Stay.**

The Parties hereby acknowledge and agree and shall not dispute that after the commencement of the Chapter 11 Cases, any Party is authorized to terminate, and to take any action necessary to effectuate the termination of, this Agreement pursuant to terms hereof, notwithstanding Section 362 of the Bankruptcy Code or any other applicable law; underlined(provided), that nothing herein shall prejudice any Party's rights to argue that the giving of notice of termination was not otherwise proper under the terms of this Agreement. No cure period contained in this Agreement shall be extended pursuant to Sections 108 or 365 of the Bankruptcy Code or any other applicable law without the prior written consent of each of the Consenting Noteholders, and the Debtors hereby waive, to the greatest extent possible, the applicability of the automatic stay to such steps necessary to effectuate the termination of this Agreement. The Parties expressly stipulate and consent hereunder to the prospective modification of the automatic stay provisions of the Bankruptcy Code for purposes of exercising termination rights under this Agreement, to the extent the Bankruptcy Court determines in a Final order that such relief is applicable.

30.    **Settlement Discussions.**

This Agreement is part of a proposed settlement of matters that could otherwise be the subject of litigation among the Parties. Nothing herein shall be deemed an admission of any kind. Pursuant to Federal Rule of Evidence 408 and any applicable state rules of evidence, this Agreement and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than a proceeding related to the terms of this Agreement.

31.    **Consideration**.

The Parties hereby acknowledge that no consideration, other than that specifically described herein or in the other Definitive Restructuring Documents, shall be due or paid to any Party for its agreement to vote to accept the Plan in accordance with the terms and conditions of this Agreement, other than the Company Parties' representations, warranties and agreement to use its commercially reasonable efforts to seek to confirm and consummate the Plan.

32.    **Confidentiality and Publicity**.

(a)    Other than as may be required by applicable law and regulation or by any governmental or regulatory authority, no Party shall issue any press release, make any filing with the SEC (other than required under applicable securities law and regulation as reasonably determined in good faith by outside counsel to the Company Parties) or make any other public announcement regarding this Agreement without the consent of the Company Parties and the Required Consenting Noteholders, which consent shall not be unreasonably delayed, conditioned, or withheld, and each Party shall coordinate with the other Parties regarding any public statements

made, including any communications with the press, public filings or filings with the SEC, with respect to this Agreement; for the avoidance of doubt, each Party shall have the right, without any obligation to any other Party, to decline to comment to the press with respect to this Agreement.

(b)        Under no circumstances may any Party make any public disclosure of any kind that would disclose the names, particular holdings of Covered Claims/Interests, or the amount of loans or commitments under the DIP Facility of any Consenting Noteholder without the prior written consent of such Consenting Noteholder (it being understood and agreed that each Consenting Noteholder's signature page to this Agreement and the schedules hereto shall be redacted to remove the name of such Consenting Noteholder and the amount and/or percentage of Covered Claims/Interests held by, and commitments under the DIP Facility of, such Consenting Noteholder); provided that (x) the Company Parties may disclose the aggregate holdings of the Consenting Noteholders, but not individual holdings of any individual Consenting Noteholder (which shall be treated as "advisors' eyes only"), in any filing with the SEC in respect of this Agreement and (y) the Company Parties may disclose such amounts without consent to the extent that, upon the advice of counsel, it is required to do so by any governmental or regulatory authority or court of competent jurisdiction (including the Bankruptcy Court), or by applicable law, in which case the Company Parties, prior to making such disclosure, shall allow the Consenting Noteholders to whom such disclosure relates reasonable time at its own cost to seek a protective order with respect to such disclosures.  The Company Parties shall not name any Consenting Noteholder in any press release without such Consenting Noteholder's prior written consent.

(c)        The Company Parties will submit to counsel to the Consenting Noteholders all press releases and material public securities filings relating to this Agreement or the Restructuring and, except where it is not practicable to do so due to exigent circumstances outside of the Company Parties' control, provide counsel to the Consenting Noteholders a reasonable opportunity to review and comment on such press releases and public filings; provided that Pyxus shall be under no obligation to consult with, or obtain the prior approval of, any other Party as it relates to communications with vendors, customers, and other third parties regarding the general nature of the Restructuring.

33.    **Survival**.

Notwithstanding (i) a Permitted Transfer of Covered Claims/Interests in accordance with Section 13 or (ii) the termination of this Agreement in accordance with its terms (including without limitation pursuant to Sections 8 and 14(b)(i)), the agreements and obligations of the Parties in this Section 33 and Sections 1, 2(b), 8(f) (with respect to fees and expenses accrued prior to the termination of this Agreement), 9, 10, 11, 12, 14(i), 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 30 and 32(b), and in respect of the DIP Backstop Fee set forth (and as defined) under the heading "DIP Facility" in the Restructuring Term Sheet, shall survive such Permitted Transfer and/or termination and shall continue in full force and effect for the benefit of the Parties in accordance with the terms hereof.

*[Signature Pages Follow]*

IN WITNESS WHEREOF, this Agreement has been duly executed as of the date first above written.

**PYXUS INTERNATIONAL, INC.**

By: _____

Name:    Joel L. Thomas

Title:    Executive Vice President, Chief
Financial Officer

**ALLIANCE ONE INTERNATIONAL, LLC**
**ALLIANCE ONE NORTH AMERICA, LLC**
**ALLIANCE ONE SPECIALTY PRODUCTS, LLC**
**GSP PROPERTIES, LLC**

By: _____

Name:    Joel L. Thomas

Title:    Authorized Person

[Signature Page – Restructuring Support Agreement]

**EXHIBIT A**

**Form Of Transfer Agreement**

TRANSFER AGREEMENT

  The undersigned ("Transferee") hereby acknowledges that it has read and understands the Restructuring Support Agreement, dated as of  June 14, 2020 (including the Restructuring Term Sheet (as defined therein), together with all annexes, exhibits and schedules attached thereto, in each case, as may be amended, modified or supplemented from time to time only in accordance with the terms thereof, the "Agreement"), by and among (x) Pyxus International, Inc., a Virginia corporation, and each of its subsidiaries party thereto, (y) [TRANSFEROR'S NAME] ("Transferor") and (z) certain other Consenting Noteholders (as defined in the Agreement) party thereto, and (i) agrees to be bound by the terms and conditions of the Agreement to the extent Transferor was thereby bound, (ii) hereby makes as of the date hereof all representations and warranties made therein by all other Consenting Noteholders, and (iii) shall be deemed a Consenting First Lien Noteholder and/or a Consenting Second Lien Noteholder, as the case may be, under the terms of the Agreement, in each case, solely with respect to the Transferred Claims.  The Transferee is acquiring First Lien Notes Claims or Second Lien Notes Claims, as the case may be, from Transferor in the amounts set forth on Schedule 1 hereof (the "Transferred Claims").  All notices and other communications given or made pursuant to the Agreement shall be sent to the Transferee at the address set forth below in the Transferee's signature below.

Date Executed: _____

         [TRANSFEREE]

         By: _____
         Name:
         Title:

## SCHEDULE 1 TO TRANSFER AGREEMENT

| Transferor | Transferee | First Lien Notes Claims | Second Lien Notes Claims |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |

**<u>EXHIBIT B</u>**

**<u>Restructuring Term Sheet</u>**

[See separate attachment]

**Pyxus International, Inc.**
**Restructuring Term Sheet**

This term sheet (together with all annexes, exhibits and schedules attached hereto, the "**Term Sheet**") sets forth certain material terms of a proposed consensual restructuring (the "**Restructuring**") of the outstanding indebtedness and equity interests of Pyxus International, Inc. ("**Pyxus**") and certain of its affiliates identified below (collectively, the "**Debtors**" and together with all of their non-Debtor affiliates, the "**Company**").  This Term Sheet is the "Restructuring Term Sheet" referenced in the Restructuring Support Agreement (as amended, supplemented or otherwise modified in accordance with its terms, the "**RSA**"), dated as of June 14, 2020 and to which this Term Sheet is attached as Exhibit B.[1]

This Term Sheet does not address all terms that would be required in connection with the Restructuring or that will be set forth in the Definitive Restructuring Documentation which are subject to negotiations and execution.   The Restructuring will not contain any material terms or conditions that are inconsistent in any material respect with this Term Sheet.

| Overview of the Restructuring | |
|---|---|
| **Implementation** | The Restructuring will be implemented through prepackaged cases (the "**Chapter 11 Cases**") commenced by the Debtors under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") pursuant to a joint prepackaged plan of reorganization consistent with the RSA in all respects (the "**Plan**"). |
| | The Debtors in the Chapter 11 Cases will be (i) Pyxus, (ii) Alliance One International, LLC, (iii) Alliance One North America, LLC, (iv) Alliance One Specialty Products, LLC and (v) GSP Properties, LLC. |
| | As used in this Term Sheet, the term "**Reorganized Debtors**" means, collectively, the Debtors as reorganized pursuant to the Restructuring and any successor(s) thereto, as of the effective date of the plan (the "**Plan Effective Date**"). |
| **Debtors' Prepetition Claims and Interests to be Restructured** | All Claims (the "**ABL Claims**") arising under, derived from, or based on loans outstanding under the ABL Credit Agreement, dated as of October 14, 2016, by and among Pyxus, as borrower, each of the guarantors named therein, Deutsche Bank AG, New York Branch, as administrative agent and collateral agent, and the lenders from time to time party thereto (as amended, restated, supplemented or otherwise modified from time to time the "**ABL Credit Agreement**").  As of the Execution Date, the ABL Claims are $44,900,000 in aggregate principal amount of loans outstanding under the ABL Credit Agreement, all accrued and unpaid interest thereon, and all fees and expenses payable thereunder (and no letters of credit are outstanding thereunder). |
| | All Claims (the "**First Lien Notes Claims**") arising under, derived from, or based on the Indenture, dated as of October 14, 2016, by and among Pyxus, as issuer, the guarantors named therein and The Bank of New York Mellon Trust Company, N.A., as trustee and collateral agent (as amended, restated, supplemented or otherwise modified from time to time, the "**First Lien Notes Indenture**", and the 8.500% Senior Secured First Lien Notes due 2021 outstanding thereunder, the "**First Lien** |

---

[1]       Capitalized terms used but not defined herein shall have the meaning ascribed to them in the RSA.

|  | **Notes**").  As of the Execution Date, the First Lien Notes Claims are $275,000,000 in aggregate principal amount of First Lien Notes, all accrued and unpaid interest thereon, and all fees and expenses payable under the First Lien Notes Indenture. |
|  | All Claims (the "**Second Lien Notes Claims**") arising under, derived from, or based on the Indenture, dated as of August 1, 2013, by and among Pyxus, as issuer, the guarantors named therein and Law Debenture Trust Company of New York, as trustee and collateral agent (as amended, restated, supplemented or otherwise modified from time to time, the "**Second Lien Notes Indenture**", and the 9.875% Senior Secured Second Lien Notes due 2021 outstanding thereunder, the "**Second Lien Notes**").  As of the Execution Date, the Second Lien Notes Claims are $635,686,000 in aggregate principal amount of Second Lien Notes, all accrued and unpaid interest thereon, and all fees and expenses payable under the Second Lien Notes Indenture. |
|  | "**Pyxus Equity Interests**" include any equity security, as such term is defined in section 101(16) of the Bankruptcy Code, including all issued, unissued, authorized, or outstanding shares of capital stock and any other common stock, preferred stock, limited liability company interests, and any other equity, ownership, or profit interests of Pyxus, including all options, warrants, rights, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, repurchase rights, convertible, exercisable, or exchangeable securities, or other agreements, arrangements, or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in Pyxus, whether or not arising under or in connection with any employment agreement and whether or not certificated, transferable, preferred, common, voting, or denominated "stock" or a similar security. |
| **Means of Implementation** | |
| **DIP Facility** | The Chapter 11 Cases and the Company's business operations during the Chapter 11 Cases will be funded in part by a $206,700,000 delayed-draw term loan debtor-in-possession financing facility (the "**DIP Facility**", and the loans thereunder, the "**DIP Loans**"). |
|  | Pursuant to the RSA, and subject to the terms and conditions thereof, the Initial Commitment Parties have committed, on a several and not joint basis, to provide 100% of the DIP Facility.  Holders of Second Lien Notes may elect to participate in the DIP Facility to the extent, and in accordance with the terms and conditions, set forth in the DIP Facility Term Sheet. |
|  | The Company Parties shall pay to each Initial Commitment Party identified as a "Backstop Party" on Schedule 3 to the RSA its ratable share (based on such Initial Commitment Party's commitment in respect of the DIP Facility as a percentage of the aggregate commitments of all such Initial Commitment Parties in respect of the DIP Facility as of the Execution Date) of a non-refundable backstop fee (the "**DIP Backstop Fee**"), which fee shall be earned on the Execution Date and due and payable (A) on the Plan Effective Date, in full in-kind in the form of New Common Stock equal to 4.25% of the aggregate New Common Stock, subject to dilution by (x) the MIP and (y) the Second Lien Notes RSA Fee or (B) if earlier, on the third Business Day immediately following the earliest of (x) (I) the termination of the RSA with respect |

| | |
|---|---|
| | to the Consenting Second Lien Noteholders or (II) the acceleration of the DIP Loans and the termination of the commitments under the DIP Facility, in each case of this clause (x) as a result of a breach by a Debtor or its affiliates of its obligations under the RSA or the DIP Credit Agreement, (y) the termination of the RSA pursuant to Section 14(b)(i) or (z) the repayment in full in cash of the DIP Facility, in cash in an amount equal to $18.0 million. |
| **Exit ABL Facility** | On the Plan Effective Date, Reorganized Pyxus will enter into a credit agreement as the borrower in respect of a senior secured asset-based revolving or term loan credit facility (the "**Exit ABL Facility**") providing for commitments of no less than $60 million from one or more third party lenders or existing creditors of the Company having terms and conditions consistent with this Term Sheet and otherwise consistent with the RSA in all respects. <br><br> The rights and priorities of the liens securing the Exit ABL Facility, the Exit Secured Notes (as defined below) or the Replacement First Lien Financing (as defined below), as applicable, and the Exit Term Facility (as defined below) shall be set forth in the Exit Intercreditor Agreement. |
| **Exit Secured Notes** | On the Plan Effective Date, Reorganized Pyxus will issue notes (the "**Exit Secured Notes**") in an initial aggregate principal amount equal to $280.8 million having terms and conditions consistent with this Term Sheet and the Exit Secured Notes Term Sheet and otherwise consistent with the RSA in all respects. <br><br> Notwithstanding the foregoing, solely if Pyxus obtains and accepts a binding commitment for Replacement First Lien Financing on or prior to the 60th day after the Petition Date (or, if earlier, the confirmation date), such Replacement First Lien Financing shall be consummated on the Plan Effective Date and Reorganized Pyxus shall not issue any Exit Secured Notes. <br><br> "**Replacement First Lien Financing**" means a financing facility or notes (i) in an aggregate principal amount sufficient to refinance the First Lien Notes in full (but not in part), in cash, including the payment of the redemption premium and accrued and unpaid interest, (ii) having economic terms that are more favorable to Reorganized Pyxus in the aggregate (and no less favorable in any material respect) than the economic terms of the Exit Secured Notes and (iii) having non-economic terms and conditions that are as or more favorable to Reorganized Pyxus in all material respects than the Exit Secured Notes. |
| **Exit Term Facility** | On the Plan Effective Date, the outstanding DIP Loans shall automatically convert into or be exchanged for (the "**DIP-to-Exit Facility Conversion**") term loans under a secured term loan facility (the "**Exit Term Facility**") having terms and conditions consistent with this Term Sheet and the Exit Term Facility Term Sheet and otherwise consistent with the RSA in all respects.  The initial aggregate principal amount of term loans under the Exit Term Facility (the "**Exit Term Loans**") shall equal (x) the aggregate principal amount of DIP Loans outstanding on the Plan Effective Date immediately prior to the DIP-to-Exit Facility Conversion, *plus* (y) the Total Exit Fee (as defined in the DIP Credit Agreement). |

| New Common Stock | On and after the Plan Effective Date, Reorganized Pyxus will issue New Common Stock as set forth in this Term Sheet.  The rights and obligations of the holders of New Common Stock will be set forth in the New Shareholders Agreement consistent with the RSA in all respects. |
|---|---|

| **Treatment of Claims and Interests** |
|---|

Holders of allowed Claims against and equity interests in the Debtors will receive the following treatment in full and final satisfaction of such allowed Claims (including accrued and unpaid interest, as applicable) and equity interests, which shall be released and discharged under the Plan.

| **Type of Claim** | **Treatment** | **Impairment/ Voting** |
|---|---|---|
| **Treatment of Administrative, Priority and Tax Claims** | Except to the extent that a holder of an allowed Administrative / Priority / Tax Claim (as defined below) agrees to less favorable treatment, each holder of an allowed administrative, priority or tax Claim (an "**Administrative / Priority / Tax Claim**") shall have such Claim satisfied in full, in cash, which payments shall be made in the ordinary course of business or on the later of the Plan Effective Date (or as soon thereafter as reasonably practicable) and the date on which such Claim becomes an allowed Claim (or as soon as reasonably practicable thereafter), or otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code. | Unimpaired Deemed to accept |
| **Treatment of DIP Facility Claims** | Each holder of an allowed Claim arising under, derived from, or based on the DIP Facility (a "**DIP Facility Claim**") shall receive, on the Plan Effective Date, (a) payment in full in cash of all accrued and unpaid interest on all outstanding DIP Loans and all fees (other than the DIP Exit Fee) and expenses payable pursuant to the DIP Documents and (b) its *pro rata* share (determined based on the aggregate principal amount of DIP Loans held by such DIP Lender as a percentage of all DIP Loans outstanding on the Plan Effective Date) of (x) the Exit Term Loans and (y) the Exit Equity. The "**Exit Equity**" shall mean New Common Stock equal to 45.0% of the aggregate New Common Stock (subject to dilution by (x) the MIP and (y) the Second Lien Notes RSA Fee). | N/A |
| **Treatment of Other Secured Claims** | Except to the extent that a holder of an allowed Other Secured Claim (as defined below) agrees to less favorable treatment, to the extent such Claim has not already been paid in full during the Chapter 11 Cases, each holder of an allowed Other Secured Claim shall receive, at the option of the Debtors and with the consent of the Required Consenting Noteholders: (a) payment in full in cash of the due and unpaid portion of its Other Secured Claim on the later of (x) the Plan Effective Date (or as soon thereafter as reasonably practicable) and (y) as soon as practicable after the date such Claim becomes due and payable; (b) the collateral securing its allowed Other Secured Claim; | Unimpaired Deemed to Accept |

4

| | (c) reinstatement of its allowed Other Secured Claim; or (d) such other treatment rendering its allowed Other Secured Claim unimpaired in accordance with section 1124 of the Bankruptcy Code. "**Other Secured Claim**" means any secured claim against any Debtor, other than an ABL Claim, a First Lien Notes Claim, a Second Lien Notes Claim, or a DIP Facility Claim, including any secured tax Claim. | |
|---|---|---|
| **Treatment of ABL Claims** | Each holder of an allowed ABL Claim shall have such Claim paid in full in cash on the date of the initial funding under the DIP Facility from the proceeds thereof. | N/A |
| **Treatment of First Lien Notes Claims** | Each holder of an allowed First Lien Notes Claim shall receive on the Plan Effective Date either (1) (a) payment in cash of all accrued and unpaid interest on such holder's First Lien Notes at the non-default rate (to the extent not paid during the Chapter 11 Cases) and (b) its *pro rata* share of $280.8 million of Exit Secured Notes, constituting the principal amount of Exit Secured Notes together with the redemption premium, or (2) its *pro rata* share of $280.8 million plus all accrued and unpaid interest due on such holder's First Lien Notes at the non-default rate (to the extent not paid during the Chapter 11 Cases) payable in cash with the proceeds of the Replacement First Lien Financing. | Impaired Entitled to Vote |
| **Treatment of Second Lien Notes Claims** | Each holder of an allowed Second Lien Notes Claim shall either receive (1) its *pro rata* share (based on a denominator of $635,686,000) of 100% of the New Common Stock on the Plan Effective Date (subject to dilution by (a) the MIP, (b) the Exit Equity, (c) the DIP Backstop Fee and (d) the Second Lien Notes RSA Fee) (the "**Second Lien Notes Stock Option**") or (2) cash equal to 2.00% of the principal amount of all Second Lien Notes beneficially owned by such holder as of the date of distribution to holders of allowed Second Lien Notes Claims (the "**Second Lien Notes Cash Option**"). A Holder of an allowed Second Lien Notes Claims must elect to participate in either the Second Lien Notes Cash Option or the Second Lien Notes Stock Option as to the entirety of the Second Lien Notes Claim beneficially owned by such Holder. A holder of an allowed Second Lien Notes Claim that elects to participate in the Second Lien Notes Stock Option must duly and timely complete and submit an election form in accordance with the instructions set forth therein (the "**Second Lien Notes Stock Election Form**"). A holder of an allowed Second Lien Notes Claim that elects to participate in the Second Lien Notes Cash Option does **not** need to complete or submit a Second Lien Notes Stock Election Form.  For the avoidance of doubt, a holder of an allowed Second Lien Notes Claim that does not duly and timely submit a Second Lien Notes Stock Election Form in accordance with the instructions set forth | Impaired Entitled to Vote |

| | therein will be deemed to have elected the Second Lien Notes Cash Option.<br><br>Shares of New Common Stock that would have been issued to holders of Second Lien Notes Claims who duly and timely exercise (or are deemed to have exercised) the Second Lien Notes Cash Option had such holders duly and timely exercised the Second Lien Notes Stock Option will be allocated (a) 50.75% to holders of Second Lien Notes who duly and timely exercise the Second Lien Notes Stock Option, (b) 45% to the recipients of the Exit Equity and (c) 4.25% to the recipients of the DIP Backstop Fee (in each case ratably among the persons entitled to such distributions or fees, as applicable). | |
|---|---|---|
| **Treatment of Foreign Credit Line Claims** | Except to the extent that a holder of an allowed Foreign Credit Line Claim (as defined below) agrees to less favorable treatment, each holder of an allowed Claim arising under, derived from, or based on any Debtors' obligations under foreign credit lines (a "**Foreign Credit Line Claim**") shall be reinstated. | Unimpaired<br><br>Deemed to Accept |
| **Treatment of General Unsecured Claims** | Except to the extent that a holder of an allowed General Unsecured Claim (as defined below) agrees to less favorable treatment, each holder of an allowed General Unsecured Claim shall receive, at the Debtors' option and with the consent of the Required Consenting Noteholders: (i) if such allowed General Unsecured Claim is due and payable on or before the Plan Effective Date, payment in full, in cash, of the unpaid portion of its allowed General Unsecured Claim on the Plan Effective Date; (ii) if such allowed General Unsecured Claim is not due and payable on or before the Plan Effective Date, payment in the ordinary course of business consistent with past practices; or (iii) other treatment, as may be agreed upon by the Debtors and the Required Consenting Noteholders, such that such allowed General Unsecured Claim shall be rendered unimpaired pursuant to section 1124(1) of the Bankruptcy Code.<br><br>"**General Unsecured Claim**" means any claim against a Debtor that is not an Administrative / Priority / Tax Claim, a DIP Facility Claim, an ABL Claim, a First Lien Notes Claim, a Second Lien Notes Claim, a Foreign Credit Line Claim, an Intercompany Claim (as defined below) or any claim arising under section 510(b) of the Bankruptcy Code. | Unimpaired<br><br>Deemed to Accept |
| **Treatment of Intercompany Claims** | On the Plan Effective Date, each claim against a Debtor held by another Debtor or a non-Debtor  affiliate (an "**Intercompany Claim**") shall be, at the option of the Debtors and with the reasonable consent of the Required Consenting Second Lien Noteholders, either reinstated, compromised, or canceled and released without any distribution on account thereof, subject to any Corporate Restructuring Transactions (as defined below). | Impaired<br><br>Deemed to Reject<br><br>or<br><br>Unimpaired<br><br>Deemed to Accept |

| | | |
|---|---|---|
| **Treatment of Intercompany Interests** | On the Plan Effective Date, the equity interests in each of the Debtors other than Pyxus shall be reinstated, subject to any Corporate Restructuring Transactions. | Unimpaired<br><br>Deemed to Accept |
| **Treatment of Pyxus Equity Interests** | On the Plan Effective Date, all Pyxus Equity Interests shall be discharged, cancelled, released, and extinguished, without any distribution on account thereof, and will be of no further force or effect.<br><br>Notwithstanding the foregoing, each Qualifying Holder of Pyxus Common Stock will receive its *pro rata* share of the Existing Common Stock Cash Pool (as defined below) (determined based upon the aggregate number of shares of Pyxus common stock held by such holder as a percentage of all shares of Pyxus common stock outstanding as of the applicable record date).  Any portion of the Existing Common Stock Cash Pool attributable to a holder of Pyxus common stock that is not a Qualifying Holder of Pyxus Common Stock shall be retained by the Reorganized Debtors.<br><br>"**Existing Common Stock Cash Pool**" means $1,000,000 of cash.<br><br>"**Qualifying Holder of Pyxus Common Stock**" means each holder of Pyxus common stock that does not (i) opt out of the releases in the Plan prior to the deadline for doing so or (ii) oppose or object to, or seek to impede or delay, confirmation of the Plan. | Impaired<br><br>Deemed to Reject |
| **Other Terms of the Restructuring** | | |
| **Executory Contracts and Unexpired Leases** | All of the Debtors' executory contracts and unexpired leases shall be assumed as of the Plan Effective Date other than those identified on a schedule of rejected contracts or leases to be filed as part of a Plan supplement as determined by Pyxus, with the reasonable consent of Required Consenting Second Lien Noteholders and in consultation with the Consenting First Lien Noteholders. | |

| | |
|---|---|
| **Management Incentive Plan** | The Reorganized Debtors shall adopt and implement, on or after the Plan Effective Date, a management incentive plan (such plan, the "**MIP**") pursuant to which 8% of the New Common Stock on a fully diluted basis shall be reserved for grant to the participants; provided, all individual grants under the MIP will be determined by the Reorganized Pyxus Board (as defined below). |
| **Board of Reorganized Company** | The board of directors (or similar governing body) of Reorganized Pyxus (the "**Reorganized Pyxus Board**") initially shall include seven (7) directors, comprised of the Chief Executive Officer of Reorganized Pyxus, two (2) directors appointed by Glendon Capital Management LP (or its applicable affiliates), two (2) directors appointed by Monarch Alternative Capital LP (or its applicable affiliates) and two (2) independent directors appointed by the Financing Commitment Parties in a manner customary for transactions of this type, each of whom shall be identified in the Plan supplement. |
| **Organizational and Governance Matters** | The charter, bylaws, and/or other organizational documents of each of the Reorganized Debtors, other than Reorganized Pyxus, shall be amended and restated in a manner consistent with section 1123(a)(6) of the Bankruptcy Code and in a manner consistent with the RSA in all respects. The rights and obligations of the holders of the New Common Stock shall be set forth in the New Shareholders Agreement and each holder of New Common Stock as of the Plan Effective Date shall be deemed party to and bound by the New Shareholders Agreement whether or not such holder executes and delivers a counterpart to the New Shareholders Agreement. |
| **Tax Matters** | The Debtors and Required Consenting Noteholders shall negotiate in good faith to determine a structure to implement the Restructuring in a tax-efficient manner as agreed among the Reorganized Debtors and the Required Consenting Second Lien Noteholders. |
| **Conditions Precedent to Consummation of the Plan** | The consummation of the Plan and the occurrence of the Plan Effective Date shall be subject to the satisfaction of certain conditions precedent customary in transactions of the type described herein, including the following:<br><br>• The RSA shall remain in full force and effect and shall not have been terminated.<br><br>• The Final DIP Order shall remain in full force and effect and no event of default shall have occurred and be continuing under the DIP Facility.<br><br>• All conditions precedent to the effectiveness of the Exit ABL Facility having terms and conditions consistent with this Term Sheet and otherwise consistent with the RSA in all respects shall have been satisfied or duly waived.<br><br>• The final version of the Plan supplement and all of the schedules, documents, and exhibits contained therein, and all other schedules, documents, supplements, and exhibits to the Plan, shall be consistent with the RSA in all respects, and shall have been filed in a manner consistent with the RSA in all respects. |

|  | • The Debtors and, in respect of any necessary anti-trust approvals, the applicable Consenting Noteholders shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan and each of the other transactions contemplated by the Restructuring.<br><br>• The Bankruptcy Court shall have entered the Confirmation Order in form and substance consistent with the RSA in all respects and such order shall be a final order.<br><br>• All fees and expenses (including the fees payable pursuant to Sections 8(f) and 18 of the RSA, the DIP Backstop Fee and the DIP Exit Fee) shall have been paid in full in accordance with the RSA and the DIP Credit Agreement.<br><br>The conditions precedent may be waived by the Debtors with the consent of the Required Consenting Noteholders. |
|---|---|
| **Director and Officer Indemnification** | Any obligations of the Debtors pursuant to their organizational documents to indemnify current and former officers, directors, agents, and/or employees shall not be discharged or impaired by confirmation of the Plan.<br><br>Director and officer insurance will continue in place for the directors and officers of all of the Debtors during the Chapter 11 Cases on existing or comparable terms.<br><br>To the extent not previously obtained, on or prior to the Plan Effective Date, the Debtors shall acquire a standard tail policy covering any director and officer at any time prior to the Plan Effective Date in at least the scope and amount as currently maintained by the Debtors for six years after the Plan Effective Date.  Any such tail policy shall not be impaired or terminated by the Plan. |
| **Exemption from SEC Registration; Company Status** | The issuance of all New Common Stock and the Exit Secured Notes (and, in each case, the rights with respect thereto) under the Plan will be exempt from registration with the U.S. Securities and Exchange Commission (the "**SEC**") under section 1145 of the Bankruptcy Code. To the extent section 1145 is unavailable, such securities shall be exempt from SEC registration as a private placement pursuant to Section 4(2) of the Securities Act of 1933, as amended, and/or the safe harbor of Regulation D promulgated thereunder, or such other exemption as may be available from any applicable registration requirements.<br><br>Reorganized Pyxus shall be a public, SEC reporting company or a private, non-SEC reporting company on the Effective Date as mutually agreed upon by the Company and the Required Consenting Second Lien Noteholders and as disclosed in a supplement to the Plan. |
| **Employee Matters** | The Pyxus International, Inc. Executive Officer Retention Plan and the Pyxus International, Inc. Key Employee Retention Plan, each approved on April 17, 2020, shall be assumed pursuant to the Plan, and the terms and conditions thereof may not be modified without the consent of the Debtors and the Required Consenting Noteholders. |

| | |
|---|---|
| **Releases; Other Customary Plan Provisions** | The Plan will provide for other standard and customary provisions, including provisions in respect of the cancellation of existing claims and interests; exculpations, injunctions and mutual releases in the form set forth **Annex 1**; the vesting of assets; the compromise and settlement of claims; the retention of jurisdiction by the Bankruptcy Court; and the resolution of disputed claims. |
| **Corporate Restructuring Transaction** | The Confirmation Order shall be deemed to authorize, among other things, all actions as may be necessary or appropriate, consistent with the RSA, to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan. |
| | The Reorganized Debtors may implement certain corporate restructuring transactions on or after the Plan Effective Date as approved by and having terms and conditions satisfactory to the Required Consenting Noteholders (the "**Corporate Restructuring Transactions**"). The Corporate Restructuring Transactions may include the transfer, merging and consolidation of certain of Pyxus' domestic and non-domestic subsidiaries in order to, among other things, organize such subsidiaries geographically and/or along product lines, rationalize corporate organization and maximize certain tax benefits and attributes. The Corporate Restructuring Transaction may be described in the Plan or the Confirmation Order. |

**Annel 1**[2]

**Release and Exculpation Language**

1.  "Causes of Action" means any claims, interests, damages, remedies, causes of action, demands, rights, actions, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, Liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable, directly or derivatively, matured or unmatured, suspected or unsuspected, in contract, tort, law, equity, or otherwise. Causes of Action also include:  (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law; (b) the right to object to or otherwise contest Claims or Interests; (c) claims pursuant to sections 362, 510, 542, 543, 544 through 550, or 553 of the Bankruptcy Code; (d) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any state or foreign law fraudulent transfer or similar claim.

2.  "Exculpated Party" means, collectively, and in each case in its capacity as such: (a) the Debtors; (b) the Reorganized Debtors; (c) each Related Party of each Entity in clauses (a) and (b); and (d) any other Person entitled to the protections of section 1125(e) of the Bankruptcy Code; *provided* that non-Debtor Affiliates of the Debtors shall not be Exculpated Parties.

3.  "Related Party" means, each of, and in each case in its capacity as such, current and former directors, managers, officers, investment committee members, special or other committee members, equityholders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds, predecessors, participants, successors, assigns, subsidiaries, Affiliates, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, employees, agents, trustees, advisory board members, financial advisors, attorneys (including any other attorneys or professionals retained by any current or former director or manager in his or her capacity as director or manager of an Entity), accountants, investment bankers, consultants, representatives, and other professionals and advisors and any such Person's or Entity's respective heirs, executors, estates, and nominees.

4.  "Released Party" means collectively, and in each case in its capacity as such:  (a) each of the Debtors; (b) the Reorganized Debtors; (c) the DIP Agent; (d) each of the DIP Lenders; (e) each Holder of a First Lien Notes Claim who votes in favor of the Plan; (f) the First Lien Notes Indenture Trustee; (g) each Holder of a Second Lien Notes Claim who votes in favor of the Plan; (h) the Second Lien Notes Indenture Trustee; (i) the agents or indenture trustees under the Exit Secured Notes, Exit ABL Facility, and Exit Term Facility; (j) each lender or holder under the Exit Secured Notes, Exit ABL Facility, and Exit Term Facility; (k) the Initial Commitment Parties; (l) each current and former Affiliate of each Entity in clause (a) through (k); and (m) each Related Party of each Entity in clause (a) through (l); *provided, however*, that in each case, an Entity shall not be a Released Party if it (A) timely provides, either formally or informally in writing, an objection to the releases contained in Article VIII.E of the Plan that is not resolved before Confirmation of the Plan or (B) elects to opt out of the releases contained in Article VIII.F of the Plan; *provided, further*, that any such Entity shall be identified by name as a non-Released Party in the Confirmation Order.

---

[2]     Capitalized terms used but not defined in this Annex 1 shall have the meaning ascribed to them in the Plan.

5. "Releasing Parties" means collectively and in each case in their capacity as such: (a) the Released Parties identified in subsection (a)–(l) and those Released Parties identified in subsection (m) of the definition of "Released Party" on behalf of whom the parties identified in subsections (a)–(l) of the definition of "Released Party" have the authority, including under any agreement or applicable non-bankruptcy law, to grant the Third-Party Release set forth in Article VIII.F of the Plan; (b) the Holders of all Claims and Interests who vote to accept the Plan; (c) the Holders of all Claims or Interests that are Unimpaired under the Plan; (d) the Holders of all Claims or Interests whose vote to accept or reject the Plan is solicited but who do not vote either to accept or to reject the Plan and do not opt out of granting the releases set forth herein; (e) the Holders of all Claims or Interests who vote to reject the Plan but do not opt out of granting the releases set forth herein; (f) the Holders of all Claims or Interests (other than Holders of Existing Pyxus Interests) who are deemed to reject the Plan and who do not (A) timely provide, either formally or informally in writing, an objection to the releases contained in Article VIII.F of the Plan or (B) elect to opt out of the releases contained in Article VIII.F of the Plan; (g) the Holders of all Claims and Interests (other than Holders of Existing Pyxus Interests) who were given notice of the opportunity to opt out of granting the releases set forth herein but did not opt out; (h) the Holders of Existing Pyxus Interests who do not duly submit an Equityholder Opt-Out Form opting out of the releases contained in Article VIII.F of the Plan; and (i) each Related Party of each Entity in clause (b) through clause (h).

*Debtor Release*

**Effective as of the Effective Date, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Effective Date, each Released Party is deemed released and discharged by each and all of the Debtors, the Reorganized Debtors, and their Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Causes of Action, whether known or unknown (including any derivative claims, asserted or assertable on behalf of any of the Debtors) that the Debtors, the Reorganized Debtors, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), the purchase, sale, or rescission of any Security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the DIP Facility, the DIP Orders, the First Lien Notes, the Second Lien Notes, the Exit ABL Facility, the Exit Term Facility, the Exit Secured Notes or Replacement First Lien Financing, as applicable, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, entry into, or Filing of, as applicable, the Restructuring Support Agreement and related prepetition transactions, the Disclosure Statement, the New Pyxus Constituent Documents, the New Shareholders Agreement, the Plan, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the New Pyxus Constituent Documents, the New Shareholders Agreement, or the Plan (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion), the Plan Supplement, the Filing of the Chapter 11 Cases, the pursuit of Confirmation of the Plan, the pursuit of Consummation of the Plan, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act, omission, transaction, agreement, event, or other occurrence taking**

place on or before the Effective Date except for claims or liabilities arising out of or relating to any act or omission by a Released Party that is determined in a Final Order of a court of competent jurisdiction to have constituted actual fraud. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any obligations arising after Consummation of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, including the assumption of the Indemnification Provisions as set forth in the Plan.

*Third-Party Release*

Effective as of the Effective Date, each Releasing Party, in each case on behalf of itself and its respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, is deemed to have released and discharged each Debtor, Reorganized Debtor, and Released Party from any and all Causes of Action, whether known or unknown (including any derivative claims, asserted or assertable on behalf of any of the Debtors) that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership or operation thereof), the purchase, sale, or rescission of any Security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the DIP Facility, the DIP Orders, the First Lien Notes, the Second Lien Notes, the Exit ABL Facility, the Exit Term Facility, the Exit Secured Notes or Replacement First Lien Financing, as applicable, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, entry into, or Filing of, as applicable, the Restructuring Support Agreement and related prepetition transactions, the Disclosure Statement, the New Pyxus Constituent Documents, the New Shareholders Agreement, the Plan, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the New Pyxus Constituent Documents, the New Shareholders Agreement, or the Plan (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion), the Plan Supplement, the Filing of the Chapter 11 Cases, the pursuit of Confirmation of the Plan, the pursuit of Consummation of the Plan, the administration and implementation of the Plan, including the issuance or distribution of any Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act, omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date except for claims or liabilities arising out of or relating to any act or omission by a Released Party that is determined in a Final Order of a court of competent jurisdiction to have constituted actual fraud. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any obligations arising after Consummation of any party or Entity under the Plan, any Restructuring Transaction, any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, including the assumption of the Indemnification Provisions as set forth in the Plan.

*Exculpation*

Effective as of the Effective Date, to the fullest extent permissible under applicable law and without affecting or limiting either the Debtor Release or the Third-Party Release, and except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party

is released and exculpated from any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the formulation, preparation, dissemination, negotiation, entry into, or Filing of, as applicable, the Restructuring Support Agreement and related prepetition transactions, the Chapter 11 Cases, the Disclosure Statement, the Plan, the Plan Supplement, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the Filing of the Chapter 11 Cases, the pursuit of Confirmation of the Plan, the pursuit of Consummation of the Plan, the administration and implementation of the Plan, including the issuance of any Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion), except for claims or liabilities arising out of or relating to any act or omission that is determined in a Final Order of a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

*Injunction*

**Effective as of the Effective Date, pursuant to section 524(a) of the Bankruptcy Code, to the fullest extent permissible under applicable law, and except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities that have held, hold, or may hold Claims or Interests that have been released, discharged, or are subject to exculpation are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties: (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (3) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims or Interests unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a claim or interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released or settled pursuant to the Plan.**

## **EXHIBIT C**

## **DIP Facility Term Sheet**

[See separate attachment]

**Pyxus International, Inc.**
**DIP Facility Term Sheet**

This term sheet (together with all annexes, exhibits and schedules attached hereto, the "**Term Sheet**") sets forth certain material terms of the proposed DIP Facility (as defined below) and related accommodations. This Term Sheet is the "DIP Facility Term Sheet" referenced in the Restructuring Support Agreement (as amended, supplemented or otherwise modified in accordance with its terms, the "**RSA**"), dated as of June 14, 2020 and to which this Term Sheet is attached as Exhibit C.[1]

This Term Sheet does not address all terms that would be required in connection with the DIP Facility or that will be set forth in the DIP Documents which are subject to negotiations and execution. The DIP Documents will not contain any material terms or conditions that are inconsistent in any material respect with this Term Sheet.

| | |
|---|---|
| **Overview** | The DIP Lenders (as defined below) intend to provide, subject to the terms and conditions set forth herein and in the RSA, a debtor-in-possession financing to be used to refinance the ABL Credit Agreement (as defined below) and fund Pyxus' working capital during the pendency of the Chapter 11 Cases under the Bankruptcy Code. |
| **Borrower** | Pyxus International, Inc. ("**Pyxus**" or the "**Borrower**"). |
| **Guarantors** | Alliance One International, LLC, Alliance One North America, LLC, Alliance One Specialty Products, LLC, GSP Properties, LLC, A.C. Monk & Company, Inc., Alliance One International Services Inc., AOSP Investments, LLC, Austin Carolina Company, Carolina Leaf Tobacco Co., Inc., China American Tobacco Company, Cres Tobacco Company LLC, Dibrell Brothers, Incorporated, Dimon International, Inc., Eastern Carolina Packaging, LLC, Global Specialty Products, LLC, Monk Austin International, Inc., The Austin Tobacco Company, Incorporated, Tobacco Services, LLC, W.A. Adams Company, Twelfth State Brands, LLC, Pyxus Agriculture USA, LLC, PureAg-NC, LLC, Criticality, LLC, Alliance One International Holdings, Ltd., Pyxus Agricultural Holdings Limited, Trans-Continental Leaf Tobacco Corp., Ltd. ("**TCLTC**") (collectively, the "**Loan Guarantors**" and, together with the Borrower, the "**Loan Parties**"). |
| **Administrative Agent and Collateral Agent** | Cortland Capital Market Services LLC shall act as the administrative agent and as the collateral agent for the DIP Facility (in such capacities, the "**DIP Agent**"). |
| **Lenders** | The Initial Commitment Parties, together with any permitted assignees and successors (including pursuant to the DIP Allocation (as defined below)), each a "**DIP Lender**", and collectively, the "**DIP Lenders**". |
| **DIP Allocation** | Each holder of Second Lien Notes as of June 5, 2020 (the "**Record Date**") |

---

[1]    Capitalized terms used but not defined herein shall have the meaning ascribed to them in the RSA.

that (x) is a signatory to the RSA as of the Execution Date, or that becomes a signatory thereto after the Execution Date and is a Qualifying DIP Participant (as defined below), shall have the right to participate in 87.5% of the DIP Facility based on its Second Lien Notes Pro Rata Share (as defined below) and (y) is a member of the *ad hoc* group of holders of Second Lien Notes shall also have the right to participate in 12.5% of the DIP Facility based on the schedule set forth in the RSA (the "**DIP Allocation**"). The DIP Allocation will be conducted on terms and conditions set forth in syndication procedures and related documentation, which procedures and documentation shall be reasonably satisfactory to the Required Financing Commitment Parties (as defined below) and Pyxus (the "**Syndication Procedures**"); *provided*, the Financing Commitment Parties shall use commercially reasonable efforts to cause the Syndication Procedures to be distributed as soon as reasonably practicable and in no event later than 10:00 am New York Time on the Business Day immediately following the date of the Bankruptcy Court's entry of the Interim DIP Order (or such later date as agreed by Pyxus and the Required Financing Commitment Parties). Pursuant to the Syndication Procedures, each Qualifying DIP Participant electing to participate in the DIP Facility shall, among other things (i) provide written notification of such election to the DIP Agent by no later than the date that is ten (10) calendar days after the date of the Bankruptcy Court's entry of the Interim DIP Order (the "**DIP Allocation Date**") and (ii) execute a joinder to (A) the RSA and (B) the DIP Credit Agreement (attached as <u>Annex II</u> hereto).  Each applicable Initial Commitment Party shall have the right, subject to its commitment under Section 6 of the RSA, to assign its commitments in respect of the DIP Facility to participating Qualifying DIP Participants in accordance with the DIP Allocation (the effective date of the assignment of such commitments pursuant to the DIP Allocation, the "**DIP Allocation Date**").

"**Qualifying DIP Participant**" means a holder of Second Lien Notes that (x) is an accredited investor (as defined by Rule 501 of the Securities Act), (y) is entitled to a minimum DIP Allocation of $3.5 million in principal amount of DIP Loans pursuant to the Syndication Procedures and (z) certifies, and whose nominee certifies, that it was the beneficial owner of such Second Lien Notes as of the Record Date.

"**Second Lien Notes Pro Rata Share**" means, with respect to each holder of Second Lien Notes, (x) the aggregate principal amount of Second Lien Notes beneficially owned by such holder of Second Lien Notes as of the Record Date, *divided by* (y) the aggregate principal amount of all Second Lien Notes outstanding at such time.

"**Required Financing Commitment Parties**" means Financing Commitment Parties holding at least a majority of the aggregate outstanding principal amount of DIP Loans and commitments in respect of the DIP Facility held by all Financing Commitment Parties at the applicable time.

| | |
|---|---|
| **Existing ABL Facility** | That certain ABL Credit Agreement, dated as of October 14, 2016, by and among Pyxus, as borrower, each of the guarantors named therein, Deutsche Bank AG, New York Branch, as administrative agent and collateral agent, and the lenders from time to time party thereto (as amended, restated, supplemented or otherwise modified from time to time, the "**ABL Credit Agreement**"). |
| **Adequate Protection – First Lien Notes** | The collateral agent under the First Lien Notes Indenture for the benefit of itself and the holders of First Lien Notes shall, in respect of the First Lien Notes and the other secured obligations under the First Lien Notes Indenture (the "**First Lien Notes Obligations**"), be granted the following protection, pursuant to sections 361, 507, 363(e) and 364(d)(1) of the Bankruptcy Code or otherwise, of its pre-petition security interests for any diminution in the value of the pre-petition security interests of such party (each such diminution, a "**Diminution in Value**"), whether or not such Diminution in Value results from the sale, lease or use by the Debtors of the collateral securing the First Lien Notes Obligations (including, without limitation, cash collateral), or from the stay of enforcement of any pre-petition security interest arising from section 362 of the Bankruptcy Code, or otherwise:

(i) <u>Adequate Protection Lien</u>. Effective and perfected as of the date of the Bankruptcy Court's entry of the Interim DIP Order and without the necessity of the execution of mortgages, security agreements, pledge agreements, financing statements or other agreements, a security interest on all DIP Collateral, subject and subordinate only to (x) Liens on the DIP Priority Collateral (as defined below) of the Debtors securing the obligations under the DIP Facility (other than DIP Liens on First Lien Notes Priority Collateral), (y) the Carve Out (as defined below) and (z) certain adequate protection liens granted to the lenders under the Debtors' prepetition ABL and receivables facilities, subject to the priorities set forth in the draft interim order attached to the DIP Credit Agreement (the "**First Lien Notes Adequate Protection Lien**").

(ii) <u>Super-Priority Claim</u>. Entitled to joint and several superpriority claim status in the Chapter 11 Cases, subject and subordinate only to (x) the obligations under the DIP Facility (other than with respect to recovery from First Lien Notes Priority Collateral) (y) the Carve Out and (z) certain adequate protection claims granted to the lenders under the Debtors' prepetition ABL and receivables facilities, subject to the priorities set forth in the draft interim order attached to the DIP Credit Agreement (the "**First Lien Notes Adequate Protection Claim**").

As additional adequate protection, the collateral agent under the First Lien Notes Indenture for the benefit of itself and holders of First Lien Notes shall receive the following:

(i) <u>Fees and Expenses</u>. Current cash payments in respect of all prepetition and postpetition reasonable and documented professional fees and expenses incurred on behalf of (A) the |

|  | professionals for the Ad Hoc Group of Consenting First Lien Noteholders in connection with the Chapter 11 Cases, which professionals are: (a) Stroock & Stroock & Lavan LLP, as counsel, (b) Pachulski, Stang, Ziehl & Jones LLP, as Delaware counsel, and (c) Perella Weinberg Partners L.P., as financial advisor (in the case of clause (c), only to the extent agreed to in a writing signed by the Debtors and the financial advisor prior to the date hereof) and (B) one counsel to the trustee and the collateral agent under the First Lien Notes Indenture. |
|--|--|
|  | (ii) <u>Interest Payments</u>.  Current cash payment under the First Lien Notes Indenture in respect of all accrued but unpaid interest on the First Lien Notes, at the non-default contract rate, on the dates such payments are due and payable under the First Lien Notes Indenture as if the Petition Date has not occurred, whether such amounts accrued prepetition or postpetition. |
|  | (iii) <u>Financial Reporting</u>.   The advisors to the Ad Hoc Group of Consenting First Lien Noteholders shall receive: (I) copies of the DIP Reporting (as defined in the Interim DIP Order) promptly after providing the same to the DIP Agent and/or DIP Lenders, if provided, and (II) a copy of Approved DIP Budget (as defined below), promptly after the same is approved by the DIP Lenders, in each case to the extent required by, and subject to, the Interim DIP Order and subject to the confidentiality restrictions set forth in the DIP Credit Agreement. |
| **Adequate Protection – Second Lien Notes** | The collateral agent under the Second Lien Notes Indenture for the benefit of itself and the holders of Second Lien Notes shall, in respect of the Second Lien Notes and the other secured obligations under the Second Lien Notes Indenture (the "**Second Lien Notes Obligations**"), be granted the following protection, pursuant to sections 361, 507, 363(e) and 364(d)(1) of the Bankruptcy Code or otherwise, of its pre-petition security interests for any Diminution in Value of the pre-petition security interests of such party, whether or not such Diminution in Value results from the sale, lease or use by the Debtors of the collateral securing the Second Lien Notes Obligations (including, without limitation, cash collateral), or from the stay of enforcement of any pre-petition security interest arising from section 362 of the Bankruptcy Code, or otherwise: |
|  | (i)    <u>Adequate Protection Lien</u>.  Effective and perfected as of the date of the Bankruptcy Court's entry of the Interim DIP Order and without the necessity of the execution of mortgages, security agreements, pledge agreements, financing statements or other agreements, a security interest on all DIP Collateral of the Debtors, subject and subordinate only to (w) Liens on the DIP Collateral securing the obligations under the DIP Facility, (x) the Carve Out, (y) certain adequate protection liens granted to the lenders under the Debtors' prepetition ABL and receivables facilities, subject to the priorities set forth in the draft interim order attached to the DIP Credit Agreement, and (z) the First Lien |

|  | Notes Adequate Protection Lien securing the First Lien Notes Adequate Protection Claim. |
|  | (ii) <u>Super-Priority Claim</u>.  Entitled to joint and several superpriority claim status in the Chapter 11 Cases, subject and subordinate only to (w) the obligations under the DIP Facility, (x) the Carve Out (y) certain adequate protection claims granted to the lenders under the Debtors' prepetition ABL and receivables facilities, subject to the priorities set forth in the draft interim order attached to the DIP Credit Agreement and (z) the First Lien Notes Adequate Protection Claim. |
|  | (iii) <u>Fees and Expenses</u>.  Current cash payments in respect of all reasonable professional fees and expenses incurred on behalf of any trustee or agent under the Second Lien Notes Indenture, and the prepetition and postpetition fees and disbursements of Wachtell, Lipton, Rosen & Katz, Morris, Nichols, Arsht & Tunnell, LLP and TRS Advisors LLC, in each case in connection with professional services rendered on behalf of certain holders of Second Lien Notes. |
| **Carve Out** | The liens on and security interest in the DIP Collateral (as defined below) and the superpriority administrative expense claims shall be subject to the Carve Out.<br><br>For purposes hereof, "**Carve Out**" shall have the meaning assigned to such term in the Interim DIP Order. |
| **Type and Amount of the DIP Facility** | Superpriority debtor-in-possession credit facility in the aggregate principal amount of $206.7 million (the "**DIP Facility**", and the loans outstanding thereunder, the "**DIP Loans**"), of which: |
|  | (i) a maximum principal amount of $88.5 million or such lesser amount approved by the Bankruptcy Court in the Interim DIP Order shall be available upon entry of the Interim DIP Order, which amount shall be funded by the Financing Commitment Parties and the other parties to the RSA as of the Execution Date in accordance with the schedule set forth in the RSA; |
|  | (ii) a maximum principal amount equal to $131.7 million or such lesser amount approved by the Bankruptcy Court in the Interim DIP Order, less the aggregate principal amount of any DIP Loans funded pursuant to the preceding clause (i), shall be available following the DIP Allocation Date (the "**Allocation Date Draw**"), which amount shall be funded by each DIP Lender in a respective amount such that, after giving effect thereto, each DIP Lender holds DIP Loans in accordance with its respective commitment after giving effect to the DIP Allocation; and |
|  | (iii) a maximum principal amount of $206.7 million, less the aggregate principal amount of any DIP Loans funded pursuant to the preceding clauses (i) and (ii), shall be available following |

|  | entry of the Final DIP Order (the "**Final Draw**"), which amount shall be funded by each DIP Lender in accordance with its commitment at such time. |
|  | Proceeds from borrowings under the DIP Facility shall be funded into a segregated or other account of the Borrower over which the DIP Agent (for the benefit of the DIP Lenders) has a legal, valid, binding, continuing, enforceable, first priority lien (the "**Segregated DIP Account**"). |
|  | The use of the proceeds of the DIP Facility shall be consistent with the then Approved DIP Budget (as defined below), subject to the Budget Compliance Covenant (as defined below). |
| **Closing Date** | The date of the initial funding of the DIP Facility after entry of the Interim DIP Order (the "**Closing Date**"). |
| **Maturity and DIP-to-Exit Facility Conversion** | The DIP Facility will mature on the earliest to occur of (a) six (6) months after the Closing Date, (b) the Plan Effective Date and (c) the acceleration of the DIP Loans and the termination of the commitments under the DIP Facility after an event of default under the DIP Credit Agreement (the "**Maturity Date**"). |
|  | On the Plan Effective Date, (a) all accrued and unpaid interest on all outstanding DIP Loans and all fees (other than the DIP Exit Fee (as defined below)) and expenses payable pursuant to the DIP Credit Agreement shall be paid in full in cash, (b) all outstanding DIP Loans, together with the amount of the DIP Exit Fee, shall automatically be converted into or exchanged for Exit Term Loans under the Exit Term Facility in accordance with the Restructuring Term Sheet (the "**Exit Conversion**") and (c) each DIP Lender shall receive its *pro rata* share of the Exit Equity/Warrants in accordance with the Restructuring Term Sheet. |
|  | At the Company's election, outstanding DIP Loans, all accrued and unpaid paid interest thereon, and all fees and expenses payable pursuant to the DIP Credit Agreement (including the DIP Exit Fee) shall be paid in full in cash. |
|  | Notwithstanding the foregoing, in lieu of converting or exchanging DIP Loans into Exit Term Loans as set forth above, each DIP Lender shall have the right (the "**Cash Exit Option**") to effect the Exit Conversion with respect to all or a portion of its DIP Loans by (x) funding (or by its designee funding) (such funding entity, the "**Exit Term Lender**") cash to Reorganized Pyxus in respect of Exit Term Loans borrowed under the Exit Term Facility on the Plan Effective Date in an amount not to exceed the aggregate principal amount of such Lender's DIP Loans and (y) Reorganized Pyxus applying all such cash immediately following receipt thereof on the Plan Effective Date to repay in cash a like principal amount of such DIP Lender's DIP Loans (it being understood and agreed that the Exit Term Lender shall be the lender under the Exit Term Facility for all purposes with respect to any Exit Term Loan borrowed thereunder pursuant to the Cash Exit Option).  The DIP Agent, the DIP Lenders and the Company Parties shall cooperate with one another to implement the Cash Exit Option pursuant to terms, conditions and procedures reasonably |

| | |
|---|---|
| | satisfactory to the Borrower and the Required Financing Commitment Parties. |
| **Amortization** | None. |
| **Fees and Interest Rates** | As set forth on <u>Annex I</u> attached hereto. |
| **Mandatory Prepayments** | Usual and customary for financings of this type, including asset sales and incurrences of debt, subject to exceptions and exclusions to be agreed upon by Pyxus and the Required Financing Commitment Parties; *provided* that there shall be no mandatory prepayments of the DIP Loans required from the proceeds of realizations on First Lien Notes Priority Collateral (as defined in the Senior Lien Intercreditor Agreement (as defined below)) until the First Lien Notes Obligations are paid in full. |
| | "**Senior Lien Intercreditor Agreement**" means that certain intercreditor agreement, dated as of October 14, 2016, by and among Deutsche Bank AG, New York Branch, as collateral agent under the ABL Credit Agreement, and The Bank of New York Mellon Trust Company, N.A, as trustee and collateral agent under the First Lien Notes Indenture, as amended, restated, supplemented or otherwise modified from time to time. |
| **Voluntary Prepayments** | Permitted, in whole or in part, without premium or penalty, subject to limitations as to minimum amounts of prepayments (and customary LIBOR breakage). |
| **Collateral and Priority** | The DIP Facility (and all guarantees of the DIP Facility by the Loan Guarantors) shall at all times, subject to the Carve Out: |
| | (i)  be entitled to joint and several superpriority claim status in the Chapter 11 Cases, senior to all other claims; |
| | (ii)  be secured by a perfected court-ordered first priority lien on (x) all assets of the Debtors that are unencumbered as of the Petition Date, including, subject to entry of the Final DIP Order, the proceeds of avoidance actions, (y) all assets of the Debtors constituting ABL Priority Collateral (as defined in the Senior Lien Intercreditor Agreement) and (z) the Segregated DIP Account; |
| | (iii)  be secured by a perfected first priority lien on all assets of the non-Debtor Loan Parties (other than assets of TCLTC which is providing an unsecured guarantee), subject to exceptions and exclusions to be agreed upon by Pyxus and the Required Financing Commitment Parties (the foregoing clauses (ii) and (iii), collectively, the "**DIP Priority Collateral**"); |
| | (iv)  be secured by a perfected court-ordered junior priority lien on (x) all assets of Pyxus and the Debtors that are guarantors of the First Lien Notes as of the Petition Date constituting First Lien Notes |

|  | Priority Collateral, junior to the liens on such assets securing the First Lien Notes Obligations and (y) all other assets of the Debtors to the extent subject to a valid, perfected and non-avoidable lien securing other obligations (other than under the ABL Credit Agreement or the First Lien Notes Indenture) as of the Petition Date, junior solely to such liens securing such other obligations (collectively, and together with DIP Priority Collateral, the "**DIP Collateral**"). |
|  | The DIP Collateral shall be subject to "permitted liens" under the applicable DIP Documents to the extent mutually agreed upon by Pyxus and the Required Financing Commitment Parties. |
| **Guarantees** | Each Loan Guarantor shall unconditionally guarantee all of the indebtedness, obligations and liabilities of the Borrower arising under or in connection with the DIP Facility, subject to the claims and liens set forth herein. |
| **Milestones** | The Loan Parties shall achieve the following transaction milestones (the "**Milestones**"), each of which shall be extended automatically to the extent the corresponding milestones set forth in the RSA are extended in accordance with the term thereof and otherwise at any time with the written approval of the Required Financing Commitment Parties: |
|  | (i)    no later than two (2) Business Days after the Petition Date, the Bankruptcy Court shall have entered the Interim DIP Order consistent with the RSA in all respects; |
|  | (ii)    no later than thirty-five (35) days after entry of the Interim DIP Order, the Bankruptcy Court shall have entered the Final DIP Order consistent with the RSA in all respects; |
|  | (iii)    no later than sixty (60) days after the Petition Date, the Bankruptcy Court shall have entered the Confirmation Order and an order approving the Disclosure Statement (which may be the Confirmation Order) consistent with the RSA in all respects; and |
|  | (iv)    no later than seventy-five (75) days after the Petition Date, the Plan Effective Date shall have occurred. |
| **Documentation** | The DIP Facility (including the terms and conditions applicable thereto) will be documented pursuant to and evidenced by (a) a credit agreement, negotiated in good faith, in form and substance substantially similar to the Documentation Precedent, with such modifications as are (i) set forth herein, (ii) necessary to reflect the terms of the Interim DIP Order or the Final DIP Order, as applicable, (iii) usual and customary for debtor-in-possession financings of this kind and/or otherwise necessary to effectuate the financing contemplated hereby and/or (iv) mutually agreed among the Borrower and the Required Financing Commitment Parties, (b) the Interim DIP Order, (c) the Final DIP Order and (d) as applicable, the related notes, security agreements, collateral agreements, pledge agreements, control agreements, guarantees, mortgages and other legal documentation or instruments as are, |

|  | in each case, usual and customary for debtor-in-possession financings of this type and/or reasonably necessary to effectuate the financing contemplated hereby, as determined by the Required Financing Commitment Parties (this paragraph, the "**Documentation Principles**"). |
|---|---|
|  | "**Documentation Precedent**" means that certain Superpriority Secured Debtor-in-Possession Credit Agreement, dated as of April 10, 2020 among Quorum Health Corporation, as it relates to the bankruptcy- and DIP-specific provisions and mechanics for a term loan facility, and the other parties party thereto and the ABL Credit Agreement, as to the defined terms, representations and warranties, covenants and defaults, as applicable. |
| **Representations and Warranties** | Subject to the Documentation Principles, substantially similar to the ABL Credit Agreement. |
| **Affirmative Covenants** | Subject to the Documentation Principles, substantially similar to the ABL Credit Agreement. |
| **Negative Covenants** | Subject to the Documentation Principles, substantially similar to the First Lien Notes Indenture (or, in the case of the merger, asset sale and liens covenants, the ABL Credit Agreement). |
| **Events of Default** | Subject to the Documentation Principles, substantially similar to the ABL Credit Agreement. |
| **Minimum Liquidity Covenant** | The Debtors shall not allow Liquidity (as defined below) to be less than (a) prior to the entry of the Final DIP Order, $15,000,000 and (b) thereafter, $25,000,000, in either case on the last business day of two consecutive calendar weeks. |
|  | "**Liquidity**" means, as of any time, the sum of (i) unrestricted cash and cash equivalents of the Borrower and its subsidiaries (excluding cash and cash equivalents in local international bank accounts), (ii) DIP Facility proceeds in the Segregated DIP Account and (iii) the principal amount of DIP Loans available for borrowing under the DIP Credit Agreement less any fees payable upon such borrowing (as to which all conditions precedent other than delivery of a borrowing notice have been satisfied). |
| **Budget Compliance Covenant; Additional Reporting** | The Debtors will prepare and deliver a cash flow forecast, in form and substance reasonably acceptable to, and consented to by, the Required Financing Commitment Parties (the "**Initial DIP Budget**"), setting forth all line-item and cumulative receipts and operating disbursements on a weekly basis for the period beginning as of the week of the Closing Date through and including the thirteenth (13th) week after such week. The Initial DIP Budget shall be the "**Approved DIP Budget**" for all purposes of the DIP Documents until superseded by any supplemental budget as set forth below and for purposes of the DIP Variance Report and the Budget Compliance Covenant shall refer to the most recently delivered Approved DIP Budget for the weeks covered thereby, and for prior periods, the Approved DIP |

Budget in effect at the beginning of such period; provided that for the first four weeks for which the DIP Variance Report and the Budget Compliance Covenant are applicable, the Approved DIP Budget shall be the Initial DIP Budget for all purposes.

On or before 12:00 p.m. New York City time on Wednesday of each fourth (4th) calendar week following the week in which the Petition Date occurs, the Debtors shall deliver a supplemental budget covering the subsequent 13-week period that commences with the beginning of such week in which the supplemental budget is delivered, consistent with the form and level of detail set forth in the Initial DIP Budget and otherwise in form and substance reasonably acceptable to, and consented to by, the Required Financing Commitment Parties in their reasonable discretion. Upon, and subject to, the approval of any such supplemental budget as set forth in the immediately preceding sentence, such supplemental budget shall constitute the then-approved Approved DIP Budget effective as of the beginning of the week in which it was delivered.

By no later than 12:00 p.m. New York City time on Thursday of each calendar week following the week in which the Petition Date occurs (each such Thursday, a "**Variance Report Date**"), the Debtors shall deliver to the DIP Agent and the DIP Lenders (and their advisors) a line- item by line-item variance report (each, a "**DIP Variance Report**") setting forth, in reasonable detail, (x) the actual receipts and operating disbursements (including any professional fees) for each line item in the Approved DIP Budget for the week ending on the most recent Friday (and, in the case of the first such report, for the week in which the Petition Date occurs), (y) any differences between such actual amounts for each line item in the Approved DIP Budget for the applicable period and projected amounts set forth in the Approved DIP Budget for such line item included in the Approved DIP Budget for such period and on a cumulative basis for the period from the beginning of the week in which the Petition Date occurs through the end of such most recently ended week (such cumulative report to be prepared by aggregating the variances set forth in each DIP Variance Report) and (z) the computations necessary to determine compliance with the Budget Compliance Covenant, together with a statement from the Borrower's chief financial officer certifying the information contained in the report. The DIP Variance Report shall also provide a reasonably detailed explanation for any variance in such DIP Variance Report in excess of 5.0% in receipts or operating disbursements for each such line item during the Testing Period as compared to projections for such Testing Period in the Approved DIP Budget. The term "**Testing Period**" means, as of any Variance Report Date, the four-week period ending on the most recent Friday (or, until the DIP Variance Report includes four weeks, the period since the beginning of the week in which the Petition Date occurs).

The Debtors shall not permit, as of any Variance Report Date, (x) the actual aggregate operating disbursements or capital expenditures of the Loan Parties and their subsidiaries for any Testing Period to exceed 115% (or, with respect to any Testing Period that is shorter than four weeks, 120%) of the projected aggregate operating disbursements (excluding professional fees) or capital expenditures, respectively, of the Loan Parties and their subsidiaries

<table>
<tr><td></td><td>for such period set forth in the Approved DIP Budget or (y) the actual aggregate receipts for the Testing Period to be less than 85% (or, with respect to any Testing Period that is shorter than four weeks, 80%) of the projected aggregate receipts for such period test set forth in the Approved DIP Budget (the "<strong>Budget Compliance Covenant</strong>").<br><br>The Debtors and their advisors, as applicable (including appropriately senior members of management with respect to clause (c) below), shall host the following telephonic conference calls with the DIP Lenders and/or their advisors, as applicable: (a) promptly following the delivery of each Variance Report, a call with the Financing Commitment Parties' financial advisor to discuss the contents of such Variance Report, (b) a weekly call (at a time to be mutually agreed to the extent not otherwise covered during the call described in clause (a)) with the Financing Commitment Parties' advisors to discuss contemplated material filings, the Approved DIP Budget and budget-related initiatives, recent performance, cash and liquidity management, operational activities, current business and market conditions, material performance changes, the "borrowing base" and foreign lines of credit and (c) no less frequently than monthly, a call with the DIP Lenders to discuss the Approved DIP Budget and budget-related initiatives, recent performance, cash and liquidity management, operational activities, current business and market conditions, material performance changes, the "borrowing base" and foreign lines of credit.</td></tr>
<tr><td><strong>Expenses and Indemnification</strong></td><td>Usual and customary for facilities of this type, including all reasonable and documented fees and out-of-pocket expenses of any advisors and professionals engaged by the DIP Agent and a single counsel and advisor to the DIP Lenders and a single local counsel in Delaware and in each relevant foreign jurisdiction.</td></tr>
<tr><td><strong>Amendments</strong></td><td>Required Lenders, except for amendments customarily requiring approval by affected DIP Lenders under the DIP Facility.<br><br>"<strong>Required DIP Lenders</strong>" shall mean DIP Lenders holding greater than 50% of the outstanding DIP Loans and/or commitments under the DIP Facility.</td></tr>
<tr><td><strong>Governing Law</strong></td><td>This Term Sheet is and the DIP Documents will be governed by the laws of the State of New York (except as otherwise set forth therein) and, to the extent applicable, the Bankruptcy Code.</td></tr>
</table>

Annex I

Interest and Certain Fees

| | |
|---|---|
| Interest Rate: | The DIP Loans shall bear interest at a rate per annum equal to the Adjusted LIBO Rate (as defined in the Documentation Precedent) (subject to a floor of 1.50%) + 10.25%. |
| Interest Payment Dates: | Interest shall be payable in cash in arrears, with respect to any Eurodollar rate borrowings, on the last day of the interest period in effect for such Eurodollar rate borrowing (which shall be no longer than one month) and, with respect to any base rate borrowing, on the last business day of each month, upon any prepayment due to acceleration and at final maturity. |
| Commitment Fee: | A non-refundable commitment fee equal to 3.25% of the aggregate commitments under the DIP Facility shall be earned, due and payable in cash in full on (and subject to the occurrence of) the Closing Date (or, as applicable, the Allocation Date Draw). Such commitment fee shall be shared ratably among the DIP Lenders based on their pro rata share of the commitments under the DIP Facility as of the Closing Date (or as of the Allocation Date Draw, as the case may be), and shall be netted from the proceeds of the Closing Date draw (or Allocation Date Draw, as the case may be). |
| Exit Fee: | A non-refundable exit fee equal to 3.25% of the aggregate principal amount of DIP Loans shall be earned on the Closing Date and due and payable on the Maturity Date (or, if earlier, upon the prepayment, repayment or other satisfaction in full in cash of the DIP Loans) (the "**DIP Exit Fee**") (a) in the form of Exit Term Loans under the Exit Term Facility in the event the Maturity Date is the Plan Effective Date, and (b) in the form of cash otherwise. The DIP Exit Fee shall be shared ratably among the DIP Lenders based on their pro rata share of the outstanding DIP Loans at the time of such repayment, prepayment or other satisfaction. |
| Ticking Fee: | A non-refundable ticking fee calculated on a daily basis on the aggregate daily amount of each DIP Lender's undrawn commitment at a rate per annum equal to 3.0%, accruing commencing on the Closing Date shall be earned, due and payable in cash in arrears on the date of the Third Draw, on the date the commitments terminate in full, upon any prepayment due to acceleration, and at final maturity. |
| Agent Fees: | A fee as set forth in a separately agreed letter with the DIP Agent, which shall be earned in full upon entry of the Interim DIP Order and payable as set forth in such letter. |
| Default Rate: | After any event of default and (other than with respect to overdue amounts) delivery of notice by the DIP Agent, the applicable interest rate for all DIP Loans will be increased to, and overdue interest, fees and other amounts (other than overdue principal) shall bear interest at 2.00% per annum above the rate otherwise applicable to such obligations. |

Rate and Fee Basis:    All per annum rates shall be calculated on the basis of a year of 360 days. All amounts payable under this Term Sheet will be made in Dollars and, in any case, shall not be subject to counterclaim or set-off for, or otherwise be affected by, any claim or dispute relating to any other matter.

*    *    *    *    *

**<u>DIP Credit Agreement</u>**

**Execution Version**

**SUPERPRIORITY SECURED DEBTOR-IN-POSSESSION
CREDIT AGREEMENT**

dated as of

June [___], 2020

among

PYXUS INTERNATIONAL, INC.,
a Debtor and Debtor in Possession under Chapter 11 of the Bankruptcy Code,
as Borrower,

THE LENDERS PARTY HERETO,

and

CORTLAND CAPITAL MARKET SERVICES LLC,
as Administrative Agent and Collateral Agent

_____

# TABLE OF CONTENTS

<div align="right"><u>Page</u></div>

ARTICLE I Definitions ............................................................................................................ 1

    SECTION 1.01    Defined Terms............................................................................ 1
    SECTION 1.02    Terms Generally...................................................................... 26
    SECTION 1.03    Timing of Payment or Performance ....................................... 26
    SECTION 1.04    LLC Division........................................................................... 26

ARTICLE II The Credits .......................................................................................................... 26

    SECTION 2.01    Commitments .......................................................................... 26
    SECTION 2.02    Loans ...................................................................................... 28
    SECTION 2.03    Borrowing Procedure ............................................................. 28
    SECTION 2.04    Evidence of Debt; Repayment of Loans.................................. 29
    SECTION 2.05    Fees ........................................................................................ 30
    SECTION 2.06    Interest on Loans .................................................................... 31
    SECTION 2.07    Default Interest ...................................................................... 31
    SECTION 2.08    Alternate Rate of Interest ...................................................... 32
    SECTION 2.09    Termination and Reduction of Commitments ............................ 32
    SECTION 2.10    Conversion and Continuation of Borrowings......................... 32
    SECTION 2.11    Repayment of Borrowings ..................................................... 33
    SECTION 2.12    Optional Prepayment ............................................................. 33
    SECTION 2.13    Mandatory Prepayments ........................................................ 33
    SECTION 2.14    Reserve Requirements; Change in Circumstances ................. 34
    SECTION 2.15    Change in Legality ................................................................. 35
    SECTION 2.16    Indemnity ............................................................................... 36
    SECTION 2.17    Pro Rata Treatment................................................................ 36
    SECTION 2.18    Sharing of Setoffs.................................................................. 37
    SECTION 2.19    Payments ................................................................................ 37
    SECTION 2.20    Taxes ...................................................................................... 38
    SECTION 2.21    Assignment of Commitments under Certain Circumstances; Duty to Mitigate ............................................................................... 41
    SECTION 2.22    Priority and Liens................................................................... 43
    SECTION 2.23    No Discharge; Survival of Claims.......................................... 43
    SECTION 2.24    Payment of Obligations ......................................................... 44
    SECTION 2.25    Conversion of Loans to Exit Facility ..................................... 44
    SECTION 2.26    Dutch Parallel Debts.............................................................. 45

ARTICLE III Representations and Warranties ........................................................................ 45

    SECTION 3.01    Company Status...................................................................... 45
    SECTION 3.02    Power and Authority .............................................................. 46
    SECTION 3.03    No Violation........................................................................... 46
    SECTION 3.04    Approvals ............................................................................... 46
    SECTION 3.05    Financial Statements; Undisclosed Liabilities; Projections .......... 46
    SECTION 3.06    Litigation................................................................................ 47
    SECTION 3.07    True and Complete Disclosure ............................................... 47
    SECTION 3.08    Use of Proceeds; Margin Regulations ................................... 48
    SECTION 3.09    Tax Returns and Payments .................................................... 48
    SECTION 3.10    Compliance with ERISA ........................................................ 49

<div align="center">i</div>

SECTION 3.11    Security Documents ...................................................................... 50
SECTION 3.12    Properties................................................................................... 50
SECTION 3.13    Subsidiaries ................................................................................ 51
SECTION 3.14    Compliance with Laws .................................................................. 51
SECTION 3.15    Investment Company Act ................................................................ 51
SECTION 3.16    No Default .................................................................................. 51
SECTION 3.17    Environmental Matters................................................................... 51
SECTION 3.18    Employment and Labor Relations ..................................................... 52
SECTION 3.19    Intellectual Property, etc ................................................................ 52
SECTION 3.20    Insurance ................................................................................... 52
SECTION 3.21    Borrowing Base Calculation ............................................................ 53
SECTION 3.22    Anti-Terrorism Law ...................................................................... 53
SECTION 3.23    Anti-Corruption Laws ................................................................... 53
SECTION 3.24    Sanctions ................................................................................... 54
SECTION 3.25    Material Contracts ........................................................................ 54
SECTION 3.26    DIP Budget ................................................................................. 54
SECTION 3.27    Centre of Main Interests ................................................................ 54

ARTICLE IV Conditions of Lending ............................................................................ 55

SECTION 4.01    All Credit Events.......................................................................... 55
SECTION 4.02    Conditions to Borrowing on the Closing Date ..................................... 55
SECTION 4.03    Conditions to Borrowing on the Initial Allocation Date ......................... 58
SECTION 4.04    Conditions to Borrowing on the Full Availability Date ........................... 58

ARTICLE V Affirmative Covenants ............................................................................ 58

SECTION 5.01    Information Covenants ................................................................... 59
SECTION 5.02    Books, Records and Inspections; Annual Meetings ............................... 62
SECTION 5.03    Maintenance of Property; Insurance.................................................. 63
SECTION 5.04    Existence; Franchises .................................................................... 64
SECTION 5.05    Compliance with Requirements of Law, etc ........................................ 64
SECTION 5.06    Anti-Corruption Laws ................................................................... 64
SECTION 5.07    Sanctions ................................................................................... 64
SECTION 5.08    Compliance with Environmental Laws ............................................... 64
SECTION 5.09    ERISA Information Undertakings...................................................... 65
SECTION 5.10    Performance of Obligations............................................................. 66
SECTION 5.11    Payment of Taxes ......................................................................... 66
SECTION 5.12    [Reserved] .................................................................................. 66
SECTION 5.13    Additional Security; Further Assurances; etc....................................... 66
SECTION 5.14    Real Estate Leases ........................................................................ 67
SECTION 5.15    [Reserved] .................................................................................. 67
SECTION 5.16    Management and Advisor Calls ........................................................ 67
SECTION 5.17    Milestones .................................................................................. 67
SECTION 5.18    Bankruptcy Related Matters ............................................................ 68
SECTION 5.19    Post-Closing Matters ..................................................................... 68

ARTICLE VI Negative Covenants ............................................................................... 68

SECTION 6.01    Restricted Payments. ..................................................................... 68
SECTION 6.02    Dividend and Other Payment Restrictions Affecting Subsidiaries. .............. 69
SECTION 6.03    Incurrence of Indebtedness and Issuance of Preferred Stock. ..................... 71

SECTION 6.04      Consolidation, Merger, Purchase or Sale of Assets, etc............................. 73
SECTION 6.05      Transactions with Affiliates. ....................................................... 74
SECTION 6.06      Liens. .............................................................................. 75
SECTION 6.07      Business Activities. ................................................................ 78
SECTION 6.08      Corporate Existence. ............................................................... 78
SECTION 6.09      Budget Covenant .................................................................... 78
SECTION 6.10      Use of Proceeds .................................................................... 78
SECTION 6.11      Additional Bankruptcy Matters ...................................................... 78
SECTION 6.12      Minimum Liquidity .................................................................. 79

ARTICLE VII Events of Default ........................................................................... 79

SECTION 7.01      Payments ........................................................................... 80
SECTION 7.02      Representations, etc. ............................................................... 80
SECTION 7.03      Covenants .......................................................................... 80
SECTION 7.04      Default under Other Agreements ..................................................... 80
SECTION 7.05      Bankruptcy, etc. ................................................................... 80
SECTION 7.06      ERISA. ............................................................................. 81
SECTION 7.07      Security Documents ................................................................. 81
SECTION 7.08      Guaranties. ........................................................................ 81
SECTION 7.09      Judgments .......................................................................... 81
SECTION 7.10      Change of Control .................................................................. 82
SECTION 7.11      RSA ................................................................................ 82
SECTION 7.12      Cases .............................................................................. 82
SECTION 7.13      Specified Agreements ............................................................... 84

ARTICLE VIII The Administrative Agent and the Collateral Agent ......................................... 84

ARTICLE IX Miscellaneous ............................................................................... 86

SECTION 9.01      Notices............................................................................. 86
SECTION 9.02      Survival of Agreement .............................................................. 88
SECTION 9.03      Binding Effect ..................................................................... 88
SECTION 9.04      Successors and Assigns.............................................................. 88
SECTION 9.05      Expenses; Indemnity ................................................................ 92
SECTION 9.06      Right of Setoff .................................................................... 94
SECTION 9.07      Applicable Law ..................................................................... 94
SECTION 9.08      Waivers; Amendment.................................................................. 94
SECTION 9.09      Certain Releases of Guarantees and Security Interests ............................... 95
SECTION 9.10      Interest Rate Limitation............................................................ 96
SECTION 9.11      Entire Agreement ................................................................... 97
SECTION 9.12      WAIVER OF JURY TRIAL ............................................................... 97
SECTION 9.13      Severability........................................................................ 97
SECTION 9.14      Orders Control...................................................................... 97
SECTION 9.15      Headings............................................................................ 97
SECTION 9.16      Jurisdiction; Consent to Service of Process ........................................ 97
SECTION 9.17      Confidentiality..................................................................... 98
SECTION 9.18      USA PATRIOT Act Notice.............................................................. 99
SECTION 9.19      Acknowledgement and Consent to Bail-In of Affected Financial
                  Institutions....................................................................... 99
SECTION 9.20      No Fiduciary Relationship .......................................................... 101

SCHEDULE 1.01(a):    Subsidiary Guarantors
SCHEDULE 1.01(b):    Existing Securitization Facilities
SCHEDULE 1.01(c):    Additional Investments
SCHEDULE 2.01:       Lenders, Commitments and Notice Information
SCHEDULE 3.13:       Subsidiaries
SCHEDULE 3.20:       Insurance
SCHEDULE 3.25:       Material Contracts
SCHEDULE 5.19:       Post-Closing Matters
SCHEDULE 6.04:       Permitted Asset Dispositions
SCHEDULE 6.06:       Existing Liens
SCHEDULE 7.13:       Specified Agreements

EXHIBIT A:           Administrative Questionnaire
EXHIBIT B:           Form of Assignment and Acceptance
EXHIBIT C:           Form of Borrowing Request
EXHIBIT D-1:         Form of Guarantee Agreement
EXHIBIT D-2:         Form of Pledge and Security Agreement
EXHIBIT E:           Form of Interim Order
EXHIBIT F:           Form of Compliance Certificate

SUPERPRIORITY SECURED DEBTOR-IN-POSSESSION CREDIT AGREEMENT, dated as of June [__], 2020 (this "***Agreement***"), among PYXUS INTERNATIONAL, INC., a Virginia corporation and a Debtor and debtor in possession under Chapter 11 of the Bankruptcy Code (the "***Borrower***"), the Lenders (as defined in <u>Article I</u>), CORTLAND CAPITAL MARKET SERVICES LLC, as administrative agent (in such capacity, the "***Administrative Agent***") and as collateral agent (in such capacity, the "***Collateral Agent***") for the Lenders.

PRELIMINARY STATEMENT

WHEREAS, on June 15, 2020 (the "***Petition Date***"), the Borrower and certain of the Subsidiary Guarantors each filed voluntary petitions with the Bankruptcy Court commencing their respective cases that are pending under Chapter 11 of the Bankruptcy Code (each a "***Case***" and collectively, the "***Cases***") and have continued in the possession of their assets and in the management of their business as debtors in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

WHEREAS, the Borrower has requested that the Lenders provide it with a term loan facility in an aggregate principal amount equal to $206,700,000 (the "***Credit Facility***"), subject to the conditions set forth herein, and all of the Borrower's obligations under the Credit Facility are to be guaranteed by the Subsidiary Guarantors.

WHEREAS, the Lenders are willing to extend such credit to the Borrower on the terms and subject to the conditions set forth herein.

WHEREAS, the respective priorities of the Credit Facility and the other Obligations with respect to the DIP Collateral shall be as set forth in the Interim Order and the Final Order, in each case upon entry thereof by the Bankruptcy Court, and in the Security Documents.

Accordingly, in consideration of the mutual agreements herein contained and other good and valuable consideration, the sufficiency and receipt of which are hereby acknowledged, the parties hereto hereby agree as follows:

## ARTICLE I

### Definitions

SECTION 1.01 ***Defined Terms.***  As used in this Agreement, the following terms shall have the meanings specified below:

"***ABL Refinancing***" shall mean the repayment or refinancing of all principal, accrued and unpaid interest, and fees outstanding on the Closing Date, the cash collateralization of all letters of credit (if any), the termination of all outstanding commitments, and the release of all Liens and guarantees, under that certain ABL Credit Agreement, dated as of October 14, 2016 (the "***ABL Credit Agreement***"), among the Borrower, the lenders and other parties from time to time party thereto, and Deutsche Bank AG New York Branch, as administrative agent and collateral agent.

"***ABR***" when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, is bearing interest at a rate determined by reference to the Alternate Base Rate.

"***Acceptable Confirmation Order***" shall mean an order of the Bankruptcy Court confirming an Acceptable Plan that is in form and substance consistent with the RSA and otherwise reasonably

satisfactory to the Required Financing Commitment Parties and the Loan Parties in their reasonable discretion (as the same may be amended, supplemented, or modified from time to time after entry thereof with the consent of the Required Financing Commitment Parties in their reasonable discretion).

"*Acceptable Plan*" shall mean a Reorganization Plan that is consistent with the RSA and otherwise reasonably satisfactory to the Required Financing Commitment Parties and the Loan Parties in their reasonable discretion (as the same may be amended, supplemented, or modified from time to time after entry thereof with the consent of the Required Financing Commitment Parties in their reasonable discretion).

"*Account*" shall mean an "account" as such term is defined in Article 9 of the UCC, and any and all supporting obligations in respect thereof.

"*Adjusted LIBO Rate*" shall mean, with respect to any Eurodollar Borrowing for any Interest Period, an interest rate per annum equal to the product of (a) the LIBO Rate in effect for such Interest Period and (b) Statutory Reserves.

"*Administrative Questionnaire*" shall mean an Administrative Questionnaire in the form of Exhibit A, or such other form as may be supplied from time to time by the Administrative Agent.

"*Affiliate*" of any specified Person shall mean any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person.  For purposes of this definition, "*control*," as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities, by agreement or otherwise.  For purposes of this definition, the terms "*controlling*," "*controlled by*" and "*under common control with*" have correlative meanings.

"*Agent Fee Letter*" shall mean the Fee Letter, dated as of the Closing Date, by and among Cortland Products Corp. and the Borrower.

"*Agents*" shall mean the Administrative Agent and the Collateral Agent.

"*Alternate Base Rate*" shall mean, for any day, a rate per annum equal to the greatest of (a) the Prime Rate in effect on such day, (b) the Federal Funds Effective Rate in effect on such day plus 1/2 of 1% and (c) the Adjusted LIBO Rate in effect at approximately 11:00 a.m. (London time) on such day for a one month Interest Period commencing on the second Business Day after such day plus 1%. If the Administrative Agent shall have determined (which determination shall be conclusive absent manifest error) that it is unable to ascertain the Federal Funds Effective Rate or the Adjusted LIBO Rate for any reason, including the inability or failure of the Administrative Agent to obtain sufficient quotations in accordance with the terms of the definition of the term Federal Funds Effective Rate, the Alternate Base Rate shall be determined without regard to clause (b) or (c), as applicable, of the preceding sentence until the circumstances giving rise to such inability no longer exist.  Any change in the Alternate Base Rate due to a change in the Prime Rate, the Federal Funds Effective Rate or the Adjusted LIBO Rate shall be effective on the effective date of such change in the Prime Rate, the Federal Funds Effective Rate or the Adjusted LIBO Rate, as the case may be.

"*Applicable Percentage*" shall mean, for any day, with respect to any Eurodollar Loan or ABR Loan, 10.25% per annum and 9.25% per annum, respectively

"*Approved DIP Budget*" shall have the meaning assigned to such term in the Interim Order or the Final Order, as applicable, and the Initial DIP Budget shall be the "Approved DIP Budget" for all

purposes of this Agreement and the other Loan Documents until superseded by any supplemental budget as set forth in Section 5.01(o) and for purposes of the DIP Variance Report and the covenant set forth in Section 6.09 shall refer to the most recently delivered Approved DIP Budget for the weeks covered thereby, and for prior periods, the Approved DIP Budget in effect at the beginning of such period; provided that for the first four weeks for which the DIP Variance Report and the covenant set forth in Section 6.09 are applicable, the Approved DIP Budget shall be the Initial DIP Budget for all purposes.

"*Approved Fund*" shall mean any person (other than a natural person) that is engaged in making, purchasing, holding or investing in commercial loans and similar extensions of credit in the ordinary course of its activities and that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

"*Asset Sale*" shall mean any sale, transfer or other disposition by the Borrower or any of its Subsidiaries of any asset (including, without limitation, any capital stock or other securities of, or Equity Interests in, another Person) but excluding sales, transfer or other dispositions permitted under Section 6.04 (other than Section 6.04(i)).

"*Assignment and Acceptance*" shall mean an assignment and acceptance entered into by a Lender and an assignee, and accepted by the Administrative Agent, in the form of Exhibit B or such other form as shall be approved by the Administrative Agent.

"*Automatic Stay*" shall have the meaning assigned to such term under Section 362 of the Bankruptcy Code.

"*Backstop Commitment Party*" shall mean each Lender (or affiliate thereof) identified as a "Backstop Party" on Schedule 3 to the RSA.

"*Bank Levy*" shall mean the United Kingdom Tax known as the "bank levy" as set out in Schedule 19 of the Finance Act 2011.

"*Bank Product Obligations*" shall mean all obligations and liabilities (whether direct or indirect, absolute or contingent, due or to become due or now existing or hereafter incurred) of the Borrower or any Subsidiary, whether on account of principal, interest, reimbursement obligations, fees, indemnities, costs, expenses or otherwise, which may arise under, out of, or in connection with any treasury, investment, depository, clearing house, wire transfer, cash management or automated clearing house transfers of funds services or any related services, to any person.

"*Bankruptcy Code*" shall mean Title 11 of the United States Code entitled "Bankruptcy," as now and hereafter in effect, or any successor thereto.

"*Bankruptcy Court*" shall mean the United States Bankruptcy Court for the District of Delaware, or any other court having jurisdiction over the Cases from time to time.

"*Bankruptcy Rules*" shall mean the Federal Rules of Bankruptcy Procedure, as the same may from time to time be in effect and applicable to the Cases.

"*Board*" shall mean the Board of Governors of the Federal Reserve System of the United States of America.

"*Borrower*" shall have the meaning assigned to such term in the preamble.

"***Borrower Materials***" shall have the meaning assigned to such term in <u>Section 9.01</u>.

"***Borrowing***" shall mean Loans of the same Type made, converted or continued on the same date and, in the case of Eurodollar Loans, as to which a single Interest Period is in effect.

"***Borrowing Base***" shall mean, as of any date of calculation, the amount calculated pursuant to the Borrowing Base Certificate most recently delivered to the Administrative Agent in accordance with <u>Section 5.01(h)</u>, equal to the "Borrowing Base" as defined in the ABL Credit Agreement as in effect immediately prior to the ABL Refinancing.

"***Borrowing Base Certificate***" shall have the meaning assigned to such term in <u>Section 5.01(h)</u>.

"***Borrowing Request***" shall mean a written request by the Borrower in accordance with the terms of <u>Section 2.03</u> and substantially in the form of <u>Exhibit C</u>, or such other form as shall be approved by the Administrative Agent.

"***Breakage Event***" shall have the meaning assigned to such term in <u>Section 2.16</u>.

"***Business***" shall mean any corporation, limited liability company, partnership, limited partnership, limited liability partnership or other business entity (or the adjectival form thereof, where appropriate) or the equivalent of the foregoing in any foreign jurisdiction.

"***Business Day***" shall mean any day other than a Saturday, Sunday or day on which banks in New York City are authorized or required by law to close; *provided*, *however*, that when used in connection with a Eurodollar Loan, the term "*Business Day*" shall also exclude any day on which banks are not open for dealings in dollar deposits in the London interbank market.

"***Capital Expenditures***" shall mean, with respect to any Person, all expenditures by such Person which should be capitalized in accordance with GAAP and, without duplication, the amount of all Capitalized Lease Obligations incurred by such Person.

"***Capitalized Lease Obligations***" shall mean, with respect to any Person, all rental obligations of such Person which, under GAAP, are or will be required to be capitalized on the books of such Person, in each case taken at the amount thereof accounted for as indebtedness in accordance with such principles.

"***Carve Out***" shall have the meaning assigned to such term in the Interim Order or the Final Order, as applicable.

"***Case***" or "***Cases***" shall have the meaning assigned to such term in the preliminary statement.

"***Cash Equivalents***" shall mean (a) securities issued or directly and fully guaranteed or insured by the United States or any agency or instrumentality thereof (<u>provided</u> that the full faith and credit of the United States is pledged in support thereof) having maturities of not more than twelve (12) months from the date of acquisition ("***Government Obligations***"), (b) Investments in deposits in (including money market funds of), or certificates of deposits, bankers' acceptances, export notes, trade credit assignments, guarantees and instruments of a similar nature issued by, (i) any bank or trust company organized under the laws of the United States or any state thereof having capital and surplus in excess of $100,000,000, (ii) any international bank organized under the laws of any country which is a member of the OECD or a political subdivision of any such country, and having a combined capital and surplus of at least $100,000,000, or (iii) leading banks in a country where the Borrower or the Subsidiary making such Investment does business; <u>provided</u>, that all such Investments mature within 270 days of the date of such

Investment; and provided, further, that all Investments pursuant to clause (iii) above are (A) solely of funds generated in the ordinary course of business by operations of the relevant investor in the country where such Investment is made, and (B) denominated in the currency of the country in which such Investment is made or in Dollars, (c) commercial paper maturing within 270 days and having one of the two highest ratings of either S&P, Moody's or Fitch Investors' Service, Inc., (d) money market funds (other than those referred to in clause (c) above) that have assets in excess of $2,000,000,000, are managed by recognized and responsible institutions and invest solely in obligations of the types referred to in clauses (a), (b)(i) and (ii) and (c) above, (e) repurchase agreements with a bank or trust company (including a Lender) or recognized securities dealer having capital and surplus in excess of $500,000,000 for direct obligations issued by or directly and fully guaranteed by the United States, and (f) obligations of any state of the United States or any political subdivision thereof for the payment of the principal and redemption price of and interest on which there shall have been irrevocably deposited Government Obligations maturing as to principal and interest at times and in amounts sufficient to provide such payment.

"*Change in Law*" shall mean (a) the adoption of any law, rule or regulation after the Closing Date, (b) any change in any law, rule or regulation or in the interpretation or application thereof by any Governmental Authority after the Closing Date or (c) compliance by any Lender (or, for purposes of Section 2.14, by any lending office of such Lender or by such Lender's holding company, if any) with any policy, guideline or directive (whether or not having the force of law) of any Governmental Authority made or issued after the Closing Date; provided that, notwithstanding anything herein to the contrary, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (ii) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law," regardless of the date enacted, adopted or issued.

"*Change of Control*" shall mean such time as:

(1)    any Person or group (within the meaning of Section 13(d) or 14(d) of the Securities Act of 1933, as amended) has become, directly or indirectly, the beneficial owner, by way of merger, consolidation or otherwise, of 35% or more of the voting power of the Voting Stock of the Borrower on a fully-diluted basis, after giving effect to the conversion and exercise of all outstanding warrants, options and other securities of the Borrower convertible into or exercisable for Voting Stock of the Borrower (whether or not such securities are then currently convertible or exercisable); or

(2)    the sale, lease or transfer of all or substantially all of the consolidated assets of the Borrower to any Person or group; or

(3)    the board of directors of the Borrower shall cease to consist of a majority of Continuing Directors; or

(4)    the Borrower consolidates with or merges with or into another Person or any Person consolidates with, or merges with or into, the Borrower (in each case, whether or not in compliance with the terms of this Agreement), in any such event pursuant to a transaction in which immediately after the consummation thereof Persons owning a majority of the Voting Stock of the Borrower immediately prior to such consummation shall cease to own a majority of the Voting Stock of the Borrower.

"***Closing Date***" shall mean the date on which the conditions precedent set forth in <u>Sections 4.01</u> and <u>4.02</u> have been satisfied or waived.

"***Code***" shall mean the Internal Revenue Code of 1986, as amended.

"***Commitment***" shall mean, with respect to any Lender, the commitment of such Lender to make Loans hereunder as set forth on <u>Schedule 2.01</u>, under the headings "Initial Loan Commitments—Interim Order Loans" and "Post-Initial Allocation Commitments", which "Post-Initial Allocation Commitments" on <u>Schedule 2.01</u> will be updated on the Initial Allocation Date as set forth in <u>Section 2.01(c)</u> to reflect the Initial Allocation, or in the Assignment and Acceptance pursuant to which such Lender assumed its commitment, as applicable, as the same may be (a) reduced from time to time pursuant to <u>Section 2.09</u> and (b) modified from time to time pursuant to assignments by or to such Lender pursuant to <u>Section 9.04</u>. The aggregate amount of all Lenders' Commitments on the Closing Date immediately before the funding of the Interim Order Loan is $206,700,000 (the "***Total Commitment***").

"***Confirmed Order***" shall mean an order or other indication of interest, in accordance with industry standards, by a customer not an Affiliate of the Borrower or any of its Subsidiaries which has been accepted in the ordinary course of business by representatives of the Borrower or any of its Subsidiaries.

"***Continuing Directors***" shall mean, as of any date of determination, any member of the Board of Directors of the Borrower who:

      (1)      was a member of such Board of Directors on the Closing Date; or

      (2)      was nominated for election or elected to such Board of Directors with the approval of a majority of the Continuing Directors who were members of such Board of Directors at the time of such nomination or election.

"***Corporate Restructuring Transaction***" shall have the meaning assigned to such term in Exhibit B to the RSA.

"***Credit Event***" shall have the meaning assigned to such term in <u>Section 4.01</u>.

"***Credit Facility***" shall have the meaning assigned to such term in the Preliminary Statement.

"***Debtors***" shall mean the Borrower and any Subsidiary thereof that is a debtor in the Cases.

"***Deemed Capitalized Leases***" shall mean obligations of the Borrower or any Subsidiary of the Borrower that are classified as "capital lease obligations" under GAAP due to the application of FASB ASC Topic 840 or any subsequent pronouncement having similar effect and, except for such regulation or pronouncement, such obligation would not constitute a Capitalized Lease Obligation.

"***Default***" shall mean any event or condition which upon notice, lapse of time or both would constitute an Event of Default.

"***Defaulting Lender***" shall mean any Lender that (a) defaults in its obligation to make any Loan or fulfill any obligation required to be made or fulfilled by it hereunder in the case of any funding requirement within two Business Days of the date such Loans were required to be funded by it hereunder, unless such Lender notifies the Administrative Agent and the Borrower in writing that such failure is the result of such Lender's good faith determination that one or more conditions precedent to funding (which

conditions precedent, together with the applicable default, if any, shall be specifically identified in such writing) has not been satisfied, (b) has notified the Administrative Agent or any Loan Party in writing that it does not intend to satisfy any such obligations, (c) has become the subject of a bankruptcy or insolvency proceeding, or has had a receiver, conservator, trustee, custodian, administrator, assignee for the benefit of creditors or similar person charged with the reorganization or liquidation of its business, appointed for it, or has taken any action in furtherance of, or indicating its consent to, approval of or acquiescence in any such proceeding or appointment or has a parent company that has become the subject of a bankruptcy or insolvency proceeding, or has had a receiver, conservator, trustee, custodian, administrator, assignee for the benefit of creditors or similar person charged with the reorganization or liquidation of its business, appointed for it, or has taken any action in furtherance of, or indicating its consent to, approval of or acquiescence in any such proceeding or appointment; *provided* that if a Lender would be a "Defaulting Lender" solely by reason of events relating to a parent company of such Lender or solely because a Governmental Authority has been appointed as receiver, conservator, trustee or custodian for such Lender, such Lender shall not be a "Defaulting Lender" if and for so long as such Lender confirms in writing, upon request by the Administrative Agent, that it will continue to comply with its obligations to make Loans and fulfill all other obligations required to be made and fulfilled by it hereunder, or (d) has, or has a direct or indirect parent company that has, become the subject of a Bail-In Action (as defined in <u>Section 9.19</u>).

"***DIP Collateral***" and "***Collateral***" shall mean any and all assets, whether real or personal, tangible or intangible, on which Liens are purported to be granted pursuant to the Security Documents as security for the Obligations and the "Collateral" referred to in the Orders, including substantially all real and personal property of the Loan Parties, other than Excluded Assets.

"***DIP Priority Collateral***" shall mean any and all DIP Collateral other than First Lien Notes Priority Collateral and Encumbered Collateral.

"***DIP Proceeds Account***" shall mean a segregated or other deposit account of the Borrower, including without limitation, the Borrower's existing concentration account, over which the Collateral Agent (for the benefit of the Secured Parties) has a legal, valid, binding, continuing, enforceable, first priority Lien.

"***DIP Superpriority Claims***" has the meaning specified in the Interim Order or the Final Order, as applicable.

"***Disqualified Stock***" shall mean any Equity Interest that, by its terms (or by the terms of any security into which it is convertible, or for which it is exchangeable, in each case at the option of the holder of the Equity Interest), or upon the happening of any event, matures or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise, or redeemable at the option of the holder of the Equity Interest, in whole or in part, on or prior to the date that is 91 days after the Stated Maturity Date. Notwithstanding the preceding sentence, any Equity Interest that would constitute Disqualified Stock solely because the holders of the Equity Interest have the right to require the Borrower to repurchase such Equity Interest upon the occurrence of a change of control or an asset sale will not constitute Disqualified Stock if the terms of such Equity Interest provide that the Borrower may not repurchase or redeem any such Equity Interest pursuant to such provisions unless such repurchase or redemption complies with <u>Section 6.01</u> hereof.   The amount of Disqualified Stock deemed to be outstanding at any time for purposes of this Agreement will be the maximum amount that the Borrower and its Subsidiaries may become obligated to pay upon the maturity of, or pursuant to any mandatory redemption provisions of, such Disqualified Stock, exclusive of accrued dividends.

"***dollars***" or "***$***" shall mean lawful money of the United States of America.

"***Domestic Subsidiary***" of any Person shall mean any Subsidiary of such Person incorporated or organized in the United States or any State thereof or the District of Columbia.

"***Dutch Pledge***" shall mean the Dutch law governed pledge over shares dated [on the Closing Date] between Alliance One International Holdings, Ltd., as pledgor, Intabex Netherlands B.V. as the company, and the Collateral Agent, as collateral agent, in respect of the pledge by Alliance One International Holdings, Ltd. over its shares in Intabex Netherlands B.V.

"***Dutch Parallel Debt***" shall mean, in relation to an Underlying Debt, an obligation to pay the Collateral Agent an amount equal to (and in the same currency as) the amount of that Underlying Debt.

"***Eligible Assignee***" shall mean any commercial bank, insurance company, investment or mutual fund or other entity (but not any natural person) that is an "accredited investor" (as defined in Regulation D under the Securities Act of 1933, as amended) that extends credit or invests in bank loans as one of its businesses; *provided* that in any event, "Eligible Assignee" shall not include (x) the Borrower or any Affiliate (which for this purpose shall not include the Administrative Agent or any of its branches or Affiliates engaged in the business of making commercial loans) thereof or (y) any Defaulting Lender.

"***Encumbered Collateral***" shall mean any assets of the Debtors subject to a valid, binding, enforceable, perfected and non-avoidable Lien securing obligations (other than the First Lien Notes Obligations and obligations under the ABL Credit Agreement) as of the Petition Date.

"***Environmental Claims***" shall mean any and all administrative, regulatory or judicial actions, suits, demands, demand letters, directives, claims, liens, written notices of noncompliance or violation, investigations and/or proceedings relating in any way to any noncompliance with, or liability arising under, Environmental Law or to any permit issued, or any approval given, under any Environmental Law (hereafter, "***Claims***"), including, without limitation, (a) any and all Claims by governmental or regulatory authorities for enforcement, cleanup, removal, response, remedial or other actions or damages pursuant to any Environmental Law, and (b) any and all Claims by any third party seeking damages, contribution, indemnification, cost recovery, compensation or injunctive relief arising out of or relating to an alleged injury or threat of injury to human health, safety or the environment due to the presence of Hazardous Materials.

"***Environmental Law***" shall mean any Federal, state, foreign or local statute, law (including principles of common law), rule, regulation, ordinance, code, directive, judgment or order, now or hereafter in effect and in each case as amended, and any judicial or administrative interpretation thereof, relating to the protection of the environment, or of human health (as it relates to the exposure to Hazardous Materials) or to the presence, Release or threatened Release, or the manufacture, use, transportation, treatment, storage, disposal or recycling of Hazardous Materials, or the arrangement for any such activities.

"***Equity Interests***" of any Person shall mean any and all shares, interests, rights to purchase, warrants, options, participation or other equivalents of or interest in (however designated) equity of such Person, including any common stock, preferred stock, any limited or general partnership interest (including membership interest or share) and any limited liability company membership interest.

"***ERISA***" shall mean the U.S. Employee Retirement Income Security Act of 1974, as amended from time to time, and the regulations promulgated and rulings issued thereunder. Section references to ERISA are to ERISA, as in effect at the date of this Agreement and any subsequent provisions of ERISA, amendatory thereof, supplemental thereto or substituted therefor.

"*ERISA Affiliate*" shall mean any person, as defined in Section 3(9) of ERISA, that for purposes of Title I or Title IV of ERISA or Section 412 of the Code would be deemed at any relevant time to be a single employer or otherwise aggregated with the Borrower or any of its Subsidiaries under Section 414 of the Code or Section 4001 of ERISA.

"*ERISA Event*" shall mean any one or more of the following:

(1)     any Reportable Event;

(2)     the filing of a notice of intent to terminate any Plan, if such termination would require material additional contributions in order to be considered a standard termination within the meaning of Section 4041(b) of ERISA, the filing under Section 4041(c) of ERISA of a notice of intent to terminate any Plan or the termination of any Plan under Section 4041(c) of ERISA;

(3)     institution of proceedings by the PBGC, or the occurrence of an event or condition which would reasonably be expected to constitute grounds for the institution of proceedings by the PBGC under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Plan;

(4)     the failure to make a required contribution to any Plan that would result in the imposition of a lien or other encumbrance or the provision of security under the Code or ERISA, or the arising of such a lien or encumbrance; there being or arising any "unpaid minimum required contribution" or "accumulated funding deficiency" (as defined or otherwise set forth in Section 4971 of the Code or Part 3 of Subtitle B of Title I of ERISA), whether or not waived; or the filing of any request for or receipt of a minimum funding waiver under Section 412 of the Code with respect to any Plan, or that such filing may be made or a determination that any Plan is, or is expected to be, considered an at-risk plan or in endangered or critical status within the meaning of Title IV of ERISA;

(5)     engaging in a non-exempt prohibited transaction within the meaning of Section 4975 of the Code or Section 406 of ERISA;

(6)     the complete or partial withdrawal of the Borrower or any of its Subsidiaries or any ERISA Affiliate from a Multiemployer Plan, the insolvency or critical status under Title IV of ERISA of any Multiemployer Plan; or the receipt by the Borrower or any of its Subsidiaries or any ERISA Affiliate, of any notice, or the receipt by any Multiemployer Plan from any of the Borrower, any of its Subsidiaries or any ERISA Affiliate of any notice, that a Multiemployer Plan is in endangered or critical status under Section 305 of ERISA; or

(7)     the Borrower, any of its Subsidiaries or an ERISA Affiliate incurring any material liability under Title IV of ERISA with respect to any Plan (other than premiums due and not delinquent under Section 4007 of ERISA).

"*Eurodollar*" when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are bearing interest at a rate determined by reference to the Adjusted LIBO Rate.

"*Event of Default*" shall have the meaning assigned to such term in Article VII.

"*Excluded Assets*" shall (i) with respect to each Loan Party that is not a UK Loan Party, have the meaning assigned to such term in the Pledge and Security Agreement or in any other Security Document

and (ii) with respect to each UK Loan Party, shall mean the assets and property specified in Section 3.3.1 of the UK Debenture.

"*Excluded Taxes*" shall mean any of the following Taxes imposed on or with respect to a Recipient or required to be withheld or deducted from a payment to a Recipient, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of such Recipient being organized under the laws of, or having its principal office or, in the case of any Lender, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a Lender, U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan or Commitment pursuant to a law in effect on the date on which (i) such Lender acquires such interest in the Loan or Commitment (other than pursuant to an assignment request by the Borrower under Section 2.21(a)) or (ii) such Lender changes its lending office, except in each case to the extent that, pursuant to Section 2.20, amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender acquired the applicable interest in a Loan or Commitment or to such Lender immediately before it changed its lending office, (c) Taxes attributable to such Recipient's failure to comply with Section 2.20(e), and (d) any withholding Taxes imposed under FATCA.

"*Existing Securitization Facilities*" shall mean the facilities under the documents described on Schedule 1.01(b).

"*Exit Term Facility Term Sheet*" shall mean the Exit Term Facility Term sheet attached as Exhibit E to the RSA, as such term sheet may be amended, supplemented or otherwise modified from time to time in accordance with the terms of the RSA.

"*Fair Market Value*" shall mean the value that would be paid by a willing buyer to an unaffiliated willing seller in a transaction not involving distress or necessity of the seller, determined in good faith by the board of directors of the Borrower (unless otherwise provided in this Agreement).

"*FATCA*" shall mean Sections 1471 through 1474 of the Code (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof, any agreement entered into pursuant to Section 1471(b)(1) of the Code, any intergovernmental agreements (and any fiscal or regulatory legislation, rules or official administrative practices adopted) implementing any of the foregoing.

"*Federal Funds Effective Rate*" shall mean, for any day, the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average of the quotations for the day for such transactions received by the Administrative Agent from three Federal funds brokers of recognized standing selected by it. If the Federal Funds Effective Rate is less than zero, it shall be deemed to be zero hereunder.

"*Final Availability Amount*" shall mean (i) the Total Commitment (or such lesser amount approved by the Bankruptcy Court in the Final Order) less (ii) the Interim Availability Amount.

"*Final Order*" shall mean, collectively, the order of the Bankruptcy Court entered in the Cases after a final hearing under Bankruptcy Rule 4001(c)(2) or such other procedures as approved by the Bankruptcy Court, which order shall be in the form of the Interim Order (with only such modifications thereto as are necessary to convert the Interim Order to a final order and such other modifications as are

reasonably satisfactory to the Required Financing Commitment Parties (and, with respect to those provisions thereof that affect the rights, obligations, liabilities and duties of the Administrative Agent or the Collateral Agent, to the Administrative Agent or the Collateral Agent, as applicable) in their reasonable discretion), together with all extensions, modifications, and amendments thereto.

"***Final Order Entry Date***" shall mean the date on which the Final Order is entered by the Bankruptcy Court.

"***Final Order Loan***" shall have the meaning assigned to such term in <u>Section 2.01</u>.

"***Financial Officer***" of any person shall mean the chief financial officer, finance director, principal accounting officer, treasurer, assistant treasurer or controller of such person.

"***Financing Commitment Parties***" shall have the meaning assigned to such term in <u>the RSA</u>.

"***First Day Orders***" shall mean all orders entered by the Bankruptcy Court on or, within five Business Days of, the Petition Date, or based on motions filed on or about the Petition Date which, for the avoidance of doubt, shall include a "cash management order".

"***First Lien Notes***" shall mean the Borrower's 8.500% Senior Secured First Lien Notes due 2021 issued and outstanding under the First Lien Notes Indenture.

"***First Lien Notes Indenture***" shall mean that certain Indenture, dated as of October 14, 2016, between the Borrower, the guarantors from time to time party thereto, and The Bank of New York Mellon Trust Company, N.A., as trustee, collateral agent, registrar and paying agent.

"***First Lien Notes Obligations***" shall have the meaning assigned to the term "Secured Obligations" in the First Lien Notes Indenture.

"***First Lien Notes Priority Collateral***" shall, solely as to the Borrower and or guarantors in respect of the First Lien Notes Obligations, have the meaning assigned to the term "First Lien Notes Priority Collateral" in the Senior Lien Intercreditor Agreement; *provided* that the First Lien Notes Priority Collateral hereunder shall be limited to such "First Lien Notes Priority Collateral" that is subject to a valid, binding, enforceable, perfected and non-avoidable Lien securing the First Lien Notes Obligations as of the Petition Date.

"***Fiscal Year***" shall mean the four consecutive fiscal quarters ending on March 31 of each calendar year.

"***Foreign Lender***" shall mean a Lender that is not a U.S. Person.

"***Foreign Pension Plan***" shall mean any plan, fund (including, without limitation, any superannuation fund), scheme or other similar program established or maintained outside the United States by the Borrower or any one or more of its Subsidiaries primarily for the benefit of employees of the Borrower or such Subsidiaries residing outside the United States, which plan, fund, scheme or other similar program provides, or results in, retirement income, a deferral of income in contemplation of retirement or payments to be made upon termination of employment, and which plan is not subject to ERISA or the Code.

"***Foreign Subsidiary***" of any Person shall mean any Subsidiary of such Person that is not a Domestic Subsidiary of such Person.

"***Full Availability Date***" shall mean the date on which the conditions precedent set forth in Sections 4.01 and 4.04 have been satisfied or waived and the borrowing of the Final Order Loan occurs.

"***GAAP***" shall generally accepted accounting principles in the United States as in effect from time to time.

"***Governmental Authority***" shall mean the government of the United States of America, any other nation or any political subdivision thereof, whether state, provincial or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other national or supra-national entity or body exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"***Granting Lender***" shall have the meaning assigned to such term in Section 9.04(i).

"***Guarantee***" shall mean a guarantee other than by endorsement of negotiable instruments for deposit or collection in the ordinary course of business, direct or indirect, in any manner including, without limitation, by way of a pledge of assets or through letters of credit or reimbursement agreements in respect thereof, of all or any part of any Indebtedness (whether arising by virtue of partnership arrangements, or by agreements to keep-well, to purchase assets, goods, securities or services, to take or pay or to maintain financial statement conditions or otherwise).

"***Guarantee Agreement***" shall mean the Subsidiaries Guarantee Agreement, substantially in the form of Exhibit D-1, dated as of the Closing Date among the Borrower, the Subsidiaries party thereto and the Collateral Agent for the benefit of the Secured Parties.

"***Hazardous Materials***" shall mean any chemicals, materials, wastes, pollutants, contaminants, or substances in any form that are prohibited, limited or regulated pursuant to any Environmental Law by virtue of their toxic or otherwise deleterious characteristics, including without limitation any petroleum or petroleum products, radioactive materials, asbestos in any form that is or could become friable, urea formaldehyde foam insulation, dielectric fluid containing levels of polychlorinated biphenyls, and radon gas.

"***Hedge Agreement***" shall mean, with respect to any Person, any agreement entered into to protect such Person against fluctuations in interest rates, or currency or raw materials values, including, without limitation, any interest rate swap, cap or collar agreement, or similar arrangement between such Person and one or more counterparties, any foreign currency exchange agreement, currency protection agreements, commodity purchase or option agreements, or other interest or exchange rate or commodity price hedging agreements.

"***Hedging Obligations***" shall mean, with respect to any specified Person, the obligations of such Person under any Hedge Agreement.

"***Indebtedness***" shall mean, with respect to any specified Person, any indebtedness of such Person (excluding accrued expenses and trade payables), whether or not contingent:

> (1)    in respect of borrowed money;

> (2)    evidenced by or issued in exchange for bonds, notes, debentures or similar instruments or letters of credit (or reimbursement agreements in respect thereof);

(3)    in respect of the maximum amount available to be drawn or paid under letters of credit, bankers' acceptances, bank guaranties, surety and appeal bonds and similar obligations issued for the account of such Person and all unpaid drawings and unreimbursed payments in respect of such letters of credit, bankers' acceptances, bank guaranties, surety and appeal bonds and similar obligations;

(4)    representing Capitalized Lease Obligations or attributable debt in respect of sale-leaseback transactions;

(5)    representing the balance deferred and unpaid of the purchase price of any property or services due more than six months after such property is acquired or such services are completed; or

(6)    representing any Hedging Obligations or other Bank Product Obligations,

if and to the extent any of the preceding items (other than letters of credit, attributable debt in respect of sale-leaseback transactions and Hedging Obligations) would appear as a liability upon a balance sheet of the specified Person prepared in accordance with GAAP, but excluding Deemed Capitalized Leases.  In addition, the term "Indebtedness" includes all Indebtedness of others secured by a Lien on any asset of the specified Person (whether or not such Indebtedness is assumed by the specified Person) and, to the extent not otherwise included, the Guarantee by the specified Person of any Indebtedness of any other Person.  Indebtedness shall be calculated without giving effect to the effects of FASB ASC Topic 815 and related interpretations to the extent such effects would otherwise increase or decrease an amount of Indebtedness for any purpose under this Agreement as a result of accounting for any embedded derivatives created by the terms of such Indebtedness.

"*Indemnified Taxes*" shall mean (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Loan Party under any Loan Document and (b) to the extent not otherwise described in (a) hereof, Other Taxes.

"*Indemnitee*" shall have the meaning assigned to such term in Section 9.05(b).

"*Initial Allocation*" shall have the meaning assigned to the term "DIP Allocation" in the DIP Term Sheet attached as Exhibit C to the RSA.

"*Initial Allocation Commitment Notice*" shall have the meaning assigned to such term in Section 2.01(c).

"*Initial Allocation Date*" shall mean the effective date of the assignment of Commitments (and related rights and obligations under this Agreement) pursuant to the Initial Allocation and the date on which the borrowing of the Initial Allocation Date Loan occurs, which is expected to be not more than ten (10) Business Days after the Closing Date (or such other practicable time as reasonably agreed by the Required Financing Commitment Parties, the Administrative Agent and the Borrower).

"*Initial Allocation Date Loan*" shall have the meaning assigned to such term in Section 2.01.

"*Initial Budget*" shall have the meaning assigned to such term in the Interim Order or the Final Order, as applicable, and delivered pursuant to Section 4.02(c).

"*Initial Lenders*" shall mean the Lenders listed on Schedule 2.01 as of the Closing Date.

"***Initial Loan***" shall have the meaning assigned to such term in <u>Section 2.01</u>.

"***Interest Payment Date***" shall mean, with respect to any Eurodollar Borrowing, the last day of the Interest Period of such Eurodollar Borrowing, and with respect to any ABR Borrowing, the last day of the calendar month; *provided*, *however*, that if any Interest Payment Date would be a day other than a Business Day, such Interest Payment Date shall be the next preceding Business Day.

"***Interest Period***" shall mean, with respect to any Eurodollar Borrowing, the period commencing on the date of such Borrowing and ending on the numerically corresponding day (or, if there is no numerically corresponding day, on the last day) in the calendar month that is one month thereafter, or as otherwise set forth in <u>Section 2.01</u>; *provided*, *however*, that if any Interest Period would end on a day other than a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period shall end on the next preceding Business Day.  Interest shall accrue from and including the first day of an Interest Period to but excluding the last day of such Interest Period.  For purposes hereof, the date of a Borrowing initially shall be the date on which such Borrowing is made and thereafter shall be the effective date of the most recent conversion or continuation of such Borrowing.

"***Interim Availability Amount***" shall mean $131,700,000 or such lesser amount approved by the Bankruptcy Court in the Interim Order.

"***Interim Order***" shall mean the order of the Bankruptcy Court entered in the Cases after an interim hearing (assuming satisfaction of the standard prescribed in Bankruptcy Rule 4001 and other applicable law) substantially in the form of <u>Exhibit E</u> hereto or otherwise in form and substance reasonably satisfactory to the Required Financing Commitment Parties and the Loan Parties in their reasonable discretion, which, among other matters but not by way of limitation, authorizes, on an interim basis, the Borrower and Subsidiary Guarantors to execute and perform under the terms of this Agreement and the other Loan Documents.

"***Interim Order Loan***" shall have the meaning assigned to such term in <u>Section 2.01</u>.

"***Inventory***" shall mean "inventory" as such term is defined in Article 9 of the UCC.

"***Investments***" shall mean, with respect to any Person, all direct or indirect investments by such Person in other Persons (including Affiliates) in the forms of loans (including Guarantees or other obligations), advances or capital contributions (excluding commission, travel and similar advances to officers and employees made in the ordinary course of business to the extent consistent with the Approved DIP Budget and any applicable order of the Bankruptcy Court), purchases or other acquisitions for consideration of Indebtedness, Equity Interests or other securities, together with all items that are or would be classified as investments on a balance sheet prepared in accordance with GAAP.  Except as otherwise provided in this Agreement, the amount of an Investment will be determined at the time the Investment is made and without giving effect to subsequent changes in value.

"***IRS***" shall mean the United States Internal Revenue Service.

"***Leaseholds***" of any Person shall mean all the right, title and interest of such Person as lessee or licensee in, to and under leases or licenses of land, improvements and/or fixtures.

"***Lender Advisors***" shall mean Wachtell, Lipton, Rosen & Katz; Morris Nichols Arsht & Tunnell LLP;  and the Lender Financial Advisor.

"***Lender Financial Advisor***" shall mean TRS Advisors LLC, in its capacity as financial advisor to the Initial Lenders.

"***Lenders***" shall mean (a) the persons listed on Schedule 2.01 (other than any such person that has ceased to be a party hereto pursuant to an Assignment and Acceptance) and (b) any person that has become a party hereto pursuant to an Assignment and Acceptance.

"***LIBO Rate***" shall mean, with respect to any Eurodollar Borrowing for any Interest Period, the rate of interest appearing on the applicable Bloomberg page (or on any successor or substitute page of such service, or any successor to such service as determined by the Administrative Agent) as the London interbank offered rate administered by ICE Benchmark Administration Limited for deposits in dollars for a term comparable to such Interest Period, at approximately 11:00 a.m. (London time) on the date which is two Business Days prior to the commencement of such Interest Period; *provided* that in no event shall the LIBO Rate be less than 1.50%; *provided*, *further*, that, to the extent that an interest rate is not ascertainable pursuant to the foregoing provisions of this definition, the rate shall be, at any time, the rate per annum determined by the Administrative Agent (the "***Interpolated Rate***") (which determination shall be conclusive and binding absent manifest error) to be equal to the rate that results from interpolating on a linear basis between: (a) the LIBO Rate for the longest period (for which that LIBO Rate is available in Dollars) that is shorter than the Interest Period and (b) the LIBO Rate for the shortest period (for which that LIBO Rate is available for Dollars) that exceeds the Interest Period, in each case, at such time; *provided* that in no event shall the Interpolated Rate be less than 1.50%.

"***Lien***" shall mean any mortgage, pledge, declaration of trust, charge, hypothecation, assignment, assignment by way of security, deposit arrangement, encumbrance, lien (statutory or other), preference, priority or other security agreement of any kind or nature whatsoever (including, without limitation, any conditional sale or other title retention agreement, any financing or similar statement or notice filed under the UCC or any other similar recording or notice statute, and any lease having substantially the same effect as any of the foregoing).

"***Liquidity***" shall mean, as of any time, the sum of (i) unrestricted domestic cash and Cash Equivalents of the Borrower and its Subsidiaries (excluding cash and Cash Equivalents in the DIP Proceeds Account), (ii) Loan proceeds in the DIP Proceeds Account; provided that on the date the Interim Order Loan is made, the amount of such Loan proceeds for purposes of this clause (ii) shall be deemed to have a starting balance equal to the Interim Availability Amount before deductions until but excluding the date the Initial Allocation Date Loan is made, irrespective of whether a lesser amount of actual Loan proceeds is in such account for the same period and (iii) after the entry of the Final Order, the principal amount of Loans available for borrowing hereunder (as to which all conditions precedent other than delivery of a borrowing notice have been satisfied), in each case at such time.

"***LLC Division***" shall mean the statutory division of any limited liability company into two or more limited liability companies pursuant to Section 18.217 of the Delaware Limited Liability Company Act or a comparable provision of a different jurisdiction's laws, as applicable.

"***Loan Documents***" shall mean this Agreement, the Security Documents, the Agent Fee Letter, the promissory notes, if any, executed and delivered pursuant to Section 2.04(e), and the DIP Orders.

"***Loan Parties***" shall mean the Borrower and the Subsidiary Guarantors.

"***Loans***" shall mean the term loans made by the Lenders to the Borrower pursuant to Section 2.01.

"***Margin Stock***" shall have the meaning assigned to such term in Regulation U.

"***Material Adverse Effect***" shall mean any event, change, condition, occurrence or circumstance which has had, or could reasonably be expected to have, either individually or in the aggregate, (a) a material adverse change in, or a material adverse effect on, the business, operations, property, assets, liabilities (actual or contingent) or condition (financial or otherwise) of the Borrower and its Subsidiaries taken as a whole or (b) a material adverse effect (i) on the rights or remedies of the Lenders, the Administrative Agent or the Collateral Agent hereunder or under any other Loan Document, (ii) on the ability of the Loan Parties taken as a whole to perform their obligations to the Lenders, the Administrative Agent or the Collateral Agent hereunder or under any other Loan Document, or (iii) upon the legality, validity, binding effect or enforceability against any Loan Party of any Loan Document to which it is a party, other than, in each case, as a result of the events leading up to, and, resulting from the commencement of a proceeding under Chapter 11, the continuation and prosecution thereof, including circumstances or conditions resulting from, or incidental to, such events, commencement, continuation and prosecution, which shall not, individually or in the aggregate, constitute a Material Adverse Effect; *provided* that no effect on the business, assets, operations, financial condition or operating results of the Borrower and the Subsidiaries as a result of the Coronavirus Disease 2019 (COVID-19) shall constitute a Material Adverse Effect under <u>clause (a)</u> of the definition thereof.

"***Material Contract***" shall mean any contract or other arrangement to which the Borrower or any of its Subsidiaries is a party (other than the Loan Documents) for which breach, nonperformance, cancellation or failure to renew could reasonably be expected to have a Material Adverse Effect.

"***Material Domestic Subsidiary***" shall mean (i) any Domestic Subsidiary of the Borrower or any Foreign Subsidiary of the Borrower that guarantees or otherwise provides direct credit support for any Indebtedness of the Borrower, in each case that would constitute a "significant subsidiary" of the Borrower as defined in Rule 1.02 of Regulation S-X promulgated by the SEC except that for purposes of this definition all references in such Rule 1.02 to "ten percent (10%)" shall be deemed to be references to "five percent (5%)" and (ii) any Subsidiary of the Borrower that guaranteed the First Lien Notes or the Second Lien Notes as of the Petition Date.

"***Material Foreign Subsidiary***" shall mean any Foreign Subsidiary of the Borrower that would constitute a "significant subsidiary" of the Borrower as defined in Rule 1.02 of Regulation S-X promulgated by the SEC.

"***Material Local Credit Facilities***" shall mean those local credit facilities of any of the Borrower's Subsidiaries with an outstanding principal balance at any time after the Closing Date of more than $25,000,000.

"***Maturity Date***" shall mean the earliest of (i) the date that is six (6) months after the Closing Date (the "***Stated Maturity Date***"), (ii) the date of the substantial consummation (as defined in Section 1101(2) of the Bankruptcy Code) of an Acceptable Plan, (iii) the date on which the Loan Parties consummate a sale of all or substantially all of the assets of the Loan Parties pursuant to section 363 of the Bankruptcy Code or otherwise and (iv) such earlier date on which the Loans shall become due and payable by acceleration or otherwise in accordance with the terms of this Agreement and the other Loan Documents.

"***Minimum Hold Percentage***" shall mean, with respect to each Lender party to this Agreement on the Closing Date, the applicable percentage under the heading "Minimum Hold Percentage—Closing Date Lenders" on <u>Schedule 2.01</u>.

"**_Minority Interest Consolidated Entity_**" shall mean any Person that is not a Subsidiary of the Borrower but is consolidated in the Borrower's financial statements for purposes of GAAP.

"**_Moody's_**" shall mean Moody's Investors Service, Inc., or any successor thereto.

"**_Multiemployer Plan_**" shall mean a multiemployer plan as defined in Section 4001(a)(3) of ERISA, which is contributed to (or to which there is or may be an obligation to contribute to) by the Borrower or any of its Subsidiaries or an ERISA Affiliate or with respect to which the Borrower or any of its Subsidiaries has any current liability (including on account of an ERISA Affiliate).

"**_Net Cash Proceeds_**" shall mean (a) with respect to any Asset Sale, the Net Sale Proceeds in respect of such Asset Sale; and (b) with respect to any issuance or incurrence of Indebtedness, the cash proceeds thereof, net of all taxes and customary fees, commissions, costs and other expenses incurred in connection therewith.

"**_Net Sale Proceeds_**" shall mean, for any Asset Sale, the gross cash proceeds (using the fair market value of any Cash Equivalents, and including any cash or Cash Equivalents received by way of deferred payment pursuant to a promissory note, receivable or otherwise, but only as and when received) received from such sale or other disposition of assets, net of (i) reasonable, direct cash transaction costs (including, without limitation, any underwriting, brokerage or other customary selling commissions, reasonable legal, advisory and other fees and expenses (including title and recording expenses), associated therewith and sales, VAT and transfer taxes arising therefrom), (ii) the amount of such gross cash proceeds required to be used to permanently repay any Indebtedness (other than Indebtedness secured pursuant to the Security Documents and the Secured Notes Documents) which is secured by a Permitted Lien on the respective assets which were sold or otherwise disposed of that is prior or senior to the Lien securing the Obligations (including to the extent the assets subject of such Asset Sale constitute First Lien Notes Priority Collateral), and (iii) the estimated net marginal increase in income taxes which will be payable by the Borrower's consolidated group or any Subsidiary of the Borrower with respect to the Fiscal Year of the Borrower in which the sale or other disposition occurs as a result of such sale or other disposition.

"**_Notice and Instruction Form_**" shall mean the Notice and Instruction Form delivered by or on behalf of the Borrower to holders of Second Lien Notes in connection with the Initial Allocation.

"**_Obligations_**" shall mean (a) the due and punctual payment of (i) the principal of and interest on the Loans, when and as due, whether at maturity, by acceleration, upon one or more dates set for prepayment or otherwise, and (ii) all other monetary obligations of the Borrower to any of the Secured Parties under this Agreement and each of the other Loan Documents, including fees, costs, expenses and indemnities, whether primary, secondary, direct, contingent, fixed or otherwise (other than the Borrower's Dutch Parallel Debt), (b) the due and punctual performance of all other obligations of the Borrower under or pursuant to this Agreement and each of the other Loan Documents and (c) the due and punctual payment and performance of all the obligations of each other Loan Party under or pursuant to this Agreement and each of the other Loan Documents.

"**_Orders_**" shall mean, collectively, the Interim Order and the Final Order.

"**_Other Connection Taxes_**" shall mean, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in

any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"*Other Taxes*" shall mean any and all present or future stamp, court or documentary, intangible, recording, filing or similar taxes or any other excise or property taxes, charges or similar levies arising from any payment made under any Loan Document or from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to Section 2.21).

"*PACA*" shall mean the Perishable Agricultural Commodities Act of 1980, as amended.

"*Participant Register*" shall have the meaning assigned to such term in Section 9.04(f).

"*Payment in Full*" or "*Paid in Full*" shall mean, with respect to the Obligations, (A) (i) termination of the Commitments of all of the Lenders and (ii) payment in full in cash of all Obligations under the Loan Documents (other than contingent indemnification obligations and other obligations not then payable which expressly survive termination and as to which no claim has been asserted) or (B) consummation of the Exit Conversion in accordance with the terms and conditions herein.

"*PBGC*" shall mean the U.S. Pension Benefit Guaranty Corporation.

"*Permitted Investments*" shall mean:

(1)     any Investment (i) in the Borrower or in a Subsidiary of the Borrower existing on the Petition Date; (ii) by the Borrower or any Subsidiary of the Borrower in any domestic Loan Party or any UK Loan Party; (iii) by any Subsidiary Guarantor or any Subsidiary of such Subsidiary Guarantor in another Subsidiary Guarantor or Subsidiary of a Subsidiary Guarantor; and (iv) by any Subsidiary not described in the foregoing clause (iii) in any other such Subsidiary;

(2)     any Investment in cash or Cash Equivalents;

(3)     any Investment made as a result of the receipt of non-cash consideration from an asset sale that was made pursuant to and in compliance with Section 6.04 or any other disposition of assets not constituting an Asset Sale;

(4)     any acquisition of assets or Equity Interest solely in exchange for the issuance of Equity Interests (other than Disqualified Stock) of the Borrower;

(5)     any Investments received in compromise or resolution of (a) obligations of trade creditors or customers that were incurred in the ordinary course of business of the Borrower or any of its Subsidiaries, including pursuant to any plan of reorganization or similar arrangement upon the bankruptcy or insolvency of any trade creditor or customer; or (b) litigation, arbitration or other disputes;

(6)     Investments represented by Hedging Obligations entered into prior to the Petition Date;

(7)     loans and advances to growers and other suppliers of tobacco (including Affiliates) in the ordinary course of its business in an aggregate outstanding principal amount consistent with past practice of the Borrower and its Affiliates;

(8)    any guarantee and any guarantee of Indebtedness permitted to be incurred pursuant to Section 6.03;

(9)    any Investment existing on, or made pursuant to binding commitments existing on, the Petition Date;

(10)    Investments made in the ordinary course of such Person's business in export notes, trade credit assignments, bankers' acceptances, guarantees and instruments of a similar nature issued in connection with the financing of international trading transactions by:

(a)    any commercial bank or trust company (or any Affiliate thereof) organized under the laws of the United States of America, any state thereof, or the District of Columbia having capital and surplus in excess of $100.0 million; or

(b)    any international bank organized under the laws of any country which is a member of the OECD or a political subdivision of any such country, and having a combined capital and surplus in excess of $100.0 million;

(11)    any Investment in accounts receivables owing to the Borrower or any of its Subsidiaries, if created or acquired in the ordinary course of business consistent with past practice and payable or dischargeable in accordance with customary trade terms of the Borrower or such Subsidiary;

(12)    the Borrower and its Subsidiaries may make loans and advances to their officers, directors and employees for moving, relocation and travel expenses and other similar expenditures, in each case in the ordinary course of business in an aggregate amount not to exceed $500,000 at any time (determined without regard to any write-downs or write-offs of such loans and advances);

(13)    to the extent constituting Investments under Sections 6.03(b)(xii) and (xiii);

(14)    the Borrower and its Subsidiaries may make advances in the form of a prepayment of expenses to vendors, suppliers and trade creditors consistent with their past practices, so long as such expenses were incurred in the ordinary course of business of the Borrower or such Subsidiary;

(15)    Investments (other than in Collateral) in Persons consisting of non-cash consideration; provided that the aggregate value of all such consideration under this clause (15) shall not exceed $750,000;

(16)    the Borrower and its Subsidiaries may make additional Investments described on Schedule 1.01(c); and

(17)    the Borrower and its Subsidiaries may make additional Investments not otherwise permitted under this clause (17) in an aggregate principal amount not to exceed $250,000.

"**_Permitted Refinancing Indebtedness_**" shall mean with respect to any Indebtedness, any subsequent extension, renewal or refinancing thereof; provided that (i) the aggregate principal amount of the Indebtedness to be extended, renewed or refinanced does not increase from that amount outstanding at the time of any such extension, renewal or refinancing and (ii) after giving effect to such extension,

renewal or refinancing, such Indebtedness has a final maturity no earlier, and a weighted average life to maturity no shorter, than the Indebtedness extended, renewed or refinanced.

"*Permitted Variance*" shall mean any variance permitted under Section 6.09.

"*Person*" or "*person*" shall mean any individual, corporation, partnership, joint venture, association, joint-stock company, trust, unincorporated organization, limited partnership, limited liability partnership, limited or unlimited liability company or government or other entity.

"*Petition Date*" shall have the meaning assigned to such term in the Preliminary Statement.

"*Plan*" shall mean an "employee benefit plan" as defined in Section 3(3) of ERISA (other than a Multiemployer Plan) maintained, sponsored or contributed to by the Borrower or any of its Subsidiaries or with respect to which the Borrower or any of its Subsidiaries has any liability (including on account of an ERISA Affiliate).

"*Platform*" shall have the meaning assigned to such term in Section 9.01.

"*pledge*" shall include any pledge or charge of any asset.

"*Pledge and Security Agreement*" shall mean the Pledge and Security Agreement, substantially in the form of Exhibit D-2, dated as of the Closing Date among the Borrower, the Subsidiaries party thereto and the Collateral Agent for the benefit of the Secured Parties.

"*Prepetition Secured Debt*" shall mean the Indebtedness under the First Lien Notes and the Second Lien Notes.

"*Prime Rate*" shall mean the rate of interest per annum publicly announced from time to time by The Wall Street Journal as the "Prime Rate" in the United States (or, if The Wall Street Journal ceases to quote such rate, the highest per annum interest rate published by the Federal Reserve Board in Federal Reserve Statistical Release H.15 (519) (Selected Interest Rates) as the "bank prime loan" rate or, if such rate is no longer quoted therein, any similar rate quoted therein (as determined by the Administrative Agent) or any similar release by the Federal Reserve Board (as determined by the Administrative Agent)); each change in the Prime Rate shall be effective from and including the date such change is publicly announced as being effective.

"*Projections*" shall mean the projections that were prepared by or on behalf of the Borrower in connection with the Transactions and delivered to the Lenders prior to the Closing Date.

"*Public Lender*" shall have the meaning assigned to such term in Section 9.01.

"*Real Property*" of any Person shall mean all the right, title and interest of such Person in and to land, improvements and fixtures thereon, including freeholds and Leaseholds.

"*Recipient*" shall mean (a) the Administrative Agent or (b) any Lender, as applicable.

"*Recovery Event*" shall mean the receipt by the Borrower or any of its Subsidiaries of any cash insurance proceeds or condemnation award payable by reason of theft, loss, physical destruction or damage, taking or similar event with respect to any of their respective property or assets.

"*Register*" shall have the meaning assigned to such term in Section 9.04(d).

"*Regulation T*" shall mean Regulation T of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"*Regulation U*" shall mean Regulation U of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"*Regulation X*" shall mean Regulation X of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"*Related Parties*" shall mean, with respect to any specified person, such person's Affiliates and the respective directors, trustees, officers, employees, agents and advisors (including its attorneys and financial advisors) of such person and such person's Affiliates.

"*Release*" or "*Released*" shall mean disposing, discharging, injecting, spilling, pumping, leaking, leaching, dumping, emitting, escaping, emptying, pouring, seeping, migrating or the like, into or upon any land or water or air, or otherwise entering into the environment.

"*Reorganization Plan*" shall mean a joint prepackaged Chapter 11 plan of reorganization with respect to any or all of the Cases of the Debtors.

"*Reportable Event*" shall mean an event described in Section 4043(c) of ERISA with respect to a Plan that is subject to Title IV of ERISA other than those events as to which the 30-day notice period is waived under applicable regulations.

"*Required Financing Commitment Parties*" shall mean, at any time, Financing Commitment Parties having Loans and Commitments representing more than 50% of the sum of all Loans and Commitments outstanding at such time held by all Financing Commitment Parties and in any event including at least three (3) unaffiliated Financing Commitment Parties.

"*Required Lenders*" shall mean, at any time, Lenders (other than Defaulting Lenders) having Loans and Commitments representing more than 50% of the sum of all Loans and Commitments (other than those held by Defaulting Lenders) outstanding at such time.

"*Requirement of Law*" shall mean, as to any Person, each law, treaty, rule (including rule of public policy), regulation, statute, order, executive order, ordinance, decree, determination, judgment, consent decree, writ, injunction, settlement agreement or governmental requirement enacted, promulgated, imposed or entered into or agreed by an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"*Responsible Officer*" of any person shall mean any executive officer, executive vice president or Financial Officer of such person and any other officer, director or similar official thereof responsible for the administration of the obligations of such person in respect of this Agreement (including, for the avoidance of doubt, any person designated as an "Authorized Person" by any Loan Party with respect to the Loan Documents).

"*Restricted Investment*" shall mean an Investment other than a Permitted Investment.

"*RSA*" shall mean that certain Restructuring Support Agreement dated as of June 14, 2020, executed and delivered by the Borrower and the other parties thereto, as such agreement may be amended, supplemented or otherwise modified from time to time in accordance with the terms thereof.

"**S&P**" shall mean Standard & Poor's Ratings Service, or any successor thereto.

"**Sanctioned Country**" shall mean, at any time, a country, region or territory which is itself the subject or target of any Sanctions (at the time of this Agreement, Crimea, Cuba, Iran, North Korea and Syria).

"**Sanctioned Person**" shall mean, at any time, (a) any Person listed in any Sanctions-related list of designated Persons maintained by the Office of Foreign Assets Control of the U.S. Department of the Treasury, the U.S. Department of State, or by the United Nations Security Council, the European Union or any European Union member state, (b) any Person operating, organized or resident in a Sanctioned Country or (c) any Person owned or controlled by any such Person or Persons described in the foregoing clauses (a) or (b).

"**Sanctions**" shall mean all economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by (a) the U.S. government, including those administered by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State, (b) the United Nations Security Council, the European Union, any European Union member state or Her Majesty's Treasury of the United Kingdom or (c) the Swiss government, including those administered by the Swiss State Secretariat for Economic Affairs and the Directorate of International Law.

"**SEC**" shall mean the U.S. Securities and Exchange Commission or any Governmental Authority succeeding to any or all of its functions.

"**Second Lien Notes**" shall mean the Borrower's 9.875% Senior Secured Second Lien Notes due 2021 issued and outstanding under the Second Lien Notes Indenture.

"**Second Lien Notes Indenture**" shall mean that certain Indenture, dated as of August 1, 2013, between the Borrower, the guarantors from time to time party thereto, Law Debenture Trust Company of New York, as trustee, Law Debenture Trust Company of New York, as collateral trustee and Deutsche Bank Trust Company Americas, as registrar and paying agent.

"**Second Lien Notes Obligations**" shall have the meaning assigned to the term "Secured Obligations" in the Second Lien Notes Indenture.

"**Secured Parties**" shall have the meaning assigned to the term "DIP Secured Parties" in the Orders.

"**Security Documents**" shall mean the DIP Orders, the Pledge and Security Agreement, the UK Debenture, the UK Trust Deed, the Dutch Pledge, the Guarantee Agreement and each of the security agreements, trust deeds, mortgages and other instruments and documents executed and delivered pursuant to any of the foregoing or pursuant to Section 5.13.

"**Senior Lien Intercreditor Agreement**" shall mean that certain Senior Lien Intercreditor Agreement, dated as of October 14, 2016, between Deutsche Bank AG New York Branch and The Bank of New York Mellon Trust Company N.A.

"**SPC**" shall have the meaning assigned to such term in Section 9.04(i).

"**Specified Agreements**" shall have the meaning set forth on Schedule 7.13.

"**Stated Maturity**" shall mean, with respect to any installment of interest or principal on any series of Indebtedness, the date on which the payment of interest or principal was scheduled to be paid in the documentation governing such Indebtedness as of the date hereof, and will not include any contingent obligations to repay, redeem or repurchase any such interest or principal prior to the date originally scheduled for the payment thereof.

"**Statutory Reserves**" shall mean a fraction (expressed as a decimal), the numerator of which is the number one and the denominator of which is the number one minus the aggregate of the maximum reserve percentages (including any marginal, special, emergency or supplemental reserves) expressed as a decimal established by the Board and any other banking authority, domestic or foreign, to which the Administrative Agent or any Lender (including any branch, Affiliate or other fronting office making or holding a Loan) is subject for Eurocurrency Liabilities (as defined in Regulation D of the Board). Eurodollar Loans shall be deemed to constitute Eurocurrency Liabilities (as defined in Regulation D of the Board) and to be subject to such reserve requirements without benefit of or credit for proration, exemptions or offsets that may be available from time to time to any Lender under such Regulation D. Statutory Reserves shall be adjusted automatically on and as of the effective date of any change in any reserve percentage.

"**Subsidiary**" shall mean, with respect to any specified Person:

(1)       any corporation, association or other business entity of which more than 50% of the total voting power of shares of Equity Interest entitled (without regard to the occurrence of any contingency and after giving effect to any voting agreement or stockholders' agreement that effectively transfers voting power) to vote in the election of directors, managers or trustees of the corporation, association or other business entity is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person (or a combination thereof); and

(2)       any partnership or limited liability company of which (a) more than 50% of the capital accounts, distribution rights, total equity and voting interests or general and limited partnership interests, as applicable, are owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of that Person or a combination thereof, whether in the form of membership, general, special or limited partnership interests or otherwise, and (b) such Person or any Subsidiary of such Person is a controlling general partner or otherwise controls such entity.

"**Subsidiary Guarantor**" shall mean each Subsidiary listed on <u>Schedule 1.01(a)</u>, and each other Subsidiary that is or becomes a party to the Guarantee Agreement pursuant to <u>Section 5.13</u>.

"**Taxes**" shall mean any and all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"**Threshold Amount**" shall mean $25,000,000.

"**Total Commitment**" shall have the meaning assigned to such term in the definition of "Commitments."

"**Transactions**" shall mean, collectively, (a) the execution, delivery and performance by the Loan Parties of the Loan Documents to which they are a party and the making of the Borrowings hereunder on

the Closing Date, (b) the Cases, (c) all related transactions to occur on, prior to or after the Closing Date and (d) the payment of fees and expenses related to the foregoing.

"*Type*," when used in respect of any Loan or Borrowing, shall refer to the Rate by reference to which interest on such Loan or on the Loans comprising such Borrowing is determined.  For purposes hereof, the term "*Rate*" shall mean the Adjusted LIBO Rate and the Alternate Base Rate.

"*UCC*" shall mean the Uniform Commercial Code as from time to time in effect in the relevant jurisdiction.

"*UK Debenture*" shall mean the English law governed debenture dated [on the Closing Date] between Alliance One International Holdings, Ltd. and Pyxus Agriculture Holdings Limited, as chargors, and the Collateral Agent, as collateral agent.

 "*UK Loan Party*" and "*UK Loan Parties*" shall mean any Loan Party or Loan Parties organized or existing under the laws of the United Kingdom, including of England and Wales or Scotland.

"*UK Legal Reservations*" shall mean, in the case of any UK Loan Party or any Loan Document governed by English law or to which a UK Loan Party is party: (i) the principle that certain remedies may be granted or refused at the discretion of the court, the limitation of enforcement by laws relating to bankruptcy, insolvency, liquidation, reorganisation, court schemes, moratoria, administration and other laws generally affecting the rights of creditors and secured creditors; (ii) the time barring of claims under applicable limitation laws and defences of acquiescence, set off or counterclaim and the possibility that an undertaking to assume liability for or to indemnify a person against non-payment of stamp duty may be void; (iii) the principle that in certain circumstances Collateral granted by way of fixed charge may be recharacterised as a floating charge or that Collateral purported to be constituted as an assignment may be recharacterised as a charge; (iv) the principle that additional interest imposed pursuant to any relevant agreement may be held to be unenforceable on the grounds that it is a penalty and thus void; (v) the principle that a court may not give effect to an indemnity for legal costs incurred by an unsuccessful litigant; (vi) the principle that the creation or purported creation of Collateral over any contract or agreement which is subject to a prohibition on transfer, assignment or charging may be void, ineffective or invalid and may give rise to a breach of the contract or agreement over which Collateral has purportedly been created; (vii) similar principles, rights and defences under the laws of any relevant jurisdiction; (viii) the making or the procuring of the appropriate registrations, filing, endorsements, notarisation, stampings and/or notifications of the Security Documents and/or the Collateral created thereunder and (ix) any other matters which are set out as qualifications or reservations (however described) as to matters of law in any legal opinion delivered to the Administrative Agent or Collateral Agent pursuant to any Loan Document.

"*UK Perfection Requirement*" shall mean any registration, filing, endorsement, notarization, stamping, notification or other action or step to be made or procured in any jurisdiction in order to create, perfect or enforce the Lien created by a Security Document and/or to achieve the relevant priority for the Lien created thereunder.

"*UK Security Documents*" shall mean the Security Documents governed by the laws of the United Kingdom, including England and Wales and Scotland.

"*UK Trust Deed*" shall mean the English law governed security trust deed dated [on the Closing Date] between Pyxus International, Inc. and the Collateral Agent, as collateral trustee.

24

"***U.S. Person***" shall mean any Person that is a "United States Person" as defined in Section 7701(a)(30) of the Code.

"***U.S. Tax Compliance Certificate***" has the meaning specified in Section 2.20(e).

"***Uncommitted Inventories***" shall mean tobacco inventories for which the Borrower or any of its Subsidiaries has not received a Confirmed Order, which such inventories are reflected on the books and records of the Borrower or any of its Subsidiaries as uncommitted inventories in accordance with GAAP.

"***Underlying Debt***" shall mean, in relation to the Borrower and at any given time, each obligation (whether present of future, actual or contingent) owing by the Borrower to a Lender under the Loan Documents (including, for the avoidance of doubt, any change or increase in those obligations pursuant to or in connection with any amendment or supplement or restatement or novation of any Loan Document, in each case whether or not anticipated as of the date of this Agreement) excluding the Borrower's Dutch Parallel Debts.

"***Unfunded Pension Liability***" of any Plan subject to Title IV of ERISA shall mean the amount, if any, by which the value of the accumulated plan benefits under such Plan determined on a plan termination basis in accordance with actuarial assumptions at such time consistent with those prescribed by the PBGC for purposes of Section 4044 of ERISA, exceeds the Fair Market Value of all plan assets allocable to such liabilities under Title IV of ERISA (excluding any accrued but unpaid contributions).

"***USA PATRIOT Act***" shall mean The Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Title III of Pub. L. No. 107-56 (signed into law October 26, 2001)).

"***Variance Report***" shall have the meaning assigned to such term in Section 5.01(r).

"***Variance Report Date***" shall have the meaning assigned to such term in Section 5.01(r).

"***Variance Testing Period***" shall mean, as of any Variance Report Date, the four-week period ending on the most recent Friday (or, if shorter, the period from the beginning of the week in which the Petition Date occurred through the week ending on the most recent Friday).

"***Voting Stock***" of any Person shall mean all of the class or classes pursuant to which the holders thereof have the general voting power under ordinary circumstances to elect at least a majority of the board of directors, managers or trustees of such Person (irrespective of whether or not at the time Equity Interests of any other class or classes shall have or might have voting power by reason of the happening of any contingency).

"***Wholly-Owned Domestic Subsidiary***" shall mean, as to any Person, any Domestic Subsidiary of such Person that is a Wholly-Owned Subsidiary.

"***Wholly-Owned Subsidiary***" shall mean, as to any Person, (i) any corporation 100% of whose Equity Interest is at the time owned by such Person and/or one or more Wholly-Owned Subsidiaries of such Person and (ii) any partnership, limited liability company, association, joint venture or other entity in which such Person and/or one or more Wholly-Owned Subsidiaries of such Person has a 100% equity interest at such time (other than, in the case of a Foreign Subsidiary of the Borrower with respect to the preceding clauses (i) and (ii), directors' qualifying shares and/or other nominal amounts of shares required to be held by Persons other than the Borrower and its Subsidiaries under applicable law).

25

"***Withholding Agent***" shall mean any Loan Party or the Administrative Agent.

SECTION 1.02 ***Terms Generally***.  The definitions in <u>Section 1.01</u> shall apply equally to both the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation."  The word "will" shall be construed to have the same meaning and effect as the word "shall"; and the words "asset" and "property" shall be construed as having the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.  All references herein to Articles, Sections, Exhibits and Schedules shall be deemed references to Articles and Sections of, and Exhibits and Schedules to, this Agreement unless the context shall otherwise require.  Except as otherwise expressly provided herein, any reference in this Agreement to any Loan Document shall mean such document as amended, restated, supplemented or otherwise modified from time to time. The financial statements to be furnished to the Lenders pursuant hereto shall be made and prepared in accordance with GAAP applied on a basis consistent with the most recent audited consolidated financial statements of the Borrower delivered to the Lenders prior to the Closing Date (except as set forth in the notes thereto or as otherwise disclosed in writing by the Borrower to the Lenders); provided that, (i) notwithstanding anything to the contrary contained herein, all such financial statements shall be prepared without giving effect to any election under FASB ASC 825 (or any similar accounting principle permitting a Person to value its financial liabilities at the fair value thereof), and (ii) no Person that is a Minority Interest Consolidated Entity shall be consolidated with the Borrower and its Subsidiaries for purposes of such financial statements.

SECTION 1.03 ***Timing of Payment or Performance***.  Except as otherwise provided herein, when the payment of any obligation or the performance of any covenant, duty, or obligation is stated to be due or performance required on (or before) a day which is not a Business Day, the date of such payment or performance shall extend to the immediately succeeding Business Day, and such extension of time shall be reflected in computing interest or fees, as the case may be.

SECTION 1.04 ***LLC Division***.  For all purposes under the Loan Documents, in connection with any division or plan of division under Delaware law (including any LLC Division, or any comparable event under a different jurisdiction's laws, as applicable):  (a) if any asset, right, obligation or liability of any person becomes the asset, right, obligation or liability of a different person, then it shall be deemed to have been transferred from the original person to the subsequent person, and (b) if any new person comes into existence, such new person shall be deemed to have been organized on the first date of its existence by the holders of its Equity Interests at such time.

## ARTICLE II

### The Credits

SECTION 2.01 ***Commitments***.

(a)    Subject to the terms and conditions set forth herein and in the Orders, each Lender agrees, severally and not jointly, to make Loans in dollars to the Borrower in up to three (3) draws,  (a) the first of which shall be on the Closing Date (any Loans made on such date, the "***Interim Order Loan***"), (b) the second of which shall be on the Initial Allocation Date (any Loans made on such date, the "***Initial Allocation Date Loan***", and together with the Interim Order Loan, the "***Initial Loan***") and (c) the third of which shall be on the Full Availability Date (any Loans made on such date, the "***Final Order Loan***"), in each case, in an aggregate principal

amount not to exceed such Lender's Commitment as of such date (prior to giving effect to the making of such Loans); provided, that:

        (i)      the Interim Order Loan shall be (x) in an aggregate principal amount not to exceed the lesser of (A) $88,480,725.68 and (B) the amount approved by the Bankruptcy Court in the Interim Order and (y) funded by the Lenders party to this Agreement on the Closing Date in the amounts set forth on Schedule 2.01 under the heading "Initial Loan Commitments—Interim Order Loans";

        (ii)      the Initial Allocation Date Loan shall be (x) in an aggregate amount equal to the Interim Availability Amount *minus* the aggregate principal amount of the Interim Order Loan and (y) funded by each Lender in a respective amount such that, after giving effect to the Initial Allocation Date Loan, each Lender holds Loans equal to the product of (1) a fraction the numerator of which is the aggregate amount of the Initial Loan and the denominator of which is the Total Commitment and (2) such Lender's Commitment as set forth under the heading "Post-Initial Allocation Commitments" on Schedule 2.01 (for the avoidance of doubt, the Initial Allocation Date Loan will not be funded ratably across all Lenders); and

        (iii)      the Final Order Loan shall be funded ratably by each Lender in accordance with its Commitment as set forth under the heading "Post-Initial Allocation Loan Commitments" on Schedule 2.01 and in an aggregate amount equal to the Final Availability Amount; and

      (b)      Each Borrowing shall consist of Loans of the same Type made on the same day by the Lenders ratably according to their respective Commitments as set forth above. Notwithstanding anything to the contrary, unless the Administrative Agent and the Borrower shall otherwise agree, the initial Interest Period of any Initial Allocation Date Loan or Final Order Loan that is a Eurodollar Loan (if any) shall commence on the Initial Allocation Date or the Full Availability Date, as applicable, and shall end on the last day of the then-current Interest Period for the Interim Order Loan or Initial Loan, respectively, that is a Eurodollar Loan then outstanding (if any). For the avoidance of doubt, once funded the Interim Order Loan, the Initial Allocation Date Loan and the Final Order Loan shall constitute a single class of Loans.

      (c)      No later than the twelfth day after entry of the Interim Order (or such other time as reasonably acceptable to the Administrative Agent, the Borrower and the Required Financing Commitment Parties), provided that the Borrower has received the schedule described in this clause (c) from the Financing Commitment Parties or their financial advisor, (i) the Borrower shall deliver to the Administrative Agent a written notice, in form and substance reasonably satisfactory to the Administrative Agent (the "***Initial Allocation Commitment Notice***"), which notice shall attach a schedule updating the "Post-Initial Allocation Commitments" on Schedule 2.01 (as delivered pursuant to Section 2.01(c)) identifying each Lender and the amount of its Commitment and (ii) each Lender that is not a party hereto on the Closing Date shall deliver to the Administrative Agent a signature page to the "Master Joinder to the DIP Credit Agreement" attached as Annex II to the Notice and Instruction Form, executed by such Lender and the Borrower, pursuant to which, *inter alia*, such Lender shall deliver (and shall represent and warrant that it has delivered) to the Administrative Agent a completed Administrative Questionnaire, such documentation and other information under applicable "know your customer" and anti-money laundering rules and regulations requested by the Administrative Agent, and such documentation and other information required under Section 2.20. The schedule delivered pursuant to clause (i) of this Section 2.01(c) shall be conclusive and binding absent

manifest error.  The parties hereto agree that the Administrative Agent may conclusively rely on the Initial Allocation Commitment Notice and this provision in adjusting the Register to reflect the Commitment of each Lender.

SECTION 2.02 *Loans*.

(a)    Each Loan shall be made as part of a Borrowing consisting of Loans made by the Lenders ratably in accordance with their applicable Commitments as set forth in Section 2.01; *provided*, *however*, that the failure of any Lender to make any Loan shall not in itself relieve any other Lender of its obligation to lend hereunder (it being understood, however, that no Lender shall be responsible for the failure of any other Lender to make any Loan required to be made by such other Lender).

(b)    Subject to Sections 2.08 and 2.15, each Borrowing shall be comprised entirely of ABR Loans or Eurodollar Loans as the Borrower may request pursuant to Section 2.03.  Each Lender may at its option make any Eurodollar Loan by causing any domestic or foreign branch or Affiliate of such Lender to make such Loan; *provided* that any exercise of such option shall not affect the obligation of the Borrower to repay such Loan in accordance with the terms of this Agreement.  Borrowings of more than one Type may be outstanding at the same time.  For purposes of the foregoing, Borrowings having different Interest Periods, regardless of whether they commence on the same date, shall be considered separate Borrowings.

(c)    Each Lender shall make each Loan to be made by it hereunder on the proposed date thereof by wire transfer of immediately available funds to such account in New York City as the Administrative Agent may designate not later than 10:00 a.m., New York City time, and the Administrative Agent shall promptly credit the amounts so received to the DIP Proceeds Account.

(d)    Unless the Administrative Agent shall have received notice from a Lender prior to the date of any Borrowing that such Lender will not make available to the Administrative Agent such Lender's portion of such Borrowing, the Administrative Agent may assume that such Lender has made such portion available to the Administrative Agent on the date of such Borrowing in accordance with paragraph (c) above and the Administrative Agent may, but shall not be obligated to, in reliance upon such assumption, make available to the Borrower on such date a corresponding amount.  If the Administrative Agent shall have so made funds available then, to the extent that such Lender shall not have made such portion available to the Administrative Agent, such Lender agrees to repay to the Administrative Agent forthwith on demand such corresponding amount together with interest thereon, for each day from the date such amount is made available to the Borrower to but excluding the date such amount is repaid to the Administrative Agent at a rate determined by the Administrative Agent to represent its cost of overnight or short-term funds (which determination shall be conclusive absent manifest error).  If such Lender shall not repay to the Administrative Agent such corresponding amount within three Business Days after demand by the Administrative Agent, then the Administrative Agent shall be entitled to recover such amount with interest thereon at the rate per annum equal to the interest rate applicable at the time to the Loans comprising such Borrowing, on demand, from the Borrower.  If such Lender shall repay to the Administrative Agent such corresponding amount, such amount shall constitute such Lender's Loan as part of such Borrowing for purposes of this Agreement.

SECTION 2.03 *Borrowing Procedure*.  In order to request a Borrowing, the Borrower shall deliver a fully executed Borrowing Request to the Administrative Agent (a) in the case of a Eurodollar Borrowing, not later than 12:00 (noon), New York City time, one Business Day (or in the case of the

Final Order Loan, three Business Days) before a proposed Borrowing, and (b) in the case of an ABR Borrowing, not later than 11:00 a.m., New York City time, one Business Day before a proposed Borrowing.  Each such Borrowing Request shall be irrevocable, and shall specify the following information:  (i) whether the Borrowing then being requested is to be a Eurodollar Borrowing or an ABR Borrowing; (ii) the date of such Borrowing (which shall be a Business Day); (iii) the number and location of the DIP Proceeds Account to which funds are to be disbursed; (iv) the amount of such Borrowing; and (v) if such Borrowing is to be a Eurodollar Borrowing, the Interest Period with respect thereto; *provided*, *however*, that, notwithstanding any contrary specification in any Borrowing Request, each requested Borrowing shall comply with the requirements set forth in <u>Sections 2.01</u> and <u>2.02</u>; *provided*, *further*, that the Borrower may condition each Borrowing in such notice on the entry of the Interim Order or the Final Order, as applicable.  If no election as to the Type of Borrowing is specified in any such notice, then the requested Borrowing shall be an ABR Borrowing.  If no Interest Period with respect to any Eurodollar Borrowing is specified in any such notice, then except as set forth in <u>Section 2.01</u>, the Borrower shall be deemed to have selected an Interest Period of one month's duration.  The Administrative Agent shall promptly advise the applicable Lenders of any notice given pursuant to this <u>Section 2.03</u> (and the contents thereof), and of each Lender's portion of the requested Borrowing.

Each Lender will make each Loan to be made by it hereunder on the proposed date thereof by wire transfer of immediately available funds by 10:00 a.m., New York City time, to the account of the Administrative Agent most recently designated by it for such purpose by notice to the Lenders; provided, that in the case of the Initial Allocation Date Loan, any Lender required to fund such Loan pursuant to <u>Section 2.01(a)(ii)</u> that is not a Lender on the Closing Date shall wire such funds to the escrow account of the Administrative Agent specified in the Notice and Instruction Form by the deadline set forth therein.  Upon receipt of all requested funds, the Administrative Agent will make such Loans available to the Borrowers by promptly wiring the amounts so received, in like funds, to the DIP Proceeds Account.

SECTION 2.04 ***Evidence of Debt; Repayment of Loans***.

(a)    The Borrower hereby unconditionally promises to pay to the Administrative Agent for the account of each Lender the principal amount of each Loan of such Lender as provided in <u>Section 2.11</u>.

(b)    Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrower to such Lender resulting from each Loan made by such Lender from time to time, including the amounts of principal and interest payable and paid to such Lender from time to time under this Agreement.

(c)    The Administrative Agent shall maintain accounts in which it will record (i) the amount of each Loan made hereunder, the Type thereof and, if applicable, the Interest Period applicable thereto, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrower to each Lender hereunder and (iii) the amount of any sum received by the Administrative Agent hereunder from the Borrower or any Subsidiary Guarantor and each Lender's share thereof.

(d)    The entries made in the accounts maintained pursuant to <u>paragraphs (b)</u> and <u>(c)</u> above shall be prima facie evidence of the existence and amounts of the obligations therein recorded; *provided*, *however*, that the failure of any Lender or the Administrative Agent to maintain such accounts or any error therein shall not in any manner affect the obligations of the Borrower to repay the Loans in accordance with their terms.  In the event of any conflict between the accounts maintained pursuant to paragraph (b) or (c) above, the accounts maintained by the Administrative Agent pursuant to paragraph (c) shall control.

(e)     Any Lender may request that Loans made by it hereunder be evidenced by a promissory note.  In such event, the Borrower shall execute and deliver to such Lender a promissory note payable to such Lender and its registered assigns and in a form and substance reasonably acceptable to the Administrative Agent and the Borrower.  Notwithstanding any other provision of this Agreement, in the event any Lender shall request and receive such a promissory note, the interests represented by such note shall at all times (including after any assignment of all or part of such interests pursuant to Section 9.04) be represented by one or more promissory notes payable to the payee named therein or its registered assigns.

SECTION 2.05 *Fees*.

(a)     The Borrower agrees to pay to the Administrative Agent for the account of the Lenders, an upfront fee in an amount equal to 3.25% of the Total Commitment (the "***Total Upfront Fee***"), which shall be allocated as follows: (i) to each Lender party to this Agreement on the Closing Date, an amount equal to (1) its Minimum Hold Percentage, *multiplied by* (2) the Total Upfront Fee, which fee shall be earned, due, and payable in cash on the Closing Date upon the funding of its portion of the Interim Order Loan, and shall be netted from such funding on the Closing Date and (ii) to each Lender, an amount equal to (A) such Lender's Commitment as set forth on Schedule 2.01 under the heading "Post-Initial Allocation Commitments", *divided by* (B) the Total Commitment and *multiplied by* (C) the Total Upfront Fee, *minus* the amount (if any) paid to such Lender pursuant to clause (i) above, which fee shall be earned, due, and payable on the Initial Allocation Date upon the funding of its portion of the Initial Allocation Date Loan, and shall be netted from such funding on the Initial Allocation Date.

(b)     The Borrower agrees to pay to the Administrative Agent for the ratable account of each Lender (including, in the case of any Backstop Commitment Party, prior to the Initial Allocation, the portion of its Commitment (if any) to be allocated in the Initial Allocation) (other than a Defaulting Lender for such time as such Lender is a Defaulting Lender), a non-refundable ticking fee calculated on a daily basis on the aggregate daily unused amount of such Lender's Commitment at a rate per annum equal to 3.0%, accruing commencing on the date hereof and due and payable in arrears on the earlier to occur of (i) the Full Availability Date and the Borrowing of the Final Order Loan and (ii) the date on which the Commitments are reduced to zero.

(c)     The Borrower agrees to pay to the Lenders (or, at each Lender's option and upon such Lender's written designation (which may be provided by electronic communication), one or more of its affiliates or funds or accounts that are managed, advised or sub-advised by such Lender (each, a "***Related Lender***")) an exit fee equal to the product of 3.25% of the Total Commitment (the "***Total Exit Fee***"), which is earned on the date hereof and shall be due and payable on the Maturity Date (or, if earlier, upon the prepayment, repayment or other satisfaction in full in cash of the Loans) to each Lender ratably in accordance with the aggregate principal amount of Loans held by such Lender on such date.  The Total Exit Fee due to the Lenders shall be payable in kind in the form of a like amount of loans under the Exit Term Facility Credit Agreement (as defined below); *provided*, that if the Maturity Date occurs other than in connection with the substantial consummation (as defined in Section 1101(2) of the Bankruptcy Code) of an Acceptable Plan, or the Loans hereunder are prepaid, repaid or otherwise satisfied in full in cash, such Total Exit Fee shall be immediately due and payable in cash to the Administrative Agent for the benefit of each Lender (or its designated Related Lender) ratably in accordance with the aggregate principal amount of Loans held by such Lender at such time.

(d)     The Borrower agrees to pay to the Backstop Commitment Parties (and not any Lender other than the Backstop Commitment Parties) (or, at each Backstop Commitment Party's

option and upon such Backstop Commitment Party's written designation (which may be provided by electronic communication), one or more of its Related Lenders) a backstop fee (the "***Total Backstop Fee***"), which was earned on the Execution Date (as defined in the RSA) and shall be due and payable on the Maturity Date to each Backstop Commitment Party ratably in accordance with its Commitments as of the Execution Date (as defined in the RSA) as set forth in the schedules thereto.  The Total Backstop Fee due to the Backstop Commitment Parties shall be equal to 4.25% of all shares of the same class of reorganized common equity distributable to the holders of Second Lien Notes pursuant to an Acceptable Plan (subject to dilution solely by the MIP and the Second Lien Notes RSA Fee (as such terms are defined in the RSA)); *provided*, that if prior to the substantial consummation (as defined in Section 1101(2) of the Bankruptcy Code) of an Acceptable Plan (A) (x) the RSA terminates with respect to the Consenting Second Lien Noteholders (as defined in the RSA) or (y) the Loans and Commitments hereunder are terminated or accelerated, in each case of this clause (A) as a result of a breach by the Borrower or its affiliates of its or their obligations under the RSA or hereunder, (B) the RSA is terminated pursuant to Section 14(b)(i) thereof or (C) the Loans hereunder are prepaid, repaid or otherwise satisfied in full in cash, such Total Backstop Fee shall be due and payable, in cash on the third Business Day after the earliest of any such event in an amount equal to $18.0 million, to the Administrative Agent for the benefit of each Backstop Commitment Party (or its designated Related Lender) ratably in accordance with the preceding sentence.

(e)     The Borrower agrees to pay to the Administrative Agent, for its own account, the administrative fees set forth in the Agent Fee Letter at the times and in the amounts specified therein.

(f)     All fees shall be paid on the dates due, in immediately available funds, to the Administrative Agent for distribution, if and as appropriate, among the Lenders.  Once paid, none of such fees shall be refundable under any circumstances.

SECTION 2.06 ***Interest on Loans***.

(a)     Subject to the provisions of Section 2.07, the Loans comprising each ABR Borrowing shall bear interest (computed on the basis of the actual number of days elapsed over a year of 365 or 366 days, as the case may be) at a rate per annum equal to the Alternate Base Rate plus the Applicable Percentage in effect from time to time.

(b)     Subject to the provisions of Section 2.07, the Loans comprising each Eurodollar Borrowing shall bear interest (computed on the basis of the actual number of days elapsed over a year of 360 days) at a rate per annum equal to the Adjusted LIBO Rate for the Interest Period in effect for such Borrowing plus the Applicable Percentage in effect from time to time.

(c)     Interest on each Loan shall be payable in arrears on each Interest Payment Date except as otherwise provided in this Agreement. The applicable Alternate Base Rate or Adjusted LIBO Rate for each Interest Period or day within an Interest Period, as the case may be, shall be determined by the Administrative Agent, and such determination shall be conclusive absent manifest error.

SECTION 2.07 ***Default Interest***.  At all times during which an Event of Default is continuing, the Borrower shall pay interest on all Obligations hereunder at a rate per annum (computed on the basis of the actual number of days elapsed over a year of 365 or 366 days, as the case may be, when determined by reference to the Prime Rate and over a year of 360 days at all other times) equal to 2.00% per annum above the then-applicable rate.

SECTION 2.08 ***Alternate Rate of Interest***.  In the event, and on each occasion, that on the day two Business Days prior to the commencement of any Interest Period for a Eurodollar Borrowing the Administrative Agent shall have determined that dollar deposits in the principal amounts of the Loans comprising such Borrowing are not generally available in the London interbank market, or that the rates at which such dollar deposits are being offered will not adequately and fairly reflect the cost to any Lender of making or maintaining its Eurodollar Loan during such Interest Period, or that reasonable means do not exist for ascertaining the Adjusted LIBO Rate, the Administrative Agent shall, as soon as practicable thereafter, give written notice of such determination to the Borrower and the Lenders.  In the event of any such determination, until the Administrative Agent shall have advised the Borrower and the Lenders that the circumstances giving rise to such notice no longer exist, any request by the Borrower for a Eurodollar Borrowing pursuant to Section 2.03 or 2.10 shall be deemed to be a request for an ABR Borrowing.  Each determination by the Administrative Agent under this Section 2.08 shall be conclusive absent manifest error.

SECTION 2.09 ***Termination and Reduction of Commitments***.  The Commitments shall be reduced dollar-for-dollar immediately after the funding of any Loans pursuant to Section 2.01, and any unused Commitments shall be reduced to zero and terminated on the Full Availability Date (immediately after the funding of the Final Order Loan on such date).

SECTION 2.10 ***Conversion and Continuation of Borrowings***.  The Borrower shall have the right at any time upon prior written irrevocable notice to the Administrative Agent (a) not later than 11:00 a.m., New York City time, on the date of conversion, to convert any Eurodollar Borrowing into an ABR Borrowing, (b) not later than 12:00 (noon), New York City time, three Business Days prior to conversion or continuation, to convert any ABR Borrowing into a Eurodollar Borrowing or to continue any Eurodollar Borrowing as a Eurodollar Borrowing for an additional Interest Period, and (c) not later than 12:00 (noon), New York City time, three Business Days prior to conversion, to convert the Interest Period with respect to any Eurodollar Borrowing to another permissible Interest Period, subject in each case to the following:

     (i)     each conversion or continuation shall be made pro rata among the Lenders in accordance with the respective principal amounts of the Loans comprising the converted or continued Borrowing;

     (ii)     each conversion shall be effected by each Lender and the Administrative Agent by recording for the account of such Lender the new Loan of such Lender resulting from such conversion and reducing the Loan (or portion thereof) of such Lender being converted by an equivalent principal amount; accrued interest on any Eurodollar Loan (or portion thereof) being converted shall be paid by the Borrower at the time of conversion;

     (iii)     if any Eurodollar Borrowing is converted at a time other than the end of the Interest Period applicable thereto, the Borrower shall pay, upon demand, any amounts due to the Lenders pursuant to Section 2.16;

     (iv)     any portion of a Borrowing of any Loans maturing or required to be repaid in less than one month may not be converted into or continued as a Eurodollar Borrowing;

     (v)     any portion of a Eurodollar Borrowing that cannot be converted into or continued as a Eurodollar Borrowing by reason of the immediately preceding clause shall be automatically converted at the end of the Interest Period in effect for such Borrowing into an ABR Borrowing; and

(vi)    upon notice to the Borrower from the Administrative Agent given at the request of the Required Lenders, after the occurrence and during the continuance of a Default or Event of Default, no outstanding Loan may be converted into, or continued as, a Eurodollar Loan.

Each notice pursuant to this <u>Section 2.10</u> shall be irrevocable and shall refer to this Agreement and specify (i) the identity and amount of the Borrowing that the Borrower requests be converted or continued, (ii) whether such Borrowing is to be converted to or continued as a Eurodollar Borrowing or an ABR Borrowing and (iii) if such notice requests a conversion, the date of such conversion (which shall be a Business Day). The Administrative Agent shall advise the Lenders of any notice given pursuant to this <u>Section 2.10</u> and of each Lender's portion of any converted or continued Borrowing. If the Borrower shall not have given notice in accordance with this <u>Section 2.10</u> to continue any Eurodollar Borrowing into a subsequent Interest Period (and shall not otherwise have given notice in accordance with this <u>Section 2.10</u> to convert such Borrowing), such Borrowing shall, at the end of the Interest Period applicable thereto (unless repaid pursuant to the terms hereof), automatically be converted into an ABR Borrowing.

SECTION 2.11 *Repayment of Borrowings*.

(a)    The Borrower shall pay to the Administrative Agent, for the account of the Lenders, on the Maturity Date, the aggregate principal amount of all Loans outstanding on such date, together with accrued and unpaid interest thereon to but excluding the date of such payment.

(b)    All repayments pursuant to this <u>Section 2.11</u> shall be subject to <u>Section 2.05(c)</u>, <u>Section 2.05(d)</u> and <u>Section 2.16</u>, but shall otherwise be without premium or penalty.

SECTION 2.12 *Optional Prepayment*.

(a)    The Borrower shall have the right at any time and from time to time to prepay any Borrowing, in whole or in part, upon prior written notice to the Administrative Agent received before 11:00 a.m., New York City time at least three Business Days' in advance of the prepayment date in the case of Eurodollar Loans, or at least one Business Day in advance of the prepayment date in the case of ABR Loans; *provided*, *however*, that each partial prepayment shall be in an amount that is an integral multiple of $1,000,000 or, if less, the entire principal amount thereof then outstanding.

(b)    Optional prepayments of Loans shall be paid to the Lenders in accordance with their respective pro rata share of the outstanding Loans at the time.

(c)    Each notice of prepayment shall specify the prepayment date and the principal amount of each Borrowing (or portion thereof) to be prepaid, shall be irrevocable and shall commit the Borrower to prepay such Borrowing in the amount stated therein on the date stated therein; *provided* that a notice of prepayment may state that such notice is conditioned upon the effectiveness of other credit facilities, indentures or similar agreements or any other event, in which case such notice may be revoked by the Borrower (by notice to the Administrative Agent on or prior to the specified effective date) if such condition is not satisfied. All prepayments under this <u>Section 2.12</u> shall be subject to <u>Section 2.05(c)</u>, <u>Section 2.05(d)</u> and <u>Section 2.16</u> but otherwise without premium or penalty. All prepayments under this <u>Section 2.12</u> shall be accompanied by accrued and unpaid interest on the principal amount to be prepaid to but excluding the date of payment.

SECTION 2.13 *Mandatory Prepayments*.

(a)    Unless otherwise agreed to by the Required Financing Commitment Parties, not later than the third Business Day after the receipt of Net Cash Proceeds by the Borrower or a Subsidiary in respect of any Asset Sale (other than of First Lien Notes Priority Collateral), the Borrower shall apply 100% of such Net Cash Proceeds received to prepay outstanding Loans in accordance with Section 2.13(d).  After the First Lien Notes have been repaid, redeemed or otherwise satisfied in full, not later than the third Business Day after the receipt of Net Cash Proceeds in respect of any Asset Sale of First Lien Notes Priority Collateral, the Borrower shall apply 100% of such Net Cash Proceeds received to prepay outstanding Loans in accordance with Section 2.13(d).

(b)    Unless otherwise agreed to by the Required Financing Commitment Parties, in the event that the Borrower or any of its Subsidiaries shall receive Net Cash Proceeds from the issuance or incurrence of Indebtedness for money borrowed (other than any cash proceeds from the issuance of Indebtedness for money borrowed permitted pursuant to Section 6.03), the Borrower shall, substantially simultaneously with (and in any event not later than the third Business Day following) the receipt of such Net Cash Proceeds by the Borrower or such Subsidiary, apply an amount equal to 100% of such Net Cash Proceeds to prepay outstanding Loans in accordance with Section 2.13(d)(d).

(c)    Notwithstanding anything to the contrary set forth in this Section 2.13, such Net Cash Proceeds shall not be required to be applied as set forth herein to the extent that the repatriation of cash from Subsidiaries outside of the United States would reasonably be expected to result in material adverse tax consequences to the Borrower and its Subsidiaries as reasonably determined by the Borrower.

(d)    Mandatory prepayments of outstanding Loans under this Agreement shall be allocated pro rata among the Loans.  The amount of any mandatory prepayment in respect of Loans shall be applied first to Loans that are ABR Loans to the full extent thereof before application to Loans that are Eurodollar Loans, in a manner that minimizes the amount of any payments required to be made by the Borrower pursuant to Section 2.16.

(e)    The Borrower shall deliver to the Administrative Agent, at the time of each prepayment required under Section 2.13(a) or (b), as applicable, subject to Section 2.13(c), (i) a certificate signed by a Financial Officer of the Borrower setting forth in reasonable detail the calculation of the amount of such prepayment and (ii) to the extent practicable, before 11:00 a.m. at least two days' prior written notice of such prepayment.  Each notice of prepayment shall specify the prepayment date, the Type of each Loan being prepaid and the principal amount of each Loan (or portion thereof) to be prepaid.  All prepayments of Borrowings under this Section 2.13 shall be subject to Section 2.05(c), Section 2.05(d) and Section 2.16, but shall otherwise be without premium or penalty, and shall be accompanied by accrued and unpaid interest on the principal amount to be prepaid to but excluding the date of payment (which interest amounts shall reduce the amount of Net Cash Proceeds required to be applied to prepay the Loans).

SECTION 2.14 *Reserve Requirements; Change in Circumstances*.

(a)    Notwithstanding any other provision of this Agreement, if any Change in Law shall impose, modify or deem applicable any reserve, special deposit or similar requirement against assets of, deposits with or for the account of or credit extended by any Lender (except any such reserve requirement which is reflected in the Adjusted LIBO Rate), shall subject any Lender or the Administrative Agent to any Taxes (other than (i) Indemnified Taxes imposed on or with

respect to any payment made by or on account of any obligation of any Loan Party under any Loan Document and (ii) Excluded Taxes) on its Loans, Commitments or other obligations or its deposits, reserves, other liabilities or capital attributable thereto or shall impose on such Lender or the London interbank market any other condition affecting this Agreement or Eurodollar Loans made by such Lender, and the result of any of the foregoing shall be to increase the cost to such Lender of making or maintaining any Eurodollar Loan or increase the cost to any Lender of purchasing or maintaining a participation therein or to reduce the amount of any sum received or receivable by such Lender hereunder (whether of principal, interest or otherwise) by an amount deemed by such Lender to be material, then the Borrower will pay to such Lender from time to time such additional amount or amounts as will compensate such Lender for such additional costs incurred or reduction suffered.

(b)    If any Lender shall have determined that any Change in Law regarding capital adequacy or liquidity has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement or the Loans made pursuant hereto to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy or liquidity) by an amount deemed by such Lender to be material, then from time to time the Borrower shall pay to such Lender, as the case may be, such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered.

(c)    A certificate of a Lender setting forth the amount or amounts necessary to compensate such Lender or its holding company, as applicable, as specified in paragraph (a) or (b) above shall be delivered to the Borrower and shall be conclusive absent manifest error.  The Borrower shall pay such Lender the amount shown as due on any such certificate delivered by it within 30 days after its receipt of the same.

(d)    Failure or delay on the part of any Lender to demand compensation for any increased costs or reduction in amounts received or receivable or reduction in return on capital shall not constitute a waiver of such Lender's right to demand such compensation; *provided* that the Borrower shall not be under any obligation to compensate any Lender under paragraph (a) or (b) above with respect to increased costs or reductions with respect to any period prior to the date that is 180 days prior to such request if such Lender knew or could reasonably have been expected to know of the circumstances giving rise to such increased costs or reductions and of the fact that such circumstances would result in a claim for increased compensation by reason of such increased costs or reductions; *provided*, *further*, that the foregoing limitation shall not apply to any increased costs or reductions arising out of the retroactive application of any Change in Law within such 180-day period.  The protection of this Section 2.14 shall be available to each Lender regardless of any possible contention of the invalidity or inapplicability of the Change in Law that shall have occurred or been imposed.

SECTION 2.15 *Change in Legality*.

(a)    Notwithstanding any other provision of this Agreement, if any Change in Law shall make it unlawful for any Lender to make or maintain any Eurodollar Loan or to give effect to its obligations as contemplated hereby with respect to any Eurodollar Loan, then, by written notice to the Borrower and to the Administrative Agent:

(i)      such Lender may declare that Eurodollar Loans will not thereafter (for the duration of such unlawfulness) be made by such Lender hereunder (or be continued for additional Interest Periods) and ABR Loans will not thereafter (for such duration) be converted into Eurodollar Loans, whereupon any request for a Eurodollar Borrowing (or to convert an ABR Borrowing to a Eurodollar Borrowing or to continue a Eurodollar Borrowing for an additional Interest Period) shall, as to such Lender only, be deemed a request for an ABR Loan (or a request to continue an ABR Loan as such for an additional Interest Period or to convert a Eurodollar Loan into an ABR Loan, as the case may be), unless such declaration shall be subsequently withdrawn; and

(ii)     such Lender may require that all outstanding Eurodollar Loans made by it be converted to ABR Loans, in which event all such Eurodollar Loans shall be automatically converted to ABR Loans as of the effective date of such notice as provided in paragraph (b) below.

In the event any Lender shall exercise its rights under (i) or (ii) above, all payments and prepayments of principal that would otherwise have been applied to repay the Eurodollar Loans that would have been made by such Lender or the converted Eurodollar Loans of such Lender shall instead be applied to repay the ABR Loans made by such Lender in lieu of, or resulting from the conversion of, such Eurodollar Loans.

(b)     For purposes of this Section 2.15, a notice to the Borrower by any Lender shall be effective as to each Eurodollar Loan made by such Lender, if lawful, on the last day of the Interest Period then applicable to such Eurodollar Loan; in all other cases such notice shall be effective on the date of receipt by the Borrower.

SECTION 2.16 **Indemnity**.  The Borrower shall indemnify each Lender against any loss or expense (but not against any lost profits) that such Lender may sustain or incur as a consequence of (a) any event, other than a default by such Lender in the performance of its obligations hereunder, which results in (i) such Lender receiving or being deemed to receive any amount on account of the principal of any Eurodollar Loan prior to the end of the Interest Period in effect therefor, (ii) the conversion of any Eurodollar Loan to an ABR Loan, or the conversion of the Interest Period with respect to any Eurodollar Loan, in each case other than on the last day of the Interest Period in effect therefor, or (iii) any Eurodollar Loan to be made by such Lender (including any Eurodollar Loan to be made pursuant to a conversion or continuation under Section 2.10) not being made after notice of such Loan shall have been given by the Borrower hereunder (any of the events referred to in this clause (a) being called a "**Breakage Event**") or (b) any default in the making of any payment or prepayment of any Eurodollar Loan required to be made hereunder.  In the case of any Breakage Event, such loss shall include an amount equal to the excess, as reasonably determined by such Lender, of (i) its cost of obtaining funds for the Eurodollar Loan that is the subject of such Breakage Event for the period from the date of such Breakage Event to the last day of the Interest Period in effect (or that would have been in effect) for such Loan over (ii) the amount of interest likely to be realized by such Lender in redeploying the funds released or not utilized by reason of such Breakage Event for such period.  A certificate of any Lender setting forth any amount or amounts which such Lender is entitled to receive pursuant to this Section 2.16 shall be delivered to the Borrower and shall be conclusive absent manifest error.

SECTION 2.17 **Pro Rata Treatment**.  Except as required under Sections 2.01 and 2.15, each Borrowing, each payment or prepayment of principal of any Borrowing (other than any such payment on the effective date of an Acceptable Plan pursuant to any Lender's exercise of its Cash Exit Option (as defined below)), each payment of interest on the Loans, each reduction of the Commitments and each conversion of any Borrowing to or continuation of any Borrowing as a Borrowing of any Type shall be

allocated pro rata among the Lenders in accordance with their respective principal amounts of their outstanding Loans or, in the case of a reduction of Commitments, their respective outstanding Commitments. Each Lender agrees that in computing such Lender's portion of any Borrowing to be made hereunder, the Administrative Agent may, in its discretion, round each Lender's percentage of such Borrowing to the next higher or lower whole dollar amount.

SECTION 2.18 **Sharing of Setoffs**.  Each Lender agrees that if it shall, through the exercise of a right of banker's lien, setoff or counterclaim against the Borrower or any other Loan Party, or pursuant to a secured claim under Section 506 of Title 11 of the United States Code or other security or interest arising from, or in lieu of, such secured claim, received by such Lender under any applicable bankruptcy, insolvency or other similar law or otherwise, or by any other means (excluding means expressly contemplated elsewhere in this Agreement), obtain payment (voluntary or involuntary) in respect of any Loans as a result of which the unpaid principal portion of its Loans shall be proportionately less than the unpaid principal portion of the Loans of any other Lender, it shall be deemed simultaneously to have purchased from such other Lender at face value, and shall promptly pay to such other Lender the purchase price for, a participation in the Loans of such other Lender, so that the aggregate unpaid principal amount of the Loans and participations in Loans held by each Lender shall be in the same proportion to the aggregate unpaid principal amount of all Loans then outstanding as the principal amount of its Loans prior to such exercise of banker's lien, setoff or counterclaim or other event was to the principal amount of all Loans outstanding prior to such exercise of banker's lien, setoff or counterclaim or other event; *provided*, *however*, that if any such purchase or purchases or adjustments shall be made pursuant to this Section 2.18 and the payment giving rise thereto shall thereafter be recovered, such purchase or purchases or adjustments shall be rescinded to the extent of such recovery and the purchase price or prices or adjustment restored without interest.  The Borrower expressly consents to the foregoing arrangements and agrees that any Lender holding a participation in a Loan deemed to have been so purchased may exercise any and all rights of banker's lien, setoff or counterclaim with respect to any and all moneys owing by the Borrower to such Lender by reason thereof as fully as if such Lender had made a Loan directly to the Borrower in the amount of such participation.

SECTION 2.19 **Payments**.

(a)    The Borrower shall make each payment (including principal of or interest on any Borrowing or any fees or other amounts) hereunder and under any other Loan Document not later than 1:00 p.m., New York City time, on the date when due in immediately available dollars, without setoff, defense or counterclaim.  Each such payment shall be made to the Administrative Agent.  The Administrative Agent shall promptly distribute to each Lender any payments received by the Administrative Agent on behalf of such Lender.  Any amounts received after such time on any date may, in the discretion of the Administrative Agent, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon.

(b)    Except as otherwise expressly provided herein, whenever any payment (including principal of or interest on any Borrowing or any fees or other amounts) hereunder or under any other Loan Document shall become due, or otherwise would occur, on a day that is not a Business Day, such payment may be made on the next succeeding Business Day, and such extension of time shall in such case be included in the computation of interest or fees, if applicable.

(c)    Unless the Administrative Agent shall have received notice from the Borrower prior to the date on which any payment is due to the Administrative Agent for the account of the Lenders hereunder that the Borrower will not make such payment, the Administrative Agent may assume that the Borrower has made such payment on such date in accordance herewith and may, but shall not be obligated to, in reliance upon such assumption, distribute to the Lenders the

amount due.  In such event, if the Borrower does not in fact make such payment, then each of the Lenders severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender, and to pay interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at a rate determined by the Administrative Agent to represent its cost of overnight or short-term funds (which determination shall be conclusive absent manifest error).

SECTION 2.20 *Taxes*.

(a)     Any and all payments by or on account of any obligation of the Borrower or any other Loan Party hereunder or under any other Loan Document shall be made free and clear of and without deduction for any Taxes, except as required by applicable law. If any applicable law requires the deduction or withholding of any Tax from any such payment by a Withholding Agent, then the applicable Withholding Agent shall make such deduction or withholding and shall timely pay the full amount deducted to the relevant Governmental Authority in accordance with applicable law, and if such Tax is an Indemnified Tax, then the sum payable shall be increased as necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section 2.20) the Administrative Agent or Lender (as the case may be) receives an amount equal to the sum it would have received had no such deductions been made.

(b)     In addition, the Borrower shall timely pay to the relevant Governmental Authority in accordance with applicable law, or at the option of the Administrative Agent timely reimburse it for the payment of, any Other Taxes.

(c)     The Loan Parties shall jointly and severally indemnify the Administrative Agent and each Lender, within 10 days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section 2.20) that are payable or paid by the Administrative Agent or such Lender, as the case may be, or required to be withheld or deducted from a payment to the Administrative Agent or such Lender, as the case may be, and any penalties, interest and reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to the Borrower by a Lender or by the Administrative Agent on behalf of itself or a Lender, shall be conclusive absent manifest error.

(d)     As soon as practicable after any payment of Indemnified Taxes, Excluded Taxes or Other Taxes by the Borrower or any other Loan Party to a Governmental Authority, the Borrower shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(e)     (i)     Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments under this Agreement shall deliver to the Borrower (with a copy to the Administrative Agent), at the time or times reasonably requested by the Borrower or the Administrative Agent, such properly completed and executed documentation prescribed by applicable law or reasonably requested by the Borrower or the Administrative Agent as will permit such payments to be made without withholding or at a reduced rate of withholding.  In addition, any Lender, if reasonably requested by the Borrower or the Administrative Agent, shall deliver such other documentation prescribed by applicable law or

reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements. Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in paragraphs (e)(ii) (A), (ii)(B) and (ii)(D) below) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(ii) Without limiting the generality of the foregoing,

(A) any Lender that is a U.S. Person shall deliver to the Borrower and the Administrative Agent on or about the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), an executed copy of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding tax;

(B) any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or about the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), whichever of the following is applicable:

(1) in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Loan Document, an executed copy of IRS Form W-8BEN-E or IRS Form W-8BEN establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, IRS Form W-8BEN-E or IRS Form W-8BEN establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(2) in the case of a Foreign Lender claiming that its extension of credit will generate U.S. effectively connected income, an executed copy of IRS Form W-8ECI;

(3) in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate substantially in the form of Exhibit E-1 to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code (a "U.S. Tax Compliance Certificate") and (y) an executed copy of IRS Form W-8BEN-E or IRS Form W-8BEN; or

(4) to the extent a Foreign Lender is not the beneficial owner, an executed copy of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN-E, IRS Form W-8BEN, a U.S. Tax Compliance Certificate substantially in the form of Exhibit E-2 or Exhibit E-3, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; provided

that if the Foreign Lender is a partnership and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate substantially in the form of Exhibit E-4 on behalf of each such direct and indirect partner;

(C)   any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or about the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed copies of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable law to permit the Borrower or the Administrative Agent to determine the withholding or deduction required to be made; and

(D) if a payment made to a Lender under this Agreement or any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Withholding Agent, at the time or times reasonably requested by the Withholding Agent, such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Withholding Agent as may be necessary for the Withholding Agent to comply with its obligations under FATCA, to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount, if any, to deduct and withhold from such payment.  Solely for purposes of this <u>clause (D)</u>, "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrower and the Administrative Agent in writing of its legal inability to do so.

(f)       Each Lender shall severally indemnify the Administrative Agent, within 10 days after demand therefor, for (i) any Indemnified Taxes attributable to such Lender (but only to the extent that the Borrower or any other Loan Party has not already indemnified the Administrative Agent for such Indemnified Taxes and without limiting the obligation of the Borrower or any other Loan Party to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of <u>Section 9.04(f)</u> relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Administrative Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error.  Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Administrative Agent to the Lender from any other source against any amount due to the Administrative Agent under this <u>paragraph (f)</u>.

(g)    If any party determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section 2.20 (including by the payment of additional amounts pursuant to this Section 2.20), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section 2.20 with respect to the Taxes giving rise to such refund), net of all out of pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund).    Such indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid over pursuant to this paragraph (g) (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such indemnified party is required to repay such refund to such Governmental Authority.    Notwithstanding anything to the contrary in this paragraph (g), in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this paragraph (g) the payment of which would place the indemnified party in a less favorable net after Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts giving rise to such refund had never been paid.    This paragraph (g) shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

(h)    Each party's obligations under this Section 2.20 shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments, and the repayment, satisfaction or discharge of all obligations under any Loan Document.

SECTION 2.21 *Assignment of Commitments under Certain Circumstances; Duty to Mitigate*.

(a)    In the event (i) any Lender delivers a certificate requesting compensation pursuant to Section 2.14, (ii) any Lender delivers a notice described in Section 2.15, (iii) the Borrower is required to pay any additional amount to any Lender or any Governmental Authority on account of any Lender pursuant to Section 2.20, (iv) any Lender refuses to consent to any amendment, waiver or other modification of any Loan Document requested by the Borrower that requires the consent of a greater percentage of the Lenders than the Required Lenders and such amendment, waiver or other modification is consented to by the Required Lenders or (v) any Lender becomes a Defaulting Lender, then, in each case, to the extent the Backstop Commitment Parties do not purchase all of such Defaulting Lender's Loans and Commitments pursuant to clause (b) of this Section 2.21, the Borrower may, at its sole expense and effort (including with respect to the processing and recordation fee referred to in Section 9.04(b)), upon notice to such Lender and the Administrative Agent, require such Lender to transfer and assign, without recourse (in accordance with and subject to the restrictions contained in Section 9.04), all of its interests, rights and obligations under this Agreement (or, in the case of clause (iv) or (v) above, all of its interests, rights and obligations with respect to the Loans and Commitments that are the subject of the related consent, amendment, waiver or other modification or in respect of which such Lender is a Defaulting Lender, as the case may be) to an Eligible Assignee that shall assume such assigned obligations and, with respect to clause (iv) above, shall consent to such requested amendment, waiver or other modification of any Loan Document (which Eligible Assignee may be another Lender, if a Lender accepts such assignment); *provided* that (x) such assignment shall not conflict with any law, rule or regulation or order of any court or other Governmental Authority having jurisdiction, (y) the Borrower shall have received the prior written consent of the Administrative Agent, which consents shall not unreasonably be withheld, conditioned or

delayed, and (z) the Borrower or such Eligible Assignee shall have paid to the affected Lender in immediately available funds an amount equal to the sum of the principal of and interest accrued to the date of such payment on the outstanding Loans of such Lender plus all other amounts accrued for the account of such Lender hereunder with respect thereto (including any amounts under Sections 2.14, 2.16 and 2.20); *provided*, *further*, that, if prior to any such transfer and assignment the circumstances or event that resulted in such Lender's claim for compensation under Section 2.14, notice under Section 2.15 or the amounts paid pursuant to Section 2.20, as the case may be, cease to cause such Lender to suffer increased costs or reductions in amounts received or receivable or reduction in return on capital, or cease to have the consequences specified in Section 2.15, or cease to result in amounts being payable under Section 2.20, as the case may be (including as a result of any action taken by such Lender pursuant to paragraph (b) below), or if such Lender shall waive its right to claim further compensation under Section 2.14 in respect of such circumstances or event or shall withdraw its notice under Section 2.15 or shall waive its right to further payments under Section 2.20 in respect of such circumstances or event or shall consent to the proposed amendment, waiver, consent or other modification or shall cease to be a Defaulting Lender, as the case may be, then such Lender shall not thereafter be required to make any such transfer and assignment hereunder.    Each Lender hereby grants to the Administrative Agent an irrevocable power of attorney (which power is coupled with an interest) to execute and deliver, on behalf of such Lender as assignor, any Assignment and Acceptance necessary to effectuate any assignment of such Lender's interests hereunder in the circumstances contemplated by this Section 2.21(a).

(b)    Upon any Lender becoming a Defaulting Lender, the Administrative Agent will notify the Lenders in writing.  Each Backstop Commitment Party shall have the right, exercisable in its sole discretion within five (5) Business Days of receipt of such notice, to purchase its pro rata share (based on the Commitments of each Backstop Commitment Party as of immediately after the Initial Allocation Date) of the outstanding Loans and Commitments of such Defaulting Lender at a purchase price equal to 96.75% of the outstanding amount thereof (plus accrued and unpaid interest and any ticking fee thereon), and such Defaulting Lender is hereby required to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in Section 9.04), all its interests, rights (other than its existing rights to payments pursuant to Section 2.14 or 2.20) and obligations under this Agreement related to the purchased Loans to the purchasing Backstop Commitment Parties at such purchase price.  Thereafter, each purchasing Backstop Commitment Party shall be entitled to all interests and fees associated with the purchased Loans and Commitments in accordance with the terms of this Agreement.    In connection with any such purchase, the Borrower, the Administrative Agent, such Defaulting Lender and the replacement Lender will otherwise comply with Section 9.04; provided that if such Defaulting Lender does not comply with Section 9.04 within three (3) Business Days after the Backstop Commitment Parties' election under this Section 2.21(b), compliance with Section 9.04 will not be required to effect such assignment.  Notwithstanding anything contained in this Agreement, to the extent any Backstop Commitment Party declines to make such purchase, the Administrative Agent may, and, at the direction of the Required Lenders, shall, reduce the outstanding principal amount of such Defaulting Lender's Loans by such Defaulting Lender's pro rata share of the Total Upfront Fee (to the extent already paid).

(c)    If (i) any Lender shall request compensation under Section 2.14, (ii) any Lender delivers a notice described in Section 2.15 or (iii) the Borrower is required to pay any additional amount to any Lender or any Governmental Authority on account of any Lender, pursuant to Section 2.20, then such Lender shall use reasonable efforts (which shall not require such Lender to incur an unreimbursed loss or unreimbursed cost or expense or otherwise take any action inconsistent with its internal policies or legal or regulatory restrictions or suffer any disadvantage

or burden deemed by it to be significant) (x) to file any certificate or document reasonably requested in writing by the Borrower or (y) to assign its rights and delegate and transfer its obligations hereunder to another of its offices, branches or affiliates, if such filing or assignment would reduce its claims for compensation under Section 2.14 or enable it to withdraw its notice pursuant to Section 2.15 or would reduce amounts payable pursuant to Section 2.20, as the case may be, in the future.  The Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Lender in connection with any such filing or assignment, delegation and transfer.

SECTION 2.22 *Priority and Liens*.

(a)     Each of the Loan Parties hereby covenants and agrees that upon the entry of, and subject to, the Interim Order (and when applicable, the Final Order) and subject to the Carve Out, the Obligations:  (i) pursuant to Section 364(c)(1) of the Bankruptcy Code, shall at all times constitute allowed DIP Superpriority Claims in the Cases, which DIP Superpriority Claims shall rank senior to all other claims; (ii) pursuant to Section 364(c)(2) of the Bankruptcy Code, shall at all times (subject, in the case of UK Loan Parties and UK Security Documents, to the UK Legal Reservations and the UK Perfection Requirements) be secured by a valid, binding, continuing, enforceable, perfected, first priority Lien on the DIP Priority Collateral owned by Debtors; (iii) pursuant to Section 364(c)(3) and 364(d)(1) of the Bankruptcy Code, shall be secured by a valid, binding, continuing, enforceable, perfected Lien on (x) the First Lien Notes Priority Collateral, which Lien securing the Obligations shall be junior solely to the Lien securing the First Lien Notes Obligations and senior to the Lien securing the Second Lien Notes Obligations and (y) the Encumbered Collateral, which Lien securing the Obligations shall be junior solely to the Lien securing such other obligations as of the Petition Date.

(b)     The relative priorities of the Liens described in this Section 2.22 with respect to the DIP Collateral shall be as set forth in the Interim Order (and, when entered, the Final Order), the Guarantee Agreement, and the Pledge and Security Agreement.  In accordance with the Interim Order (and, once entered, the Final Order), all of the Liens described in this Section 2.22 shall be effective and perfected upon entry of the Interim Order without the necessity of the execution, recordation or filing by the Debtors of security agreements, control agreements, pledge agreements, financing statements or other similar documents, or the possession or control by the Administrative Agent or Collateral Agent, of, or over, any DIP Collateral, as, and to the extent, set forth in the Interim Order.

(c)     Each Loan Party that is a Debtor hereby confirms and acknowledges that, pursuant to, and to the extent set forth in, the Interim Order (and, when entered, the Final Order), the Liens in favor of the Collateral Agent on behalf of and for the benefit of the Secured Parties in all of the DIP Collateral, now existing or hereafter acquired, shall be created and perfected without the necessity of the execution, recordation or filing by the Debtors of security agreements, control agreements, pledge agreements, financing statements or other similar documents, or the possession or control by the Administrative Agent or Collateral Agent, of, or over, any DIP Collateral.

SECTION 2.23 *No Discharge; Survival of Claims*.  Each of the Loan Parties agrees that prior to Payment in Full of the Obligations, (a) its obligations under the Loan Documents shall not be discharged by the entry of an order confirming a Reorganization Plan (and each of the Loan Parties, pursuant to Section 1141(d)(4) of the Bankruptcy Code, hereby waives any such discharge) and (b) the superpriority claims and Liens granted to the Agents and the Lenders pursuant to the Orders shall not be affected in any manner by the entry of an order confirming a Reorganization Plan*.*

SECTION 2.24 ***Payment of Obligations***.    Upon the maturity (whether by acceleration or otherwise) of the Obligations of the Loan Parties under this Agreement or any of the other Loan Documents, the Administrative Agent and the Lenders shall be entitled to immediate payment of such Obligations without further application to or order of the Bankruptcy Court.

SECTION 2.25 ***Conversion of Loans to Exit Facility***.  Notwithstanding anything to the contrary herein or in any other Loan Document, upon the consummation of, and pursuant to, an Acceptable Plan, subject to the satisfaction (or waiver by the Required Financing Commitment Parties) of the conditions set forth in this <u>Section 2.25</u>, the Acceptable Plan and the Exit Term Facility Credit Agreement (the "***Exit Conversion***"):

(a)    each Lender, severally and not jointly, hereby agrees to continue and convert its Loans outstanding hereunder on the effective date of the Acceptable Plan as loans under a credit agreement (the "***Exit Term Facility Credit Agreement***") and related documentation governing such continued and converted Loans to the extent that such agreement and related documentation is consistent in all respects with the Exit Term Facility Term Sheet and is otherwise reasonably satisfactory to the Required Financing Commitment Parties and, as to the provisions directly affecting them, the agents party thereto;

(b)    Reorganized Pyxus (as defined in the RSA), and each subsidiary thereof that is required to guarantee the obligations under the Exit Term Facility Credit Agreement in accordance with the Exit Term Facility Term Sheet, shall assume all the Obligations hereunder with respect to the Loans and all other obligations in respect thereof in the manner set forth in the Plan, the Exit Term Facility Credit Agreement and/or related loan documents;

(c)    all Loans outstanding hereunder at such time shall be continued and converted as loans under the Exit Term Facility Credit Agreement;

(d)    each Lender hereunder shall be a lender under the Exit Term Facility Credit Agreement in respect of its Loans continued and converted;

(e)    the collateral agent under the Exit Term Facility Credit Agreement shall have, for the benefit of the lenders and other secured parties thereunder, a fully perfected security interest in all right, title and interest in all of the collateral contemplated by, and with such priority as provided for in, the Exit Term Facility Term Sheet;

(f)    the administrative agent and collateral agent under the Exit Term Facility Credit Agreement shall be selected by the Borrower and the Required Financing Commitment Parties; and

(g)    upon the effectiveness of the Exit Term Facility Credit Agreement in accordance with the terms hereof and the effective date of the Acceptable Plan, the Loans, the Commitments, this Agreement and all Obligations hereunder shall terminate and be superseded and replaced by the Exit Term Facility Credit Agreement.

Notwithstanding the foregoing, in lieu of continuing and converting Loans into loans under the Exit Term Facility Credit Agreement as set forth above, each Lender shall have the right (the "***Cash Exit Option***") to effect the Exit Conversion with respect to all or a portion of its Loans by (x) funding (or by its designee funding) (such funding entity, the "***Exit Term Lender***") cash to Reorganized Pyxus (as defined in the RSA) in respect of loans borrowed under the Exit Term Facility Credit Agreement on the effective date of the Acceptable Plan in an amount not to exceed the aggregate principal amount of such

Lender's then-outstanding Loans and (y) Reorganized Pyxus (as defined in the RSA) applying all such cash immediately following receipt thereof on such effective date to repay in cash a like principal amount of such Lender's Loans (it being understood and agreed that the Exit Term Lender shall be the lender under the Exit Term Facility Credit Agreement for all purposes with respect to any loans borrowed thereunder pursuant to the Cash Exit Option).  The Administrative Agent, the Lenders and the Loan Parties shall cooperate with one another to implement the Cash Exit Option pursuant to terms, conditions and procedures reasonably satisfactory to the Borrower and the Required Financing Commitment Parties.

SECTION 2.26 *Dutch Parallel Debts*

(a)	The Borrower undertakes with the Collateral Agent to pay to the Collateral Agent its Dutch Parallel Debts.

(b)	Paragraph (a) of this Clause is:

(i)	for the purpose of ensuring and preserving the validity and effect of the Security Documents governed by Dutch law;

(ii)	without prejudice to the other provisions of the Loan Documents; and

(iii)	each Dutch Parallel Debt is a separate and independent obligation and shall not constitute the Collateral Agent and any Lender as joint creditors of any Underlying Debt.

SECTION 2.27 *Dutch Parallel Debts Payment*.  The Borrower shall not be obliged to pay any Dutch Parallel Debt before the corresponding Underlying Debt has fallen due.

SECTION 2.28 *Dutch Parallel Debts Application*.  Any payment made, or amount recovered, in respect of the Borrower's Dutch Parallel Debts shall reduce the Underlying Debts owed to a Lender by the amount which that Lender has received out of that payment or recovery under the Loan Documents.

## ARTICLE III

### Representations and Warranties

Each Loan Party represents and warrants to the Administrative Agent, the Collateral Agent and each of the Lenders that:

SECTION 3.01 *Company Status*.  Each Loan Party (a) is a duly organized, incorporated, established and validly existing Business in good standing (or the foreign equivalent, if any) under the laws of the jurisdiction of its organization, incorporation and establishment (in each case, to the extent each such concept exists in such jurisdiction) (b) subject to the entry and terms of the Orders and other orders of the Bankruptcy Court, as applicable, has the requisite organizational and constitutional power and authority to own its material property and assets and to transact the business in which it is engaged and presently proposes to engage and (c) is duly qualified and is authorized to do business and is in good standing (or the foreign equivalent, if any) in each jurisdiction where the ownership, leasing or operation of its property or the conduct of its business requires such qualifications except, in the case of this clause, for failures to be so qualified or authorized which, either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

SECTION 3.02 ***Power and Authority***.  Subject to the entry and terms of the Orders, each Loan Party has the requisite organizational and constitutional power and authority to execute, deliver and perform the terms and provisions of each of the Loan Documents to which it is party and has taken all necessary Business action to authorize the execution, delivery and performance by it of each of such Loan Documents.  Each Loan Party has duly executed and delivered each of the Loan Documents to which it is party, and each of such Loan Documents constitutes its legal, valid and binding obligation enforceable in accordance with its terms, except to the extent that the enforceability thereof may be limited by (a) applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws generally affecting creditors' rights (including the entry into and the terms of the Orders) (b) equitable principles (regardless of whether enforcement is sought in equity or at law) and (c) in the case of each UK Loan Party and UK Security Document, to the UK Legal Reservations and the UK Perfection Requirements).

SECTION 3.03 ***No Violation***.  Subject to the entry and terms of the Orders, neither the execution, delivery or performance by any Loan Party of the Loan Documents to which it is a party, nor compliance by it with the terms and provisions thereof, (a) will contravene any Requirement of Law, (b) will conflict with or result in any breach of any of the terms, covenants, conditions or provisions of, or constitute a default under, or result in the creation or imposition of (or the obligation to create or impose) any Lien (except pursuant to the Loan Documents) upon any of the property or assets of any Loan Party or any of its Subsidiaries pursuant to the terms of any indenture, mortgage, charge, pledge, debenture, deed of trust, credit agreement or loan agreement, or any other material agreement, contract or instrument, in each case to which any Loan Party or any of its Subsidiaries is a party or by which it or any its property or assets is bound or to which it may be subject including, without limitation, the Loan Documents, or (c) will violate any provision of the certificate or articles of incorporation, articles of association, memorandum of association, certificate of formation or incorporation (as applicable), limited liability company agreement or bylaws (or equivalent organizational or constitutional documents), as applicable, of any Loan Party or any of its Subsidiaries.

SECTION 3.04 ***Approvals***.  Other than entry of the Orders, no order, consent, approval, license, authorization or validation of, or filing, recording or registration with (except for (x) those that have otherwise been obtained or made on or prior to the Closing Date and which remain in full force and effect on the Closing Date and (y) filings with respect to the Subsidiary Guarantors which are not Debtors which are necessary to perfect the security interests created or intended to be created under the Security Documents, which filings will be made within ten days following the Closing Date or as required by Section 2.20), or exemption by, any Governmental Authority is required to be obtained or made by, or on behalf of, any Loan Party to authorize, or is required to be obtained or made by, or on behalf of, any Loan Party in connection with, (a) the execution, delivery and performance of any Loan Document or (b) the legality, validity, binding effect or enforceability of any such Loan Document, except for (x) filings with the Registrar of Companies at Companies House, HM Land Registry, and comparable offices in foreign jurisdictions and equivalent filings in foreign jurisdictions (y) any other filings or registrations required to perfect liens created by the Security Documents (including in respect of UK Loan Parties and each UK Security Document, filings with the Registrar of Companies at Companies House and HM Land Registry) (and in each case subject, in the case of each UK Loan Party and each Security Document governed by English law, to the UK Legal Reservations and the UK Perfection Requirements).

SECTION 3.05 ***Financial Statements; Undisclosed Liabilities; Projections***.

(a)    (i) The audited consolidated balance sheet of the Borrower and its Subsidiaries at March 31, 2017, March 31, 2018 and March 31, 2019 and the related consolidated statements of income and cash flows and changes in shareholders' equity of the Borrower and its Subsidiaries for the Fiscal Years of March 31, 2017, March 31, 2018 and March 31, 2019, ended on such dates, in each case as set forth in the Borrower's applicable Form 10-K and furnished to the

Lenders, present fairly in all material respects the consolidated financial position of the Borrower and its Subsidiaries at the date of said financial statements and the results for the respective periods covered thereby; and (ii) the unaudited consolidated balance sheet of the Borrower and its Subsidiaries at June 30, 2019, September 30, 2019 and December 31, 2019 and the related consolidated statements of income and cash flows and changes in shareholders' equity of the Borrower for the fiscal quarter ended on such date as set forth in the Borrower's June 30, 2019, September 30, 2019 and December 31, 2019 Form 10-Q, as applicable, present fairly in all material respects the consolidated financial position of the Borrower and its Subsidiaries at the date of said financial statements and the results for the period covered thereby, subject to normal year-end adjustments. All such financial statements have been prepared in accordance with GAAP consistently applied except to the extent provided in the notes to said financial statements and subject, in the case of the unaudited financial statements, to normal year-end audit adjustments (all of which are of a recurring nature and none of which, individually or in the aggregate, would be material) and the absence of footnotes.

(b)    Except as fully disclosed in the financial statements referred to in <u>Section 3.05(a)</u> or in other filings with the SEC made on or prior to the Petition Date, there were, as of the Closing Date, no liabilities or obligations with respect to the Borrower or any of its Subsidiaries of any nature whatsoever (whether absolute, accrued, contingent or otherwise and whether or not due) which, either individually or in the aggregate, could reasonably be expected to have an Material Adverse Effect. The Borrower does not know of any basis for the assertion against it or any of its Subsidiaries of any liability or obligation of any nature whatsoever that is not fully disclosed in the financial statements referred to in <u>Section 3.05(a)</u> or in other filings with the SEC made on or prior to the Petition Date which, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

(c)    The Projections have been prepared in good faith and are based on reasonable assumptions at the time such Projections were made, and there are no statements or conclusions in the Projections which are based upon or include information known to the Borrower to be misleading in any material respect or which fail to take into account material information known to the Borrower regarding the matters reported therein. On the Closing Date, the Borrower believes that the Projections are reasonable and attainable, it being recognized by the Lenders, however, that projections as to future events are not to be viewed as facts and that the actual results during the period or periods covered by the Projections may differ from the projected results included in such Projections and such differences may be material.

(d)    Since the Petition Date, nothing has occurred that has had, or could reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.

SECTION 3.06 ***Litigation***.  Other than the Cases, there are no litigations, investigations, actions, suits or proceedings pending or, to the best knowledge of the Borrower, threatened (a) with respect to the Transactions or any Loan Document or (b) that has had, or could reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.

SECTION 3.07 ***True and Complete Disclosure***.  All factual information (taken as a whole) furnished by or on behalf of the Borrower in writing to the Administrative Agent or any Lender (including, without limitation, all information contained in the Loan Documents) for purposes of or in connection with this Agreement, the other Loan Documents or any transaction contemplated herein or therein is, and all other such factual information (taken as a whole) hereafter furnished by or on behalf of the Borrower in writing to the Administrative Agent or any Lender will be, true and accurate in all material respects on the date as of which such information is dated or certified (or, if such information has

47

been updated, amended or supplemented, on the date as of which any such update, amendment or supplement is dated or certified) and not incomplete by omitting to state any material fact necessary in order to make such information (taken as a whole) not misleading in any material respect at such time in light of the circumstances under which such information was provided, it being understood and agreed that for purposes of this Section 3.07, such factual information shall not include the Projections or any pro forma financial information, budgets or any other estimation.

SECTION 3.08 ***Use of Proceeds; Margin Regulations***.

(a)    All proceeds of the Loans will be used in accordance with the terms of the Approved DIP Budget (subject to Permitted Variances), including, without limitation:  (i) to effect the ABL Refinancing, (ii) to pay amounts due to Lenders and the Administrative Agent hereunder and professional fees and expenses (including legal, financial advisor, appraisal and valuation-related fees and expenses) incurred by Lenders and the Administrative Agent, including those incurred in connection with the preparation, negotiation, documentation and court approval of the Transactions, (iii) to make adequate protection payments, (iv) to provide working capital, and for other general corporate purposes of the Loan Parties and their Subsidiaries, and (v) to pay administration costs of the Cases and Claims or amounts approved by the Bankruptcy Court in the Orders, the First Day Orders and "second day" orders or other orders entered by the Bankruptcy Court which are satisfactory to the Required Financing Commitment Parties.

(b)    No part of any Credit Event (or the proceeds thereof) will be used to purchase or carry any Margin Stock or to extend credit for the purpose of purchasing or carrying any Margin Stock.  Neither the making of any Loan nor the use of the proceeds thereof nor the occurrence of any other Credit Event will violate or be inconsistent with the provisions of Regulation T, Regulation U or Regulation X.  Not more than 25% of the value of the assets of the Borrower and its Subsidiaries taken as a whole is represented by Margin Stock.

(c)    The Borrower will not, directly or indirectly, use the proceeds of the Loans, or lend, contribute or otherwise make available such proceeds to any subsidiary, joint venture partner or other Person, (i) to fund any activities or business of or with any Sanctioned Person, or in any Sanctioned Country, or (ii) in any other manner that would result in a violation of Sanctions by any Person (including any Person participating in the Loans, whether as underwriter, advisor, investor, or otherwise).

SECTION 3.09 ***Tax Returns and Payments***.  Each of the Borrower and each of its Subsidiaries has timely filed or caused to be timely filed with the appropriate Governmental Authority all federal and other material returns, statements, forms and reports for taxes (the "***Returns***") required to be filed by, or with respect to the income, properties or operations of, the Borrower and/or any of its Subsidiaries.  The Returns accurately reflect in all material respects all liability for taxes of the Borrower and its Subsidiaries, as applicable, for the periods covered thereby.  The Borrower and each of its Subsidiaries has paid all material taxes and assessments payable by it which have become due, other than those that are being contested in good faith and adequately disclosed and fully provided for on the financial statements of the Borrower and its Subsidiaries in accordance with GAAP and except taxes the payment of which are stayed by the Cases.  There is no action, suit, proceeding, investigation, audit or claim now pending or, to the knowledge of the Borrower, threatened by any authority regarding any material taxes relating to the Borrower or any of its Subsidiaries which, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

SECTION 3.10 *Compliance with ERISA*.

(a)     Each Plan is in compliance in form and operation with its terms and with ERISA and the Code (including without limitation the Code provisions compliance with which is necessary for any intended favorable tax treatment) and all other applicable laws and regulations, except where any failure to comply could not reasonably be expected, either individually or in the aggregate, to result in a Material Adverse Effect.  No ERISA Event has occurred, or is reasonably expected to occur, other than as could not, either individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

(b)     There exists no actual Unfunded Pension Liability with respect to any Plan, which either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

(c)     There are no actions, suits or claims pending against or involving a Plan (other than routine claims for benefits) or, to the knowledge of the Borrower, which would reasonably be expected to be asserted successfully against any Plan and, if so asserted successfully, could reasonably be expected either individually or in the aggregate to result in a Material Adverse Effect.

(d)     The Borrower, its Subsidiaries and any ERISA Affiliate have made all contributions to or under each Plan and Multiemployer Plan required by law within the applicable time limits prescribed thereby, the terms of such Plan or Multiemployer Plan, respectively, or any contract or agreement requiring contributions to a Plan or Multiemployer Plan except where any failure to comply, either individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

(e)     No Plan which is subject to Section 412 of the Code or Section 302 of ERISA has applied for or received an extension of any amortization period, within the meaning of Section 412 of the Code or Section 303 or 304 of ERISA.  The Borrower, its Subsidiaries and any ERISA Affiliate have not ceased operations at a facility so as to become subject to the provisions of Section 4068(a) of ERISA, withdrawn as a substantial employer so as to become subject to the provisions of Section 4063 of ERISA or ceased making contributions to any Plan subject to Section 4064(a) of ERISA to which it made contributions except as, with respect to each of the foregoing, could not reasonably be expected to result in a Material Adverse Effect.  None of the Borrower, its Subsidiaries or any ERISA Affiliate have incurred or reasonably expect to incur liability to the PBGC which, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect, and no lien imposed under the Code or ERISA on the assets of the Borrower, its Subsidiaries or any ERISA Affiliate exists or is likely to arise on account of any Plan.  None of the Borrower, its Subsidiaries or any ERISA Affiliate has any liability under Section 4069 or 4212(c) of ERISA.

(f)     Except as could not, either individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect:  each Foreign Pension Plan has been maintained in compliance with its terms and with the requirements of any and all applicable laws, statutes, rules, regulations and orders and has been maintained, where required, in good standing with applicable regulatory authorities; all contributions required to be made with respect to a Foreign Pension Plan have been timely made; neither the Borrower nor any of its Subsidiaries has incurred any obligation in connection with the termination of, or withdrawal from, any Foreign Pension Plan; and the present value of the accrued benefit liabilities (whether or not vested) under each Foreign Pension Plan, determined as of the end of the Borrower most recently ended fiscal

year on the basis of actuarial assumptions, each of which is reasonable, did not exceed the current value of the assets of such Foreign Pension Plan allocable to such benefit liabilities.

SECTION 3.11 *Security Documents*.

(a)    Subject to (y) in the case of the Debtors, the entry of the Orders and (z) in the case of UK Loan Parties and UK Security Documents, the UK Legal Reservations and the UK Perfection Requirements, each of the Security Documents are effective to create in favor of the Collateral Agent for the benefit of the Secured Parties a legal, valid, and enforceable security interest in all right, title and interest of the Loan Parties party thereto in the Collateral described therein, and the Collateral Agent, for the benefit of the Secured Parties, has a fully perfected security interest in all right, title and interest in all of the Collateral described therein, with (A) in the case of the Debtors, such priority as provided for in the Orders and (B) in the case of the other Loan Parties, first priority, and in each case subject to Permitted Liens. In the case of Collateral owned by Subsidiary Guarantors that are Domestic Subsidiaries which are not Debtors, (A) when financing statements are filed in the offices specified in the schedules to the Pledge and Security Agreement, the Collateral Agent (for the benefit of the Secured Parties) shall have a fully perfected Lien (subject to all Permitted Liens) on, and security interest in, all right, title and interest of such Subsidiary Guarantors in such Collateral and, subject to Section 9-315 of the New York Uniform Commercial Code (to the extent applicable), the proceeds thereof, as security for the Obligations to the extent perfection can be obtained by filing Uniform Commercial Code financing statements, in each case prior and superior in right to the Lien of any other person (except Permitted Liens) and (B) the recordation of (x) the grant of security interest in U.S. Patents, if applicable, and (y) the grant of security interest in U.S. Trademarks, if applicable, in the respective form attached to the Pledge and Security Agreement, in each case in the United States Patent and Trademark Office, together with filings on Form UCC-1 made pursuant to the Pledge and Security Agreement, will create, to the extent as may be perfected by such filings and recordation, a perfected security interest in the United States trademarks and patents covered by the Pledge and Security Agreement, and the recordation of the grant of security interest in U.S. Copyrights, if applicable, in the form attached to the Pledge and Security Agreement with the United States Copyright Office, together with filings on Form UCC-1 made pursuant to the Pledge and Security Agreement, will create, to the extent as may be perfected by such filings and recordation, a perfected security interest in the United States copyrights covered by the Pledge and Security Agreement.

(b)    Except for the entry of the Orders, and no filings or recordings are required in order to perfect such security interests in the Collateral owned by the Debtors.

(c)    The Interim Order, when entered by the Bankruptcy Court, is (and the Final Order when entered by the Bankruptcy Court will be) effective to create in favor of the Collateral Agent for the benefit of the Secured Parties, a legal, valid, binding and enforceable perfected security interest in the Collateral owned by the Debtors without the necessity of the execution of mortgages, security agreements, pledge agreements, financing statements or other agreements or documents except to the extent set forth in such Orders.

(d)    Subject to entry of the Interim Order (and the Final Order, as applicable) the Obligations of the Debtors shall have the status and priority set forth in Section 2.22 and, for the avoidance of doubt, are subject to the Carve Out.

SECTION 3.12 *Properties*.  Each of the Borrower and each of its Subsidiaries (in the case of the UK Loan Parties, subject to the UK Legal Reservations and the UK Perfection Requirements) has good

and indefeasible title to all material properties (and to all buildings, fixtures and improvements located thereon) owned by it, including all material property reflected in the most recent historical balance sheets referred to in <u>Section 3.05(a)</u> (except as sold or otherwise disposed of since the date of such balance sheet in the ordinary course of business or as permitted by the terms of this Agreement), free and clear of all Liens, other than Permitted Liens.  Each of the Borrower and each of its Subsidiaries have a valid and indefeasible leasehold interest in the material properties leased by it free and clear of all Liens other than Permitted Liens.

SECTION 3.13 ***Subsidiaries***.  On and as of the Closing Date, the Borrower has no Subsidiaries other than those Subsidiaries listed on <u>Schedule 3.13</u>.  <u>Schedule 3.13</u> sets forth, as of the Closing Date, the percentage ownership (direct and indirect) of the Borrower, identifies the direct owner thereof and which Subsidiaries are Material Domestic Subsidiaries and Material Foreign Subsidiaries.  All outstanding Equity Interests of each Material Domestic Subsidiary and each Material Foreign Subsidiary have been duly and validly issued, are fully paid and non-assessable and have been issued free of preemptive rights.  Each Material Domestic Subsidiary and each Material Foreign Subsidiary has no outstanding securities convertible into or exchangeable for its Equity Interests or outstanding any right to subscribe for or to purchase, or any options or warrants for the purchase of, or any agreement providing for the issuance (contingent or otherwise) of or any calls, commitments or claims of any character relating to, its Equity Interests or any stock appreciation or similar rights.

SECTION 3.14 ***Compliance with Laws***.  The Borrower and its Subsidiaries are in compliance with all Requirements of Law except to the extent that the failure to comply therewith could not, in the aggregate, reasonably be expected to have a Material Adverse Effect.

SECTION 3.15 ***Investment Company Act***.  Neither the Borrower nor any of its Subsidiaries is an "investment company" or a company "controlled" by an "investment company," within the meaning of the Investment Company Act of 1940, as amended.

SECTION 3.16 ***No Default***.  No Default or Event of Default has occurred and is continuing.

SECTION 3.17 ***Environmental Matters***.

(a)    Except as could not reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect:  (i) the Borrower and each of its Subsidiaries is in compliance with all applicable Environmental Laws and has obtained and is in compliance with the terms of any permits required under such Environmental Laws; (ii) there are no Environmental Claims pending or to the knowledge of the Borrower, threatened, against the Borrower or any of its Subsidiaries; (iii) no Lien, other than a Permitted Lien, has been recorded or to the knowledge of the Borrower, threatened under any Environmental Law with respect to any Real Property owned by the Borrower or any Subsidiary; (iv) neither the Borrower nor any of its Subsidiaries has agreed to assume or accept responsibility for any existing liability of any other Person under any Environmental Law; and (v) there are no facts, circumstances, conditions or occurrences with respect to the past or present business, operations, properties or facilities of the Borrower or any of its Subsidiaries, or any of their respective predecessors, that could reasonably be expected to give rise to any Environmental Claim against or any liability for the Borrower or any of its Subsidiaries under any Environmental Law.

(b)    Since January 1, 2015, neither the Borrower nor any of its Subsidiaries has received any letter or written request for information under Section 104(e) of the Comprehensive Environmental Response, Compensation, and Liability Act (42 U.S.C. § 9601, et seq.) or any

comparable state law with regard to any matter that could reasonably be expected, either individually or in the aggregate, to result in a Material Adverse Effect.

(c)    Neither the Borrower nor any of its Subsidiaries has been issued or been required to obtain a permit for the treatment, storage or disposal of hazardous waste at any of its facilities pursuant to the federal Resource Conservation and Recovery Act, 42 U.S.C. § 6901, et. seq. ("**RCRA**"), or any equivalent state law, nor are any such facilities regulated as "interim status" facilities required to undergo corrective action pursuant to RCRA or any state equivalent, except, in each case, for such matters that could not reasonably be expected, either individually or in the aggregate, to result in a Material Adverse Effect.

(d)    (i) To the knowledge of the Borrower, neither the Borrower nor any of their Subsidiaries has any underground storage tanks (A) that are not properly registered or permitted under applicable Environmental Laws, or (B) that are leaking or disposing of Hazardous Materials, and (ii) to the extent required by applicable Environmental Law, the Borrower and its Subsidiaries have notified all of their employees of the existence, if any, of any health hazard arising from the conditions of their employment and have met all notification requirements under all Environmental Laws.

SECTION 3.18 **Employment and Labor Relations**.  Except as could not reasonably be expected, either individually or in the aggregate, to have a Material Adverse Effect, neither the Borrower nor any of its Subsidiaries is engaged in any unfair labor practice.  There is (a) no unfair labor practice complaint pending against the Borrower or any of its Subsidiaries or, to the knowledge of the Borrower, threatened against any of them, before the National Labor Relations Board, and no grievance or arbitration proceeding arising out of or under any collective bargaining agreement is so pending against the Borrower or any of its Subsidiaries or, to the knowledge of the Borrower, threatened against any of them, (b) no strike, labor dispute, slowdown or stoppage pending against the Borrower or any of its Subsidiaries or, to the knowledge of the Borrower, threatened against the Borrower or any of its Subsidiaries, (c) no union representation question exists with respect to the employees of the Borrower or any of its Subsidiaries, (d) no equal employment opportunity charges or other claims of employment discrimination are pending or, to the Borrower's knowledge, threatened against the Borrower or any of its Subsidiaries, and (e) no wage and hour department investigation has been made of the Borrower or any of its Subsidiaries, except (with respect to any matter specified in clauses (a) – (e) above, either individually or in the aggregate) such as could not reasonably be expected to have a Material Adverse Effect.

SECTION 3.19 **Intellectual Property, etc**.  Each of the Borrower and each of its Subsidiaries owns or has the right to use all the patents, trademarks, permits, domain names, service marks, trade names, copyrights, licenses, franchises, inventions, trade secrets, proprietary information and know-how of any type, whether or not written (including, but not limited to, rights in computer programs and databases), and formulas, or rights with respect to the foregoing, and has obtained assignments of all leases, licenses and other rights of whatever nature, used in the conduct of its business, without any known conflict with or infringement or misappropriation of the rights of others which conflict, infringement or misappropriation could reasonably be expected, either individually or in the aggregate, to have a Material Adverse Effect.

SECTION 3.20 **Insurance**.  Schedule 3.20 sets forth a listing of all insurance maintained by the Borrower and its Subsidiaries as of the Closing Date, with the amounts insured (and any deductibles) set forth therein.

SECTION 3.21 ***Borrowing Base Calculation***.  The calculation by the Borrower of the Borrowing Base in any Borrowing Base Certificate delivered to the Administrative Agent and the valuation thereunder is complete and accurate in all material respects.

SECTION 3.22 ***Anti-Terrorism Law***.

(a)    Neither the Borrower nor any of its Subsidiaries is in violation of any legal requirement relating to any laws with respect to terrorism or money laundering ("***Anti-Terrorism Laws***"), including Executive Order No. 13224 on Terrorist Financing effective September 24, 2001 (the "***Executive Order***") and the Patriot Act.   Neither the Borrower nor any of its Subsidiaries and, to the knowledge of the Borrower, no agent of the Borrower or any of its Subsidiaries acting on behalf of the Borrower or any of its Subsidiaries, as the case may be, is any of the following:

(i)    a Person that is listed in the annex to, or is otherwise subject to the provisions of, the Executive Order;

(ii)    a Person owned or controlled by, or acting for or on behalf of, any Person that is listed in the annex to, or is otherwise subject to the provisions of, the Executive Order;

(iii)    a Person with which any Lender is prohibited from dealing or otherwise engaging in any transaction by any Anti-Terrorism Law;

(iv)    a Person that commits, threatens or conspires to commit or supports "terrorism" as defined in the Executive Order; or

(v)    a Person that is named as a "specially designated national and blocked person" on the most current list published by the U.S. Department of the Treasury Office of Foreign Assets Control at its official website or any replacement website or other replacement official publication of such list.

(b)    Neither the Borrower nor any of its Subsidiaries and, to the knowledge of the Borrower, no agent of the Borrower or any of its Subsidiaries acting on behalf of the Borrower or any of its Subsidiaries, as the case may be, (i) conducts any business or engages in making or receiving any contribution of funds, goods or services to or for the benefit of a Person described in Section 3.22(a), (ii) deals in, or otherwise engages in any transaction relating to, any property or interests in property blocked pursuant to the Executive Order, or (iii) engages in or conspires to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any Anti-Terrorism Law.

SECTION 3.23 ***Anti-Corruption Laws***.

(a)    During the past five years, except as publicly disclosed in connection with the Borrower's 2010 settlements with the U.S. Department of Justice and the SEC and in the Borrower's Form 10-K for Fiscal Year ended on March 31, 2016, neither the Borrower nor any of its Subsidiaries, or any respective director, officer, or employee of the Borrower or any of its Subsidiaries, nor to the knowledge of the Borrower, its joint venture partners or other Affiliates, or any respective agent or other Person acting on behalf of the Borrower or any of its Subsidiaries:  (i) has used any funds for any unlawful contribution, gift, property, entertainment or other unlawful expense related to political activity; (ii) has made or taken any action to further

or facilitate any offer, payment, gift, promise to pay, or any offer, gift or promise of anything else of value, directly or indirectly, in order to improperly influence official action, to obtain or retain business for the Borrower or its Subsidiaries, or to secure an improper advantage for the Borrower or its Subsidiaries; (iii) has made, offered, taken, or will make, offer or take any act in furtherance of any bribe or unlawful rebate, payoff, influence payment, property, gift, kickback or other unlawful payment; or (iv) is aware of or has taken any action, directly or indirectly, that would result in a violation of any provision of the Bribery Act 2010 of the United Kingdom, the OECD Convention on Bribery of Foreign Public Officials in International Business Transactions, the Foreign Corrupt Practices Act of 1977, as amended, and the rules and regulations thereunder or any other applicable anti-bribery and anti-corruption laws and/or regulations.  The Borrower, its Subsidiaries and their Affiliates have instituted and maintain policies and procedures reasonably designed to promote and ensure continued compliance with all applicable anti-bribery and anti-corruption laws and with the representation and warranty contained herein.

(b)    No part of the proceeds of the Loans will be used by the Borrower or any of its Subsidiaries, directly or indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper or undue advantage, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended, the UK Bribery Act 2010, or any other applicable anti-bribery or anti-corruption laws.

SECTION 3.24 *Sanctions*.  The Borrower has implemented and maintains in effect policies and procedures designed to ensure compliance by the Borrower, its Subsidiaries and their respective directors, officers, employees and agents while acting on behalf of the Borrower or any of its Subsidiaries with Sanctions applicable to the Borrower and its Subsidiaries, and the Borrower, its Subsidiaries and their respective officers and employees and, to Borrower's knowledge, their respective directors and agents, while acting on behalf of the Borrower and its Subsidiaries, are in compliance with applicable Sanctions and are not knowingly engaged in any activity that would reasonably be expected to result in the Borrower being designated as a Sanctioned Person.  None of (a) the Borrower, any Subsidiary or any of their respective directors, officers or employees, or (b) to the knowledge of the Borrower, any agent of the Borrower or any Subsidiary that will act in any capacity in connection with or benefit from the credit facility established hereby, is a Sanctioned Person, except in such instances that would not result in a Sanctions violation to the Borrower or any of its Subsidiaries.

SECTION 3.25 *Material Contracts*.  Schedule 3.25 contains a true, correct and complete list of all the Material Contracts in effect on the Closing Date.  Except as described on Schedule 3.25, all Material Contracts are in full force and effect and no defaults exist thereunder other than defaults the consequence of which, either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

SECTION 3.26 *DIP Budget*.  The Approved DIP Budget has been prepared in good faith on the basis of the assumptions stated therein, which assumptions were believed to be reasonable at the time made, it being understood that projections as to future events are not to be viewed as facts and actual results may vary materially from such forecasts.

SECTION 3.27 *Centre of Main Interests*.  For the purposes of The Council of the European Union Regulation No. (EU) 2015/848 of 20 May 2015 on insolvency proceedings (recast) (the "Regulation"), so far as it is aware and if and for so long as the Regulation is applicable or deemed to be applicable in the United Kingdom, for the purposes of the Regulation, each UK Loan Party's centre of main interest (as that term is used in Article 3(1) of the Regulation) is situated in its jurisdiction of incorporation.

**ARTICLE IV**

**Conditions of Lending**

SECTION 4.01 ***All Credit Events***. The obligations of the Lenders to make any Loans hereunder (the making of any Loans hereunder, excluding any conversion or continuation of Loans, a "***Credit Event***") are subject to the satisfaction (or waiver) of the following conditions precedent:

(a)     The representations and warranties of the Borrower and each other Loan Party contained in <u>Article III</u> or any other Loan Document shall be true and correct in all material respects on and as of the date of such Credit Event; *provided* that, to the extent that such representations and warranties specifically refer to an earlier date, they shall be true and correct in all material respects as of such earlier date; *provided*, *further*, that any representation and warranty that is qualified as to "materiality," "Material Adverse Effect" or similar language shall be true and correct (after giving effect to any qualification therein) in all respects on such respective dates.

(b)     The Administrative Agent shall have received a notice of such Borrowing as required by <u>Section 2.03</u>.

(c)     Immediately prior to and immediately after such Credit Event, no Default or Event of Default shall have occurred and be continuing.

(d)     The making of such Loan shall not violate any Requirement of Law applicable to the Loan Parties, after giving effect to the Orders and any other order of the Bankruptcy Court entered on or prior to the date of the applicable Credit Event, and shall not be enjoined, temporarily, preliminarily or permanently.

(e)     Prior to or substantially simultaneously therewith, the Administrative Agent and the Lenders shall have received the fees in the amounts previously agreed in writing by the Agents or the Lenders, as applicable, or otherwise required to be paid pursuant to the Loan Documents on or prior to such date and all expenses (including the reasonable fees, disbursements and other charges of counsel to the extent payable in accordance with the terms hereof) payable by the Loan Parties (with respect to expenses, to the extent invoices have been presented at least one Business Day prior to such date) shall have been paid, in each case subject to and in accordance with the Orders; which amounts shall as required herein and otherwise may, at the election of the Borrower, be paid from the proceeds of the Loans funded on the date of such Borrowing unless required to be paid by the Borrower prior to such date.

(f)     The Administrative Agent and the Financing Commitment Parties shall have received a certificate, dated as of the date of the applicable Credit Event and signed by a Financial Officer of the Borrower, certifying compliance with the conditions precedent set forth in <u>paragraphs (a)</u>, <u>(c)</u> and <u>(d)</u> of this <u>Section 4.01</u>.

Each Credit Event shall be deemed to constitute a representation and warranty by the Borrower on the date of such Credit Event as to the applicable matters specified in <u>paragraphs (a)</u>, <u>(c)</u> and <u>(d)</u> of this <u>Section 4.01</u>.

SECTION 4.02 ***Conditions to Borrowing on the Closing Date***.  The obligations of the Lenders to make the Interim Order Loan is subject to the satisfaction (or waiver) of the conditions precedent in <u>Section 4.01</u> and the following conditions precedent:

55

(a)     The Administrative Agent shall have received (i) a counterpart of this Agreement and each other Loan Document signed on behalf of each party hereto and thereto (including via any electronic means) or (ii) evidence satisfactory to the Administrative Agent (which may include a facsimile or other electronic imaging transmission) that such party has signed such a counterpart.

(b)     The Administrative Agent shall have received, on behalf of itself and the Lenders, a favorable written opinion of Simpson Thacher & Bartlett LLP, counsel for the Borrower, of Macfarlanes LLP, counsel for the Lenders, and of De Brauw Blackstone Westbroek N.V., counsel for the Lenders, in each case (i) dated the Closing Date, (ii) addressed to the Administrative Agent and the Lenders, and (iii) in form and substance reasonably satisfactory to the Required Financing Commitment Parties, covering such matters customarily covered in opinions of this type as the Financing Commitment Parties shall reasonably request, and the Borrower hereby requests such counsel to deliver such opinions.

(c)     The Financing Commitment Parties shall have received the Initial Budget (which shall include the initial 13-week projections as of a date not more than five (5) Business Days prior to the Closing Date) in form and substance acceptable to the Required Financing Commitment Parties.

(d)     The Administrative Agent and the Financing Commitment Parties shall have received (i) a copy of the certificate or articles of incorporation, including all amendments thereto, of each Loan Party, certified as of a recent date by the Secretary of State of the state of its organization, and a certificate as to the good standing of each Loan Party as of a recent date, from such Secretary of State (in each case or the foreign equivalent, if any); (ii) a certificate of the Secretary or Assistant Secretary of each Loan Party (or, in the case of a UK Loan Party, a certificate of a director of such UK Loan Party) dated the Closing Date and certifying (A) that attached thereto is a true and complete copy of the constitutional documents, articles of association, memorandum of association, certificate of incorporation and by-laws of such Loan Party as in effect on the Closing Date and at all times since a date prior to the date of the resolutions described in clause (B) below, (B) that attached thereto is a true and complete copy of resolutions duly adopted by the Board of Directors (or its equivalent) of such Loan Party (and, in the case of a UK Loan Party, of resolutions duly passed by its members) authorizing the execution, delivery and performance of the Loan Documents to which such person is a party and, in the case of the Borrower, the borrowings hereunder, and that such resolutions have not been modified, rescinded or amended and are in full force and effect, (C) that the certificate or articles of incorporation, constitutional documents, articles of association and memorandum of association of such Loan Party have not been amended since the date of the last amendment thereto shown on the certificate of good standing (or the foreign equivalent, if any) furnished pursuant to clause (i) above, and (D) as to the incumbency and specimen signature of each officer executing any Loan Document or any other document delivered in connection herewith on behalf of such Loan Party; (iii) a certificate of another officer as to the incumbency and specimen signature of the Secretary or Assistant Secretary executing the certificate pursuant to clause (ii) above; (iv) in the case of a UK Loan Party, a certificate of a director confirming that the entry into the Loan Documents and the transactions contemplated by the Loan Documents would not exceed any guarantee or security limits under the constitutional documents of such UK Loan Party or under any other agreement or instrument to which such UK Loan Party is a party; (v) in the case of a UK Loan Party, a resolution of the direct shareholders of that UK Loan Party approving the terms of the Loan Documents to which such UK Loan Party is a party and (vi) such other documents as the Financing Commitment Parties may reasonably request.

(e)    *[Reserved]*.

(f)    The Collateral Agent shall have received the results of a search of the Uniform Commercial Code filings (or equivalent filings) made with respect to the Loan Parties in the states (or other jurisdictions) of formation of such persons as indicated on the applicable schedules to the Pledge and Security Agreement, together with copies of the financing statements (or similar documents) disclosed by such search, and accompanied by evidence satisfactory to the Collateral Agent that the Liens indicated in any such financing statement (or similar document) would be permitted under <u>Section 6.06</u> or have been or will be contemporaneously released or terminated.

(g)    The Lenders shall have received the financial statements referred to in <u>Section 3.05</u>.

(h)    The Administrative Agent and the Lenders shall have received, at least five Business Days prior to the Closing Date, to the extent requested at least eight Business Days prior to the Closing Date, (i) all documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act and (ii) if the Borrower qualified as a "legal entity customer" under the Beneficial Ownership Regulation, a customary certification regarding beneficial ownership required by the Beneficial Ownership Regulation in relation to the Borrower.

(i)    The Petition Date shall have occurred.

(j)    The Bankruptcy Court shall have entered the Interim Order within five (5) Business Days after the Petition Date, it being understood that drafts thereof approved by counsel to the Administrative Agent and the Required Financing Commitment Parties on or prior to the Petition Date are reasonably satisfactory, and the Interim Order shall not have been vacated, reversed, modified, amended or stayed, in the case of any modification or amendment, in a manner that is adverse to the Lenders, without the consent of the Required Financing Commitment Parties.

(k)    All First Day Orders shall have been entered by the Bankruptcy Court and all such entered First Day Orders shall be reasonably satisfactory in form and substance to the Required Financing Commitment Parties, it being understood that counsel to the Required Financing Commitment Parties have reviewed drafts of all First Day Orders on or prior to the Petition Date and all such drafts are reasonably satisfactory.

(l)    No trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code or examiner with enlarged powers beyond those set forth in Sections 1106(a)(3) and (4) of the Bankruptcy Code shall have been appointed in any of the Cases.

(m)    The RSA shall not have terminated and shall be in full force and effect.

(n)    The Collateral Agent, for the benefit of the Secured Parties, shall have valid and perfected Liens on all DIP Collateral pursuant to the Interim Order and the other Loan Documents to the extent contemplated hereby and thereby, subject to <u>Section 5.19</u>.

(o)    The Closing Date shall not be later than one (1) Business Day after the Interim Order is entered on the docket of the Bankruptcy Court unless the Required Financing Commitment Parties shall have consented to such later date.

(p)    The ABL Refinancing shall have been consummated, or substantially simultaneously with the Closing Date shall be consummated.

SECTION 4.03 ***Conditions to Borrowing on the Initial Allocation Date***.  The obligation of the Lenders to make the Initial Allocation Date Loan is subject to the satisfaction (or waiver) of the conditions precedent in Section 4.01 and the following conditions precedent:

(a)    The Closing Date shall have occurred.

(b)    The Collateral Agent, for the benefit of the Secured Parties, shall have valid and perfected Liens on all DIP Collateral pursuant to the Orders and the other Loan Documents to the extent contemplated hereby and thereby, subject to Section 5.19.

(c)    The Loan Parties shall be in compliance in all material respects with the Interim Order.

SECTION 4.04 ***Conditions to Borrowing on the Full Availability Date***.  The obligation of the Lenders to make the Final Order Loan is subject to the satisfaction (or waiver) of the conditions precedent in Section 4.01 and the following conditions precedent:

(a)    The Closing Date shall have occurred.

(b)    All "second day" orders approving on a final basis the relief granted under any First Day Orders shall have been entered by the Bankruptcy Court, shall be reasonably satisfactory to the Required Financing Commitment Parties, shall be in full force and effect, shall not have been vacated or reversed, shall not be subject to a stay and shall not have been modified or amended in a manner that is adverse to the Lenders without the consent of the Required Financing Commitment Parties.

(c)    The Final Order shall have been entered by the Bankruptcy Court, and such order shall be in full force and effect and shall not have been reversed, modified, amended, stayed or vacated, in the case of any modification or amendment, in a manner that is adverse to the Lenders without the consent of the Required Financing Commitment Parties.

(d)    The Collateral Agent, for the benefit of the Secured Parties, shall have valid and perfected Liens on all DIP Collateral pursuant to the Orders and the other Loan Documents to the extent contemplated hereby and thereby and subject to Section 5.19.

(e)    The Loan Parties shall be in compliance in all material respects with the Final Order.

## ARTICLE V

## Affirmative Covenants

The Borrower hereby covenants and agrees that from and after the date of this Agreement until the Payment in Full of the Obligations:

SECTION 5.01 *Information Covenants*.  The Borrower will furnish, (x) as to clauses (a), (o) and (r) below, to the Lender Financial Advisor and (y) otherwise, to the Administrative Agent (for distribution to each Lender) and:

(a)      Monthly Financial Statements.  As soon as available and in any event within 15 Business Days after the end of each month (commencing with June 2020), (i) monthly financial statements and other reports customarily prepared by the Borrower or its Subsidiaries to manage and operate their business and (ii) a report detailing the amounts outstanding as of the last day of such month under each line of credit of the Borrower's Foreign Subsidiaries.

(b)      Quarterly Financial Statements.  As soon as available and in any event within 45 days after the close of each of the first three fiscal quarters in each Fiscal Year of the Borrower (commencing with the fiscal quarter ending June 30, 2020), the consolidated balance sheet of the Borrower and its Subsidiaries (including Minority Interest Consolidated Entities) as at the end of such fiscal quarter and the related consolidated statements of income and statement of cash flows for such fiscal quarter and for the elapsed portion of the Fiscal Year ended with the last day of such fiscal quarter, in each case setting forth comparative figures for the corresponding fiscal quarter in the prior Fiscal Year, all of which shall be certified by a Financial Officer of the Borrower that they fairly present in all material respects in accordance with GAAP the financial condition of the Borrower and its Subsidiaries (including Minority Interest Consolidated Entities) as of the dates indicated and the results of their operations for the periods indicated, subject to normal year-end audit adjustments and the absence of footnotes.

(c)      Annual Financial Statements.  As soon as available and in any event within 90 days (or in the case of the Fiscal Year ended March 31, 2020, 120 days) after the close of each Fiscal Year of the Borrower (commencing with the Fiscal Year ended March 31, 2020), (i) the consolidated balance sheet of the Borrower and its Subsidiaries as at the end of such Fiscal Year and the related consolidated statements of income and statement of cash flows for such Fiscal Year setting forth, comparative figures for the preceding Fiscal Year and certified by Deloitte & Touche LLP or other independent certified public accountants of recognized national standing reasonably acceptable to the Required Lenders, accompanied by an opinion of such accounting firm and (ii) management's discussion and analysis of the important operational and financial developments during such Fiscal Year.

(d)      Management Letters.  Promptly after the Borrower's or any of its Subsidiaries' receipt thereof, a copy of any "management letter" received from its certified public accountants and management's response thereto.

(e)      Officer's Certificates.  At the time of the delivery of the financial statements provided for in Section 5.01(c), a compliance certificate from a Financial Officer of the Borrower in the form attached hereto as Exhibit F, which certificate shall (i) certify on behalf of the Borrower that, to such officer's knowledge after due inquiry, no Default or Event of Default has occurred and is continuing or, if any Default or Event of Default has occurred and is continuing, specifying the nature and extent thereof, (ii) include related financial statements (which may be in summary form) reflecting adjustments necessary to eliminate the accounts of Minority Interest Consolidated Entities (if any) (together with supporting detail as may be requested by the Required Lenders), and (iii) include a description of the Indebtedness for borrowed money of Foreign Subsidiaries, a description of the facilities under which such Indebtedness is outstanding and the outstanding principal amount, in each case as of the last day of such period for which financial statements were delivered pursuant to Section 5.01(c).

59

(f)    Notice of Default, Litigation and Material Adverse Effect.  Promptly, and in any event within three Business Days after any Responsible Officer of the Borrower or any of its Subsidiaries obtains knowledge thereof if such event continues for three Business Days, notice of (i) the occurrence of any event which constitutes a Default or an Event of Default, (ii) any litigation or governmental investigation or proceeding pending against the Borrower or any of its Subsidiaries, other than in connection with the Cases, (x) which, either individually or in the aggregate, has had, or could reasonably be expected to have, a Material Adverse Effect or (y) with respect to any Loan Document, (iii) any other event, change or circumstance that has had, or could reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect, or (iv) any written allegations from any Governmental Authority or NGO as to material human rights violations involving the Borrower or any of its Subsidiaries.

(g)    Environmental Matters.  Promptly after any Responsible Officer of the Borrower obtains knowledge thereof, notice of one or more of the following environmental matters to the extent that such environmental matters, either individually or when aggregated with all other such environmental matters, could reasonably be expected to have a Material Adverse Effect:

(i)    any pending or threatened Environmental Claim against the Borrower or any of its Subsidiaries or relating to any Real Property owned, leased or operated by the Borrower or any of its Subsidiaries;

(ii)    any condition or occurrence on or arising from any Real Property owned, leased or operated by the Borrower or any of its Subsidiaries that (A) results in noncompliance by the Borrower or any of its Subsidiaries with any applicable Environmental Law or (B) could reasonably be expected to form the basis of an Environmental Claim against the Borrower or any of its Subsidiaries or relating to any such Real Property;

(iii)    any condition or occurrence on any Real Property owned, leased or operated by the Borrower or any of its Subsidiaries that could reasonably be expected to cause such Real Property to be subject to any restrictions on the ownership, lease, occupancy, use or transferability by the Borrower or any of its Subsidiaries of such Real Property under any Environmental Law; and

(iv)    the taking of any removal or remedial action to the extent required by any Environmental Law or any Governmental Authority in response to the Release or threatened Release of any Hazardous Material on any Real Property owned, leased or operated by the Borrower or any of its Subsidiaries.

All such notices shall describe in reasonable detail the nature of the claim, investigation, condition, occurrence or removal or remedial action and the Borrower's or such Subsidiary's response thereto.

(h)    Borrowing Base Certificate.  Not later than 5:00 P.M. (New York time) on or before the fifteenth Business Day of each calendar month, a borrowing base certificate setting forth the Borrowing Base (in each case with supporting calculations in reasonable detail) substantially in the form delivered pursuant to the ABL Credit Agreement (each, a "***Borrowing Base Certificate***"), which shall be prepared as of the last Business Day of the month immediately preceding such delivery.  Each such Borrowing Base Certificate shall include such supporting information as delivered pursuant to the ABL Credit Agreement.

(i)        Patriot Act.  Promptly following the Administrative Agent's or any Lender's request therefor, all documentation and other information that the Administrative Agent or such Lender reasonably requests in order to comply with its ongoing obligations under the applicable "know your customer" and anti-money laundering rules and regulations, including the Patriot Act.

(j)        PACA.  Promptly inform the Administrative Agent if a Loan Party or any of its Subsidiaries obtains any notice regarding the existence of any Lien on, or trust over, any of the Collateral arising under PACA and promptly provide the Administrative Agent with a copy of such notice.

(k)        Cancellation of Insurance.  Promptly (but in any event within 1 Business Day of receipt thereof) inform the Administrative Agent if any Loan Party receives notice of cancellation of any insurance policy required to be maintained pursuant to Section 5.03.

(l)        Change of Accounting Principles.    The Borrower shall deliver to the Administrative Agent and each Lender at the same time as the delivery of any annual or quarterly financial statements given in accordance with the provisions of Section 5.01(a) or (c), as applicable, (i) a description in reasonable detail of any material change in the application of accounting principles employed in the preparation of such financial statements from those applied in the most recently preceding quarterly or annual financial statements as to which no objection shall have been made in accordance with the provisions above and (ii) a reasonable estimate of the effect on the financial statements on account of such changes in application.

(m)        Material Weakness Letter.  Promptly upon receipt thereof, a copy of any "material weakness letter" submitted by independent accountants to the Borrower or any of its Subsidiaries in connection with any annual, interim or special audit of the books of such Person.

(n)        Other Information.  From time to time, such other information or documents (financial or otherwise) with respect to the Borrower or any of its Subsidiaries as any Lender or the Lender Advisors may reasonably request.

(o)        Supplement to Approved DIP Budget.  To the Lender Financial Advisor, no later than 12:00 p.m. New York City time on the Wednesday of each fourth (4th) calendar week following the week in which the Petition Date occurs, a supplemental budget covering the 13-week period that commences with the beginning of the week in which the supplemental budget is required to be delivered, consistent with the form and level of detail set forth in the Initial Budget, including the same line-items provided with the Initial Budget, and otherwise in form and substance reasonably acceptable to Required Financing Commitment Parties.  Upon, and subject to, the approval of any such supplemental budget by the Required Financing Commitment Parties pursuant to the immediately preceding sentence, such supplemental budget shall constitute the then-approved Approved DIP Budget, effective as of the beginning of the week in which it was delivered; *provided* that unless and until the Required Financing Commitment Parties approve such supplemental budget as provided herein, the then-current Approved DIP Budget shall remain in effect.

(p)        Orders and Pleadings.  As soon as reasonably practicable in advance of, but no later than two (2) calendar days prior to the earlier of (x) filing with the Bankruptcy Court or (y) delivering to any statutory committee appointed in the Cases or the United States Trustee for the District of Delaware (the "***U.S. Trustee***"), as the case may be, all proposed orders and pleadings related to the Loans and the Loan Documents, any other financing or use of cash

collateral, any sale or other disposition of Collateral outside the ordinary course, cash management, adequate protection, any Reorganization Plan and/or any disclosure statement related thereto or any request to approve any compromise and settlement of claims (except that, with respect to any emergency pleading or document for which, despite the Loan Parties' best efforts, such advance notice is impracticable, the Loan Parties shall be required to furnish such documents as soon as reasonably practicable and in no event later than substantially concurrently with such filings or deliveries thereof, as applicable).

(q)     Additional Bankruptcy Information.  By the earlier of (x) two (2) calendar days prior to being filed (and if impracticable, then as soon as possible and in no event later than as promptly as practicable before being filed) on behalf of any of the Loan Parties with the Bankruptcy Court or (y) at the same time as such documents are provided by any of the Loan Parties to any statutory committee appointed in the Cases or the U.S. Trustee, all other notices, filings, motions, pleadings or other information concerning the financial condition of the Loan Parties or any request to approve any compromise and settlement of claims or for relief under Section 363, 365, 1113 or 1114 of the Bankruptcy Code or Bankruptcy Rule 9019 or any other request for relief (to the extent not covered by Section 5.01(p) above).

(r)     Variance Reports.  By no later than 12:00 p.m. New York City time on the Thursday of each calendar week following the week in which the Petition Date occurs (each such Thursday, a "*Variance Report Date*") commencing with June 25, 2020, a line-item by line-item variance report (each, a "*Variance Report*") setting forth, in reasonable detail: (x) the actual receipts and operating disbursements (including any professional fees) for each line item in the Approved DIP Budget for the week ending on the most recent Friday (and, in the case of the first such report, the week in which the Petition Date occurs), (y) any differences between such actual amounts for each line item in the Approved DIP Budget for such period versus projected amounts set forth in the Approved DIP Budget for such period for each line item included in the Approved DIP Budget for such period and on a cumulative basis for the period from the beginning of the week in which the Petition Date occurs through the end of such period (such cumulative report to be prepared by aggregating the variances set forth in each Variance Report) and (z) the computations necessary to determine compliance with Section 6.09 together with a statement from a Financial Officer certifying the information contained in the report.  The Variance Report shall also provide a reasonably detailed explanation for any variance in such Variance Report in excess of 5.0% in actual receipts or operating disbursements for each such line item during the Variance Testing Period as compared to projections for such line items during the Variance Testing Period as set forth in the Approved DIP Budget for such period.

SECTION 5.02 **Books, Records and Inspections; Annual Meetings**.  The Borrower will, and will cause each of its Subsidiaries to, keep proper books of record and accounts in which full, true and correct (in all material respects) entries in conformity with GAAP and all requirements of law shall be made of all dealings and transactions in relation to its business and activities (including, without limitation, proper books and records with respect to the Material Local Credit Facilities).  In addition to the requirements set forth in Section 5.01(n), the Borrower will, and will cause each other Loan Party to, permit officers and designated representatives of any Lender or the Lender Financial Advisor at the expense of the Borrower (a) to visit and inspect, under guidance of officers of the Borrower or such other Loan Party, any of the properties of the Borrower or such other Loan Party, (b) to examine the books of account of the Borrower or such other Loan Party and discuss the affairs, finances and accounts of the Borrower or such other Loan Party with, and be advised as to the same by, its and their officers and independent accountants and (c) to verify Accounts and/or Inventory, all upon reasonable prior notice and at such reasonable times and intervals and to such reasonable extent as any such Lender or the Lender Financial Advisor may reasonably request; provided, however, that, so long as no Event of Default exists,

the Lenders and the Lender Financial Advisor shall be limited to one such visit during any Fiscal Year of the Borrower at the expense of the Borrower at locations reasonably requested by such Lenders or Lender Financial Advisor through the Administrative Agent. The Loan Parties shall maintain their fiscal reporting period on a March 31 fiscal year, and each Domestic Subsidiary shall maintain its respective fiscal reporting period on the present basis.

SECTION 5.03 *Maintenance of Property; Insurance*.

(a) The Borrower will, and will cause each of its Subsidiaries to, (i) keep all property necessary to the business of the Borrower and its Subsidiaries in good working order and condition, (x) except ordinary wear and tear and obsolescence, (y) except and subject to the occurrence of casualty events and (z) except where failure to do so would not materially or adversely affect its business, (ii) maintain with financially sound and reputable insurance companies insurance on all such property and against all such risks as is consistent and in accordance with industry practice for companies similarly situated owning similar properties and engaged in similar businesses as the Borrower and its Subsidiaries, and (iii) furnish to the Administrative Agent, upon its request therefor, full information as to the insurance carried. In addition to the requirements of the immediately preceding sentence, the Borrower and its Subsidiaries will at all times cause insurance of the types described in Schedule 3.20 to be maintained (with the same scope of coverage as that described in Schedule 3.20) at levels which are consistent with their practices immediately before the Closing Date. Such insurance shall include physical damage insurance on all real and personal property (whether now owned or hereafter acquired) on an all risk basis and business interruption insurance.

(b) The Borrower will, and will cause each other Loan Party to, at all times keep its property insured in favor of the Collateral Agent, and all policies and certificates (or certified copies thereof including any endorsements) with respect to such insurance (and any other insurance maintained by the Borrower and/or such Subsidiaries) (i) shall be endorsed to the Collateral Agent's satisfaction for the benefit of the Collateral Agent (including, without limitation, by naming the Collateral Agent as lender loss payee and/or additional insured), (ii) shall provide that the respective insurers irrevocably waive any and all rights of subrogation with respect to the Collateral Agent and the other Secured Parties, and (iii) shall be deposited with the Collateral Agent. The Borrower will, and will cause each of its Subsidiaries to, use commercially reasonable efforts to obtain endorsements to its insurance policies stating that such insurance policies shall not be canceled without at least 30 days' prior written notice thereof by the respective insurer to the Collateral Agent.

(c) If the Borrower or any of its Subsidiaries shall fail to maintain insurance in accordance with this Section 5.03, or if the Borrower or any of its Subsidiaries shall fail to so endorse and deposit all policies or certificates with respect thereto, the Administrative Agent shall have the right (but shall be under no obligation) to procure such insurance and the Borrower agrees to reimburse the Administrative Agent for all costs and expenses of procuring such insurance.

(d) If at any time the improvements on any Real Property subject (or required to be subject) to a Lien securing the Obligations are located in an area identified as a special flood hazard area by the Federal Emergency Management Agency or any successor thereto or other applicable agency, the Borrower will, and will cause each of its Subsidiaries to, at all times keep and maintain flood insurance in an amount no less than the amount sufficient to comply with the rules and regulations promulgated under the National Flood Insurance Act of 1968 and Flood Disaster Protection Act of 1973, each as amended from time to time.

SECTION 5.04 **Existence; Franchises**.    The Borrower will, and will cause each of its Subsidiaries to, do or cause to be done, all things necessary to preserve and keep in full force and effect its existence and its material rights, franchises, licenses, permits, copyrights, trademarks and patents; *provided*, *however*, that nothing in this Section 5.04 shall prevent (i) sales of assets and other transactions by the Borrower or any of its Subsidiaries in accordance with Section 6.04, (ii) the withdrawal by the Borrower or any of its Subsidiaries of its qualification as a foreign Business in any jurisdiction if such withdrawal could not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect or (iii) the change in form of organization of the Borrower or any of its Subsidiaries, if the Borrower in good faith determines that such change in organization is in the best interest of the Borrower or such Subsidiary, is not materially disadvantageous to the Lenders and, in the case of a change in the form of organization of any Loan Party, the Administrative Agent has consented thereto.

SECTION 5.05 **Compliance with Requirements of Law, etc**.    The Borrower will, and will cause each of its Subsidiaries to, comply with all Requirements of Law, except such non-compliances as could not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect; *provided*, that the Loan Parties shall comply with the Orders in all respects.

SECTION 5.06 **Anti-Corruption Laws**.    The Borrower will conduct its, and will cause each of its Subsidiaries and the directors, officers, employees and agents of any of the foregoing to conduct their, business on behalf of the Borrower and its Subsidiaries in a manner so as to not, directly or indirectly, violate the United States Foreign Corrupt Practices Act of 1977, as amended, the UK Bribery Act 2010, or any other applicable anti-bribery or anti-corruption laws.

SECTION 5.07 **Sanctions**.    The Borrower will maintain in effect and enforce policies and procedures designed to ensure compliance by the Borrower, its Subsidiaries and their respective directors, officers, employees and agents, while acting on behalf of the Borrower and its Subsidiaries, with Sanctions applicable to the Borrower and its Subsidiaries.  The Borrower will make best efforts to ensure compliance by the Borrower, its Subsidiaries and their respective directors, officers, employees and agents, while acting on behalf of the Borrower and its Subsidiaries, with Sanctions applicable to the Borrower and its Subsidiaries.

SECTION 5.08 **Compliance with Environmental Laws**.

(a)        The Borrower will comply, and will (x) cause each of its Subsidiaries to comply and (y) ensure compliance by its tenants and subtenants, in each case, with all Environmental Laws and permits applicable to, or required in respect of the conduct of its business or operations or by, the ownership, lease or use of its Real Property now or hereafter owned, leased or operated by the Borrower or any of its Subsidiaries, except for such noncompliances as could not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, and will promptly pay or cause to be paid all costs and expenses incurred in connection with such compliance, and will keep or cause to be kept all such Real Property free and clear of any Liens, other than Permitted Liens, imposed pursuant to such Environmental Laws.  Neither the Borrower nor any of its Subsidiaries will generate, use, treat, store, Release or dispose of, or permit the generation, use, treatment, storage, Release or disposal of Hazardous Materials on any Real Property now or hereafter owned, leased or operated by the Borrower or any of its Subsidiaries, or transport or permit the transportation of Hazardous Materials to or from any such Real Property, except for Hazardous Materials generated, used, treated, stored, Released or disposed of at any such Real Properties in compliance in all material respects with all applicable Environmental Laws and as required in connection with the normal operation, use and maintenance of the business or operations of the Borrower or any of its Subsidiaries, except in

connection with such noncompliance as could not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(b)    (i) The Borrower will provide, at the sole expense of the Borrower and at the reasonable request of the Required Lenders after receipt of any notice of the type described in Section 5.01(g), an environmental site assessment report concerning any Real Property owned, leased or operated by the Borrower or any of its Subsidiaries, prepared by an environmental consulting firm reasonably approved by the Required Lenders, indicating the presence or absence of Hazardous Materials and the potential cost of any removal or remedial action in connection with such Hazardous Materials on such Real Property.  If the Borrower fails to provide the same within 60 days after such request was made, the Administrative Agent may order the same, the cost of which shall be borne by the Borrower, and the Borrower shall grant and hereby grants to the Administrative Agent and the Lenders and their respective agents access to such Real Property and specifically grant the Administrative Agent and the Lenders an irrevocable non-exclusive license, subject to the rights of tenants, to undertake such an assessment at any reasonable time upon reasonable notice to the Borrower, all at the sole expense of the Borrower.

(c)    Conduct and complete all investigations, studies, sampling and testing, and all remediation, removal and other actions required under Environmental Laws and promptly comply in all respects with all lawful orders and directives of all Governmental Authorities regarding Environmental Laws except to the extent that the same are being contested in good faith by appropriate proceedings and the pendency of such proceedings could not reasonably be expected to have a Material Adverse Effect.

SECTION 5.09 *ERISA Information Undertakings*.    The Borrower will deliver to the Administrative Agent (in sufficient copies for all Lenders, if the Administrative Agent so requests):

(a)    promptly and in any event within 15 days after receiving a request from the Administrative Agent a copy of the most recent IRS Form 5500 (including the Schedule B) with respect to a Plan; and

(b)    promptly, and in any event within 30 days after the Borrower, any Subsidiary of the Borrower or any ERISA Affiliate knows or has reason to know that any ERISA Event has occurred that would reasonably be expected to result in a material liability to the Borrower or any of its Subsidiaries, a certificate of a Responsible Officer of the Borrower describing such ERISA Event and the action, if any, proposed to be taken with respect to such ERISA Event and a copy of any notice filed with the PBGC or the IRS pertaining to such ERISA Event and any notices received by the Borrower, any Subsidiary of the Borrower or ERISA Affiliate from the PBGC or any other governmental agency with respect thereto; *provided* that, in the case of ERISA Events under paragraph (4) of the definition thereof, the 30-day notice period set forth above shall be a 10-day period, and, in the case of ERISA Events under paragraph (2) of the definition thereof, in no event shall notice be given later than 10 days after the occurrence of the ERISA Event.

The Borrower shall:

(a)    ensure that any material liability imposed on them or any ERISA Affiliate pursuant to Title IV of ERISA is paid and discharged when due;

(b)    ensure that neither it nor any ERISA Affiliate adopts an amendment to a Plan requiring the provision of security under ERISA or the Code without the prior consent of the Administrative Agent or the Lenders; and

(c)        ensure that no Plan is terminated under Section 4041 of ERISA.

SECTION 5.10 ***Performance of Obligations***.  The Borrower will, and will cause each of its Subsidiaries to, perform all of its obligations under the terms of each mortgage, indenture, security agreement, loan agreement or credit agreement and each other agreement, contract or instrument by which it is bound, except such non-performances as could not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect and except to the extent stayed by the Cases.

SECTION 5.11 ***Payment of Taxes***.  The Borrower will pay and discharge, and will cause each of its Subsidiaries to pay and discharge, all material taxes, assessments and governmental charges or levies imposed upon it or upon its income or profits or upon any properties belonging to it, prior to the date on which penalties attach thereto, and all lawful claims which, if unpaid, might become a Lien or charge upon any properties of the Borrower or any of its Subsidiaries not otherwise permitted under <u>Section 6.06(a)</u>; *provided* that neither the Borrower nor any of its Subsidiaries shall be required to pay any such tax, assessment, charge, levy or claim (i) which is being contested in good faith and by proper proceedings if it has maintained adequate reserves with respect thereto in accordance with GAAP or is stayed by the Cases or (ii) if the aggregate amount of such monetary obligations is less than (x) in the case of Loan Parties, $10,000,000 and (y) in the case of non-Loan parties, the Threshold Amount.

SECTION 5.12 ***[Reserved].***

SECTION 5.13 ***Additional Security; Further Assurances; etc***.

(a)        The Borrower will cause each Wholly-Owned Domestic Subsidiary or any other Person that becomes a Wholly-Owned Domestic Subsidiary after the Closing Date to promptly, but no later than 20 Business Days after the date on which such Person becomes a Domestic Subsidiary (as such date may be extended by the Required Lenders in their sole discretion), (i) become a Subsidiary Guarantor as described in the Guarantee Agreement by way of execution of a joinder agreement thereto substantially in the form attached thereto as Exhibit A and (ii) grant security interests over any Collateral as described in the Pledge and Security Agreement by way of execution of a joinder agreement thereto substantially in the form attached thereto as Exhibit 10.

(b)        ***[Reserved].***

(c)        The Borrower and its Subsidiaries will cause (i) 100% of the Equity Interests of each Subsidiary that is a Subsidiary Guarantor and (ii) 100% of the Equity Interests of each Domestic Subsidiary and 65% of the aggregate of the total outstanding Voting Stock (and 100% of each class of issued and outstanding Equity Interest other than Voting Stock) of each Foreign Subsidiary (that is not a Loan Party) held directly by the Borrower or any Subsidiary Guarantor (or, if less, the full amount owned by the Borrower and each such Subsidiary Guarantor), in each case, to be subject at all times to a first priority, perfected Lien in favor of the Administrative Agent for the ratable benefit of the Secured Parties pursuant to the terms and conditions of the Security Documents and the Senior Lien Intercreditor Agreement, as applicable.

(d)        Subject to <u>Section 5.19</u>, the Loan Parties will (i) cause each loan or advance that is outstanding on or after the Closing Date to a Loan Party by a Subsidiary to be evidenced by an intercompany note duly executed and delivered, (ii) deliver such intercompany note to the Collateral Agent, together with an appropriate allonges or other endorsement reasonably satisfactory to the Collateral Agent, and (iii) execute such Security Documents in connection with the pledge of such promissory notes as the Administrative Agent may reasonably request.

(e)    The Borrower will, and will cause each of the other Loan Parties to, at the expense of the Borrower, make, execute, endorse, acknowledge, file and/or deliver to the Collateral Agent from time to time such vouchers, invoices, schedules, confirmatory assignments, conveyances, financing statements, transfer endorsements, powers of attorney, mortgages, certificates (including flood certificates and evidence of flood insurance if applicable), real property surveys, reports and other assurances or instruments and take such further steps relating to the Collateral covered by any of the Security Documents as the Collateral Agent may reasonably require.  Furthermore, the Borrower will, and will cause the other Loan Parties to, deliver to the Collateral Agent such opinions of counsel, title insurance, flood hazard determinations and other related documents as may be reasonably requested by the Collateral Agent to assure itself that this Section 5.13 has been complied with.

SECTION 5.14 *Real Estate Leases*.  The Borrower will, and will cause each of the Loan Parties to, timely and fully pay and perform its obligations under all leases and other agreements with respect to each leased location or public warehouse where any Collateral is or may be located except to the extent that the same are being contested in good faith and except to the extent stayed by the Cases.

SECTION 5.15 *[Reserved]*

SECTION 5.16 *Management and Advisor Calls*.  The Borrower will, and will cause each of the Loan Parties, and/or their advisors, as applicable (including appropriately senior members of management with respect to clause (c) below), shall host the following telephonic conference calls with the Administrative Agent, the Lenders and/or the Lender Advisors, as applicable:

(a)    Promptly following the delivery of each Variance Report pursuant to Section 5.01(r), a call (at a time to be mutually agreed) with the Lender Financial Advisor to discuss the contents of such Variance Report.

(b)    To the extent not covered during the call described in clause (a), a weekly call (at a time to be mutually agreed) with the Lender Advisors to discuss contemplated material filings, the Approved DIP Budget and budget-related initiatives, recent performance, cash and liquidity management, operational activities, current business and market conditions, material performance changes, the Borrowing Base and foreign lines of credit.

(c)    No less frequently than monthly, a call (at a time to be mutually agreed) with the Lenders to discuss the Approved DIP Budget and budget-related initiatives, recent performance, cash and liquidity management, operational activities, current business and market conditions, material performance changes, the Borrowing Base and foreign lines of credit.

SECTION 5.17 *Milestones*. The Borrower will, and will cause each of the Loan Parties to, use their commercially reasonable efforts to pursue and implement the Restructuring (as defined in the RSA) in accordance with the RSA and in any event shall achieve the following milestones, which dates shall be automatically extended to the extent extended under the RSA in accordance with its terms and otherwise at any time with the written approval of the Required Financing Commitment Parties:

(a)    on or before three (3) Business Days after the Petition Date, the Bankruptcy Court shall have entered the Interim Order;

(b)    on or before thirty-five (35) days after entry of the Interim Order, the Bankruptcy Court shall have entered the Final Order;

(c)     on or before sixty (60) days after the Petition Date, the Bankruptcy Court shall have entered the Acceptable Confirmation Order and an order approving a disclosure statement (which may be the Acceptable Confirmation Order);

(d)     no later than seventy-five (75) days after the Petition Date, the Acceptable Plan shall have become effective.

SECTION 5.18 *Bankruptcy Related Matters*.   The Borrower will, and will cause each of the Loan Parties to,:

(a)     cause all proposed (i) First Day Orders, (ii) "second day" orders approving the relief granted in the First Day Orders on a final basis, (iii) orders related to or affecting the Loans and other Obligations and the Loan Documents, any other financing or use of cash collateral, any sale or other disposition of DIP Collateral outside the ordinary course, cash management, adequate protection, any Reorganization Plan and/or any disclosure statement related thereto, (iv) orders concerning the financial condition of the Borrower or any of its Subsidiaries or other Indebtedness of the Loan Parties or seeking relief under section 363, 365, 1113 or 1114 of the Bankruptcy Code or section 9019 of the Federal Rules of Bankruptcy Procedure, (v) orders authorizing additional payments to critical vendors (outside of the relief approved in the First Day Orders and "second day" orders) and (vi) orders establishing procedures for administration of the Cases or approving significant transactions submitted to the Bankruptcy Court, in each case, proposed by the Debtors to be in accordance with and permitted by the terms of this Agreement and reasonably acceptable to the Required Financing Commitment Parties in their reasonable discretion in all respects, it being understood and agreed that the forms of orders approved by the Required Financing Commitment Parties prior to the Petition Date are in accordance with and permitted by the terms of this Agreement and are reasonably acceptable in all respects;

(b)     comply in all material respects with each order entered by the Bankruptcy Court in connection with the Cases; and

(c)     consult in good faith with the Required Financing Commitment Parties' advisors regarding the form and substance of any documents described in <u>Section 5.01(p)</u> or <u>(q)</u> (except that with respect to any emergency pleading or document for which, advance notice is impracticable).

SECTION 5.19 *Post-Closing Matters*.   The Borrower will deliver (or caused to be delivered) to the Administrative Agent or the Collateral Agent, as applicable, each item set forth on <u>Schedule 5.19</u>, within the time period set forth therein, to the extent such item is not delivered on or before the Closing Date.

## ARTICLE VI

## Negative Covenants

The Borrower hereby covenants and agrees that from and after the date of this Agreement until the Payment in Full of the Obligations:

SECTION 6.01 *Restricted Payments.*

(a)     The Borrower will not, and will not permit any of its Subsidiaries to, directly or indirectly:

(i)        declare or pay any dividend or make any other payment or distribution on account of the Borrower's or any of its Subsidiaries' Equity Interests (including, without limitation, any payment in connection with any merger or consolidation involving the Borrower's or any of its Subsidiaries) or to the direct or indirect holders of the Borrower's or any of its Subsidiaries' Equity Interests in their capacity as such (other than dividends or distributions payable in Equity Interests (other than Disqualified Stock) of the Borrower);

(ii)        purchase, redeem or otherwise acquire or retire for value (including without limitation, in connection with any merger or consolidation involving the Borrower) any Equity Interests of the Borrower or any direct or indirect parent of the Borrower;

(iii)        make any payment on or with respect to, or purchase, redeem, defease or otherwise acquire or retire for value any Indebtedness of the Debtors arising prior to the Petition Date (other than (x) as expressly contemplated herein or in the Interim Order, Final Order, any First Day Order or related "second day" order and (y) in the ordinary course of business consistent with past practice in respect of any intercompany Indebtedness between or among the Borrower and any of its Subsidiaries incurred in the ordinary course of business consistent with past practice); provided that the provisions of this clause (iii) shall not be deemed to apply to any Indebtedness of any Subsidiary that is not a Subsidiary Guarantor (including any such Indebtedness guaranteed by the Borrower or any Subsidiary Guarantor); or

(iv)        make any Restricted Investment

(all such payments and other actions prohibited as set forth in these clauses (i) through (iv) above being collectively referred to as "**_Restricted Payments_**").

(b)        The provisions of <u>Section 6.01(a)</u> hereof will not prohibit, in each case to the extent consistent with the Approved DIP Budget and any applicable order of the Bankruptcy Court:

(i)        the payment of any dividend (or, in the case of any partnership or limited liability company, any similar distribution) by a Subsidiary of the Borrower to the holders of its Equity Interests on a pro rata basis; and

(ii)        the repurchase of Equity Interests deemed to occur upon the exercise of stock options or warrants to the extent such Equity Interests represent a portion of the exercise price of those stock options or warrants.

SECTION 6.02 **_Dividend and Other Payment Restrictions Affecting Subsidiaries._**

(a)        The Borrower will not, and will not permit any of its Subsidiaries to, directly or indirectly, create or permit to exist or become effective any consensual encumbrance or restriction on the ability of any Subsidiary to:

(i)        pay dividends or make any other distributions on its Equity Interest to the Borrower or any of its Subsidiaries, or with respect to any other interest or participation in, or measured by, its profits, or pay any indebtedness owed to the Borrower or any of its Subsidiaries (except for the waiving or deferring in the ordinary course of business

consistent with past practice subrogation and reimbursement rights in connection with the guarantee obligations permitted pursuant to this Agreement);

(ii)      make loans or advances to the Borrower or any of its Subsidiaries; or

(iii)     sell, lease or transfer any of its properties or assets to the Borrower or any of its Subsidiaries.

(b)      The restrictions in Section 6.02(a) hereof will not apply to encumbrances or restrictions existing under or by reason of:

(i)      agreements existing on the Closing Date as in effect on the date hereof and any amendments, restatements, modifications, renewals, supplements, refundings, replacements or refinancings of those agreements; provided that such amendments, restatements, modifications, renewals, supplements, refundings, replacements or refinancings are not materially more restrictive, taken as a whole, with respect to such dividend and other payment restrictions than those contained in those agreements on the date hereof;

(ii)      this Agreement and the other Loan Documents;

(iii)     agreements governing other Indebtedness permitted to be incurred pursuant to Section 6.03 and any amendments, restatements, modifications, renewals, supplements, refundings, replacements or refinancings of those agreements permitted to be incurred pursuant thereto; provided, that (A) the restrictions are ordinary and customary with respect to the type of Indebtedness being incurred and (B) such encumbrances or restrictions will not materially affect the Borrower's ability to make payments of principal or interest on the Loans, as determined at the time such Indebtedness is incurred in good faith by the senior management of the Borrower;

(iv)      applicable law, rule, regulation or order;

(v)      customary non-assignment provisions in contracts and licenses entered into in the ordinary course of business;

(vi)      Liens permitted to be incurred under the provisions of Section 6.06 hereof that limit the right of the debtor to dispose of the assets subject to such Liens;

(vii)     restrictions on cash or other deposits or net worth imposed by customers under contracts entered into in the ordinary course of business;

(viii)    purchase money obligations for property acquired in the ordinary course of business and Capitalized Lease Obligations that impose restrictions on the property purchased or leased of the nature described in clause (iii) of Section 6.02(a) hereof; and

(ix)      provisions limiting the disposition or distribution of assets or property in joint venture agreements, sale-leaseback agreements, stock sale agreements and other similar agreements (including agreements entered into in connection with a Restricted Investment) entered into with the approval of the Borrower's board of directors, which limitation is applicable only to the assets that are the subject of such agreements.

SECTION 6.03 *Incurrence of Indebtedness and Issuance of Preferred Stock.*

(a)       The Borrower will not, and will not permit any of its Subsidiaries to, directly or indirectly, create, incur, issue, assume, guarantee or otherwise become directly or indirectly liable, contingently or otherwise, with respect to (collectively, "***incur***") any Indebtedness, and the Borrower will not issue any Disqualified Stock and will not permit any of its Subsidiaries to issue any shares of preferred stock.

(b)       The provisions of <u>Section 6.03(a)</u> hereof will not prohibit the incurrence of any of the following items of Indebtedness (collectively, "***Permitted Debt***"):

(i)       Indebtedness (and Guarantees thereof) existing on the Petition Date (other than Indebtedness of foreign Subsidiaries of the Borrower);

(ii)       Indebtedness created hereunder and under the other Loan Documents;

(iii)       The incurrence by the Borrower or any of its Subsidiaries of Indebtedness represented by Capitalized Lease Obligations, mortgage financings or purchase money obligations, in each case, incurred for the purpose of financing all or any part of the purchase price or cost of design, construction, installation or improvement of property, plant or equipment used in the business of the Borrower or any of its Subsidiaries, in an aggregate principal amount, including all Permitted Refinancing Indebtedness incurred to renew, refund, refinance, replace, defease or discharge any Indebtedness incurred pursuant to this clause (iii), not to exceed $5,000,000 at any time outstanding;

(iv)       the incurrence by the Borrower or any of its Subsidiaries of Bank Product Obligations in the ordinary course of business and of Hedging Obligations entered into prior to the Petition Date in order to manage existing or anticipated interest rate, exchange rate or commodity price risks and not for speculative purposes;

(v)       the incurrence by the Borrower or any of its Subsidiaries of Indebtedness owing under documentary or standby letters of credit for the purchase of goods or other merchandise generally;

(vi)       The incurrence by the Borrower or any of its Subsidiaries of Indebtedness in respect of workers' compensation claims, self-insurance obligations, bankers' acceptances, performance and surety bonds in the ordinary course of business;

(vii)       The incurrence by the Borrower or any of its Subsidiaries of Indebtedness owing under overdraft facilities in connection with cash management arrangements in the ordinary course of business;

(viii)       the incurrence by (x) foreign Subsidiaries of the Borrower of Indebtedness in an aggregate amount (or accreted value, as applicable) at any time outstanding not to exceed $875,000,000 and (y) the Borrower or any of its Subsidiaries of Indebtedness in an aggregate amount (or accreted value, as applicable) at any time outstanding not to exceed $5,000,000;

(ix)       Guarantees by the Borrower or any Subsidiary which are incurred in the ordinary course of business for the purpose of carrying unsold tobacco inventories held

against Confirmed Orders and other Guarantees by the Borrower or any Subsidiary incurred in the ordinary course of business with respect to Uncommitted Inventories in an aggregate amount not to exceed the amount of such Uncommitted Inventories;

(x)    To the extent constituting Indebtedness, financings permitted under Section 6.04(l);

(xi)    the incurrence by the Borrower or any of its Subsidiaries of Permitted Refinancing Indebtedness in exchange for, or the net proceeds of which are used to renew, refund, refinance, replace, defease or discharge any Indebtedness that was permitted by this Agreement to be incurred under clauses (iii), (viii) or (xi) of this Section 6.03(b);

(xii)    the incurrence by the Borrower or any of its Subsidiaries of intercompany Indebtedness between or among the Borrower and any of its Subsidiaries in the ordinary course of business consistent with past practice; provided, that any such Indebtedness, to the extent owed by the Borrower or any Subsidiary Guarantor, shall be unsecured and expressly subordinated to the prior payment in full in cash of all Obligations and an intercompany note evidencing such indebtedness owed to a Loan Party shall delivered to the Collateral Agent pursuant to Section 5.13 and 5.19; and

(xiii)    the Guarantee by the Borrower or any of its Subsidiaries of Indebtedness of the Borrower or a Subsidiary of the Borrower to the extent that the guaranteed Indebtedness was permitted to be incurred by another provision of this Section 6.03; provided that if the Indebtedness being guaranteed is subordinated to or pari passu with the Credit Facility, then the Guarantee must be subordinated or pari passu, as applicable, to the same extent as the Indebtedness guaranteed.

For purposes of determining compliance with this Section 6.03, in the event that an item of Indebtedness meets the criteria of more than one of the categories of Permitted Debt described in clauses (i) through (xiii) above the Borrower will be permitted to classify such item of Indebtedness on the date of its incurrence, or later reclassify all or a portion of such item of Indebtedness, in any manner that complies with this Section 6.03.

The Borrower will not incur, and will not permit any Subsidiary Guarantor to incur, any Indebtedness (including Permitted Debt) that is contractually subordinated in right of payment to any other Indebtedness of the Borrower or such Subsidiary Guarantor unless such Indebtedness is also contractually subordinated in right of payment to the Credit Facility and the Guarantees thereof on substantially identical terms; provided, however, that no Indebtedness will be deemed to be contractually subordinated in right of payment to any other Indebtedness of the Borrower solely by virtue of being unsecured or by virtue of being secured on junior priority basis.

The accrual of interest or preferred stock dividends and the accretion or amortization of original issue discount will not be deemed to be an incurrence of Indebtedness or an issuance of preferred stock or Disqualified Stock for purposes of this covenant. For purposes of determining compliance with any U.S. dollar-denominated restriction on the incurrence of Indebtedness, the U.S. dollar-equivalent principal amount of Indebtedness denominated in a foreign currency shall be utilized, calculated based on the relevant currency exchange rate in effect on the date such Indebtedness was incurred. Notwithstanding any other provision of this Section 6.03, the maximum amount of Indebtedness that the Borrower or any Subsidiary may incur pursuant to this

Section 6.03 shall not be deemed to be exceeded solely as a result of fluctuations in exchange rates or currency values.

The amount of any Indebtedness outstanding as of any date will be:

(i)    the accreted value of the Indebtedness, in the case of any Indebtedness issued with original issue discount;

(ii)    the principal amount of the Indebtedness, in the case of any other Indebtedness; and

(iii)    in respect of Indebtedness of another Person secured by a Lien on the assets of the specified Person, the lesser of:

(A)    the Fair Market Value of such assets at the date of determination; and

(B)    the amount of the Indebtedness of the other Person.

SECTION 6.04 *Consolidation, Merger, Purchase or Sale of Assets, etc.*

The Borrower will not, and will not permit any of its Subsidiaries to, wind up, liquidate or dissolve its affairs or enter into any partnership, joint venture, or transaction of merger or consolidation, or convey, sell, lease or otherwise dispose of all or any part of its property or assets, or enter into any sale-leaseback transactions, or purchase or otherwise acquire (in one or a series of related transactions) any part of the property or assets (other than purchases or other acquisitions of inventory, materials, equipment, goods and services in the ordinary course of business) of any Person, except that:

(a)    Capital Expenditures by the Borrower and its Subsidiaries shall be permitted (other than Capital Expenditures constituting an acquisition) in an amount not to exceed $8,000,000 after the date hereof in accordance with the capital expenditures budget delivered to the Lenders prior to the date hereof or the Approved DIP Budget;

(b)    the Borrower and its Subsidiaries may sell inventory in the ordinary course of business;

(c)    the Borrower and its Subsidiaries may liquidate or otherwise dispose of obsolete, expired, worn-out, excess or redundant property in the ordinary course of business;

(d)    Permitted Investments may be made;

(e)    the Borrower and its Subsidiaries may lease (as lessee) or license (as licensee) real or personal property (so long as any such lease or license does not create a Capitalized Lease Obligation except to the extent permitted by Section 6.03(b)(iii));

(f)    the Borrower and its Subsidiaries may sell or discount, in each case without recourse and in the ordinary course of business, Accounts arising in the ordinary course of business, but only in connection with the compromise or collection thereof and not as part of any financing transaction;

(g)    the Borrower and its Subsidiaries may grant non-exclusive licenses, sublicenses, leases or subleases to other Persons not materially interfering with the conduct of the business of the Borrower or any of its Subsidiaries, in each case so long as no such grant otherwise affects the Collateral Agent's security interest in the asset or property subject thereto;

(h)    the Borrower and its Subsidiaries may liquidate or otherwise dispose of Cash Equivalents in the ordinary course of business, in each case for cash at Fair Market Value;

(i)    the Borrower and its Subsidiaries may make dispositions resulting from any taking under power of eminent domain or by condemnation or similar proceeding of, any property or asset of the Borrower or its Subsidiaries to the extent such taking or condemnation could not, either individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect;

(j)    Dividends may be paid to the extent permitted by <u>Section 6.01</u>;

(k)    the Borrower and its Subsidiaries may dispose of property and assets to the extent such property and assets were the subject of a casualty or of condemnation proceedings upon the occurrence of the related Recovery Event;

(l)    the sale of Accounts arising from sales of tobacco, which Accounts are sold pursuant to the Existing Securitization Facilities or substantially similar factoring arrangements without recourse;

(m)    the Borrower and its Subsidiaries may cancel or abandon intellectual property rights which are, in the reasonable business judgment of the Borrower or such Subsidiary, no longer material to, or no longer used or useful in the business of the Borrower or such Subsidiary;

(n)    the dissolution, liquidation or winding up of a Subsidiary (other than a Guarantor) of the Borrower, if the Borrower determines in good faith that such a dissolution, liquidation or winding up is in the best interests of the Borrower and its Subsidiaries and is not materially disadvantageous to the Lenders; and

(o)    the Borrower and its Subsidiaries may consummate the Corporate Restructuring Transaction and transactions listed on <u>Schedule 6.04</u>.

To the extent the Required Lenders waive the provisions of this <u>Section 6.04</u> with respect to the sale of any Collateral, or any Collateral is sold as permitted by this <u>Section 6.04</u> (other than to the Borrower or a Subsidiary thereof), such Collateral shall be sold free and clear of the Liens created by the Security Documents, and the Administrative Agent and the Collateral Agent shall be authorized to take any actions deemed appropriate in order to effect and/or evidence the foregoing; <u>provided</u>, <u>however</u>, that the Administrative Agent's Lien shall attach to the proceeds of any such sale.   In connection with a termination or release pursuant to this Section, the Administrative Agent and the Collateral Agent shall promptly execute and deliver to the applicable Loan Party, at the Borrower's expense, all documents that the applicable Loan Party shall reasonably request to evidence such termination or release, as applicable.

SECTION 6.05 *Transactions with Affiliates.*

The Borrower will not, and will not permit any of its Subsidiaries to, enter into any transaction or series of transactions with any officer, director, shareholder or Affiliate other than (a) transactions between the Borrower and any of its Subsidiaries in the ordinary course of business consistent with past

practices as of the date hereof, (b) transactions on terms and conditions substantially as favorable as would be obtainable in a comparable arm's-length transaction with a Person other than an officer, director, shareholder or Affiliate and (c) loans or advances to employees in the ordinary course of business after the Petition Date not to exceed $500,000 in the aggregate at any one time outstanding (determined without regard to any write-downs or write-offs of such loans and advances).

SECTION 6.06 *Liens.*

The Borrower will not, and will not permit any of its Subsidiaries to, create, incur, assume or suffer to exist any Lien upon or with respect to any property or assets (real or personal, tangible or intangible) of the Borrower or any of its Subsidiaries, whether now owned or hereafter acquired, or sell any such property or assets subject to an understanding or agreement, contingent or otherwise, to repurchase such property or assets (including sales of Accounts), or assign any right to receive income or permit the filing of any financing statement under the UCC or any other similar or equivalent notice of Lien under any similar or equivalent recording or notice statute in any jurisdiction; *provided* that the provisions of this Section 6.06 shall not prevent the creation, incurrence, assumption or existence of the following (Liens described below are herein referred to as "*Permitted Liens*"):

(a)     inchoate Liens for taxes, assessments or governmental charges or levies not yet delinquent or Liens for taxes, assessments or governmental charges or levies being contested in good faith and by appropriate proceedings for which adequate reserves have been established in accordance with GAAP;

(b)     Liens in respect of property or assets of the Borrower or any of its Subsidiaries imposed by law, which were incurred in the ordinary course of business and do not secure Indebtedness for borrowed money, such as carriers', warehousemen's, materialmen's and mechanics' liens and other similar Liens arising in the ordinary course of business, and (i) which do not in the aggregate materially detract from the value of the Borrower's or such Subsidiary's property or assets or materially impair the use thereof in the operation of the business of the Borrower or such Subsidiary or (ii) which are being contested in good faith by appropriate proceedings, which proceedings have the effect of preventing the forfeiture or sale of the property or assets subject to any such Lien;

(c)     (i) Liens in existence on the Closing Date on assets of the Debtors which are listed in Schedule 6.06 and (ii) Liens in existence on the Closing Date on assets of the Subsidiaries of the Borrower that are not Debtors which are listed in Schedule 6.06 and any modifications, replacements, renewals or extensions thereof; provided that (A) such modified, replacement, renewal or extension Lien does not extend to any additional property other than (i) after-acquired property that is affixed or incorporated into the property covered by such Lien, (ii) to the extent otherwise constituting a Permitted Lien and (iii) proceeds and products thereof, and (B) the obligations secured or benefited by such modified, replacement, renewal or extension Lien are permitted by Section 6.03;

(d)     (i) Liens created by or pursuant to this Agreement and the Security Documents and (ii) Liens granted as adequate protection on account of the First Lien Notes Obligations and Second Lien Notes Obligations and otherwise pursuant to and in accordance with the Orders;

(e)     (i) licenses, sublicenses, leases or subleases granted by the Borrower or any of its Subsidiaries to other Persons not materially interfering with the conduct of the business of the Borrower or any of its Subsidiaries and (ii) any interest or title of a lessor, sublessor or licensor

under any lease or license agreement not prohibited by this Agreement to which the Borrower or any of its Subsidiaries is a party;

(f)    Liens upon assets of the Borrower or any of its Subsidiaries subject to Capitalized Lease Obligations to the extent such Capitalized Lease Obligations are permitted by Section 6.03(b)(iii); *provided* that (i) such Liens only serve to secure the payment of Indebtedness arising under such Capitalized Lease Obligation and (ii) the Lien encumbering the asset giving rise to the Capitalized Lease Obligation does not encumber any asset of the Borrower or any other asset of the Borrower or any Subsidiary of the Borrower, other than proceeds of such asset;

(g)    Liens placed upon equipment, machinery or other capital asset acquired after the Closing Date and used in the ordinary course of business of the Borrower or any of its Subsidiaries and placed at the time of the acquisition thereof by the Borrower or such Subsidiary or within 90 days thereafter to secure Indebtedness incurred to pay all or a portion of the purchase price thereof or to secure Indebtedness incurred solely for the purpose of financing the acquisition of any such equipment, machinery or capital asset or extensions, renewals or replacements of any of the foregoing for the same or a lesser amount; *provided* that (i) the Indebtedness secured by such Liens is permitted by Section 6.03(b)(iii) and (ii) in all events, the Lien encumbering the equipment or machinery so acquired does not encumber any other asset of the Borrower or such Subsidiary, other than proceeds of such asset;

(h)    zoning restrictions, easements, rights-of-way, use restrictions, encroachments and other similar charges or encumbrances, and minor title deficiencies, in each case not securing Indebtedness and not materially interfering with the conduct of the business of the Borrower or any of its Subsidiaries (taken as a whole);

(i)    Liens arising from precautionary UCC financing statement filings regarding operating leases entered into in the ordinary course of business;

(j)    Liens arising out of the existence of judgments or awards; *provided* that in the case of any Loan Party, the Borrower or any other Loan Party shall in good faith be prosecuting an appeal or proceedings for review and in respect of which there shall have been secured a subsisting stay of execution pending such appeal or proceedings and the Borrower or the applicable Loan Party shall have set aside on its books, if required by GAAP, appropriate reserves for such Liens, *provided*, *further*, that the aggregate amount of all cash and the Fair Market Value of all other property subject to such Liens arising after the Petition Date does not exceed the Threshold Amount;

(k)    statutory and common law landlords' liens under leases to which the Borrower or any of its Subsidiaries is a party;

(l)    attachment, judgment or similar Liens arising in connection with court proceedings that are not stayed by the Cases; *provided*, that the execution or other enforcement of such Liens with respect to judgments or decrees in the aggregate do not give rise to an Event of Default under Section 7.09 is effectively stayed, the claims secured thereby are being actively contested in good faith by appropriate proceedings and the applicable Loan Party or Subsidiary shall have set aside on its books, if required by GAAP, appropriate reserves for such Liens;

(m)    in respect of any real property, any facts that are disclosed by any survey thereof or title insurance with respect thereto that do not materially impair the value of such real property or the operations conducted on such real property;

(n)    Liens arising out of any conditional sale, title retention, consignment or other similar arrangements for the sale of goods entered into by the Borrower or any of its Subsidiaries in the ordinary course of business to the extent such Liens do not attach to any assets other than the goods subject to such arrangements;

(o)    Liens (i) incurred in the ordinary course of business in connection with the purchase or shipping of goods or assets (or the related assets and proceeds thereof), which Liens are in favor of the seller or shipper of such goods or assets and only attach to such goods or assets, and (ii) in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods;

(p)    bankers' Liens, rights of setoff and other similar Liens existing solely with respect to cash and Cash Equivalents on deposit in one or more accounts maintained by the Borrower or any of its Subsidiaries, in each case granted in the ordinary course of business in favor of the bank or banks or other financial institutions with which such accounts are maintained, securing amounts owing to such bank or banks with respect to cash management and operating account arrangements;

(q)    Liens granted in the ordinary course of business on insurance policies, proceeds thereof and the unearned portion of insurance premiums with respect thereto securing the financing of the unpaid cost of the insurance policies to the extent the financing is permitted under Section 6.03;

(r)    Liens (not securing Indebtedness) which are incurred in the ordinary course of business in connection with workers' compensation, unemployment insurance, old-age pensions, social security and public liability laws and similar legislation;

(s)    Liens securing the performance of bids, tenders, leases, contracts (other than for the repayment of Indebtedness), statutory obligations, and other obligations of like nature, incurred as an incident to and in the ordinary course of business; and

(t)    Liens on Accounts arising from transactions permitted by both Section 6.04(l) and 6.03(b)(x);

(u)    the Carve Out;

(v)    Liens on the assets of a Foreign Subsidiary that is not a Loan Party securing foreign lines of credit of the Foreign Subsidiaries in an aggregate principal amount at any time outstanding not to exceed $450,000,000; and

(w)    Liens existing on any asset prior to the acquisition thereof by a Loan Party or a Subsidiary and not created in contemplation of such event and do not attach to any other asset; and

(x)    additional Liens (other than over DIP Collateral) of the Borrower or any of its Subsidiaries not otherwise permitted by this Section 6.06 that do not secure Indebtedness in a principal amount in excess of $5,000,000 in the aggregate for all such Liens at any time.

In connection with the granting of Liens of the type described in clauses (c), (f), (g), (i), (t) and (x) of this Section 6.06 by the Borrower or any of its Subsidiaries, the Administrative Agent and the Collateral Agent shall be authorized to take any actions deemed appropriate by it in connection therewith (including,

without limitation, by executing appropriate lien releases in favor of the holder or holders of such Liens, in either case solely with respect to the item or items of equipment or other assets subject to such Liens).

SECTION 6.07 *Business Activities.*

The Borrower will not, and will not permit any of its Subsidiaries to, engage directly or indirectly in any business other than the businesses engaged in by it and its Subsidiaries as of the date hereof and reasonable extensions thereof and businesses ancillary or complementary thereto.

SECTION 6.08 *Corporate Existence.*

Except as otherwise contemplated under <u>Section 5.04</u>, the Borrower shall do or cause to be done all things necessary to preserve and keep in full force and effect:

(a)    its corporate existence, and the corporate, partnership or other existence of each of its Subsidiaries, in accordance with the respective organizational documents (as the same may be amended from time to time) of the Borrower or any such Subsidiary; and

(b)    the rights (charter and statutory), licenses and franchises of the Borrower and its Subsidiaries.

SECTION 6.09 *Budget Covenant*.  The Debtors shall not permit, as of any Variance Report Date, (x) the actual aggregate operating disbursements (excluding professional fees) or Capital Expenditures of the Loan Parties and their Subsidiaries for any Variance Testing Period to exceed 115% (or, in the case of any Variance Testing Period of less than four weeks, 120%) of the projected aggregate operating disbursements (excluding professional fees) or Capital Expenditures, as applicable, of the Loan Parties and their Subsidiaries for such period set forth in the Approved DIP Budget, or (y) the actual aggregate receipts for the Variance Testing Period to be less than 85% (or, in the case of any Variance Testing Period of less than four weeks, 80%) of the projected aggregate receipts for such period set forth in the Approved DIP Budget.

SECTION 6.10 *Use of Proceeds*.

(a)    The Borrower will not use the proceeds of any Credit Event, whether directly or indirectly, in a manner inconsistent with the uses set forth in <u>Section 3.08</u>.

(b)    The Borrower will (i) not contribute or otherwise make available the proceeds of any Loan or any Credit Event hereunder, directly or indirectly, to any person or entity (whether or not related to the Borrower, any of its Subsidiaries or member of its group of companies) for the purpose of financing the activities of any Sanctioned Person, to the extent such contribution or provision of proceeds would be prohibited by Sanctions or would otherwise, to the knowledge and belief of the Borrower, cause any person to be in breach of Sanctions; (ii) not fund all or part of any repayment of any Loans or Obligations hereunder out of proceeds derived from transactions which would be prohibited by Sanctions or would otherwise cause any person to be in breach of Sanctions; and (iii) ensure that appropriate controls and safeguards are in place designed to prevent any proceeds of any Loan or any Credit Event hereunder from being used contrary to clause (i) above.

SECTION 6.11 *Additional Bankruptcy Matters*.

The Borrower will not, and will not permit its Subsidiaries, to do any of the following:

(a)    assert, join, investigate, support or prosecute any claim or cause of action against any of the Secured Parties (in their capacities as such), unless such claim or cause of action is in connection with the enforcement of the Loan Documents or the RSA against any of the Secured Parties; *provided* that nothing contained in this Section 6.11(a) shall prohibit the Debtors from responding to or complying with discovery requests of any statutory committee appointed or appearing in the Cases, in whatever form, made in connection with an investigation against any of the Secured Parties or the payment from proceeds of the Loans of professional fees related thereto;

(b)    in the case of the Debtors, enter into any agreement to return any of its inventory to any of its creditors for application against any pre-petition Indebtedness, pre-petition trade payables or other pre-petition claims under Section 546(c) of the Bankruptcy Code or agree that any creditor may take any setoff or recoupment against any of its pre-petition Indebtedness, pre-petition trade payables or other pre-petition claims based upon any such return pursuant to Section 553(b)(1) of the Bankruptcy Code or otherwise if, after giving effect to any such agreement, setoff or recoupment, the aggregate amount applied to pre-petition Indebtedness, pre-petition trade payables and other pre-petition claims subject to all such agreements, setoffs and recoupments since the Petition Date would exceed $250,000;

(c)    subject to the terms of the Orders and subject to Article VII, object to, contest, delay, prevent or interfere with in any material manner the exercise of rights and remedies by the Agents, the Lenders or other Secured Parties with respect to the DIP Collateral following the occurrence of an Event of Default, including without limitation a motion or petition by any Secured Party to lift an applicable stay of proceedings to do the foregoing (*provided* that any Loan Party may contest or dispute whether an Event of Default has occurred in accordance with the terms of the Orders);

(d)    except as expressly provided or permitted under this Agreement (including, without limitation, to the extent pursuant to the Orders, any First Day Orders or "second day" orders) or as otherwise contemplated in the then Approved DIP Budget, make any payment or distribution to any non-Debtor Affiliate or insider of any Debtor outside of the ordinary course of business;

(e)    hold any proceeds of the Loans in any account other than the DIP Proceeds Account, pending application thereof in accordance with this Agreement; or

(f)    without the consent of the Required Financing Commitment Parties, move to assume or reject any material lease, material license or other material contract of any Debtor pursuant to Section 365 of the Bankruptcy Code.

SECTION 6.12 *Minimum Liquidity*.    On the last Business Day of each week following the Closing Date, the Borrower shall not allow Liquidity to be less than (a) prior to the Final Order Entry Date, $15,000,000 and (b) thereafter, $25,000,000, in either case on the last Business Day of two consecutive such weeks.

## ARTICLE VII

### Events of Default

Upon the occurrence of any of the following specified events (each, an "***Event of Default***"):

SECTION 7.01 **Payments**.  The Borrower shall (a) default in the payment when due of any principal of any Loan, or (b) default, and such default shall continue unremedied for three or more Business Days, in the payment when due of any interest on any Loan or any fees or any other amounts owing hereunder or under any other Loan Document; or

SECTION 7.02 **Representations, etc**.  Any representation, warranty or statement made or deemed made by any Loan Party herein or in any other Loan Document or in any certificate delivered to the Administrative Agent or any Lender pursuant hereto or thereto shall prove to be untrue in any material respect (or any respect, to the extent qualified by materiality or Material Adverse Effect) on the date as of which made or deemed made; or

SECTION 7.03 **Covenants**.  The Borrower or any of its Subsidiaries shall (a) default in the due performance or observance by it of any term, covenant or agreement contained in Sections 5.01(e), 5.01(f), 5.01(p), 5.01(q), 5.04, 5.17, or Article VI, (b) default in the due performance or observance by it of Section 5.01(g), 5.01(h), 5.01(o), 5.01(r), 5.07, 5.16 or 5.18 so long as such default shall continue unremedied for a period of five days or (c) default in the due performance or observance by it of any other term, covenant or agreement contained in this Agreement (other than those set forth in Sections 7.01 or 7.02 or clause (a) or (b) above) and such default shall continue unremedied for a period of twenty days after the earlier of (i) the date on which such default shall first become known to any Responsible Officer of the Borrower or any other Loan Party or (ii) the date on which written notice thereof is given to the defaulting party by the Administrative Agent or the Required Lenders; or

SECTION 7.04 **Default under Other Agreements**.  Except as a result of the commencement of the Cases or unless the payment, acceleration and/or exercise of remedies with respect to any such Indebtedness is stayed by the Bankruptcy Court, (a) the Borrower or any of its Subsidiaries shall (i) default in any payment of any Indebtedness (other than the Obligations) beyond the period of grace, if any, provided in an instrument or agreement under which such Indebtedness was created or (ii) default in the observance or performance of any agreement or condition relating to any Indebtedness (other than the Obligations) or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event shall occur or condition exist, the effect of which default or other event or condition is to cause, or to permit the holder or holders of such Indebtedness incurred after the Petition Date (or a trustee or agent on behalf of such holder or holders) to cause (determined without regard to whether any notice is required), any such Indebtedness to become due prior to its Stated Maturity, or (b) any Indebtedness (other than the Obligations) of the Borrower or any of its Subsidiaries shall be declared to be (or shall become) due and payable prior to the Stated Maturity thereof; provided that it shall not be a Default or an Event of Default under this Section 7.04 unless the aggregate principal amount of all Indebtedness as described in preceding clauses (a) and (b) is at least equal to the Threshold Amount; or

SECTION 7.05 **Bankruptcy, etc**.  In each case other than the Cases: the Borrower or any of its Subsidiaries shall commence a voluntary case concerning itself under the Bankruptcy Code; or an involuntary case (including an expropriation, attachment, sequestration, distress or execution or an analogous process in any jurisdiction affecting any assets of the Borrower or any of its Subsidiaries) is commenced against the Borrower or any of its Subsidiaries, and the petition, claim or process in the case of an involuntary case is not dismissed within sixty days after the filing thereof, provided, however, that during the pendency of such period, each Lender shall be relieved of its obligation to extend credit hereunder; or a custodian (as defined in the Bankruptcy Code), liquidator, receiver, administrative receiver, administrator, reconstructor, compulsory manager, or other similar officer is appointed for, or takes charge of, all or substantially all of the property of the Borrower or any of its Subsidiaries, to operate all or any substantial portion of the business of the Borrower or any of its Subsidiaries, or the Borrower or any of its Subsidiaries commences any other proceeding under any reorganization, arrangement, adjustment of debt, relief of debtors, dissolution, insolvency, administration, creditor

voluntary arrangement, receivership, composition, compromise, assignment or similar arrangement with creditors by reason of actual or anticipated financial difficulties or liquidation or similar law of any jurisdiction whether now or hereafter in effect relating to the Borrower or any of its Subsidiaries (other than the Cases), or there is commenced against the Borrower or any of its Subsidiaries any such proceeding which remains undismissed for a period of 60 days after the filing thereof, or the Borrower or any of its Subsidiaries is adjudicated insolvent or bankrupt (other than in connection with the Cases); or any order of relief, moratorium or other order approving any such case or proceeding (other than the Cases) is entered; or the Borrower or any of its Subsidiaries makes a general assignment for the benefit of creditors; or any Business action is taken by the Borrower or any of its Subsidiaries for the purpose of effecting any of the foregoing; or

SECTION 7.06 *ERISA.*

(a)       One or more ERISA Events shall have occurred;

(b)       there is or arises an actual Unfunded Pension Liability (taking into account only Plans with positive Unfunded Pension Liability);

(c)       any material contribution required to made with respect to a Foreign Pension Plan has not been timely made; or

(d)       there is or arises any potential withdrawal liability under Section 4201 of ERISA, if the Borrower, any Subsidiary of the Borrower or the ERISA Affiliates were to withdraw completely from any and all Multiemployer Plans;

and the liability of any or all of the Borrower, any Subsidiary of the Borrower and the ERISA Affiliates contemplated by the foregoing clauses (a), (b), (c) and (d), either individually or in the aggregate, has had, or could be reasonably expected to have, a Material Adverse Effect; or

SECTION 7.07 *Security Documents*.  Any of the Security Documents shall cease to be in full force and effect, or shall cease to give the Collateral Agent for the benefit of the Secured Parties (other than pursuant to the terms hereof) a perfected security interest in, and Lien on, all of the Collateral covered thereby, in favor of the Collateral Agent, superior to and prior to the rights of all third Persons (except in accordance with the Orders), and subject to no other Liens (except as permitted by Section 6.06), or any Loan Party shall default in the due performance or observance of any term, covenant or agreement on its part to be performed or observed pursuant to any such Security Document and such default shall continue beyond the period of grace, if any, specifically applicable thereto pursuant to the terms of such Security Document; or

SECTION 7.08 *Guaranties*.  The Guarantee Agreement or any provision thereof shall cease to be in full force or effect as to any Subsidiary Guarantor, or any Subsidiary Guarantor or any Person acting for or on behalf of such Subsidiary Guarantor shall deny or disaffirm such Subsidiary Guarantor's obligations under the Guarantee Agreement or any Subsidiary Guarantor shall default in the due performance or observance of any term, covenant or agreement on its part to be performed or observed pursuant to the Guarantee Agreement; or

SECTION 7.09 *Judgments*.  Except for any order fixing the amount of any claim in the Cases, one or more judgments or decrees shall be entered against the Borrower or any Subsidiary of the Borrower involving in the aggregate for the Borrower and its Subsidiaries a liability (to the extent not paid or not covered by a reputable and solvent insurance company) and such judgments and decrees either shall be final and non-appealable or shall not be vacated, discharged or stayed or bonded pending appeal

for any period of thirty consecutive days, and the aggregate amount of all such judgments equals or exceeds the Threshold Amount; or

SECTION 7.10 *Change of Control*.  A Change of Control shall occur; or

SECTION 7.11 *RSA*.    The RSA shall have terminated for any reason by the Debtors, the Required Consenting First Lien Noteholders (as such term is defined in the RSA) or, other than as a result of a breach thereof by any Consenting Second Lien Noteholder (as defined in the RSA) that is also a Lender, the Required Consenting Second Lien Noteholders (as such term is defined in the RSA), or is modified, amended or waived in any manner materially adverse to the Secured Parties without the prior consent of the Administrative Agent at the direction of Required Financing Commitment Parties;

SECTION 7.12 *Cases*.  There shall occur any of the following in the Cases:

(a)    the bringing of a motion or taking of any action by any of the Debtors or any Subsidiary, or any person claiming to act by or through any Debtor or any Subsidiary (i) to grant any Lien other than Liens permitted pursuant to Section 6.06 or the Orders upon or affecting any DIP Collateral or (ii) to use cash collateral of the Agents and the other Secured Parties under Section 363(c) of the Bankruptcy Code without the prior written consent of the Required Financing Commitment Parties, except as provided in the Interim Order or Final Order;

(b)    the entry of an order in any of the Cases confirming a Reorganization Plan that is not an Acceptable Plan;

(c)    (A) the entry of an order amending, supplementing, staying, vacating or otherwise modifying the Interim Order or the Final Order in any material respect without the written consent of the Required Financing Commitment Parties, the filing of a motion by a Loan Party or any Subsidiary thereof for reconsideration with respect to the Interim Order or the Final Order, or the Interim Order or the Final Order shall otherwise not be in full force and effect or (B) any Debtor or any Subsidiary shall fail to comply with the Orders in any material respect;

(d)    the allowance of any claim or claims under Section 506(c) of the Bankruptcy Code or otherwise against any Agent, any Lender, any other Secured Party or any of the DIP Collateral;

(e)    the appointment of a trustee, receiver or an examiner (other than a fee examiner) in the Cases with expanded powers to operate or manage the financial affairs, the business, or reorganization of the Debtors;

(f)    the dismissal of any Case, or the conversion of any Case from one under Chapter 11 to one under Chapter 7 of the Bankruptcy Code, or any Debtor shall file a motion or other pleading seeking the dismissal of the Case under Section 1112 of the Bankruptcy Code or otherwise;

(g)    any Debtor shall file a motion seeking, or the Bankruptcy Court shall enter an order granting, relief from or modification of the Automatic Stay (i) to allow any creditor (other than the Agents) to execute upon or enforce a Lien on any DIP Collateral with a value in excess of $2,500,000, (ii) except as set forth in the RSA, approving any settlement or other stipulation not approved by the Required Financing Commitment Parties (which approval shall not be unreasonably withheld) with any secured creditor of any Debtor providing for payments as adequate protection or otherwise to such secured creditor or (iii) with respect to any Lien on or

the granting of any Lien on any DIP Collateral to any federal, state or local environmental or regulatory agency or authority;

(h)    the commencement of a suit or an action (but not including a motion for standing to commence a suit or an action) by a Loan Party or any Subsidiary thereof against any Agent, any Lender or any other Secured Party, where such suit or action asserts or seeks by or on behalf of a Debtor, a claim or any legal or equitable remedy that would (x) have the effect of invalidating, subordinating or challenging any or all of the Obligations or Liens of any Agent (on behalf of the Secured Parties) to any other claim, or (y) have a Material Adverse Effect on the rights and remedies of any Agent or the collectability of all or any portion of the Obligations (other than a challenge as to whether an Event of Default has, in fact, occurred and is continuing);

(i)    the entry of an order in the Cases terminating the exclusive right of any Debtor to file a Chapter 11 plan pursuant to Section 1121 of the Bankruptcy Code;

(j)    there shall arise or be granted by the Bankruptcy Court (i) any claim having priority over any or all administrative expenses of the kind specified in clause (b) of Section 503 of the Bankruptcy Code or clause (b) of Section 507 of the Bankruptcy Code (other than the Carve Out) or (ii) any Lien on the DIP Collateral having a priority senior to or pari passu with the Liens and security interests granted herein, except, in each case, as expressly provided in the Loan Documents or in the Orders then in effect (but only in the event specifically consented to by the Administrative Agent (at the direction of the Required Financing Commitment Parties)), whichever is in effect;

(k)    an order of the Bankruptcy Court shall be entered denying or terminating use of cash collateral by the Debtors;

(l)    the filing of any motion by the Debtors seeking approval of (or the entry of an order by the Bankruptcy Court approving) adequate protection in respect of the First Lien Notes Obligations that is inconsistent with an Order;

(m)    without the Required Financing Commitment Parties' consent, the entry of any order by the Bankruptcy Court granting, or the filing by any Debtor or any of its Subsidiaries of any motion or other request with the Bankruptcy Court (in each case, other than the Orders and motions seeking entry thereof or permitted amendments or modifications thereto) seeking authority to use any cash proceeds of any of the DIP Collateral other than in accordance with this Agreement or to obtain any financing under Section 364 of the Bankruptcy Code other than pursuant to the Loan Documents;

(n)    without the Required Financing Commitment Parties' consent, the filing by any Debtor or any of its Subsidiaries of any motion or other request with the Bankruptcy Court seeking authority to consummate a sale of material assets constituting DIP Collateral outside the ordinary course of business and not permitted hereunder;

(o)    any Debtor shall make any payment (whether by way of adequate protection or otherwise) of principal or interest or otherwise on account of any of its pre-petition Indebtedness or payables other than payments authorized or required by one or more First Day Orders or related "second day" orders or any of the Orders (or other orders with the consent of Required Financing Commitment Parties) and consistent with the then Approved DIP Budget; or

(p)    the filing by any of the Debtors of a Reorganization Plan other than an Acceptable Plan;

SECTION 7.13 ***Specified Agreements***.    The events described on <u>Schedule 7.13</u> shall have occurred.

then, and in every such event, and at any time thereafter during the continuance of such event, the Administrative Agent, at the request of the Required Financing Commitment Parties shall, by notice to the Borrower, take either or both of the following actions, at the same or different times:  (i) terminate forthwith the Commitments and (ii) declare the Loans then outstanding to be forthwith due and payable in whole or in part, whereupon the principal of the Loans so declared to be due and payable, together with accrued interest thereon and any unpaid accrued fees and all other liabilities of the Borrower accrued hereunder and under any other Loan Document, shall become forthwith due and payable, without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived by the Borrower, anything contained herein or in any other Loan Document to the contrary notwithstanding; provided that prior to the exercise of any right described herein or in any other Loan Document, the Administrative Agent shall be required to provide five (5) business days' written notice to the Remedies Notice Parties (as defined in the Orders) to the extent set forth in, and otherwise subject to the provisions of, the Orders.

## ARTICLE VIII

### The Administrative Agent and the Collateral Agent

Each of the Lenders hereby irrevocably appoints the Administrative Agent and the Collateral Agent as their agents and authorizes the Agents to take such actions on its behalf and to exercise such powers as are delegated to such Agent by the terms of the Loan Documents, together with such actions and powers as are reasonably incidental thereto.  Without limiting the generality of the foregoing, the Agents are hereby expressly authorized to execute any and all documents (including releases) with respect to the DIP Collateral and the rights of the Secured Parties with respect thereto, as contemplated by and in accordance with the provisions of this Agreement, the Security Documents, and the Orders.

The provisions of this <u>Article VIII</u> are solely for the benefit of Agents and Lenders and no Loan Party shall have any rights as a third party beneficiary of any of the provisions thereof.  In performing its functions and duties hereunder, each Agent shall act solely as an agent of Lenders and does not assume and shall not be deemed to have assumed any obligation towards or relationship of agency or trust with or for the Loan Parties or any of their respective Subsidiaries.

Neither Agent shall have any duties or obligations except those expressly set forth in the Loan Documents.  Without limiting the generality of the foregoing, (a) neither Agent shall be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing, (b) neither Agent shall have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby that such Agent is instructed in writing to exercise by the Required Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in <u>Section 9.08</u>), and (c) except as expressly set forth in the Loan Documents, neither Agent shall have any duty to disclose, nor shall it be liable for the failure to disclose, any information relating to the Borrower or any of the Subsidiaries that is communicated to or obtained by the bank serving as Administrative Agent and/or Collateral Agent or any of its Affiliates in any capacity.  Neither Agent shall be liable (nor shall any Lender or Loan Party have any right of action whatsoever against any Agent) for any action taken or not taken by it with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be

necessary under the circumstances as provided in <u>Section 9.08</u>) or in the absence of its own gross negligence or willful misconduct as determined by a final, non-appealable judgment of a court of competent jurisdiction.  Neither Agent shall be deemed to have knowledge of any Default unless and until written notice thereof is given to such Agent by the Borrower or a Lender, and neither Agent shall be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with any Loan Document, (ii) the contents of any certificate, report or other document delivered thereunder or in connection therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth in any Loan Document, (iv) the validity, enforceability, effectiveness or genuineness of any Loan Document or any other agreement, instrument or document, or (v) the satisfaction of any condition set forth in <u>Article IV</u> or elsewhere in any Loan Document, other than to confirm receipt of items expressly required to be delivered to such Agent.

Each Agent shall be entitled to refrain from any act or the taking of any action (including the failure to take an action) in connection herewith or any of the other Loan Documents or from the exercise of any power, discretion or authority vested in it hereunder or thereunder unless and until such Agent shall have received instructions in respect thereof from Required Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in <u>Section 9.08</u>) and, upon receipt of such instructions from Required Lenders (or such other Lenders, as the case may be), such Agent shall be entitled to act or refrain from acting, or to exercise such power, discretion or authority, in accordance with such instructions, including for the avoidance of doubt refraining from any action that, in its opinion or the opinion of its counsel, may be in violation of the automatic stay under the Bankruptcy Code or that may effect a forfeiture, modification or termination of property of a Defaulting Lender in violation of the Bankruptcy Code.  Each Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing believed by it to be genuine and to have been signed or sent by the proper person.  Each Agent may also rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper person, and shall not incur any liability for relying thereon.  Each Agent may consult with legal counsel (who may be counsel for the Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

The Agents are not obliged to expend or risk its own funds or otherwise incur any financial liability in the performance of its duties, obligations or responsibilities or the exercise of any right, power, authority or discretion if it has grounds for believing the repayment of such funds or adequate indemnity against, or security for, such risk or liability is not reasonably assured to it.  The Agents shall not be responsible for any unsuitability, inadequacy, expiration or unfitness of any security interest created hereunder or pursuant to any other security documents pertaining to this matter nor shall it be obligated to make any investigation into, and shall be entitled to assume, the adequacy and fitness of any security interest created hereunder or pursuant to any other security document pertaining to this matter.  In no event shall the Agents be liable for any indirect, special, punitive or consequential loss or damage of any kind whatsoever, including, but not limited to, lost profits, even if such loss or damage was foreseeable or it has been advised of the likelihood of such loss or damage and regardless of the form of action.  In no event shall the Agents be responsible or liable for any failure or delay in the performance of its obligations hereunder arising out of or caused by, directly or indirectly, forces beyond its control, including, without limitation, strikes, work stoppages, accidents, acts of war or terrorism, civil or military disturbances, nuclear or natural catastrophes or acts of God, and interruptions, loss or malfunctions of utilities, communications or computer (software and hardware) services.

Each Agent may perform any and all its duties and exercise its rights and powers by or through any one or more sub-agents appointed by it.  Each Agent and any such sub-agent may perform any and all its duties and exercise its rights and powers by or through their respective Related Parties.  The

exculpatory provisions of the preceding paragraphs shall apply to any such sub-agent and to the Related Parties of each Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the Credit Facilities as well as activities as Agent.

Subject to the appointment and acceptance of a successor Agent as provided below, either Agent may resign at any time by notifying the Lenders and the Borrower.  Upon any such resignation, the Required Lenders shall have the right, with the consent (not to be unreasonably withheld, conditioned or delayed) of the Borrower, to appoint a successor; *provided* that during the existence and continuation of an Event of Default pursuant to Sections 7.01 or 7.05, no consent of the Borrower shall be required.  If no successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Agent gives notice of its resignation, then the retirement of the retiring Agent shall become effective on such 30th day and the retiring Agent may (but shall not have any obligation to do so), on behalf of the Lenders, appoint a successor Agent and, so long as no Event of Default pursuant to Sections 7.01 or 7.05 shall have occurred and be continuing, reasonably acceptable to the Borrower.  Upon the acceptance of its appointment as Agent hereunder by a successor, such successor shall succeed to and become vested with all the rights, powers, privileges and duties of the retiring Agent, and the retiring Agent shall be discharged from its duties and obligations hereunder.  The fees payable by the Borrower to a successor Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor.  After an Agent's resignation hereunder, the provisions of this Article VIII and Section 9.05 shall continue in effect for the benefit of such retiring Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while acting as Agent.

Each Lender acknowledges that it has, independently and without reliance upon the Agents or any other Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement.  Each Lender also acknowledges that it will, independently and without reliance upon the Agents or any other Lender and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement or any other Loan Document, any related agreement or any document furnished hereunder or thereunder.

## ARTICLE IX

### Miscellaneous

SECTION 9.01 **Notices**.  Notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail, sent by fax or other electronic transmission (in PDF format) as follows:

(a)    if to the Borrower, to it at 8001 Aerial Center Parkway, Morrisville, NC, 27560, Attention of Joel L. Thomas, Email: jlthomas@pyxus.com; and

(b)    if to the Administrative Agent, to Cortland Capital Market Services LLC, 225 W. Washington St., 9th Floor, Chicago IL 60606 Attention of Steve Lenard, Email: cpc.agency@cortlandglobal.com and legal@cortlandglobal.com; and

(c)    if to a Lender, to it at its address (email or fax number) set forth on Schedule 2.01 or in the Assignment and Acceptance pursuant to which such Lender shall have become a party hereto.

All notices and other communications given to any party hereto in accordance with the provisions of this Agreement shall be deemed to have been given on the date of receipt if delivered by hand or overnight courier service or sent by fax or other electronic transmission (in PDF format) on the date five Business Days after dispatch by certified or registered mail if mailed, in each case delivered, sent or mailed (properly addressed) to such party as provided in this Section 9.01 or in accordance with the latest unrevoked direction from such party given in accordance with this Section 9.01.  As agreed to among the Borrower, the Administrative Agent and the applicable Lenders from time to time, notices and other communications may also be delivered by e-mail to the e-mail address of a representative of the applicable person provided from time to time by such person.

The Borrower hereby acknowledges that (a) the Administrative Agent will make available to the Lenders materials and/or information provided by or on behalf of the Borrower hereunder (collectively, the "***Borrower Materials***") by posting the Borrower Materials on Intralinks or another similar electronic system (the "***Platform***") and (b) certain of the Lenders may be "public-side" Lenders (i.e., Lenders that do not wish to receive material non-public information with respect to the Borrower or its securities) (each, a "***Public Lender***").  The Borrower hereby agrees that (i) all Borrower Materials that are to be made available to Public Lenders shall be clearly and conspicuously marked "PUBLIC" which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page thereof; (ii) by marking Borrower Materials "PUBLIC," the Borrower shall be deemed to have authorized the Administrative Agent and the Lenders to treat such Borrower Materials as not containing any material non-public information with respect to the Borrower or its securities for purposes of foreign, United States Federal and state securities laws (*provided*, *however*, that to the extent such Borrower Materials constitute Information (as defined below), they shall be treated as set forth in Section 9.17); (iii) all Borrower Materials marked "PUBLIC" are permitted to be made available through a portion of the Platform designated as "Public Investor" and (iv) the Administrative Agent shall be entitled to treat any Borrower Materials that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not marked as "Public Investor."  Notwithstanding the foregoing, the following Borrower Materials shall be marked "PUBLIC," unless the Borrower notifies the Administrative Agent promptly that any such document contains material non-public information:  (A) the Loan Documents, (B) any notification of changes in the terms of the Credit Facility and (C) all information delivered pursuant to Sections 5.01(a), (b), (c), (d), (g), (p) and (r).

Each Public Lender agrees to cause at least one individual at or on behalf of such Public Lender to at all times have selected the "Private Side Information" or similar designation on the content declaration screen of the Platform in order to enable such Public Lender or its delegate, in accordance with such Public Lender's compliance procedures and applicable law, including foreign, United States Federal and state securities laws, to make reference to communications that are not made available through the "Public Side Information" portion of the Platform and that may contain material non-public information with respect to the Borrower or its securities for purposes of foreign, United States Federal or state securities laws.

THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE."  NEITHER THE ADMINISTRATIVE AGENT NOR ANY OF ITS RELATED PARTIES WARRANTS THE ACCURACY OR COMPLETENESS OF THE COMMUNICATIONS OR THE ADEQUACY OF THE PLATFORM AND EACH EXPRESSLY DISCLAIMS LIABILITY FOR ERRORS OR OMISSIONS IN THE COMMUNICATIONS.  NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS IS MADE BY THE ADMINISTRATIVE AGENT OR ANY OF ITS RELATED PARTIES IN CONNECTION WITH THE COMMUNICATIONS OR THE PLATFORM.  IN NO EVENT SHALL THE ADMINISTRATIVE AGENT OR ANY OF ITS

RELATED PARTIES HAVE ANY LIABILITY TO ANY LOAN PARTY, ANY LENDER OR ANY OTHER PERSON FOR DAMAGES OF ANY KIND, WHETHER OR NOT BASED ON STRICT LIABILITY AND INCLUDING DIRECT OR INDIRECT, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES, LOSSES OR EXPENSES (WHETHER IN TORT, CONTRACT OR OTHERWISE) ARISING OUT OF ANY LOAN PARTY'S OR THE ADMINISTRATIVE AGENT'S TRANSMISSION OF COMMUNICATIONS THROUGH THE INTERNET, EXCEPT TO THE EXTENT THE LIABILITY OF ANY SUCH PERSON IS FOUND IN A FINAL RULING BY A COURT OF COMPETENT JURISDICTION TO HAVE RESULTED PRIMARILY FROM SUCH PERSON'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT.

The Administrative Agent agrees that the receipt of communications by the Administrative Agent at its e-mail address set forth above shall constitute effective delivery of the communications to the Administrative Agent for purposes of the Loan Documents.  Each Lender agrees that receipt of notice to it (as provided in the next sentence) specifying that the communications have been posted to the Platform shall constitute effective delivery of the communications to such Lender for purposes of the Loan Documents.  Each Lender agrees to notify the Administrative Agent in writing (including by electronic communication) from time to time of such Lender's e-mail address to which the foregoing notice may be sent by electronic transmission and that the foregoing notice may be sent to such e-mail address.

Nothing herein shall prejudice the right of the Administrative Agent or any Lender to give any notice or other communication pursuant to any Loan Document in any other manner specified in such Loan Document.

SECTION 9.02 *Survival of Agreement*.   All covenants, agreements, representations and warranties made by the Borrower herein and in the certificates or other instruments prepared or delivered in connection with or pursuant to this Agreement or any other Loan Document shall be considered to have been relied upon by the Lenders and shall survive the making by the Lenders of the Loans, regardless of any investigation made by the Lenders or on their behalf, and shall continue in full force and effect as long as the principal of or any accrued interest on any Loan or any fee or any other amount payable under this Agreement or any other Loan Document is outstanding and unpaid and so long as the Commitments have not been terminated.  The provisions of Sections 2.14, 2.16, 2.20, 9.05 and 9.17 shall remain operative and in full force and effect regardless of the expiration of the term of this Agreement, the consummation of the Transactions, the repayment of any of the Loans, the expiration of the Commitments, the invalidity or unenforceability of any term or provision of this Agreement or any other Loan Document, or any investigation made by or on behalf of the Administrative Agent, the Collateral Agent or any Lender.

SECTION 9.03 *Binding Effect*.  This Agreement shall become effective when it shall have been executed by the Borrower and the Administrative Agent and when the Administrative Agent shall have received counterparts hereof which, when taken together, bear the signatures of each of the other parties hereto.

SECTION 9.04 *Successors and Assigns*.

(a)    Whenever in this Agreement any of the parties hereto is referred to, such reference shall be deemed to include the permitted successors and assigns of such party; and all covenants, promises and agreements by or on behalf of the Borrower, the Administrative Agent, the Collateral Agent or the Lenders that are contained in this Agreement shall bind and inure to the benefit of their respective successors and assigns.

(b)    Each Lender may assign to one or more Eligible Assignees all or a portion of its interests, rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans at the time owing to it), with notice to the Borrower and (except in the case of assignments in connection with the Initial Allocation or pursuant to Section 2.21(b)) the prior written consent of the Administrative Agent and the Borrower (not to be unreasonably withheld, conditioned or delayed); *provided*, *however*, that (i) except in the case of assignments in connection with the Initial Allocation or pursuant to Section 2.21(b), the amount of the Commitment or Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Acceptance with respect to such assignment is delivered to the Administrative Agent) shall be not less than $1,000,000 (with respect to an assignment of Loans) (or, in any case, if less, the entire remaining amount of such Lender's Commitment or Loans) without the prior written consent of the Administrative Agent and the Borrower (*provided*, that the consent of the Borrower shall not be required after the occurrence and during the continuance of any Event of Default referred to in Sections 7.01 or 7.05), (ii) except in the case of assignments in connection with the Initial Allocation or pursuant to Section 2.21(b), the parties to each such assignment shall execute and deliver to the Administrative Agent an Assignment and Acceptance via an electronic settlement system acceptable to the Administrative Agent (or, if previously agreed with the Administrative Agent, manually), and shall pay to the Administrative Agent a processing and recordation fee of $3,500 (which fee may be waived or reduced in the sole discretion of the Administrative Agent and will not apply in the case of an assignment by a Lender to an Approved Fund that is managed by such Lender or an Affiliate of such Lender or by an entity or an Affiliate of an entity that administers or manages such Lender), (iii) the assignee, if it shall not be a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire and all applicable tax forms, (iv) all documents reasonably requested by the Administrative Agent pursuant to anti-money laundering rules and regulations and (v) the assignee must be or become a party to the RSA.  Upon acceptance and recording pursuant to paragraph (e) of this Section 9.04, from and after the effective date specified in each Assignment and Acceptance, (A) the assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Acceptance, have the rights and obligations of a Lender under this Agreement and (B) the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Acceptance, be released from its obligations under this Agreement (and, in the case of an Assignment and Acceptance covering all or the remaining portion of an assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 2.14, 2.16, 2.20 and 9.05, as well as to any fees accrued for its account and not yet paid).

(c)    By executing and delivering an Assignment and Acceptance, the assigning Lender thereunder and the assignee thereunder shall be deemed to confirm to and agree with each other and the other parties hereto as follows:  (i) such assigning Lender warrants that it is the legal and beneficial owner of the interest being assigned thereby free and clear of any adverse claim and that its Commitment is as set forth in such Assignment and Acceptance; (ii) except as set forth in (i) above, such assigning Lender makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with this Agreement, or the execution, legality, validity, enforceability, genuineness, sufficiency or value of this Agreement, any other Loan Document or any other instrument or document furnished pursuant hereto, or the financial condition of the Borrower or any Subsidiary or the performance or observance by the Borrower or any Subsidiary of any of its obligations under this Agreement, any other Loan Document or any other instrument or document furnished pursuant hereto; (iii) such assignee represents and warrants that it is an Eligible Assignee and is legally authorized to enter into such Assignment and Acceptance; (iv) such assignee confirms that it has received a copy of this Agreement, together with copies of the most recent financial

statements referred to in Section 3.05 or delivered pursuant to Section 5.01 and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into such Assignment and Acceptance; (v) such assignee will independently and without reliance upon the Administrative Agent, the Collateral Agent, such assigning Lender or any other Lender and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement; (vi) such assignee appoints and authorizes the Administrative Agent and the Collateral Agent to take such action as agent on its behalf and to exercise such powers under this Agreement as are delegated to the Administrative Agent and the Collateral Agent, respectively, by the terms hereof, together with such powers as are reasonably incidental thereto; and (vii) such assignee agrees that it will perform in accordance with their terms all the obligations which by the terms of this Agreement are required to be performed by it as a Lender.

(d)     The Administrative Agent, acting for this purpose as a non-fiduciary agent of the Borrower, shall maintain at one of its offices in The City of New York a copy of each Assignment and Acceptance delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitment of, and principal amount (and stated interest) of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "*Register*"). The entries in the Register shall be conclusive absent manifest error and the Borrower, the Administrative Agent, the Collateral Agent and the Lenders may treat each person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.   The Register shall be available for inspection by the Borrower, the Collateral Agent and any Lender, at any reasonable time and from time to time upon reasonable prior written notice.   Borrower hereby designates Administrative Agent to serve as Borrower's agent solely for purposes of maintaining the Register as provided in this Section 9.04(d), and Borrower hereby agrees that, to the extent Administrative Agent serves in such capacity, Administrative Agent and its Related Parties shall constitute an "Indemnitee" hereunder and be indemnified in accordance with Section 9.05(b) hereunder in connection with serving in such capacity.

(e)     Upon its receipt of, and consent to, a duly completed Assignment and Acceptance executed by an assigning Lender and an assignee, an Administrative Questionnaire completed in respect of the assignee (unless the assignee shall already be a Lender hereunder), the processing and recordation fee referred to in paragraph (b) above, if applicable, and the written consent of the Administrative Agent and, if required, the Borrower to such assignment and any applicable tax forms, the Administrative Agent shall promptly (i) accept such Assignment and Acceptance and (ii) record the information contained therein in the Register.  No assignment shall be effective unless it has been recorded in the Register as provided in this paragraph (e).

(f)     Each Lender may without the consent of the Borrower or the Administrative Agent sell participations to one or more banks or other persons in all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans owing to it); *provided*, *however*, that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, (iii) the participating banks or other persons shall be entitled to the benefit of the cost protection provisions contained in Sections 2.14, 2.16 and 2.20 (subject to the requirements and limitations therein including the requirements under Section 2.20(e)) to the same extent as if they were Lenders (but, with respect to any particular participant, to no greater extent than the Lender that sold the participation to such participant except to the extent such entitlement to receive a greater payment results from a Change in Law that occurs after the participant acquired the applicable participation), it being understood that the tax forms required

under Section 2.20(e) shall be delivered to the participating Lender and (iv) the Borrower, the Administrative Agent and the Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement, and such Lender shall retain the sole right to enforce the obligations of the Borrower relating to the Loans and to approve any amendment, modification or waiver of any provision of this Agreement (other than amendments, modifications or waivers decreasing any fees payable to such participating bank or person hereunder or the amount of principal of or the rate at which interest is payable on the Loans in which such participating bank or person has an interest, extending any scheduled principal payment date or date fixed for the payment of interest on the Loans in which such participating bank or person has an interest, increasing or extending the Commitments in which such participating bank or person has an interest or releasing any Subsidiary Guarantor (other than pursuant to the terms thereof or in connection with the sale of such Subsidiary Guarantor in a transaction permitted by Section 6.04) or all or substantially all of the DIP Collateral). Each Lender that sells a participation agrees, at the Borrower's request and expense, to use reasonable efforts to cooperate with the Borrower to effectuate the provisions of Section 2.21 with respect to any participant. Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain a register on which it enters the name and address of each participant and the principal amounts (and stated interest) of each participant's interest in the Loans or other obligations under the Loan Documents (the "***Participant Register***"); *provided* that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any participant or any information relating to a participant's interest in any Commitments, Loans or its other obligations under any Loan Document) to any person except to the extent that such disclosure is necessary to establish that such Commitment, Loan or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations. The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary. For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

(g)     Any Lender or participant may, in connection with any assignment or participation or proposed assignment or participation pursuant to this Section 9.04, disclose to the assignee or participant or proposed assignee or participant any information relating to the Borrower furnished to such Lender by or on behalf of the Borrower; *provided* that, prior to any such disclosure of information designated by the Borrower as confidential, each such assignee or participant or proposed assignee or participant shall execute an agreement whereby such assignee or participant shall agree (subject to customary exceptions) to preserve the confidentiality of such confidential information on terms no less restrictive than those applicable to the Lenders pursuant to Section 9.17.

(h)     Any Lender may at any time pledge or assign all or any portion of its rights under this Agreement to secure extensions of credit to such Lender or in support of obligations owed by such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank or other central banking authority; *provided* that no such pledge or assignment shall release a Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(i)     Notwithstanding anything to the contrary contained herein, any Lender (a "***Granting Lender***") may grant to a special purpose funding vehicle (an "***SPC***"), identified as such in writing from time to time by the Granting Lender to the Administrative Agent and the Borrower, the option to provide to the Borrower all or any part of any Loan that such Granting

Lender would otherwise be obligated to make to the Borrower pursuant to this Agreement; *provided* that (i) nothing herein shall constitute a commitment by any SPC to make any Loan and (ii) if an SPC elects not to exercise such option or otherwise fails to provide all or any part of such Loan, the Granting Lender shall be obligated to make such Loan pursuant to the terms hereof. The making of a Loan by an SPC hereunder shall utilize the Commitment of the Granting Lender to the same extent, and as if, such Loan were made by such Granting Lender. Each party hereto hereby agrees that no SPC shall be liable for any indemnity or similar payment obligation under this Agreement (all liability for which shall remain with the Granting Lender). In furtherance of the foregoing, each party hereto hereby agrees (which agreement shall survive the termination of this Agreement) that, prior to the date that is one year and one day after the payment in full of all outstanding commercial paper or other senior indebtedness of any SPC, it will not institute against, or join any other person in instituting against, such SPC any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings under the laws of the United States or any State thereof. In addition, notwithstanding anything to the contrary contained in this Section 9.04, any SPC may (i) with notice to, but without the prior written consent of, the Borrower and the Administrative Agent and without paying any processing fee therefor, assign all or a portion of its interests in any Loans to the Granting Lender or to any financial institutions (consented to by the Borrower and Administrative Agent) providing liquidity and/or credit support to or for the account of such SPC to support the funding or maintenance of Loans and (ii) disclose on a confidential basis any non-public information relating to its Loans to any investor, potential investor, rating agency, commercial paper dealer, collateral manager, servicer or provider of any surety, guarantee or credit or liquidity enhancement to such SPC.

(j)    The Borrower shall not assign or delegate any of its rights or duties hereunder without the prior written consent of the Administrative Agent and each Lender, and any attempted assignment without such consent shall be null and void.

SECTION 9.05 *Expenses; Indemnity*.

(a)    The Borrower agrees to pay all reasonable and documented out-of-pocket expenses incurred by the Administrative Agent, the Collateral Agent and the Lenders in connection with the preparation and administration of this Agreement and the other Loan Documents or in connection with any amendments, modifications or waivers of the provisions hereof or thereof (whether or not the transactions hereby or thereby contemplated shall be consummated) or incurred by the Administrative Agent, the Collateral Agent and the Lenders in connection with the enforcement or protection of its rights in connection with this Agreement and the other Loan Documents, including its rights under this Section 9.05, or in connection with the Loans made issued hereunder, the negotiation and implementation of the RSA and an Acceptable Plan and any other matter, motion or order bearing on the validity, priority and/or repayment of the Obligations in accordance with the terms hereof, including the fees, charges and disbursements of Wachtell, Lipton, Rosen & Katz, Morris Nichols Arsht & Tunnell LLP, Macfarlanes LLP and De Brauw Blackstone Westbroek N.V., and the fees, charges and disbursements of the Lender Financial Advisor and, in connection with any such enforcement or protection, the fees, charges and disbursements of one counsel in each relevant additional jurisdiction (and any such additional counsel, if necessary, as a result of actual or potential conflicts of interest) for the Administrative Agent, the Collateral Agent and the Lenders.

(b)    The Borrower agrees to indemnify the Administrative Agent, the Collateral Agent, each Lender and each Related Party of any of the foregoing persons (each such person being called an "***Indemnitee***") against, and to hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities, penalties and related reasonable out-of-pocket expenses,

including reasonable fees, charges and disbursements of one counsel in each relevant jurisdiction (and any such additional counsel, if necessary, as a result of actual or potential conflicts of interest) for all Indemnitees, incurred by or asserted against any Indemnitee arising out of, in any way connected with, or as a result of (i) the execution or delivery of this Agreement or any other Loan Document or any agreement or instrument contemplated thereby, the performance by the parties thereto of their respective obligations thereunder or the consummation of the Transactions or any related transaction and the other transactions contemplated thereby (including the syndication of the Credit Facility), or, in the case of the Administrative Agent or Collateral Agent (and any sub-agent thereof) and its Related Parties only, the administration of this Agreement and the other Loan Documents, (ii) the use of the proceeds of the Loans, (iii) any claim, litigation, investigation or proceeding relating to any of the foregoing, whether or not any Indemnitee is a party thereto (and regardless of whether such matter is initiated by a third party or by the Borrower, any other Loan Party or any of their respective Affiliates), or (iv) any actual or alleged presence or Release of Hazardous Materials on any property currently or formerly owned or operated by the Borrower or any of the Subsidiaries, or any Environmental Claim related in any way to the Borrower or the Subsidiaries; *provided* that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities, penalties or related expenses (x) are determined by a court of competent jurisdiction by final judgment to have resulted primarily from (1) the gross negligence, bad faith or willful misconduct of such Indemnitee or (2) a material breach of the obligations under this Agreement of such Indemnitee or any of such Indemnitee's Affiliates or of any of its or their respective officers, directors, employees, agents, advisors or other representatives of the foregoing under this Agreement (as determined by a court of competent jurisdiction in a final and nonappealable decision) or (y) result from any proceeding (other than a proceeding against a party hereto acting pursuant to this Agreement or in its capacity as such or of any of its Affiliates or its or their respective officers, directors, employees, agents, advisors and other representatives and the successors of each of the foregoing) solely between or among Indemnitees not arising from any act or omission of a Loan Party or any of its Affiliates.

(c)      To the extent that the Borrower fails to pay any amount required to be paid by it to the Administrative Agent or the Collateral Agent under paragraph (a) or (b) of this Section 9.05, each Lender severally agrees to pay to the Administrative Agent or the Collateral Agent, as the case may be, such Lender's pro rata share (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount; *provided* that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Administrative Agent or the Collateral Agent (or any sub-agent of the foregoing) in its capacity as such.  For purposes hereof, a Lender's "pro rata share" shall be determined based upon its share of the sum of the outstanding Loans and unused Commitments at the time.

(d)      To the extent permitted by applicable law, neither the Borrower nor any Indemnitee shall assert, and each hereby waives, any claim against any Indemnitee or the Borrower and each of their respective Affiliates, as applicable, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement or any Loan Document or other agreement or instrument contemplated hereby, the Transactions or any Loan or the use of the proceeds thereof; *provided*, that nothing contained in this sentence shall limit the Borrower's indemnification obligations above to the extent such special, indirect, consequential and punitive damages are included in any third party claim in connection with which any Indemnitee is entitled to indemnification hereunder

(e)     No Indemnitee referred to above shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed by it through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Loan Documents or the Transactions.

(f)     The provisions of this Section 9.05 shall remain operative and in full force and effect regardless of the expiration of the term of this Agreement, the consummation of the Transactions, the repayment of any of the Loans, the expiration of the Commitments, the invalidity or unenforceability of any term or provision of this Agreement or any other Loan Document, or any investigation made by or on behalf of the Administrative Agent, the Collateral Agent or any Lender.  All amounts due under this Section 9.05 shall be payable, within 30 days of written demand therefor with a reasonably detailed summary of the amounts claimed.

SECTION 9.06 **Right of Setoff**.  If an Event of Default shall have occurred and be continuing, each Lender or an Affiliate of such Lender is hereby authorized at any time and from time to time, except to the extent prohibited by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other indebtedness at any time owing by such Lender or an Affiliate of such Lender to or for the credit or the account of the Borrower against any of and all the obligations of the Borrower now or hereafter existing under this Agreement and other Loan Documents held by such Lender, *provided* that at such time such obligations are due or payable.  The rights of each Lender and Affiliates of such Lender under this Section 9.06 are in addition to other rights and remedies (including other rights of setoff) which such Lender or an Affiliate of such Lender may have. Notwithstanding anything to the contrary contained herein or in any other Loan Document, each Secured Party expressly waives its right of setoff (and any similar right including bankers' liens) with respect to all lockboxes, deposit accounts and other cash management accounts maintained by any grantor and into which any collections for Government Accounts are deposited.  For purposes hereof, "**Government Accounts**" means all accounts on which any federal or state government unit or any intermediary for any federal or state government unit is the obligor.

SECTION 9.07 **Applicable Law**.    THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS (OTHER THAN AS EXPRESSLY SET FORTH IN OTHER LOAN DOCUMENTS) SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK, OR, AS APPLICABLE, THE BANKRUPTCY CODE.

SECTION 9.08 **Waivers; Amendment**.

(a)     No failure or delay of the Administrative Agent, the Collateral Agent or any Lender in exercising any power or right hereunder or under any other Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power.  The rights and remedies of the Administrative Agent, the Collateral Agent and the Lenders hereunder and under the other Loan Documents are cumulative and are not exclusive of any rights or remedies that they would otherwise have.  No waiver of any provision of this Agreement or any other Loan Document or consent to any departure by the Borrower or any other Loan Party therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) below, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.  No notice or demand on the Borrower in any case shall entitle the Borrower to any other or further notice or demand in similar or other circumstances.

(b)      Except as otherwise provided herein, neither this Agreement nor any provision hereof, may be waived, amended or modified except pursuant to an agreement or agreements in writing entered into by the Borrower and the Required Lenders; *provided*, *however*, that no such agreement shall (i) decrease the principal amount of, or extend the maturity of or any scheduled principal payment date or date for the payment of any interest on any Loan, or waive or excuse any such payment or any part thereof, decrease the rate of interest on any Loan or reduce the amount of any fee payable hereunder, without the prior written consent of each Lender directly adversely affected thereby, (ii) increase or extend the Commitment or decrease or extend the date for payment of any fees or any other amount due and payable hereunder to any Lender without the prior written consent of such Lender, (iii) amend or modify the pro rata requirements of Section 2.17, the sharing provisions of Section 2.18, the provisions of Section 9.04(j) or the provisions of this Section 9.08 or release all or substantially all of the value of the Subsidiary Guarantors (other than pursuant to the terms hereof or thereof or in connection with the sale of such Subsidiary Guarantor in a transaction permitted by Section 6.04) or all or substantially all of the DIP Collateral (or subordinate the Liens in favor of the Collateral Agent on all or substantially all of the DIP Collateral), without the prior written consent of each Lender, (iv) *[reserved]*, (v) modify the protections afforded to an SPC pursuant to the provisions of Section 9.04(i) without the written consent of such SPC, (vi) [reserved], (vi) reduce the percentage contained in the definition of the term "Required Lenders," or impose additional restrictions on the ability of the Lenders to assign their rights and obligations under the Loan Documents, without the prior written consent of each Lender (it being understood that with the consent of the Required Lenders, additional extensions of credit pursuant to this Agreement may be included in the determination of the Required Lenders on substantially the same basis as the Commitments on the date hereof), (vii) amend the definition of "Financing Commitment Party" or "Required Financing Commitment Parties" without the prior written consent of each Financing Commitment Party, (viii) amend the definition of "Backstop Commitment Party" without the prior written consent of each Backstop Commitment Party or (ix) reduce the number or percentage of the Lenders required to consent, approve or otherwise take any action under the Loan Documents without the prior written consent of each Lender affected thereby; *provided*, *further*, that (A) no such agreement shall amend, modify or otherwise affect the rights or duties of the Administrative Agent or Collateral Agent hereunder or under any other Loan Document without the prior written consent of the Administrative Agent or the Collateral Agent; and (B) the Borrower and the Administrative Agent may amend or supplement this Agreement and any other Loan Documents, without the consent of any Lender, in order to (x) cure an obvious error or any error or omission of a technical or immaterial nature or (y) cause any other Loan Documents to be consistent with this Agreement.

SECTION 9.09 ***Certain Releases of Guarantees and Security Interests***.

(a)      Upon the closing of any sale, transfer or other disposition of all of the Equity Interests of any Subsidiary Guarantor permitted pursuant to Section 6.04, (i) the obligations of such Subsidiary Guarantor pursuant to the Guarantee Agreement shall automatically be discharged and released without any further action by the Collateral Agent or any Lender, and (ii) the Administrative Agent and the Lenders will, upon the reasonable request and at the sole expense of the Borrower, execute and deliver any instrument or other document in a form acceptable to the Collateral Agent which may reasonably be required to evidence such discharge and release, all without representation, recourse or warranty.

(b)      Upon the closing of any sale, transfer or other disposition of Equity Interests of any Subsidiary Guarantor or any other Subsidiary of the Borrower permitted pursuant to Section 6.04, (i) the Collateral Agent shall release to the Borrower, without representation,

warranty or recourse, express or implied, the pledged Equity Interests issued by such Subsidiary Guarantor and any pledged Equity Interests issued by any other Subsidiary, as applicable, held by such Subsidiary Guarantor, (ii) the Collateral Agent shall release its security interest in all DIP Collateral of such Subsidiary, and (iii) the Collateral Agent will, upon the request and at the sole expense of the Borrower, execute and deliver any instrument or other document in a form acceptable to the Collateral Agent which may reasonably be required to evidence such release.

(c)     *[Reserved]*.

(d)     The Collateral Agent will, upon the request and at the sole expense of the Borrower, execute and deliver any instrument or other document in a form acceptable to the Collateral Agent which may be reasonably be required to discharge and release, all without representation, recourse or warranty, any Lien on any DIP Collateral granted to or held by the Collateral Agent under any Loan Document (i) upon Payment in Full of the Obligations, (ii) that is sold, transferred or otherwise disposed of or to be sold, transferred or otherwise disposed of as part of or in connection with any sale, transfer or other disposition permitted hereunder to a person other than the Borrower or any Subsidiary Guarantor, and upon consummation by the Borrower or any Subsidiary of any such sale, transfer or other disposition, any Lien granted by the Borrower or such Subsidiary under the Loan Documents on such DIP Collateral shall automatically be discharged and released, and (iii) the Collateral Agent and the Lenders will, upon the request and at the sole expense of the Borrower, execute and deliver any instrument or other document in a form acceptable to the Collateral Agent which may reasonably be required to evidence such discharge and release, all without representation, recourse or warranty.

(e)     The Lenders hereby irrevocably authorize each of the Agents, at their option and in its discretion, to take the actions described in this <u>Section 9.09</u>.  Upon request by any Agent at any time, the Borrower shall deliver a certificate to such Agent stating that any sale, transfer or other disposition described in this <u>Section 9.09</u> is permitted under the Loan Documents.  Upon request by any Agent at any time, the Required Lenders will confirm in writing the Agents' authority to release or subordinate its interest in particular types or items of property, or to release any Subsidiary Guarantor from its obligations, in each case pursuant to this <u>Section 9.09</u>.  The Agents shall not be responsible for or have a duty to ascertain or inquire into any representation or warranty regarding the existence, value or collectability of the Collateral, the existence, priority or perfection of the Collateral Agent's Lien thereon, or any certificate prepared by any Loan Party in connection therewith, nor shall the Administrative Agent be responsible or liable to the Lenders for any failure to monitor or maintain any portion of the Collateral.

SECTION 9.10 *Interest Rate Limitation*.  Notwithstanding anything herein to the contrary, if at any time the interest rate applicable to any Loan, together with all fees, charges and other amounts which are treated as interest on such Loan under applicable law (collectively the "***Charges***"), shall exceed the maximum lawful rate (the "***Maximum Rate***") which may be contracted for, charged, taken, received or reserved by the Lender holding such Loan or participation in accordance with applicable law, the rate of interest payable in respect of such Loan or participation hereunder, together with all Charges payable in respect thereof, shall be limited to the Maximum Rate and, to the extent lawful, the interest and Charges that would have been payable in respect of such Loan or participation but were not payable as a result of the operation of this <u>Section 9.10</u> shall be cumulated and the interest and Charges payable to such Lender in respect of other Loans or participations or periods shall be increased (but not above the Maximum Rate therefor) until such cumulated amount, together with interest thereon at the Federal Funds Effective Rate to the date of repayment, shall have been received by such Lender.

SECTION 9.11 *Entire Agreement*.  This Agreement and the other Loan Documents constitute the entire contract between the parties relative to the subject matter hereof.  Any other previous agreement among the parties with respect to the subject matter hereof is superseded by this Agreement and the other Loan Documents.  Nothing in this Agreement or in the other Loan Documents, expressed or implied, is intended to confer upon any person (other than the parties hereto and thereto, their respective successors and assigns permitted hereunder) and, to the extent expressly contemplated hereby, the Related Parties of each of the Administrative Agent, the Collateral Agent and the Lenders any rights, remedies, obligations or liabilities under or by reason of this Agreement or the other Loan Documents.

SECTION 9.12 *WAIVER OF JURY TRIAL*.  EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS.    EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS, AS APPLICABLE, BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 9.12.

SECTION 9.13 *Severability*.  In the event any one or more of the provisions contained in this Agreement or in any other Loan Document should be held invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein and therein shall not in any way be affected or impaired thereby (it being understood that the invalidity of a particular provision in a particular jurisdiction shall not in and of itself affect the validity of such provision in any other jurisdiction).  The parties shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

SECTION 9.14 *Orders Control*.  To the extent that any specific provision hereof is inconsistent with any of the Orders, the Interim Order or Final Order (as applicable) shall control.

SECTION 9.15 *Headings*.  Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and are not to affect the construction of, or to be taken into consideration in interpreting, this Agreement.

SECTION 9.16 *Jurisdiction; Consent to Service of Process*.

(a)    During the pendency of the Cases, each party to this Agreement hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of the Bankruptcy Court, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement or the other Loan Documents, or for recognition or enforcement of any judgment (in each case other than with respect to any Security Document to the extent expressly provided otherwise therein), and each of the parties hereto hereby irrevocably and unconditionally agrees that, during the pendency of the Cases, all claims in respect of any such action or proceeding may be heard and determined in such Bankruptcy Court (in each case other than with respect to any Security Document to the extent expressly provided otherwise therein).  Following the close of the Cases, the Borrower hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of any New York State court or Federal court of the United States of America sitting in New York City, and any appellate court

from any thereof, in any action or proceeding arising out of or relating to this Agreement or the other Loan Documents, or for recognition or enforcement of any judgment (in each case other than with respect to any Security Document to the extent expressly provided otherwise therein), and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State or, to the extent permitted by law, in such Federal court (in each case other than with respect to any Security Document to the extent expressly provided otherwise therein).  Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Nothing in this Agreement shall affect any right that the Administrative Agent, the Collateral Agent or any Lender may otherwise have to bring any action or proceeding relating to this Agreement or the other Loan Documents against the Borrower or its properties in the courts of any jurisdiction following the close of the Cases.

(b)     The Borrower hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or the other Loan Documents during the pendency of the Cases in the Bankruptcy Court or, following the close of the Cases, in any New York State or Federal court.  Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(c)     Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in <u>Section 9.01</u>.  Nothing in this Agreement will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

(d)     Without limiting the foregoing, each of the Loan Parties (other than any Loan Party organized under the laws of the United States or any State thereof or the District of Columbia) irrevocably designates, appoints and empowers as of the Closing Date, the Borrower (the "**Process Agent**"), with an office on the Closing Date at 8001 Aerial Center Parkway, Morrisville, NC, 27560, as its authorized designee, appointee and agent to receive, accept and acknowledge on its behalf and for its property, service of copies of the summons and complaint and any other process which may be served in any legal action or proceeding relating to this Agreement and the other Loan Documents to which it is a party or for recognition and enforcement of any judgment in respect thereof; such service may be made by mailing or delivering a copy of such process to such Loan Party in care of the Process Agent at the Process Agent's above address, and each such Loan Party hereby irrevocably authorizes and directs the Process Agent to accept such service on its behalf. Each of the Loan Parties (other than any Loan Party organized under the laws of the United States or any State thereof or the District of Columbia) further agrees to take any and all such action as may be necessary to maintain the designation and appointment of the Process Agent in full force in effect for a period of three years following the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder (other than contingent amounts not then due and payable); provided, that if the Process Agent shall cease to act as such, each such Loan Party agrees to promptly designate a new authorized designee, appointee and agent in New York City on the terms and for the purposes reasonably satisfactory to the Administrative Agent hereunder.

SECTION 9.17 *Confidentiality*.  Each of the Administrative Agent, the Collateral Agent and the Lenders agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its and its Affiliates' officers, directors, employees and agents, including accountants, legal counsel, numbering, administration and settlement service providers, and

other advisors (it being understood that the persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent requested by any regulatory authority or quasi-regulatory authority (such as the National Association of Insurance Commissioners), (c) to the extent required by applicable laws or regulations or by any subpoena or similar legal process, (d) in connection with the exercise of any remedies hereunder or under the other Loan Documents or any suit, action or proceeding relating to the enforcement of its rights hereunder or thereunder, (e) subject to an agreement containing provisions substantially the same as those of this Section 9.17, to (i) any actual or prospective assignee of or participant in any of its rights or obligations under this Agreement and the other Loan Documents or (ii) any actual or prospective counterparty (or its advisors) to any swap or derivative transaction relating to the Borrower or any Subsidiary or any of their respective obligations, (f) with the consent of the Borrower or (g) to the extent such Information becomes publicly available other than as a result of a breach of this Section 9.17. For the purposes of this Section 9.17, "**_Information_**" shall mean all information received from the Borrower and related to the Borrower or its business, other than any such information that was available to the Administrative Agent, the Collateral Agent or any Lender on a nonconfidential basis prior to its disclosure by the Borrower; _provided_ that any Lender, the Administrative Agent or the Collateral Agent shall use commercially reasonable efforts give the Borrower prior notice of any disclosure pursuant to clause (c) to the extent permissible and reasonably practicable, except with respect to any audit or examination conducted by bank accountants or any governmental regulatory authority exercising examination or regulatory authority. Any person required to maintain the confidentiality of Information as provided in this Section 9.17 shall be considered to have complied with its obligation to do so if such person has exercised the same degree of care to maintain the confidentiality of such Information as such person would accord its own confidential information.

SECTION 9.18 **_USA PATRIOT Act Notice_**. Each Lender and the Administrative Agent (for itself and not on behalf of any Lender) hereby notifies the Borrower that pursuant to the requirements of the USA PATRIOT Act, it is required to obtain, verify and record information that identifies the Borrower, which information includes the name and address of the Borrower or such Subsidiary and other information that will allow such Lender or the Administrative Agent, as applicable, to identify the Borrower or such Subsidiary in accordance with the USA PATRIOT Act.

SECTION 9.19 **_Acknowledgement and Consent to Bail-In of Affected Financial Institutions_**. Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among the parties hereto, each party hereto acknowledges that any liability of any Affected Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the Write-Down and Conversion Powers of the applicable Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

    (a)    the application of any Write-Down and Conversion Powers by the applicable Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an Affected Financial Institution; and

    (b)    the effects of any Bail-In Action on any such liability, including, if applicable:

        (i)    a reduction in full or in part or cancellation of any such liability;

        (ii)    a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such Affected Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii)     the variation of the terms of such liability in connection with the exercise of the Write-Down and Conversion Powers of the applicable Resolution Authority.

The following terms shall for purposes of this <u>Section 9.19</u> have the meanings set forth below:

"***Affected Financial Institution***" means (a) any EEA Financial Institution or (b) any UK Financial Institution.

"***Bail-In Action***" means the exercise of any Write-Down and Conversion Powers by the applicable Resolution Authority in respect of any liability of any Affected Financial Institution.

"***Bail-In Legislation***" means, (a) with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law, regulation, rule or requirement for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule and (b) with respect to the United Kingdom, Part I of the United Kingdom Banking Act 2009 (as amended from time to time) and any other law, regulation or rule applicable in the United Kingdom relating to the resolution of unsound or failing banks, investment firms or other financial institutions or their Affiliates (other than through liquidation, administration or other insolvency proceedings).

"***EEA Financial Institution***" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in <u>clause (a)</u> of this definition and is subject to the supervision of an EEA Resolution Authority, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in <u>clauses (a)</u> or <u>(b)</u> of this definition and is subject to consolidated supervision of an EEA Resolution Authority with its parent.

"***EEA Member Country***" means any of the member states of the European Union, Iceland, Liechtenstein and Norway.

"***EEA Resolution Authority***" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"***EU Bail-In Legislation Schedule***" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"***Resolution Authority***" means an EEA Resolution Authority or, with respect to any UK Financial Institution, a UK Resolution Authority.

"***UK Financial Institution***" means any BRRD Undertaking (as such term is defined under the PRA Rulebook (as amended form time to time) promulgated by the United Kingdom Prudential Regulation Authority) or any Person falling within IFPRU 11.6 of the FCA Handbook (as amended from time to time) promulgated by the United Kingdom Financial Conduct Authority, which includes certain credit institutions and investment firms, and certain Affiliates of such credit institutions or investment firms.

"***UK Resolution Authority***" means the Bank of England or any other public administrative authority having responsibility for the resolution of any UK Financial Institution.

"***Write-Down and Conversion Powers***" means (a) with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule and (b) with respect to the United Kingdom, any powers of the applicable Resolution Authority under the Bail-In Legislation to cancel, transfer or dilute shares issued by a UK Financial Institution, to cancel, reduce, modify or change the form of a liability of any UK Financial Institution or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that Person or any other Person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that Bail-In Legislation that are related to or ancillary to any of those powers.

SECTION 9.20 ***No Fiduciary Relationship***.    The Borrower, on behalf of itself and its subsidiaries, agrees that in connection with all aspects of the transactions contemplated hereby and any communications in connection therewith, the Borrower, the other Subsidiaries and their Affiliates, on the one hand, and the Administrative Agent, the Collateral Agent, the Lenders and their Affiliates, on the other hand, will have a business relationship that does not create, by implication or otherwise, any fiduciary duty on the part of the Administrative Agent, the Collateral Agent, the Lenders or their Affiliates, and no such duty will be deemed to have arisen in connection with any such transactions or communications.   The Administrative Agent, the Collateral Agent, the Lenders and their Affiliates may be engaged, for their own accounts or the accounts of customers, in a broad range of transactions that involve interests that differ from those of the Borrower and their Affiliates, and none of the Administrative Agent, the Collateral Agent, the Lenders and their Affiliates has any obligation to disclose any of such interests to the Borrower or any of their Affiliates.   To the fullest extent permitted by law, the Borrower hereby waives and releases any claims that it or any of its Affiliates may have against the Administrative Agent, the Collateral Agent, the Lenders and their Affiliates with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated hereby.

*[Signature pages follow]*

IN WITNESS WHEREOF, the parties hereto have caused their duly authorized officers to execute and deliver this Agreement as of the date first above written.

PYXUS INTERNATIONAL, INC.

By:_____
Name:  Joel L. Thomas
Title:  Executive Vice President, Chief
            Financial Officer

Cortland Capital Market Services LLC, as
Administrative Agent and Collateral
Agent

By: _____
Name: _____
Title: _____

[], as a Lender

By: _____
Name: _____
Title: _____

# **EXHIBIT D**

## **Exit Secured Notes Sheet**

[See separate attachment]

**Pyxus International, Inc.**
**Exit Secured Notes Term Sheet**

This term sheet (together with all annexes, exhibits and schedules attached hereto, the "**Term Sheet**") sets forth certain material terms of the proposed Exit Secured Notes (as defined below) and related accommodations.  This Term Sheet is the "Exit Secured Notes Term Sheet" referenced in the Restructuring Support Agreement (as amended, supplemented or otherwise modified in accordance with its terms, the "**RSA**"), dated as of June 14 2020 and to which this Term Sheet is attached as Exhibit D.[1]

This Term Sheet does not address all terms that would be required in connection with the Exit Secured Notes or that will be set forth in the Exit Secured Notes Documents (as defined below) which are subject to negotiations and execution. The Exit Secured Notes Documents will not contain any material terms or conditions that are inconsistent in any material respect with this Term Sheet.

| | |
|---|---|
| **Overview** | $280,843,750 aggregate principal amount of 10% Senior Secured Notes (the "**Exit Secured Notes**"). |
| **Issuer** | Pyxus International, Inc. (the "**Issuer**"). |
| **Trustee and Collateral Agent** | A financial institution selected by the Required Consenting First Lien Noteholders and reasonably acceptable to the Issuer shall act as the trustee and collateral agent under the Exit Secured Notes Indenture (as defined below). |
| **Maturity Date** | 4 years from the Plan Effective Date. |
| **Interest Rate** | 10% per annum. |
| **Call Protection** | After the Plan Effective Date, the Issuer may redeem the Exit Secured Notes at its option, in whole or from time to time in part, at the redemption prices set forth below. <br><br>• Prior to the second anniversary of the Plan Effective Date, at a redemption price equal to 100% of the aggregate principal amount of Exit Secured Notes to be redeemed, plus accrued and unpaid interest thereon, plus a customary make-whole premium (using a discount rate equal to the treasury rate on a comparable treasury note plus 50 basis points); <br>• On or after the second anniversary but prior to the third anniversary of the Plan Effective Date, at a redemption price equal to 105.0% of the aggregate principal amount of Exit Secured Notes to be redeemed, plus accrued and unpaid interest thereon; <br>• On or after the third anniversary of but prior to the date that is 3.5 years after the Plan Effective Date, at a redemption price equal to 102.5% of the aggregate principal amount of Exit Secured Notes to be redeemed, plus accrued and unpaid interest thereon; and <br>• On or after the date that is 3.5 years after the Plan Effective Date, at a redemption price equal to 100% of the aggregate principal amount of Exit Secured Notes to be redeemed, plus accrued and unpaid interest thereon. <br><br>The Exit Secured Notes Indenture shall include customary language that the call protection shall be payable upon acceleration, bankruptcy or other insolvency events. |

---

[1]        Capitalized terms used but not defined herein shall have the meaning ascribed to them in the RSA.

| | |
|---|---|
| **Guarantees**[2] | The Exit Secured Notes initially will be guaranteed by:<br><br>• Alliance One Specialty Products, LLC, Alliance One International, LLC, Alliance One North America, LLC and each other domestic subsidiary of the Issuer, if any, that guarantees the Exit Term Facility or the Exit ABL Facility as of the Plan Effective Date (collectively, the "**Exit Secured Notes Domestic Guarantors**"); and<br>• each foreign subsidiary of the Issuer, if any, that guarantees the Exit Term Facility as of the Plan Effective Date (collectively, the "**Exit Secured Notes Foreign Guarantors**"), subject to applicable laws and applicable local law limitations; provided, that any such guarantee by an Exit Secured Notes Foreign Guarantor shall be subordinated in right of payment to such subsidiary's guarantee of the Exit Term Facility. |
| **Collateral and Priority**[2] | Subject to the Documentation Principles (as defined below), the Exit Secured Notes and the other obligations under the Exit Secured Notes Indenture will be secured by:<br>• a lien on all "First Lien Notes Priority Collateral" (as defined in the Senior Lien Intercreditor Agreement (as defined below)) of the Issuer and the Exit Secured Notes Domestic Guarantors (the "**Notes Priority Collateral**"), senior to the liens thereon securing obligations under the Exit ABL Credit Agreement and the Exit Term Facility Agreement;<br>• a lien on all "ABL Priority Collateral" (as defined in the Senior Lien Intercreditor Agreement) of the Issuer and the Exit Secured Notes Domestic Guarantors, (x) junior to the lien thereon securing obligations under the Exit ABL Credit Agreement in respect of up to $125.0 million in aggregate principal amount of loans and letters of credit outstanding thereunder from time to time, (y) junior to the lien thereon securing obligations under the Exit Term Facility Agreement in an amount equal to (A) $125.0 million, *minus* (B) the aggregate principal amount of loans and letters of credit outstanding under the Exit ABL Credit Agreement from time to time and (z) *pari passu* with the liens thereon securing obligations under the Exit ABL Credit Agreement and the Exit Term Facility Agreement, as applicable, in excess of such amounts; and<br>• a lien on all assets of the Exit Secured Notes Foreign Guarantors pledged to secure obligations under the Exit Term Facility Agreement (if any), junior to the lien thereon securing obligations under the Exit Term Facility Agreement.<br><br>Subject to the Documentation Principles, the rights and priorities of the liens securing the Exit ABL Credit Agreement, the Exit Secured Notes and the Exit Term Facility shall be set forth in one or more Exit Intercreditor Agreements.<br><br>"**Senior Lien Intercreditor Agreement**" means that certain intercreditor agreement, dated as of October 14, 2016, by and among Deutsche Bank AG, New York Branch, as collateral agent under the ABL Credit Agreement, and The Bank of New York Mellon Trust Company, N.A, as trustee and collateral agent under the First Lien Notes Indenture. |
| **Guarantee and Collateral Releases** | After the Plan Effective Date, any guarantee by an Exit Secured Notes Foreign Guarantor of, and all assets of such Exit Secured Notes Foreign Guarantor pledged |

---

[2] To be structured in a manner to permit the Corporate Restructuring Transaction (if any).

|  | |
|---|---|
|  | to secure, the Exit Secured Notes, shall automatically be released and terminated to the extent the continuing provision of such guarantee or lien, as applicable, could reasonably be expected to result in material adverse tax consequences to the Issuer and its subsidiaries (as reasonably determined by the Issuer); *provided*, that for so long as the Exit Term Facility (and any indebtedness incurred to refinance the Exit Term Facility in respect of which the applicable Exit Secured Notes Foreign Guarantor is an obligor) is outstanding, no such guarantee or lien shall be released unless it is released concurrently under the Exit Term Facility (and/or such refinancing indebtedness).<br><br>After the Plan Effective Date, any guarantee by an Exit Secured Notes Foreign Guarantor of, and all assets of such Exit Secured Notes Foreign Guarantor pledged to secure, the Exit Secured Notes shall automatically be released and terminated upon such subsidiary being released as a guarantor and pledgor under the Exit Term Facility (and any indebtedness in respect of which the applicable Exit Secured Notes Foreign Guarantor is an obligor incurred to refinance the Exit Term Facility) upon the repayment (other than in connection with a refinancing of the Exit Term Facility with indebtedness in respect of which the applicable Exit Secured Notes Foreign Guarantor is an obligor) of the Exit Term Facility (or any such refinancing indebtedness). |
| **Documentation** | The Exit Secured Notes (including the terms and conditions applicable thereto) will be documented pursuant to and evidenced by (a) an indenture in form and substance substantially similar to the First Lien Notes Indenture (subject to the Documentation Principles (as defined below), the "**Exit Secured Notes Indenture**") and (b) as applicable, the related notes, security agreements, collateral agreements, pledge agreements, intercreditor agreements, control agreements, guarantees, mortgages and other legal documentation or instruments, in each case, in form and substance substantially similar to the applicable Security Documents (as defined in the First Lien Notes Indenture) (the foregoing clauses (a) and (b), subject to the Documentation Principles, collectively, the "**Exit Secured Notes Documents**"), in each case negotiated in good faith and with such modifications as are (i) set forth herein, (ii) necessary to reflect the terms of the Plan, (iii) usual and customary for exit financings of this kind and/or otherwise necessary to effectuate the financing contemplated hereby and/or (iv) reasonably agreed among the Issuer, the Required Consenting First Lien Noteholders, the Required Ad Hoc First Lien Consenting Noteholders and the Required Consenting Second Lien Noteholders in light of the reasonable commercial needs of the Reorganized Debtors (this paragraph, the "**Documentation Principles**"). |
| **Affirmative Covenants** | Subject to the Documentation Principles, substantially similar to the First Lien Notes Indenture, except as set forth on Annex I hereto. |
| **Negative Covenants** | Subject to the Documentation Principles, substantially similar to the First Lien Notes Indenture, except as set forth on Annex I hereto. |
| **Financial Covenants** | None. |
| **Events of Default** | Subject to the Documentation Principles, substantially similar to the First Lien Notes Indenture. |
| **Amendments** | Subject to the Documentation Principles, substantially similar to the First Lien Notes |

| | Indenture. |
|---|---|
| **Distribution and Resales** | The Exit Secured Notes will be distributed pursuant to the Plan under Section 1145 of the Bankruptcy Code and resales shall occur as 144A-for-life. |
| **Governing Law** | The Exit Secured Notes Documents will be governed by the laws of the State of New York. |

**Annex I**

- The definition of "Change of Control" shall be modified to be a sponsor-style definition with "permitted holder" concept and holding company exception.

- The ability of the Issuer to reinvest asset sale proceeds will be limited.

- Section 4.03 (Reports) shall be modified to be consistent with market standards for privately-held companies (if applicable), which shall include at a minimum (i) annual audited consolidated financial statements and a reasonably detailed management's discussion and analysis, (ii) quarterly unaudited consolidated financial statements and a reasonably detailed management's discussion and analysis and (iii) quarterly conference calls with the noteholders to discuss the Issuer's results of operations and financial performance for the immediately preceding fiscal quarter and year-to-date, including a question and answer session.

- Section 4.07 (Restricted Payments) shall be modified to (i) exclude payments in respect of the Exit Term Facility from the definition of "Restricted Payments" (other than (x) during the continuance of any default or event of default and (y) as set forth in the Exit Intercreditor Agreements), (ii) prohibit dividends to holders of New Common Stock subject to ordinary course, de minimis and other exceptions to be agreed (including exceptions in respect of any company incentive or other compensation plan), (iii) limit non-ordinary course investments from the Issuer and guarantors to non-guarantor subsidiaries, subject to agreed upon baskets, (iv) limit investments by domestic guarantors in foreign guarantors, subject to agreed upon baskets, and (v) otherwise modify baskets in a manner to be agreed for the operational needs of the reorganized company.

- Section 4.09 (Incurrence of Indebtedness and Issuance of Preferred Stock) shall be modified to (i) permit the incurrence of the Exit Term Facility (and any refinancing thereof), (ii) change clause (14) thereof to permit additional indebtedness at any time outstanding not to exceed the greater of (a) $875 million and (b) the sum of (x) 65% of Eligible Inventory, plus (y) 65% of Permitted Advances on Purchases of Tobacco, plus (z) 85% of Eligible Receivables (as such terms are defined in the First Lien Notes Indenture), in each case which basket shall be limited to indebtedness incurred by foreign subsidiaries, (iii) fix the credit facilities basket size at $90 million and eliminate incremental capacity thereunder, (iv) limit the incurrence of debt by non-guarantor subsidiaries, subject to agreed upon baskets, and (v) otherwise modify baskets in a manner to be agreed for the operational needs of the reorganized company.

- Section 4.12 (Liens) shall be modified to permit the incurrence of the liens securing the Exit Term Facility (and any refinancing thereof, subject to the lien priorities set forth herein) and otherwise modify baskets in a manner to be agreed for the operational needs of the reorganized company.

- Section 3.03 (Notice of Redemption) shall be modified to reduce minimum written notice for redemptions from 30 days to 15 days.

- Provisions requiring compliance with the Trust Indenture Act of 1939, as amended, shall be deleted.

- Section 9.02 (With Consent of Holders of Notes) shall be modified to clarify that the "payments for consent" covenant shall not apply to retail investors.

# **EXHIBIT E**

## **Exit Term Facility Term Sheet**

[See separate attachment]

**Pyxus International, Inc.**
**Exit Term Facility Term Sheet**

This term sheet (together with all annexes, exhibits and schedules attached hereto, the "**Term Sheet**") sets forth certain material terms of the proposed Exit Term Facility and related accommodations. This Term Sheet is the "Exit Term Facility Term Sheet" referenced in the Restructuring Support Agreement (as amended, supplemented or otherwise modified in accordance with its terms, the "**RSA**"), dated as of June 14, 2020 and to which this Term Sheet is attached as Exhibit E.[1]

This Term Sheet does not address all terms that would be required in connection with the Exit Term Facility or that will be set forth in the Exit Term Facility Documents (as defined below) which are subject to negotiations and execution. The Exit Term Facility Documents will not contain any material terms or conditions that are inconsistent in any material respect with this Term Sheet.

| | |
|---|---|
| **Overview** | On the Plan Effective Date, all outstanding DIP Loans, together with the amount of the DIP Exit Fee, shall automatically be converted into or exchanged for (or refinanced with proceeds from) a like amount of Exit Term Loans under a secured Exit Term Facility in accordance with the Restructuring Term Sheet. |
| **Borrower** | Pyxus International, Inc., as a Reorganized Debtor (the "**Borrower**"). |
| **Administrative Agent and Collateral Agent** | Cortland Capital Market Services LLC shall act as the administrative agent and the collateral agent for the Exit Term Facility (collectively, the "**Exit Facility Agent**"). |
| **Lenders** | The DIP Lenders immediately prior to the Plan Effective Date and/or their permitted successors and assignees. |
| **Maturity Date** | 4.5 years from the Plan Effective Date. |
| **Amortization** | None. |
| **Fees and Interest Rates** | As set forth on <u>Annex I</u> attached hereto. |
| **Mandatory Prepayments** | None. |
| **Voluntary Prepayments** | Prepayable at any time without premium or penalty (other than customary LIBOR breakage). |

---

[1]    Capitalized terms used but not defined herein shall have the meaning ascribed to them in the RSA.

| | |
|---|---|
| **Guarantees**[2] | The Exit Term Facility initially will be guaranteed by each subsidiary of the Borrower that guarantees the DIP Facility immediately prior to the Plan Effective Date (collectively, the "**Loan Guarantors**" and, together with the Borrower, the "**Loan Parties**"). Each Loan Guarantor shall unconditionally guarantee all of the indebtedness, obligations and liabilities of the Borrower and the other Loan Parties arising under or in connection with the Exit Term Facility.<br><br>After the Plan Effective Date, any Loan Guarantor's guarantee shall automatically be released to the extent the continuing provision of such guarantee could reasonably be expected to result in material adverse tax consequences to the Borrower and its subsidiaries (as reasonably determined by the Borrower). |
| **Collateral and Priority**[2] | Subject to the Documentation Principles (as defined below), the Exit Term Loans and the other obligations under the Exit Term Facility Documents will be secured by:<br><br>• a lien on all assets of the foreign Loan Parties to the extent such lien secured the DIP Facility, senior to the lien thereon securing obligations under the Exit Secured Notes Indenture;<br>• a lien on all "ABL Priority Collateral" (as defined in the Senior Lien Intercreditor Agreement) of the domestic Loan Parties, (x) junior to the lien thereon securing obligations under the Exit ABL Credit Agreement, (y) senior to the lien thereon securing obligations under the Exit Secured Notes Indenture in respect of principal obligations under the Exit Term Facility Agreement in an amount equal to (A) $125.0 million, *minus* (B) the aggregate principal amount of loans and letters of credit outstanding under the Exit ABL Credit Agreement from time to time and (z) *pari passu* with the lien thereon securing the obligations under the Exit Secured Notes Indenture in respect of obligations outstanding under the Exit Term Facility Agreement in excess of such amount; and<br>• a lien on all "First Lien Notes Priority Collateral" (as defined in the Senior Lien Intercreditor Agreement) of the domestic Loan Parties, (x) senior to the lien thereon securing obligations under the Exit ABL Credit Agreement and (y) junior to the lien thereon securing obligations under the Exit Secured Notes Indenture.<br><br>Subject to the Documentation Principles, the rights and priorities of the liens securing the Exit ABL Credit Agreement, the Exit Secured Notes and the Exit Term Facility shall be set forth in one or more Exit Intercreditor Agreements.<br><br>After the Plan Effective Date, any liens on assets of foreign Loan Parties securing the obligations under the Exit Term Facility Documents shall automatically be released to the extent the continuing provision of such a lien could reasonably be expected to result in material adverse tax consequences to the Borrower and its subsidiaries (as reasonably determined by the Borrower). |

---

[2] To be structured in a manner to permit the Corporate Restructuring Transaction (if any).

| | |
|---|---|
| **Documentation** | The Exit Term Facility (including the terms and conditions applicable thereto) will be documented pursuant to and evidenced by (a) the Exit Term Facility Agreement in form and substance substantially similar to the Documentation Precedent (as defined below), with such modifications as are (i) set forth herein, (ii) necessary to reflect the terms of the RSA and of the Acceptable Plan to be consummated on the Plan Effective Date and (iii) usual and customary for secured term loan financings of this kind and/or otherwise necessary to effectuate the financing contemplated hereby and (b) as applicable, the related notes, security agreements, collateral agreements, pledge agreements, control agreements, guarantees, mortgages and other legal documentation or instruments as are, in each case, usual and customary for secured financings of this type and/or reasonably necessary to effectuate the financing contemplated hereby, as reasonably determined by the Required Consenting Second Lien Noteholders (collectively, the "**Exit Term Facility Documents**", and this paragraph, the "**Documentation Principles**"). <br><br> "**Documentation Precedent**" means the Exit Secured Notes Indenture as to negative covenants and events of default (and in any case shall be no more restrictive than the Exit Secured Notes Indenture with respect to negative covenants and events of default) and the Exit ABL Credit Agreement otherwise, subject to appropriate modifications with respect to cash-flow term loans rather than asset-backed revolving loans. |
| **Representations and Warranties** | Subject to the Documentation Principles, substantially similar to the Exit ABL Credit Agreement. |
| **Affirmative Covenants** | Subject to the Documentation Principles, substantially similar to the Exit ABL Credit Agreement. |
| **Negative Covenants** | Subject to the Documentation Principles, substantially similar to the Exit Secured Notes Indenture, with modifications thereto to (i) provide "cushion" to baskets and thresholds therein customary for first lien/second lien financing structures and (ii) include restrictions on investments or asset sales by foreign Loan Parties and subsidiaries of such foreign Loan Parties (any of the foregoing, a "**Specified Entity**") in or to domestic Loan Parties or foreign non-Loan Party subsidiaries of the Borrower (other than another Specified Entity) other than investments in connection with the sales and purchases of inventory and other transactions in the ordinary course of business consistent with past practices and other exceptions to be agreed upon. |
| **Events of Default** | Subject to the Documentation Principles, substantially similar to the Exit Secured Notes Indenture. |
| **Expenses and Indemnification** | Subject to the Documentation Principles, substantially similar to the Exit ABL Credit Agreement. |
| **Amendments** | Subject to the Documentation Principles, substantially similar to the Exit ABL Credit Agreement. |

| **Governing Law** | New York |

<div align="center">Interest and Certain Fees</div>

| | |
|---|---|
| Interest Rate: | The Exit Term Loans shall bear interest initially at a rate per annum equal to the Adjusted LIBO Rate (or such similar term as defined in the Exit ABL Credit Agreement) (subject to a floor of 1.50%) + 8.0% (the "**Cash Interest**"). |
| | In addition to the Cash Interest, from and after the first anniversary of the Plan Effective Date, the Exit Term Loans shall also bear interest at a rate per annum equal to 1.0%, which interest shall be payable in kind in the form of additional Exit Term Loans (the "**PIK Interest**").  The rate per annum of such PIK Interest shall increase to (i) 2.0% from and after the second anniversary of the Plan Effective Date, (ii) 3.0% from and after the third anniversary of the Plan Effective Date and (iii) 4.0% from and after the fourth anniversary of the Plan Effective Date. |
| Interest Payment Dates: | Cash Interest shall be payable in cash and PIK Interest shall be payable in kind as set forth above, in each case in arrears on the last day of each interest period, upon any prepayment due to acceleration and at final maturity. |
| Fees: | None. |
| Default Rate: | After any event of default, overdue principal, interest, fees and other amounts, as applicable, shall bear interest at 2.00% per annum above the rate otherwise applicable to such obligations. |
| Rate and Fee Basis: | All per annum rates shall be calculated on the basis of a year of 360 days. All amounts payable under this Term Sheet will be made in Dollars (other than PIK Interest) and, in any case, shall not be subject to counterclaim or set-off for, or otherwise be affected by, any claim or dispute relating to any other matter. |

<div align="center">*        *        *        *        *</div>

**Exhibit D**

**Financial Projections**

In connection with the Disclosure Statement, the Debtors' management team ("Management") prepared the following financial projections for fiscal years 2021 through 2025 (the "Financial Projections"). The Financial Projections were prepared by Management and are based on several assumptions with respect to the future performance of the Reorganized Debtors' operations. The Financial Projections were prepared to establish the feasibility of the Plan[1] and therefore take into account the estimated effects of the deleveraging of the Debtors as set forth in the Plan.

The Debtors' advisor RPA Advisors, LLC ("RPA") has assisted in preparing the Financial Projections and has relied upon the accuracy and completeness of financial and other information furnished by Management and did not attempt to independently audit or verify such information. All estimates and assumptions shown within the Financial Projections were developed by Management and RPA. The Financial Projections have not been audited or reviewed by independent accountants. The assumptions disclosed herein are those that Management believes to be significant to the Financial Projections. Although Management is of the opinion that these assumptions are reasonable under the circumstances, such assumptions are subject to significant uncertainties, including but not limited to, macroeconomic and political environment; applicable laws and regulations; changes in customer demand and collection rates; successful implementation of growth plans and capital expenditures; business combinations among the Debtor's competitors, suppliers or customers; severe or unfavorable weather affecting tobacco growers; availability and cost of tobacco materials, interest rates and inflation, foreign currency exchange rates and other economic factors affecting the Reorganized Debtors' businesses. Despite efforts to foresee and plan for the effects of changes in these circumstances, the impact cannot be predicted with certainty. Consequently, actual financial results could vary significantly from projected results.

THESE FINANCIAL PROJECTIONS WERE NOT PREPARED WITH A VIEW TOWARD COMPLIANCE WITH PUBLISHED GUIDELINES OF THE SEC OR GUIDELINES ESTABLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS FOR PREPARATION AND PRESENTATION OF PROSPECTIVE FINANCIAL INFORMATION.

ALTHOUGH MANAGEMENT HAS PREPARED THE FINANCIAL PROJECTIONS IN GOOD FAITH AND BELIEVES THE ASSUMPTIONS TO BE REASONABLE, IT IS IMPORTANT TO NOTE THAT NEITHER THE DEBTORS NOR THE REORGANIZED DEBTORS CAN PROVIDE ANY ASSURANCE THAT SUCH ASSUMPTIONS WILL BE REALIZED. AS DESCRIBED IN DETAIL IN THE DISCLOSURE STATEMENT, A VARIETY OF RISK FACTORS COULD AFFECT THE REORGANIZED DEBTORS' FINANCIAL

---

[1] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Disclosure Statement, to which these Financial Projections are attached as Exhibit D or the Plan attached to the Disclosure Statement as Exhibit A.

RESULTS AND MUST BE CONSIDERED. ACCORDINGLY, THE FINANCIAL PROJECTIONS SHOULD BE REVIEWED IN CONJUNCTION WITH A REVIEW OF THE DISCLOSURE STATEMENT AND THE ASSUMPTIONS DESCRIBED HEREIN, INCLUDING ALL RELEVANT QUALIFICATIONS AND FOOTNOTES.

The Financial Projections contain certain forward-looking statements, all of which are based on various estimates and assumptions. Such forward looking statements are subject to inherent uncertainties and to a wide variety of significant business, economic, and competitive risks, including those summarized herein. When used in the Financial Projections, the words, "anticipate," "believe," "estimate," "will," "may," "intend," "expect," and similar expressions should be generally identified as forward-looking statements. Although the Debtors believe that their plans, intentions, and expectations reflected in the forward-looking statements are reasonable, they cannot be sure that they will be achieved. These statements are only predictions and are not guarantees of future performance or results. Forward-looking statements are subject to risks and uncertainties that could cause actual results to differ materially from those contemplated by a forward-looking statement. All forward-looking statements attributable to the Debtors or Persons or Entities acting on their behalf are expressly qualified in their entirety by the cautionary statements set forth herein. Forward-looking statements speak only as of the date on which they are made. Except as required by law, the Debtors expressly disclaim any obligation to update any forward-looking statement, whether because of new information, future events, or otherwise.

The Financial Projections should be read in conjunction with the assumptions, qualifications, and explanations set forth in the Disclosure Statement and the Plan in their entirety as well as the notes and assumptions set forth below.

The Financial Projections are subject to inherent risks and uncertainties, most of which are difficult to predict and many of which are beyond Management's control. Although Management believes these assumptions are reasonable under the circumstances, such assumptions are subject to significant uncertainties, including, but not limited to, (a) macroeconomic and political environment; (b) applicable laws and regulations; (c) changes in customer demand and collection rates; (d) successful implementation of growth plans and capital expenditures; (e) business combinations among the Debtors' competitors, suppliers or customers; (f) severe or unfavorable weather affecting tobacco growers; (g) availability and cost of tobacco materials; (h) interest rates and inflation; and (i) foreign currency exchange rates and other economic factors affecting the Reorganized Debtors' businesses. Additional information regarding these uncertainties are described in Section VIII of the Disclosure Statement. Should one or more of the risks or uncertainties referenced in the Disclosure Statement occur, or should underlying assumptions prove incorrect, actual results and plans could differ materially from those expressed in the Financial Projections. Further, new factors could cause actual results to differ materially from those described in the Financial Projections, and it is not possible to predict all such factors, or to the extent to which any such factor or combination of factors may cause actual results to differ from those contained in the Financial Projections. The Financial Projections herein are not, and must not be viewed as, a representation of fact, prediction or guaranty of the reorganized Debtors' future performance.

THE DEBTORS DO NOT, AS A MATTER OF COURSE, PUBLISH OR DISCLOSE THEIR FINANCIAL PROJECTIONS. ACCORDINGLY, THE DEBTORS DO NOT INTEND, AND DISCLAIM ANY OBLIGATION TO, (A) FURNISH UPDATED FINANCIAL

PROJECTIONS TO HOLDERS OF CLAIMS OR INTERESTS AT ANY TIME IN THE FUTURE, (B) INCLUDE UPDATED INFORMATION IN ANY DOCUMENTS THAT MAY BE REQUIRED TO BE FILED WITH THE SECURITIES AND EXCHANGE COMMISSION, OR (C) OTHERWISE MAKE UPDATED INFORMATION OR FINANCIAL PROJECTIONS PUBLICLY AVAILABLE. THE SUMMARY FINANCIAL PROJECTIONS AND RELATED INFORMATION PROVIDED IN THE DISCLOSURE STATEMENT AND THE EXHIBITS THERETO HAVE BEEN PREPARED EXCLUSIVELY BY MANAGEMENT. THE FINANCIAL PROJECTIONS, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ARE NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS WHICH, THOUGH CONSIDERED REASONABLE BY MANAGEMENT, MAY NOT BE REALIZED, AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, AND COMPETITIVE UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE DEBTORS' CONTROL. THE DEBTORS CAUTION THAT NO REPRESENTATIONS CAN BE MADE AS TO THE ACCURACY OF THE FINANCIAL PROJECTIONS AND RELATED INFORMATION OR AS TO THE REORGANIZED DEBTORS' ABILITY TO ACHIEVE THE PROJECTED RESULTS. SOME ASSUMPTIONS INEVITABLY WILL NOT MATERIALIZE AND EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THE FINANCIAL PROJECTIONS WERE PREPARED MAY BE DIFFERENT FROM THOSE ASSUMED OR MAY BE UNANTICIPATED, AND THUS MAY AFFECT FINANCIAL RESULTS IN A MATERIAL AND POSSIBLY ADVERSE MANNER. THE FINANCIAL PROJECTIONS AND RELATED INFORMATION, THEREFORE, MAY NOT BE RELIED UPON AS A GUARANTY OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR.

1) **General Assumptions**

   A. **Overview**

   The Debtors and their consolidated subsidiaries produce, independently verified, and traceable agricultural products, ingredients and services to businesses and customers. The Debtors' principal business is as a tobacco leaf merchant, purchasing, processing, packing, storing and shipping tobacco to cigarette and other consumer tobacco products manufacturers worldwide. While the leaf tobacco business currently forms the core of the Debtors' operations, the Debtors also have been undergoing a transformation to diversify their business lines and leverage their core strengths in agronomy and traceability to develop a suite of "next generation" products. The Debtors have invested a substantial amount of resources into building a portfolio of brands featuring e-liquids, hemp and cannabidiol ("CBD") products predominantly in the US and legal cannabis in Canada. These next generation products have contributed a small percentage of the Company's historical revenue but are expected to grow considerably over the next few years.

   B. **Accounting Policies**

   The Financial Projections have been prepared using accounting policies that are materially consistent with those applied in the Company's historical financial statements. The Financial Projections do not reflect the formal implementation of reorganization accounting pursuant to FASB Accounting Standards Codification Topic 852, *Reorganizations* ("ASC 852"). Overall, the

implementation of ASC 852 is not anticipated to have a material impact on the underlying economics of the Plan.

### C. Methodology

In developing the Financial Projections, Management collects and analyzes data provided by their regional operations including, but not limited to, inputs regarding growing season, expected crop yields, customer activity and purchasing plans/indications for the upcoming year. Management further refines the forecast to include their strategic plans and expectations based on historical buying trends and customer discussions to develop a comprehensive operating plan and forecast.

### D. Plan Consummation

The Financial Projections assume that the Plan will be consummated on or around July 31, 2020.

## 2) Assumptions with Respect to Summary Financials FY2020

### A. Overview

The FY2020 data is based upon Company estimates and is subject to change based upon the Company's financial closing procedures and the completion of the Company's financial statements and has not been reviewed by the independent registered accounting firm of the Company. The Company's actual results may be materially different from these estimates. These estimates should not be viewed as a substitute for full audited consolidated financial statements prepared in accordance with GAAP. There can be no assurance that the Company's final results for FY2020 will not differ from these estimates. The FY2020 data should be reviewed in conjunction with a review of the Disclosure Statement and the assumptions described herein, including all relevant qualifications and footnotes. You should not place undue reliance on these estimates. The Company operates on a March 31 fiscal year end.

## 3) Assumptions with Respect to the Summary Financial Projections FY2021 – FY2025

### A. Overview

The projected results of operations and cash flows over the projected period are based on the assumed emergence date on or around July 31, 2020.  As part of their ongoing cost reduction initiatives, Management has reviewed the overall expenditures of the Company and has implemented changes related to travel, capital projects, SG&A and other categories.   The projections presented below include the planned implementation of these initiatives.

### B. Working Capital

Working capital assumptions are based on changes in accounts receivable, accounts payable, inventory, advances to tobacco suppliers, notes payable to banks and other current assets and liabilities. Projected balances are based on the historical cash conversion cycle of the Company's specific business units. Prospective working capital assumptions were supplemented

by Management as deemed appropriate and reflect the reorganized Company's estimated post-emergence capital structure

### C. Capital Structure

The reorganized Company's estimated post-emergence capital structure is assumed to be effective beginning on or around July 31, 2020. The Financial Projections assume the following key assumptions at emergence:

- An ABL Facility similar to the Debtors' pre-petition ABL. The ABL Facility is assumed to have approximately $25 million drawn as of the effective date.

- $213.4 million secured Exit Term Facility with a 4.5-year maturity. The Exit Term Facility has no call protection. The Exit Term Facility accrues cash interest at an annual rate of LIBOR (subject to a floor of 1.5%) plus 800 basis points. After the first year, in addition to the cash interest, the Exit Term Facility shall also bear interest at a rate per annum equal to 1.0% payable in kind in the form of additional Exit Term Loans. The rate per annum of such PIK Interest shall increase by 1.0% annually.

- $280.8 million of Exit Secured Notes with a 4-year maturity and cash interest at an annual rate of 10.0%. The Exit Secured Notes will be subject to "make-whole" call protection for the first two years, after which they may be redeemed at 105.0% of the aggregate principal amount until three years after the Effective Date. After such date but prior to 3.5 years after the Effective Date, the Exit Secured Notes may be redeemed at 102.5% of the aggregate principal amount. On or after the 3.5-year anniversary of the Effective Date the Exit Secured Notes are no longer call-protected.

### D. Basis of Presentation (Non-GAAP)

Non-GAAP Adjusted EBITDA may exclude certain items including reserves on customer receivables, non-cash compensation, amortization of a former Brazilian subsidiary that is now a JV, recovery of Brazilian tax credits, expenses related to One Tomorrow transformation, entity restructuring and impairment charges and discontinued Kenya leaf operations.

### E. Sales

The Financial Projections are based on Management's view of the Reorganized Debtors' product strategies and overall economic outlook. Sales are expected to be approximately $1,799 million in FY2021 increasing to $1,909 million in FY2022, $2,038 million in FY2023, $2,163 million in FY2024 and $2,262 million in FY2025.

### F. Cost of Goods Sold

Cost of Goods Sold includes the purchase of tobacco and other raw materials, processing expense, transportation and storage cost and other operating expenses. These costs are based on historical trends and expectations of management, with adjustments for ongoing cost reduction efforts implemented in FY2021.

**G. Selling, General and Administrative Expenses**

Selling, General and Administrative Costs ("SG&A") are primarily comprised of costs, and other expenses associated with overhead. Projected SG&A is based primarily on historical SG&A costs, with adjustments for ongoing cost reduction efforts implemented in FY2021.

**H. Other Income, Net**

Other Income, Net includes interest income, gain from equity ownership in unconsolidated subsidiaries and minority interest.

**I. Depreciation and Amortization**

Depreciation and amortization reflects the anticipated book expenses based on the carrying asset values.

**J. Adjustments**

Adjustments include reserves on customer receivables, non-cash compensation, amortization of a former Brazilian subsidiary that is now a JV, recovery of Brazilian tax credits, expenses related to One Tomorrow transformation, entity restructuring and impairment charges and discontinued Kenya leaf operations.

**K. Capital Expenditures**

Forecasted capital expenditures ("CapEx") Projection for capex includes, but is not limited to, capital investments, expansion of business lines, routine replacement of equipment as well as investments in other assets that will add value. Forecasts include the impact of an ongoing cost reduction effort implemented in FY2021.

## Summary Financials FY2020

The FY2020 data is based upon Company estimates and is subject to change based upon the Company's financial closing procedures and the completion of the Company's financial statements and has not been reviewed by the independent registered accounting firm of the Company. The Company's actual results may be materially different from these estimates. These estimates should not be viewed as a substitute for full audited consolidated financial statements prepared in accordance with GAAP. There can be no assurance that the Company's final results for FY2020 will not differ from these estimates. The FY2020 data should be reviewed in conjunction with a review of the Disclosure Statement and the assumptions described herein, including all relevant qualifications and footnotes. You should not place undue reliance on these estimates.

## Unaudited Financial Statements

| Income Statement ($, millions) | Year End March 31, 2020 | | Balance Sheet ($, millions) | As of March 31, 2020 |
|---|---|---|---|---|
| Full Service Sales | 343 | | Cash | 170 |
| Third-Party Processing Sales | 181 | | Accounts Receivable | 250 |
| Sales Volume Sold (kilos, millions) | 524 | | Inventory | 731 |
| | | | Other Current | 87 |
| Sales | 1,527 | | Current Assets | 1,239 |
| COGS | (1,303) | | PP&E, Net | 338 |
| Gross Margin | 225 | | Other Non Current | 194 |
| SG&A | (193) | | Total Assets | 1,771 |
| Other Inc | 2 | | | |
| Restr and Asset Imp | (5) | | Notes Payable | 540 |
| Goodwill Impairment | (34) | | Accounts Payable and Accrued | 171 |
| Operating Income | (5) | | Other Current | 80 |
| Interest Expense | (137) | | Current Liabilities | 792 |
| Interest Income | 4 | | Long Term Debt | 904 |
| Pre-Tax Income | (138) | | Other Non Current | 147 |
| Tax Expense | (132) | | Non Current Liabilities | 1,051 |
| Equity Pickup | 6 | | Equity | (72) |
| Minority Int | 6 | | Total Liabilities & Equity | 1,771 |
| Net Income | (259) | | | |
| Deprecation & Amortization | 36 | | | |
| Interest Expense | 137 | | | |
| Tax Expense | 132 | | | |
| EBITDA | 46 | | | |
| Adjustments[1] | 69 | | | |
| Adjusted EBITDA | 115 | | | |
| Capex | (59) | | | |
| Adjusted EBITDA Less Capex | 56 | | | |

[1] Adjustments include reserves on customer receivables, non-cash compensation, other income, restructuring and impairment expenses, amortization of a former Brazilian subsidiary that is now a JV, recovery of Brazilian tax credits, expenses related to One Tomorrow transformation, entity restructuring and discontinued Kenya leaf operations.

## Summary Financial Projections FY2021 – FY2025

EBIT, Adjusted EBITDA and Adjusted EBITDA Less Capex are non-GAAP financial measures. The Company has not provided a reconciliation of projected EBIT, Adjusted EBITDA and Adjusted EBITDA Less Capex to projected net income (loss) because full-year net income will include special items that have not yet occurred and are difficult to predict with reasonable certainty. Due to this uncertainty, the Company cannot reconcile projected EBIT, Adjusted EBITDA and Adjusted EBITDA Less Capex to U.S. GAAP net income (loss) without unreasonable effort.

Working capital assumptions are based on changes in accounts receivable, accounts payable, inventory, advances to tobacco suppliers, notes payable to banks and other current assets and liabilities. Projected balances are based on the historical cash conversion cycle of the Company's specific business units. Prospective working capital assumptions were supplemented by Management as deemed appropriate and reflect the reorganized Company's estimated post-emergence capital structure

| | *Year End March 31,* | | | | |
|---|---|---|---|---|---|
| | **2021** | **2022** | **2023** | **2024** | **2025** |
| *Income Statement ($, millions)* | | | | | |
| | | | | | |
| Full Service Sales | 400 | 381 | 388 | 393 | 395 |
| Third-Party Processing Sales | 193 | 230 | 234 | 239 | 244 |
| Sales Volume Sold (kilos, millions) | 593 | 611 | 622 | 632 | 640 |
| | | | | | |
| Sales | 1,799 | 1,909 | 2,038 | 2,163 | 2,262 |
| COGS | (1,532) | (1,614) | (1,694) | (1,771) | (1,840) |
| Gross Margin | 268 | 295 | 345 | 392 | 422 |
| SG&A | (200) | (212) | (224) | (237) | (248) |
| Other Income, Net[1] | 16 | 12 | 14 | 16 | 17 |
| EBIT | 84 | 95 | 135 | 172 | 191 |
| Depreciation & Amortization | 37 | 38 | 38 | 39 | 39 |
| Adjustments[2] | 8 | 3 | 3 | 3 | 2 |
| Adjusted EBITDA | 128 | 137 | 176 | 214 | 232 |
| Capex | (48) | (32) | (25) | (26) | (27) |
| Adjusted EBITDA Less Capex | 80 | 105 | 151 | 188 | 205 |

[1] Other Income, Net includes interest income, equity pickup and minority interest.

[2] Adjustments include reserves on customer receivables, non-cash compensation, amortization of a former Brazilian subsidiary that is now a JV, recovery of Brazilian tax credits, expenses related to One Tomorrow transformation, entity restructuring and discontinued Kenya leaf operations.

| | *As of March 31,* **2021** |
|---|---|
| **Balance Sheet ($, millions)** | |
| Cash | 366 |
| Accounts Receivable | 265 |
| Inventory | 517 |
| Other Current | 63 |
| Current Assets | 1,211 |
| PP&E, Net | 356 |
| Other Non Current | 194 |
| Total Assets | 1,761 |
| | |
| Notes Payable | 451 |
| Accounts Payable and Accrued | 167 |
| Other Current | 34 |
| Current Liabilities | 652 |
| Long Term Debt | 494 |
| Other Non Current | 152 |
| Non Current Liabilities | 646 |
| Equity | 463 |
| Total Liabilities & Equity | 1,761 |

**<u>Exhibit E</u>**

**Valuation Analysis**

## Valuation Analysis of Reorganized Pyxus and its Subsidiaries

THE INFORMATION CONTAINED HEREIN IS NOT A PREDICTION OR GUARANTEE OF THE ACTUAL MARKET VALUE THAT MAY BE REALIZED THROUGH THE SALE OF ANY SECURITIES TO BE ISSUED PURSUANT TO THE PLAN. THE INFORMATION IS PRESENTED SOLELY FOR THE PURPOSE OF PROVIDING ADEQUATE INFORMATION UNDER SECTION 1125 OF THE BANKRUPTCY CODE TO ENABLE THE HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN TO MAKE AN INFORMED JUDGMENT ABOUT THE PLAN AND SHOULD NOT BE USED OR RELIED UPON FOR ANY OTHER PURPOSE, INCLUDING THE PURCHASE OR SALE OF CLAIMS AGAINST THE DEBTORS OR ANY OF THEIR AFFILIATES.

THE VALUATION ANALYSIS DOES NOT CONSTITUTE A RECOMMENDATION TO ANY HOLDER OF ALLOWED CLAIMS OR ANY OTHER PERSON AS TO HOW SUCH PERSON SHOULD VOTE OR OTHERWISE ACT WITH RESPECT TO THE PLAN. LAZARD HAS NOT BEEN REQUESTED TO, AND DOES NOT EXPRESS ANY VIEW AS TO, THE POTENTIAL TRADING VALUE OF REORGANIZED PYXUS' SECURITIES ON ISSUANCE OR AT ANY OTHER TIME.

### A. Lazard's Estimated Valuation

Solely for the purposes of the Plan and the Disclosure Statement, Lazard Frères & Co. LLC ("Lazard"), as investment banker to the Debtors, has estimated a range of total enterprise value ("Enterprise Value") for Reorganized Pyxus and its subsidiaries the ("Reorganized Company") on a consolidated going-concern basis and pro forma for the transactions contemplated by the Plan (the "Valuation Analysis"). The Valuation Analysis is based on financial information and projections provided by the Debtors' management, including the financial projections for the period of fiscal years 2021 through 2025 (the "Projection Period") attached to the Disclosure Statement as **Exhibit E** (collectively the "Projections"), and information that is publicly available or was provided by other sources. The Valuation Analysis assumes that the Effective Date will occur on July 31, 2020. The valuation estimates set forth herein represent valuation analyses of the Reorganized Company based on the application of customary valuation techniques to the extent deemed appropriate by Lazard.

Based on the Projections and solely for the purposes of the Plan, Lazard estimates that the potential range of Enterprise Value of the Reorganized Company is approximately $1,230 to $1,490 million. Based on the potential range of Enterprise Value and assumed net debt of $960 million as of the Effective Date, Lazard estimates an imputed range of potential equity value for the Reorganized Company of $270 to $530 million. For purposes of the Valuation Analysis, Lazard assumed that, between the date of filing of the Disclosure Statement and the assumed Effective Date, no material changes will occur that would affect the Projections or Valuation Analysis. Lazard's Valuation Analysis does not constitute an opinion as to fairness from a financial point of view of the consideration to be received or paid under the Plan, of the terms and provisions of the Plan, or with respect to any other matters.

B.  **Valuation Methodology**

      Lazard has estimated the consolidated value of the Reorganized Company by primarily relying on two generally accepted valuation techniques: (i) Discounted Cash Flow ("DCF") Analysis and (ii) Comparable Public Company Analysis.  While Lazard recognizes that the precedent transaction methodology is often used, Lazard believes that this methodology has less relevance for purposes of assessing the Enterprise Value of the Reorganized Company due to the lack of recent comparable precedent transactions, among other factors.  For purposes of estimating the consolidated value of the Reorganized Company, Lazard employed a sum-of-the-parts approach that values the Reorganized Company's two operating segments separately, taking into account differences in the business and financial characteristics of the Leaf and Global Specialty Products businesses.

(i)      Discounted Cash Flow Analysis:

      DCF analysis is a forward-looking enterprise valuation methodology that estimates the value of an asset or business by calculating the present value of expected future cash flows to be generated by that asset or business.  Under this methodology, projected future cash flows are discounted by the weighted average cost of capital (the "Discount Rate") of the business.  The Discount Rate reflects the estimated rate of return that would be required by debt and equity investors to invest in the business.  The Enterprise Value of the firm is determined by calculating the present value of the unlevered after-tax free cash flows based on the Projections plus an estimate for the value of the firm beyond the Projection Period, known as the terminal value.  The terminal value is derived using the normalized earnings before interest, taxes, depreciation and amortization ("EBITDA") in the final year of the Projection Period, and discounted back to the assumed Effective Date.

(ii)     Comparable Public Company Analysis:

      Comparable Public Company Analysis estimates the value of a company relative to other publicly traded companies with similar business and financial characteristics.  Lazard first selected sets of publicly traded companies that it believes exhibit similar business and financial characteristics to the Leaf and Global Specialty Products businesses.  Criteria for the selected reference groups included, among other relevant characteristics, similarity in operations, business risks, growth prospects, product mix, customer base, margins, market presence, size and scale of operations.  The selected reference groups may not be comparable to the Leaf and Global Specialty Products businesses in all aspects, and may differ materially in certain specific respects.

      In deriving Enterprise Value ranges under the Comparable Public Company Analysis methodology, Lazard used EBITDA and Revenues as its primary valuation metrics.  Lazard calculated FY2020A (representing the Company's fiscal year ending March 31, 2020), FY2021E (representing  Reorganized Company's fiscal year ending March 31, 2021) and FY2022E (representing the Reorganized Company's'  fiscal year ending March 31, 2022)  multiples of this reference group, applying certain

qualitative judgments based on the characteristics of the Leaf and Global Specialty Products businesses and each of their selected reference groups.  Lazard then applied a range of multiples to the implied FY2020A, FY2021E and FY2022E EBITDA of the Leaf business and implied FY2020A, FY2021E and FY2022E Revenue of the Global Specialty Products business.

In performing the sum-of-the-parts valuation analysis described above, Lazard separately estimated the enterprise values of the Leaf and Global Specialty Products businesses based on the application of the Discounted Cash Flow and Comparable Public Company analyses.  While a sum-of-the-parts approach assigns value to each of the Company's two operating segments, the valuation analysis described herein must be considered as a whole.  Reliance on only one of the methodologies used, or portions of the analysis performed, could create a misleading or incomplete conclusion as to Enterprise Value.

THE VALUATION ANALYSIS REFLECTS WORK PERFORMED BY LAZARD ON THE BASIS OF INFORMATION IN RESPECT OF THE BUSINESSES AND ASSETS OF THE DEBTORS AVAILABLE TO LAZARD AS OF JUNE 12, 2020. IT SHOULD BE UNDERSTOOD THAT, ALTHOUGH SUBSEQUENT DEVELOPMENTS MAY HAVE AFFECTED OR AFFECT LAZARD'S CONCLUSIONS, LAZARD DOES NOT HAVE ANY OBLIGATION TO UPDATE, REVISE, OR REAFFIRM ITS VALUATION ANALYSIS AND DOES NOT INTEND TO DO SO. LAZARD IS NOT MAKING ANY ASSESSMENT REGARDING IMPACT OR THE ECONOMIC EFFECTS OF THE COVID-19 VIRUS, INCLUDING WITH RESPECT TO THE POTENTIAL IMPACT OR EFFECTS ON THE FUTURE FINANCIAL PERFORMANCE OF THE REORGANIZED DEBTORS. SUBSEQUENT DEVELOPMENTS, INCLUDING, WITHOUT LIMITATION, IN RELATION TO COVID-19, MAY AFFECT THE PROJECTIONS AND OTHER INFORMATION THAT LAZARD UTILIZED IN THE VALUATION ANALYSIS. LAZARD ASSUMES NO RESPONSIBILITY FOR UPDATING OR REVISING THE VALUATION ANALYSIS BASED ON CIRCUMSTANCES OR EVENTS AFTER THE DATE HEREOF.

LAZARD DID NOT INDEPENDENTLY VERIFY THE PROJECTIONS OR OTHER INFORMATION THAT LAZARD USED IN THE VALUATION ANALYSIS, AND NO INDEPENDENT VALUATIONS OR APPRAISALS OF THE DEBTORS WERE SOUGHT OR OBTAINED IN CONNECTION THEREWITH.

THE VALUATION ANALYSIS WAS DEVELOPED SOLELY FOR PURPOSES OF THE PLAN AND THE ANALYSIS OF POTENTIAL RELATIVE RECOVERIES TO HOLDERS OF CLAIMS THEREUNDER.  THE VALUATION ANALYSIS REFLECTS THE APPLICATION OF VARIOUS VALUATION TECHNIQUES, DOES NOT PURPORT TO BE AN OPINION AND DOES NOT PURPORT TO REFLECT OR CONSTITUTE AN APPRAISAL, LIQUIDATION VALUE, OR ESTIMATE OF THE ACTUAL MARKET VALUE THAT MAY BE REALIZED THROUGH THE SALE OF ANY SECURITIES TO BE ISSUED OR ASSETS TO BE SOLD PURSUANT TO THE PLAN, WHICH MAY BE SIGNIFICANTLY DIFFERENT THAN THE AMOUNTS SET FORTH IN THE VALUATION ANALYSIS.

THE VALUE OF AN OPERATING BUSINESS IS SUBJECT TO NUMEROUS UNCERTAINTIES AND CONTINGENCIES THAT ARE DIFFICULT TO PREDICT AND

WILL FLUCTUATE WITH CHANGES IN FACTORS AFFECTING THE FINANCIAL CONDITION AND PROSPECTS OF SUCH A BUSINESS. AS A RESULT, THE VALUATION ANALYSIS IS NOT NECESSARILY INDICATIVE OF ACTUAL OUTCOMES, WHICH MAY BE SIGNIFICANTLY MORE OR LESS FAVORABLE THAN THOSE SET FORTH HEREIN. BECAUSE SUCH ESTIMATES ARE INHERENTLY SUBJECT TO UNCERTAINTIES, NEITHER THE DEBTORS, LAZARD, NOR ANY OTHER PERSON ASSUMES RESPONSIBILITY FOR THEIR ACCURACY.  IN ADDITION, THE POTENTIAL VALUATION OF NEWLY ISSUED SECURITIES IS SUBJECT TO ADDITIONAL UNCERTAINTIES AND CONTINGENCIES, ALL OF WHICH ARE DIFFICULT TO PREDICT. ACTUAL MARKET PRICES OF SUCH SECURITIES AT ISSUANCE WILL DEPEND UPON, AMONG OTHER THINGS, PREVAILING INTEREST RATES, CONDITIONS IN THE FINANCIAL MARKETS, THE ANTICIPATED INITIAL SECURITIES HOLDINGS OF PREPETITION CREDITORS, SOME OF WHICH MAY PREFER TO LIQUIDATE THEIR INVESTMENT RATHER THAN HOLD IT ON A LONG-TERM BASIS, THE POTENTIALLY DILUTIVE IMPACT OF CERTAIN EVENTS, INCLUDING THE ISSUANCE OF EQUITY SECURITIES PURSUANT TO ANY MANAGEMENT INCENTIVE COMPENSATION PLAN, AND OTHER FACTORS THAT GENERALLY INFLUENCE THE PRICES OF SECURITIES.

Management of the Debtors advised Lazard that the Projections were reasonably prepared in good faith and on a basis reflecting the Debtors' best estimates and judgments as to the future operating and financial performance of the Reorganized Company.  The Valuation Analysis assumes that the actual performance of the Reorganized Company will correspond to the Projections in all material respects.  If the business performs at levels below or above those set forth in the Projections, such performance may have a materially negative or positive impact, respectively, on the Valuation Analysis and estimated potential ranges of Enterprise Value therein.

In preparing the Valuation Analysis, Lazard:  (a) reviewed certain historical financial information of the Debtors for recent years and interim periods; (b) reviewed certain financial and operating data of the Debtors, including the Projections; (c) discussed the Debtors' operations and future prospects with the Debtors' senior management team and third-party advisors; (d) reviewed certain publicly available financial data for, and considered the market value of, public companies that Lazard deemed generally relevant in analyzing the value of the Reorganized Company; (e) reviewed certain publicly available financial data for transactions involving companies similar in certain respects to the Leaf and Global Specialty Products businesses; (f) considered certain economic and industry information that Lazard deemed generally relevant to the Reorganized Company; and (g) conducted such other studies, analyses, inquiries, and investigations as Lazard deemed appropriate.  Lazard assumed and relied on the accuracy and completeness of all financial and other information furnished to it by the Debtors' management and other parties as well as publicly available information.

Lazard did not estimate the value of any tax attributes nor did it estimate the impact of any cancellation of indebtedness income on the Reorganized Debtors' projections.  Any changes to the assumptions on the availability of tax attributes or the impact of cancellation of indebtedness income on the Reorganized Debtors' projections could materially impact Lazard's valuation analysis.

THE SUMMARY SET FORTH ABOVE DOES NOT PURPORT TO BE A COMPLETE DESCRIPTION OF THE VALUATION ANALYSIS PERFORMED BY LAZARD. THE PREPARATION OF A VALUATION ANALYSIS INVOLVES VARIOUS DETERMINATIONS AS TO THE MOST APPROPRIATE AND RELEVANT METHODS OF FINANCIAL ANALYSIS AND THE APPLICATION OF THESE METHODS IN THE PARTICULAR CIRCUMSTANCES AND, THEREFORE, SUCH AN ANALYSIS IS NOT READILY SUITABLE TO SUMMARY DESCRIPTION. THE VALUATION ANALYSIS PERFORMED BY LAZARD IS NOT NECESSARILY INDICATIVE OF ACTUAL VALUES OR FUTURE RESULTS, WHICH MAY BE SIGNIFICANTLY MORE OR LESS FAVORABLE THAN THOSE DESCRIBED HEREIN.

LAZARD IS ACTING AS INVESTMENT BANKER TO THE DEBTORS, AND HAS NOT BEEN, WILL NOT BE RESPONSIBLE FOR, AND WILL NOT PROVIDE ANY TAX, ACCOUNTING, ACTUARIAL, LEGAL, OR OTHER SPECIALIST ADVICE.

**Exhibit F**

**Liquidation Analysis**

LIQUIDATION ANALYSIS

As part of the chapter 11 process, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court determine that a chapter 11 plan provides, with respect to each class, that each holder of a claim or an equity interest in such class either (i) has accepted the plan or (ii) will receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the amount that the holder would receive if the debtors had liquidated under chapter 7 of the Bankruptcy Code as of such date.

Below is a summary of an illustrative liquidation analysis (the "Liquidation Analysis")[1] assuming that the Debtors' chapter 11 cases are converted into cases under chapter 7 of the Bankruptcy Code. Under chapter 7 of the Bankruptcy Code, the Debtors' assets and business would be liquidated under the direction of a chapter 7 Trustee ("Trustee"). The hypothetical chapter 7 liquidation presented herein assumes that the Trustee would proceed with sales of the Debtors' assets over a period of 12 months. This assumption is highly speculative and, in fact a true liquidation could take longer. As set forth in this Liquidation Analysis, the estimated recoveries received or retained by the impaired Holders of Claims and Interests under the Plan will not be less than the estimated value of property received or retained by such Holders in a hypothetical chapter 7 liquidation. As a result, the Debtors believe that the Plan satisfies the "best interests" test of section 1129(a)(7) of the Bankruptcy Code.

A. Key Assumptions Underlying the Hypothetical Liquidation

The Debtors' financial advisor, RPA, assisted in analyzing the supporting data and considering many factors related to the liquidation. In the process of the analysis, certain assumptions underlying the analysis were required to be made. Presented and described herein are the key assumptions that the Debtors and RPA considered significant in evaluating and reviewing the Liquidation Analysis.

1. General Assumptions

The following general assumptions were considered by the Debtors and RPA as assumptions that would be applicable in any hypothetical chapter 7 liquidation, including the liquidation presented herein.

a) Administrative Procedures and Conversion of Cases

For purposes of the Liquidation Analysis, the Debtors assume that each of the Chapter 11 Cases is converted to a chapter 7 case and consolidated during the chapter 7 proceeding. In the event that the Debtors were to be liquidated in separately administered chapter 7 cases, the administrative costs to the Debtors in each of the cases, including professional fees, Trustee fees, the Debtors' operational costs, etc. would likely be higher than if the cases were consolidated.

---

[1] All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Disclosure Statement to which this Liquidation Analysis is attached as Exhibit F or in the Plan attached to the Disclosure Statement as Exhibit A.

b) Professionals Involved in the Chapter 7 Proceedings

As part of the chapter 7 case, the Debtors and RPA assume that the Trustee would choose to retain certain professionals, including counsel, advisors, consultants and appraisers, among others, to provide expertise and assistance in the liquidation of the Debtors. The Liquidation Analysis illustratively assumes that the existing counsel, advisors, consultants, etc. would be replaced by the Trustee with new professionals.

c) Timing Considerations of Chapter 7 Cases

The Debtors and RPA assume for purposes of the Liquidation Analysis that sales of the Debtors' assets across the globe would occur over a 12-month period following the Trustee's appointment, which is significantly longer than the contemplated timeline for consummating the Plan. The Liquidation Analysis assumes that the Trustee and any newly-retained professionals would require significant time to familiarize themselves with the Debtors, the Debtors' business and assets, and the Claims asserted by constituents as part of the Chapter 11 Cases. Given the complex nature of the existing Chapter 11 Cases and the technical and unique aspects of the Debtors' global business, the Trustee and any new professionals would likely require significant time before they could begin liquidating the assets. Therefore, the illustrative Liquidation Analysis assumes that the chapter 7 case would incur significant "ramp up" costs, fees, and expenses, prior to implementing a sale effort for each Debtor's assets. The Debtors may also incur substantially higher administrative costs under the liquidation than contemplated in this analysis, if assumptions regarding the requirements necessary to effect an orderly liquidation prove incorrect or the timing to fully liquidate the assets is longer than assumed.

d) Trustee and Professional Fees for Chapter 7 Administration; Wind Down Costs

The Debtors assume that under a chapter 7 liquidation, the Trustee would incur fees necessary to facilitate a sale of the Debtors' assets. The Liquidation Analysis assumes that such fees would likely be approximately three percent (3%) of the available liquidation proceeds, which is the maximum amount permitted by section 326(a) of the Bankruptcy Code. These fees are assumed to be earned for the Trustee's role in facilitating the liquidation of the Debtors' assets in numerous jurisdictions, driving and monitoring the cash collection process for the estate, supporting the diligence, data and general reporting needs of the estate as well as handling the general administrative oversight of the estate.

The Debtors assume $7.5 million as the estimated cost for advisors, attorneys and other professionals retained by the Trustee. However, this amount can fluctuate based on the length and complexity of the global wind-down process, which involves entities in numerous foreign jurisdictions, and could be substantially greater than the amounts assumed herein, especially if foreign insolvency proceedings are required to implement such sale(s).

The Debtors also have assumed $65.1 million of wind down costs, which includes the costs related to personnel required to manage warehouses, move inventory and assist with one or more sale(s) of assets in numerous foreign jurisdictions, certain of which may need to be implemented pursuant to one or more foreign insolvency proceedings.

The Debtors have estimated the cost of the wind down based on a review of the Debtors' current operational costs by line item. The Debtors estimated various reductions that potentially could be made at the commencement of the wind down and further reductions that could be implemented as the assets are liquidated and the end of the liquidation period approaches.

The Debtors also assume $23.3 million of professional fees of the Debtors' advisors that will have priority over the Holders of Claims and Interests in a chapter 7 liquidation pursuant to the DIP Order and the Bankruptcy Code.

The Debtors also considered the following assumptions that would apply in a hypothetical liquidation:

a) Sale of All of the Company's Assets through Liquidation

Under the Liquidation Analysis, the Debtors and RPA assume that the Trustee will be unable to sell the Debtors' businesses (including the tobacco and Global Specialty Products businesses of the Debtors' subsidiaries and affiliates) as going concerns given the complexity of their operations and their need for working capital to support ordinary course operations. If the Debtors are unable to timely provide financial support to their non-Debtor affiliates, such entities may need to commence insolvency proceedings, which likely would include foreign insolvency proceedings. In addition, the imposition of a Trustee may trigger cross defaults and change of control provisions in certain of the Company's contracts and regulatory licenses.  The Company may not be able to obtain necessary contractual waivers or regulatory approvals thereby further compromising the value of the Company's international businesses, including the ability to sell such businesses as going concerns.

Given the integrated nature of the Company, if the Debtors were to liquidate and cease providing financial, operational and administrative support to their subsidiaries and affiliates, the Debtors and RPA assume the non-Debtor subsidiaries and affiliates could not maintain their operations on a standalone basis. In addition, there are extensive intercompany claims among the Debtors and non-Debtor subsidiaries and affiliates that would further challenge a sale of the non-Debtor subsidiaries on a going concern basis. Therefore, a sale of all of the Company's assets is assumed to take place through a series of liquidating sales conducted over the course of a full year. The 12-month period is expected to benefit the Debtors by exposing their assets to buying interest that occurs over the course of a full selling season in the various regions where they operate. The 12-month term also is viewed as necessary in order for non-Debtor subsidiaries and affiliates, to wind up their affairs and sell their assets in an orderly process.  If the Trustee disposed of each of the Debtors' assets in a shorter period, as part of a "scrap value" liquidation, this would have the effect of forcing a number of non-Debtor entities to rapidly unwind their operations and would likely yield estimated proceeds less than those earned in the sale of the assets over a 12-month period, thus reducing the value available to the Debtors' estates.

The Liquidation Analysis assumes that the Trustee will choose to maximize recoveries for creditors by pursuing these sales in a series of transactions rather than at a single auction or sale event. The rationale for this is that the Debtors' operations are global and efforts to sell inventory and property in local regions will require coordination between the Trustee and local managers to identify likely buyers and launch dedicated marketing efforts in the specific regions. Furthermore, a global effort of this magnitude will require sufficient time to coordinate and execute.

b) Purchase Price Considerations; Intercompany Claims

The Debtors and RPA assume that asset sales conducted under the Liquidation Analysis will be at arm's length to third party purchasers. The Debtors and RPA assumed that the Debtors' estates would realize a marginal discount to outstanding receivables value (75% to 85% recovery), and a significant discount to finished goods inventory value (25% to 45% recovery) and Plant Property and Equipment (25% to 35% recovery). Specifically, the Debtors and RPA are aware that the tobacco inventory that the Company holds for sale in many cases will have a limited number of buyers, given that buyers tend to purchase specific grade, types and quality.

Additionally, the tobacco industry is made up of a close universe of buyers who are likely to be aware of the Debtors' distressed financial condition and will seek significant discounts in order to purchase the substantial volume of tobacco which will be held for sale. Management has observed this experience in liquidation events of competitors in the past and has taken this into account in the assumptions made in this analysis.

The Debtors also maintain significant intercompany claims against both Debtor and non-Debtor entities. The Liquidation Analysis assumes that Intercompany claims are treated as general unsecured claims in the recovery waterfall of each obligor.

c) Cash Generation from Operating Activities

The Liquidation Analysis assumes that the Trustee will utilize cash on hand and proceeds from sales to support the winddown expenses of the estate during liquidation. There is no guarantee that the Trustee will receive Bankruptcy Court authorization to do so. In the event that cash flows from the liquidation are not sufficient to fund the liquidation of the business, the Trustee may not have sufficient funds to conduct an appropriately timed marketing and sales process. As a result, the Trustee may be forced to begin immediately liquidating the assets, resulting in potentially lower recoveries.

d) Ability to Retain Key Personnel

The Liquidation Analysis assumes that certain key personnel currently involved in the operations of the Debtors would continue to remain involved in order to execute the orderly sale of the assets. Key personnel would be necessary to support the Debtors' selling, shipping, packing, collection, accounting and tax reporting requirements to effectively consummate the contemplated transactions. In the event that such personnel were to terminate their relationships with the Debtors,

there can be no guarantee that the Trustee would have the necessary information, resources, or support to effect the liquidation strategy as contemplated in this analysis.

### B. A Hypothetical Liquidation through Chapter 7 of the Bankruptcy Code Will Not Result in a Higher Recovery for Holders of Claims and Interests than Provided in the Plan

As presented in the Liquidation Analysis, the liquidation of the Debtors' assets under chapter 7 of the Bankruptcy Code will not result in a better recovery to the Holders of impaired Claims against and Interests in the Debtors as compared to the recoveries that are contemplated under the Plan. The Debtors believe that Consummation of the Plan will provide a substantially greater return to constituents than would any liquidation under chapter 7 of the Bankruptcy Code.

### C. Notes to Liquidation Analysis

The Debtors prepared the Liquidation Analysis with the assistance of RPA, the Debtors' financial advisor. The Liquidation Analysis contains numerous estimates. Proceeds available for recovery are based upon the asset sale transactions and orderly unwind of intercompany accounts described above.

THE LIQUIDATION ANALYSIS PRESENTED HEREIN HAS BEEN PREPARED SOLELY FOR THE PURPOSES AND USE OF THIS DISCLOSURE STATEMENT AND DOES NOT REPRESENT OR CLAIM TO REPRESENT ANY ASSUMPTIONS OR COMPARISONS FOR ANY OTHER PURPOSE. NOTHING CONTAINED IN THE LIQUIDATION ANALYSIS IS INTENDED TO BE OR CONSTITUTES A CONCESSION BY OR ADMISSION OF ANY DEBTOR FOR ANY PURPOSE.

In preparing the Liquidation Analysis, the Debtors estimated Allowed Claims based upon a review of the Debtors' financial statements to account for estimated liabilities as necessary. The Bankruptcy Court has not estimated or otherwise fixed the total amount of Allowed Claims used for purposes of preparing the Liquidation Analysis. Therefore, the Debtors' estimate of Allowed Claims set forth in the Liquidation Analysis should not be relied on for any other purpose, including determining the value of any distribution to be made on account of Allowed Claims and Interests under the Plan. The Allowance of such Claims for purposes of this Liquidation Analysis is not an admission or agreement as to the Allowance of any Claims by the Debtors.  THE ACTUAL AMOUNT OF ALLOWED CLAIMS IN THE CHAPTER 11 CASES COULD MATERIALLY DIFFER FROM THE ESTIMATED AMOUNTS SET FORTH IN THE LIQUIDATION ANALYSIS.

The Debtors note that the assumptions utilized in developing the Liquidation Analysis are inherently subject to significant uncertainties and contingencies, many of which are beyond the control of the Debtors or a chapter 7 Trustee. Accordingly, there can be no guarantees that the values assumed in the Liquidation Analysis would be realized if the Debtors were actually liquidated. In addition, any liquidation would take place in the future, at which time circumstances may exist which cannot presently be predicted.

The Debtors recognize that there are other potential alternatives that could occur in a hypothetical chapter 7 liquidation not presented in the Liquidation Analysis, including alternatives that would give rise to reduced and delayed creditor recoveries.

THE DEBTORS RESERVE THEIR RIGHT TO SUPPLEMENT, MODIFY, OR ADJUST ANY PART OF THE ILLUSTRATIVE LIQUIDATION ANALYSIS, INCLUDING A CHANGE OF THE UNDERLYING ASSUMPTIONS AND ANALYSIS SET FORTH HEREIN.

**Pyxus**
Liquidation Analysis
*($ in '000s)*

| Balance Sheet Assets | Non-Cash Balances as of Mar-20 $ | Recovery Estimate Low % | Mid % | High % | Recovery Estimate Low $ | Mid $ | High $ | |
|---|---|---|---|---|---|---|---|---|
| **Pyxus Consolidated Debtors** | | | | | | | | |
| Cash (Forecasted 7/31 Ending Cash after OPEX) | 38,447.8 | 100.0% | 100.0% | 100.0% | 38,447.8 | 38,447.8 | 38,447.8 | |
| Notes Receivable and Short Term Intercompany | 29,364.0 | 31.6% | 36.9% | 40.0% | 9,289.6 | 10,844.4 | 11,731.5 | |
| Accounts Receivable - Trade | 113,990.9 | 75.0% | 80.0% | 85.0% | 85,493.2 | 91,192.7 | 96,892.3 | |
| Accounts Receivable - Other | 1,181.4 | 75.0% | 80.0% | 85.0% | 886.0 | 945.1 | 1,004.2 | |
| Accounts Receivable - Intercompany | 276,357.5 | 3.1% | 3.1% | 3.2% | 8,554.6 | 8,671.0 | 8,785.6 | |
| Advances & Deposits Intercompany | 193,362.1 | 27.2% | 30.2% | 32.3% | 52,667.3 | 58,398.5 | 62,531.8 | |
| Inventory - Product | 189,983.4 | 25.0% | 35.0% | 45.0% | 47,495.8 | 66,494.2 | 85,492.5 | |
| Inventory - Other | 4,436.3 | 25.0% | 35.0% | 45.0% | 1,109.1 | 1,552.7 | 1,996.4 | |
| Short Term Advances to Tobacco Farmers | 61.1 | 0.0% | 5.0% | 10.0% | - | 3.1 | 6.1 | |
| Prepaid Expenses | 3,904.9 | 20.9% | 25.9% | 35.7% | 816.8 | 1,009.8 | 1,395.4 | |
| Recoverable Income Taxes | 2,667.6 | 60.0% | 70.0% | 80.0% | 1,600.6 | 1,867.3 | 2,134.1 | |
| Other Current Assets | 960.8 | 35.0% | 40.0% | 45.0% | 336.3 | 384.3 | 432.4 | |
| Capital Stocks - Consolidated Subs | 761,121.5 | 13.4% | 15.5% | 17.4% | 102,277.4 | 118,196.3 | 132,258.4 | |
| Other Assets | 22,945.1 | 35.0% | 40.0% | 45.0% | 8,030.8 | 9,178.1 | 10,325.3 | |
| Notes Receivable Long Term - Intercompany | 7,450.0 | 0.0% | 0.0% | 0.0% | - | - | - | |
| Intangible Assets | 13,934.7 | 0.0% | 0.0% | 0.0% | - | - | - | |
| Deferred Charges | 375.5 | 0.0% | 0.0% | 0.0% | - | - | - | |
| Deferred Tax Asset | 257.6 | 0.0% | 0.0% | 0.0% | - | - | - | |
| Fixed Assets (Net) - Buildings / Machinery / Land etc. | 53,953.3 | 25.0% | 30.0% | 35.0% | 13,488.3 | 16,186.0 | 18,883.6 | |
| Subtotal | 1,714,755.6 | 21.6% | 24.7% | 27.5% | 370,493.6 | 423,371.3 | 472,317.4 | |
| | | | | | | | | |
| **Total Assets** | $ 1,714,755.6 | 21.6% | 24.7% | 27.5% | $ 370,493.6 | $ 423,371.3 | $ 472,317.4 | A |

| Deductions: | | | | Low | Mid | High | |
|---|---|---|---|---|---|---|---|
| Operational Wind Down (1) | | | | $ 65,100.0 | $ 65,100.0 | $ 65,100.0 | |
| Professional Fees | | | | 7,500.0 | 7,500.0 | 7,500.0 | |
| Trustee Fees | | | | 12,200.0 | 12,200.0 | 12,200.0 | |
| Subtotal | | | | $ 84,800.0 | $ 84,800.0 | $ 84,800.0 | B |
| | | | | | | | |
| Cash Distribution Available to Creditors | | | | $ 285,693.6 | $ 338,571.3 | $ 387,517.4 | A - B = C |
| | | | | | | | |
| Estimated Carve-Out | | | | $ 7,000.0 | $ 7,000.0 | $ 7,000.0 | |
| DIP Claim | | | | 233,100.1 | 233,100.1 | 233,100.1 | |
| First Lien Claim | | | | 278,895.8 | 278,895.8 | 278,895.8 | |
| Second Lien Claim | | | | 661,841.8 | 661,841.8 | 661,841.8 | |
| Ch 11 Admin Claims | | | | 24,975.4 | 24,975.4 | 24,975.4 | |
| Other Priority Claims | | | | 12,300.0 | 12,300.0 | 12,300.0 | |
| General Unsecured | | | | 21,700.0 | 21,700.0 | 21,700.0 | |
| Equity Claim (2) | | | | 26,706.0 | 26,706.0 | 26,706.0 | |
| Subtotal Claim | | | | $ 1,266,519.1 | $ 1,266,519.1 | $ 1,266,519.1 | D |
| | | | | | | | |
| Implied Excess Collateral/(Deficiency) | | | | $ (980,825.5) | $ (927,947.9) | $ (879,001.8) | C - D = E |

**Recovery by Secured Claim:**

| | Claim $ | Recovery by Claim Low $ | Low % | Mid $ | Mid % | High $ | High % |
|---|---|---|---|---|---|---|---|
| Estimated Carve-Out | $ 7,000.0 | $ 7,000.0 | 100.00% | $ 7,000.0 | 100.00% | $ 7,000.0 | 100.00% |
| DIP Claim | 233,100.1 | 233,100.1 | 100.00% | 233,100.1 | 100.00% | 233,100.1 | 100.00% |
| First Lien Claim | 278,895.8 | 45,593.6 | 16.35% | 98,471.2 | 35.31% | 147,417.3 | 52.86% |
| Second Lien Claim | 661,841.8 | - | 0.00% | - | 0.00% | - | 0.00% |
| Ch 11 Admin Claims | 24,975.4 | - | 0.00% | - | 0.00% | - | 0.00% |
| Other Priority Claims | 12,300.0 | - | 0.00% | - | 0.00% | - | 0.00% |
| General Unsecured | 21,700.0 | - | 0.00% | - | 0.00% | - | 0.00% |
| Equity Claim (2) | 26,706.0 | - | 0.00% | - | 0.00% | - | 0.00% |
| Total | $ 1,266,519.1 | $ 285,693.6 | 22.56% | $ 338,571.3 | 26.73% | $ 387,517.4 | 30.60% |

**Notes to Liquidation Analysis:**
(1) Assumes 12 month wind down process
(2) Based on market cap as of June 12, 2020