## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | § | |
| | § | Chapter 11 |
| PYXUS INTERNATIONAL, INC., *et al.*,[1] | § | |
| | § | Case No. 20-11570 (LSS) |
| Debtors. | § | |
| | § | (Jointly Administered) |
| | § | |
| | § | **Ref: Docket Nos. 108 & 140** |

## DEBTORS' OBJECTION TO THE PETITION OF CERTAIN EQUITY HOLDERS FOR THE APPOINTMENT OF AN OFFICIAL EQUITY COMMITTEE

Pyxus International, Inc. ("***Pyxus***") and its affiliated debtors and debtors in possession (collectively, the "***Debtors***" and, together with their non-debtor subsidiaries and affiliates, the "***Company***") in the above-captioned chapter 11 cases (the "***Chapter 11 Cases***") hereby respond and object (this "***Objection***") to the *Shareholders' Petition* [Dkt. No. 108] (the "***Petition***") filed by Hongchao Sun on behalf of herself and a purported group of shareholders (collectively, the "***Equity Holders***")[2] requesting, among other forms of relief, the appointment of an official committee of equity holders in these Chapter 11 Cases. In support of this Objection, the Debtors

---

[1] The Debtors in the Chapter 11 Cases, along with the last four digits of each Debtor's United States federal tax identification number, are: Pyxus International, Inc. (6567), Alliance One International, LLC (3302), Alliance One North America, LLC (7908), Alliance One Specialty Products, LLC (0115) and GSP Properties, LLC (5603). The Debtors' mailing address is 8001 Aerial Center Parkway, Morrisville, NC 27560-8417.

[2] On July 10, 2020, Ms. Sun provided the Debtors and the United States Trustee for the District of Delaware (the "***U.S. Trustee***") the *Amending Information Regarding Petition/Motion (Docket #108)*, filed on July 13, 2020 at Docket No. 142 (the "***Petition Update***"), which asserts that the Petition is filed on behalf of approximately 145 members holding 811,761 shares. On July 11, 2020, Ms. Sun provided the Debtors and U.S. Trustee the *Verified Statement of a Group of Shareholders Pursuant to Federal Rule of Bankruptcy Procedure 2019* (the "***2019 Summary***"), which only identified 16 of the Equity Holders by name and did not provide any information about their interests in the Debtors. Just before midnight on July 12, 2020, Ms. Sun provided Debtors' counsel the list of Equity Holder information that is referenced in the Petition Update and the 2019 Summary (the "***Equity Holder List***"), and subsequently sent an updated 2019 Summary to the Debtors and U.S. Trustee noting that the Equity Holder List had been provided to Debtors' counsel on a confidential basis. The Equity Holders apparently are seeking to file the information required by Rule 2019 of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***") under seal pursuant to the *Shareholders' Motion for Entry of an Order Authorizing the Shareholders to File Under Seal Shareholders' Information* [Dkt. No. 140] (the "***Motion to Seal***"). The Debtors address the Motion to Seal at the end of this Objection.

submit the *Declaration of Brandon Aebersold in Support of Debtors' Objection to the Petition of Certain Equity Holders for the Appointment of an Official Equity Committee* (the "**Aebersold Declaration**"), the *Declaration of Joel Thomas, Executive Vice President and Chief Financial Officer of Debtor Pyxus International, Inc., in Support of the Chapter 11 Petitions and First Day Pleadings* (the "**First Day Declaration**") and the *Declaration of Brandon Aebersold in Support of the Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Granting Liens and Superpriority Claims, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing and (VI) Granting Related Relief* (the "**DIP Declaration**")[3] and the exhibits attached hereto and thereto, and respectfully state as follows:[4]

## PRELIMINARY STATEMENT

1.      The appointment of an equity committee is appropriate only in extraordinary cases.  The movant must satisfy the heavy burden of establishing a *substantial likelihood* that equity will receive a *meaningful* distribution <u>and</u> that equity interests cannot be adequately represented without an official equity committee.  This burden is rarely met, and it has certainly not been met here.

2.      While the Debtors sympathize with individual equity holders, the unfortunate reality of these Chapter 11 Cases is that the Debtors are insolvent and there is no recovery for equity under any circumstance.  In a best-case scenario of the Debtors' enterprise value, equity is out-of-the-money by ***hundreds of millions of dollars***.  Despite Ms. Sun's repeated and unsupported assertions that the Debtors are "absolutely in the money," she has not offered a

---

[3]    The First Day Declaration is attached hereto as <u>Exhibit A</u>, and the DIP Declaration is attached hereto as <u>Exhibit B.</u>

[4]    Capitalized terms not otherwise defined herein shall have the meaning ascribed to such terms in the First Day

competing valuation or even a shred of credible evidence of the Debtors' solvency, nor has she identified a single realistic method for addressing the Debtors' substantial debt obligations that need to be satisfied in full before equity is entitled to any recovery.  In contrast, the Debtors have managed to negotiate a prepackaged case with broad creditor support, obtain extensions on their critical Foreign Credit Lines and propose a Plan that not only provides a full recovery for all of the Debtors' general unsecured creditors *but also* a $1 million payout to existing out-of-the money equity notwithstanding that holders of Second Lien Notes Claims will be paid substantially less than par.  The Debtors consider the progress of these Chapter 11 Cases to be an enormous victory, particularly in light of the challenging environment caused by the COVID-19 pandemic.  Appointing an equity committee would do nothing to improve the equity holders' current position and would only jeopardize the Debtors' hard-won reorganization, put at risk the enterprise-sustaining Foreign Credit Lines and deteriorate the value of the Debtors' estates to the detriment of all stakeholders, including existing equity.

3.      While the Debtors' insolvency alone should resolve this dispute, Ms. Sun also has not demonstrated, and cannot demonstrate, that the appointment of an official equity committee is necessary to guarantee adequate representation for equity holders.  Pyxus' board of directors (the "***Board***"), which is comprised of ten directors, nine of whom are independent, and the special committee (the "***Special Committee***") comprised of five independent directors, are duty bound to maximize value for all stakeholders.  In challenging their representation, Ms. Sun relies solely on thinly constructed conspiracies and baseless implications of bad faith.  The reality is that the Board and Special Committee are both independent, have explored the possibility of

---

Declaration or the *Disclosure Statement for the Joint Prepackaged Chapter 11 Plan of Reorganization of Pyxus International, Inc. and its Affiliated Debtors* [Dkt. No. 22] (the "***Disclosure Statement***"), as applicable.

other alternatives and have fought tirelessly to preserve value and represent the interests of equity holders throughout this restructuring process.

4.      The case law is abundantly clear that the appointment of official equity committees should be the "rare exception," not the rule. *In re SunEdison, Inc.,* 556 B.R. 94, 103 (Bankr. S.D.N.Y. 2016) (citing *In re Williams Commc'ns Grp., Inc.,* 281 B.R. 216, 223 (Bankr. S.D.N.Y. 2002)); *In re Spansion, Inc.,* 421 B.R. 151, 156 (Bankr. D. Del. 2009).  Under the facts and circumstances of these cases, Ms. Sun does not come close to meeting the burden required to demonstrate the need for an official equity committee.  For these reasons, and for those set forth below, the Petition should be denied.

## BACKGROUND

### I.      Debtors' Background

5.      The Debtors commenced these Chapter 11 Cases on June 15, 2020 (the "***Petition Date***").  Prior to the Petition Date, the Debtors executed a Restructuring Support Agreement, dated June 14, 2020 (the "***RSA***"), with over 92% in principal amount of the holders of First Lien Notes and over 67% in principal amount of holders of Second Lien Notes, the only two classes entitled to vote on the Plan.  The Debtors began soliciting acceptances to the Plan on June 14, 2020, and solicitation will continue through July 20, 2020.  The transactions contemplated by the RSA and the Plan include a complete equitization of the Second Lien Notes[5] as well as certain holders of Second Lien Notes backstopping the Debtors' $206.7 million DIP Facility that will convert into the longer-term Exit Term Facility.  Additionally, the Plan provides for a $1 million release fund to be distributed *pro rata* among Qualifying Holders of Pyxus Common Stock.

---

[5]      The Plan also provides that any Second Lien Noteholders who are not party to the RSA may elect to take cash equal to 2.00% of the aggregate principal amount of their Second Lien Notes in lieu of New Common Stock.

6.     Although filing for chapter 11 became inevitable given the Company's significantly overleveraged position and limited liquidity, prior to filing the Company and its advisors explored every reasonably executable out-of-court transaction that could restructure its balance sheet and provide desperately needed working capital.  For example, as early as 2018, the Company began exploring strategic options to address its impending "maturity wall" arising from the scheduled 2021 maturities of the ABL Facility, First Lien Notes and Second Lien Notes.  *See* First Day Decl. at ¶ 68.  Without a successful refinancing by June 2020, the Company likely would have been subject to a going concern qualification in its annual financial statement (for fiscal year ended March 31, 2020), which would have materially impeded its ability to renew its Foreign Credit Lines, upon which the Company relies to purchase and ship its products worldwide.  *Id.* at ¶¶ 55, 67.  The Company pursued various refinancing strategies, but unfortunately these efforts were to no avail largely due to the Company's overleveraged balance sheet (i.e., debt-to-EBITDA ratio).  *Id.* at ¶ 68.

7.     In mid-2019, the Company considered various monetization options, including a Canadian public offering for certain of its Global Specialty Products businesses in order to capitalize on what appeared to be a growing e-liquids and Canadian cannabis industry.  *Id.* at ¶ 69.  However, a significant downturn in that market in September 2019, which has continued through today, caused the Company's investment bankers to determine that the public offering would not be feasible.  *Id.*  In early 2020, the Board appointed the Special Committee to explore strategic alternatives, which included private debt exchanges, refinancings, and investments, equity investments and transactions involving a special purpose acquisition company.  *Id.* at ¶ 11.  However, the Company did not receive any viable proposals that addressed its substantial

refinancing needs, and the outbreak of the COVID-19 pandemic and resulting economic crisis made obtaining new capital virtually impossible.  *Id.* at ¶¶ 11, 70.

8.     Additionally, in early 2020 the Company began experiencing delays in sales that caused a liquidity shortfall.  *Id.* at ¶¶ 73-74.   By March 2020, shipment delays and facility shutdowns caused by the COVID-19 crisis resulted in revenue losses that exacerbated the Company's already strained liquidity position.  *Id.* at ¶ 74.

9.     Without any traction on the aforementioned strategic initiatives and facing a rapidly declining liquidity situation, the Company engaged with the First Lien Noteholders and Second Lien Noteholders to begin negotiating the terms of a potential comprehensive restructuring.   During this time, the Debtor's proposed investment banker, Lazard Freres & Co. LLC ("***Lazard***"), also proactively reached out to the Company's substantial (5% or more) equity holders to facilitate conversations about a possible equity-led financing or other investment transaction.  *See* Aebersold Decl. at ¶ 16.   However, only one equity holder signed a non-disclosure agreement, and those discussions did not advance beyond an indicative proposal that was not feasible for several reasons, including that it required the raising of new capital that could not be raised and the consent of existing creditors that could not be obtained.[6]  *Id.*

10.    The final challenge was that all of these events were occurring just as the Company had to pay down the Foreign Credit Lines.  *See* First Day Decl. at ¶¶ 71-74.   As a result of its inability to repay, the Company was facing a significant risk of losing the Foreign Credit Lines, which would cut off access to the Company's primary source of working capital for its international operations.  *Id.* at ¶ 12.   As noted in the First Day Declaration, the Foreign

---

[6]    Notably, in the months since the Debtors first received that proposal, neither that equity holder (nor any other person) has come forth with any binding commitments or creditor support for that or any other proposal that would be an alternative to the Plan.  As noted below, the Board negotiated for a broad "fiduciary out" in the RSA so that it could accept any such proposal.  *See infra* ¶ 26.

Credit Lines are uncommitted demand facilities under which the foreign lenders can cease extending loans at any time. *Id.* at ¶ 58. In the lead-up to these Chapter 11 Cases, the Company proactively engaged in negotiations with its foreign lenders to obtain renewal commitments or waivers of termination rights. *Id.* at ¶ 60. However, accommodations made by the foreign lenders were premised upon the Company executing an efficient balance sheet restructuring that could be accomplished in a timely manner; thus, a protracted bankruptcy could trigger a default that would permit the foreign lenders to terminate the Foreign Credit Lines. *Id.*

11.    Fortunately, by late April 2020 the Company was making significant progress with the Ad Hoc First Lien Group and Ad Hoc Crossholder Group on the terms of a holistic restructuring transaction and, in connection therewith, DIP financing to be provided by certain Second Lien Noteholders.[7]    Ultimately, after months of strenuous negotiations, the Debtors executed the RSA, obtained waivers, renewed commitments and extensions on certain Foreign Credit Lines and launched the prepackaged Plan. *Id.* at ¶ 14.

12.    The Plan allows the Debtors to substantially deleverage their balance sheet by approximately $400 million (on a net basis), consensually extend the maturity date on the First Lien Notes by four years, obtain sufficient liquidity to meet operational needs and leave unimpaired all unsecured creditors, including the Company's domestic and international vendors, employees, customers and working capital lenders. The Debtors vigorously negotiated the best recovery possible for equity holders and ultimately obtained an agreement from the Consenting Noteholders to allocate $1 million of cash to the Qualifying Holders of Pyxus Common Stock under the Plan, notwithstanding that holders of Second Lien Notes Claims will recover significantly less than par. *See* Disclosure Statement, §§ I.C, V.B. Absent the concessions made

---

[7]    The facts and circumstances regarding the Debtors' and Lazard's efforts to obtain DIP financing are more fully described in the DIP Declaration.

and the financing provided by the Consenting Noteholders, the Debtors would be unable to propose a plan with anything close to this level of recovery to creditors or equity holders. Instead, the Debtors would have been forced to file a traditional "free-fall" bankruptcy case without committed financing and face a substantial risk of liquidation, resulting in a significant loss of value for the estates and a substantially reduced recovery for all stakeholders. *See* Aebersold Decl. at ¶ 12.

## II.    The Equity Holders' Petition and Related Discovery

13.    On June 26, 2020, Ms. Sun filed the Petition seeking (i) to dismiss these Chapter 11 Cases, (ii) an order appointing an equity committee, (iii) an order appointing an ethics committee and (iv) discovery from the Debtors relating to the Plan and these Chapter 11 Cases. On June 29, 2020, counsel for the Debtors sent a letter to Ms. Sun, which is attached hereto as Exhibit C, in order to schedule a status conference with the Court and request certain information required under Bankruptcy Rule 2019.  According to the Petition Update and the Equity Holder List, the Equity Holders hold approximately 811,761 shares of Pyxus common stock.

14.    On July 2, 2020, the Court held a status conference with respect to the Petition. Later that day, counsel for the Debtors sent the U.S. Trustee and Ms. Sun a letter responding to the request to form an official committee of equity holders.  The U.S. Trustee has not appointed an equity committee and has filed an objection to the Petition (*see* Dkt. No. 143).

15.    In accordance with the Court's instructions given at the status conference, the Debtors treated the information requests in the Petition as discovery demands pursuant to the Federal Rules of Civil Procedure and have engaged in extensive discovery with Ms. Sun, including responding to five separate sets of information requests.  The Debtors were prepared to include in this discovery process any other Equity Holder who executed a confidentiality agreement, but Ms. Sun stated that none of the other Equity Holders indicated an interest in

26765423.1

doing so.  On July 6, 2020, the Debtors provided their first production of documents and written answers in response to the requests for information.  That same day, the Debtors also served on Ms. Sun requests for certain documents and information, including a request for the "valuation/analysis" Ms. Sun alleges to have performed (*see* Petition at p. 10) and a reiterated request for the information required by Bankruptcy Rule 2019.  On July 7, 2020, Ms. Sun emailed Debtors' counsel complaining that she had not received all of the information requested, though she did not identify what information was missing.  The Debtors responded that they had worked through the July 4 holiday weekend to compile as much of the requested information as quickly as possible and asked Ms. Sun to identify what additional information she needed.  Ms. Sun responded on July 8, 2020 with a list of ten additional categories of information.  On July 9, 2020, the Debtors provided a second production and additional written responses to Ms. Sun's July 8 supplemental requests.  That same day, Ms. Sun sent Debtors' counsel a third set of information requests seeking an additional eight categories of information, and the following day requested two additional categories of information.  The Debtors responded fully to these third and fourth sets of requests on July 11, 2020.  Ms. Sun sent yet another request for additional information late in the evening on July 10, 2020, to which the Debtors responded on July 12, 2020.

16.     The Debtors have objected to certain of Ms. Sun's requests as burdensome, irrelevant, in some cases incomprehensible, and seeking extremely commercially sensitive information of minimal relevance.  Nevertheless, the Debtors have provided repeated written answers to the various requests and multiple productions of documents.  To the extent an objection was based on the extreme commercial sensitivity of certain information, the Debtors

provided documents and information that addressed the request but without the level of detail that could cause substantial harm to the Debtors and their business.

17.    On July 10, 2020, Ms. Sun sent Debtors' counsel the Motion to Seal and the Petition Update, which (i) provided a high-level summary of the number of Equity Holders and their aggregate holdings and indicated that the complete information required by Bankruptcy Rule 2019 would be filed under seal and not provided to the Debtors; (ii) referenced shareholder letters that apparently were submitted to the Court or the U.S. Trustee, but which had not been provided to the Debtors at that time; and (iii) complained that the Debtors purportedly have not cooperated in the discovery process.[8]

18.    The Debtors strongly disagree with the accusation that they also have not complied with discovery.  They have made more than a reasonable effort to respond to a series of unfocussed and confusing requests.  In the ten days since the July 2 status conference, the Debtors have responded to over 40 discovery requests on a rolling basis through written responses and document productions.  To the extent the Debtors have objected to any requests, they have indicated the basis for their objection and, as noted above, have endeavored to understand what Ms. Sun is seeking and to provide as much information as reasonably possible without risking substantial commercial harm, *particularly since* Ms. Sun has continuously refused to provide the Debtors with the documents and other information that they requested. Throughout this process, the Debtors have responded promptly to each of Ms. Sun's ongoing series of requests and have answered all of her follow-up questions about the information provided.

---

[8]    In response to repeated requests made by Debtors' counsel, just before midnight on July 12, 2020, Ms. Sun provided the Equity Holder List, which included names, interests held and, for most of the listed Equity Holders, the date or general time period of acquisition and either the price at which the interests were acquired or the aggregate investment of such Equity Holder to date.

19.     In contrast, the Debtors received written responses to their July 6 discovery requests at 11:00 pm on July 11, 2020, and as of the date of this Objection have not received any documents or sufficient information in response to their requests, including the "valuation/analysis" purportedly performed by the Equity Holders.

## ARGUMENT

I.     **Ms. Sun Has Failed to Demonstrate a Substantial Likelihood of a Meaningful Distribution to Equity Holders.**

20.     The appointment of an equity committee is an extraordinary remedy and "should be the rare exception" in chapter 11 cases.  *In re Spansion, Inc.*, 421 B.R. at 156; *see also In re Williams*, 281 B.R. at 223 ("The appointment of official equity committees should be the rare exception."); 7 COLLIER ON BANKRUPTCY, 16th ed. ¶ 1102.03[1] [b] [2], p. 1102-19 ("Appointment of committees of equity security holders is the exception rather than the rule in chapter 11 cases.").  As a rule, "if equity holders have no reasonable prospect of receiving a meaningful distribution, an equity committee could serve no legitimate role in negotiating a plan." *In re Spansion,* 421 B.R. at 156.

21.     The party moving for the appointment of an equity committee bears the burden of establishing that "(i) there is a *substantial likelihood* that they will receive a *meaningful* distribution in the case under a strict application of the absolute priority rule, and (ii) they are unable to represent their interests in the bankruptcy case without an official committee." *Id.*  If the moving equity holders can demonstrate something more than the remote likelihood of a recovery,[9] courts may also consider other factors, including whether the equity holders' interests already are adequately represented, the complexity of the case, the number of shareholders at

---

[9]     Inherent in meeting even this lowered burden is demonstrating that the debtor is solvent.  In *Quadrant Structured Prods. Co., LTD. v. Vertin*, the Delaware Court of Chancery noted that the great weight of authority supports using the traditional method of calculating solvency—the balance sheet test and a showing that the

issue and the cost to the Debtors' estates of an equity committee. *In re Pilgrim's Pride Corp.*, 407 B.R. 211, 216 (Bankr. N.D. Tex. 2009); *see also, e.g., In re Spansion*, 421 B.R. at 156; *In re Williams*, 281 B.R. at 223; *In re Kalvar Microfilm, Inc.*, 195 B.R. 599, 601 (Bankr. D. Del. 1996); *Exide Tech. v. State of Wisconsin Inv. Bd.*, 2002 WL 32332000, at *1–2 (D. Del. Dec. 23, 2002).

22.    The Equity Holders have not and cannot set forth any evidence that demonstrates even a reasonable possibility, let alone a substantial likelihood, of a meaningful distribution to equity in either a going concern or a liquidation scenario.  Over $1.73 billion in estimated allowed claims and structurally senior debt[10] sit between existing equity and any recovery, before giving effect to other expenses of these Chapter 11 Cases.[11]    *See* Aebersold Decl. at ¶ 12; Disclosure Statement §§ I.C, II.D.  As set forth in the Valuation Analysis, attached as <u>Exhibit C</u> to the Aebersold Declaration, Lazard has estimated the Company's consolidated total enterprise value as a going concern (the "***Going Concern Value***") as of the assumed Effective Date to be in the range of approximately $1,230 million – $1,490 million, with a mid-point of approximately $1,360 million.  Thus, even in a best-case scenario, equity holders fall ***hundreds of millions of***

---

entity "has liabilities in excess of a reasonable" market value of assets." 115 A.3d 535, 556 (Del. Ch. Ct. 2015).

[10]    These obligations are comprised of $44.9 million of debt under the ABL Facility, $275 million under the First Lien Notes, approximately $635.7 million under the Second Lien Notes, $206.7 million under the DIP Facility (used to pay the $44.9 million owed under the ABL Facility), administrative, other secured and priority claims totaling approximately $44 million and unsecured claims totaling approximately $21.7 million.  Additionally, Non-Debtor Affiliates owe approximately $557 million under the Foreign Credit Lines, almost all of which is guaranteed by Debtors, and all of which is structurally senior to the claims of equity holders.  *See* Disclosure Statement §§ I.C, II.D.

[11]    Critically, if these Chapter 11 Cases are not prosecuted successfully in accordance with the Restructuring Support Agreement and the Plan (and within the agreed upon milestone dates), it likely will result in the incurrence of substantial incremental costs caused by the need to commence insolvency proceedings in numerous foreign jurisdictions. All of these obligations would need to be satisfied in full before equity is entitled to a recovery.

*dollars short* of being entitled to any recovery in these Chapter 11 Cases, much less a meaningful recovery.

23.    Without the RSA and the Plan, it is unlikely that the Debtors could continue as a going concern and would face a significant risk of liquidation. *Id.* at ¶ 12.  As set forth in the Liquidation Analysis, attached as Exhibit B to the Aebersold Declaration, the estimated net liquidation proceeds of the Debtors in a best-case scenario would be approximately $472.3 million (the "*Liquidation Value*").  Under any liquidation scenario, the projected recoveries for First Lien Noteholders are estimated to range from 16.35% – 52.86%, and the projected recoveries for Second Lien Noteholders and unsecured creditors are estimated to be zero. *Id.*, Ex. B.  The Debtors would need to come up with over $1 billion more to satisfy their claims before there would be any recovery for equity.

24.    Ms. Sun has not offered any evidence to refute the Valuation Analysis or to support her contention that the Debtors are "totally in the money" other than baseless speculation regarding the value of the Global Specialty Products business.  *See* Petition at pp. 5-7.  Further, her assertions that shareholders were "totally caught off guard" by the Debtors' filing and that the Company took advantage of the COVID-19 pandemic in order to wipe out existing equity are belied by the facts leading up to these Chapter 11 Cases.  *See id.* at pp. 5-6, 9.  The Debtors already were experiencing significant liquidity constraints and an untenable capital structure *well before* the COVID-19 pandemic, which merely catalyzed a more immediate and acute liquidity crisis.  *See* Aebersold Decl. at ¶ 15.  As of March 31, 2020, Pyxus was levered approximately 13.0x, and as of December 31, 2019 (pre-COVID 19), its leverage was approximately 10.9x.[12] Moreover, although not dispositive of valuation, Pyxus' securities trading prices support the only

---

[12]    *See, e.g.,* p. 20 of the Company's Form 10-Q for period ended December 31, 2019, attached hereto as Exhibit F.

reasonable conclusion that the Company's equity was and has been nothing more than a speculative option bet for some time.  For example, the trading price of the Second Lien Notes was below *20 cents* on the dollar as of the Petition Date — meaning that, from the standpoint of the market, holders of the Second Lien Notes were "under water" by at least *$508 million*.[13] Contrary to Ms. Sun's claims, this decline in expected returns to creditors is not a function of the so-called "convenient" timing of the COVID-19 pandemic.  *See* Petition at p. 6.  In fact, the Second Lien Notes have traded well below par *and* trended down for more than a year prior to the Petition Date.  Indeed, the Second Lien Notes traded below 50 cents on the dollar in December 2019, prior to the global outbreak of COVID-19, have remained below that level since mid-February 2020, and have traded below 20 cents on the dollar since mid-March 2020.  *See* Ex. D.  Pyxus stock, in the meantime, has been in a steady freefall, mirroring the Company's operating performance, for over a year.  As early as December 2019, the Company's equity market capitalization fell below $60 million (as against approximately $1.5 billion in debt, mere percentage points in enterprise value away from zero).[14]

25.    Moreover, the Company's filings have long since put parties on notice of the Company's tenuous financial position and the risks associated with the Global Specialty Products business.  In the Company's Form 10-K for the fiscal year ended March 31, 2019, the Company provided a number of cautions and risk factors, including, but not limited to, the following:[15]

- [The Company] may not continue to have access to the capital markets to obtain long-term and short-term financing on acceptable terms and conditions.  [The Company]

---

[13]    Attached hereto as <u>Exhibit D</u> is a chart from Bloomberg L.P. showing the trading price of the Second Lien Notes over the last year.

[14]    Calculated using shares outstanding as of January 31, 2020.  *See* Ex. F.

[15]    The 2019 10-K is attached hereto as <u>Exhibit E</u>.

access[es] the short-term capital and, from time to time, the long-term markets to obtain financing.  Our access to, and the availability of acceptable terms and conditions of, such financing are impacted by many factors, including: (i) our credit ratings; (ii) the liquidity and volatility of the overall capital markets; and (iii) the current state of the economy, including the tobacco industry.  There can be no assurances that we will continue to have access to capital markets on terms acceptable to us.

- [The Company] may not have access to available capital to finance our local operations in non-U.S. jurisdictions.  We have typically financed our non-U.S. local operations with uncommitted short-term operating credit lines at the local level. These operating lines are typically seasonal in nature, normally extending for a term of 180 to 270 days corresponding to the tobacco crop cycle in that location. These facilities are typically uncommitted in that the lenders have the right to cease making loans or demand payment of outstanding loans at any time. In addition, each of these operating lines must be renewed with each tobacco crop season in that jurisdiction . . . Because the lenders under these operating lines typically have the right to cancel the loan at any time and each line must be renewed with each crop season, there can be no assurance that this capital will be available to our subsidiaries.  If a number of these lenders cease lending to our subsidiaries or dramatically decrease such lending, it could have a material adverse effect on our liquidity.

- [The Company] ha[s] substantial debt which may adversely affect us by limiting future sources of financing, interfering with our ability to pay interest and principal on the senior notes and subjecting us to additional risks . . . As of March 31, 2019, [the Company] had approximately $1,327.7 million [in debt service obligations] . . .  Our substantial debt could have important consequences, including: (i) making it more difficult for us to satisfy our obligations with respect to the senior notes and our other obligations; (ii) limiting our ability to obtain additional financing on satisfactory terms and to otherwise fund working capital, capital expenditures, debt refinancing, acquisitions and other general corporate requirements; (iii) a significant portion of our cash flow from operations must be dedicated to paying interest on and the repayment of the principal of our indebtedness . . . and makes us more vulnerable to a decrease in demand for leaf tobacco, increases in our operating costs or general economic or industry conditions; (iv) our ability to adjust to changing market conditions and to compete with other global leaf tobacco merchants may be hampered by the amount of debt we owe; (v) increasing our vulnerability to general adverse economic and industry conditions; (iv) placing us at a competitive disadvantage compared to our competitors that have less debt or are less leveraged; (vii) limiting our flexibility in planning for, or reacting to, changes in our business and the industry in which we operate; and (viii) restricting us from making strategic acquisitions or exploring business opportunities.

- [The Company] may not be able to refinance or renew our indebtedness, including the senior notes and the ABL Facility . . . which may have a material adverse effect on our financial condition . . . If we are unable to renew or refinance the ABL Facility, the senior notes or our other indebtedness on terms which are not materially less favorable than the terms currently available to us or obtain alternative or additional financing arrangements, we may not be able to repay the ABL Facility, the senior notes or certain

of our other indebtedness, which may result in a default under other indebtedness.  We may need to refinance all or a portion of our indebtedness, including the ABL Facility, the [First Lien Notes] and the [Second Lien Notes] on or before maturity.

- [The Company's] investments in new business lines as part of our expanded business strategy have been in companies with limited histories that are operating in newly developing markets and are subject to numerous risks and uncertainties.  Our investments, including indirect investments, in FIGR East, FIGR Norfolk, Criticality, Purilum, Nicotine River, and Humble Juice (collectively, the "new business lines") and the operation of these businesses, involve a high degree of risk . . . We cannot assure you that as these operations further develop they will be profitable or otherwise sustainable . . . In addition, these businesses are subject to numerous additional risks and uncertainties, including those specified in the risk factors [in the 10-K].

- The results of operations and financial position of the new business lines may differ materially from the expectations of the Company's management.  Due to numerous uncertainties, the results of operations and financial position of the new business lines may differ materially from the expectations of the Company's management . . . In addition, the assumptions used in planning may not prove to be accurate, and other factors may affect the financial condition or results of operations of the new business lines.

- Volatility and disruption of global financial and credit markets may negatively impact our ability to access financing and expose us to unexpected risks.  Global financial and credit markets expose us to a variety of risks as we fund our business with a combination of cash from operations, short-term seasonal credit lines, the ABL Facility, long-term debt securities and customer advances.

*See* Ex. E at p. 20.

26.    Finally, Ms. Sun's unsupported insistence that the Company has unrealized value, and vague allegations of unfulfilled alternatives to chapter 11 and the purported abandonment of the Board's fiduciary duties completely disregards critical facts of this case.  First, not one of the transactions, operational adjustments or government relief suggested in the Petition, even assuming they are accurate (which they are not), would address the Company's substantial debt obligations and prepetition liquidity needs.  As of the Petition Date, the Company had approximately $1.51 billion in prepetition funded debt obligations,[16] with a $31.4 million interest

---

[16] This consists of the $44.9 million of debt under the ABL Facility, $275 million under the First Lien Notes, $635.7 million under the Second Lien Notes and $557 million under the Foreign Credit Lines.

payment coming due on July 15, 2020, and approximately $10 million of cash on hand.  *See* Disclosure Statement, § II.D; Aebersold Decl. at ¶ 15; First Day Decl. at ¶¶ 54, 66, 128.  The Debtors' cash flow forecasts show that without the DIP Facility, the Debtors would have gone cash negative by the end of June 2020.  *See* Aebersold Decl. at ¶ 15.  Second, the accusation that the Board somehow breached its fiduciary duties by agreeing to the RSA and filing the Plan ignores that the RSA contains a broad "fiduciary out" clause under section 14(b) that would allow the Debtors to terminate the RSA to pursue a superior alternative transaction if one exists. However, tellingly, not a single party has stepped up to offer the Debtors any financing to improve the current Plan or any other superior alternative to the RSA.

27.    In short, Ms. Sun has not met her burden of demonstrating a substantial likelihood that equity can obtain a meaningful recovery in these Chapter 11 Cases.  Indeed, Ms. Sun cannot dispute the unavoidable truth that equity is not entitled to ***any*** recovery under ***any*** scenario.

## II.    The Equity Holders' Interests Are Adequately Represented.

28.    Even in cases where the debtor is solvent, an equity committee is not necessarily warranted unless it can be established that the equity holders' interests would be inadequately represented in the absence of an official equity committee.  *See In re Williams,* 281 B.R. at 223 ("[I]n most cases, even those equity holders who do expect a distribution . . . can adequately represent their interest without an official committee.").  Whether or not equity holders have "adequate representation" must be determined by the facts of each case.  *In re SunEdison, Inc.,* 556 B.R. at 102 (citing *In re Williams,* 281 B.R. at 220); *In re Eastman Kodak Co.,* 2012 WL 2501071, at *1 (Bankr. S.D.N.Y. 2012).  Equity is not entitled to exclusive representation by a committee, only adequate representation.  *In re SunEdison, Inc.,* 556 B.R. at 103 (citing *In re Edison Bros.*, 1996 WL 534853, at*4 (D. Del. 1996)).  Thus, if equity is adequately represented by another group, *e.g.* the Special Committee or management (as was the case in *Edison Bros.*),

then it should not be entitled to its own committee.  *In re Edison Bros.*, 1996 WL 534853, at*4.

("While appellants may be correct in their observation that management cannot exclusively

advocate for the interests of the shareholders, the statutory focus of § 1102(a)(2) is not whether

shareholders are 'exclusively' represented, but whether they are 'adequately' represented.").

29.    Ms. Sun maintains that an official equity committee is necessary so that the equity

holders can adequately participate in the plan process.  The Debtors disagree.  As the court in

*Williams* stated, the party seeking the appointment of a committee must prove a present and

identifiable need for representation that cannot otherwise be addressed by individual

representation.  *In re Williams*, 281 B.R. at 223.  Ms. Sun cannot meet this burden.  As

previously stated, the question is not whether the equity holders are "'exclusively' represented,

but whether they are 'adequately' represented." *In re Spansion, Inc.,* 421 B.R. at 163 (affirming

bankruptcy court's finding that the interests of the debtor's shareholders were adequately

represented by the debtor).

30.    Although the Debtors' financial condition should resolve the question of

appointing an equity committee, the "adequate representation" factor further militates against

such appointment.  The Debtors' near fully independent Board and the Special Committee

already are adequately representing the equity holders' interests, and have done so throughout

the restructuring process.  Ms. Sun's claim that the Board and Special Committee abandoned

those interests in favor of some nefarious scheme to take advantage of the COVID-19 pandemic

in order to wipe out existing equity is completely at odds with what actually transpired.  *See*

Petition at pp. 6, 9.  To the contrary, as noted above, the Company already was experiencing

financial distress well before the COVID-19 pandemic and viewed chapter 11 as a last resort

after it and its professionals explored whether there were any reasonably executable out-of-court

transactions available that would refinance its debt and provide needed liquidity. *See supra* ¶¶ 5-18. Ultimately, no such transaction was available, and it was apparent that the only way the Company's balance sheet could be restructured was through a chapter 11 filing. *Id.*

31.    Once it became clear that chapter 11 was inevitable, the Company worked tirelessly to finalize a comprehensive financial restructuring — one that specifically took equity holders into account. Indeed, even in a transaction where every single sophisticated party that analyzed the Company's financial condition concluded there was no value for equity, the Debtors fiercely negotiated with their creditors for the $1 million Existing Equity Cash Pool for participating equity holders. That $1 million payout (which represents an approximately 4% recovery to equity holders based upon the average stock price as measured at the close of each business day for the 30-day period immediately preceding the Petition Date) was only achieved because of the deal struck with the Consenting Noteholders under the RSA.

32.    Ms. Sun's challenge to the Board's adequate representation of equity holder interests relies solely on irrelevant facts or complete falsehoods to imply the Board's alleged bad faith, such as unsubstantiated insinuations of potential "high level executive" involvement in "news leaks" and "stock market manipulation"; the resignation of certain Board members in 2020; the retention payments made to certain executives prior to filing, which were reasonable, customary and fully disclosed; and the Board's failure to pursue alternatives to a chapter 11 filing, which the uncontroverted facts demonstrate is simply not the case. *See* Petition at pp. 6, 8, 10. Moreover, as noted above, potential shareholders were made well aware of the Company's overleveraged and strained financial position given the Company's fulsome disclosures in its filings and its market performance over the past year.

33.    Moreover, if the Equity Holders still believe their interests are not being adequately represented, nothing prohibits them from continuing to advocate their position, which they have demonstrated they are capable of doing, and submitting an application for compensation and reimbursement from the Debtors' estates in the (unlikely) event they are found to have made a substantial contribution to these Chapter 11 Cases.    *See* 11 U.S.C. § 503(b)(3)(D).  Thus, the appointment of a costly estate-funded official equity committee is not necessary to ensure that the interests of equity holders are adequately represented.

**III.    Additional Considerations: Size and Complexity of Case, Timing, Equity Holder Support and Cost also Counsel Against Appointment of an Equity Committee.**

A.    <u>Complexity of the Case</u>

34.    The Petition does not address any other factors considered in the decision of whether to appoint an equity committee.   However, the Debtors contend that there is no significant complexity in these Chapter 11 Cases that warrants the appointment of an equity committee.  Indeed, there have been scores of large and complex cases where the appointment of an equity committee has been denied.  *See In re SunEdison, Inc.*, 556 B.R. at 103 (appointment of an official equity committee denied notwithstanding "admitted complexities of the Debtors' cases"); *In re Owens Corning*, Case No. 00-3837 (JKF) (Bankr. D. Del. Feb. 17, 2006) (appointment of an official equity committee denied by both the U.S. Trustee and the Court); *In re Johns-Manville Corp.,* 68 B.R. 155, 164 (S.D.N.Y. 1986) ("adequate representation" of shareholders can occur without appointment of a special committee despite the extreme complexity of a case).

35.    Further, while the existence of a large and complex case does not automatically merit the appointment of an equity committee, this case is neither so large nor so complex to even raise the specter of a need for an equity committee.  While the negotiations were complex,

the recovery analysis in the Plan itself is straightforward.  Even before accounting for any additional impacts caused by COVID-19 or certain expenses of these Chapter 11 Cases, the Debtors will have approximately $1.73 billion in allowed claims and a best-case scenario Going Concern Value of $1.49 billion.  There is no value for equity, period.

B.  Timing

36.    Ms. Sun likewise does not address the Debtors' proposed timeline.  However, the Debtors' proposed timeline is reasonable, and, in fact, necessary to ensure the stability of the Debtors' business and the success of their restructuring.  Any material delay to the Debtors' emergence from chapter 11 would put at risk the consensual deal embodied in the RSA, which the Debtors and their stakeholders tirelessly negotiated, jeopardize the crucial Foreign Credit Lines necessary for the continued operation of the Debtors' business and destroy the value the Debtors have worked so hard to preserve.

C.  Equity Holder Support

37.    The Petition Update and Equity Holder List allege that the Equity Holders are a group of approximately 145 members holding 811,761 shares of Pyxus common stock.  This represents only approximately 8% of all outstanding shares and approximately $308,435 in value based upon the closing share price as of July 10, 2020.[17]  Notably, not one of the Company's institutional equity holders, who hold substantially greater interest in the Company, has voiced opposition to the Plan or indicated their support for the appointment of an equity committee.

D.  Cost of an Equity Committee

38.    Appointing an Equity Committee is certain to add significant expense to these Chapter 11 Cases, which the Debtors cannot, and should not, be forced to bear.  Indeed, the costs

---

[17]  *See* https://www.nasdaq.com/market-activity/stocks/pyxsq/historical.

to the estate must be taken into account in determining whether to appoint an equity committee. *See, e.g., In re Williams,* 281 B.R. at 220 (balancing the costs of an equity committee against the need for adequate representation and equity's ability to recoup a substantial distribution, and ultimately deciding against appointment of a committee); *see also In re Kalvar Microfilm, Inc.*, 195 B.R. at 601 (court determined that the appointment of an equity committee was not warranted due to, among other reasons, the delay and additional costs associated with appointing an equity committee).

39.    The costs of an equity committee here are steep.  The associated fees and expenses would further burden the Debtors' estates (most likely at the cost of the unsecured creditors) and potentially cause a default under the DIP Facility.  Moreover, the appointment of an official equity committee would unnecessarily complicate and delay these Chapter 11 Cases, with no corresponding benefit to any party with a cognizable economic interest.  Any delays in the implementation of the Debtors' restructuring, or change in the tenor from that of a consensual reorganization with no harm to unsecured creditors, would create instability and uncertainty in the Company's relationships with vendors, suppliers, regulators, customers and employees around the world.

40.    In short, this Court should decline to derail the Debtors' restructuring at the request of the Equity Holders who are substantially out-of-the-money and have not offered any viable alternative to the Plan, as granting the Petition will undoubtedly jeopardize the Debtors' ability to continue as a going concern and destroy value for all stakeholders.

## IV.    The Motion to Seal Should Be Denied.

41.    Ms. Sun has provided Debtors' counsel with a copy of her Equity Holder List, which generally provides the names of the Equity Holders, the number of shares held by each Equity Holder, the date or time period such shares were acquired and the price paid for such

26765423.1

22

shares or, in some cases, the Equity Holder's aggregate investment to date.  However, Ms. Sun requested that counsel keep the Equity Holder List confidential, and the Equity Holders apparently seek to file this Equity Holder List and related verified statements under seal.

42.    As an initial matter, sealing this information in its entirety runs contrary to the purpose of Bankruptcy Rule 2019.  *See In re Nw. Airlines Corp.,* 363 B.R. 704, 708 (Bankr. S.D.N.Y. 2007) (noting that Bankruptcy Rule 2019 information "provide[s] a routine method of advising the court *and all parties in interest* of the actual economic interest of all persons participating in the proceedings") (quoting *SEC Report* (1937), Part I at 902) (emphasis in original); *In re Washington Mut., Inc.,* 419 B.R. 271, 279 (Bankr. D. Del. 2009) ("[C]oncerns regarding the actual economic interests of creditors participating in bankruptcy cases still exist . . . collective action by creditors through the use of ad hoc committees or groups allows creditors to utilize other group members' holdings to obtain a greater degree of influence in a bankruptcy case than single creditors acting alone.  As such, the policies behind the disclosure requirements of Rule 2019 are as relevant today as they were 70 years ago.").  Furthermore, the majority of the information the Equity Holders seek to seal is not confidential information that warrants sealing. *Id.* ("By acting as a group, the members of the shareholders' [group] subordinated to the requirement of Rule 2019 their interest in keeping private the prices at which they individually purchased or sold the Debtors' securities.") (quoting *In re Nw. Airlines,* 363 B.R. at 708).

43.    On July 12, 2020, before receiving a copy of the Equity Holder List, Debtors' counsel reached out to Ms. Sun to again remind her of her obligations under Bankruptcy Rule 2019 and inform her that the 2019 Summary did not comply with those obligations.  Debtors' counsel  informed Ms. Sun that they would not object to the redaction of personal information such as the individuals' addresses.  Ms. Sun declined that proposal and apparently still intends to

seek authority from the Court to file the Equity Holder List and related verified statements under seal in their entirety.

44. The Debtors understand that, particularly as a group of individuals unrepresented by counsel, members of the Equity Holders have privacy concerns regarding their personal information. Nevertheless, one cannot remain entirely anonymous while simultaneously participating in these Chapter 11 Cases, objecting to the Debtors' Plan and making allegations of bad faith and abdications of fiduciary duty against the Company's directors and officers who have worked relentlessly for months to negotiate and execute a prepackaged chapter 11 case with widespread creditor support that maximizes value for all stakeholders.

45. For these reasons, the Debtors respectfully object to the Motion to Seal and request that the Court instruct the Equity Holders to file the information required by Bankruptcy Rule 2019 on the docket with only appropriate redactions.

*       *       *

In sum, while the Debtors are sympathetic to the plight of individuals who have lost considerable amounts in connection with their equity investment in the Debtors, given the lack of any prospect for a recovery to equity (other than the $1 million that the Debtors negotiated for in the RSA and Plan), the absence of any evidentiary support for Ms. Sun's allegations of bad faith and purported wrongdoing, and the Debtors' successful effort to develop and obtain creditor consent to a holistic restructuring that addresses both the Debtors' liquidity and capital structure, there simply is no basis to grant Ms. Sun's request for the appointment of an equity committee.

**WHEREFORE**, for the reasons set forth herein, the Debtors respectfully request that the

Court deny the relief requested in the Petition, and grant such other and further relief as the Court

deems appropriate.

Dated: July 13, 2020              **YOUNG CONAWAY STARGATT & TAYLOR, LLP**
Wilmington, Delaware

*/s/ Ashley E. Jacobs*
Pauline K. Morgan (No. 3650)
Kara Hammond Coyle (No. 4410)
Ashley E. Jacobs (No. 5635)
Tara C. Pakrouh (No. 6192)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone:     (302) 571-6600
Facsimile:     (302) 571-1253
Email:          pmorgan@ycst.com
                kcoyle@ycst.com
                ajacobs@ycst.com
                tpakrouh@ycst.com

- and -

**SIMPSON THACHER & BARTLETT LLP**

Sandeep Qusba (admitted *pro hac vice*)
Michael H. Torkin (admitted *pro hac vice*)
William T. Russell, Jr. (admitted *pro hac vice*)
Kathrine A. McLendon (admitted *pro hac vice*)
Nicholas E. Baker (admitted *pro hac vice*)
Jamie J. Fell (admitted *pro hac vice*)
425 Lexington Avenue
New York, New York 10017
Telephone:     (212) 455-2000
Facsimile:     (212) 455-2502
Email:          squsba@stblaw.com
                michael.torkin@stblaw.com
                wrussell@stblaw.com
                kmclendon@stblaw.com
                nbaker@stblaw.com
                jamie.fell@stblaw.com

*Proposed Counsel to the Debtors and Debtors in Possession*

26765423.1