**<u>EXHIBIT A</u>**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | § § | Chapter 11 |
| PYXUS INTERNATIONAL, INC., *et al.*,[1] | § § | |
| Debtors. | § § | Case No. 20-11570 (___) |
| | § § § | (Joint Administration Requested) |

## DECLARATION OF JOEL THOMAS,
## EXECUTIVE VICE PRESIDENT AND CHIEF FINANCIAL
## OFFICER OF DEBTOR PYXUS INTERNATIONAL, INC., IN
## SUPPORT OF THE CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS

I, Joel Thomas, pursuant to Section 1746 of title 28 of the United States Code, hereby declare that the following is true to the best of my knowledge, information and belief:

1.  I am the Executive Vice President and Chief Financial Officer of Pyxus International, Inc. ("***Pyxus***"), one of the above-captioned debtors-in-possession. Pyxus is a publicly owned agricultural company, historically operating as a leaf tobacco producer, processor and merchant in over 90 countries and more recently expanding into new non-tobacco businesses including hemp-derived products and vapable e-liquids. On June 15, 2020 (the "***Petition Date***"), Pyxus and four of its domestic subsidiaries (collectively, the "***Debtors***" and, together with their non-Debtor subsidiaries and affiliates, the "***Company***") commenced in this Court voluntary cases under Chapter 11 of the Bankruptcy Code. The Debtors are U.S. companies that serve various functions within the Company's global enterprise, including, in some instances, providing

---

[1] The Debtors in the Chapter 11 Cases, along with the last four digits of each Debtor's United States federal tax identification number, are: Pyxus International, Inc. (6567), Alliance One International, LLC (3302), Alliance One North America, LLC (7908), Alliance One Specialty Products, LLC (0115) and GSP Properties, LLC (5603). The Debtors' mailing address is 8001 Aerial Center Parkway, Morrisville, NC 27560-8417.

administrative, operational and financial support to the Company's domestic and foreign operating subsidiaries, including non-Debtors.

2.      I have served as the Company's Executive Vice President and Chief Financial Officer since January 2014.  I have previously served as Vice President and Treasurer from December 2005 through December 2013.  Prior to joining the Company, from January 1996 to December 2005, I served as Vice President and Director with Wachovia Securities (n/k/a Wells Fargo Securities) in their investment bank, focusing on leveraged bank and bond transactions.  I hold an M.B.A. degree from Nova Southeastern University and an undergraduate degree from the University of California, Berkeley.

3.      As Executive Vice President and Chief Financial Officer, I am responsible for overseeing the operations and financial activities of the Debtors, including but not limited to, cash flow, accounting, finance, business relationships, including with customers and financial institutions on a worldwide basis, workforce integration and optimization, and financial planning. As a result of my tenure with the Debtors, my review of public and non-public documents, and my discussions with other members of the Debtors' management team, I am generally familiar with the Debtors' business, financial condition, policies and procedures, day-to-day operations, and books and records.

4.      I submit this declaration (this "***Declaration***") to provide an overview of this proposed restructuring and circumstances leading up to these Chapter 11 cases, as well as to support the Debtors' Chapter 11 petitions and first day motions (the "***First Day Motions***").

5.      Except as otherwise indicated, the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by employees working under my supervision, my experience, knowledge, and information

concerning the Debtors' operations and financial condition, or my discussions with the Debtors' legal and financial advisors.  References to the Bankruptcy Code, the Chapter 11 process, and related legal matters are based on my understanding of such matters in reliance on the explanation provided by counsel.  If called upon to testify, I would testify competently to the facts set forth in this Declaration.

## I. **Preliminary Statement[2]**

6.      These highly consensual prepackaged Chapter 11 Cases were commenced after more than three months of extensive good faith negotiations among the Debtors, their foreign and domestic lenders and their other stakeholders.  Those negotiations culminated in the Debtors' prepackaged plan of reorganization (the "***Plan***"), which is supported overwhelmingly by the only two classes of creditors impaired by the Plan – holders of greater than 92% of the Debtors' First Lien Notes (comprising approximately $275 million) and greater than 67% of the Debtors' Second Lien Notes (comprising approximately $636 million) have agreed to support the Plan.

7.      Critically, the Plan does not impair any of the lenders to the Company's foreign operating subsidiaries, none of which are debtors in the Chapter 11 Cases, nor will the Company's global workforce, vendors or customers be impaired under the Plan.  Indeed, as described below, the Company is seeking permission to pay prepetition amounts owed by the Debtors to these constituents and then will continue to operate in the ordinary course during the pendency of these Chapter 11 Cases.

8.      On a go-forward basis the proposed Plan, if confirmed, would substantially deleverage the Company's balance sheet by eliminating approximately $636 million of Second Lien Notes and providing the Company with access to at least $260 million of new working capital.

---

[2] Capitalized terms used but not defined in this Overview have the meanings set forth in the remainder of this Declaration.

This right-sized capital structure will position the Company for growth and success after emergence from Chapter 11.

## II. <u>Overview</u>

9.      The Company's principal business is the production and international sale of tobacco.  The Company is particularly proud of its longstanding relationships with farmers in the U.S. and abroad, including in Eastern and Southern Africa, Southern Europe, South America and Southeastern Asia.  The Company works with its contracted farmer suppliers to produce high-quality, sustainable and traceable crops that are compliant with customer and applicable regulatory requirements.  In 2018, the Company, through non-Debtor affiliates, expanded its business to include its "Global Specialty Products" business segment, which includes a variety of vapable e-liquids and hemp-derived products (e.g., non-intoxicating cannabinoid or "CBD") and, in the Canadian market only, cannabis products that are legal under Canadian federal law. The Company's principal source of revenue is generated from its tobacco business, which accounted for over 99% of its aggregate consolidated revenue for the fiscal year ended March 31, 2020.

10.      The Company's business is fundamentally sound, with a dedicated and talented workforce and a strong customer base that includes the tobacco industry's largest companies.  In fiscal years 2019 and 2020, the Company's tobacco business generated $184 million and $151 million of adjusted EBITDA, respectively.  However, the Debtors have been burdened with an unsustainable level of debt, consisting of:

- $44,900,000 owed under its ABL Facility;

- $275,000,000 of First Lien Notes;

- $635,686,000 of Second Lien Notes; and

- Approximately $557,000,000 owed under a number of Foreign Credit Lines (defined below) of which approximately 95% is guaranteed by Pyxus.

11.     As the ABL Facility, First Lien Notes and Second Lien Notes had scheduled maturity dates of mid-2021, toward the end of 2018, the Company began to explore certain transformative transactions to address its leveraged capital structure, including a potential initial public offering of certain businesses comprising its Global Specialty Product segment, a potential debt exchange and raising new equity capital.  As described in further detail below, those efforts ultimately were not successful due to unfavorable market dynamics.  As a result, in early 2020, the Company formed a special committee of the board of directors (the "***Special Committee***") to consider a broader range of strategic alternatives.  Unfortunately, due to the unprecedented COVID-19 pandemic and other factors set forth herein, the Special Committee concluded that an out-of-court deleveraging transaction was unlikely.

12.     Most acutely and exacerbating the foregoing, the COVID-19 pandemic triggered a liquidity crisis.  With international trade at a standstill and stay-at-home orders shutting tobacco handling facilities around the world, the Company faced significant and insurmountable delays in delivering product to its customers.  By March and April, a perfect storm had occurred: revenue declined substantially, at a time when the Company's Foreign Credit Lines were maturing.  As described below, the Foreign Credit Lines typically are uncommitted local bank commercial credit facilities that provide the Company with critical seasonal working capital, but must be renewed (and repaid) annually.

13.     After exploring all other possibilities, the Debtors, guided by the Special Committee, management and its advisors, determined new capital  would be available only as part of a Chapter 11 proceeding that holistically addressed their balance sheet.  As restructuring negotiations ensued, the Debtors and the Consenting Noteholders (defined below) realized that a protracted bankruptcy case carried significant business risk for all constituents, particularly

because of the importance of the Company's foreign operations.  Therefore, the Special Committee mandated that the in-court proceeding  be a targeted and expedited balance sheet restructuring that would not interfere with the Debtors' international operations or impair their trade creditors or Foreign Credit Lines.  That approach was endorsed unequivocally by the Consenting Noteholders.

14.     By April, the Debtors and their advisors began active negotiations with  a crossover group  containing  both  First  Lien  Noteholders  and  Second  Lien  Noteholders  (the  "***Ad  Hoc Crossholder Group***").  After coming to agreement with the Ad Hoc Crossholder Group over the terms of the restructuring, the Debtors and their advisors began to engage with a group of First Lien Noteholders (the "***Ad Hoc First Lien Group***") and ultimately came to a consensual resolution with both the Ad Hoc First Lien Group and the Ad Hoc Crossholder Group.  On June 14, 2020, the Debtors and holders of greater than 92% of First Lien Notes and greater than 67% of Second Lien Notes (collectively, the "***Consenting Noteholders***"), including the members of the Ad Hoc First Lien Group and the Ad Hoc Crossholder Group, signed a Restructuring Support Agreement (together with its exhibits, and as may be amended, the "***RSA***").[3]  The RSA includes, among other things, the terms of the Plan that was filed on the Petition Date that will effectuate a comprehensive balance sheet restructuring.

15.     The key terms of the Plan include:

- Each First Lien Noteholder either will receive its ratable portion of $280.8 million of new secured notes with a four-year maturity or will have its claims (including a prepayment premium) paid in full in cash  from the proceeds of a new third-party financing.

- Each Second Lien Noteholder will either receive, at its election (x) its ratable share of 100% of the new common stock to be issued by reorganized Pyxus on the effective date of the Plan (the "New Common Stock"), subject to dilution by New Common Stock issued as fees under the Plan or RSA or as part of a new management incentive plan or (y) cash in an amount equal to 2% of the aggregate outstanding principal amount of such holder's Second Lien Notes

---

[3] A copy of the RSA is attached as Exhibit C to the Disclosure Statement which was filed on the Petition Date.

Claims. Holders of Second Lien Notes that do not affirmatively make an election will be deemed to elect the cash option, and, as part of the RSA, the Consenting Noteholders have agreed to elect to receive New Common Stock.

- Holders of Pyxus' existing equity interests are not entitled to any recovery on account of such interests. However, holders of Pyxus common stock that do not affirmatively opt-out of the third party releases contained in the Plan and do not object, oppose or seek to impede confirmation of the Plan will receive a ratable share of $1 million in cash.

- All other creditors and stakeholders, including all employees, vendors and lenders under the Foreign Credit Lines, will be unimpaired and reinstated.

16.     The RSA also includes a commitment from certain members of the Ad Hoc Crossholder Group (in such capacity, the "***Financing Commitment Parties***") to backstop a $206.7 million debtor-in-possession financing facility (the "***DIP Facility***") that will refinance the ABL Facility and convert (together with an approximately $6.7 million exit fee) into an Exit Term Facility on emergence, thereby securing critical working capital during and after these Chapter 11 Cases. Under the Plan, upon and subject to such conversion, holders of the DIP Facility will also receive approximately 45% of the New Common Stock, subject to dilution by the new management incentive plan.

17.     In addition, the Plan contemplates a new asset-based loan facility being put in place upon emergence with commitments of not less than $60 million.

18.     Pursuant to the RSA, the Debtors have committed to achieve  a number of bankruptcy milestones, including:

- the Interim DIP Order must be entered within 2 business days of the Petition Date;

- the Final DIP Order must be entered within 35 days of the Interim DIP Order;

- the Plan must be confirmed and the Disclosure Statement approved within 60 days of the Petition Date; and

- the Plan must be consummated  within 75 days of the Petition Date.

19.     It is crucial that the Debtors satisfy these milestones, not only to avoid a breach of the RSA, but also to minimize the risks to the foreign operations that might result from a protracted bankruptcy case.[4]

### III. The Pyxus Business

**A. Pyxus' History, Products and Services**

20.     The Company (through predecessors) has been operating for over 146 years and currently employs approximately 3,564 employees, excluding seasonal employees and farmers. Historically, the Company's core business has been as a tobacco leaf merchant.  This entails the purchase, processing, packing, storing and shipping of tobacco to manufacturers of cigarettes and other consumer tobacco products through the Company's subsidiaries.  The Company does not manufacture cigarettes.  The Company also provides agronomy expertise to growers of leaf tobacco, hemp, groundnuts and sunflower seeds.

21.     In 2018, the Company began a transformation process designed to diversify its products and services by leveraging its core strengths in agronomy and traceability.  This process included diversification into the production and sale of "e-liquids" for vapable products and CBD oil, which is a non-intoxicating extract from industrial hemp.  Pyxus, through certain Non-Debtor Affiliates (as defined below), also took controlling stakes in two Canadian cannabis producers producing cannabis exclusively for sale in the Canadian market, where production for medicinal use has been legal since 2001 and recreational use has been federally legal since 2018.  The Company operates its federally legal Canadian cannabis business lines primarily through joint ventures and Company-owned subsidiaries, none of which are Debtors in these Chapter 11 Cases.

---

[4] As one example, the Company needs to acquire approximately $20 million of farm supplies in Brazil in early August that it would typically fund through a Foreign Credit Line. There is a significant risk that the lender will refuse to advance loans so long as the Debtors are in bankruptcy and thus that the Company would be forced to fund the purchase from its balance sheet during a period of limited liquidity.

22.     The Company's operations are organized by product category and geographic area and aggregated into three segments: (i) Leaf – North America, (ii) Leaf – Other Regions and (iii) Other Products and Services (also known as the Global Specialty Products).

23.     The "Leaf" segments cover the Company's core business of purchasing, processing, packing, storing and shipping tobacco to manufacturers of cigarettes and other consumer tobacco products throughout the world.  The Company's leaf tobacco operations deal primarily in flue-cured, burley and oriental tobaccos that are used in international brand cigarettes. The Company purchases tobacco in more than 35 countries and ships to approximately 90 countries.  The Company purchases tobacco directly from suppliers and assumes the risk of matching the quantities and grades required by its customers to the entire crop it must purchase under contract.

24.     In some markets, the Company buys tobacco from local entities that have purchased tobacco from their own suppliers and, in certain cases, it processes tobacco at its facilities for customers who need this service.  The Company also supplies seeds, fertilizer, pesticides and other products related to growing tobacco to farmers on a short-term basis to assist in crop production. In an increasing number of markets, the Company also provides agronomy expertise to its contracted tobacco grower base for growing leaf tobacco, hemp, groundnuts and sunflower seeds.

25.     A substantial portion of the Company's inventory is sourced abroad. Once purchased, the Company processes tobacco to meet each customer's specifications as to quality, yield, chemistry, particle size, moisture content and other characteristics.  The processing of leaf tobacco facilitates shipping, prevents spoilage, and is an essential service to the Company's customers, because the quality of processed leaf tobacco substantially affects the quality of the manufacturer's end product. The Company processes tobacco in company-owned and third-party

facilities around the world, including the United States, Argentina, Brazil, China, Zimbabwe, Jordan, Guatemala, India, Tanzania, Malawi, Thailand, Indonesia, Macedonia, Kenya and Turkey.

26.     The "Other Products and Services" (also known as Global Specialty Products) segment is comprised of the new business lines, including hemp-derived CBD, flavors for multiple uses, "e-liquids" for electronic cigarettes and, in the Canadian market, federally legal cannabis. These business lines are primarily operated through various joint ventures and Company-owned subsidiaries, none of which are Debtors.   The revenue from these product lines represent approximately 1% of total aggregate revenue for the fiscal year ended 2020.

**B.  The Debtors' Businesses**

27.     The Company operates its businesses through the Debtors, other domestic and international subsidiaries and affiliates (collectively, the "***Non-Debtor Affiliates***") and domestic and international joint ventures. In addition to housing certain domestic operations and assets, certain of the Debtors also provide critical financial, logistical and administrative support to Non-Debtor Affiliates.

28.     Debtor Pyxus is the publicly-listed parent of the Company and employs senior management.   One of its primary functions is distributing funds to its various subsidiaries, including from borrowings under the ABL Facility.  Pyxus does not directly own or operate any factories or facilities.  Debtor Alliance One International, LLC ("***AOI***") imports processed tobacco from foreign suppliers which it then sells to domestic customers.   It also acquires domestic processed tobacco through an intercompany arrangement with Debtor Alliance One North America, LLC ("***AONA***"), which it exports to foreign customers.  A portion of the receivables that AOI generates are sold to certain financial institutions through the Receivables Facilities described in further detail below.  Debtor GSP Properties leases office space in New York.

29.     AONA purchases, processes, packs, stores, and ships tobacco to domestic manufacturers of cigarettes and other consumer tobacco products.  Processing begins first by classifying flue-cured and burley tobacco according to grade.  Tobacco is then blended to meet customer specifications regarding color, body and chemistry, threshed to remove the stem from the leaf and further processed to produce strips of tobacco and sieve out small scrap. AONA processes domestic tobacco, excluding both "cut rag" (described below) and cut-rolled expanded stem tobaccos.  AONA's tobacco processing activities are comprised of (i) the purchase of U.S.-origin green tobacco from U.S. suppliers and (ii) the sale of U.S.-origin tobacco to U.S. customers or to AOI for export to non-U.S. customers.  Debtor Alliance One Specialty Products LLC ("*AOSP*") houses the Company's cut rag operations, by which it turns strips of leaf tobacco into cut rag tobacco, the type used in traditional cigarettes, cigars,  roll your own products and pipe products.  AOSP also indirectly holds the Company's interests in the North American non-Debtor joint ventures for "e-liquids" and vaping products.

## C. Pyxus' Customers

30.     The primary customers of the Company's tobacco leaf business are major consumer tobacco product manufacturers.  The consumer tobacco business is dominated by a relatively small number of large multinational cigarette manufacturers and by government-controlled entities. Philip Morris International, Inc., China Tobacco International, Inc. and Imperial Brands, PLC each accounted for more than approximately 10% of the Company's revenues for the years ended March 31, 2019 and 2018.

31.     In the 2019 fiscal year, approximately 14% of sales were to customers in the United States, with remaining sales going to customers in Europe, Asia, Africa and other geographic regions of the world.

## D. Permitting and Licensing

32.     The Company is heavily regulated in the jurisdictions in which it operates and is proud of its record of compliance.  As of 2019, the FDA's existing regulatory powers over tobacco products were extended to "new" tobacco products, including certain "e-liquids," e-cigarettes and other vaping products that contain (or are used to consume e-liquid containing) tobacco-derived ingredients (*e.g.*, nicotine).  In addition, the Federal Trade Commission regulates advertising of all products, including certain of the Company's products that also are FDA-regulated.  The Company, including certain of the Debtors, also holds processing and import licenses from the Alcohol and Tobacco Tax and Trade Bureau.  The Company also is subject to a myriad of international laws and regulatory schemes, including the *Cannabis Act* with respect to its non-Debtor Canadian federally legal joint ventures.

## E. Employees

33.     As of the Petition Date, the Company globally employs approximately 3,564 individuals (excluding seasonal employees), 554 in the United States and 3,010 abroad.  Most of the approximately 4,710 seasonal employees, as well as approximately 125 full-time factory personnel in the United States, are members of unions and covered by collective bargaining agreements.  The Debtors  have only 476 employees.

## IV. <u>Corporate and Capital Structure</u>

## A. Corporate Structure

34.     Pyxus common stock has been traded on the New York Stock Exchange since 1995.

35.     Pyxus has approximately 100 direct and indirect subsidiaries as of the Petition Date, which include joint ventures that are consolidated on an equity basis in the Company's financial statements.  A chart setting forth the Company's entire corporate structure as of the Petition Date is attached as Exhibit A to this Declaration.

36.     Pyxus' executive team consists of the following individuals:

| Name | Position |
|------|----------|
| J. Pieter Sikkel | President and Chief Executive Officer |
| Tracy G. Purvis | Executive Vice President - Business Services |
| Joel L. Thomas | Executive Vice President - Chief Financial Officer |
| Laura D. Jones | Senior Vice President - Human Resources |
| William L. O'Quinn, Jr. | Senior Vice President - Chief Legal Officer and Secretary |

## B. The Debtors' Prepetition Capital Structure

37.     As of the Petition Date, the Debtors had approximately $1,513 million in principal amount of outstanding funded debt obligations, comprised of:

| Type of Debt | Description | Maturity | Principal Outstanding |
|--------------|-------------|----------|----------------------|
| ABL Facility | Revolving credit facility based on eligible accounts receivable and eligible inventory | January 2021 | $44,900,000 |
| First Lien Notes | 8.5% senior secured first lien notes due 2021 | April 2021 | $275,000,000 |
| Second Lien Notes | 9.875% senior secured second lien notes due 2021 | July 2021 | $635,686,000 |
| Foreign Credit Lines | Uncommitted short-term seasonal lines of credit at the local level | Various | $557,000,000 |

38.     The ABL Facility and the First Lien Notes share *pari passu* crossing liens on substantially all of the Debtor Obligors' (as defined below) assets. The ABL Facility has priority in respect of the ABL Priority Collateral and the First Lien Notes have priority in respect of the Notes Priority Collateral (each as defined below). The Second Lien Notes are secured by second priority liens on a portion of the ABL Priority Collateral and First Lien Notes Collateral, junior in each case to the liens securing the ABL Facility and First Lien Notes.

39.     In addition, many of the Company's foreign subsidiaries (none of which are Debtors) borrow under seasonal lines of credit from local financial institutions (the "***Foreign***

*Credit Lines*") to fund local operations, including the local purchase of tobacco. Pyxus guarantees a significant portion of the Foreign Credit Lines.

## C. ABL Facility

40.     On October 14, 2016, Pyxus entered into the ABL Credit Agreement (as amended, supplemented or otherwise modified from time to time, the "*ABL Credit Agreement*") with certain lenders (the "*ABL Lenders*") and Deutsche Bank AG New York Branch, as Administrative Agent and Collateral Agent (the "*ABL Collateral Agent*"), establishing a senior secured revolving asset-based lending facility (the "*ABL Facility*") of $60 million subject to a borrowing base composed of its eligible accounts receivable and inventory.

41.     The borrowing base is subject to customary reserves, which are established by the ABL Collateral Agent in its permitted discretion as set forth in the ABL Credit Agreement.  As of the Petition Date, although the borrowing base is $77.9 million, only $44.9 million in principal amount of loans is currently outstanding.  If Pyxus were to borrow more than $45 million, the ABL Collateral Agent would be permitted to impose cash dominion and sweep the Debtors' cash in its deposit accounts on a daily basis to repay the ABL Facility.

42.     Pyxus' obligations as the borrower under the ABL Facility are (a) guaranteed by AOSP, AONA and AOI (collectively with Pyxus, the "*Debtor Obligors*") and (b) secured by substantially all of the Debtor Obligors' tangible and intangible assets, subject to certain exceptions and permitted liens (the "*Collateral*").

43.     The ABL Collateral Agent, on behalf of the ABL Lenders, and the First Lien Indenture Trustee (as defined below), on behalf of the First Lien Noteholders, and Pyxus are party to the Senior Lien Intercreditor Agreement, dated as of October 14, 2016 (as amended, the "*Senior Lien Intercreditor Agreement*"), which governs the respective rights and remedies of the ABL Lenders and First Lien Noteholders in respect of the Collateral.  The Senior Lien Intercreditor

Agreement gives the ABL Facility priority over the First Lien Notes in respect of Collateral consisting of accounts receivable, certain chattel paper, inventory, payment intangibles, certain investment property, cash (other than identifiable cash proceeds of the Notes Priority Collateral), deposit accounts, related general intangibles and instruments and proceeds of the foregoing (collectively, the "*ABL Priority Collateral*").

44.　　The ABL Facility is junior in priority to the First Lien Notes in respect of the remaining Collateral, including material owned  real property in the United States, capital stock of subsidiaries owned directly by a Debtor Obligor (but only 65% of the voting capital stock of direct foreign subsidiaries), intellectual property rights, equipment, related general intangibles and instruments and proceeds of the foregoing (collectively, the "*Notes Priority Collateral*").

45.　　The ABL Facility matures on January 14, 2021 and bears interest at LIBOR plus 2.50% or Base Rate plus 1.50% (each such term as defined in the ABL Credit Agreement), exclusive of default interest of 2.00%.

46.　　Given the over-collateralization of the ABL Facility and its senior position regarding the Debtor Obligors' working capital assets, the Debtors are requesting authorization to use a portion of the DIP Facility to repay the ABL Facility in full.

**D.  First Lien Notes**

47.　　On October 14, 2016, Pyxus issued $275 million in aggregate principal amount of 8.50% Senior Secured First Lien Notes due 2021 (the "*First Lien Notes*" and the holders thereof, the "*First Lien Noteholders*") pursuant to an Indenture (as amended, the "*First Lien Indenture*") between Pyxus and the Bank of New York Mellon Trust Company, N.A., as the indenture trustee and collateral agent (the "*First Lien Indenture Trustee*").   As of the Petition Date, there was approximately $275 million in principal amount outstanding under the First Lien Notes.  Like the ABL Facility, the First Lien Notes are guaranteed by the Debtor Obligors and are secured by liens

on the Collateral (see "*ABL Facility*" above for a discussion on the Collateral as shared between the ABL Facility and the First Lien Notes).

48.     Pursuant to the Senior Lien Intercreditor Agreement, the First Lien Noteholders are deemed to consent to any debtor-in-possession financing that the ABL Collateral Agent consents (or otherwise does not object) to, even if such financing is secured by priming liens on the ABL Priority Collateral, so long as (among other conditions) such financing does not have senior priority to the First Lien Notes as to the Notes Priority Collateral.

49.     The First Lien Notes bear interest at a rate of 8.50% per annum payable semi-annually in arrears in cash on April 15 and October 15 of each year, subject to an additional 1.00% of default interest, on demand, following the occurrence of a payment default.

50.     The First Lien Notes mature on April 15, 2021.  If the First Lien Notes are voluntarily redeemed by Pyxus prior to October 15, 2020 they are subject to a redemption premium equal to 2.125% of the principal amount of the redeemed notes.  Thereafter, the First Lien Notes can be redeemed with no premium.

51.     As described herein, the First Lien Notes will be refinanced or replaced under the Plan.

**E.  Second Lien Notes**

52.     On August 1, 2013, Pyxus issued $735 million in aggregate principal amount of 9.875% senior secured second lien notes due 2021 (the "*Second Lien Notes*"  and the holders thereof, the "*Second Lien Noteholders*") pursuant to an Indenture (as amended, supplemented or otherwise modified from time to time, the "*Second Lien Indenture*") between Pyxus and Wilmington Trust, National Association as the successor trustee and collateral trustee (the "*Second Lien Indenture Trustee*").    As of the Petition Date, there was $635,686,000 in principal amount outstanding under the Second Lien Notes.

53.     The Second Lien Notes are guaranteed by AONA and AOI (together with Pyxus, the "**Debtor Second Lien Notes Obligors**").  The Second Lien Notes are secured by liens on the ABL Priority Collateral of the Debtor Second Lien Notes Obligors as well as certain capital stock of subsidiaries and the "cut rag" processing facility located in North Carolina, which facility is part of the Notes Priority Collateral.  The ABL Collateral Agent, on behalf of the ABL Lenders, and the First Lien Indenture Trustee, on behalf of the First Lien Noteholders, and the Second Lien Indenture Trustee, on behalf of the Second Lien Noteholders are party to the Junior Lien Intercreditor Agreement, dated as of August 1, 2013 (as amended, the "**Junior Lien Intercreditor Agreement**"), which governs the rights and remedies of the ABL Lenders, First Lien Noteholders and Second Lien Noteholders in respect of the Collateral. Under the Junior Lien Intercreditor Agreement, the liens securing the Second Lien Notes are junior to the liens securing both the ABL Facility and the First Lien Notes.[5]

54.     The Second Lien Notes bear interest at a rate of 9.875% per annum, payable semi-annually in arrears in cash on January 15 and July 15 of each year.  The Second Lien Notes are subject to an additional 1.00% of default interest following the occurrence of a payment default. The Second Lien Notes mature on July 15, 2021.

## F.  Foreign Credit Lines

55.     Certain of the Company's foreign Non-Debtor Affiliates (the "**Foreign Borrowers**") borrow under the Foreign Credit Lines.  The Company uses the proceeds from these facilities to purchase tobacco from local farmers and run operations including production facilities in Africa, Europe and South America.  The Foreign Borrowers occasionally purchase seeds,

---

[5] The Junior Lien Intercreditor Agreement provides that Second Lien Noteholders are deemed to consent to any debtor-in-possession financing that the ABL Collateral Agent consents (or otherwise does not object) to, even if such financing is secured by priming liens on the ABL Priority Collateral and/or Notes Priority Collateral.

fertilizers, pesticides and other products related to growing tobacco, and provide them to farmers in these regions with which the Foreign Borrowers have contracts to purchase the resulting tobacco crop. The resulting crop is then purchased and marketed by the Company. The Foreign Credit Lines are typically seasonal in nature, normally extending for a term of 180 to 270 days corresponding to the tobacco crop cycle in the applicable location.

56.     As of May 31, 2020, approximately $557 million is drawn and outstanding under the Foreign Credit Lines. Approximately 35 Foreign Credit Lines are currently available, spread among approximately 30 lenders, the four largest of which are identified in the following table:

| Rank | Lender | Amount outstanding as of the Petition Date (in millions) |
|------|--------|----------------------------------------------------------|
| 1 | Eastern & Southern African Trade & Development Bank (TDB) | $ 269.6 |
| 2 | Banco do Brasil SA | $ 106.3 |
| 3 | Industrial and Commercial Bank of China (ICBC) | $ 56.0 |
| 4 | Standard Bank of South Africa Limited | $ 33.0 |

57.     The Foreign Credit Lines may be unsecured or secured by certain assets of the Foreign Borrowers, consisting primarily of receivables and tobacco inventory on hand. Although none of the Foreign Borrowers are Debtors, Pyxus guaranties approximately 95% of the outstanding principal of the Foreign Credit Lines.

58.     Many of the Foreign Credit Lines are uncommitted, demand facilities. This gives Foreign Credit Line lenders the right to stop making loans or require payment on demand at any time. The Company customarily renews the Foreign Credit Lines at the start of the tobacco crop season in the relevant country.

59.     It is essential that the Company have uninterrupted access to the Foreign Credit Lines because they are the Company's primary source of liquidity for its international operations

and allow the Company to adequately manage cash during planting and harvesting season, before inventory can be monetized. As described further below, one of the primary causes of these Chapter 11 Cases is that the Company was unable to repay its valuable Foreign Credit Lines earlier this year due to impacts from COVID-19 and risked losing them as a result.

60.     Given the critical nature of the Foreign Credit Lines, the Company has proactively engaged with its largest lenders to ensure continued access to their facilities during and after these Chapter 11 Cases. Certain of those lenders renewed their commitments prior to the Petition Date but included covenants in respect of these Chapter 11 Cases, while others entered into limited waiver agreements or amendments in respect of termination events that may be caused by the commencement of these cases and related consequences. However, a protracted bankruptcy proceeding could nonetheless trigger events of defaults that would permit those lenders to terminate their facilities and exercise remedies against collateral that is crucial to the Company's ongoing operations.

**G.  Receivables Facilities**

61.     The Company relies on certain facilities to monetize accounts receivables given the delay between shipping its products and receiving payments from customers. Pyxus, AOI and AONA, all of whom are Debtors, are sellers under that certain Third Amended and Restated Receivables Purchase Agreement, dated as of December 21, 2018, and Alliance One International GmbH ("**AOI GmbH**"), a Non-Debtor Affiliate, is a seller under that certain Fourth Amended and Restated Receivables Purchase Agreement, dated as of December 21, 2018 (as amended, supplemented or otherwise modified from time to time, collectively, "**Finacity RPAs**"). Finacity Receivables 2006-2, LLC (the "**Finacity Purchaser**") purchases all right, title and interest to the receivables sold by Pyxus, AOI, AONA and AOI GmbH under the Finacity RPAs and then enters into back-to-back sales with certain financial institutions. The Finacity Purchaser purchases the

receivables under the Finacity RPAs for a discount to the face amount, of which a portion is paid up front with the balance deferred. The sales of receivables under the Finacity RPAs have been structured as a true sale and are non-recourse to the sellers, subject to certain customary repurchase obligations for (among other things) breaches of representations and warranties by the Company sellers. As of the week of June 8, 2020, approximately $80 million was outstanding under the Finacity RPAs.

62. Pyxus and AOI GmbH are also sellers under that certain Amendment and Restatement Agreement, dated December 2, 2016 (as amended, supplemented or otherwise modified from time to time, the "**Standard Bank RPA**" together with the Finacity RPAs, the "**Securitization Facilities**"), with Standard Bank of South Africa Limited ("**Standard Bank**"). The Standard Bank RPA is a $125 million uncommitted receivables facility. As of the week of June 8, 2020, approximately $20 million was outstanding under the Standard Bank RPA. Similar to the Finacity RPAs, these purchases are structured as true sales, without recourse to Pyxus or AOI GmbH, subject to certain customary repurchase obligations for (among other things) failure by either of the Company sellers to perform their obligations under the applicable sales contract. The receivables are purchased at a discount to the invoiced amount, less any applicable fees and discounts. Upon payment of the invoice by the customer to Standard Bank, the sellers are entitled to receive agreed-upon additional amounts paid by the customer to Standard Bank in respect of such invoice. In general, the Company financed approximately 5% of all receivables through the Standard Bank RPA in fiscal year 2020. The Standard Bank RPA expires by its terms on December 6, 2020.

63. These Chapter 11 Cases trigger termination events under each of the Receivables Facilities. Because the Receivables Facilities are a critical source of liquidity for the Company,

prior to the Petition Date, Pyxus approached the counterparties under the Receivables Facilities and successfully obtained waivers and/or amendments necessary to continue the availability of the Receivables Facilities during these Chapter 11 Cases and, in the case of the Finacity RPAs, reached an agreement to renew the facility for another two years, subject to entry of an interim order in respect thereof by the Court (as described in further detail in Section VI below).  However, the extension of the Finacity RPAs is tied to bankruptcy milestones and other bankruptcy-related defaults that will be triggered if the Chapter 11 Cases are not completed by September 3, 2020. Similarly, the prepetition amendments to the Standard Bank RPA require the consummation of the restructuring within a certain timeline.

## H.  Intercompany Financing

64.     The Debtors, in the ordinary course of business, engage in intercompany transactions among themselves and their Non-Debtor Affiliates, which typically result in intercompany accounts receivables and payables and Intercompany Loans (as defined below) (collectively, together with all other ordinary-course intercompany transactions, the "***Intercompany Transactions***").

65.     The costs and revenues associated with the Intercompany Transactions are accounted for among the legal entities and result in Intercompany Claims (as defined below) that are tracked electronically in the accounting system and can be ascertained, traced and accounted for as needed.  The system of Intercompany Transactions is important to the Debtors' ability to manage their cash flow and to support the operations of Non-Debtor Affiliates. If the Intercompany Transactions (including fund transfers) were to be discontinued, the cash management system would be disrupted, which could stifle the Debtors' reorganization efforts.

# V. Key Events Leading to Chapter 11

## A. Excess Leverage and the Failed Canadian IPO

66.     Pyxus (f/k/a Alliance One International, Inc.) was formed by the merger of DIMON Incorporated and Standard Commercial Corporation in 2005.  At the time, both companies had significant amounts of corporate debt, which the merged Company has continued to carry and service.  In 2013 and 2016, Pyxus issued the Second Lien Notes and First Lien Notes, respectively, to refinance some of that legacy debt and for working capital.  In 2016, Pyxus also entered into the ABL Facility to fund working capital expenses.  Each year, the Debtors pay approximately $85 million in interest on these facilities, which imposes a significant burden on their free cash flow.

67.     The First Lien Notes, Second Lien Notes and ABL Facility were scheduled to mature by July, 2021, but in reality needed to be refinanced by June 2020, when the Company's annual financial statements were to be published.[6]  Absent a refinancing by June, 2020, the Company's independent auditors likely would have included a "going concern qualification" in the annual financial statement, which would have triggered events of default or caused Foreign Credit Line lenders not to renew.

68.     In order to address its "maturity wall," the Company began developing a refinancing strategy in 2018; however, its options were limited due to its leverage metrics.  Net income remained fairly flat during this period for a number of reasons, including the strengthening U.S. dollar and the U.S.-China trade dispute.  As a consequence, the Company's debt to EBITDA ratio – a common metric for leverage – remained high and existing cash flow would not support a traditional refinancing of the First Lien Notes and Second Lien Notes.

---

[6] The Company's fiscal year ends on March 31st, with its 10-K due 75 days thereafter.

69.     To address that issue, the Company attempted to capitalize on the growth of its new and growing Global Specialty Products business lines to raise capital.  Beginning in mid-2019, the Company tried to take advantage of a strong market for "cannabis" companies in Canada and began preparing for a potential initial public offering of its Canadian cannabis business combined with its hemp and CBD business and e-liquids flavor and fragrance business.  The Company moved quickly to take advantage of the positive market conditions: it engaged investment bankers in Canada and dedicated considerable resources to complete all the requisite regulatory filings.  Unfortunately, there was a sudden and significant downturn in the public markets for Canadian cannabis companies and the Company's investment bankers determined an IPO was not feasible based on conditions in September and October 2019.

70.     In reaction to those unfavorable market conditions, the Company pivoted, and began exploring private capital solutions.  However, the offers it received were inadequate to address its refinancing needs.  The Company pivoted again, and in late 2019, Pyxus pursued possible financing transactions, including a potential debt-for-debt exchange.  However, a confluence of factors beyond the Company's control, most significantly the COVID-19 pandemic, made that effort impossible and catalyzed these Chapter 11 Cases.

**B.  Delayed Sales and COVID-19**

71.     In any given fiscal year, the Company sells a substantial portion of its tobacco between October and March.  Because there is a significant delay between a sale and payment for such sale, the Company usually sells its receivables into the Receivables Facilities and uses the proceeds to repay the Foreign Credit Lines in Africa and South America in its fourth quarter (which ends March 31).

72.     Unfortunately, the Company's sales in the third quarter of fiscal year 2020 were delayed, which triggered a liquidity shortfall just as it was preparing to repay the Foreign Credit Lines and renew its principal Receivables Facility maturing at the end of May.

73.     While the Company typically would manage through the shortfall, the COVID-19 epidemic exacerbated the Company's already tenuous financial position.

74.     Starting in January, 2020, exports from China to customers in other areas of the world began to become delayed. In early March, tobacco handling facilities across the globe were prohibited from operating, ports were closed and vessel callings slowed down, all resulting in valuable inventory and product being stuck in port. In addition, social distancing laws closed many of the retailers in which the Company sells its Global Specialty Products.  The resulting revenue collapse triggered an unprecedented liquidity crisis. Ongoing uncertainty regarding US-China trade negotiations, COVID-19 impacts on the Company's customer requirements and consumers' economic and physical ability to purchase the Company's Global Specialty Products created future uncertainty as regards its business lines.

## C.  Negotiations with Key Stakeholders

75.     Facing the perfect storm, the Company concluded new capital would not be available without a holistic recalibration of its balance sheet and that a Chapter 11 proceeding likely would be necessary to achieve that objective.  While the Company continued to explore all strategic alternatives, an out-of-court solution presented numerous insurmountable challenges, including the lack of material unencumbered assets, the time frame needed to consummate a transaction and the ability to obtain the requisite level of support to consummate an exchange or voluntary maturity extension.

76.     To assist with a potential restructuring, the Company retained  Lazard Frères & Co. LLC ("*Lazard*") as its investment banker, RPA Asset Management Services, LLC ("*RPA*") as its

financial advisor and Simpson Thacher & Bartlett LLP and Young Conaway Stargatt & Taylor LLP as its counsel. In March 2020, legal and financial advisors to the Ad Hoc Crossholder Group entered into nondisclosure agreements with the Company, and soon thereafter the Company and its advisors began negotiating the contours of a comprehensive restructuring.[7] Following multiple rounds of negotiations, certain members of the Ad Hoc Crossholder Group entered into nondisclosure agreements as well.

77. In parallel with these negotiations, the Company began soliciting interest in debtor-in-possession and exit financing. The Debtors (with guidance from RPA and Lazard) estimated they needed at least $200 million of working capital during the Chapter 11 Cases to bridge the liquidity trough caused by COVID-19. In addition to seeking proposals from the current lenders, Lazard sent requests for proposal to over 35 third party institutions, including existing lenders, large money-center banks, a number of sophisticated alternative investment institutions and certain of the Company's largest shareholders. Although a number of parties signed nondisclosure agreements, only two potential lender groups, including one group composed of members of the Ad Hoc Crossholder Group, expressed sustained interest in providing a DIP Facility. After continued engagement and negotiation, members of the Ad Hoc Crossholder Group submitted the only viable proposal for a DIP Facility.

78. As part of a comprehensive Chapter 11 restructuring that would fully equitize the Second Lien Notes, the Ad Hoc Crossholder Group was willing to commit to the DIP Facility and agreed to have the obligations thereunder convert into an exit term facility on the effective date of the Plan. Over the course of several weeks, numerous proposals and counter-proposals were sent among advisors and principals on the terms of the DIP Facility and the restructuring more

---

[7] Market indicators support the conclusion that the Company is hopelessly insolvent and that the Second Lien Notes are the "fulcrum" security in the Company's existing capital structure.

generally. The proposed DIP Facility consists of $206.7 million in new money, of which $131.7 million would be available upon entry of the Proposed Interim Order, and the balance upon entry of the Final Order (each as defined in the DIP Motion).

79.     Throughout the same period, the Company also negotiated with advisors and members of the Ad Hoc First Lien Group and Ad Hoc Crossholder Group regarding the treatment of the First Lien Notes. Members of the Ad Hoc First Lien Group favored a refinancing or, alternatively, for better economic terms on the "take back" notes than the Debtors (and members of the Ad Hoc Crossholder Group) initially proposed. After several weeks, the parties settled on terms that balanced these competing interests: under the Plan the First Lien Notes (including a capitalized prepayment premium of $5.8 million) either will be exchanged for new secured notes that have a longer term but higher interest rate than the First Lien Notes or will be repaid in full with cash from proceeds of new, third party financing if the Debtors can secure commitments for such financing within 60 days of the Petition Date (and, in any event, prior to the Confirmation Date).

**D. The Restructuring Support Agreement**

80.     These negotiations concluded on June 14, 2020, when the Consenting Noteholders and the Debtors signed the RSA. The Debtors commenced solicitation the same date.

81.     To incentivize participation, Pyxus agreed to pay a support fee of $5.5 million to all Consenting First Lien Noteholders and $5.0 million to all Consenting Second Lien Noteholders that signed the RSA prior to the Petition Date. The fees are payable on the Plan effective date or within three Business Days of the RSA terminating as a result of a breach by the Debtors or the Debtors exercising their fiduciary out termination right. The fee payable to the Consenting Second Lien Noteholders will be paid in the form of New Common Stock in lieu of cash if the Plan is consummated.

26643097.1

82.     The RSA contains a number of termination events that may be triggered if the Debtors pursue a restructuring transaction that is inconsistent with the Plan or otherwise file restructuring documents that are not in form and substance consistent with the terms contemplated by the RSA. Importantly, the Debtors have a "fiduciary out" that gives them the right to terminate the RSA in order to pursue a superior alternative transaction if presented during the Chapter 11 Cases. For their part, the Consenting Noteholders have agreed to support and vote in favor of the Plan and not to opt out of the third party releases contained therein. Accordingly, even though the solicitation of the Plan will remain open until July 20, 2020, the Debtors are confident they will receive the requisite levels of voting support for confirmation.

## VI.   The First Day Motions

83.     The Debtors are seeking approval of the First Day Motions and related orders (the "*Proposed Orders*") and respectfully request that the Court grant such First Day Motions and enter the Proposed Orders.[8]

84.     I am familiar with the substance of each First Day Motion, and I believe that the relief sought in each First Day Motion (a) is necessary to enable the Debtors to operate in Chapter 11 with minimal disruption or loss of productivity or value, (b) constitutes a critical element in the Debtors achieving a successful and prompt reorganization and (c) best serves the Debtors' estates and their stakeholders' interests. I have reviewed each of the First Day Motions, and the facts and descriptions of the relief set forth therein are true and correct to the best of my information and belief and are incorporated herein in their entirety by reference. If asked to testify as to the facts supporting each of the First Day Motions, I would testify as to such facts. For the reasons set forth

---

[8] Capitalized terms used but not defined in this section have the meaning ascribed to such terms in the respective First Day Motion.

26643097.1

below and in the First Day Motions, I believe that the Court should grant each of the First Day Motions.

## A.  Administrative and Procedural Pleadings

### 1.      Joint Administration Motion[9]

85.    The Debtors seek the joint administration of their Chapter 11 Cases, five in total, for procedural purposes only. Many of the motions, hearings and other matters involved in the Chapter 11 Cases will affect all of the Debtors. Thus, I believe that the joint administration of the Chapter 11 Cases will avoid the unnecessary time and expense of duplicative motions, applications, orders and other pleadings, thereby saving considerable time and expense for the Debtors and resulting in substantial savings for their estates. I also believe that joint administration of the Chapter 11 Cases will ease the administrative burden on the Court and all parties in interest.

### 2.      Prime Clerk Application[10]

86.    Pursuant to the Section 156(c) Application, the Debtors seek entry of an order (i) appointing Prime Clerk LLC ("*Prime Clerk*") as claims and noticing agent for the Debtors and their Chapter 11 Cases, effective as of the Petition Date, including assuming full responsibility for the distribution of notices and the maintenance, processing and docketing of proofs of claim filed in the Debtors' Chapter 11 Cases, and (ii) granting related relief.

87.    Based on my discussions with the Debtors' advisors and other management, I believe that the Debtors' selection of Prime Clerk to act as the claims and noticing agent is appropriate under the circumstances and in the best interest of the estates. Moreover, it is my

---

[9] "*Joint Administration Motion*" means the *Debtors' Motion for Entry of an Order Directing Joint Administration of Chapter 11 Cases*, filed contemporaneously herewith.

[10] "*Prime Clerk Application*" means the *Debtors' Application for Entry of an Order Authorizing the Retention and Appointment of Prime Clerk LLC as Claims and Noticing Agent for the Debtors*, filed contemporaneously herewith.

understanding that based on all engagement proposals obtained and reviewed that Prime Clerk's rates are competitive and comparable to the rates charged by their competitors for similar services.

88.      The Debtors anticipate that there will be approximately 6,500 persons and entities to be noticed in these Chapter 11 Cases.  In light of the number of parties in interest and the complexity of the Debtors' business, the Debtors submit that the appointment of a claims and noticing agent will provide the most effective and efficient means of, and relieve the Debtors and/or the Clerk's office of the administrative burden of, noticing and processing proofs of claim and is in the best interests of both the Debtors' estates and their creditors.  Accordingly, on behalf of the Debtors, I respectfully submit that the Court should approve Prime Clerk's Section 156(c) Application.

### 3.      Motion to Enforce Automatic Stay[11]

89.      As described in further detail above, the Company comprises a global, publicly-owned agricultural company, historically operating as a leaf tobacco producer, processor and merchant in over 90 countries.  The nature of the Company's business necessitates daily interaction with a variety of foreign vendors and creditors.

90.      Nevertheless, there only are five Debtor entities in the Chapter 11 Cases.  None of the Non-Debtor Affiliates are part of this reorganization process.  Due to the global nature of the Company's business, and the Debtors' extensive dealings with non-U.S. creditors unfamiliar with the protections afforded Chapter 11 debtors under the Bankruptcy Code, the Debtors request out of an abundance of caution that the Court enter the Proposed Order confirming certain protections afforded under the Bankruptcy Code: (i) restating the protections of sections 362, 365, 525 and 541(c) of the Bankruptcy Code and (ii) granting related relief.  The Proposed Order will facilitate

---

[11] "**Automatic Stay Motion**" means the *Debtors' Motion for Entry of an Order (I) Restating and Enforcing Protections of 11 U.S.C. §§ 105(a), 362, 365, 525 and 541(c) and (II) Granting Related Relief*, filed contemporaneously herewith.

protecting the Company from parties, particularly those in foreign jurisdictions who are not familiar with the Bankruptcy Code or its protections, who otherwise might violate these provisions. The Proposed Order also may reduce the confusion that likely will ensue with respect to the Non-Debtor Affiliates' role in the Chapter 11 Cases.

### 4.    Consolidation Motion[12]

91.    The Debtors seek entry of an order (i) authorizing the Debtors to (a) file a consolidated list of creditors in lieu of submitting a separate mailing matrix for each Debtor, (b) file a consolidated list of the Debtors' 30 largest unsecured creditors and (c) seal certain personal identifiable information for the Debtors' individual creditors and interest holders, and (ii) granting related relief.

92.    The Debtors request that the Court authorize the Debtors to file and maintain a consolidated creditor matrix (the "**Creditor Matrix**") in electronic format only, in lieu of separate matrices for each Debtor, in these Chapter 11 Cases.  Because the Debtors have many thousands of creditors and other parties in interest, converting the Debtors' computerized information to a format compatible with the matrix requirements would be a burdensome task and would greatly increase the risk of error with respect to information already on computer systems maintained by the Debtors or their agents.  In addition, certain of the Debtors share many creditors and many creditors have claims against multiple Debtors; as such, the Debtors request authority to file a single, consolidated list of their 30 largest general unsecured creditors.  Compiling separate top 20 creditor lists for each individual Debtor would consume a substantial amount of the Debtors' time

---

[12] "**Consolidation Motion**" means the *Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to (A) File a Consolidated List of Creditors in Lieu of Submitting a Separate Mailing Matrix for Each Debtor, (B) File a Consolidated List of the Debtors' Thirty Largest Unsecured Creditors and (C) Seal Certain Personally Identifiable Information for Individual Creditors and Interest Holders, and (II) Granting Related Relief*, filed contemporaneously herewith.

and resources.  Moreover, the Debtors, working together with Prime Clerk have already prepared a single, consolidated list of the Debtors' creditors in electronic format and will make the Creditor Matrix available in electronic form to any party in interest who so requests it.

93.     The Debtors also request to redact from any paper filed or to be filed with the Court in these Chapter 11 Cases the home addresses of the Debtors' individual creditors and interest holders because such information could be used, among other things, to perpetrate identity theft or locate survivors of domestic violence or stalking who have otherwise taken steps to conceal their whereabouts.  Absent such relief, the Debtors would unnecessarily render individuals more susceptible to identity theft and could jeopardize the safety of individuals who, unbeknownst to the Debtors, are survivors of domestic violence or stalking by publishing their home addresses without any advance notice or opportunity to opt out or take protective measures.  The Debtors propose to provide an unredacted version of the Creditor Matrix and any other applicable filings to the Court, the Office of the United States Trustee for the District of Delaware (the "***U.S. Trustee***"), counsel to an official committee of unsecured creditors appointed in these Chapter 11 Cases (if any) and other parties in interest upon reasonable request.  Accordingly, I believe that the relief requested in the Consolidation Motion is in the best interests of the Debtors, their estates, and all parties in interest and should be granted in all respects.

### 5.     Scheduling Motion[13]

94.     The Debtors request entry of an order: (a) scheduling a combined hearing on the adequacy of the Disclosure Statement and confirmation of the Plan (the "***Combined Hearing***");

---

[13] "***Scheduling Motion***" means the *Motion of the Debtors for Entry of an Order (I) Scheduling Combined Hearing on Adequacy of Disclosure Statement and Confirmation of Prepackaged Plan; (II) Fixing Deadline to Object to Disclosure Statement and Prepackaged Plan; (III) Approving Prepetition Solicitation Procedures and Form and Manner of Notice of Commencement, Combined Hearing and Objection Deadline; (IV) Approving the Form and Manner of Notice of the Plan Election Forms; (V) Approving Notice and Objection Procedures for the Assumption or Rejection of Executory Contracts and Unexpired Leases; (VI) Conditionally (A) Directing the United States Trustee*

(b) approving procedures for objecting to the Disclosure Statement and the Plan, including a deadline for such objection (the "***Plan/Disclosure Statement Objection Deadline***"); (c) approving the prepetition solicitation procedures (the "***Solicitation Procedures***"), including the forms of ballots and the form and manner of the notice of the commencement of these Chapter 11 Cases, the Combined Hearing and the Plan/Disclosure Statement Objection Deadline; (d) approving the form and manner of notice of the forms on which Holders of Existing Pyxus Interests may opt out of the voluntary releases contained in Article VIII.F of the Plan (the "***Equityholder Opt-Out Election Forms***") and Holders of Allowed Second Lien Notes Claims may elect to receive the Second Lien Notes Stock Option (the "***Second Lien Notes Stock Election Forms***" and, together with the Equityholder Opt-Out Forms, the "***Plan Election Forms***"); (e) approving notice and objection procedures for the assumption or rejection of executory contracts and unexpired leases; (f) conditionally (i) directing that the U.S. Trustee not convene a meeting of the creditors (the "***Creditors' Meeting***") under section 341(a) of the Bankruptcy Code and (ii) excusing the requirement that the Debtors file statements of financial affairs ("***SOFAs***"), schedules of assets and liabilities ("***Schedules***") and the periodic reports of financial information with respect to entities in which the Debtors' estates hold a controlling or substantial interest (the "***Rule 2015.3 Reports***") pursuant to Bankruptcy Rule 2015.3(a); and (g) granting related relief.

95.     In connection with the foregoing, the Debtors request that the Court approve certain proposed dates and deadlines relevant to the Solicitation Procedures and Combined Hearing. For the convenience of the Court and parties in interest, the pertinent dates are set forth below.

---

*Not to Convene Section 341(a) Meeting of Creditors and (B) Waiving Requirement of Filing Schedules and Statements and Rule 2015.3 Reports; and (VII) Granting Related Relief*, filed contemporaneously herewith.

| Event | Date/Deadline |
|---|---|
| Voting Record Date | June 12, 2020 |
| Commencement of Solicitation | June 14, 2020 |
| Petition Date | June 15, 2020 |
| Combined Hearing Notice Date | Within three business days, or as soon as reasonably practicable, after entry of the Proposed Order |
| Service of Plan Election Forms | June 20, 2020 |
| Plan Supplement Filing Deadline | July 13, 2020 |
| Voting Deadline | July 20, 2020 at 5:00 p.m. (Prevailing Eastern Time) |
| Plan/Disclosure Statement Objection Deadline | July 20, 2020 at 5:00 p.m. (Prevailing Eastern Time) |
| Plan Election Form Deadline | July 20, 2020 at 5:00 p.m. (Prevailing Eastern Time) |
| Executory Contract Objection Deadline | July 20, 2020 at 5:00 p.m. (Prevailing Eastern Time) |
| Plan/Disclosure Statement Reply Deadline (including, to the extent applicable, replies to any Executory Contract Procedures objections) | July 23, 2020 at 11:59 p.m. (Prevailing Eastern Time) |
| Deadline to File Proposed Confirmation Order | July 23, 2020 at 11:59 p.m. (Prevailing Eastern Time) |
| Deadline to File Brief in Support of Confirmation | July 23, 2020 at 11:59 p.m. (Prevailing Eastern Time) |
| Combined Hearing | July 27, 2020 at ___:00 __.m (Prevailing Eastern Time) |

96.     I believe that emerging from the Chapter 11 Cases on the schedule set forth above will maximize the value of the Estates.  The Company depends on an array of foreign customers, suppliers and working capital lenders to successfully operate the business, and those parties may limit or terminate contracts or credit during these Chapter 11 Cases.[14]  Any adverse effects of the Chapter 11 Cases upon the Company's businesses and going-concern value will be minimized, and the benefit to creditors and other stakeholders maximized, through prompt distributions

---

[14] As one example, the Company needs to acquire approximately $20 million of farm supplies in Brazil in early August that it would typically fund through a foreign credit line.  There is a significant risk that the lender will refuse to advance loans so long as the Debtors are in bankruptcy, forcing the Company to fund the purchase from its balance sheet during a period of limited liquidity.

pursuant to the terms of the Plan. Likewise, an expeditious restructuring will serve to minimize administrative expenses of the Estates.

97. The Debtors commenced solicitation with respect to the Plan prior to the Petition Date. On June 14, 2020, the Debtors caused their Solicitation Agent, Prime Clerk, to distribute the Disclosure Statement, Plan and the appropriate Ballot to members of the Voting Classes or their brokers, dealers, commercial banks, trust companies, or other agent nominees (the "*Nominees*") by email and overnight mail (collectively, the "*Solicitation Package*"). The Solicitation Package advised recipients, among other things, of the July 20, 2020 deadline to vote on the Plan (the "*Voting Deadline*").

98. The Ballots substantially conform to Official Form No. 14. Holders that received the Solicitation Package were directed in the Disclosure Statement and applicable Ballot to follow the instructions contained in the Ballot (and described in the Disclosure Statement) to complete and submit the respective Ballots to cast a vote to accept or reject the Plan. Each Holder was explicitly informed that Ballots must be returned to the Solicitation Agent at the address specified on the Ballots prior to the Voting Deadline or to the Nominees with sufficient time for the Nominees to complete and return the Master Ballots to the Solicitation Agent prior to the Voting Deadline, as applicable. The Ballots also contain an option for each member of the Voting Classes that do not vote in favor of the Plan to opt-out of the voluntary releases contained in Article VIII.F of the Plan and summarize the release, injunction and exculpatory provisions of the Plan so that holders of Claims in the Voting Classes can make an informed decision on whether to make such opt-out election.

99. By the Scheduling Motion, the Debtors are also seeking approval of the form and manner of notice of the Plan Election Forms. The Second Lien Notes Stock Election Form allows

Holders of Allowed Second Lien Notes to elect to receive the Second Lien Notes Stock Option in lieu of the Second Lien Notes Cash Option under the Plan.  Through the Equityholder Opt-Out Form, Holders of Existing Pyxus Interests may opt out of the voluntary releases contained in Article VIII.F of the Plan.  The Debtors believe that the Plan Election Forms provide the Holders of Existing Pyxus Interests and Holders of Second Lien Notes Claims with sufficient information and clear instructions to assist them in making the election offered to them under the Plan, including the consequences of submitting a Plan Election Form and not making any election.  I believe the proposed schedule set forth in the Scheduling Motion for delivery of the Plan Election Forms will afford Holders of Existing Pyxus Interests and Holders of Second Lien Notes Claims adequate time to evaluate and make a decision prior to both the Plan Election Form Deadline and the Plan/Disclosure Statement Objection Deadline.

100.    The Debtors commenced solicitation of the Plan prepetition and anticipate the near-term confirmation of the Plan and subsequent emergence from chapter 11.  Accordingly, the Debtors seek an extension and conditional waiver of the Creditors' Meeting and the filing of SOFAs, Schedules and the Rule 2015.3 Reports.  The Plan is the result of extensive negotiations with the Consenting Noteholders, all of whom were represented by sophisticated counsel and advisors.  As of the Petition Date, pursuant to the signed RSA, the Debtors have already received commitments of support from the Consenting First Lien Noteholders, holding greater than 92% in amount of First Lien Notes Claims in Class 3 and from Consenting Second Lien Noteholders holding greater than 67% in amount of Second Lien Notes Claims in Class 4.  In addition, Holders of General Unsecured Claims will be paid in full or otherwise Unimpaired under the Plan and other contemplated "first day" relief sought by the Debtors.  Therefore, the Debtors submit that their creditors are not prejudiced by the lack of a Creditors' Meeting.  Furthermore, the request for a

final waiver of the requirement to file the Schedules, SOFAs and Rule 2015.3 Reports is appropriate given the prepackaged nature of the Plan. It is my understanding that the purpose of filing Schedules, SOFAs and Rule 2015.3 Reports is to permit parties in interest to understand the Debtors' assets and liabilities to facilitate plan negotiations and maximize recoveries to creditors. Here, as noted above, all Holders of Allowed General Unsecured Claims will be Unimpaired. Consequently, the Debtors do not plan to establish a general bar date in the Chapter 11 Cases. As a result, the SOFAs and Schedules would not serve their traditional purpose in the Chapter 11 Cases. Finally, the preparation and filing of the Schedules, SOFAs and Rule 2015.3 Reports would require a substantial expenditure of time and resources by the Debtors, diverting management's time and attention from ensuring a smooth transition into chapter 11 without serving the purposes of the reports.

101.    I believe that the relief requested in the Scheduling Motion is in the best interests of the Debtors' estates, their creditors and all other parties in interest, and will enable the Debtors to effectuate expeditiously their restructuring and preserve value, minimize administrative expenses of the estates and cause each of the parties in interest to be properly informed as promptly as possible of the anticipated schedule of events for confirmation of the Plan. Accordingly, I respectfully submit that the Scheduling Motion should be approved.

## B. Business Operation Motions

### 1.    Cash Management Motion[15]

102.    In the Cash Management Motion, the Debtors seek entry of interim and final orders (i) authorizing the continued use of the Debtors' existing cash management system (the "**Cash**

---

[15] "**Cash Management Motion**" means the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Continued Use of the Debtors' Existing Cash Management System and Bank Accounts, (II) Waiving Certain United States Trustee Requirements, (III) Authorizing Continued Performance of Intercompany Transactions Including Intercompany Loans, (IV) Authorizing an Interim Suspension of Section 345(b) Deposit and Investment Requirements and (V) Granting Related Relief*, filed contemporaneously herewith.

*Management System*") and bank accounts (collectively, the "***Debtor Bank Accounts***"), and to implement reasonable changes as the Debtors deem necessary, including the opening and closing of bank accounts; (ii) waiving certain requirements of the U.S. Trustee to the extent that the requirements are inconsistent with the Debtors' practices under their existing Cash Management System or other actions described therein; (iii) authorizing continued performance of intercompany transactions among the Debtors and their Non-Debtor Affiliates, including the intercompany loans and granting administrative expense status to postpetition Intercompany Claims; (iv) authorizing an interim suspension of the requirements of section 345(b) of the Bankruptcy Code; and (v) granting related relief.

### (a)    Overview of Cash Management System

103.    In the ordinary course of business prior to the Petition Date, the Debtors used an integrated Cash Management System, which is similar to those utilized by other comparably-sized companies, to efficiently collect, concentrate and disburse the funds generated by the Debtors' business operations, both from customer payments and from sales of receivables into the securitization facilities described in this declaration.  I believe that the Cash Management System is integral to the operation and administration of the Debtors' business as it enables the Debtors to monitor the collection and disbursement of funds and control the administration of the Debtor Bank Accounts.

104.    The Cash Management System has two main components: (a) cash collection and concentration; and (b) cash disbursement.  A schematic illustration of the Cash Management System is attached as **Exhibit D** to the Cash Management Motion and a list of the Debtors' bank accounts is attached as **Exhibit E** to the Cash Management Motion.

(b)    **Bank Accounts and Bank Fees**

105.    The Debtors maintain a total of 27 Debtor bank accounts.  Nine of the Debtor bank accounts are actively used to facilitate the Debtors' business operations while the remaining 18 Debtor Bank Accounts are inactive and maintained solely as legacy accounts or for relationship purposes.  Each of the active Debtor bank accounts is maintained at Bank of America Merrill Lynch ("**BAML**") or Branch Banking & Trust Company (n/k/a Truist Bank) ("**BB&T**") while the inactive Debtor Bank Accounts are maintained at BAML, BB&T, Wells Fargo Bank, N.A. ("**Wells Fargo**"), Credit Suisse Group AG ("**Credit Suisse**"), Deutsche Bank AG ("**Deutsche Bank**") and American National Bank.

106.    The Debtors use their centralized Cash Management System to facilitate the flow of funds collected in the ordinary course of their operations to the primary concentration account for each Debtor.  Revenue collected by Debtors AOI, AONA and AOSP (collectively, the "**Operating Companies**") is deposited in their respective concentration accounts (each, an "**Operating Company Concentration Account**") maintained at BAML.  Additionally, Pyxus maintains a concentration account (the "**Parent Concentration Account**" and together with the Operating Company Concentration Accounts, the "**Concentration Accounts**") in its name, at BAML, which periodically receives disbursements from AOI for working capital purposes.

107.    The Operating Companies disburse funds from their respective Operating Company Concentration Accounts to their respective disbursement accounts (the "**Operating Company Disbursement Accounts**"), which also are maintained at BAML and are used to fund vendor payments and seasonal working capital needs, as further described below.  Pyxus also maintains a disbursement account (the "**Parent Disbursement Account**" and together with the Operating Company Disbursement Accounts, the "**Disbursement Accounts**").  Pyxus uses the Parent Disbursement Account to fund its own working capital needs, including payroll for each of

the Debtor entities, as well as to fund the working capital needs for its U.S. Non-Debtor Affiliates engaged in the non-leaf, Global Specialty Products segment.

108.    The Debtors' Bank Accounts also include 18 inactive bank accounts located in the United States, Switzerland and United Kingdom that are not used for collection or disbursement of Debtor funds (the "***Inactive Accounts***").  These accounts are legacy accounts or accounts that are maintained for relationship purposes, and contain funds in an aggregate amount of approximately $50,000 across the 18 inactive accounts.  The Debtors do not intend or expect to use the Inactive Accounts during these Chapter 11 Cases but wish to maintain them and pay associated fees, costs and expenses.

109.    The Debtors permit their banks to deduct service charges and other fees, costs, and expenses arising in the ordinary course (collectively, the "***Bank Fees***") from the Debtor Bank Accounts.  The Debtors' average monthly Bank Fees total approximately $15,000, and the Debtors estimate that they owe up to the same amount in prepetition Bank Fees.

### (c)    Intercompany Transactions

110.    Given the size and global nature of their enterprise, the Debtors, in the ordinary course of business, engage in intercompany transactions among themselves and with their Non-Debtor Affiliates, which result primarily in (i) intercompany receivables and payables (the "***Intercompany Claims***") and (b) the intercompany advances and loans (the "***Intercompany Loans***" and together with the Intercompany Claims, the "***Intercompany Transactions***").  As noted above, I believe that the system of Intercompany Transactions is vitally important to the Debtors' ability to manage their cash flow and to support the operations of Non-Debtor Affiliates.  If the Debtors were required to cease the Intercompany Transactions, I believe their operations would be disrupted, resulting in possible degradation of value to the detriment of their estates and creditors.

26643097.1

39

111.    In the ordinary course of business, the Debtors sell and purchase goods and services from various Debtors and Non-Debtor Affiliates.  The Debtors also make corporate allocations and charges to the various Debtors and Non-Debtor Affiliates in respect of their proportional shares of collective corporate expenses including, most notably, insurance costs, procurement costs, headquarters costs and fees for the use of infrastructure.  The Debtors' records of Intercompany Transactions reflect the net position of these transactions.

112.    The Debtors maintain a documented system of intercompany loans among the Debtors and their Non-Debtor Affiliates, which serve critical long- and short-term corporate needs. AOI's Operating Company Disbursement Account is used to fund the seasonal working capital needs of certain foreign Non-Debtor Affiliates, including growing or purchasing tobacco product, operating expenses, administrative expenses, capital expenditures and payment of principal and interest on the Foreign Credit Lines.

113.    I understand that AOI expects to fund approximately $100 million over the next seven weeks to these Non-Debtor Affiliates, primarily for working capital needs for the upcoming growing season in Africa.  These amounts will be recorded as Intercompany Claims, which are subsequently repaid by the applicable Non-Debtor Affiliate(s), primarily out of the proceeds of tobacco customer sales made by it, with such proceeds received directly by AOI.  Similarly, AOI provides working capital to AOI GmbH, who in turn provides funding for the seasonal working capital needs of additional foreign Non-Debtor Affiliates, again primarily related to advances for tobacco growing activities and overhead.  I understand that AOI expects to fund approximately $70 million over the next seven weeks, $40 million of which will be funded only after entry of the Proposed Final Order, to AOI GmbH, which will be recorded as Intercompany Claims.

114.     Additionally, as noted above, Pyxus is a substantial long-term lender to U.S. Non-Debtor Affiliates operating the non-Canadian (i.e., non-cannabis) portions of the Global Specialty Products business segment, advancing funds necessary for continued operations of the non-Canadian Global Specialty Products business segment.  Over the course of these Chapter 11 Cases, Pyxus expects to fund approximately $200,000 during the next seven weeks to these U.S. non-leaf, Global Specialty Products subsidiaries.  These amounts are recorded as Intercompany Claims.  Pyxus also is a borrower of additional Intercompany Loans from AOI.  These intra-Debtor loans are primarily used for working capital purposes.  The net position of the Debtors' Intercompany Transactions are set forth in **Exhibit C** to the Cash Management Motion.

115.     The Debtors believe that the continued operational funding of their Non-Debtor Affiliates during the pendency of these Chapter 11 Cases is essential to maintaining the Debtors' business and maximizing the value of their estates as a going concern.  These Intercompany Loans serve the critical purpose of supporting the Debtors' ongoing tobacco operations and cash generation across the world.  This funding is particularly crucial to the Debtors' operations during this time as foreign Non-Debtor Affiliates in certain regions are, by funding growing and purchasing tobacco, building inventory needed to generate revenue in the third and fourth fiscal quarters.  Without the means to fund growing and/or purchasing and processing green tobacco during the season, the Debtors and their affiliates will be unable to fulfill customer orders later in the year, which would severely disrupt the projected revenue streams.  Accordingly, by the Cash Management Motion, the Debtors seek authority to make (and continue to receive) payments on the Intercompany Loans consistent with ordinary-course prepetition practices, subject to a cap on making cash payments to Non-Debtor Affiliates in excess of $80 million in the aggregate prior to

entry of the Proposed Final Order, absent receiving further authority from the Court.[16] The payments contemplated by the Intercompany Loans comprise one part of an intricate and highly integrated system of foreign lines and international procurement, processing and sales of tobacco, all of which needs to run smoothly and in a timely manner to maintain the value of the enterprise.

### (d) Depository Policies and Practices

116. The Debtors believe that they are substantially in compliance with the requirements of section 345 of the Bankruptcy Code because the Debtor Bank Accounts, excluding certain of the Inactive Accounts, are maintained at BAML and BB&T, each of which is on the list of authorized depositories maintained by the U.S. Trustee. Of the Inactive Accounts, six are maintained at Credit Suisse, two are maintained at American National Bank, two are maintained at Wells Fargo, two are maintained at Deutsche Bank, three are maintained at BB&T and three are maintained at BAML. Wells Fargo is also on the list of authorized depositories maintained by the U.S. Trustee. While Credit Suisse and American National Bank are not authorized depositories, they are reputable banking institutions with appropriate deposit insurance, and in any case the Debtors hold only *de minimis* funds in such accounts. As discussed below, the Debtors are seeking an interim waiver of the requirements under section 345(b) of the Bankruptcy Code as it pertains to the Inactive Accounts and to the extent any other Debtor Bank Accounts are not currently in compliance with section 345(b).

117. I believe that the Cash Management System is an ordinary-course, customary, and essential business practice, the continued use of which is essential to the Debtors' business

---

[16] As more fully described in the DIP Financing Motion (as defined below), the Debtors are seeking authority to use proceeds of DIP Loans (as defined in the DIP Financing Motion) to continue to fund these critical Intercompany Loans and to support the Debtors' global business operations. The DIP Lenders have agreed to this use of DIP Loans, subject to the terms and conditions of the DIP Credit Agreement (all capitalized but undefined terms as defined in the DIP Financing Motion).

operations during the Chapter 11 Cases and their goal of maximizing value for the benefit of all parties in interest. I believe that requiring the Debtors to adopt a new, segmented cash management system during the Chapter 11 Cases would be expensive, burdensome and unnecessarily disruptive to the Debtors' operations, and that any disruption of the Cash Management System would have severe and adverse effects on the Debtors' restructuring efforts and the Debtors' ultimate ability to maximize estate value for the benefit of the Debtors' creditors and other parties in interest. Thus, in my opinion, maintaining the existing Cash Management System without disruption is both essential to the Debtors' ongoing operations and in the best interests of the Debtors, their estates, and all interested parties. Accordingly, the Debtors should be allowed to maintain and continue to use the Cash Management System, including maintenance of their existing Bank Accounts.

118. The Debtors also should be authorized to continue to deposit and maintain their funds in the Bank Accounts in accordance with existing practices under the Cash Management System, subject to any reasonable changes the Debtors may implement to the Cash Management System; and, for the reasons discussed above, the deposit requirements of section 345(b) of the Bankruptcy Code, to the extent that the requirements are inconsistent with these practices, should be waived on an interim basis for a period of up to 45 days after the Petition Date.

119. Finally, the Debtors should be authorized to pay, honor or otherwise settle prepetition Intercompany Claims and to engage in Intercompany Transactions postpetition in the ordinary course of business. I believe that the Debtors' business judgment to pay prepetition Intercompany Claims is sound because the Intercompany Claims reduce the administrative costs they incur, facilitate the satisfaction of the Debtors' obligations and are integral to their daily operations. Failing to honor prepetition Intercompany Claims may result in disruptions to certain

Debtors' operations and deterioration of estate value. Thus, I believe that continuation of the payment or settlement of the Intercompany Claims is in the best interests of the Debtors' estates and their creditors. Further, I believe that continuing to engage in Intercompany Transactions, including the advancing of Intercompany Loans, is in the ordinary course of their businesses. However, in the event that consummating Intercompany Transactions is not in the ordinary course, I maintain that the Intercompany Transactions are vital to the Debtors' business and restructuring efforts, and the Debtors should be authorized to continue the Intercompany Transactions as a sound exercise of their business judgment.

### 2.    Receivables Financing Motion[17]

120.    In the Receivables Financing Motion, the Debtors seek entry of interim and final orders (i) authorizing the Debtors, in their discretion, to (a) enter into extensions and/or amendments to the Receivables Facilities and pay any related fees and reimbursements of expenses owed thereunder; (b) continue selling receivables and related rights pursuant to the Receivables Facilities and perform all postpetition obligations thereunder; (c) grant protective security interests in the receivables and certain related assets; and (d) perform and satisfy all of their prepetition obligations under the Receivables Facilities; and (ii) granting related relief.

121.    As described above, the Company historically has monetized a significant portion of accounts receivable generated by Pyxus, AOI, AONA and AOI GmbH (the "*Receivables*") through certain Receivables Facilities arranged by each of Finacity Corporation and The Standard Bank of South Africa Limited (collectively, the "*Facilities Banks*"). The Receivables Facilities

---

[17] "*Receivables Financing Motion*" means the *Debtors' Motion For Entry of Interim and Final Orders Pursuant to Sections 105, 362(D), 363(B)(1), 363(F), 363(M), 364(C)(1), 364(C)(2) And 364(E) of the Bankruptcy Code (I) Authorizing The Debtors To (A) Enter Into Extensions and/or Amendments to The Receivables Facilities, (B) Continue Selling Receivables and Related Rights Pursuant to The Receivables Facilities and Perform All of Their Postpetition Obligations Thereunder, (C) Grant Protective Security Interests In The Receivables and Related Assets and (D) Perform And Satisfy All Of Their Prepetition Obligations Under The Receivables Facilities, and (II) Granting Other Related Relief,* filed contemporaneously herewith.

comprise the Company's securitization program (the "**_Securitization Program_**"), pursuant to which the Debtors sell Receivables through the Receivables Facilities as a means to generate critical up-front liquidity to the Company and to fund the Company's general working capital. I understand that these sales are structured and treated as true sales. The Debtors have granted protective security interests in the respective Receivables and certain related assets to the Facilities Banks, in the unlikely event of a recharacterization as a financing.

122.     I believe that the Securitization Program is an integral component of the Debtors' capital structure and that it should be kept in place during the Chapter 11 Cases to preserve value for all interested stakeholders. Without the liquidity provided by the Securitization Program, the Debtors' DIP financing needs would be significantly increased. This is particularly so as the Company is currently entering a tobacco growing season and will need the liquidity from its Receivables to fund its working capital.

123.     Accordingly, I believe that the Receivables Financing Motion is in the best interests of the Debtors and should be granted in all respects. The Debtors should be granted the authority to continue performing under the Receivables Facilities and, in the unlikely event the sales are recharacterized as financings, the Debtors should be granted the authority to grant protective security interests in the sold Receivables. Importantly, these protective security interests have been consented to by the ABL Lenders, the First Lien Noteholders, the Second Lien Noteholders and the DIP Commitment Parties, who have each agreed to release their respective liens in respect of sold Receivables upon the sale of such Receivables.

### 3.     DIP Financing Motion[18]

124.     In the DIP Financing Motion, the Debtors seek the entry of interim and final orders (i) authorizing the Debtors to obtain the senior secured priming and superpriority debtor-in-possession multiple-draw term loan facility pursuant to the terms of the DIP Credit Agreement; (b) execute and deliver the DIP Loan Documents and perform such other acts as may be necessary, desirable or appropriate in connection therewith; and (c) use Cash Collateral (as defined in the Bankruptcy Code); (ii) granting to the DIP Agent, for the benefit of all DIP Secured Parties, automatically perfected security interests in and liens on all of the DIP Collateral, and providing superpriority claims with respect to the DIP financing; (iii) approving the forms of adequate protection to be provided by the Debtors to the Prepetition Secured Parties; (iv) modifying the automatic stay to the extent necessary to effectuate the terms and conditions of the DIP Loan Documents and the DIP Orders; and (v) granting related relief.

125.     Prior to the Petition Date, the Debtors engaged in extensive, good faith and arm's-length negotiations with the Ad Hoc Crossholder Group regarding the terms and conditions of a proposed DIP financing.  These efforts resulted in the agreement between the Debtors and the Ad Hoc Crossholder Group and certain other participating Second Lien Noteholders regarding the terms of a DIP Facility that are reflected in the DIP Financing Motion and the Proposed Orders granting the DIP Financing Motion.

126.     The DIP Facility consists of a multi-draw term loan facility for up to $206.7 million in new money (less original issue discount).  The DIP Facility allows the Debtors to immediately access up to $131.7 million (less original issue discount) upon entry of the Proposed Interim Order

---

[18] "***DIP Financing Motion***" means *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing The Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Granting Liens and Superpriority Claims, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing and (VI) Granting Related Relief*, filed contemporaneously herewith.

including to pay amounts authorized by the First Day Motions and to pay administrative costs during the Chapter 11 Cases, in accordance with the Budget provided in the DIP Credit Agreement.

127.    I believe that the Debtors' ability to enter into the DIP Facility and borrow thereunder is vital to preserving the value of the enterprise by adequately financing the business of the Debtors and their Non-Debtor Affiliates and therefore I believe that the DIP Financing Motion is in the best interests of the Debtors and should be granted in all respects.  Substantially all of the Debtors' cash is potentially the Cash Collateral of the Prepetition ABL Lenders and therefore, absent the DIP Facility refinancing the Prepetition ABL Facility in full in cash, and the consent or authorization from this Court, the Debtors cannot utilize such cash.

128.    In any event, I believe the Debtors' current cash balance of approximately $10 million is insufficient to meaningfully fund their businesses.  This is especially true with respect to the cash needs of the Debtors' foreign Non-Debtor Affiliates, which require liquidity to maintain foreign credit facilities, finance upcoming tobacco growing seasons and purchase foreign green tobacco for processing and sale to customers.  As I describe above, tobacco sales generated by the operation of these foreign Non-Debtor Affiliates are one of the largest revenue sources for the consolidated Pyxus enterprise.  Without access to this cash and the additional liquidity that the DIP Facility will provide, there is a significant likelihood that the Debtors and the foreign Non-Debtor Affiliates will be required to curtail operations during key growing seasons and potentially begin a liquidation that will cause irreparable harm to the Debtors and their estates, and, ultimately, their creditors.

129.    In particular, I believe the Non-Debtor Affiliates' spending needs during the interim period leading up to a final hearing are substantial and will be funded in part by the proceeds of the DIP Loans.  During this interim period, I understand that the Non-Debtor Affiliates will spend

approximately the following amounts, which is consistent with the authority requested above in the Cash Management Motion to continue to fund the Non-Debtor Affiliates in the ordinary course: (a) $78 million for the purchase of green tobacco product in Malawi, Turkey, Zambia, Zimbabwe, Tanzania, Brazil and China, without which Pyxus will be unable to fulfill future customer orders; (b) $22 million for operating expenses, primarily for processing green tobacco; (c) $10.5 million for administrative expenses and capital expenditures; (d) $3.5 million for interest payments on Foreign Credit Lines (as defined below) guaranteed by Pyxus; and (e) $38 million for principal repayments on Foreign Credit Lines used to finance tobacco growing and buying operations at various locations.

130.   I understand that the proceeds from the DIP Loans will be used as follows: (a) approximately $45 million will be used to repay the ABL Facility; (b) approximately $52 million will be used to pay for transaction expenses related to the Chapter 11 Cases, including adequate protection interest payments, transaction expenses and professional fees; and (c) approximately $103 million will be used to provide operating funds to the Debtors and their Non-Debtor Affiliates.  As noted above, the funds expended by the operating Non-Debtor Affiliates will be used to fund the purchase of tobacco inventory by the Debtors and Non-Debtor Affiliates, fund operating expenses and for the repayment of the Foreign Credit Lines.

131.   I understand that, as part of the DIP Facility arrangement, and as adequate protection for any diminution in the value of their respective collateral during the Chapter 11 Cases, the Debtors have agreed to provide the Prepetition Secured Parties with adequate protection that includes (a) adequate protection liens; (b) superpriority claims; (c) payment of postpetition interest; (d) payment of certain fees and expenses as set forth in the DIP Financing Motion; and (e) certain reporting requirements.

132.   Moreover, I am aware that in the DIP Financing Motion and related orders the Debtors have admitted, stipulated, and agreed to various facts, including but not limited to: (a) that the Debtors are truly and justly indebted and liable to the Prepetition Secured Parties, without defense, counterclaim, recoupment, offset of any kind and (b) that the Secured Obligations are secured by perfected liens and security interests (with the priorities set forth in the DIP Financing Motion) over substantially all of the assets of the Debtors, including, without limitation, Cash Collateral and (c) certain other matters.

133.   I understand that, subject to paragraph 28 of the Proposed Interim Order, these stipulations and admissions by the Debtors contained in the Proposed Interim Order are binding upon the Debtors and any successors thereto, including any Chapter 7 or Chapter 11 trustee appointed or elected for any of the Debtors in the Chapter 11 Cases or any Successor Cases, and upon all other parties in interest, in all circumstances and for all purposes, unless a challenge that specifically challenges the Debtors' stipulations is filed prior to the Challenge Deadline and the Court enters a final non-appealable order in favor of the plaintiff in any such challenge.

134.   I have also been informed that notwithstanding the Debtors' stipulations in the Proposed Interim Order, the Debtors' irrevocably waive the right to challenge or contest in any way the perfection, validation, and enforceability of the Prepetition Liens or the validity or enforceability of the Prepetition Secured Obligations and the Prepetition Credit Documents.

135.   I believe that the Debtors need authorization to incur the DIP financing to pay expenses as set forth above, all in accordance with Approved DIP Budget.  Indeed, I believe that absent such relief, the Debtors' businesses will be brought to an immediate halt, with damaging consequences for the Debtors and their estates and creditors.

4.      **Workforce Obligations Motion**[19]

136.     In the Workforce Obligations Motion, the Debtors seek entry of interim and final orders (i) authorizing the Debtors, in their discretion, to (a) pay all prepetition wages, salaries and compensation to Employees, Temporary Workers and Independent Contractors (each as defined below) and all related administrative and incidental costs (collectively, the "***Compensation Obligations***") and prepetition employee benefits (collectively, the "***Employee Benefit Obligations***"); (b) pay all employment, unemployment, Social Security and federal, state and local taxes relating to the Compensation Obligations and Employee Benefit Obligations, whether withheld from wages or paid directly by the Debtors to governmental authorities (collectively, "***Payroll Taxes***"), and make other payroll deductions, including, but not limited to, retirement and other employee benefit plan contributions, union dues, garnishments and voluntary deductions (collectively with the Payroll Taxes, the "***Payroll Deduction Obligations***" and collectively with the Compensation Obligations and Employee Benefit Obligations, the "***Prepetition Workforce Obligations***"); (c) pay all prepetition retirement benefits to former Employees (collectively, the "***Retiree Benefit Obligations***" and together with the Prepetition Workforce Obligations, the "***Prepetition Obligations***"); and (d) honor and continue the Debtors' prepetition programs, policies and practices as described in the Workforce Obligations Motion in the ordinary course of business; and (ii) granting related relief.

137.     The Debtors estimate that the Prepetition Workforce Obligations totaling approximately $2,603,412 will be due and payable (the "***Interim Amount***") prior to the final hearing on the Workforce Obligations Motion.  The Debtors are requesting authority to pay

---

[19] "***Workforce Obligations Motion***" means the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Pay Certain Prepetition Employment Obligations and (B) Maintain Employee Benefits Programs and (II) Granting Related Relief*, filed contemporaneously herewith.

Prepetition Workforce Obligations in an aggregate amount not to exceed the Interim Amount, subject to the $13,650 per-payee cap established by sections 507(a)(4) and (a)(5) of the Bankruptcy Code and, after the final hearing, to pay all other Prepetition Obligations.

### (a)    Overview of the Debtors' Workforce

138.    As of the Petition Date, the Debtors employed approximately 476 employees (the "*Employees*").  The Employees include 442 Full-Time Employees, 14 Part-Time Employees and 20 Seasonal Employees.  Approximately 314 of the Debtors' current Employees are Salaried Employees and approximately 162 are Hourly Employees.  The Debtors also regularly utilize the services of contract workers (the "*Independent Contractors*" and temporary workers (the "*Temporary Workers*," and, together with the Employees and Independent Contractors, the "*Workforce*") to provide a variety of services to fill immediate business needs of the Debtors and allow the Debtors to have a flexible workforce to meet their operational needs in a cost-effective manner.  As of the Petition Date, there were five Independent Contractors and nine Temporary Workers engaged with the Debtors.

139.    Approximately 143 of the Debtors' active Employees in Wilson, North Carolina, as well as 399 Seasonal Employees currently on seasonal layoff, are represented by the branch Local No. 270-T of the Bakery, Confectionary, Tobacco Workers and Grain Millers International Union under the Collective Bargaining Agreement, dated as of April 1, 2020 and expiring on March 31, 2023, with Debtors Alliance One North America, LLC and Alliance One Specialty Products, LLC (the "*CBA*").  The Debtors' remaining 333 active Employees are not represented by any union.

### (b)    Overview of Compensation and Benefits

140.    *Compensation Obligations*.  Employees are categorized into two payroll groups. Monthly Salaried Employees are paid on a monthly basis on the 25th of each month (or the

immediately preceding business day if such pay date falls on a weekend or holiday). Weekly Hourly Employees employed at the Debtors' locations in Farmville, North Carolina, Wilson, North Carolina and Danville, Virginia are paid weekly on each Thursday. In addition to regular wage and salary obligations, certain Employees are entitled to earn commission payments. Specifically, sales representatives employed at Pyxus receive commission based on net sales. As of the Petition Date, there were three such Employees entitled to commission payments, which are paid in arrears with the monthly payroll process.

141.    In the ordinary course of business, the Debtors take deductions from Employees' paychecks for payments to third parties on behalf of Employees for various federal, state and local income, employment, payroll and other taxes, as well as for savings programs, benefit plans, flexible spending accounts, insurance programs and other similar programs (collectively, the "***Deductions***"). Additionally, in the ordinary course of business, the Debtors may be required by law to withhold from certain Employees' wages amounts for various garnishments, such as tax levies, child support and other court-ordered obligations (collectively, the "***Garnishments***"). Further, as part of the CBA, the Debtors are required to withhold union dues from participating Employees' pay once a month (the "***Union Dues***").

142.    The Debtors estimate that the Compensation Obligations total approximately $1,752,053 (comprised of $887,572 owed to Employees, $22,000 owed to Independent Contractors, $50,400 owed to Temporary Workers, $6,485 attributable to Garnishments, $1,428 attributable to Union Dues, $758,168 attributable to Deductions and $26,000 attributable to administrative processing fees).

143.    ***Retention Plan.***    Prior to the Petition Date, the Debtors implemented a Key Employee Retention Plan (the "***Retention Plan***" and the compensation thereunder, the "***Retention***

*Compensation*") for the benefit of key personnel, all of whom are non-Insider Employees. Retention agreements were executed with eligible Employees on or around April 20, 2020 and provide for the payment of four equal installments of the applicable retention bonus amounts, with the first being due and payable on June 30, 2020 and the remaining installments becoming payable on the last day of the next three fiscal quarters thereafter. The Retention Compensation to the 29 eligible non-Insider Employees totals approximately $2,463,000, of which $615,750 will become payable on June 30, 2020.

144.     The Retention Plan provides a retention incentive for Employees determined to be critical to the success of the Debtors' reorganization and whose retention is necessary to sustain the value of the Debtors' operations and business. These Employees have significant knowledge and experience unique to the Debtors' operations, and replacing them, if even possible during the Chapter 11 Cases, would require significant hiring and training efforts. Losing these Employees during this time would be highly disruptive to the Debtors' operation of their business and their reorganization efforts to the detriment of the Debtors and their stakeholders. Therefore, I believe that, to the extent the continuation of the Retention Plan and payment of the Retention Compensation is found not to be ordinary course, it is nonetheless a reasonable exercise of the Debtors' business judgment. Further, I understand that the Debtors are seeking authority to pay the Retention Compensation only upon entry of the Proposed Final Order.

145.     ***Benefits Programs***. In the ordinary course of business, the Debtors maintain a number of benefits programs and policies for their Employees as more fully described in the Workforce Obligations Motion, including (i) paid time off and vacation; (ii) medical, bereavement and civic duty leave; (iii) severance; (iv) expense reimbursement; (v) medical, dental and vision plans; (vi) flexible spending plans; (vi) life and disability insurance; (vii) other benefit programs

such as education assistance; and (viii) retirement benefits, including the 401(k) Plan and the Cash Balance Pension Plan.

146.    The Debtors estimate that, as of the Petition Date, the owe approximately $620,027 on account of the aforementioned Employee Benefits.  For the avoidance of doubt, no prepetition amounts are owed on account of the Debtors' Severance Obligations, and no Employee eligible under the Debtors' Severance Plan is an Insider.  Additionally, I understand that the Debtors have confirmed that no amounts are owed on account of any benefits plan in excess of the statutory cap. I believe that the Employee Benefits are typical and customary, and continuing to offer them is necessary for the Debtors to retain Employees and maintain productivity during the Chapter 11 Cases.

147.    ***Workers Compensation***.  The Debtors maintain workers' compensation insurance through Hartford Financial Services Group, Inc. ("***Hartford***") that provides coverage for employee-related injuries, disability or death, as prescribed by state and federal workers' compensation laws  and  other  statutes.  Under the policies, Hartford provides insurance for workers' compensation claims in excess of the $250,000 deductible per incident.  Under the deductible, the Debtors paid approximately $548,380 in fiscal year 2019 on account of covered claims (collectively,  the "***Workers' Compensation Claims***").  As of the Petition Date, there are 20 current Workers' Compensation Claims open against the Debtors, and the total accrued but unpaid obligations in connection with the Workers' Compensation Claims are approximately $231,332.

148.    ***Retiree Benefit Obligations***.  I understand that, by the Workforce Obligations Motion, the Debtors also seek to honor and continue the retirement programs for the benefit of their participating and former Employees and, upon entry of the Proposed Final Order, to pay the

Retiree Benefit Obligations (as described herein).  The Debtors maintain various non-qualified and legacy retirement programs, including the Supplemental Retirement Account Plan, the Supplemental Executive Retirement Plan, the Pension Equity Plan, the Standard Commercial Corporation Supplemental Retirement Plan, the Dibrell Supplemental Executive Retirement Plan and certain plans per the provisions of certain employee contracts (collectively, the "***Non-Qualified Retirement Benefits***").  Additionally, the Debtors provide retiree life insurance and legacy retiree medical insurance benefits to certain former Employees.  The Debtors estimate that, as of the Petition Date, they owe approximately $298,000 on account of Retiree Benefit Obligations.  The continuation of these programs and payment of the Retiree Benefit Obligations will avoid significant financial hardship for these former Employees and demoralization of participating and eligible Employees.  Thus, I believe it is a reasonable exercise of the Debtors' business judgment to continue to administer the Non-Qualified Retirement Benefits and other retirement benefits described in the Workforce Obligations Motion in the ordinary course of business and, upon entry of the Proposed Final Order, to pay the Retiree Benefit Obligations.

149.    The Workforce performs a variety of critical functions.  I believe that the Debtors' ability to preserve their businesses and safely and productively operate their businesses is dependent on the expertise and continued enthusiasm and service of their Workforce.  If the Debtors fail to pay the Prepetition Obligations in the ordinary course of business, the Workforce may suffer extreme personal hardship and, in some cases, may be unable to pay their basic living expenses.  I believe this would have a highly negative impact on Workforce morale and productivity, thereby resulting in immediate and irreparable harm to the Debtors' continuing operations and their estates.  Therefore, payment of the Prepetition Obligations and continuation of the Debtors' programs and policies is vital to preventing the loss of key members of the

Workforce during the pendency of the Chapter 11 Cases and to maintaining the stability of the Debtors' operations. Accordingly, I believe that the relief requested in Workforce Obligations Motion is in the best interests of the Debtors, their estates and all parties in interest and should be granted in all respects.

### 5.   Taxes Motion[20]

150.    The Debtors seek entry of interim and final orders (i) authorizing, but not directing, the Debtors to remit and pay (or, if applicable, use tax credits to offset) prepetition amounts owing in respect of all taxes, including, but not limited to property, income, franchise, and other miscellaneous taxes (the "***Prepetition Taxes***") to various federal, state and local authorities (collectively, the "***Taxing Authorities***"), and prepetition amounts owing in respect to certain custom duties, licensing, permitting, reporting, regulatory and other miscellaneous fees (the "***Fees***" or "***Regulatory Fees***" and together with the Prepetition Taxes, the "***Prepetition Taxes and Fees***") to certain federal, state and local government agencies (collectively, the "***Regulatory Authorities***" and together with the Taxing Authorities, the "***Authorities***"), and (ii) granting related relief.

151.    As corporate entities, the Debtors incur various tax liabilities and fees and in the past have generally paid such tax liabilities and fees to the relevant Authorities when due in the ordinary course of business. The Debtors are subject to real and personal property taxes; income and franchise taxes; customs duties and license, permitting, reporting, regulatory and other miscellaneous taxes and fees. I have been informed that, as of the Petition Date, the Debtors estimate that they have accrued liabilities, which are not yet due, in the approximate amount of

---

[20] "***Taxes Motion***" means the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Prepetition Taxes and Fees and (II) Granting Related Relief*, filed contemporaneously herewith.

$11,594,528 on account of Prepetition Taxes and Fees, $1,793,560 of which will be due in the first 30 days of the Chapter 11 Cases.

152.    Payment of the Prepetition Taxes and Fees is critical to the Debtors' continued, uninterrupted operations.  The Debtors' failure to pay these obligations may cause the Authorities to take precipitous action, including, but not limited to, seeking to lift the automatic stay, and imposing personal liability on the Debtors' officers and directors, which would disrupt the Debtors' day-to-day operations and could potentially impose significant costs on the Debtors' estates.  Failure to pay the Prepetition Taxes and Fees could also have a negative impact on the Debtors' existing permits and licenses.  In addition, the Debtors believe that certain Prepetition Taxes and Fees are entitled to priority and must be satisfied before any general unsecured claims against the Debtors' estates, and thus permitting the Debtors to pay prepetition Taxes would affect only the timing of the payments, and not the amount of the ultimate recovery.  Accordingly, I believe that the relief requested in Taxes Motion is in the best interests of the Debtors, their estates and all parties in interest and should be granted in all respects.

### 6.    Utilities Motion[21]

153.    The Debtors seek entry of interim and final orders (i) prohibiting utilities, as that term is used in section 366 of the Bankruptcy Code (each, a "**Utility Company**," and collectively, the "**Utility Companies**"), from altering, refusing or discontinuing services to, or discriminating against, the Debtors solely on the basis of the commencement of the Debtors' Chapter 11 Cases, a debt owed by the Debtors for services rendered before the Petition Date or any perceived inadequacy of the Debtors' proposed adequate assurance of payment to Utility Companies for

---

[21] "**Utilities Motion**" means the *Debtors' Motion for Entry of Interim and Final Orders (I) Prohibiting Utilities from Altering, Refusing or Discontinuing Service, (II) Approving the Debtors' Proposed Form of Adequate Assurance of Payment to Utilities and (III) Establishing Procedures for Resolving Objections to the Debtors' Proposed Form of Adequate Assurance*, filed contemporaneously herewith.

postpetition services; (ii) approving the Debtors' proposed adequate assurance of payment to Utility Companies for postpetition services; (iii) approving procedures for resolving objections to the Debtors' proposed adequate assurance of payment to Utility Companies for postpetition services and (iv) granting related relief.

154.     The Debtors obtain electricity, gas, water, sewer, waste, telephone, internet, data communications and other similar services (the "***Utility Services***") from Utility Companies to operate their businesses.  On average, the Debtors pay approximately $309,377 each month for their Utility Services, calculated as a historical average payment for the past 12 months.  The Debtors propose depositing $154,689 into a segregated account as additional assurance of payment (the "***Utility Deposit***"), which is an amount sufficient to cover one-half of the Debtors' average monthly cost based on the historical average payment.  The Utility Deposit will be held at the Debtors' Utility Deposit Account, and the Debtors' creditors will have no lien on any Utility Deposit.

155.     The Debtors intend to pay postpetition obligations owed to the Utility Companies in the ordinary course of business.  The Debtors expect that cash flows from operations and the use of the Debtors' proposed postpetition financing will be sufficient to pay postpetition obligations related to their utility services in the ordinary course of business.  Nevertheless, I have reviewed the proposed Adequate Assurance Procedures and I believe that the procedures provide Utility Companies with adequate assurance of payment, and I do not believe that other or further assurances of payment to Utility Companies for postpetition Utilities Services are necessary. However, I understand that the Debtors have also proposed procedures to resolve requests for additional or alternative assurance of payment in an orderly and fair manner.

156.     Preserving Utility Services on an uninterrupted basis is essential to the Debtors'

ongoing operations and to the success of these Chapter 11 Cases.  Indeed, any interruption in

Utility Services, even for a brief period, would disrupt the Debtors' ability to continue operations.

Given the Debtors' need to receive uninterrupted Utility Services, the relief requested fairly

balances Utility Companies' rights and the Debtors' rights under the Bankruptcy Code.  I do not

believe that Utility Companies will be prejudiced by either the proposed adequate assurance or the

requirement to provide the Debtors with uninterrupted service.  Accordingly, on behalf of the

Debtors, I respectfully submit that the Court should approve the Utilities Motion.

### 7.     Insurance Motion[22]

157.     The Debtors seek entry of interim and final orders (i) authorizing the Debtors, in

their discretion, to (a) maintain, supplement, amend, extend, renew or replace their existing

insurance policies and Surety Bonds (as defined below) (collectively, the "***Insurance Programs***")

and (b) pay any premiums, deductibles, assessments, self-insured retention amounts, true-up

amounts, broker fees, administrative fees, bond fees and other fees and costs related to the

Insurance Programs (collectively, the "***Insurance Obligations***") whether arising before or after

the Petition Date, related to the Insurance Programs; and (ii) granting related relief. The Debtors

estimate that before the final hearing on the Insurance Motion, prepetition Insurance Obligations

totaling approximately $3,324,979 will be due and payable.

### (a)     Insurance Policies

158.     The Debtors currently maintain approximately 29 insurance policies, which protect

against operational risk inherent in the Debtors' businesses and provide coverage in compliance

---

[22] "***Insurance Motion***" means the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Maintain and Renew Their Prepetition Insurance Programs and Pay All Obligations in Respect Thereof and (II) Granting Related Relief*, filed contemporaneously herewith.

with various state and local laws (collectively, the "**Insurance Policies**"). The Insurance Policies help to protect the Debtors against, among other things, general liability; property loss; aircraft liability; political risk; crime; commercial automobile liability; umbrella and excess liability; marine cargo liability; workers compensation liability; media, cyber and technology attacks; and foreign liability. In addition, the Debtors maintain several Insurance Policies protecting against directors' and officers' liability and other management liability, including among other things, fiduciary liability. The aggregate amount of annual and monthly premiums for the Insurance Policies is approximately $12,604,336. Prior to the Petition Date, the Debtors paid all monthly premiums in full. However, certain Insurance Policies with annual premiums were renewed shortly before the Petition Date and, as a result, approximately $6,681,698 in annual premiums remain outstanding as of the Petition Date.

### (b)   The Surety Bond Program

159.   From time to time, the Debtors post surety bonds (the "**Surety Bonds**") as collateral to secure certain obligations, including those owed to the U.S. Customs and Border Protection Agency (the "**Customs Bonds**") and to the Georgia Department of Agriculture. The Surety Bonds are continuous and remain in full force and effect until cancelled. As of the Petition Date, the Debtors have outstanding three Surety Bonds totaling approximately $1,575,000, the premiums for which were paid in full prepetition. The Customs Bonds are secured by cash collateral in the amount of $1 million. The Debtors pay the full annual premiums for each of the Surety Bonds on or about each Surety Bond's anniversary date, totaling approximately $29,500 across all of the Surety Bonds. Prior to the Petition Date, the Debtors paid all premiums for the Surety Bonds in full. However, Debtors recently renewed the Georgia Department of Agriculture Non-Auction Dealer Bond, and, as a result, approximately $2,000 in premiums on the bond remain outstanding as of the Petition Date and is due before July 1, 2020.

160.     Participation in the Insurance Programs and the payment of the Debtors' obligations in respect thereof are necessary costs of preserving the Debtors' estates.  With respect to the Insurance Programs, the Debtors seek only to maintain their existing Insurance Policies and Surety Bonds and honor their obligations related thereto in the ordinary course of their prepetition business on a postpetition basis.  Such obligations include, among other things, renewing the Insurance Policies and Surety Bonds when they expire, and paying the premiums when they come due.  As for the Insurance Policies, the insurance carriers may refuse to renew the Insurance Policies, which will require the Debtors to obtain replacement policies and possibly reconfigure their risk management program.  That scenario would require the commitment of significant resources and could result in less favorable coverage or terms from the Debtors' insurers during the early stages of these Chapter 11 Cases.  I believe that any lapse in insurance coverage would leave the Debtors exposed to substantial liability, and it is therefore essential that the Debtors maintain their Insurance Programs and honor the Debtors' obligations related thereto throughout these cases.  Accordingly, I believe that the relief requested in the Insurance Motion is in the best interests of the Debtors, their estates, and all parties in interest and should be granted in all respects.

### 8.     Customer Programs Motion[23]

161.     The Debtors seek interim and final orders (i) authorizing the Debtors, in their discretion, to (a) maintain and administer customer-related programs, practices, and policies (collectively, the "**Customer Programs**") and honor prepetition obligations to customers arising under the Customer Programs in the ordinary course of business and in a manner consistent with past practice (collectively, the "**Prepetition Customer Obligations**") and (b) renew, replace,

---

[23] "**Customer Programs Motion**" means the *Debtors' Motion for Entry of an Order Authorizing the Debtors to Honor and Continue Customer Programs and Customer Obligations in the Ordinary Course of Business*, filed contemporaneously herewith.

implement, modify, or terminate any of the Customer Programs, in each case, as the Debtors deem appropriate in their business judgment and in the ordinary course of business, without further application to the Court, and (ii) granting certain related relief.

162.    The Debtors' customer base primarily consists of major consumer tobacco product manufacturers (collectively, the "***Customers***").  In the ordinary course of business, the Debtors engage in certain practices to develop, support and sustain a positive reputation with their Customers and in the marketplace generally.  From time to time, certain products the Debtors supply to their Customers are defective as the result of leaf quality, fumigation, or other issues or otherwise do not conform to their Customers' specifications (the "***Non-Conforming Goods***").  Similarly, despite the Debtors' efforts to manage their supply chain, certain products will occasionally be delivered in an inaccurate quantity (the "***Misdelivered Goods***" and together with the Non-Conforming Goods, the "***Adjusted Goods***").  In addition, the Debtors have in the past corrected billing errors after sending invoices to Customers.  Though infrequent, such errors may include duplicative invoicing (when two invoices are created for the same shipment), improper invoicing (when the invoice created does not properly reflect the goods shipped or is otherwise incorrect), duplicative payment (when a Customer makes two payments on account of the same shipment), mispricing (when a Customer is charged or pays an incorrect price for the Debtors' products), or other billing and payment errors (collectively, the "***Invoicing Errors***").

163.    Generally, the Debtors issue credits to their Customers on account of Adjusted Goods or Invoicing Errors.  The Debtors typically do not issue cash payments to their Customers as the result of such credits and, instead, pay these amounts by crediting the applicable Customer's existing accounts receivable balance.  Alternatively, with respect to Adjusted Goods, the Debtors may agree to correct or accept a return of the products previously shipped.  The correct or returned

goods or adjustment will be in such quantity or amount as is allocable to the Adjusted Goods or sufficient to correct the Invoicing Error, as appropriate.  In the last year, the Debtors have made approximately $4.4 million in adjustments on account of Adjusted Goods and Invoicing Errors.

164.    Continuing the Customer Programs without interruption and timely paying Prepetition Customer Obligations are vital to the Debtors' business and will facilitate a smooth transition into Chapter 11, enhancing the prospect of success of these cases.  On the other hand, failing to honor the Customer Programs likely would erode the Debtors' reputation and harm the Debtors' customer relations, in turn, decreasing the Debtors' chance for a successful reorganization.  I believe that the requested relief will advance the restructuring of the Debtors' businesses, both in terms of profitability and the engendering of goodwill with essential customers, especially at this critical time early in these cases.  Accordingly, I believe that the relief requested in the Customer Programs Motion is in the best interests of the Debtors, their estates, and all parties in interest and should be granted in all respects.

### 9.    Equity Trading (NOL) Motion[24]

165.    In the NOL Motion, the Debtors seek the entry of interim and final orders (i) approving certain notification and hearing procedures related to certain transfers of Debtor Pyxus' existing common stock, evidenced by any Beneficial Ownership thereof (any such record or Beneficial Ownership of existing common stock, the "**Common Stock**"), as detailed in **Exhibit 1** to the Proposed Interim Order (the "**Procedures**"); (ii) directing that any purchase, sale or other transfer of Common Stock in violation of the Procedures shall be null and void *ab initio*; and (iii) granting related relief.

---

[24] "**NOL Motion**" means the *Debtors' Motion for Entry of Interim and Final Orders Approving Notification and Hearing Procedures for Certain Transfers of and Declarations of Worthlessness with Respect to Common Stock*, filed contemporaneously herewith.

166.    Generally, a company generates net operating losses ("**NOLs**," and together with certain other tax attributes, "***Tax Attributes***") if the operating expenses it incurred exceed the revenues it earned during a single tax year.  A company may apply, or "carry back" and "carry forward," NOLs to reduce past and future tax payments depending on the tax year in which the NOLs were generated (subject to certain conditions as discussed in the NOL Motion).

167.    As of March 31, 2020, the Debtors estimate that they have U.S. federal NOLs in the amount of approximately $356.1 million and U.S. state NOLs in the amount of approximately $639.5 million.  Also, as of March 31, 2020, the Debtors estimate that they have foreign tax credit carryforwards in the amount of approximately $4.6 million.  Finally, the Debtors further estimate that, as of March 31, 2020, they have certain disallowed business interest expense under section 163(j) of the IRC in the amount of approximately $142.7 million.  These Tax Attributes provide the potential for material future tax savings or other tax structuring possibilities in the Chapter 11 Cases.  The Tax Attributes are of significant value to the Debtors and their estates because the Tax Attributes may be utilized by the Debtors to offset any taxable income generated by transactions consummated during the Chapter 11 Cases.  The value of the Tax Attributes will inure to the benefit of all of the Debtors' stakeholders.

168.    The Debtors do not believe Pyxus has undergone an "ownership change" for three years prior to the Petition Date, and therefore, none of its Tax Attributes is currently subject to the limitations under sections 382 and 383 of the IRC.  Accordingly, I understand that the Debtors retain significant Tax Attributes that would be severely impaired by the occurrence of an "ownership change" during the pendency of the Chapter 11 Cases.  Therefore, to maximize the use of NOLs and enhance recoveries for the Debtors' stakeholders, the Debtors seek limited relief that will enable them to closely monitor certain transfers of Beneficial Ownership of Common

Stock and claims of worthless stock deductions with respect to Beneficial Ownership of Common Stock so as to be in a position to act expeditiously to preserve the Tax Attributes.

169.    I believe the relief requested in the NOL Motion is limited solely to the extent necessary to preserve estate value.  The Proposed Orders will affect only (a) holders of the equivalent of 4.5% or more of outstanding Common Stock, (b) parties who are interested in purchasing sufficient Common Stock to result in such party becoming a holder of 4.5% or more of Beneficial Ownership of outstanding Common Stock, and (c) any 50% Shareholder (as defined below) seeking to claim a worthless stock deduction.

170.    By establishing and implementing the Procedures, the Debtors will be in a position to object to "ownership changes" that threaten their ability to preserve the value of their Tax Attributes for the benefit of the estates.  Accordingly, I believe the relief requested in the NOL Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and the NOL Motion should be granted in all respects.

## E.  Payment of Claims Motions

### 10.    Pay Trade Motion[25]

171.    The Debtors seek entry of interim and final orders (i) authorizing, but not directing, the Debtors to pay allowed prepetition claims for goods or services related to the Debtors' operations and other ordinary course claims (collectively, the "***Prepetition Trade Claims***") of creditors (collectively, the "***Trade Creditors***"), including, but not limited to, vendors of goods and services, in the ordinary course of business, (ii) authorizing applicable banks and other applicable

---

[25] "***Pay Trade Motion***" means the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Prepetition Claims of Trade Creditors, (II) Authorizing Applicable Banks and Other Financial Institutions to Honor and Process Related Checks and Transfers and (III) Granting Related Relief*, filed contemporaneously herewith.

financial institutions to honor and process related checks and transfers and (iii) granting related relief.

172.    The Debtors incur numerous fixed, liquidated and undisputed payment obligations to the Trade Creditors in the ordinary course of business.  The Trade Creditors provide the Debtors with goods and services essential to the operation of the Debtors' businesses, including, among other things: agricultural products and ingredients essential to the manufacture of the Debtors' products, parts and equipment used in the Debtors' manufacturing process, information technology services, product testing, lobbying and public relations services, shipping and warehousing services, logistics, fumigation, quality control services, leases of property and equipment, legal services, utility services, and maintenance and repair services, among others.

173.    Although a substantial portion of such Prepetition Trade Claims would be classified as general unsecured claims under the Plan, certain Prepetition Trade Claims may (a) be administrative priority claims under sections 503(b)(9) of the Bankruptcy Code or (b) give rise to shipper's, warehouseman's, mechanic's or other liens against the Debtors' property.  The Debtors have paid approximately $27.4 million on average to Trade Creditors during the twelve-month period preceding the Petition Date.   As of the Petition Date, the Debtors estimate that approximately $18.3 million of Prepetition Trade Claims are outstanding, approximately $13.1 million of which will become due and payable prior to the final hearing on the Pay Trade Motion.

174.    The Debtors are not seeking to pay all Prepetition Trade Claims immediately; rather, if authorized by the Court to pay such claims, the Debtors will process such payments in accordance with their normal accounts payable procedures, as they become due and payable in the ordinary course of the Debtors' businesses and consistent with past practice or as otherwise agreed to between the Debtors and the applicable Trade Creditors.  The Debtors' postpetition financing

facility will provide the Debtors with ample funding to pay the Prepetition Trade Claims and the Debtors' budget specifically contemplates such funding.

175.     I believe that it is a sound exercise of the Debtors' business judgment to pay the Prepetition Trade Claims as they become due in the ordinary course of business or as otherwise agreed to with the respective Trade Creditors because doing so will help the Debtors avoid the potential for value-destructive interruption to their business operations during these Chapter 11 Cases.  The goods and services provided by Trade Creditors are necessary for the continued operation of the Debtors' businesses.  Irrespective of the proposed Plan treatment leaving Trade Creditors unimpaired, the Debtors anticipate that the failure to pay certain Prepetition Trade Claims as they become due would likely result in certain Trade Creditors refusing to provide essential goods and services and/or conditioning the delivery of such goods and services on compliance with onerous and commercially unreasonable terms.  Indeed, where a Trade Creditor may itself be facing financial hardship, the Debtors' failure to pay Prepetition Trade Claims may leave such Trade Creditor with little choice but to stop working for, or providing deliveries to, the Debtors.

176.     I believe that this chain of events could lead to a material disruption to the Debtors' operations, and cause irreparable harm to the Debtors' businesses, goodwill, market share and ultimate ability to restructure pursuant to the Plan.  Replacement vendors and the search for such vendors, even to the extent available, would likely result in substantially higher costs for the Debtors.  Moreover, I do not believe that the Debtors can rely on bringing motions to compel Trade Creditors to perform to address any potential holdups as their primary means of ensuring an uninterrupted supply of goods and services.  A disruption may occur before the Debtors would be able to successfully bring an action in the Court to compel performance or otherwise enforce the

automatic stay.  In addition, I understand that certain of the Debtors' arrangements with the Trade

Creditors may not be executory in nature.  The counterparty of such an arrangement may decide

not to continue to do business with the Debtors unless paid on account of prepetition amounts due

from the Debtors.  In sum, if the Trade Creditors refuse to transact with the Debtors or limit credit

or other trade terms, the operations of the Debtors' businesses will likely be significantly disrupted.

177.    I believe that the relief requested in the Pay Trade Motion is in the best interests of

the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to

continue to manage their businesses in chapter 11 without disruption.  Accordingly, I believe that

the Pay Trade Motion should be granted in all respects.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

and correct to the best of my knowledge and belief

Dated:  June 15, 2020
       Wilmington, Delaware

By:  /s/ Joel Thomas
    Name:  Joel Thomas
    Title:  Executive Vice President and Chief
        Financial Officer

# Exhibit A

# Corporate Structure Chart

[See attached]

PYXUS INTERNATIONAL, INC. (USA) CO #150
AOI RELIEF FUND, INC. (USA)
ALLIANCE ONE INTERNATIONAL, LLC (USA) CO #140
DIBRELL BROTHERS, INCORPORATED (USA)
THE AUSTIN TOBACCO COMPANY, INC. (USA)
AUSTIN CAROLINA COMPANY (USA)
A. C. MONK & COMPANY, INC (USA)
CHINA AMERICAN TOBACCO COMPANY (USA)
CAROLINA LEAF TOBACCO COMPANY (USA)
DIMON INTERNATIONAL, INC. (USA)
MONK-AUSTIN INTERNATIONAL, INC. (USA)
W A ADAMS COMPANY (USA)
ALLIANCE ONE INTERNATIONAL SERVICES, INC.(USA)
TOBACCO SERVICES LLC (USA)
CRES TOBACCO COMPANY LLC (USA) CO
ALLIANCE ONE SPECIALTY PRODUCTS LLC* (USA) CO #120
EASTERN CAROLINA PACKAGING, LLC (USA) CO #129
AOSP INVESTMENTS LLC (USA) CO #122
HUMBLE SPECIALTY PRODUCTS LLC (USA)
PURILUM, LLC (USA) CO #133
NICOTINE RIVER LLC (USA) CO #1
TWELFTH STATE BRANDS, LLC (USA) CO #124
HUMBLE JUICE CO., LLC USA) CO #135
ALLIANCE ONE NORTH AMERICA, LLC (USA) CO #101
ALLIANCE ONE TOBACCO CANADA, INC. (CANADA) CO #113
BRITISH LEAF TOBACCO COMPANY OF CANADA, INC. (CANADA)
ALLIANCE ONE ROTAG AG (FORMERLY DIMON ROTAG AG) (GERMANY) CO #204
ALLIANCE ONE MACEDONIA AD (MACEDONIA) CO #214
ALLIANCE ONE TOBACCO BULGARIA EOOD (BULGARIA) CO #210
DIMON SOUTH AFRICA (PTY) LTD (SOUTH AFRICA) CO #615
ALLIANCE ONE TOBACCO TANZANIA LTD. (TANZANIA) CO #607
ASSOCIATION OF TANZANIA TOBACCO TRADERS LTD (TANZANIA)
ALLIANCE ONE TOBACCO (UGANDA) LIMITED CO #647
DIMON HELLAS TOBACCO SA (GREECE) CO #206
GLOBAL SPECIALTY PRODUCTS, LLC (USA) CO #125
PYXUS AGRICULTURE USA, LLC (USA) CO #136
GSP PROPERTIES, LLC (USA)
ZIP FULFILLMENT LLC (USA) CO #132
PUREAG-NC, LLC (USA) CO #126
CRITICALITY LLC (USA)
ALLIANCE ONE INTERNATIONAL HOLDINGS, LTD (UK) CO #741
INTABEX NETHERLANDS BV (NETHERLANDS) CO #709
KAYPACHA SAU (ARGENTINA)
PT INDONESIA TRI SEMBILAN (INDONESIA) CO #511
RIO GRANDE TABACOS (BRAZIL) CO #404
ALLIANCE ONE BRASIL EXPORTADORA TABACOS LTDA (BRAZIL) CO #402
CHINA BRASIL TABACOS EXPORTADORA S/A. (BRAZIL) CO # 416
ALLIANCE ONE TABACO GUATEMALA SA (GUATEMALA) CO #303
ALLIANCE ONE TOBACCO D.O.O. (SERBIA) CO #226
ALLIANCE ONE TOBACCO ARGENTINA SA (ARGENTINA) CO #307
MASHONALAND TOBACCO HOLDINGS (PVT) LTD (ZIMBABWE) CO #616
MASHONALAND TOBACCO COMPANY (ZIMBABWE) CO #643
FIGR BRANDS, INC. (CANADA)
FIGR CANADA HOLDING ULC (CANADA) CO # 128
CANADA'S ISLAND GARDENS, INC. (DBA FIGR EAST, INC.) (CANADA) CO #130
FIGR NORFOLK, INC (FKA GOLDLEAF PHARM, INC.) (CANADA) CO #131
ALLIANCE ONE INTERNATIONAL TABAK B.V. (NETHERLANDS) CO #703
ALL CHINA REP OFFICE
ALLIANCE ONE INTERNATIONAL GmbH (SWITZERLAND) CO # 702
VIETNAM REP OFFICE
STANDARD COMMERCIAL SA (SWITZERLAND) CO #722
ALLIANCE ONE TUTUN AS (TURKEY) CO #234
HERMAN TUTUN TIC (TURKEY)
ORYANTAL TUTUN PAKETLEME SANAYIE VE TICARET AS (TURKEY) CAB#251
WORLD LEAF TRADING FZE (DUBAI) CO #736
WORLD LEAF TRADING (WLT) AFRICA (MAURITIUS) CO #738
WORLDLEAF TRADING CAYMAN (CAYMAN ISLANDS) CO #737
GLOBAL LEAF TRADING FZE (DUBAI) CO #739
CARRINGTON & MICHAUX AG (SWITZERLAND) CO #718
SCTS (UK) LTD. (UK) CO #723
DIMON INTERNATIONAL AG (SWITZERLAND)
ALLIANCE ONE INTERNATIONAL SERVICES LIMITED (UK) CO #705
SCTC (UK) LTD. (UK) CO #724
ALLIANCE ONE INDUSTRIES INDIA PVT LTD (INDIA) CO #506
ALLIANCE ONE TOBACCO (MALAWI) LTD CO #602*
IMPALA FARMING CO. LIMITED (MALAWI) CO #614
TOBACCO PROCESSORS ASSOCIATION LIMITED (MALAWI)
TABAGRI (2003) LIMITED (MALAWI) CO #635
TABMARC LIMITED (MALAWI) CO #636
INTABEX S.A. AG LTD (SWITZERLAND)
TRANS-CONTINENTAL LEAF TOBACCO AG (SWITZERLAND) CO # 734
W.A. ADAMS INTERNATIONAL AG (SWITZERLAND)
TRANS-CONTINENTAL LEAF TOBACCO CORP. LTD. (LIECHTENSTEIN) CO #725
MAURITIUS TOBACCO INVESTMENTS LTD (MAURITIUS) CO #730
LEAF TRADING COMPANY, LTD (RUSSIA) CO #728
GADORA TOBACCO, PSC (JORDAN) CO #740
STANCOM TOBACCO (PRIVATE) LTD. (ZIMBABWE) CO #644
SENA INVESTMENTS (PVT) LTD (ZIMBABWE) CO # 639
STANFIRE (PVT) LTD (ZIMBABWE)
KINGOLWIRA TOBACCO COMPANY LIMITED (TANZANIA) CO #648
ALLIANCE ONE TOBACCO (KENYA) LTD (KENYA) CO #629
ALLIANCE ONE ZAMBIA LTD. (FKA STANCOM TOBACCO SERVICES LTD.) (ZAMBIA) CO #646
DIMON TANZANIA LTD. (TANZANIA)
PT ALLIANCE ONE INDONESIA (INDONESIA) CO #516
ALLIANCE ONE INTERNATIONAL SINGAPORE, PTE. LTD. (SINGAPORE) CO #505
ALLIANCE ONE SERVICES THAILAND LTD (THAILAND) CO # 514
ALLIANCE ONE MYANMAR COMPANY LIMITED (MYANMAR) CO #519
ALLIANCE ONE (BEIJING) ENTERPRISE MANAGEMENT AND CONSULTING CO. LTD. (CHINA)
ALLIANCE ONE (BEIJING) ENTERPRISE MANAGEMENT AND CONSULTING SERVICES CO., LTD KUNMING BRANCH
ALLIANCE ONE (BEIJING) ENTERPRISE MANAGEMENT AND CONSULTING SERVICES CO., LTD BAOSHAN BRANCH
ALLIANCE ONE (BEIJING) ENTERPRISE MANAGEMENT AND CONSULTING SERVICES CO., LTD GUIYANG BRANCH
ALLIANCE ONE (BEIJING) ENTERPRISE MANAGEMENT AND CONSULTING SERVICES CO., LTD CHENGDU BRANCH
ADAMS INTERNATIONAL LTD (THAILAND) CO #507
CHIENGMAI COMMERCIAL CO., LTD (THAILAND)
SINOVEST ENTERPRISES COL, LTD. (THAILAND)
SIAM TOBACCO EXPORT CORPORATION LTD. (THAILAND) CO #509
SOUTHERTON HOLDINGS (HONG KONG) LIMITED
GLOBAL LEAF SERVICES HONG KONG LIMITED (HONG KONG) CO #742
LI FU HENG LIAN (BEIJING) CONSULTING CO., LTD (CHINA)
PYXUS AGRICULTURE HOLDINGS LIMITED (UK) CO #815
PYXUS AGRICULTURE TANZANIA LTD (TANZANIA) CO #816
PYXUS AGRICULTURE LTD (MALAWI) CO #817
PYXUS AGRICULTURE CANADA, LTD. (CANADA)
ANTHOS BOTANICAL DOOEL (MACEDONIA) CO #252
100%
99.999%
99.999% (0.001% AOIT BV)
99.99%
99.9%
49%
35%
95% (5% BY TCLTC)
55%
51%
50%
40%
80%
94.3%
92%
99.95%
99.6%
60%
99.98%
99.9995% (0.0005% AOI Services, Inc.)
99.90% (0.10% AOI SERVICES)
17%
42.7%
25%
1L/2L/ABL Obligor
DIP Guarantor
Sellers under receivables facility
Filing Entity
Borrower or Guarantor under a Foreign Line of Credit
* Alliance One Specialty Products, LLC is not a 2L Guarantor

