IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | § | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| PYXUS INTERNATIONAL, INC., *et al.*,[1] | § | Case No. 20-11570 (LSS) |
| | § | |
| Debtors. | § | (Jointly Administered) |
| | § | |
| | § | **Ref. Docket No. 150** |
| | § | |

**DECLARATION OF BRANDON AEBERSOLD IN SUPPORT OF DEBTORS'
OBJECTION TO THE PETITION OF CERTAIN EQUITY HOLDERS
FOR THE APPOINTMENT OF AN OFFICIAL EQUITY COMMITTEE**

I, Brandon Aebersold, make this declaration under penalty of perjury:

1. I am a Managing Director at Lazard Frères & Co. LLC. ("***Lazard***"), the investment banker to Pyxus International, Inc. and its debtor affiliates, as debtors and debtors in possession (collectively, the "***Debtors***" and, together with their non-Debtor subsidiaries and affiliates, the "***Company***") in the above-captioned chapter 11 cases (the "***Chapter 11 Cases***").

2. Prior to joining Lazard, I practiced law at the firm of Simpson Thacher & Bartlett LLP, where I focused on mergers and acquisitions and leveraged finance transactions. I joined Lazard in 2007 following graduation from The University of Chicago Booth School of Business. Throughout my years of investment banking and restructuring experience, I have advised corporate clients, governments and creditor groups in a broad range of restructuring, reorganization and capital raising transactions, in traditional and distressed situations, across a diverse variety of

---

[1] The Debtors in the Chapter 11 Cases, along with the last four digits of each Debtor's United States federal tax identification number, are: Pyxus International, Inc. (6567), Alliance One International, LLC (3302), Alliance One North America, LLC (7908), Alliance One Specialty Products, LLC (0115) and GSP Properties, LLC (5603). The Debtors' mailing address is 8001 Aerial Center Parkway, Morrisville, NC 27560-8417.

26765516.1

industries. In addition, I have substantial experience marketing, structuring, and evaluating debtor-in-possession ("**DIP**") financings, secured debt facilities, and exit financings.

3.   I submit this declaration (this "**Declaration**") in support of the Debtors' objection (the "**Objection**") to the *Shareholders' Petition* dated June 26, 2020 [Dkt. No. 108] (the "**Petition**") filed by Ms. Hongchao Sun on behalf of herself and purportedly a group of other equity holders (collectively, the "**Equity Holders**").[2]

4.   Except as otherwise indicated herein, all facts set forth in this Declaration are based upon: (a) my personal knowledge of the Debtors' operations and finances based on information provided by the Debtors, (b) my review of relevant documents, including information provided by other parties, (c) information provided to me by employees of Lazard, (d) information provided to me by, or discussions with, the members of the Debtors' management team or its other advisors, and/or (e) my years of experience.

5.   I am over the age of 18 years and authorized to submit this Declaration on behalf of the Debtors. If called to testify, I could and would competently testify to the facts set forth herein. I am not being specifically compensated for this testimony, and Lazard is receiving compensation only as part of its engagement with the Debtors.

**A.   Lazard Qualifications and Background**

6.   Lazard is the primary U.S. operating subsidiary of a preeminent international investment banking, financial advisory and asset management firm. Lazard is registered as a broker-dealer with the United States Securities and Exchange Commission and the Financial Industry Regulatory Authority. Together with its predecessors and affiliates, Lazard has been

---

[2]   Capitalized terms used but not otherwise defined herein have the meaning given to them in the Objection the *Disclosure Statement for the Joint Prepackaged Chapter 11 Plan of Reorganization of Pyxus International, Inc. and its Affiliated Debtors* [Dkt. No. 22] (the "***Disclosure Statement***"), as applicable.

26765516.1

2

advising clients around the world for over 165 years. Lazard and its professionals have considerable expertise and experience in providing investment banking and financial advisory services to financially distressed companies and to creditors, equity holders and other constituencies in reorganization proceedings and complex financial restructurings, both in and out of court. In addition, Lazard's investment banking professionals have extensive experience in advising debtors in chapter 11 cases and have served as investment bankers to numerous debtors, chapter 11 trustees, creditors' committees and buyers in chapter 11 proceedings. Since 1990, Lazard professionals have been involved in over 250 restructurings, representing over $1 trillion in debtor assets.

7. In March, 2020, the Debtors engaged Lazard as their investment banker in connection with the Debtors' restructuring initiatives. Since its engagement, Lazard has worked with the Debtors' management, financial team and other professionals retained by the Debtors with respect to the Debtors' evaluation of strategic and restructuring alternatives, including, among other things, (i) analyzing the Debtors' liquidity and projected cash flows, (ii) understanding the Debtors' business operations, properties and finances, (iii) reviewing and analyzing the Debtors' balance sheet and capital structure alternatives, (iv) providing strategic advice to the Debtors' board of directors and management, (v) participating in negotiations with certain of the Debtors' stakeholders, (vi) soliciting, negotiating and analyzing debtor-in-possession and exit financing needs and options and (vii) assisting the Debtors in connection with preparations for the commencement of these Chapter 11 Cases, including work related to the DIP Facility and Plan.

8. I also am familiar with the financial projections (the "***Financial Projections***") prepared by the Debtors' management and their financial advisor, RPA Advisors, LLC ("***RPA***"), which are attached as <u>Exhibit D</u> to the Disclosure Statement as well as the analysis of recoveries

under various liquidation scenarios (the "*Liquidation Analysis*") prepared by RPA, which is attached as Exhibit F to the Disclosure Statement.[3] I understand that the Financial Projections take into account cash receipts and disbursements anticipated by the Debtors' management during the projected period and consider a number of factors, including, but not limited to, Debtors' management's anticipated impact of the chapter 11 filing on business operations, fees and interest expenses associated with postpetition financing, professional fees, payroll costs, customer and vendor relationships, other required operational payments and management's view on various operational, regulatory and market factors that may impact the Company's operations and financial performance.

**B.    Report Regarding Valuation**

9.    In connection with the development of the Plan, Lazard conducted a valuation analysis of the Company, a summary of which is set forth in the going concern valuation analysis (the "*Valuation Analysis*") included as Exhibit E to the Disclosure Statement.[4] The Valuation Analysis provides the range of estimated value of the Reorganized Debtors on a going concern basis as of an assumed Effective Date of July 31, 2020. The Valuation Analysis should be read in conjunction with the Disclosure Statement and the Plan.

10.    In preparing the Valuation Analysis, Lazard, among other things, (i) reviewed the Company's historical and projected financial and operational data, including the Financial Projections and business plans prepared by the Company's management; (ii) had frequent meetings with the Company's board and management to review various financial and operational data; (iii) discussed the Company's operations and future prospects with the senior management

---

[3]    The Financial Projections and Liquidation Analysis are also attached hereto as Exhibit A and Exhibit B, respectively.

[4]    The Valuation Analysis is also attached hereto as Exhibit C.

26765516.1

and other professionals retained by the Debtors; (iv) reviewed certain publicly available information for transactions involving companies similar in certain respects to the Company's Leaf and Global Specialty Products businesses; (v) considered certain economic and industry information that Lazard deemed generally relevant to the Reorganized Company; and (vi) conducted other studies, analyses, inquiries and investigations as Lazard deemed appropriate. Lazard considered multiple methodologies and financial analyses commonly used as valuation techniques and relied primarily on the discounted cash flow ("*DCF*") and comparable public companies methodologies.

11.     The preparation of a valuation analysis is a complex analytical process involving subjective determinations about which methodologies of financial analysis are most appropriate and relevant.  DCF analysis is a forward-looking enterprise valuation methodology that estimates the value of an asset or business by calculating the present value of expected future cash flows to be generated by that asset or business.  Projected future cash flows were determined based on the Financial Projections and then discounted by the weighted average cost of capital.  The enterprise value was determined by adding to the present value of cash flows the estimated terminal value, which is derived using the normalized EBITDA in the final year of the projection period, and discounted back to the assumed Effective Date.  Comparable public company analysis estimates the value of a company relative to other publicly traded companies with similar business and financial characteristics.  Lazard first selected sets of publicly traded companies that it believes exhibit similar business and financial characteristics to the Leaf and Global Specialty Products businesses.   Criteria for the selected reference groups included, among other relevant characteristics, similarity in operations, business risks, growth prospects, product mix, customer base, margins, market presence, size and scale of operations.  Lazard performed a sum-of-the-parts

analysis to separately estimate the values of the Debtors' Leaf and Global Specialty Products businesses based on the aforementioned methodologies in order to determine the Total Enterprise Value (as defined below). The methodologies relied upon, assumptions made, and applicable qualifications and limitations described in the Valuation Analysis are fully incorporated herein by reference.

12. According to the results of the Liquidation Analysis and the Valuation Analysis, the Company's debt is greater than its value in a hypothetical liquidation or as a going concern. Lazard has estimated the Company's consolidated total enterprise value as a going concern (the "*Going Concern Value*") as of the assumed Effective Date to be in the range of approximately $1,230 million – $1,490 million, with a mid-point of approximately $1,360 million. Furthermore, as forth in the Liquidation Analysis, the estimated net liquidation proceeds of the Debtors in a best-case scenario would be approximately $472.3 million (the "*Liquidation Value*"). The Debtors, together with their advisors, estimate that the allowed claims against the Debtors will total approximately $1.73 billion,[5] which is over $200 million in excess of the high end of the range of estimated Going Concern Value and over $1.3 billion in excess of the estimated the Liquidation Value. Notably, under any liquidation scenario, the projected recoveries for First Lien Noteholders are estimated to range from 16.35% – 52.86%, and the projected recoveries for Second Lien Noteholders and unsecured creditors are estimated to be zero. Under a Going Concern Value, the

---

[5] These obligations are comprised of $44.9 million of debt under the ABL Facility, $275 million under the First Lien Notes, approximately $635.7 million under the Second Lien Notes, approximately $557 million under the Foreign Credit Lines, $206.7 million under the DIP Facility (used to pay the $44.9 million outstanding under the ABL Facility), administrative, other secured and priority claims totaling approximately $44 million and unsecured claims totaling approximately $21.7 million. *See* Disclosure Statement §§ I.C, II..D.

Second Lien Noteholders are only estimated to recover up to 40.3% (using high end of valuation range), and the First Lien Noteholders and unsecured creditors are estimated to recover 100%.

13.  Based upon the above described analyses and the Debtors' historical and projected financial performance, I believe that Pyxus equity holders would not be entitled to receive distributions on account of their equity interests under any currently available scenario.[6]

C.  **Debtors' Efforts to Execute Out-of-Court Transaction and Obtain Financing**

14.  As explained in the *Declaration of Joel Thomas, Executive Vice President and Chief Financial Officer of Debtor Pyxus International, Inc., in Support of the Chapter 11 Petitions and First Day Pleadings* [Dkt. No. 2] (the "**First Day Declaration**"), which was admitted into evidence at the First Day Hearing, the Debtors have a highly-levered capital structure and faced significant challenges leading to the commencement of these Chapter 11 Cases. I understand the Debtors pursued various strategic alternatives, refinancings, and investments prior to Lazard's engagement, but for the reasons described in the Objection and the First Day Declaration, those strategic initiatives could not be consummated.

15.  Further, while the COVID-19 pandemic presented additional challenges to the Company's operations and liquidity and accelerated the Company's timeline to find an out-of-court solution, the Company was already on a path to these Chapter 11 Cases. The Debtors entered chapter 11 with a cash balance of approximately $10 million as of the Petition Date. This amount, along with the Debtors' operating cash flow as currently projected by the Debtors' management, was insufficient to fund ongoing operations and expenses. Based upon management's cash flow models and discussions with the Debtors' management and other professional advisors, I believe

---

[6] I understand that the Debtors have requested the valuation or analysis that the Equity Holders claim to have had performed. *See* Petition, p. 10. As of the date hereof, I understand the Debtors have not received any competing valuation or analysis, and therefore I cannot specifically respond to any assertions or arguments made by the Equity Holders regarding an alternative or higher valuation of the Company.

26765516.1

that without filing these Chapter 11 Cases and obtaining the DIP Facility, the Debtors would have been cash negative by the end of June 2020. Lazard and the Debtors' other professional advisors assisted the Company in exploring whether there existed any executable out-of-court transaction that would allow the Company to restructure its debt and obtain sorely needed liquidity. Ultimately, the Debtors filed for chapter 11 as a last resort after they, in consultation with their advisors (including Lazard), determined that no such transaction was available.

16. Since its engagement in March 2020, Lazard has worked with the Debtors' management to evaluate strategic alternatives and restructuring transactions and has participated in various negotiations with stakeholders and third parties related to restructuring transactions and potential financing. In April 2020, as part of the Debtors' efforts to secure new capital, Lazard reached out to Pyxus equity holders who held over 5% of Pyxus Common Stock in order to discuss potential equity-led financing or other investment transactions. Ultimately, only one equity holder executed a non-disclosure agreement, and those discussions did not advance beyond an indicative proposal that (i) required the raising of new capital that could not be raised, (ii) required the consent of existing creditors that could not be obtained, (iii) contemplated paying the Second Lien Noteholders at a significant discount and (iv) would still have required a bankruptcy filing to effectuate.

17. Around the same time, Lazard also was assisting the Debtors in evaluating their financing needs and beginning the process to secure DIP financing. As I previously stated in my DIP Declaration,[7] based on management's forecasted cash flows and liquidity projections, it was

---

[7] "***DIP Declaration***" refers to the *Declaration of Brandon Aebersold in Support of the Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Granting Liens and Superpriority Claims, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing and (VI) Granting Related Relief* [Dkt. No. 16].

26765516.1

determined that the Debtors' overall DIP financing need was approximately $200 million. Lazard directly and indirectly reached out to 35 potential providers of DIP financing, including existing lenders, large money-center banks, a number of sophisticated alternative investment institutions and certain of the Company's largest shareholders. Significant discussions were held with six potential financing parties who executed non-disclosure agreements, and due diligence was conducted by several professional institutions. Following the diligence process, two parties continued to express interest in providing DIP financing – the ad hoc group of First Lien Noteholders and Second Lien Noteholders (the "*Ad Hoc Group*") and one third-party lender. Ultimately, the only definitive offer for DIP financing that the Debtors received was the offer from the Ad Hoc Group, which is the DIP financing embodied in the DIP Credit Agreement that has been approved by the Court on an interim basis. The Debtors and Lazard are precluded from identifying the thirty-five potential DIP financing providers pursuant to the terms of confidentiality agreements entered into with those sources of potential financing.

18. Critically, the DIP Facility was an integral component of a holistic balance sheet restructuring to be implemented through the Plan, which allows the Company to continue its foreign operations without interruption and pay unsecured creditors in full in the ordinary course of business. Without the DIP Facility, and in connection therewith the Plan, the Debtors would most likely have been forced to curtail their operations and faced a significant risk of liquidation, and in that circumstance not only would the existing equity holders have received no recovery, but the Debtors' unsecured creditors would also not have received any recovery.

[*Remainder of page intentionally left blank.*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated: July 13, 2020  
New York, New York

*/s/ Brandon Aebersold*  
Brandon Aebersold  
Managing Director  
Lazard Frères & Co. LLC

26765516.1