

FILED

2020 JUL 16   AM 9: 25

CLERK
U.S. BANKRUPTCY COURT
DISTRICT OF DELAWARE

From:
Hongchao Sun, On Behalf of A Group of Shareholders
bullrongrong@gmail.com 301-473-6949 New Castle, DE
**To:**
**The Clerk's Office**
**US Bankruptcy Court for District of Delaware**
**824 N Market Street, Wilmington, DE 19801**

### Re: In re Pyxus International, No. 20-11570 (LSS)
### Judge: the Honorable Judge Silverstein

All submitted documents/exhibits/evidence/including
confidential information are for the **hearing on July 17, 2020**
for our **shareholders' motion (docket#108) to appoint Equity
Committee**

*Thank You !*

## Critical Issues:

1.  **$132 million tax expense for FY20 might be the most direct cause of the liquidity issue leading to Chapter 11; Yet the company still refuse to provide any details regarding this tax expense; without the sudden huge expense, the company should've had $100-$120 million cash in hand as of June 15, 2020 as if no Chapter 11, instead of $10 million cash as the company claimed;**
2.  **The true nature of this $132 million tax expense would not only help to reveal the true cause of the Chapter 11 but also might resolve the liquidity issue if there's any way it could be recovered;**
3.  **The company still refuses to publish FY20 Annual and FY20Q4 financial results; it's extremely unfair for common shareholders being wiped out without even knowing these critical financial results.**
4.  **Based on the current research, the Movant and the shareholders believe the the company's valuation might reflect it's 2018 valuation of its Global Specialty Products, leading to the company's total assets valuation being significantly underestimated/underrepresented.**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

In re:                                                  Chapter 11

PYXUS INTERNATIONAL, INC., et al.,                  Case No. 20-11570 (___)
Debtors                                             (Join Administration Requested)

## MS. HONGCHAO SUN ("MOVANT") MOTION FOR AN ORDER
## FOR CERTAIN INFORMATION AND DOCUMENT PRODUCTIONS FROM DEBTOR

### **BACKGROUND**

1.  The Movant and the Debtor have had multiple correspondence exchanges in regards to information and documents that the Movant continues to seek.  The Movant has received three (3) formal responses from the Debtor, dated July 6, July 9 and July 11, 2020. As none of them appear in the Court docket, they are included here as [**Exhibits A, B, and C**].

2.  The Movant feels that the Debtor is withholding relevant information and claiming confidentiality over documents and information that should be provided. The Debtor had originally asked the Movant to sign a non-disclosure confidentiality agreement. This has put the Movant in the untenable and even more stressful position of not being able to share or discuss any "confidential" documents and information with other shareholders (the application of the

1

term being solely decided by the Debtor).  Yet, with most ongoing requests the information is

still not being forwarded to the Movant, because it is deemed by the Debtor to be "confidential".

3.  Due to the speed that this proceeding is moving forward at, the Movant feels that the Debtor

will continue to stifle and delay the production of relevant information and documents.  As such,

the Movant asks the Court to order production of all outstanding document and information

requests that have been made of the Debtor. As a reference, a full background information

regarding the entire "discovery" as of July 15 is provided in **[Exhibit D]**.


## OUTSTANDING PRODUCTION REQUESTS

1.  A breakdown of the FY21 to FY25 income statement projections, showing percentages
    and amounts attributable to each of "Tobacco sales", "Global Specialty Products",
    "Value-Added Agricultural Products", and any "Other".

2.  A breakdown of the FY18 to FY20 income statements, showing percentages and
    amounts attributable to each of "Tobacco sales", "Global Specialty Products",
    "Value-Added Agricultural Products", and any "Other".

3.  Details relating to the IPO in 2019, the Investment Bankers involved, the date that the
    IPO was proposed/suggested to the Investment Bankers and the date that the Investment
    Bankers provided their opinion that it was not feasible, along with a copy of the opinion
    letter or report. If the opinion letter or report requires redactions, please go ahead and
    redact it. Kindly provide reasons for the redactions, along with the document.

4.  Confirmation of the 5%+ institutional investor that signed the non-disclosure agreement
    with the debtor and the date of the signing.

5.  Confirmation of when the company forecasts that the "closing process" and audit of
    fiscal 2020 financials will be completed.

6.  Confirmation of all global applications made for payroll, pension and tax subsidies
    related to the covid-19 pandemic, whether approved yet or not, with the subsidiary
    involved and the program claimed under identified. Although you had previously
    identified FIGR, the "CEWS" program had already been extended to August 29, 2020 at

the time of your writing. Please update the amounts and status. You also indicated that the "CARES Act" would provide an estimated $2,366,000.00 in relief, but did not specify the time period covered. Please provide the dates.

7. Complete FY20 Annual and FY20Q4 financial results; if still not finished as the company previously stated, please provide an estimated time that the company eventually finishes these financial results.

8. Full disclosure of all information related to the company's Tax Expense of FY18, FY19, and FY20. Questions regarding the $132 million tax expense for FY20 still remain unanswered. If the company still couldn't provide details for FY20; then please at least provide the information for FY18 and FY19.

9. The company's most recent valuation reports regarding the company's total assets (both tangible and intangible).

10. Federal Insurance Co (Chubb) Special Contingency coverage policy and the associated underwriting file.

11. Confirmation of date that Debtor started carrying Special Contingency insurance, confirmation of how many claims have been made to date, the claim application dates, and amounts received from the insurer for each claim.

12. Lloyd's Of London Political Risk coverage policy and the associated underwriting file.

13. Confirmation of date that Debtor started carrying Political Risk insurance, confirmation of how many claims have been made to date, the claim application dates, and amounts received from the insurer for each claim.

14. Confirmation of any claims made through any of the insurance policies since January 1, 2020, with claim application dates and confirmation of which specific policy.

15. Confirmation as to the date Lazard Frères & Co. LLC was retained for the purpose of performing the Valuation Analysis for the Debtor.

16. A Copy of the Lazard Frères & Co. LLC file, inclusive of any draft versions of the Valuation Analysis for the Debtor.

17. Confirmation of the amount Lazard Frères & Co. LLC invoiced the Debtor for their report.

3

18. All quarterly financial statements from Canada's Island Gardens (DBA FIGR East, Inc) since date of first equity purchase, confirmation of that date, and confirmation of initial percentage of ownership.

19. All quarterly financial statements from FIGR Norfolk (FKA Goldleaf Pharm Inc) since date of first equity purchase, confirmation of that date, and confirmation of initial percentage of ownership.

20. Confirmation of date when the Debtor finalized purchase of 100% equity of Criticality LLC (USA).

21. All quarterly financial statements from Criticality LLC (USA) since date of first equity purchase, confirmation of that date, and confirmation of initial percentage of ownership.

22. All quarterly financial statements from Humble Juice Co. LLC since date of first equity purchase, confirmation of that date, and confirmation of initial percentage of ownership.

23. Copy of any SEC File 3-8891 related documents and correspondence, regarding the 2018 Cease-and-Desist proceedings, in the debtor's possession.

24. Copy of SEC File 001-13684 related documents and correspondence, regarding the February 14, 2019 letter request sent to Joel L. Thomas.

25. Confirmation that no Director or insider of the company made their equity shares available for shorting, or held their shares in a brokerage account that was accessible to borrowing by short-sellers.

26. In regards to Wilby M. Boada's LinkedIn page, please confirm that the $1,300,000,000+ pipeline revenue is included in the future revenue projections presented to the Court by the Debtor.

27. Copy of any The Shareholder Foundation investigation related documents and correspondence in the Debtor's possession.

28. Confirmation of who leaked the bankruptcy filing news to Twitter user Harvard Zhang, along with confirmation of whether an internal investigation of the leak was started, and whether the SEC was notified of the leak by the Debtor.

29. Confirmation of FIGR's vape-oil market share in the province Ontario for February, March, April and May.

30. A list of the "9 start-ups with 10 founders" mentioned in Bryan Mazur's LinkedIn page.

4

31. The Debtor's current projection for the size of the Canadian cannabis market for FY21 to FY25.

Again, the Movant and shareholders respectfully ask the Court to order production of all

outstanding document and information requests that have been made to the Debtor.

Hongchao Sun

On Behalf of A Group of Shareholders

New Castle, DE

*Exhibit A*

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| PYXUS INTERNATIONAL, INC., *et al.*,[1] | ) Case No. 20-11570 (LSS) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |
| | ) |

## DEBTORS' RESPONSES AND OBJECTIONS TO
## SHAREHOLDER DISCOVERY REQUESTS

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, made applicable to these proceedings by Federal Rules of Bankruptcy Procedure 7026 and 7034, Pyxus International, Inc. ("Pyxus") and its affiliated debtors and debtors in possession (collectively, the "Debtors" and, together with the Debtors' non-debtor subsidiaries and affiliates, the "Company") in the above-captioned cases (the "Chapter 11 Cases") hereby submit the following objections and responses to the discovery requests (the "Requests" and each a "Request") contained in the *Shareholders' Petition* dated June 26, 2020 [Dkt. 108] filed by Ms. Hongchao Sun on behalf of herself and purportedly a group of certain other shareholders.[2]

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Pyxus International, Inc. (6567); Alliance One International, LLC (3302) ("AOI"); Alliance One North America, LLC (7908) ("AONA"); Alliance One Specialty Products, LLC (0115); and GSP Properties, LLC (5603). The Debtors' service address is: 8001 Aerial Center Parkway, Morrisville, NC 27560-8417.

[2]    All capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the Debtors' Disclosure Statement [Dkt. 22].

## GENERAL OBJECTIONS

The Debtors incorporate into their responses the following general objections to the Requests:

1.      The Debtors object to each Request to the extent that it seeks to impose obligations on the Debtors that are inconsistent with or greater than the obligations imposed by the Federal Rules of Civil Procedure, the Federal Rules of Bankruptcy Procedure, or the Local Rules of the United States Bankruptcy Court for the District of Delaware.

2.      The Debtors object to each Request to the extent that it purports to require the Debtors to conduct anything beyond a reasonable and good faith search for documents or information, particularly in light of the expedited timeframe for discovery.

3.      The Debtors object to each Request to the extent that it is vague, ambiguous, overly broad, unduly burdensome or does not specify the documents or information sought with sufficient particularity.

4.      The Debtors object to each Request to the extent that it seeks documents or information already within Ms. Sun's knowledge, possession and/or control or readily accessible by means other than a discovery request to the Debtors.

5.      The Debtors object to each Request to the extent it requests documents or information protected by the attorney-client privilege, work product doctrine, joint defense or common interest doctrine, business strategy privilege or any other applicable privilege or protection.  In responding to each Request, the Debtors do not waive, but preserve, all such applicable privileges and protections.  In the event that the Debtors disclose any privileged or protected information, such disclosure is inadvertent and will not constitute a waiver of any privilege or protection.

6.      The Debtors object to each Request to the extent that it calls for the production of confidential information that is protected from disclosure by law, court order, or any agreement with respect to confidentiality or nondisclosure.

7.      The Debtors object to each Request to the extent it is cumulative or duplicative of other discovery requests.

8.      The Debtors make their responses to these Requests based on their present knowledge and without prejudice to their rights to produce or object to evidence of any kind and to amend or supplement these responses as necessary.

9.      The Debtors reserve the right to challenge the competence, relevance, materiality, or admissibility of, or to object on any grounds to the use of any documents or information produced in response to the Requests in any proceeding in these Chapter 11 Cases or any other subsequent action.

## **RESPONSES**

1.  The latest balance sheet as of the date of bankruptcy petition filing date, June 15, 2020.

    a.  **Debtors' Response**: Please refer to the document Bates stamped as PYXUS_000001 for the Company's financial projections and latest balance sheet as of March 31, 2020.

2.  Itemized list of all the assets:

    (i) NOLs.

    a.  **Debtors' Response**: As of March 31, 2020, the Debtors estimate that they have U.S. federal NOLs in the amount of approximately $356.1 million and U.S. state NOLs in the amount of approximately $639.5 million.  As of March 31, 2020, the Debtors estimate that they have foreign tax credit carryforwards in the amount of approximately $4.6 million.  Please refer to the document Bates stamped as PYXUS_000017 for further detail.

    (ii) All tangible and intangible assets that are secured against the ABL Facility in the form of inventory, accounts receivables, credit receivables, etc.

b. **Debtors' Response**: The ABL Facility was paid down with the proceeds of the DIP Facility and terminated. This repayment also released any claim or security interest that the ABL Collateral Agent and ABL Lenders held with respect to the applicable collateral. However, for reference, the Debtors have provided detail on the collateral that previously secured the ABL Facility. *See* PYXUS_000011 and PYXUS_000016.

(iii) Itemized list of the total ABL Credit that's drawn. (*i.e.*, details of the $44.9 million that's drawn and how it's spent to-date (future accruals / placeholders vs. actually using it)).

c. **Debtors' Response**: There are currently no outstanding amounts under the ABL Facility. The ABL Facility was fully repaid utilizing the proceeds from the Debtors' DIP Facility and was terminated upon repayment. The prior amounts that were drawn from the ABL Facility were used to finance the operations of the Company. Such uses included, but were not limited to, financing of global operations, capital expenditures, funding of expenses for selling, general and administrative expenses, and other general corporate purposes. As cash is fungible, it is not possible to determine exactly which expenses were paid using ABL Facility proceeds.

(iv) A list of all the assets that are captured as collateral against the ABL Facility (*e.g.*, equipments, real estate, intellectual property, intercompany indebtedness) accounting for the appropriate loan to value ratios.

d. **Debtors' Response**: Please refer to the documents Bates stamped as PYXUS_000011 and PYXUS_000016 for a summary of the assets that previously collateralized the ABL Facility, which has been repaid and terminated. The ABL Collateral included accounts receivable and inventory.

As to the portion of the Request seeking an "accounting for the appropriate loan to value ratios," the Debtors respond that this Request is vague, ambiguous and not applicable to the facts of the case. Based upon the Debtors' reasonable understanding of the Request, the Debtors respond that they are not aware of any documents or information responsive to this portion of the Request.

(v) On similar lines for the First Lien Notes ($275 million), Second Lien Notes (about $635.7 million), provide a complete list of the itemized collateral assets and their valuation.

e. **Debtors' Response**: Please refer to the document Bates stamped as PYXUS_000011.

(vi) Updated outstanding amount in foreign credit lines as of June 15, 2020. Itemized list of the foreign credit line that's drawn and it's spent till date (future accruals / placeholders vs. actually using it). List of all the assets that are captured as co-lateral against the foreign credit line (*e.g.*, inventories, equipments, real estate, intellectual property, intercompany indebtedness). Complete accounting for the principal and interest paid as of June 15, 2020. Projected principle and interest for fiscal year ended March 31, 2021. Accounting for the appropriate loan to value ratios.

    f.    **Debtors' Response**: The Foreign Credit Lines are revolving credit lines that are drawn for use by the local (country-specific) operating entity. These lines are available only for use in local operations and are used to fund, *inter alia*, the purchase of tobacco inventory and other local operations. Funds are drawn as-needed and used for the aforementioned purposes shortly after a borrowing is made. When secured, the Foreign Credit Lines are secured by local inventory and receivables. Several of the Foreign Credit Lines are unsecured.

          As of May 31, 2020, approximately $557 million is owed in total under the Foreign Credit Lines. Repayments of approximately $537 million are projected through March 31, 2021, and additional borrowings of approximately $420 million are projected in the same period. Projected interest for the period through March 31, 2021 is approximately $27 million.

          Please refer to the document Bates stamped as PYXUS_000018 for itemized information on the Foreign Credit Lines as of May 31, 2020.

          As to the portion of the Request seeking an "accounting for the appropriate loan to value ratios," the Debtors respond that this Request is vague, ambiguous and not applicable to the facts of the case. Based upon the Debtors' reasonable understanding of the Request, the Debtors respond that they are not aware of any documents or information responsive to this portion of the Request.

(vii) Updated outstanding in receivables facilities as of June 15, 2020. Projected outstanding in receivables facilities by quarter for fiscal year ended March 31, 2020. Accounting for appropriate loan to value ratios and/or cost analysis.

    g.    **Debtors' Response**: As of the week of June 8, 2020, there was approximately $80 million outstanding under the Finacity RPAs and $20 million under the Standard Bank RPA. As of March 31, 2019, the total receivables outstanding equaled $211 million. As of June 30, 2019, the total receivables outstanding equaled $78 million. As of September 30, 2019, the total receivables outstanding equaled $126 million. As of December 31, 2019, the total receivables outstanding equaled $68 million. As of March 31, 2020, the total receivables outstanding equaled $135 million.

As to the portion of the Request seeking an "accounting for the appropriate loan to value ratios and/or cost analysis," the Debtors respond that this Request is vague, ambiguous and not applicable to the facts of the case. Based upon the Debtors' reasonable understanding of the Request, the Debtors respond that they are not aware of any documents or information responsive to this portion of the Request.

(viii) Full disclosure of non-debtor affiliates. Full disclosure of intercompany financing with cost analysis and appropriate accounting practice. Full disclosure on cash flows were sent to/spent on non-debtor affiliates for fiscal year ended March 31, 2018, fiscal year ended March 31, 2019 and fiscal year ended March 31, 2020 and period as of June 15, 2020. Projected intercompany financing to support the operations of non-debtor affiliates for next three years.

h. **Debtors' Response**: Please refer to the document Bates stamped as PYXUS_000019 for the Company's Corporate Structure Chart.

As to the portion of the Request seeking a "[f]ull disclosure of intercompany financing with cost analysis and appropriate accounting practice," the Debtors respond that this Request is vague, ambiguous and the Debtors do not understand what documents or information this Request is seeking. The Debtors request clarification and are willing to meet and confer on this issue.

Please refer to the document Bates stamped as PYXUS_000021 for the Debtors' Intercompany Loan Summary for the year ended March 31, 2020. The Debtors will produce any additional non-privileged documents that are responsive to this Request.

The Company's projections include financing to Non-Debtor Affiliates. *See* PYXUS_000001.

3. Request to the company to provide summary of projected lawyers/consulting fees etc. at the end of bankruptcy proceeding.

a. **Debtors' Response**: As of the Petition Date, the Debtors and their advisors contemplated emerging from bankruptcy the week ending July 31, 2020. Based on this timeframe, the professional fees were estimated to total approximately $22 million. However, this figure is not inclusive of fees and expenses that may be incurred by additional professionals retained during the Chapter 11 Cases, including Deloitte & Touche LLP ("<u>Deloitte</u>") and Ernst & Young LLP, whose retention applications were filed on July 6, 2020. Additional detail responsive to this Request is provided in the professionals' retention applications that were filed with the Bankruptcy Court at Docket Numbers 113, 114, 115, 116, 118, 119, 131 and 134.

4. Request to the company to provide complete schedule of the DIP Facility. Summary of DIP commission fees and complete details of the DIP interest rate.

    a. **Debtors' Response**: The *Interim Order (I) Authorizing The Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing and (V) Granting Related Relief* [Dkt. 84] authorizes the Debtors to obtain postpetition financing on a secured superpriority basis, consisting of a new money term loan facility in the aggregate principal amount of $206.7 million. The initial DIP budget included borrowings under the DIP Facility of $84 million (net of fees) in the week ended June 19, 2020, $41 million in the week ended July 3, 2020 and $75 million in the week ending July 24, 2020. Please refer to the documents Bates stamped as PYXUS_000026 and PYXUS_000039 for further detail.

       The loans issued under the DIP Facility (the "DIP Loans") bear interest at a rate per annum equal to the Adjusted LIBO Rate (subject to a floor of 1.50%) + 10.25%. The DIP Facility has a non-refundable ticking fee on the aggregate daily amount of each undrawn commitment at a rate per annum equal to 3.0%. Fees also include a non-refundable commitment fee equal to 3.25% of the aggregate commitments under the DIP Facility and a non-refundable exit fee equal to 3.25% of the aggregate principal amount of DIP Loans. *See* PYXUS_000026.

5. Request to the company to provide projections of forecasted revenue v/s expenses for the next three years in both scenarios, as with or without the chapter 11.

    a. **Debtors' Response**: The Company has provided its projections for the next five fiscal years in the document Bates stamped as PYXUS_000001. Without the financing provided by the DIP Facility, the Company would have run out of cash and been forced to liquidate, which was one of the factors requiring the Debtors to file these Chapter 11 Cases. The projected recoveries under various liquidation scenarios are provided in the document Bates stamped as PYXUS_000040.

6. Request to the company to provide full disclosure on the "global operations efficiency program" which the company released on February 24, 2020. The company announced that would report on progress in its implementation of the global operations efficiency effort by May 1, 2020. Shareholders were not communicated with the "progress" on this program as expected, as of today.

    a. **Debtors' Response**: Given the liquidity challenges the Company was facing, the Company has focused primarily on working capital reductions rather than structural changes, as many structural changes would result in significant upfront costs (e.g., severance). The Company's focus on cost reductions have included elimination of travel, reduction or delay of Capex projects, freezes on salary increases, delays in training and hiring and other initiatives. The Company's financial projections include savings realized from these cost reduction initiatives.

7. Request to the company to provide full payroll information for fiscal year ended March 31, 2018, fiscal year ended March 31, 2019, fiscal year ended March 31, 2020 and period from April 1 to June 15, 2020.

   a. **Debtors' Response**: Please refer to the document Bates stamped as PYXUS_000199.

8. Request to the company to provide full disclosure on their efforts in internal audit if there was any, for fiscal year ended March 31, 2018, fiscal year ended March 31, 2019, fiscal year ended March 31, 2020 and period from April 1 to June 15, 2020.

   a. **Debtors' Response**: Please refer to the document Bates stamped as PYXUS_000047 for Deloitte's Reports of Independent Registered Public Accounting Firm with respect to the Company's annual reports for fiscal years 2018 and 2019. As reported in its Form 12b-25 filed on June 15, 2020, the Company has not yet completed the audit for fiscal year 2020.

9. Request to the company to provide full disclosure on the company's / management's / executives' / board members' / direct family members' / affiliates' / subsidiaries' / associated individuals and/or institutions' etc. activities on its stock market and corporate bonds market if any.

   a. **Debtors' Response**: Please refer to the documents Bates stamped as PYXUS_000049 and PYXUS_000167.

10. Request to the company to provide full disclosure on the entire process of the chapter 11 from the very first beginning, including all the timing of every "progress" of this chapter 11. The company never disclosed any possibility of bankruptcy to the public/shareholders until June 15, 2020, when the company filed the chapter 11. Also, request to the company to fully disclose the 35 third-party institutions for the dip proposal along with details in both timing and contents and if there are any follow-ups from 35 third-party institutions before and after June 15, 2020.

   a. **Debtors' Response**: Since 2019, the Company has sought to address both its liquidity needs and over-leveraged capital structure. Throughout fiscal year 2019 and into fiscal year 2020, the Company explored numerous out-of-court transactions, including a public offering of their Global Special Products business, private debt exchanges and refinancings, and investments, equity investments and transactions involving special purpose acquisition companies. Unfortunately, as explained in the *Declaration of Joel Thomas, Executive Vice President and Chief Financial Officer of Debtor Pyxus International, Inc., in Support of the Chapter 11 Petitions and First Day Pleadings*, the Company and its investment bankers determined a public offering was not feasible given the adverse market conditions that began in late 2019 and have continued through today, the Company did not receive any viable refinancing offers that addressed the Company's substantial refinancing needs, and obtaining new capital was not an option, particularly in the midst of the COVID-19 pandemic. Without traction on these initiatives and with

almost $1 billion in First Lien Notes and Second Lien Notes maturing in the first half of 2021, the Company faced the prospect of a going concern qualification in its fiscal year end (March 31, 2020) audited financials, which would have materially impeded its ability to renew the Foreign Credit Lines, the Company's primary source of working capital. Therefore, in early 2020, the Company began discussions with its creditors to explore how these issues could be addressed. Over the course of four months, the Company met with representatives of First Lien Noteholders and Second Lien Noteholders to keep them informed of the Company's refinancing efforts and strategic initiatives, and to negotiate the terms of a potential comprehensive restructuring. During this time, the Company also reached out to substantial (5% or more) shareholders regarding a potential investment. However, only one shareholder signed a non-disclosure agreement, and the discussions with that shareholder did not extend beyond a highly speculative transaction that did not contemplate paying the Company's secured creditors at par and had no financial backing. By late in the spring of 2020, the Company began making significant progress with the First Lien Noteholders and Second Lien Noteholders. These discussions ultimately resulted in the execution of the Restructuring Support Agreement and the launching of the Plan. As the Company has repeatedly stated, during this process the Company was consistently pursuing out-of-court possibilities and only filed for chapter 11 as a last resort once it determined that no executable out-of-court restructuring would be possible.

With respect to the DIP financing, the 35 potential providers of DIP financing included existing lenders, large money-center banks, a number of sophisticated alternative financial institutions, certain of the Company's substantial (5% or more) shareholders and other lenders who were indirectly contacted by certain of the potential financing parties who had already executed confidentiality agreements with the Company. The Company is bound by confidentiality agreements and prohibited from disclosing the names of the potential financing providers. Prior to execution of the DIP Credit Agreement, significant discussions were held with six potential financing parties, and due diligence was conducted by several professional institutions. Following the diligence process, two parties continued to express interest in providing DIP financing – an ad hoc group of Second Lien Noteholders and a third-party lender. Ultimately, the Debtors received only one definitive offer for DIP financing, which is the offer now embodied in the current DIP Credit Agreement. Since the Petition Date, no parties have been contacted or alternative sources of financing sought.

11. Request to the company to fully disclose if there are any buyout offers/interests/inquiries, public offering offers/interests/inquiries on the table, before and/or after June 15, 2020.

    a. **Debtors' Response**: As noted in the response to Request No. 10, the Company and its professionals explored whether there were any executable out-of-court transactions available that would refinance the Company's debt and provide it with much needed liquidity. Ultimately, no such transaction was available. Since June 15, 2020, no such offers have been made to the Company or to the Company's advisors.

12. Request to the company to provide financial statements for the fiscal quarter ended March 31, 2020 and the fiscal year ended March 31, 2020 without as if there was no chapter 11.

    a. **Debtors' Response**: Please refer to the document Bates stamped as PYXUS_000010 for the Company's financial statements for the year and quarter ended March 31, 2020.

13. Request to the company to provide operational progresses regarding the delayed shipments caused by COVID-19 and hurricane etc. and its positive effects on the company's liquidity and related forward-looking statements if any.

    a. **Debtors' Response**: The Company's projections include its management's view on the impacts (positive and negative) of the operational response to shipment delays caused by COVID-19, trade disputes/tariffs and reaction to other influences, including weather related impacts on crops and shipping. *See* PYXUS_000001.

14. Request to the company to provide updated forward-looking statements reflecting the scientific and regulatory progress regarding the COVID-19/vaping link which caused the downturn in the cannabis/hemp industry from September/October last year; and updated forward-looking statements reflecting the regulatory progress in cannabis/hemp legalization on both products level and industry level and both us and global markets level; and updated forward-looking statements reflecting the us easing/lifting ban on importing tobacco from Mawawi [sic].

    a. **Debtors' Response**: The Company's projections include its management's view of the impacts (positive and negative) of the operational response to each of the factors mentioned in the Request as well as the results of operations, which takes into account these same factors. *See* PYXUS_000001.

15. Request to the company to modify their website regarding their stock price information. As of now, it still shows $2.91 NYSE there and it could potentially mislead shareholders who are not aware of the chapter 11 yet. Request the court to allow adding/amending the number of shareholders as well as the numbers of shares holding as of June 15, 2020 of the company since there are more and more shareholders becoming aware of this chapter 11 and joining this petition. As of now, none of us has received any formal notice from the company regarding this chapter. We mostly learned about this chapter 11 from online while not all shareholders have the access/device to internet. Request to the court to consider appropriate extensions of deadlines along with this chapter 11 process for shareholders who were not informed by the company regarding this chapter 11.

    a. **Debtors' Response**: The Company's website has been updated.

Dated: July 6, 2020
       New York, New York

SIMPSON THACHER & BARTLETT LLP

   /s/ *William T. Russell, Jr.*                 .

William T. Russell, Jr. (*pro hac vice* pending)
Sandeep Qusba (*pro hac vice* admitted)
Michael H. Torkin (*pro hac vice* admitted)
Jamie J. Fell (*pro hac vice* admitted)
425 Lexington Avenue
New York, NY 10017
Telephone: (212) 455-2000
Facsimile:  (212) 455-2502

*Proposed Counsel to the Debtors and Debtors in
Possession*

*Exhibit B*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| PYXUS INTERNATIONAL, INC., *et al.*,[1] | ) Case No. 20-11570 (LSS) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

## DEBTORS' RESPONSES AND OBJECTIONS TO
## SUPPLEMENTAL SHAREHOLDER DISCOVERY REQUESTS

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, made applicable to these proceedings by Federal Rules of Bankruptcy Procedure 7026 and 7034, Pyxus International, Inc. ("Pyxus") and its affiliated debtors and debtors in possession (collectively, the "Debtors" and, together with the Debtors' non-debtor subsidiaries and affiliates, the "Company") in the above-captioned cases (the "Chapter 11 Cases") hereby submit the following objections and responses to the supplemental discovery requests (the "Supplemental Requests" and each a "Supplemental Request") provided by Ms. Hongchao Sun on July 8, 2020 on behalf of herself and purportedly a group of certain other shareholders.[2]

## GENERAL OBJECTIONS

The Debtors incorporate into their responses the following general objections to the Supplemental Requests:

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Pyxus International, Inc. (6567); Alliance One International, LLC (3302); Alliance One North America, LLC (7908); Alliance One Specialty Products, LLC (0115); and GSP Properties, LLC (5603). The Debtors' service address is: 8001 Aerial Center Parkway, Morrisville, NC 27560-8417.

[2]     All capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the *Disclosure Statement for the Joint Prepackaged Chapter 11 Plan of Reorganization of Pyxus International, Inc. and its Affiliated Debtors* [Docket No. 22] (the "Disclosure Statement").

1.      The Debtors object to each Supplemental Request to the extent that it seeks to impose obligations on the Debtors that are inconsistent with or greater than the obligations imposed by the Federal Rules of Civil Procedure, the Federal Rules of Bankruptcy Procedure, or the Local Rules of the United States Bankruptcy Court for the District of Delaware.

2.      The Debtors object to each Supplemental Request to the extent that it purports to require the Debtors to conduct anything beyond a reasonable and good faith search for documents or information, particularly in light of the expedited timeframe for discovery.

3.      The Debtors object to each Supplemental Request to the extent that it is vague, ambiguous, overly broad, unduly burdensome or does not specify the documents or information sought with sufficient particularity.

4.      The Debtors object to each Supplemental Request to the extent that it seeks documents or information already within Ms. Sun's knowledge, possession and/or control or readily accessible by means other than a discovery request to the Debtors.

5.      The Debtors object to each Supplemental Request to the extent it requests documents or information protected by the attorney-client privilege, work product doctrine, joint defense or common interest doctrine, business strategy privilege or any other applicable privilege or protection.  In responding to each Supplemental Request, the Debtors do not waive, but preserve, all such applicable privileges and protections.  In the event that the Debtors disclose any privileged or protected information, such disclosure is inadvertent and will not constitute a waiver of any privilege or protection.

6.      The Debtors object to each Supplemental Request to the extent that it calls for the production of confidential information, including sensitive commercial or proprietary information

and information protected from disclosure by law, court order, or any agreement with respect to confidentiality or nondisclosure.

7.     The Debtors object to each Supplemental Request to the extent it is cumulative or duplicative of other discovery requests.

8.     The Debtors make their responses to these Supplemental Requests based on their present knowledge and without prejudice to their rights to produce or object to evidence of any kind and to amend or supplement these responses as necessary.

9.     The Debtors reserve the right to challenge the competence, relevance, materiality, or admissibility of, or to object on any grounds to the use of any documents or information produced in response to the Supplemental Requests in any proceeding in these Chapter 11 Cases or any other subsequent action.

<b><u>RESPONSES</u></b>

1. On PYX_000008 (public), the projected income statements for FY21, FY22, FY23, FY24, FY25, please provide the detailed "breakdowns" for "tobacco" and "global specialty products". For "global specialty products", please further provide detailed "breakdowns" for different brands/categories/etc.

   a. **Debtors' Response**: The Debtors will make a reasonable search for and produce any additional non-privileged documents responsive to this Supplemental Request, but will not provide information at the brand and category level because of the extremely commercially sensitive nature of that information.

2. Please provide income statements for FY19 and FY18; please also provide the detailed "breakdowns" for "tobacco" and "global specialty products". For "global specialty products", please further provide detailed "breakdowns" for different brands/categories/etc.

   a. **Debtors' Response**: Please refer to PYXUS_000582 and PYXUS_000696. The Debtors will make a reasonable search for and produce any additional non-privileged documents responsive to this Supplemental Request, but will not provide information at the brand and category level because of the extremely commercially sensitive nature of that information.

3. Please provide the scenario analysis as if there was no Chapter 11. If the company did not

conduct such analysis, please let me/us know.

    a. **Debtors' Response**: As the Debtors have repeatedly explained, if they had not filed for chapter 11, they would most likely have been forced to curtail operations and liquidate. Please refer to the Liquidation Analysis in document Bates stamped as PYXUS_000040, which is also available on the Court's docket at Docket No. 22, Exhibit F. Please also refer to the document Bates stamped as PYXUS_000329.

4. Valuation of the company's total assets (including all the affiliates of the company); If the company did not conduct such analysis, please let me/us know.

    a. **Debtors' Response**: Please refer to the Valuation Analysis in document Bates stamped as PYXUS_000330. The Valuation Analysis is also available on the Court's docket at Docket No. 22, Exhibit E.

5. About the company's mid-2019 Canadian IPO, please provide a copy of the IPO proposal. I don't remember the company has provided any related information regarding this IPO until the Chapter 11.

    a. **Debtors' Response**: In 2019, the Company was considering various monetization options related to the Global Specialty Products business lines or portions thereof. One option explored was an IPO of the Global Specialty Products business. As previously disclosed, due to adverse market conditions the Company's investment bankers advised that the IPO would not be feasible. On multiple earnings calls in 19Q4-20Q3, the Company publicly disclosed the possibility of and certain details regarding the monetization of subsidiaries in the "Other Products and Services" segment in fiscal 2020. Please refer to the earnings call transcripts Bates stamped as PYXUS_000200, 000218, 000236, and 000253.

      Please note that these earnings call transcripts were not created by Pyxus and contain the following disclaimer: "Any replay, rebroadcast, transcript or other reproduction of this conference call other than the replays provided by Pyxus International has not been authorized and is strictly prohibited. Investors should be aware that any unauthorized reproduction of this conference call may not be an accurate reflection of its contents."

6. Please provide the information/documentation/record regarding the institutional shareholder executed a non-disclosure agreement and entered into discussions with Pyxus. We think this "potential" alternative other than Chapter 11 needs to be evaluated by shareholders.

    a. **Debtors' Response**: Please refer to the document Bates stamped as PYXUS_000336.

7. Please provide a detailed statement/explanation about how Lazard, directly or indirectly, reached out over 35 potential providers of the financing. If there's a uniform

email/proposal/inquiry, please also a copy of it.

    a. **Debtors' Response**: There was no "uniform email/proposal/inquiry" used to reach out to the 35 potential financing providers. A detailed description of this process is provided in (i) the Disclosure Statement (pp. 13-14), (ii) the *Declaration of Brandon Aebersold in Support of the Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Granting Liens and Superpriority Claims, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing and (VI) Granting Related Relief* [Dkt. 16], and (iii) the Debtors' Responses and Objections to Shareholder Discovery Requests dated July 6, 2020.

8. Please provide reason that the company did not get any financial relief / loan like many other companies did during March and April.

    a. **Debtors' Response**: The Company is utilizing relief under the payroll deferral programs and pension contribution deferral programs available under the Coronavirus, Aid, Relief and Economic Security Act (the "<u>CARES Act</u>"). The savings attributable to the payroll tax deferral relief is estimated to total approximately $1,830,000, and the savings attributable to the pension contribution deferral relief is estimated to total approximately $536,000. The Company diligently investigated other options for financial relief under the CARES Act and the Families First Coronavirus Response Act (the "<u>FFCRA</u>"). The Company is too large (more than 500 employees) for eligibility under the FFCRA, and the Company was not eligible for any other relief under the CARES Act as it was deemed an "essential business" as an agricultural provider and not subject to mandatory closure, which a requirement for relief under this program.

9. Please provide if the company is expecting a government loan in July and August, 2020.

    a. **Debtors' Response**: The Company is not expecting any government loan. Please refer to the Debtors' response to Supplemental Request No. 8.

10. Please provide a copy of the CFO's resume.

    a. **Debtors' Response**: As Joel Thomas has been with Pyxus for over 15 years, he does not keep an updated resume. A detailed description of his relevant education and workforce experience is provided in the *Declaration of Joel Thomas, Executive Vice President and Chief Financial Officer of Debtor Pyxus International, Inc., in Support of the Chapter 11 Petitions and First Day Pleadings* [Dkt. 2].

    Additionally, please see the below communications bio used by the Company for Mr. Thomas:

    Mr. Thomas has served as Executive Vice President and Chief Financial Officer since January 2014, having previously served as Vice President and Treasurer from

December 2005 through December 2013. Prior to joining the Company, from January 1996 to December 2005, Mr. Thomas served as Vice President and Director with Wachovia Securities (n/k/a Wells Fargo Securities) in their investment bank, focusing on leveraged bank and bond transactions.

Dated: July 9, 2020
New York, New York

SIMPSON THACHER & BARTLETT LLP

_/s/ *William T. Russell, Jr.*_            .

William T. Russell, Jr. (*pro hac vice* admitted)
Sandeep Qusba (*pro hac vice* admitted)
Michael H. Torkin (*pro hac vice* admitted)
Jamie J. Fell (*pro hac vice* admitted)
425 Lexington Avenue
New York, NY 10017
Telephone: (212) 455-2000
Facsimile:  (212) 455-2502

*Proposed Counsel to the Debtors and Debtors in Possession*

*Exhibit C*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| PYXUS INTERNATIONAL, INC., *et al.*,[1] | ) | Case No. 20-11570 (LSS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | |

### DEBTORS' RESPONSES AND OBJECTIONS TO
### SUPPLEMENTAL SHAREHOLDER DISCOVERY REQUESTS

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, made applicable to these proceedings by Federal Rules of Bankruptcy Procedure 7026 and 7034, Pyxus International, Inc. ("Pyxus") and its affiliated debtors and debtors in possession (collectively, the "Debtors" and, together with the Debtors' non-debtor subsidiaries and affiliates, the "Company") in the above-captioned cases (the "Chapter 11 Cases") hereby submit the following objections and responses to the supplemental discovery requests (the "Supplemental Requests" and each a "Supplemental Request") provided by Ms. Hongchao Sun on July 9, 2020 and July 10, 2020 on behalf of herself and purportedly a group of certain other shareholders.[2]

### GENERAL OBJECTIONS

The Debtors incorporate into their responses the following general objections to the Supplemental Requests:

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Pyxus International, Inc. (6567); Alliance One International, LLC (3302); Alliance One North America, LLC (7908); Alliance One Specialty Products, LLC (0115); and GSP Properties, LLC (5603). The Debtors' service address is: 8001 Aerial Center Parkway, Morrisville, NC 27560-8417.

[2]  All capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the *Disclosure Statement for the Joint Prepackaged Chapter 11 Plan of Reorganization of Pyxus International, Inc. and its Affiliated Debtors* [Docket No. 22] (the "Disclosure Statement").

1.      The Debtors object to each Supplemental Request to the extent that it seeks to impose obligations on the Debtors that are inconsistent with or greater than the obligations imposed by the Federal Rules of Civil Procedure, the Federal Rules of Bankruptcy Procedure, or the Local Rules of the United States Bankruptcy Court for the District of Delaware.

2.      The Debtors object to each Supplemental Request to the extent that it purports to require the Debtors to conduct anything beyond a reasonable and good faith search for documents or information, particularly in light of the expedited timeframe for discovery.

3.      The Debtors object to each Supplemental Request to the extent that it is vague, ambiguous, overly broad, unduly burdensome or does not specify the documents or information sought with sufficient particularity.

4.      The Debtors object to each Supplemental Request to the extent that it seeks documents or information already within Ms. Sun's knowledge, possession and/or control or readily accessible by means other than a discovery request to the Debtors.

5.      The Debtors object to each Supplemental Request to the extent it requests documents or information protected by the attorney-client privilege, work product doctrine, joint defense or common interest doctrine, business strategy privilege or any other applicable privilege or protection.  In responding to each Supplemental Request, the Debtors do not waive, but preserve, all such applicable privileges and protections.  In the event that the Debtors disclose any privileged or protected information, such disclosure is inadvertent and will not constitute a waiver of any privilege or protection.

6.      The Debtors object to each Supplemental Request to the extent that it calls for the production of confidential information, including sensitive commercial or proprietary information

and information protected from disclosure by law, court order, or any agreement with respect to confidentiality or nondisclosure.

7.      The Debtors object to each Supplemental Request to the extent it is cumulative or duplicative of other discovery requests.

8.      The Debtors make their responses to these Supplemental Requests based on their present knowledge and without prejudice to their rights to produce or object to evidence of any kind and to amend or supplement these responses as necessary.

9.      The Debtors reserve the right to challenge the competence, relevance, materiality, or admissibility of, or to object on any grounds to the use of any documents or information produced in response to the Supplemental Requests in any proceeding in these Chapter 11 Cases or any other subsequent action.

## RESPONSES

11. Please provide the Company's effective tax rate information for FY18, FY19, and FY20.

    a.  **Debtors' Response**: The Company includes as a line item "Cash paid for income taxes" under "Other information" in the *Condensed Consolidated Statements of Cash Flows* contained in its quarterly and annual reports.  Additional information on income taxes is included in the *Notes to Condensed Consolidated Financial Statements* on such reports.  *See, e.g.,* Note 4 in the Company's 10-Q for the first fiscal quarter of 2020.  The Company has not yet completed the closing process for fiscal year 2020.

12. Please provide details about the company's tax expense (total $132m) for FY20 by Quarters.

    a.  **Debtors' Response**: Details on the Company's tax expense is disclosed for the first, second and third fiscal quarters of 2020 in the Company's Form 10-Qs for those quarters.  The Company has not yet completed the closing process for Q4 2020.

13. Please provide details about the company's comprehensive loss for FY18, FY19, and FY20.

    a.  **Debtors' Response**: The Company's quarterly and annual filings contain schedules detailing comprehensive loss for the Company.  *See, e.g., Condensed Consolidated Statements of Comprehensive Loss* in the Company's Form 10-Q for the first fiscal

quarter of 2020; *Other Comprehensive (Loss) Income, Consolidated Statements of Comprehensive (Loss) Income* and *Statements of Consolidated Stockholders' Equity* in the Company's Form 10-K for the fiscal year ended March 31, 2019 (PYXUS_000696). The Company has not yet completed the closing process for fiscal year 2020.

14. Please provide the company's visionary strategic plan developed in the past 3 years (if any).

    a. **Debtors' Response**: The Debtors object to this Supplemental Request as vague and ambiguous and request further clarification. The Company has already provided financial forecasts and information for the next 5 years. These forecasts, along with forward-looking statements previously published by the Company, constitute the Company's plans. Please also refer to the documents Bates stamped as PYXUS_000888 and PYXUS_000915.

15. Please provide the company's partnership/strategic plan with Altria; and partnership/strategic plan with other companies if any.

    a. **Debtors' Response**: The Debtors object to this Supplemental Request as vague and ambiguous and request further clarification. Regardless, the terms or plan of any partnerships that may or may not exist would be highly confidential and subject to non-disclosure agreements with the parties involved.

16. Please provide if the company has strategic planning on spinnin [sic] off (selling) tobacco business gradually or gradually downsizing the tobacco business for certain government capital support/tax benefits, etc. Or say, what's the company's plan for the tobacco business in 1-year, 5-year, 10-year, and 20-year. If the company has been evaluating alternatives about downsizing the tobacco business, from 2-3 years ago until now. If the company received any buyout interests on tobacco business, before and after the petition date.

    a. **Debtors' Response**: The Debtors object to this Supplemental Request as vague and ambiguous and request further clarification on references to "government capital support/tax benefits, etc." The Company has no plans to wind down or otherwise sell the Leaf business. To the contrary, before the unfortunate impacts of COVID-19, the Company's full-service Leaf business (as disclosed in public filings) was increasing. The Company is working to grow this business, and it remains an integral part of the Company's future plans. From time to time the Company may make efforts to rationalize and "right size" certain operations of the Leaf business, but this in no way constitutes a wind down of this core operation.

17. How often does the board hold meetings for all members? On what level the board members get involved with the company's overall planning, operating and financing?.

    a. **Debtors' Response**: The Board holds regular meetings a minimum of four (4) times per year. In addition, special sessions of the full Board are held from time to time as needed. As disclosed in the Company's Definitive Proxy Statement dated

July 15, 2019, in fiscal year 2019 the Board held 8 meetings.  In fiscal year 2020 (ended March 31, 2020), the Board held 9 regularly scheduled and special meetings, and in fiscal year 2021 (beginning April 1, 2020) the Board has held 5 regularly scheduled and special meetings to date.

The Board members operate under the guidelines as required and appropriate for members of a U.S. public entity.    The guidelines are available at http://investors.pyxus.com/investors/governance/corporate-governance-guidelines/default.aspx.

18. Beside Lazard, did the company ever contact other investment bankers? How did the company choose Lazard to provide investment banking service?

   a. **Debtors' Response**: Prior to hiring Lazard Frères & Co. ("Lazard"), the Company and members of the Special Committee considered various investment bankers. The decision by the Board to engage Lazard was based on, among other factors, their significant experience, reputation and high level of competency in investment banking, valuation and restructuring.

19. For chapter 11 news leaks, our evidence shows that the company's Compliance Officer was already aware of the new leaks before Chapter 11. Did he take any actions?  If yes, please provide details.

   a. **Debtors' Response**: The Debtors object to this Supplemental Request as unduly burdensome and irrelevant to the issues of appointing an equity committee in these Chapter 11 Cases or the confirmability of the Debtors' Plan.

Dated: July 11, 2020          SIMPSON THACHER & BARTLETT LLP
      New York, New York

                              /s/ *William T. Russell, Jr.*          .

                              William T. Russell, Jr. (*pro hac vice* admitted)
                              Sandeep Qusba (*pro hac vice* admitted)
                              Michael H. Torkin (*pro hac vice* admitted)
                              Jamie J. Fell (*pro hac vice* admitted)
                              425 Lexington Avenue
                              New York, NY 10017
                              Telephone: (212) 455-2000
                              Facsimile:  (212) 455-2502

                              *Proposed Counsel to the Debtors and Debtors in Possession*

**Exhibit D**

Ever after the July 2, 2020 court hearing, the Movant has experienced an extremely intensive and difficult period of time in communicating with the US Trustee and multiple legal counsels of the company. Regarding the US Trustee, the biggest difficulty for the Movant is, while the Movant has been sending all the letters (from the Movant and other shareholders) and all the documents at every step, from July 2 to July 15, 2020, the US Trustee never responded; not a single word. The US Trustee's objection (docket #143) just suddenly showed up in the docket on July 13, 2020; this objection has a footer on the first page stating "No Rule 2019 Statement has yet been filed" while referring to shareholders' information in the original shareholders' petition (docket#108). In fact, the Movant provided the Rule 2019 two times; the second time was on July 12, 2020 and with the modified version providing more details of shareholders' information along with a list of shareholders information on confidential basis (with addresses and email addresses removed as communicated with the company; name, financial interest and purchase history, and numbers of shareholding as of June 15, 2020 were provided). The complete set of shareholders information was filed to court UNDER SEAL. Upon researching other Rule 2019 document(s) inn the docket, the Movant believes the provided Rule 2019 is sufficient; after all, if any question, the US Trustee could contact the Movant and shareholders directly; but the US Trustee simply states "No Rule 2019 Statement has yet been filed". The Movant and shareholders would appreciate an answer for this matter.

Regarding the company's counsels, simply to say, the Movant just realized how naive and stupid that she actually tried communicating with the company's counsels based on all the good faith for the entire time. The Movant first was asked to sign a "Confidential" agreement with the company to start receiving documents from the company. The company's counsels said 3-4 shareholders could also enter the "Confidential" agreement. Unfortunately, there were none other shareholders would like to sign (there were certain shareholders considering sign and/or agreeing to sign but eventually did not move forward). The Movant understands other shareholders' concern and respects their decision on such a "tricky" matter. After all, the Movant and these shareholders are just regular people while the company's counsels are highly-paid and intensively experienced legal professionals from top-notch law firm(s). In the next following days, the Movant was provided with some documents marked "Confidential", almost all of which she believes are actually "Public" information. Other documents marked as "Public", the Movant shared those public documents with other shareholders. It turned out almost all of the public documents were useless. Based on her best knowledge, the Movant believes those "Confidential" documents are mostly useless as well. As stated in Part II, the Movant strongly requests the court to order the company to fairly and legally mark all documents "Public" or "Confidential" in the upcoming production.

However, going through all the documents and consolidating other shareholders' thoughts on the "Public" information, the Movant indeed found some critical traces regarding the company's extremely abnormal tax expense which might directly link to the company's liquidity issue as the company claimed. The company claimed the liquidity issue was due to several factors in the disclosure statement; while the Movant concerned the liquidity might be directly caused by the company's big problem in tax expense. To be exact, the company has a $132 million in tax expense for FY20 while the company has an estimated $5

1

million net operating loss, according to the Public information. However, when the Movant requested the company to provide details of this extremely abnormal tax expense, the company simply refused by saying the FY20 annual financial is not finished. Again, the Movant believes this critical yet mysterious $132 million tax expense for FY20 must be fully disclosed to the shareholders and the public; otherwise, the company's Chapter 11 should not be allowed to move any further.

Another important trace is, the company seemed to use 2018 valuation data for its Global Specialty Products valuation, which is totally unjustified based on all the progress in the past two years. To be exact, it seemed that the company's valuation on its assets did not include the Global Specialty Products at all; in other words, the income projections used for valuation only reflect the tobacco business which is totally unjustified. The Movant requested the company to provide the income projections for next 5 years as well as the income information for the past 2 years, on a justified "breakdown" basis to reflect the income contributions from tobacco business and Global Specialty Products. The company refused. Whether the company provided their out-of-date valuation information to the Court, the USTrustee and all the Public on purpose of misleading or not; the Movant will leave this issue to the Judge to judge. But the bottomline is, the Movant strongly suggests that a fair and justified valuation of the company's total assets must be introduced and conducted under the Court and/or the US Trustee's supervision. Such fair and justified valuation of the company's total assets is not only critical to all shareholders' best interests, but could also lead to a meaningful alternative for the company to avoid a bankruptcy. Again, what's good for shareholders, is good for all stakeholders.

**Part I: Besides the original requests listed in the shareholders' petition and all the issues associated with the entire "discovery" process so far, the movant wants to make the most basic but critical request here. The movant requested this information multiple times but the company still did not provide.**

1. The company's FY20 Annual (fiscal year ended March 31, 2020) and the FY20Q4 (fiscal quarter ended March 31, 2020) financial results must be provided. The company kept refusing these critical information by saying those financial reports were not finished, while the fact is, shareholders and the public do not have any knowledge about what exactly happened on the financial/accounting level in the company during Jan 1 - June 15, 2020. This entire almost 6-month still remains a totally dark area to the public and the shareholders. The company's mysteriously sudden liquidity issue leading to the bankruptcy still remains as one of most important questions. Based on the movant's and shareholders' analysis, the company should have had about $100-$120 million in cash as of june 15, 2020 rather than $10 million cash as if there was no chapter 11 as the company claimed. Based on the public information, for FY20Q3 ended Dec 31, 2019, the company's net loss was about $22.45 million and had cash/cash equivalent $72.23 million. It was not outstanding but considering that the FY20Q4 ended March 31, 2020 should be the most profitable quarter of the year and considering the company's tobacco and global specialty products are essential business and US government's several rounds of loans/reliefs/incentives, along with all the progresses for both tobacco and global specialty products, the Covid-19 impact should've been at minimal level for the company. There should've

been around $50 million cash increase on the balance sheet, which would lead to about $100-$120 million in cash/cash equivalent for the FY20 ended March 31, 2020. What was the sudden liquidity issue from? With all the information, it just doesn't add up. Thus, the company should've had about at least $100 million cash in hand by the Chapter 11 petition date, instead of only $10 million cash as the company claimed. To answer this question, the company must fully disclose FY20 Annual (fiscal year ended March 31, 2020) and the FY20Q4 (fiscal quarter ended March 31, 2020) financial results .

2. Upon further research based on the public information, it seems that the company's expense in interests, SG&A and tax expense are abnormally high for FY20. Based on all the circumstance, shareholders already know the facts about the relatively high interests expense and extremely highly SG&A (yet shareholders have still not been provided with the full information regarding the interest and SG&A expense); but shareholders need to know the company's full disclosure in its tax expense for FY17, FY18, FY19, and FY20. To be specific, the company seems to have $132 million in tax expense for FY20, which is totally out of any character. In the company's NT-10K, it reported an estimated $5 million operating loss for FY20. How come the company could pay $132 million in tax expense? Was this tax expense real? Was it something else but marked as a tax expense? Was it an over-paid and/or pre-paid tax for future years? Or was it something else that shareholders are still not clear about? The Movant and shareholders just don't understand this extremely abnormal, out-of-nowhere $132 million tax expense. Without this tax expense, as stated in 1, the company really could have $100-$120 million cash in hand as of June 15, 2020. Without answering this question, the Movant doesn't believe there's any stand for the company to move any forward of this Chapter 11.

3. Most critically, a fair valuation of the company's total assets must be conducted. The company must provide the necessary financial information for such valuation. All income information provided for the valuation analysis should be provided on a "breakdown" basis. To be exact,  for FY21-25 income projections, the company must provide the detailed "breakdowns" for "tobacco" and "global specialty products"; for FY18-20, the company must provide income information on such "breakdown" basis as well.

With the times-revenue method, the movant estimates the company's total valuation could be at $4.5 billion in a buyout scenario. However, the movant does believe a better valuation method "Combined EBITDA/EV" method shall be used for a fair valuation of the company's total assets, which requests the company to provide necessary data on a "breakdowns" basis as stated.

First of all, to be clear, when refer to "debtors" in Chapter 11, it only includes 5 affiliates; when refer to "the company" in concept of assets valuation and alternatives other than Chapter 11, it should include all the affiliates/subsidiaries. One simple example, FIGR is a top-notch Canadian cannabis/hemp affiliate wholly owned by the company (The company's heavy investment in FIGR is one of the major reasons for the company's outstanding debt). In the light of the company's efforts in its One Tomorrow Strategy and Global Operation Efficiency Program, FIGR has significantly increased in its valuation; this is also in the background of a valuation increase

3

in the entire cannabis/hemp sector. The majority of the company's PRs in the past 2 years are all good PRs on FIGR, which could reflect the investment and the efforts the company has been making on FIGR. from February to May, FIGR consistently averaged over 10% market share in Ontario, with total vape oil sales estimated over $1M in Ontario alone. Monthly gross sale and market penetration statistics for February to May 2020 could be obtained from cannstandard.ca. However, the company excludes FIGR along with other 70+ foreign affiliates in the Chapter 11. These 70+ foreign affiliates generate about 70-80% of the company's total revenue. These are a major part of the company's total assets, and should not be excluded.

Meanwhile, when conducting the company's total assets valuation, "stock price" method shall be considered less appropriate. The company only has about 9 million shares outstanding, which is an extremely low-float stock and with extremely heavily short selling interest. During February - March 2020, the short selling interest was about the same of all floated retail shares. Besides the stock market manipulation happened right before the Chapter 11, the more important fact is, after the SEC's comments on the company's fiscal 2018 financials in Feb 2019, the company's stock price was pumped to as high as $30 during that same period of time and then started the major downtrend until the Chapter 11 filing. Not to mention the suspicious bankruptcy news leaks/reports by Harvard Zhang and Alexander Gladstone. The point is, we believe the company's stock market is heavily manipulated (based on what we see from the price/volume history based on the company's events) and it's just not reasonable/justified/appropriate to calculate the company's total assets valuation based on such stock price. Since we did not have a detailed income breakdown for FY20 (projected EBITDA based on income breakdowns would provide a more reliable and accurate valuation of the company's total assets). As a consertive estimate/analysis, based on the company having been having $1.5-$2 billion in annual revenue in the most recent 3 years, its total valuation would be at least $6 billion if used the times-revenue method (4 - 16 times) in a rough asset valuation. It would be around $4.5 billion after excluding the outstanding debt; price/share would be around $480. This estimate based on times-revenue method shall be introduced in a buy-out scenario.

To be noted, the times-revenue method is not perfect; but it's much better than the "stock price". Afterall, the times-revenue method is based on the company's reliable, solid revenue date; while the "stock price" method was based on an extreme low_float and extreme fluctuated (highly possible heavily manipulated) stock price. We don't think any qualified investment banker should introduce this method evaluating the company's total assets.

Thus, one critical question is, what is the ultimately reliable method that shall be introduced to conduct the valuation analysis of the company's total assets? "Combined EBITDA/EV" method; along with updated valuation of each categorie's intangible assets.

A. The company's total assets should be broken down to at least two categories: Tobacco and Global Specialty Products, since they are two totally different businesses, with totally different sets of incomes and cash flows; along with the totally different sets of increase in sales growth. The company's 103-page Pyxus Investor Day Presentation published on Sep

4

12, 2018, presented a very promising present at that time and a future as of now. The projected income with breakdowns in tobacco and global specialty products; the projected EBITDA; market potential in Canada and US (and in Europe); all of which supported an increased value in the company's Global Specialty Products. The Citron Reseach's coverage on the company (a month after the Pyxus Investor Day Presentation) further supported a short term stock price target at $65 and a FY23 stock price target at $280. In the following two years, most of the company's PRs have been focusing on the Global Specialty Products, particularly, FIGR. In Quarter ended on March 31, 2020, the valuation of the entire cannabis/hemp industry got boosted after almost all cannabis/hemp companies reported a surprisingly good quarter, which reflects an overall take-off in the cannabis/hemp industry. Canopy Growth Corp, made a surprisingly good $90.5 million in the quarter; Cronos Group generated a 238% year-over-year for the quarter, in amount of $12.7 million; Aurora generated $72.76 million for the quarter, with a 61% increase from the previous quarter; Aphria, reported $94.61 in net revenue for the quarter. This industry-wide take-off has boosted the investors' confidence in the entire MJ stock sector; many cannabis/hemp stocks have increased in the market cap rapidly and have been stable on the increased market-cap ever since. Along with all the good PRs on FIGR dropping at almost non-stopping speed, we have every reason to believe the significantly increased value in FIGR. This will need the company to provide more operation/marketing progresses and data. They're actually business/marketing intelligence could provide FIGR sales information at a fee; but why do we shareholders have to pay a fee for the information of an affiliate of a company that we have ownership in? The point is, the significantly increased valuation in FIGR is right there; it's unavoidable, it's undeniable, and it should not be hidden from the Court, the US Trustee, and all stakeholders including shareholders. To be noted, not only FIGR, but also the company's other global specialty products, are also in the Cannabis/Hemp sector, all of which should have an increased valuation at certain level that simply could not be ignored/overlooked/hidden.

B. For the tobacco business, although the company's performance in tobacco seemed to be declining, the market share and the profit is still right there. The entire tobacco has been relatively stable. With cost reduction at operational level, the company's tobacco business could have a very positive makeover. In fact, based on the public information, the Movants believe that the company actually has experienced a positive increase/growth in its leaf business for the second half FY20. Also, as the company's Global Specialty Products are taking off along with the entire Cannabis/Hemp industry, the company could improve its overall liquidity and pay-off its debt gradually and hence reduce the company's interest expense. The company's SG&A expenses also seem very high and should be improved at a certain level by the company's ongoing cost reduction effort. All of these improvements could significantly boost the company's EBITDA, particularly in the tobacco business. To be short, a valuation of the company's total assets based on "Combined EBITDA/EV " method along with updated valuation of each categorie's intangible assets, will significantly help shareholders and shareholders' best interest to be fairly represented and will provide one of few most critical information about this case to the Court, the US Trustee and the Public.

According to the public SEC filing, the company has maintained the current ratio at around 1.6-2.1 level in the past 2-3 years. The current ratio ranging at ard 1.6-2.1 level is good and means the company's overall financial health is healthy.

C. The company's tobacco business should have an updated valuation of intangible assets. About 150 years of history; All seemingly competent, powerful board members; Deep root and connections in the tobacco business and beyond; 70+ foreing affiliates covering 30 countries; 300,000 farmers worldwide; Rooted relationships with local government and/or banks worldwide; Potential of turning tobacco farms into cannabis/hemp farms; Local government's incentives/loans on reducing acreage of tobacco farms; The company's investment in building relations with the local communities and local governments, worldwide. The company's strategic partnership with peers, such as Philip Morris in Argentine. When we reached the buyout/takeover in the tobacco industry, we found that the buyout/takeover happened in the past years, normally in the $20-$50+ billion level. All of these factors should be fairly reflected in the valuation of the company's total assets.

D. The company's cannabis/hemp business should have an updated valuation of intangible assets; the last evaluation seems to be in 2018. There have been and there tons of value-adding developments and progresses, both in the company and the entire cannabis/hemp industry. a. The company's One Tomorrow Strategy; b. The company's Global Operation Efficiency Program; c. The company's SENTRI system; d. The company's Global Specialty Products covering FIGR, Humble Juice, Criticality, and NicRiv, etc. All affiliates/subsidiaries have been progressing during the past 2 years. For certain partially owned affiliates, the company increased ownership on the value-adding basis. e. FIGR's rapid penetration in Canadian markets, number of stores, acres of farming, marketing of new products, expansion of facility space, etc., etc., etc.. Simply to say, FIGR is a super star of the company and of the industry. Most shareholders invested in the company not for the tobacco business but for the FIGR. On Twitter, FIGR has about 3000 followers while the company, Pyxus International Inc. has about 700 followers. The point is, FIGR has been growing at full horsepower. Most of FIGR's peers have billion or multi-billion level market cap. FIGR's root in Cannabis is deep, FIGR's expertise in Cannabis is top-notch, most of, if not all, FIGR's products are both high-end and high demand. There Are FIGR news all over all kinds of news sources. Here are just few highlights:

> ●July, 2020, FIGR products become available for sale in Saskatchewan; ironically, the PR was marked " /NOT FOR DISTRIBUTION TO U.S. NEWSWIRE SERVICES OR FOR DISSEMINATION IN THE UNITED STATES/" (The Movant and other shareholders were simply shocked by such new control practice; is the company trying to hide the Canadian affiliates from its US shareholders? Why?)

> ● April, 2020, FIGR products became available for sale in British Columbia, marking FIGR's marketing into Western Canada and therefore FIGR becoming a national brand of Canada;oming a national brand of Canada;

6

● February, 2020, FIGR's president was appointed to manage the company's then newly announced Global Operation Efficiency Program, which will lead the company's entire family of Global Specialty Products;

● January, 2020, FIGR launched a line of THC vape products, referenced as Cannabis 2.0, in order to meet the growing demand for high-quality, adult-use cannabis products;

● January,, 2020, FIGR confirmed the FIGR added 210,000 square feet it Charlottestown Plant. The processing building was built to European GMP Standards - to enter European market. The expansion would enable FIGR to produce35 times more cannabis;

● December, 2019, FIGR enters Ontario cannabis market with 14 million residents (around 40% of the Canada's total population);

● November, 2019, FIGR received the permit to operate an additional 210,000 square feet leading the FIGR's total licensed square footage in Prince Edward Island to about 234,000 square feet.

Above are just a few most recent official PRs. The non-stopping trend is, with the company's full horse power support particularly in capital investment, FIGR has been making every step of its strategic plan as it planned, facility expansion, market penetration, more stores and more product lines, the next step will be the European market along with more market penetration. What's next after that, would be up to the cannabis legalization in the US and South America and even more countries and areas. There have constantly been updates/news/progresses on cannabis legalization, worldwide. The point is, the company invested intensively in FIGR, which value has been increased constantly and rapidly. It's a critical part of the company's total assets. It must be included in the valuation of the company's total assets; and its valuation must be properly conducted and reflected. Hiding such a major part of the company's total assets, is like murdering shareholders' rights and best interests.

Part II: To date, the Movant has had considerable exchanges of email correspondence with Debtor counsel regarding her initial and supplementary document production requests. However, the Movant has been placed in an untenable position by the Debtor, as they immediately asked that she sign a confidentiality agreement to view certain documents, which she did. The Debtor restricted her from sharing any of these arbitrarily deemed confidential documents with other shareholders, unless they also were to enter into confidentiality agreements with the Debtor. None have. This has completely stifled the Movant's ability to discuss, get help with research, or make any comment or submission in regards to documents marked confidential.  The Movant believed that it was the only way to quickly access relevant documents and to have any chance at success in the proceeding. Unfortunately, after spending intensive time on researching the "Confidential" information provided, the Movant believes

she was completely fooled by the company's counsels. The Movant believe almost all of those documents marked "Confidential" are simply the most basic information that every shareholder and the public should know. The Movant expressed her concern regarding the definition of the "public" and "confidential" multiple times to the company's counsels but was told that it's the company's sole position to decide which is public and which is confidential. The company's counsel replied, " The Company is in the best position to determine which information it has made public and which information is non-public.  Rest assured that we have not designated any public-available information as "Confidential."  If you believe that we have designated any material as "Confidential" in error, please identify it to us and we will take it under consideration." The Movant worked as a Financial Analyst years ago, and based on her best understanding and knowledge, almost all of those documents marked as "confidential" should be "public". There was even an incident, with a quick glance, the Movant found the company provided a SEC published document (she had seen it before), so she provided evidence to the company, and the company made a correction. But the point is, it would take a lot of time for the Movant to research every "confidential" document and find proof; this task alone would be a heavy burden. The Movant strongly requests the court to make a fair rule regarding this issue. The Movant is not familiar with such issue so she could only think of few possible solutions, any of which the Movant would deeply appreciate if could be conducted:

> 1) Court reviews all the "confidential" the Movant received and makes a judgement about which should be "Public" and which should be "Confidential". The company should promptly coordinate with the process.

> 2) EC must be appointed, so the Movant could have a legal counsel to deal with the company's counsels; and the Movant could focus on the the the real research on the critical issues of the company (SEC/IRS problems; possible tax fraud problems; misrepresentation/misleading problems in assets valuation; and more importantly, the company's fair value in its total assets and the alternatives other than a chapter 11 to wipe out all common shares; all of which are critical to having shareholders' rights and best interests to be fairly presented) ;

> 3) Court makes a rule, if the Movant proved most of the "Confidential" information is actually "public", the company must at least postpone all the deadlines since the unfair marking "Public" information as "Confidential" has consumed too much time of the Movant in the past 10 days.

**Part III: The movant doesn't want to consume too much time (the Movant really doesn't have this luxury to argue such issues) on proving how the company/the company's counsels coordinated/communicated in a very unfair, unjustified and disappointing manner in the past about 2 weeks, but rather just make a summary in below to let the court, the us trustee and the public to judge/know.**

1. The latest balance sheet as of the date of bankruptcy petition filing date, June 15, 2020.

**Debtors' Response**: Please refer to the document Bates stamped as PYXUS_000001 for the Company's financial projections and latest balance sheet as of March 31, 2020.

8

**The Movant:** the company simply did not provide the document as required. For all financial/accounting documents, date is part of its name.

2. Itemized list of all the assets:

(i) NOLs

**Debtors' Response:** As of March 31, 2020, the Debtors estimate that they have U.S. federal NOLs in the amount of approximately $356.1 million and U.S. state NOLs in the amount of approximately $639.5 million. As of March 31, 2020, the Debtors estimate that they have foreign tax credit carryforwards in the amount of approximately $4.6 million. Please refer to the document Bates stamped as PYXUS_000017 for further detail.

**The Movant:** please disclose if the company received any SEC/IRS inquiries/investigations regarding NOLs in the past 3 years.

(ii) All tangible and intangible assets that are secured against the ABL Facility in the form of inventory, accounts receivables, credit receivables, etc.

**Debtors' Response:** The ABL Facility was paid down with the proceeds of the DIP Facility and terminated. This repayment also released any claim or security interest that the ABL Collateral Agent and ABL Lenders held with respect to the applicable collateral. However, for reference, the Debtors have provided detail on the collateral that previously secured the ABL Facility. *See* PYXUS_000011 and PYXUS_000016.

**The Movant:** a paid-down ABL facility collateral should be "public" information; the company marked as "confidential"

(iii) Itemized list of the total ABL Credit that's drawn. (*i.e.,* details of the $44.9 million that's drawn and how it's spent to-date (future accruals / placeholders vs. actually using it)).

**Debtors' Response:** There are currently no outstanding amounts under the ABL Facility. The ABL Facility was fully repaid utilizing the proceeds from the Debtors' DIP Facility and was terminated upon repayment. The prior amounts that were drawn from the ABL Facility were used to finance the operations of the Company. Such uses included, but were not limited to, financing of global operations, capital expenditures, funding of expenses for selling, general and administrative expenses, and other general corporate purposes. As cash is fungible, it is not possible to determine exactly which expenses were paid using ABL Facility proceeds.

**The Movant:** shareholders have the rights to know how the credit/capital were spent. ABL was paid down but there should be details about how it was spent. Again, an itemized list is needed.

(iv) A list of all the assets that are captured as collateral against the ABL Facility (*e.g.,* equipments, real estate, intellectual property, intercompany indebtedness) accounting for the appropriate loan to value ratios.

**Debtors' Response**: Please refer to the documents Bates stamped as PYXUS_000011 and PYXUS_000016 for a summary of the assets that previously collateralized the ABL Facility, which has been repaid and terminated. The ABL Collateral included accounts receivable and inventory.

As to the portion of the Request seeking an "accounting for the appropriate loan to value ratios," the Debtors respond that this Request is vague, ambiguous and not applicable to the facts of the case. Based upon the Debtors' reasonable understanding of the Request, the Debtors respond that they are not aware of any documents or information responsive to this portion of the Request.

**The Movant**: the company marked "PYXUS_000011" and "PYXUS_000016" as confidential; the movant believe they should be "public"

(v) On similar lines for the First Lien Notes ($275 million), Second Lien Notes (about $635.7 million), provide a complete list of the itemized collateral assets and their valuation.

**Debtors' Response**: Please refer to the document Bates stamped as PYXUS_000011.

**The Movant**: in the "PYXUS_000011" marked as "confidential" (which should be "public" as the movant believes) , the company did not provide "a complete list of the itemized collateral assets and their valuation" as required. To be exact, it only provides a very general description without valuation information at all.

(vi) Updated outstanding amount in foreign credit lines as of June 15, 2020. Itemized list of the foreign credit line that's drawn and it's spent till date (future accruals / placeholders vs. actually using it). List of all the assets that are captured as co-lateral against the foreign credit line (*e.g.*, inventories, equipments, real estate, intellectual property, intercompany indebtedness). Complete accounting for the principal and interest paid as of June 15, 2020. Projected principle and interest for fiscal year ended March 31, 2021. Accounting for the appropriate loan to value ratios.

**Debtors' Response**: The Foreign Credit Lines are revolving credit lines that are drawn for use by the local (country-specific) operating entity. These lines are available only for use in local operations and are used to fund, *inter alia*, the purchase of tobacco inventory and other local operations. Funds are drawn as-needed and used for the aforementioned purposes shortly after a borrowing is made. When secured, the Foreign Credit Lines are secured by local inventory and receivables. Several of the Foreign Credit Lines are unsecured.

As of May 31, 2020, approximately $557 million is owed in total under the Foreign Credit Lines. Repayments of approximately $537 million are projected through March 31, 2021, and additional borrowings of approximately $420 million are projected in the same period. Projected interest for the period through March 31, 2021 is approximately $27 million.

Please refer to the document Bates stamped as PYXUS_000018 for itemized information on the Foreign Credit Lines as of May 31, 2020.

As to the portion of the Request seeking an "accounting for the appropriate loan to value ratios," the

Debtors respond that this Request is vague, ambiguous and not applicable to the facts of the case. Based upon the Debtors' reasonable understanding of the Request, the Debtors respond that they are not aware of any documents or information responsive to this portion of the Request.

**The movant:** "PYXUS_000018" marked as confidential; yet, again, the movant believes it       should be public since it's just a very small piece of summary. The company did not provide the itemized list as requested.

(vii) Updated outstanding in receivables facilities as of June 15, 2020. Projected outstanding in receivables facilities by quarter for fiscal year ended March 31, 2020. Accounting for appropriate loan to value ratios and/or cost analysis.

**Debtors' Response**: As of the week of June 8, 2020, there was approximately $80 million outstanding under the Finacity RPAs and $20 million under the Standard Bank RPA. As of March 31, 2019, the total receivables outstanding equaled $211 million. As of June 30, 2019, the total receivables outstanding equaled $78 million. As of September 30, 2019, the total receivables outstanding equaled $126 million. As of December 31, 2019, the total receivables outstanding equaled $68 million. As of March 31, 2020, the total receivables outstanding equaled $135 million.

As to the portion of the Request seeking an "accounting for the appropriate loan to value ratios and/or cost analysis," the Debtors respond that this Request is vague, ambiguous and not applicable to the facts of the case. Based upon the Debtors' reasonable understanding of the Request, the Debtors respond that they are not aware of any documents or information responsive to this portion of the Request.

**The Movant:** including this response, the company seemed to be avoiding all information regarding the real cost/borrowing rate associated with fee. Again, the company's cost is abnormally high on every aspect: interests, SG&A, and tax expense.

(viii) Full disclosure of non-debtor affiliates. Full disclosure of intercompany financing with cost analysis and appropriate accounting practice. Full disclosure on cash flows were sent to/spent on non-debtor affiliates for fiscal year ended March 31, 2018, fiscal year ended March 31, 2019 and fiscal year ended March 31, 2020 and period as of June 15, 2020. Projected intercompany financing to support the operations of non-debtor affiliates for next three years.

**Debtors' Response**: Please refer to the document Bates stamped as

PYXUS_000019 for the Company's Corporate Structure Chart.

As to the portion of the Request seeking a "[f]ull disclosure of intercompany financing with cost analysis and appropriate accounting practice," the Debtors respond that this Request is vague, ambiguous and the Debtors do not understand what documents or information this Request is seeking. The Debtors request clarification and are willing to meet and confer on this issue.

Please refer to the document Bates stamped as PYXUS_000021 for the Debtors' Intercompany Loan Summary for the year ended March 31, 2020. The Debtors will produce any additional non-privileged documents that are responsive to this Request.

The Company's projections include financing to Non-Debtor Affiliates. *See* PYXUS_000001.

**The Movant:** the debtors only covers 5 affiliates while the company has 70+ foreign affiliates. Please provide how consolidated and unconsolidated will be treated differently on accounting level within the company.

3. Request to the company to provide a summary of projected lawyers/consulting fees etc. at the end of bankruptcy proceedings.

**Debtors' Response**: As of the Petition Date, the Debtors and their advisors contemplated emerging from bankruptcy the week ending July 31, 2020. Based on this timeframe, the professional fees were estimated to total approximately $22 million. However, this figure is not inclusive of fees and expenses that may be incurred by additional professionals retained during the Chapter 11 Cases, including Deloitte & Touche LLP ("Deloitte") and Ernst & Young LLP, whose retention applications were filed on July 6, 2020. Additional detail responsive to this Request is provided in the professionals' retention applications that were filed with the Bankruptcy Court at Docket Numbers 113, 114, 115, 116, 118, 119, 131 and 134.

**The Movant:** Please clarify if the estimated $22 million include the $7.5million (to Mr. Brandon Aebersold/his company) upon "successful" approval of chapter 11. Also, please clarify how the company define "successful" approval? Does this mean in order to receive that $7.5 million payment for Mr. Brandon Aebersold/his company, this chapter has to be approved exactly as it's "prepacakged"?

4. Request to the company to provide a complete schedule of the DIP Facility. Summary of DIP commission fees and complete details of the DIP interest rate.

**Debtors' Response**: The *Interim Order (I) Authorizing The Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing and (V) Granting Related Relief* [Dkt. 84] authorizes the Debtors to obtain postpetition financing on a secured superpriority basis, consisting of a new money term loan facility in the aggregate principal amount of $206.7 million. The initial DIP budget included borrowings under the DIP Facility of $84 million (net of fees) in the week ended June 19, 2020, $41 million in the week ended July 3, 2020 and $75 million in the week ending July 24, 2020. Please refer to the documents Bates stamped as PYXUS_000026 and PYXUS_000039 for further detail.

The loans issued under the DIP Facility (the "DIP Loans") bear interest at a rate per annum equal to the Adjusted LIBO Rate (subject to a floor of 1.50%) + 10.25%. The DIP Facility has a non-refundable ticking fee on the aggregate daily amount of each undrawn commitment at a rate per annum equal to 3.0%. Fees also include a non-refundable commitment fee equal to 3.25% of the aggregate commitments under the DIP Facility and a non-refundable exit fee equal to 3.25% of the aggregate principal amount of DIP Loans. *See* PYXUS_000026.

**The Movant:** Please provide if and/or how the projected budget working so far? What's the current ending cash balance as of the most recent update/consolidation?

5. Request to the company to provide projections of forecasted revenue v/s expenses for the next three

12

years in both scenarios, as with or without the chapter 11.

**Debtors' Response**: The Company has provided its projections for the next five fiscal years in the document Bates stamped as PYXUS_000001. Without the financing provided by the DIP Facility, the Company would have run out of cash and been forced to liquidate, which was one of the factors requiring the Debtors to file these Chapter 11 Cases. The projected recoveries under various liquidation scenarios are provided in the document Bates stamped as PYXUS_000040.

**The Movant**: The company provided the information from the Disclosure Statement. The Movant and shareholders address related critical issues in the Introduction and the Part I.

6. Request to the company to provide full disclosure on the "global operations efficiency program" which the company released on February 24, 2020. The company announced that it would report on progress in its implementation of the global operations efficiency effort by May 1, 2020. Shareholders were not communicated with the "progress" on this program as expected, as of today.

**Debtors' Response**: Given the liquidity challenges the Company was facing, the Company has focused primarily on working capital reductions rather than structural changes, as many structural changes would result in significant upfront costs (e.g., severance). The Company's focus on cost reductions have included elimination of travel, reduction or delay of Capex projects, freezes on salary increases, delays in training and hiring and other initiatives. The Company's financial projections include savings realized from these cost reduction initiatives.

**The Movant:** As in debtors' response, regarding all the cost reduction including freezes on salary increase, how to justify the $2.6 million bonuses to 5 executives? Also, please clarify, if the company has freezed any full time employee's salary in any of its affiliates?

7. Request to the company to provide full payroll information for the fiscal year ended March 31, 2018, fiscal year ended March 31, 2019, fiscal year ended March 31, 2020 and period from April 1 to June 15, 2020.

**Debtors' Response**: Please refer to the document Bates stamped as PYXUS_000199.

**The movant:** "PYXUS_000199" was marked as "confidential" which the movant believes should be "Public". Since the company did not provide the information exactly as requested, the movant requests the company to clarify if there was any person on the company's payroll while not really working for the company? The company includes all of its 70+ affiliates globally.

8. Request to the company to provide full disclosure on their efforts in internal audit if there was any, for fiscal year ended March 31, 2018, fiscal year ended March 31, 2019, fiscal year ended March 31, 2020 and period from April 1 to June 15, 2020.

**Debtors' Response**: Please refer to the document Bates stamped as PYXUS_000047 for Deloitte's Reports of Independent Registered Public Accounting Firm with respect to the Company's annual reports for fiscal years 2018 and 2019. As reported in its Form 12b-25 filed on June 15, 2020, the Company has not yet completed the audit for fiscal year 2020.

**The Movant:** The information provided is more like a summary. Since it's marked as "Confidential" and the movant agrees this should be confidential, but the movant needs the company to clarify if there's any full report with details. Also, if there's an "expiration" date for such confidential information since the Movant believes that certain "Confidential" information should become "Public" once a certain period of time passes.

9. Request to the company to provide full disclosure on the company's / management's / executives' / board members' / direct family members' / affiliates' / subsidiaries' / associated individuals and/or institutions' etc. activities on its stock market and corporate bonds market if any.

**Debtors' Response:** Please refer to the documents Bates stamped as PYXUS_000049 and PYXUS_000167.

**The Movant:** During Jan 1 to Jun 15, 2020, did the company issue any internal BO period?

10. Request to the company to provide full disclosure on the entire process of the chapter 11 from the very first beginning, including all the timing of every "progress" of this chapter 11. The company never disclosed any possibility of bankruptcy to the public/shareholders until June 15, 2020, when the company filed the chapter 11. Also, request the company to fully disclose the 35 third-party institutions for the dip proposal along with details in both timing and contents and if there are any follow-ups from 35 third-party institutions before and after June 15, 2020.

**Debtors' Response:** Since 2019, the Company has sought to address both its liquidity needs and over-leveraged capital structure. Throughout fiscal year 2019 and into fiscal year 2020, the Company explored numerous out-of-court transactions, including a public offering of their Global Special Products business, private debt exchanges and refinancings, and investments, equity investments and transactions involving special purpose acquisition companies. Unfortunately, as explained in the *Declaration of Joel Thomas, Executive Vice President and Chief Financial Officer of Debtor Pyxus International, Inc., in Support of the Chapter 11 Petitions and First Day Pleadings*, the Company and its investment bankers determined a public offering was not feasible given the adverse market conditions that began in late 2019 and have continued through today, the Company did not receive any viable refinancing offers that addressed the Company's substantial refinancing needs, and obtaining new capital was not an option, particularly in the midst of the COVID-19 pandemic. Without traction on these initiatives and with almost $1 billion in First Lien Notes and Second Lien Notes maturing in the first half of 2021, the Company faced the prospect of a going concern qualification in its fiscal year end (March 31, 2020) audited financials, which would have materially impeded its ability to renew the Foreign Credit Lines, the Company's primary source of working capital. Therefore, in early 2020, the Company began discussions with its creditors to explore how these issues could be addressed. Over the course of four months, the Company met with representatives of First Lien Noteholders and Second Lien Noteholders to keep them informed of the Company's refinancing efforts and strategic initiatives, and to negotiate the terms of a potential comprehensive restructuring. During this time, the Company also reached out to substantial (5% or more) shareholders regarding a potential investment. However, only one shareholder signed a non-disclosure agreement, and the discussions with that shareholder did not extend beyond a highly speculative transaction that did not contemplate paying the Company's secured creditors at par and had no

14

financial backing. By late in the spring of 2020, the Company began making significant progress with the First Lien Noteholders and Second Lien Noteholders. These discussions ultimately resulted in the execution of the Restructuring Support Agreement and the launching of the Plan. As the Company has repeatedly stated, during this process the Company was consistently pursuing out-of-court possibilities and only filed for chapter 11 as a last resort once it determined that no executable out-of-court restructuring would be possible. With respect to the DIP financing, the 35 potential providers of DIP financing included existing lenders, large money-center banks, a number of sophisticated alternative financial institutions, certain of the Company's substantial (5% or more) shareholders and other lenders who were indirectly contacted by certain of the potential financing parties who had already executed confidentiality agreements with the Company. The Company is bound by confidentiality agreements and prohibited from disclosing the names of the potential financing providers. Prior to execution of the DIP Credit Agreement, significant discussions were held with six potential financing parties, and due diligence was conducted by several professional institutions. Following the diligence process, two parties continued to express interest in providing DIP financing – an ad hoc group of Second Lien Noteholders and a third-party lender. Ultimately, the Debtors received only one definitive offer for DIP financing, which is the offer now embodied in the current DIP Credit Agreement. Since the Petition Date, no parties have been contacted or alternative sources of financing sought.

**The Movant:** The company provided the information from the Disclosure Statement. Please provide full disclosure on all options that were available before and after the DIP; before and after June 15, 2020. All proposals, negotiations, formal or informal, should be fully disclosed, if any. The public and the shareholders have the rights to know. Unless for any ongoing negotiation, all previous/once ever available alternatives should be disclosed as "public".

11. Request to the company to fully disclose if there are any buyout offers/interests/inquiries, public offering offers/interests/inquiries on the table, before and/or after June 15, 2020.

**Debtors' Response:** As noted in the response to Request No. 10, the Company and its professionals explored whether there were any executable out-of-court transactions available that would refinance the Company's debt and provide it with much needed liquidity. Ultimately, no such transaction was available. Since June 15, 2020, no such offers have been made to the Company or to the Company's advisors.

**The Movant:** Again, all proposals, negotiations, formal or informal, should be fully disclosed, if any. The public and the shareholders have the rights to know. Unless for any ongoing negotiation, all previous/once ever available alternatives should be disclosed as "public".

12. Request to the company to provide financial statements for the fiscal quarter ended March 31, 2020 and the fiscal year ended March 31, 2020 without as if there was no chapter 11.

**Debtors' Response:** Please refer to the document Bates stamped as PYXUS_000010 for the Company's financial statements for the year and quarter ended March 31, 2020.

**The Movant:** "PYXUS_000010" marked with "confidential". Again, as the Movant communicated with the company's counsels multiple times, the movant doesn't believe it's justified for chapter 11 process to move any further without the company fully disclosing it's FY20Annual and FY20Q4 financial results.

(Again, these financial results directly link to the company's several mysterious/suspicious areas: tax issues, income growth and potential compliance issues)

13. Request to the company to provide operational progress regarding the delayed shipments caused by COVID-19 and hurricane etc. and its positive effects on the company's liquidity and related forward-looking statements if any.

**Debtors' Response**: The Company's projections include its management's view on the impacts (positive and negative) of the operational response to shipment delays caused by COVID-19, trade disputes/tariffs and reaction to other influences, including weather related impacts on crops and shipping. *See* PYXUS_000001.

**The Movant:** The company provided the information from the Disclosure Statement. The Movant and shareholders will have to follow up with more detailed questions.

14. Request to the company to provide updated forward-looking statements reflecting the scientific and regulatory progress regarding the COVID-19/vaping link which caused the downturn in the cannabis/hemp industry from September/October last year; and updated forward-looking statements reflecting the regulatory progress in cannabis/hemp legalization on both products level and industry level and both us and global markets level; and updated forward-looking statements reflecting the us easing/lifting ban on importing tobacco from Mawawi [sic].

**Debtors' Response**: The Company's projections include its management's view of the impacts (positive and negative) of the operational response to each of the factors mentioned in the Request as well as the results of operations, which takes into account these same factors. *See* PYXUS_000001.

**The Movant:** The provided public information seems to be as of March 31, 2020. Also, it does not cover the scientific and regulatory progress as requested, for both tobacco and GSP. In fact, the Movant believes it ignores all the positive progress in both tobacco and GSP, which directly lead to a significant under-estimated/under-presented valuation in the company's assets, particularly, FIGR and Criticality.

15. Request to the company to modify their website regarding their stock price information. As of now, it still shows $2.91 NYSE there and it could potentially mislead shareholders who are not aware of the chapter 11 yet. Request the court to allow adding/amending the number of shareholders as well as the numbers of shares holding as of June 15, 2020 of the company since there are more and more shareholders becoming aware of this chapter 11 and joining this petition. As of now, none of us has received any formal notice from the company regarding this chapter. We mostly learned about this chapter 11 from online while not all shareholders have the access/device to the internet. Request to the court to consider appropriate extensions of deadlines along with this chapter 11 process for shareholders who were not informed by the company regarding this chapter 11.

**Debtor's response**: the company's website has been updated.

**The Movant:** The company only removed its $2.91/share stock price as of June 12, 2020; but did not reflect the new/current price around $0.3/share. The Movant will leave this issue to the public to judge.

To sum up, since the company never seemed to provide production to any request in our shareholders' petition on an accurate and/or complete basis.To follow up the original requests, the Movant and shareholders had to and have to ask the company to provide further details which the company generally did not provide.

July 2, 2020

*__Via Electronic Mail__*

David L. Buchbinder, Esq.

Office of the United States Trustee for Region 3

844 King Street, Suite 2207 Wilmington, Delaware 19801

*In re: Pyxus International, Inc., et al.*, Case. No. 20-11570 (LSS)

Dear Mr. Buchbinder:

My name is Hongchao Sun, who filed the Shareholders' Petition on behalf of A Group of Shareholders concerning the Chapter 11 filed by the Pyxus International, Inc. et al., Case. No. 20-11570 (LSS). I'm writing this letter to you on behalf of A Group of Shareholders.

Earlier tonight, I received a PDF copy of a 17-page letter (From Mr. Michael Torkin to you) from the company's counsel. As of now, I assume it's the same copy you received; although I was not directly CCed. I feel it might be necessary to write this letter to you.

While I am drafting this email to you, just received another 6-page letter written to you by Mr. Joshua A. Feltman, Counsel for the Ad Hoc Crossholder Group, representing the 1st lien and the 2nd lien noteholders, which funded the DIP, which we requested the company to provide information about (see request 6) in our shareholders' petition). Concerning the Ad Hoc Crossholder Group, we did have certain information directly related to it but did not provide it in our shareholders' petition as mentioned in Point 4 (see below).

First of all and most importantly, all the statements/analysis in our shareholders' petition are valid and truthful based on our best understanding and knowledge. We attached a PDF copy of our shareholders' petition with this email. If you have any comments and/or questions, please kindly mark it in the document, so we could provide more details/background information/source of the information, etc..(There are just too much information; we could not write a whole book to explain every word just because Mr. Torkin and/or Mr. Feltman claiming it's totally wrong). While we are not receiving any documents that the court asked them to provide, they are trying to make it as hard as it could be for us to protect our ownership in the company, along with other shareholders' rights.

Furthermore, to be efficient, we'll provide a simplified summary concerning certain disputes from Mr. Torkin's and Mr. Feltman's letters, which explanations could not be found in our shareholders' petition.

1. We submitted our Shareholders' Petition to the court's physical address in Wilmington, DE on June 24, 2020. The June 26, 2020 date claimed by Mr. Torkin is the date that the petition was entered into the docket. (It could be verified through the original copy of the petition; docket #108; I already videotaped when I submitted it to the court with a stamp showing the date and exact time.)

2. As stated in our petition, we had 113 shareholders and 730563 shares reflected/represented, the cutoff time was around noon on June 24, 2020. As stated in the petition, we have a full list of names and numbers of shares held as of June 15, 2020 (when the company filed Chapter 11) available if required by court. These are all the most basic facts and truth. We had more members joining our group on or after June 24, 2020. We have reserved all the emails within the group. On June 29, 2020, we were reached by the company requesting us to provide detailed information regarding name, address, detailed shares purchase information by cost, by quarter, by year, etc.. We did not respond to such a request since the company never provided any information we requested. We felt that the company was trying to "bully" us because we don't have an attorney. A top executive from the company contacted us on June 25, 2020 asking us to provide what we had to them for their review; we did not respond because we were afraid that executive was not meaning any good to us. The company's counsel also asked our group to provide my personal living address, 2 days before today's court hearing. Out of caution for both my personal safety and privacy, our group did not respond. Meanwhile, we did start to ask our group members to provide all that information (address; purchases by

cost/quarter/year) just in case the court needed us to provide. Starting tonight, after the court hearing, we even started asking our group members to send us a signed copy of the shareholder verification statement, again, just in case. We will be more than happy to provide all related information to the Court/the US Trustee on a "SEALED" basis, because those information include our group members' private information. The point is, our financial loss is real, our emotional distress is real, our group members' efforts are real, all those truth and facts in our petition are real. We have recorded every piece of information and every single number.

3. To be noted, when refer to "the company" in the Chapter 11, it includes those 4 affiliates; when refer to "the company" in concept of assets valuation and alternatives other than Chapter 11, it should include all the affiliates. The company's total assets valuation should include all the affiliates, all of which are shareholders' interest. One simple example, FIGR is a top-notch Canadian cannabis/hemp affiliate wholly owned by the company (The company's heavy investment in FIGR is one of the major reasons for the company's outstanding debt). In the light of the company's efforts in its One Tomorrow Strategy and Global Operation Efficiency Program, FIGR has significantly increased in its valuation; this is also in the background of a valuation increase in the entire cannabis/hemp sector. If you go the company's website, check the "news" portal under the "investors" section, the majority of the company's PRs in past 2 years are all good PRs on FIGR, which could reflect the investment and the efforts the company have been making on FIGR. However, the company excludes FIGR along with other 70+ foreign affiliates in the Chapter 11. These 70+ foreign affiliates generate about 70-80% of the company's total revenue. These are a major part of the company's total assets, and should not be excluded. Apparently, shareholders and shareholders' interest were not fairly represented in the Chapter 11 progress.

4. Still, about the company's total assets valuation, the company tends to lead or mislead the public and/or related parties with the "stock price" method. The company only has about 9 million shares outstanding, which is an extremely low-float stock and with extremely heavily short selling interest. During February - March 2020, the short selling interest was about the same of all floated retail shares. Besides the stock market manipulation happened right before the Chapter 11, the more important fact is, after the SEC's comments on the company's fiscal 2018 financials in Feb 2019, the company's stock price was pumped to as high as $30 during that same period of time and then started the major downtrend until the Chapter 11 filing. All the information we put into our shareholders' petition was based on the public information available. (If you use

Google, just type "SEC Joel L Thomas", you'll see the SEC comments information right there; Joel L Thomas is the company's CFO; then open any stock price chart with ticker "PYX", you'll see the major downtrend since then.) This is just an example. The point is, why was there always an unrecoverable pump before every bad news? Was there an exit "strategy" since February 2019? Was there a grander theme behind this? As we learned from the SEC's website, a company could use a Chapter 11 leading to a privatization to shield securities fraud; once privatized, a company would no longer need to file financial reports which are required by SEC for those public companies; therefore it would be very hard for the SEC to chase after. In the company's disclosure statement, privatization is one possible outcome. Putting all the puzzles together, we, as shareholders, have every reason to concern. In fact, there was certain information which was more shocking and revealing but out of legal concern and protecting our source, we did not put those information in the petition. If Mr. Buchbinder agreed, we could schedule a conference call with our shareholders and the company's counsels, as a verbal contest regarding the equity committee. We, as shareholders, spent lots of time and effort in researching this company; some of us are very much long-term shareholders who have been following the company's every step in the past 2+ years. We don't think the company's counsels were provided all the necessary information by the company, particularly to those investment banking counsels. Back to the point, we believe the company's stock market is heavily manipulated (based on what we see from the price/volume history based on the company's events) and it's just not reasonable/justified/appropriate to calculate the company's total assets valuation based on the stock price. The company has $1.5-$2 billion in annual revenue, its total valuation would be at least $6 billion if used the times-revenue method (4 - 16 times) in a rough asset valuation.

5. Also, it's true that all common shares will be cancelled. But the company's management will have the same size of the stake (8%) in the "new" company. This is clearly stated in the company's disclosure statement. We, as shareholders, will be wiped out while the management will keep their same 8% in the "new" company, either public or privatized (As stated earlier, privatization is much more likely).

6. In the company's NT-10K, the company has an estimated $5 million in operation loss for the fiscal year ended March 31, 2020. Please be noted, based on the docket information, the company started spending the legal fee for this Chapter 11 in millions as early as February and March 2020. The company still has not filed their 10K form for the fiscal year ended March 31, 2020, which is a critical source proving the company's solvency. A profitable fiscal year ended March 31,

2020 could be very bullish to boost investors' confidence leading to a public offering. As a company with a traditional tobacco background transforming itself to the cannabis/hemp industry, the company has been considered as a favorable MJ stock by investors/shareholders like us. Many of us were eyeing the company's 10K for fiscal year ended on March 31, 2020 which was expected to be filed on June 15, 2020. Instead, the company filed its streamlined, expedited-up and prepackaged Chapter 11 on that day. We, as shareholders, were totally caught off guard. The company did not acknowledge any possibility of a bankruptcy which will wipe out common shareholders before that day. In fact, again, if you check the news portal on the company's website, the majority are PRs until Chapter 11.  Along with other concerns, questions and disputes, we believe it's justified to say, as shareholders, we were wronged/misled by the company in which we have ownership along with other shareholders' rights.

7. The company hired all those counsels to push this Chapter 11 through. Based on the docket info, the company already paid around $13 million cash to the counsels, plus millions in retainers, plus $7.5 million cash payable to Mr. Brandon Aebersold, upon a "successful" approval of Chapter 11 as stated in the document. The cost is still adding up every day. Also, around April, the company paid about $2.6 million to its 5 executives as a one-time retention bonus.

8. We grouped up because many of us tried to contact the related parties including the company but were totally ignored, after we invested millions in the company. We're still consolidating all the information, as of now, about 70 shareholders invested $4+ million in the company (We didn't ask the group members about this in the first beginning because we didn't know it would be needed someday, like now; and it's just painful to ask someone to re-live the financial loss; but, we're doing it anyway because we are forced to; and as stated earlier, we're asking members to fill the form and sign and send us a quality photocopy while they keep the original for future reference). Some of us lost almost the entire value of the investment/retirement account and/or entire life savings. We don't want to "play" the sympathy card because it doesn't matter. But we want to provide facts and truth: we invested in this company and some of us have been holding shares tight in the past 2+ years based on all the information we were provided by the company and the research in all related areas. We are shareholders and we have the ownership in this company. We have no doubt the company's total assets are in the money and there are alternatives other than a Chapter 11 As stated earlier, the most conservative, minimal total assets valuation based on the times-revenue method of the whole company could be $6 billion; which will be around $4.5 billion after excluding the outstanding debt, our shares, about 8% of the total shares outstanding, could worth $360 million.

Again, this is just a very conservative estimate. Although the company's tobacco industry has been declining, the market share and the profits are still there. In fact, the profit margin of the tobacco industry has been increasing. For the valuation of the company's cannabis/hemp business, the entire MJ sector has been boosted in the valuation thanks to all the progress in the scientific level, regulatory level and social level. Also, to be noted, takeovers/buyouts in the tobacco industry are normally $20-$50 billion level deals. Not to mention the buyouts/takeovers in the MJ sector with rapid boosting. This is also why request 13) listed in our shareholders' petition.

9. We think the whole picture is clear. In Feb 2019, the SEC had comments on the company's fiscal 2018 financials. Just like Mr.Torkin stated, yes, the bonds market was depressed over a year ago, around the same period of time as the stock market started the overall downtrend after the stock price was pumped to $30 in Feb 2019. Bonds and stock have been acting depressed in a perfect parallel pattern along with the short selling interest piling up. It looks like nothing but a classic textbook manipulation. Talking about a textbook case analysis: Why all of these? What's the purpose? Who's the winner? What's the prize? What kind of prize? What would the SEC do? Probably nothing once a company goes private? Do we already know the answers?

10. We are sincerely hoping that, Mr. David Buchbinder of US Trustee, could see this through and could see how an Equity Committee is needed and justified in this case. We started our group efforts because we still believe in justice. Your justified and fair decision on this would mean a ton to us and a lot more to people like us. Also, we understand that there shall be a budget from the company once an Equity Committee is appointed. We promise to the court, to the US Trustee and all shareholders (not only our group members but all shareholders), not even a penny will be wasted. Any penny spent will be spent only because it's necessary and will only be paid to the most efficient and least expensive legal/finance counsel we could find. Whatever budget you have in your mind, please take it half off. We are confident that we could make it as effective as it is without the "discount".

Thank you, Mr. Buchbinder.

With all the respects,

Hongchao Sun, On behalf of A Group of Shareholders

July 8, 2020

*Via Electronic Mail*

David L. Buchbinder, Esq.
Office of the United States Trustee for Region 3
844 King Street, Suite 2207 Wilmington, Delaware 19801

**In re: Pyxus International, Inc., et al. , Case. No. 20-11570 9LSS)**

Dear Mr. Buchbinder:

I submit this letter to you as a plea to honor justice and approve an equity committee for the shareholders of Pyxus International, Inc. et.al.

The Chapter 11 filing of Pyxus Internationall Inc. et al, violates all moral principles to its shareholders.

Before I begin my case for support, I would like to share a little of my story.  My name is Alyssha Eve Csuk, I am a nationally recognized and published fine art photographer and professor, who started educating myself about the markets in 2015 after losing my father to cancer in 2014 and inheriting his IRA.  Oddly, in my desire to protect what my father left me, my curiosity led me to want to learn about the markets and eventually to pick individual stocks and companies.  I have heard multiple times, invest in what you believe in.  I really liked the story of hemp, the vast array of products that can be made from hemp and the overall positive impact for the planet that hemp products sustain.  I also like cannabis, particularly when used medicinally.  My father took medical cannabis to help with his pain from the cancer.  I thought to myself, what could be a safer way to invest in the space then to choose a company that has been around for over 140 some years?  That is what led me to invest 42,524.75 in Pyxus International, believing all the analysts, Morgan Stanley and the fancy brochures of Pyxus Hemp and Cannabis products.  The loss for me is much more about losing dollars, but it symbolizes a complete failure on my part to protect the assets that my father worked so hard for.  It is truly devastating for me.  I have fought hard to be where I am at today in my career and life, I have taken risks that most would never take encountering dangerous environments and the elements, grizzly bears, storms, and have even survived as a victim of a road rage shooting. The man who shot me is now sitting behind bars, because I chased him down, because I am a photographer with a keen eye who saw everything, had the perfect details for the state trooper.  While this one is a bit more complex, I have garnered quite a bit so far and I will do everything beyond my power to not fall victim once again.

It is pretty evident that Pyxus International is using Covid as an opportunity to wipe out shareholders, as they restructure, and set themselves up for a nice ride on the road to high profitability. This is the biggest moral issue with what Pyxus is proposing to do in their

restructuring and filing for Chapter 11.  Pyxus has stated on their website that there will be no interruption in product supply and production.  This is clearly not a company that is falling off the rails! This is nothing more than a very complex highway robbery of its shareholders, while its lawyers sack 20+ million to do so. It would not surprise me if the lawyer fees are being paid for by the shareholders. That is not a pill that Pyxus shareholders have elected to swallow.

For all the shareholders in our group, Pyxus International filing for Chapter 11, came like a meteor strike from outer space, completely undetected and under the radar.  Shareholders instantly frozen on the morning of June 15, 2020, stock halted for days, shareholders stuck with the terrible news and with no way out.  How is this moral?  However, others were more privy to the information before the morning of 06/15/2020, as captured tweets of  Harvard Zhang  on Friday June 12, 2020 at 11:54 am. There has been no opportunity for shareholders to vote on the Chapter 11 filing.  Also, there has been no disclosure of Chapter 11filing in recent conference calls that followed the last several quarters of earnings reports. Nothing short of a complete lack of transparency, wrongdoing and bad faith.

Pyxus, unlike many other companies, has no investor relations line or person to speak with. How, does a company that has been in business for 145+ years not have this?  It has been very difficult for shareholders to be able to speak to anyone at the company.   However, I personally spoke with the corporate compliance director Jeff Williams on 06/17/2020 for a good 19 minutes and 13 seconds, I presented mostly ethical questions to Mr. Williams.  Sadly his response was rather terse, laconic.  Essentially, Mr. Jeff Williams had nothing to say, because simply there is no defense for what Pyxus proposes in their Chapter 11 filing.  And, I am pretty certain the only reason Mr. Williams returned my phone call, because I included the word compliance in my message.  Mr. Williams revealed in our conversation that he was aware of the tweet. Otherwise, I am certain I would not have received a return phone call. I can deduce such, as I asked the president of the company to call me and a followup from him on the tweet. I have heard nothing from either Mr. Williams or the president of Pyxus.

I ask what example is being set if Pyxus is allowed to go forward with a Chapter 11 filing that wipes out the equity of its shareholders?  How many other companies will follow suit?  How many more shareholders will fall victim to what in essence is a chameleon of a tool for companies to wipe their own miscalculations under the rug to better positions themselves for prosperity while making no sacrifices of their own (whether that be salary cuts/pay freeze). Why is their income more valuable than shareholders?  If shareholders need to take a loss than so do they and it needs to be equivalent (Pyxus wants to leave shareholders with .10 a share then executives should only be paid .10 of their salary).  Bondholders do not get wiped out and also have been and continue to get paid a dividend, while shareholders lose everything.  The company executives make no sacrifice while they inflict great wounds onto their shareholders. I ask how is this moral?

Sadly, as I learn more and more about these filings, I become ever more disheartened. From what I have garnered, it is the incentive structure that is problematic (just follow the trail of who benefits) and until voices speak loud enough we will continue to see these egregious perversions of the average investors equity in the markets and elsewhere. The infliction of the proposed Chapter 11 on its shareholders, at least for me, goes beyond the financial loss reaching to a complete degradation in trust in publicly traded companies and the markets. Which can in turn negatively impact many facets of one's life. Clearly, the way and structuring of the Chapter 11 by Pyxus is NOT ethical, I ask myself, and others is it even legal? A full investigation of the filing will help shed light this question.

It is my hope that you will not underestimate the magnitude of what is at stake. The urgency of the matter cannot be understated. It is my aim and of the shareholders of our group, that alternatives in debt financing to avoid Chapter 11 are fully explored. The aid of an equity committee will greatly help facilitate this process.

Let it not slip through the cracks as this crack has a powerful message, and a story with great potential to run, let it not become an earthquake.

Thank you, Mr. Buchbinder.


Sincerely,
Alyssha Eve Csuk
From A Group of Shareholders

July 8, 2020

*__Via Electronic Mail__*

David L. Buchbinder, Esq.
Office of the United States Trustee for Region 3
844 King Street, Suite 2207 Wilmington, Delaware 19801

**In re: Pyxus International, Inc., et al. , Case. No. 20-11570 9LSS)**

Dear Mr. Buchbinder:

I submit this letter to you as a plea to honor justice and approve an equity committee for the
shareholders of Pyxus International, Inc. et.al.

The Chapter 11 filing of Pyxus Internationall Inc. et al, violates all moral principles to its shareholders.

Before I begin my case for support, I would like to share a little of my story. My name is Frisco Baccam, I
am a Compliance Officer for a large retirement fund and a father to a beautiful little girl born this spring
2020. I started investing in individual stocks in 2009 in hopes that one day those investments would
provide for me and my family. I've never been a big risk taker especially when it comes to money
because money is so hard to come by especially for a middle-class working American like myself. This is
why I was drawn to Pyxus Internationall Inc. This company has been around for 140+ years. Never in my
wildest dreams did I think this company would file for Chapter 11 Bankruptcy.

For the past 2 years during their quarterly conference calls the CEO kept telling everyone that their
transition from tobacco to hemp was showing positive signs. They kept telling everyone that good news
was on the horizon and that this would be evident sometime mid to late 2020. This narrative kept
everyone buying up shares. As we all were anticipating the next earning report in June 2020 they pulled
the rug underneath all of us and filed for Chapter 11 Bankruptcy.

There was no rhyme, reason or warning. We were all in shock. It is my belief that they knew they were
going to file for Chapter 11 Bankruptcy all along. They kept pumping up their stock and using our money
to pay for their legal fees. We are just finding out now that Pyxus Internationall Inc. spent roughly $20
million in legal fees to expedite this Chapter 11 Bankruptcy.

While this was all going on behind closed doors the CEO and upper management had the Udacity to give
each other retention bonuses as to pat each other on the back. What a slap in the face to shareholders.

This company has annual revenue of $2 billion and is the second largest supplier of tobacco in the US.
Also, their transition into hemp and cannabis in Canada was starting to bare fruit. The simple fact that
the CEO and upper management were able to pay themselves a retention bonus and pay $20+ million to
expedite this Chapter 11 Bankruptcy shows you that they are not broke.

Chapter 11 Bankruptcy is supposed to be the last option, not the first option. This company with no moral backbone decided to take the easy way out by stealing shareholder money, using it to strike a deal with their creditors so they can get a fresh start and thrive.

What Pyxus Internationall Inc. has done to its shareholders is wrong on so many different levels. In total they stole $44,847.70 from me. This money could have been used for my daughter's education.

It is my aim and of the shareholders of our group, that alternatives in debt financing to avoid Chapter 11 are fully explored. The aid of an equity committee will greatly help facilitate this process.

Thank you, Mr. Buchbinder

Sincerely,
Frisco Baccam
From A Group of Shareholders

July 9, 2020

*Via Electronic Mail*

David L. Buchbinder, E sq.
Office of the United S tates Trustee for Region 3
844 King Street, Suite 2207 Wilmington, Delaware 19801

**In re: Pyxus International, Inc., et al. , C ase. No. 20-11570 9LSS)**

Dear Mr. Buchbinder:

I submit this letter to you as a plea to honor justice and approve a n equity committee for the shareholders of Pyxus I nternational, Inc. et.al.

The Chapter 11 filing of Pyxus Internationall Inc. et al, violates all moral principles to its shareholders.

As a small investor,invested my financial saving in PYX.Unfortunately, on 15 June 2020, the statement made by the company disappointed me.How does a company with a history of 150 years leave its shareholders in a difficult situation?it is  not believeable.Even trough company's CEO said that we will increase our share value.They entered the hemp business to grow their company 2 years ago.As a foreigner, my english is not enough to express my feelings.But we trust an American justice system to the end.We are sure that you will make the right decision for us.

Thank you, Mr. Buchbinder.

Sincerely,
Serkan Atik
From A Group of Shareholders

 **Gmail**

HONGCHAO SUN <bullrongrong@gmail.com>

---

## Re: From Hongchao Sun / A Group of Shareholders
1 message

---

**Joerg Maier** <joergmaier@gmx.net>            Tue, Jul 14, 2020 at 8:11 AM
To: HONGCHAO SUN <bullrongrong@gmail.com>

Hi Hongchao,
is the 17th hearing already scheduled (time)? As I requested earlier, do I have to participate in the hearing (time difference to Germany would make it difficult)?
If so, can you send me further instructions about how to dial-in?

This is my draft. As I have never participated any hearing I might need some advice.
Thanks
Joerg

My Statement:
I raise my voice and plead for justice and the approval of an Equality Committee for the shareholders of Pyxus International, Inc. et al. The filing under Chapter 11 of Pyxus Internationall Inc. et al. violates all moral principles towards its shareholders.
I request that the petition for relief under Chapter 11 of the United States Bankruptcy Code filed on 15 June 2020 by Pyxus International, Inc. and four affiliated debtors will be dismissed.
I apply for a full investigation of this petition for relief under Chapter 11 of the United States Bankruptcy Code.
My Story:
I invested in Pyxus shares as I believed in their products and their strategy which they present on their website. My investment started almost two years ago on January 31st, 2019. I bought 200 shares for 2740 Euro which corresponds to about 3094 USD.
over the last one and a half years I increased the number of shares several times. My last ones I bought just some days before the chapter 11 thing popped up. Today I own 5750 shares. I invested 33225,11 Euros which corresponds to about 37500 USD.
So why did I invest in Pyxus? Pyxus is presenting itself as a stable and healthy company. Their slogan is "Growing a better world". They claim for themselves to have 150 years of agricultural expertise. They pointed out to create solutions that will transform the world for the next generation. Within their investor day presentation, they talk about their transformation towards global specialty products until 2023 due to a decrease in the tobacco business. As one example they started to built up the promising hemp segment. All this has confirmed myself that I have invested in a successful company.
When I discovered the message about the petition for relief under Chapter 11 on the 15th of June 2020 I was shocked. I couldn't belive that something like this can happen. The company still is presenting itself as healthy and future oriented. The strategy still looks promising and therefore I am completely irritated that such game can be played. In my eyes this is a very cheap buy-out. Investors who trusted in Pyxus are fully utilized. This is not fair. Emotionally I still must work with this scenario every day. I will try everything what is necessary and possible to fight for justice.
In addition to the threat of immense financial damage, i am also concerned with whether or not corporate governance content can be trusted any longer.
I hope that all stakeholders will get a fair and transparent deal in the end which will not be 0,11 Cent per share. This is a ridiculous offer and a cheap try of buy-out at the expense of all investors.

Am 14.07.2020 um 05:43 schrieb HONGCHAO SUN <bullrongrong@gmail.com>:

Hi, Ethan, Runan, Joerg, and Matthew

Our group gmail got disabled (not sure why), we requested to restore but it might take at least 2 days.

Anyway, for our July 17 court hearing, please prepare your draft and send me a copy (couldn't get from the group email now). Keep in touch in the next few days.

Please feel free to contact me if you have any questions. Thanks.

Thanks.
Hongchao Sun

 **Gmail**

**HONGCHAO SUN <bullrongrong@gmail.com>**

---

## Re: From Hongchao Sun / A Group of Shareholders

---

**Ethan Miller** <ethanbenmiller@gmail.com>           Tue, Jul 14, 2020 at 7:37 AM
To: HONGCHAO SUN <bullrongrong@gmail.com>

Feel free to make edits as you see fit

Statement:

I first invested in Pyxus International in the fall of 2018, purchasing 120 shares at roughly 5,300 dollars. I was fifteen years old when I made this investment, purchasing these shares with my own money, through my mother's fidelity account. This money represents what was a plurality of my life savings at the time, earned over years of work, on top of attending school. This was supposed to be a short term investment, however shortly after I made my purchase, the value of my shares rapidly declined, and I ended up trapped in this investment, hoping one day I would be able to sell without loosing to much of my money. In April of 2019, shortly before my sixteenth birthday, I bought 100 more shares valued at nearly 2,000 dollars, thinking averaging down my investment would allow me to exit sooner. This did not work. After months of stagnation, the value of my shares dropped again, getting lower and lower with no end in sight. I am now seventeen years old, have been invested in Pyxus International for almost two years, and am now witnessing a significant portion of my savings evaporate before my eyes. Years of birthday checks, paydays, and money earned from small jobs around my neighborhood, is now gone. I realize how shortsighted this investment was, and have learned a great deal about the stock market through this experience. At this point, one year away from college with barely any money to finance my tuition, I'm desperately hoping I can once and for all end my investment and move on. I know I will lose thousands of dollars when this eventually happens, but I also recognize the injustice this company has done, and is doing, by trying to buy away my and others shares for an unjustifiably low price. Any amount of money I manage to take away from this investment, should I be offered a fair price for my shares, I will use solely to pursue my college education, majoring in Economics and Political Science. I don't expect I will have the opportunity to sell my shares for even a quarter of their original worth. But I believe I, and others, am entitled to at least a portion, I hope you agree.

> On Mon, Jul 13, 2020 at 11:44 PM HONGCHAO SUN <bullrongrong@gmail.com> wrote:
> Hi, Ethan, Runan, Joerg, and Matthew
>
> Our group gmail got disabled (not sure why), we requested to restore but it might take at least 2 days.
>
> Anyway, for our July 17 court hearing, please prepare your draft and send me a copy (couldn't get from the group email now). Keep in touch in the next few days.
>
> Please feel free to contact me if you have any questions. Thanks.
>
> Thanks.
> Hongchao Sun

**FILED**

2020 JUL 16  AM 9: 25